# EXHIBIT A

Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

- - -

D.C/J.D.M                    :
        Plaintiff,           :
                             :
                             :
                             :
vs.                          :
                             :
                             :
LIBERTY RIDGE FARM           :
Et al.                       :
        Defendant.           :

- - -

TUESDAY, DECEMBER 20, 2022
- - -

        Oral deposition of DAVID
CROSS, taken pursuant to Notice, was held
via Zoom, commencing at 8:34 a.m., on the
above date, before Danijela Ivanovic, a
Court Reporter and Notary Public in and
for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
(866) 624 6221



Page 2

```
 1   APPEARANCES:
     (via Zoom)
 2
 3   ANDREOZZI + FOOTE
     BY:  RENEE FRANCHI, ESQUIRE
 4   4503 N Front Street
     Harrisburg, PA 17110
 5   (866) 694-2307
     Representing the Plaintiff
 6
 7   MARGOLIS EDELSTEIN
     BY:  JOCELYN MENDEZ, ESQUIRE
 8   170 S. Independence Mall W
     Suite 400E
 9   Philadelphia, PA 19106
     jmendez@margolisedelstein.com
10   Representing the Defendant
11
12   Also Present,
             Meghan Wynkoop, Co-Counsel of
13           J. Mendez
14
15
16
17
18
19
20
21
22
23
24
```



Page 3

```
 1                      -   -   -

 2                    I  N  D  E  X

 3                      -   -   -

 4

 5   Testimony of: DAVID CROSS          PAGE

 6          BY MS. MENDEZ............  05, 113

 7          BY MS. FRANCHI...............  80

 8

 9

10

11                      -   -   -

12              E  X  H  I  B  I  T  S

13                      -   -   -

14

     NO.            DESCRIPTION            PAGE

15

16              (NONE MARKED.)

17

18

19

20

21

22

23

24
```



Page 4

```
 1                    -   -   -
 2              DAVID CROSS, after having
 3         been duly sworn, was examined and
 4         testified as follows:
 5              THE WITNESS:  Yes.
 6              THE COURT REPORTER:  Could
 7    you please state your name for the
 8    record?
 9              THE WITNESS:  Mr. Cross.
10              THE COURT REPORTER:  Thank
11    you.  We can begin.
12              MS. MENDEZ:  Great.  So,
13    before we fully jump in, just want
14    to put a few stipulations on the
15    record.  David, your deposition is
16    the last in a series of, I think,
17    seven or eight depositions that
18    have been taken since October.
19         At the start of those
20    depositions, Attorney Franchi put
21    some stipulations on the record,
22    and if you're still in agreement,
23    Counsel, that those same
24    stipulations can apply today, we --
```



Page 5

```
 1              MS. FRANCHI:  Yes, we can.
 2         You don't have to reiterate it all
 3         them again.
 4              MS. MENDEZ:  Cool.  Great.
 5         And also, just to put on the
 6         record, we do have an electronic
 7         version of the discovery documents
 8         that will be referenced today that
 9         has been shared with Counsel in
10         advance of the deposition.
11              Rather than admitting the
12         exhibits, I'll just be referring to
13         the pages of discovery which I've
14         created a new Bates stamp for.
15         That way, everyone's on the same
16         page with that.
17              MS. FRANCHI:  That works for
18         me.
19                   -  -  -
20                 EXAMINATION
21                   -  -  -
22    BY MS. MENDEZ:
23         Q.   Okay.  And I introduced
24    myself briefly, David, but my name is
```



Page 6

1   Jocelyn Mendez.  I'm from the law firm,

2   Margolis Edelstein.  I represent all of

3   the defendants in the lawsuit, and you

4   and I will just be having a conversation

5   today.

6          We're here to take your

7   deposition, and like I said, I'm going to

8   be asking you a series of questions.

9   Question and answer should flow sort of

10  like a conversation.

11         And just as a brief note, the

12  court reporter is typing down everything

13  that we say, so it's important that when

14  I ask a question, that you provide a

15  verbal response, a yes, a no, I don't

16  know, something like that, just because

17  she's not able to type down head nods or

18  head shakes or anything like that.

19     A.    Okay.

20     Q.    If you do not understand a

21  question, please let me know, so that I

22  can rephrase it, ask it a different way.

23  If you do answer a question that I ask,

24  I'm going to assume that you understood



Page 7

1    that question.

2             Is that fair?

3        A.    Yes.

4        Q.    Great.  Avoid when you're

5    answering questions -- like I said, all

6    answers do have to be verbal.  Avoid any

7    sort of uh-huh or uh-uh.  Again, those

8    are just hard to type and just hard to

9    understand in the transcript which we'll

10   be receiving at a later date.

11            During the course of this

12   deposition, we will be taking probably

13   quite a few breaks.  I do like to break a

14   lot, and if you need to take a break at

15   any time for any reason, you certainly

16   can take a break at any time from

17   answering questions.

18            I just ask that if I pose a

19   question to you, you answer that question

20   first before you take your break.

21       A.    All right.

22       Q.    I'm not sure what the

23   prison's procedures are on whether if you

24   need to take a restroom break or anything



Page 8

1   like that.  I'm fine if you need to take

2   any break.  I just don't know what the

3   procedures are if you have to call

4   somebody into the room or anything like

5   that.  But I'm fine with whatever you

6   need.

7              Also, your counsel may make

8   objections to the form of a question that

9   I might ask, and that's fine.  You are

10  required to still answer my question

11  unless your attorney explicitly says do

12  not answer it.

13             Is that fair?

14      A.    Fair enough.

15      Q.    Great.  So, let's get started

16  with some of the sort of general

17  background questions.

18             David, have you ever been

19  deposed before?

20      A.    No.

21      Q.    No?  This is your first time?

22      A.    Yes.

23      Q.    Do you understand that

24  currently you're under oath to testify



1   truthfully?

2        A.    Yes.

3        Q.    Are you currently on any

4   medications which would inhibit your

5   ability to testify truthfully today?

6        A.    No.

7        Q.    Okay.  Are you experiencing

8   any sort of medical conditions that

9   would --

10       A.    No.

11       Q.    -- inhibit your ability to

12  testify truthfully?

13       A.    No.

14       Q.    Okay.  And just before I

15  continue, it's very natural in normal

16  conversation to anticipate what the other

17  person is going to say.  Just because

18  we're in a deposition and we have a court

19  reporter, try your best, and I will too,

20  to make sure that I've fully finished my

21  question before you offer an answer.  And

22  I'll do the same 'cause it's hard for me

23  too 'cause it's human nature.

24              At this moment, are you under



Page 10

```
 1    the influence of any alcohol or illegal
 2    drugs?
 3          A.    No.
 4          Q.    Great.  Is there any other
 5    reason today why we cannot proceed with
 6    your testimony?
 7          A.    No.
 8          Q.    Okay.  Great.  So, David,
 9    what location are you currently taking
10    this video deposition from?
11          A.    SCI Somerset.
12          Q.    Have you done anything to
13    prepare for your deposition today?
14          A.    I've read over my paperwork
15    and stuff.  Other than that, no.
16          Q.    Okay.  What paperwork, which
17    documents did you review, if you
18    remember?
19          A.    The -- I think it was like
20    that -- the packet of paperwork where she
21    had came in and gave me and my an --
22    like, got my side of the story, and I
23    gave her my -- my response and stuff.
24          Q.    Sounds like maybe the
```



1    interrogatories?

2         A.    Yeah.

3         Q.    Okay.

4         A.    I think it was.

5         Q.    Great.  Did you review

6    anything else other than that?

7         A.    I've read everything that

8    I've received.  Medical records, the

9    discovery, all of that.

10        Q.    Okay.  Great.  And was anyone

11   else present when you reviewed the

12   documents?

13        A.    No.

14        Q.    Okay.  Have you spoken with

15   anyone besides your attorney about this

16   litigation, about this lawsuit?

17        A.    No.

18        Q.    Okay.  Have you made any

19   posts on social media or anything like

20   that?

21        A.    No.

22        Q.    Okay.  Thank you.  Moving

23   into some more background questions.

24              David, what is your full



Page 12

1    legal name?

2          A.    David Edward Cross.

3          Q.    Okay.  Have you ever gone by

4    any other name?

5          A.    I was adopted, so I had a

6    prior name before that.

7          Q.    Okay.  Do you recall what

8    that name was?

9          A.    No, I did not provide that.

10   No.

11         Q.    Okay.  Do you recall what

12   that name was?

13         A.    Yes.  Yes.  Percy David

14   Bates.

15         Q.    Percy David Bates.  Okay.

16               And what is your birthdate?

17         A.    8/19/96.

18         Q.    And where were you born?

19         A.    Bridgeton, New Jersey.

20         Q.    And do you recall around what

21   age you were adopted?

22         A.    Five.

23         Q.    Around 5?  Okay.

24         A.    Yes.



```
 1          Q.    David, do you currently hold
 2    a driver's license in any state?  Have
 3    you held a driver's license in any state?
 4          A.    No.
 5          Q.    No?  And I know that right
 6    now you are currently incarcerated, but
 7    prior to your incarceration, where were
 8    you living?  What was your address?
 9          A.    985 North Delsea Drive,
10    Vineland, New Jersey.  Apartment 2.
11          Q.    Okay.  So, New Jersey.
12                And how long were you at that
13    address in New Jersey?
14          A.    I was out -- I was out there
15    for all of 2021, but prior to that, I had
16    been back and forth between PA and New
17    Jersey.
18          Q.    Okay.  Thank you.
19                And do you recall -- we'll
20    get into some more of the specifics about
21    Liberty Ridge later, but do you recall
22    where you were living right after you
23    left Liberty Ridge?
24          A.    I stayed with Nelson Martin
```



Page 14

1    for a little bit, and then I had gone

2    to -- I think that his name is Mel

3    Burkholder, I'm not sure.  And then,

4    I moved back in with my family for a

5    short time, and then when I turned 18, I

6    moved back to New Jersey.

7            Q.    Okay.  So, after Liberty

8    Ridge, you were still within the PA area,

9    the Pennsylvania area?

10           A.    Yes.  Yes.  For a short time.

11           Q.    For a short time.  Okay.

12   Until about 18, you said.

13           A.    Yes.

14           Q.    Okay.  Thank you.  Okay.

15                 David, when you were adopted

16   or around the time of your adoption, if

17   you can remember, were you raised by both

18   parents?

19           A.    Yes.

20           Q.    And who are your parents?

21   What are their names?

22           A.    Percy Bates and Stella

23   Bates.

24           Q.    Okay.  And are they the



Page 15

```
 1  people who adopted you?

 2        A.    No.

 3        Q.    Okay.

 4        A.    Bill and Joanne Cross.

 5        Q.    Bill and Joanne Cross are

 6  your adoptive parents?

 7        A.    Yes, ma'am.

 8        Q.    And again, they adopted you

 9  when you were around 5 or so?

10        A.    Yes.

11        Q.    Okay.  Great.  David, are you

12  currently married?

13        A.    No.  Divorced.

14        Q.    Divorced?  Okay.  When was

15  your divorce?

16        A.    It was final, October 21st,

17  2020 -- this year.

18        Q.    This year?  Okay, 2022?

19        A.    Yes.

20        Q.    Okay.  And how long were you

21  married before the divorce?

22        A.    Since 2017.

23        Q.    About five years.

24              Do you have any children?
```



MAGNA
LEGAL SERVICES

Page 16

```
 1          A.     Yes.  One.
 2          Q.     One child.  Okay.
 3                 Son or daughter?
 4          A.     Daughter.
 5          Q.     What's her name?
 6          A.     Chloe Romero.
 7          Q.     Chloe.  Cute.
 8                 And how old is she?
 9          A.     She'll be 1 on Christmas Day.
10          Q.     Okay.  And your daughter, is
11   she living in New Jersey right now?
12          A.     Yes.
13          Q.     Okay.  All right.  I'm going
14   to switch gears a little bit to some of
15   the more nitty-gritty questions.
16                 So, David, if you can recall,
17   and it's fine for this next set of
18   questions if you have to give me an
19   estimate if you don't know an exact
20   number of times, but approximately, how
21   many times would you say you've been
22   arrested?
23          A.     I have six parole violations,
24   and then, 2014, 2015, '16, '17, '18, '19,
```



Page 17

1   '20.  Eight times on top of the six

2   parole violations.

3        Q.    Okay.  And you don't have to

4   go through each specific one, but

5   generally, what were some of the

6   incidents that were around each arrest?

7        A.    There's my juvenile arrest,

8   and then I was arrested for theft by

9   unlawful taking, and then two domestic

10  cases, and then, a DUI and then arrested

11  for parole violations for either

12  absconding from state or something.

13       Q.    And do you recall what the

14  juvenile case was?

15       A.    It was a sex offense.

16       Q.    Okay.  And you said -- I

17  believe you said it was two domestics.

18            Were you referring to

19  domestic violence?  Were they domestic

20  violence cases?

21       A.    Yes.

22       Q.    Okay.  Thank you.  And aside

23  from the, sort of, offenses that we just

24  went over, have you ever been charged for



Page 18

1    any other crime that we haven't

2    discussed?

3            A.    No.

4            Q.    Okay.  To your knowledge, has

5    a protection from abuse or a PFA

6    restraining order ever been issued

7    against you?

8            A.    Yes.  It was -- it was

9    dropped though.

10           Q.    It was dropped?  Okay.

11           A.    Yes.

12           Q.    Approximately when was that?

13           A.    2000 -- right after our

14   marriage in 2017, August of 2017.

15           Q.    And was that from your

16   ex-wife?

17           A.    Yes.

18           Q.    Have you ever requested a

19   restraining order against anybody?

20           A.    No.  No.

21           Q.    Have you ever been sued

22   before?

23           A.    No.

24           Q.    Prior to this current



Page 19

```
 1    lawsuit, have you ever sued anybody else?
 2         A.    No.
 3               MS. MENDEZ:  I'm going to
 4         test out my screen sharing
 5         capabilities here.  I'll be pulling
 6         up just a few documents throughout
 7         the course of today, David, just to
 8         ask if you recognize them and
 9         things like that.  So, just bear
10         with me.
11               THE WITNESS:  All right.
12               MS. MENDEZ:  Can everybody
13         see this?
14               MS. FRANCHI:  Yes.
15               MS. MENDEZ:  Okay.  I have so
16         many screens going that it appears
17         black on my screen, but just for
18         reference, this is marked as
19         D-Cross-Deposition-1.
20    BY MS. MENDEZ:
21         Q.    David, do you recognize this
22    document here?
23         A.    Yes.
24         Q.    Okay.  What do you recognize
```



Page 20

1    it to be?

2          A.    I believe it was in the

3    discovery packet, I believe.  I'm not

4    sure.

5          Q.    Okay.  If I represent to you

6    that this is the complaint -- the amended

7    complaint that was filed to initiate this

8    lawsuit, would you agree that that's what

9    this is?  I can scroll down.

10          A.    I did not see that, actually.

11    I do not have that copy.  I don't -- I'm

12    pretty sure because there was --

13          Q.    Okay.

14          A.    It was -- the paper that I

15    have, there was only two different --

16    two -- two names on there as the

17    plaintiffs.

18          Q.    Okay.  But you've seen some

19    version of this, 'cause I know there

20    were --

21          A.    Yes.

22          Q.    -- a couple of versions --

23    okay.  Great.  Thank you.

24                And, David, without going



Page 21

1   into the specifics of what you might have

2   talked to your attorney about, did you

3   direct your attorney to file this

4   lawsuit?

5          A.    Yes.

6                MS. MENDEZ:  Thank you.  I'm

7          going to stop my screenshare now.

8          Great.  That works.  Okay.

9   BY MS. MENDEZ:

10         Q.    So, other than the complaint

11  I have just shown you, have you ever

12  filed any sort of other charge or

13  complaint with any other governmental

14  agency?

15         A.    No.

16         Q.    Okay.  Great.  Thank you.  I

17  have some background questions.

18                David, did you graduate from

19  high school?

20         A.    No.

21         Q.    Did you in -- do you have a

22  GED?

23         A.    No.

24         Q.    Okay.  What's your highest



Page 22

```
 1   level of education?

 2        A.    Sixth grade or seventh.

 3        Q.    Sixth or seventh?  Okay.

 4        A.    Yes.

 5        Q.    Do you have any sort of trade

 6   certifications or any other professional

 7   licenses?

 8        A.    No.

 9        Q.    Okay.  Have you received any

10   sort of specialized training, maybe for

11   various jobs or anything like that?

12        A.    No.

13        Q.    Did you ever serve in the

14   military?

15        A.    No.

16        Q.    Okay.  Thank you.  So that

17   about does it for all of the sort of

18   background history questions that I have.

19              Now, we're going to be moving

20   more into the reason that we're here

21   today, talking about Liberty Ridge and

22   your time there and your experience

23   there.

24              So, the first question that I
```



Page 23

1    have to that end is, if you can recall,

2    because I know that we're talking about

3    quite a long time ago, so if you can

4    recall, who placed you in Liberty Ridge?

5         A.    My adoptive parents.

6         Q.    Your adoptive parents?  So,

7    that would be Bill and Joanne?

8         A.    Yes.  They were introduced to

9    it by my uncle and aunt, though.

10        Q.    Okay.  Your uncle and aunt,

11   what are their names?

12        A.    Melvin and Mary

13   Sensting.

14        Q.    Thank you for that.

15              Prior to your placement at

16   Liberty Ridge, did you have any

17   relationship with anybody named Ethan

18   Weaver or Nelson Martin?

19        A.    Not Nelson Martin, but Ethan

20   Weaver, yes.

21        Q.    Okay.  Can you describe your

22   relationship with him before Liberty

23   Ridge?

24        A.    I met him one time at a



Page 24

```
 1   family dinner, and he brought up Liberty
 2   Ridge to my uncle and aunt, and he looked
 3   at me and he said, wouldn't it be fun to
 4   go to this place, and I -- I was young,
 5   obviously, so I agreed, you know, and he
 6   talked a little about it.  Other than
 7   that, that was my only time meeting him.
 8        Q.   Okay.  So, about how long was
 9   it from that time that you met him at
10   dinner to the time that you were actually
11   enrolled?  Like how much time had passed?
12        A.   I think that was, like,
13   October, and I think I went into Liberty
14   Ridge in like November.
15        Q.   Okay.  So, about a month,
16   something like that?
17        A.   Yeah.
18        Q.   All right.  Switching gears a
19   little bit.  Talk to me about what it was
20   like growing up, David, what things were
21   like when you were a child.
22             Specifically, what sorts of
23   things would you get in trouble for, if
24   you can remember, when you were a child?
```



Page 25

```
 1          A.     I'm trying to think.

 2          Q.     Take your time.

 3          A.     Just disobeying simple

 4    things, you know.  I don't know.  Being

 5    rebellious to my parents.  In school,

 6    cause issues with the other students.

 7    Just small stuff.  Child things.

 8    Children-like things.  Children -- what

 9    children do, you know.  I don't know.

10          Q.     Do you remember how you were

11    disciplined for the trouble that you used

12    to get into?  And this is before Liberty

13    Ridge, so I'm taking it --

14          A.     Yes.

15          Q.     -- back.

16          A.     Spanked, stand in the corner,

17    sit on the chair, timeout, stuff of that

18    nature.

19          Q.     Okay.  Thank you.  And I

20    know, David, that you mentioned the

21    family dinner with your uncle and aunt

22    and when you met Ethan Weaver.

23                 Was there ever a period of

24    time during your childhood where you were
```



Page 26

1   living with your uncle and aunt?

2           A.     Yes.  Up to that, yes.

3           Q.     Oh, up to that --

4           A.     Up to that -- that dinner,

5   yes.  I was -- I was living there for six

6   months, maybe.

7           Q.     Okay.  Do you know why you

8   were living there?

9           A.     Things weren't going good at

10  home between me and my sisters and my

11  brother, and I guess, my parents -- I --

12  they took me out of school and then they

13  decided to just put me up with my uncle

14  and aunt for some time and see how it

15  went, you know.

16          Q.     What is your religious

17  background?

18          A.     Now or then?

19          Q.     Then.  So, you can tell me

20  what it was then and if you currently

21  still have a religious background, you

22  can talk about that as well.

23          A.     I really -- I mean, I grew up

24  in the Mennonites, so they're obviously



Page 27

```
 1   Christians.  Now, I practice Odinism.
 2        Q.    Odinism?
 3        A.    Yeah, I'm an Odinist.
 4        Q.    Can you talk a little bit
 5   about that?  I don't know what Odinism
 6   is.
 7        A.    It's like a pagan -- it's a
 8   pagan religion.  It believes in, like,
 9   Odin, Thor, the different gods, kind of,
10   like that.
11        Q.    Thank you.  David, as a
12   child, do you recall ever being baptized?
13        A.    No.
14        Q.    Switching gears now back to
15   Liberty Ridge and becoming enrolled in
16   the program.
17              Do you remember that process
18   at all?
19        A.    Yes.  My uncle and aunt had
20   me stay home after church.  I met -- we
21   met with Ethan.  He spoke about the
22   program and about -- between October and
23   November that I got there with my
24   parents, he would be like, oh, your
```



Page 28

1   parents want to see you.  We're going to

2   take you down there, so we went down

3   there, and then my dad came out, and he

4   was like, I need you to sign this

5   paperwork so I signed it.

6            And then, between that

7   period, my parents came to pick me up.

8   They met my uncle and aunt halfway to

9   Liberty Ridge, and they picked me up and

10  then they took me up to Liberty Ridge.

11           When I got there, there was a

12  set of house parents there, Glenn and

13  Debbie Burkholder, and then mentor, Chris

14  Eversole, and then, I believe, Ethan

15  and Rubin were there as well.

16           And they showed us the

17  property, they showed us the place, and

18  they talked about different things that

19  they had in effect there, that they were

20  planning to do, and then, they showed me

21  my room where I would be sleeping.

22           My parents left, and I

23  believe I was there for a little bit by

24  myself as the only individual there,



Page 29

```
 1   like, in the -- in the program, and then
 2   they started working me, so I don't --
 3   like that's what it all led up to.
 4              MS. MENDEZ:  I'm going to
 5         bring up another document very
 6         quickly, and this, for everyone's
 7         reference, is marked as
 8         D-Cross-Deposition-38.  I just got
 9         to scroll down there.
10   BY MS. MENDEZ:
11         Q.    David, does this document
12   look familiar to you?
13         A.    Yes.
14         Q.    Is this what you recall
15   completing before entering Liberty Ridge?
16         A.    No.  I believe I filled that
17   out once I was there.
18         Q.    You filled this out once you
19   were there.  Okay.
20         A.    Yes.
21         Q.    Just scrolling here.  So, is
22   it my understanding that prior to this
23   questionnaire, you signed another
24   document?
```



Page 30

1          A.      Yes.

2          Q.      Okay.

3          A.      I have -- I haven't seen

4   that.  Like, I don't know if that --

5   there was a signature on the paper my

6   parents filled out, but I know I filled

7   that out once I was at Liberty Ridge.

8          Q.      Okay.  Thank you for that.

9   That's all I needed to ask on that, so

10  I'll stop sharing.

11              When you filled out that

12  resident questionnaire that we just

13  looked at, were you the only person that

14  worked on that?

15         A.      Like, as far as mentor

16  helping me or somebody else helping me?

17         Q.      Yes.  Did anybody help you?

18         A.      Yes, I believe my mentor

19  might have.

20         Q.      Okay.  David, were you aware

21  of whether your parents had to pay for

22  you to stay at Liberty Ridge?

23         A.      No.

24         Q.      Before you came to Liberty



Page 31

1    Ridge, were you working at all?  I know

2    you were living with your uncle, but were

3    you doing any work?

4          A.    Yes.  He had a dairy farm in

5    Carlisle area, Chambersburg area, and I

6    would help my cousin with the cows.  And

7    then, during the daytime, I would go to

8    their feed mill.  They owned a feed mill

9    as well.

10          Q.    And let me just circle back

11   quickly to the question that I asked

12   before this when I asked whether you were

13   aware if your parents paid for you to

14   stay at Liberty Ridge, you said, no.

15                Was that no, you aren't

16   aware, or no, they didn't pay?

17          A.    I was not aware.

18          Q.    You were not aware.  Okay.

19   Thank you.

20          A.    No.

21          Q.    Okay.  One more time.

22          A.    I was not aware if they had

23   to pay.  No.

24          Q.    Okay.  Thank you.  Now,



Page 32

1    David, just -- I want you to sort of walk

2    me through a typical day at Liberty

3    Ridge, the tasks that you would complete,

4    sort of what a typical day would look

5    like for you.

6         A.    When I first got there, they

7    had the chickens going.  We would get up

8    in the morning.  It just depended on how

9    early we got up.  They would -- me and

10   the mentor, and then Ethan would go down

11   and walk through chickens, remove the

12   dead chickens, make sure that they were

13   okay, and then we would come back inside

14   and have a -- a devotional.  They did

15   like a devotional thing there.

16              Following that, we ate

17   breakfast, and then sat down with the

18   mentor and went over the -- the journal

19   type of thing that they us fill out each

20   day.  And then, if laundry needed to be

21   done, do our laundry.  And then they had

22   just started the gate project there with

23   Nolan Martin, and so, they were,

24   like, bringing that in as well, and they



Page 33

1   would show -- I would help build the

2   gates.

3            They didn't really have much

4   going on at first.  Once they got more

5   people into the program, they started

6   doing more things.

7        Q.    Okay.  Thank you.  And when

8   you say you would help build some of the

9   gates, who else was working with you?

10       A.    At first, Nolan Martin was

11  there to show us how to do it.  Once they

12  got caught on how to do it, it would be

13  just me, my mentor, and Ethan would help

14  too as well.

15       Q.    Ethan would help?  Thank you.

16            While you were at Liberty

17  Ridge, did your parents ever visit you?

18       A.    They did, I'm going to say,

19  approximately twice.  Maybe a couple

20  more.  Not -- not any more than four

21  times.  I know that for a fact.

22       Q.    While you were there, did you

23  ever call them or write them letters?

24       A.    I did write them a couple of



Page 34

1   letters.  I noticed in my -- in the
2   discovery or whatever, the packet that I
3   got that there was never -- it was never
4   sent out for me.  I don't know why it
5   wasn't sent out.  It was a Mother's Day
6   letter for my mom.
7            I believe I might have called
8   them maybe twice.  I was allowed to call
9   them twice.  They based it off behavior
10  pretty much, and my behavior wasn't the
11  best so that I really didn't get any
12  privileges.
13       Q.   Okay.  So, when you were in
14  the shop or working on the fences or
15  anything like that, do you recall any
16  sort of tools, what sort of tools you
17  were using?
18       A.   Yes, they would have me
19  use -- it's -- it's called a rip --
20  rip -- like a -- it's kind of like a -- a
21  nailer gun, but it's not nails, it's
22  rivets.  One of us would go around and
23  drill holes in the gates, and then one of
24  us would come behind and put the rivets



Page 35

1    in it and make sure that they were

2    fastened.

3              They had us -- they had me --

4    I remember using a saw one time to -- to

5    cut the gates to the right measure.

6    There was a painting machine that we ran

7    the rails through for the gates.  I

8    remember pushing the rails through the

9    gates.  It's -- that was when I first

10   started there, so yes.

11       Q.    Okay.  Before you came to

12   Liberty Ridge, had you ever used any of

13   that equipment before?

14       A.    No.

15       Q.    And I know that you said you

16   had done some work on the dairy farm when

17   you were with your uncle, so was being at

18   Liberty Ridge sort of your first

19   experience -- I'm sorry, your first

20   exposure to, sort of, construction skills

21   and that kind of thing?

22       A.    Yes.

23       Q.    Can you talk to me a little

24   bit about the farming aspect of Liberty



Page 36

```
 1   Ridge?
 2        A.    They raised chickens there.
 3   So the chickens would go out.  We would
 4   have to go in there and, obviously, put
 5   the feeders up and the waters, and then,
 6   after they were done loading out the
 7   chickens, like a day after that, we would
 8   clean out the barns.
 9              They had -- a couple of
10   months later, they got a couple of
11   animals, pigs and a couple steers, and it
12   was my job to go out and feed them.  They
13   had crops there, obviously.  I didn't
14   really interact with that at all because
15   it was all big machines they were using
16   for that.  That's the best I can put it.
17        Q.    Okay.  Did you do any
18   gardening?  Was there a small garden?  I
19   know there was a larger one.
20        A.    Yes, there was a small garden
21   there.  We helped pull weeds, help plant
22   them.  Whenever I would misbehave, they
23   would have me go out and pick up stones
24   out in the garden and stuff like that.
```



1          Q.     While you were doing any of

2     this, any of the gardening, tending the

3     chickens, any of those sorts of tasks,

4     were you ever told that you would be paid

5     for them?

6          A.     No.

7          Q.     At any point, did you ever

8     expect to be paid?

9          A.     No, 'cause of my age.

10         Q.     And moving sort of away from

11    the tending the farm and the other tasks

12    and chores, can you talk to me, David,

13    about any of the recreational activities

14    that you would do while you were at

15    Liberty Ridge?

16         A.     Walk through the woods.

17    Couple of times, we took a drive up to

18    the mountain and drove along the

19    mountain.  They didn't really have too

20    much going on there when I first got

21    there.

22         Q.     Okay.  Did you ever play

23    basketball?

24         A.     They did have a small



Page 38

```
 1  basketball area.

 2        Q.    Do you remember ever making

 3  ice cream?

 4        A.    Yes, Ethan did a couple of

 5  times.

 6        Q.    And do you recall -- maybe

 7  not in the early days but maybe later on,

 8  do you recall whether there was ever a

 9  point system while you were at Liberty

10  Ridge?  So, like, you could earn points

11  for good behavior and then cash those

12  points in for prizes or anything like

13  that?

14        A.    I remember there was a time

15  where during -- after lunch, we would sit

16  down altogether downstairs and we would

17  all do like a two-hour -- like a -- study

18  the Bible.  Ethan would have us memorize,

19  like, chapters out of the Bible and

20  stuff.

21              And by like a certain time of

22  the month, if we were able to recite it

23  all perfectly, we would get something for

24  that.  I never made it.
```



Page 39

1          Q.    So, if you can remember for
2     some of the people who did make it, what
3     were some of the things that they could
4     get for that?
5          A.    I remember them receiving a
6     toolbox.  I believe I received, like, a
7     hammer, a couple of screwdrivers, stuff
8     like that, pliers.  As far as
9     extracurricular activities went, I
10    remember we made stool step -- like,
11    stepstools at one point, and I believe it
12    was for our parents, our mom.
13         Q.    Do you recall if your parents
14    ever received those stools?
15         A.    I took it home with me.
16         Q.    Back to that small garden
17    that we talked about a few minutes ago,
18    do you recall being able to eat the food
19    that you grew there?
20         A.    Yes, we would -- we harvested
21    it and Ethan's wife would can the food
22    and stuff like that.  Yeah.  It wasn't
23    very big.
24         Q.    Right.  What were some of the



Page 40

1    foods that you would harvest?

2          A.    Potatoes, sweet corn.  They

3    had a couple of rows of beans.  There was

4    a little patch of strawberries.  They had

5    tea growing in the one spot.  I remember

6    cutting tea, taking it in.  Stuff like

7    that.  Peppers.

8          Q.    Okay.  Thank you.  So, I know

9    we talked a little bit before about some

10   of the discipline that you would have

11   back when you were with your parents,

12   your adoptive parents.

13              Can you now transition to

14   talking a little bit about the discipline

15   that you received while you were at

16   Liberty Ridge?

17          A.    When I first got there,

18   before the second person arrived, I

19   believe I had to dig like 15 post holes

20   that created, like, a fence line around

21   where the steers were.

22              They had a -- a thing where

23   if we disobeyed, that we'd have to --

24   they took a five-gallon bucket, they put



Page 41

```
 1   like a -- put a fiberglass top on it, and
 2   they drilled holes about the size of a
 3   quarter, and we had to crush stones and
 4   make -- make sure that the stones could
 5   fit through the hole and fill the bucket
 6   up.
 7               And I remember having to dig
 8   a French drain.  I remember having to dig
 9   out a couple stumps.  And refusal of any
10   of that just added more time onto that.
11   Like, let's say, if I refused and just
12   kept misbehaving during crushing the
13   stones for the bucket, they would add
14   buckets on.
15               I remember having to write
16   sentences like out of the Bible, like why
17   I shouldn't be doing what I was doing or
18   this and that.  I remember having to
19   split firewood for one of the
20   punishments.  Things of that nature.
21        Q.    What sorts of things or what
22   sorts of behavior created the need for
23   discipline, if you can remember?
24        A.    Backtalking.  Not
```



Page 42

1   participating in the group devotionals.

2   I remember going to church a couple of

3   times with them there, that I was

4   interested in a female of the church, and

5   they weren't having it, and they made me

6   sit downstairs for every church service

7   that we went to after that with my

8   mentor.

9            Then, not paying attention in

10  church or falling asleep in church,

11  they'd make me write sentences when I got

12  home.  Stuff like that.

13       Q.    Thank you.  Now, I'm sort of

14  going to transition into some of the

15  specific allegations that were made in

16  the complaint about discipline.  The

17  first question that I sort of want to ask

18  on that end is specifically about the

19  running, the running laps.

20            First of all, did you ever

21  have to run laps as a consequence?

22       A.    No, I remember somebody else

23  had to though.

24       Q.    Okay.  Did you witness that



Page 43

1    person run?

2         A.    Yes.

3         Q.    Okay.  Do you recall why they

4    were directed to run?

5         A.    I do not recall why.  No.

6         Q.    Okay.  Thank you.  That's all

7    I have on that.  All right.  Switching

8    gears a little bit here.

9              Without telling me what was

10   discussed, when did you first contact an

11   attorney regarding a lawsuit against

12   Liberty Ridge?

13        A.    I'm not sure if it was -- I

14   don't remember the exact month, but I do

15   remember receiving a call from a family

16   member stating there was allegations

17   against Liberty Ridge, and they reached

18   out to me and I decided to go look into

19   it and take it from there.

20              I would say, probably around

21   like March, April.  I can't remember the

22   exact month.

23        Q.    Of what year?

24        A.    2021.



Page 44

```
 1              MS. MENDEZ:  2021.  If it's
 2         all right with everyone, I just
 3         want to take a break, probably
 4         about three minutes, just to look
 5         through my notes.
 6              MS. FRANCHI:  That's fine
 7         with me.  Do you -- are you going
 8         to go off-camera and shut your mike
 9         off?
10              MS. MENDEZ:  Yes, yes.  Let's
11         go off for a few minutes.
12              MS. FRANCHI:  Okay.
13                   -  -  -
14              (Whereupon, a brief recess
15         was taken.)
16                   -  -  -
17    BY MS. MENDEZ:
18         Q.    David, I want to go back a
19    little bit to your time at Liberty Ridge,
20    specifically the sort of actions and
21    other things that led to consequences for
22    you.
23              Can you talk to me about any
24    time during your time at Liberty Ridge
```



Page 45

1    where you became physically violent?

2          A.    Yeah, a couple of times, I

3    can remember.  Yes.

4          Q.    Can you talk about those

5    times?

6          A.    I remember -- can't exactly

7    remember what led up to it, but I

8    remember I threw a stone at my mentor at

9    one time, and I went to the shop and they

10   came in behind me and they had tried to

11   grab me, and I remember hitting the one

12   mentor.

13              Another time, I was doing a

14   consequence, and I don't know what --

15   why -- I don't remember why I did it, but

16   I remember I felt -- I felt afraid for

17   some reason, and I remember Ethan was

18   coming towards me, and I had a digging

19   iron in my hand.  I remember swinging it

20   at him.

21              Other than that, I can't

22   really remember much on that as far as

23   that goes.

24              MS. MENDEZ:  Okay.  I'm going



Page 46

1          to pull up another document very

2          quickly here.  For everyone's

3          reference, this is marked as

4          D-Cross-Deposition-54.

5               Everyone able to see this?

6               THE WITNESS:  Yes.

7    BY MS. MENDEZ:

8          Q.    Do you recognize this

9    document, David?

10         A.    Yes.

11         Q.    What do you recognize it to

12   be?

13         A.    Daily moral inventory.  I'm

14   trying to read what it says.  Yeah, I

15   recognize it.  It's a daily moral

16   inventory we had to do every day.

17         Q.    Okay.  I know it may be a

18   little hard to see, but on this one here,

19   it looks like it's dated October 18th,

20   2013, and the goals for the day. Are you

21   able to read what that says there?

22         A.    Yeah.  I can see it and that

23   says, "Don't lie to Dr. Walker.  Don't

24   get angry at others."



1          Q.     Okay.  And then, can you read
2     what it says under the highlights and
3     victories portion?
4          A.     Got to go see Dr. Walker.
5          Q.     Do you remember who Dr.
6     Walker was?
7          A.     Yes.  He was a psychiatrist
8     that my parents had -- had me seeing a
9     couple of months prior to going to
10    Liberty Ridge.
11         Q.     And you were still seeing him
12    while you were at Liberty Ridge?
13         A.     I'd seen him, like, once or
14    twice, and then they discontinued it.
15         Q.     Who was taking you to go see
16    him?
17         A.     Ethan Weaver did.  I believe
18    Nelson Martin might've -- might've taken
19    me one -- one other time.
20         Q.     Okay.  Actually, a quick
21    question about Nelson Martin since you
22    brought him up.
23                How often do you recall
24    seeing him actually at the farm at



Page 48

```
 1   Liberty Ridge on a sort of day-to-day
 2   basis?
 3        A.    He would come up and check on
 4   the -- check out if the program was
 5   running.  He would come up for board
 6   meetings, and then, he would come up
 7   around harvest time when they harvested
 8   all the crops on the property.
 9        Q.    So, is it safe to say he
10   wasn't there every day?
11        A.    No, he was definitely not
12   there every day, no.
13             MS. MENDEZ:  I'm going to
14        reference another document now.
15        This is D-Cross-Deposition-58.
16        I'll give you a few moments with
17        this, David.  Let me know if you
18        recognize it.
19             THE WITNESS:  Yes, I
20        recognize it.
21   BY MS. MENDEZ:
22        Q.    Okay.  What do you recognize
23   this to be?
24        A.    It was a letter I had written
```



Page 49

1   them while I was incarcerated.  I believe

2   it was my first incarceration.

3          Q.    Do you remember who you sent

4   it to?

5          A.    Just to -- to the other boys

6   that were there.

7          Q.    Let's see.  This third

8   paragraph.

9                Are you able to see that?

10  Are you able to read, sort of, what that

11  third paragraph -- it says, "When I was

12  in LRF."

13         A.    Yes.

14         Q.    Can you read that for me?

15         A.    "When I was in LRF, I thought

16  that I had it rough and that Ethan and

17  the mentors were unfair, but you guys

18  don't know what the words cruel and

19  unfair are until you have done jail time,

20  and let me tell you right now, LRF is the

21  place to keep you from coming to jail."

22         Q.    Why did you write that letter

23  to the boys?

24         A.    At that time in my life, I



Page 50

1    didn't really have anybody else other

2    than the people that I knew from Liberty

3    Ridge, and I was going through some

4    things in the jail, and I was just

5    discouraged, and they were the only

6    people I had to -- that I could think of

7    to write, you know.

8              MS. MENDEZ:  Okay.  Were

9         you -- strike that.  I'm going to

10        move on to another document that I

11        now have marked as

12        D-Cross-Deposition-61, just a few

13        pages down.  It's just the rest of

14        the letter.

15   BY MS. MENDEZ:

16        Q.    I know this is a little

17   faint, but do you recognize this

18   document, David?

19        A.    Yes.

20        Q.    Okay.  What do you recognize

21   this document to be?

22        A.    I believe -- I believe it was

23   something Ethan had us all write up.

24        Q.    Give me a moment here.



Page 51

1              Are you able to read any of
2    these last two paragraphs?
3         A.    Where it starts out, "As a
4    younger child" or before that?
5         Q.    "As a younger child."
6    Correct.
7         A.    "As a younger child, I went
8    to school to learn but only because I had
9    to go.  I didn't apply myself very hard.
10   So, really, I only went to school to
11   play."
12        Q.    And then the next one?
13        A.    "Now that I'm at Liberty
14   Ridge, my mentors and Ethan Weaver are
15   trying to teach me some basic math
16   skills, which I believe will benefit me
17   in one year that I am or in my years."
18              I am not sure though.  I
19   can't really see the last part.  Can you
20   scroll it up a little bit?  Yeah, it's
21   faint.
22        Q.    Okay.
23        A.    Yeah, I can't read it.
24        Q.    Okay.  That's fine.  Thank



Page 52

```
1    you for that.  So, in that letter, you

2    mentioned Ethan and the mentors helping

3    you with math and other subjects and how

4    prior to coming to Liberty Ridge, you

5    didn't really take school seriously.

6              Talk to me about the

7    schooling at Liberty Ridge.  I know you

8    mentioned a little bit here with Ethan

9    and the mentors, but talk to me about

10   maybe other subjects that you were

11   taught.

12        A.    A lot of Bible stuff.  I

13   believe there was some, like, social

14   studies maybe, and history stuff like

15   that.  Small things.

16              MS. MENDEZ:  Okay.  I'm going

17         to quickly reference another

18         exhibit now that I have my screen

19         up.  This is D-Cross-Deposition-71.

20   BY MS. MENDEZ:

21        Q.    Does this look familiar,

22   David?

23        A.    Yes.

24        Q.    What do you believe this to
```



Page 53

1    be?

2           A.    It was a Mother's Day letter

3    to my mom.

4           Q.    This fourth paragraph here

5    starts with, I believe, "school is going

6    very good."

7                 Do you mind reading that for

8    me?

9           A.    "School is going very good.

10   Are the children out of school yet?  Is

11   Sister Anna coming back or not?  I am

12   taking vocabulary, penmanship, English,

13   reading, and math that gives us a tight

14   schedule between nine and twelve.  I

15   really enjoy school."

16          Q.    In that paragraph where

17   you're talking about vocabulary,

18   penmanship, English, reading, and math

19   and that you really enjoyed school, am I

20   correct in saying that you were talking

21   about the school that you were receiving

22   while you were at Liberty Ridge?

23          A.    Yes.

24                MS. MENDEZ:  Okay.  And just



Page 54

```
 1          quickly, while I have my screen up,
 2          I'm going to go to D-Cross
 3          Deposition-36.  I know it's
 4          slanted.  I'll try to rotate it
 5          here.
 6    BY MS. MENDEZ:
 7          Q.    Do you recognize this
 8    document, David?
 9          A.    I don't remember seeing them.
10    I believe they might have sent it to my
11    parents.  I don't know.
12          Q.    Okay.  Fair enough.  I'm
13    going to stop sharing my screen right
14    now.
15                David, how long did you stay
16    at the farm?
17          A.    I was there from 2011 to
18    2014.
19          Q.    About three years.
20                How old were you when you
21    left?
22          A.    Seventeen.
23          Q.    Why did you leave?
24          A.    Honestly, I can't give you an
```



Page 55

1    exact reason why they -- they kicked me

2    out.  I had tried to leave once on my

3    own, and then I tried to leave a second

4    time and they weren't having it, so they

5    just decided to just move me out.

6          Q.    When you say they, who are

7    you talking about?

8          A.    The board, Nelson, Ethan, the

9    rest of the board.

10         Q.    After you left Liberty Ridge,

11   did you keep in touch with anybody there?

12         A.    No.  Not other than the

13   letter that I had wrote to them while I

14   was incarcerated, no.  Robert Miller, my

15   cousin, I had stayed in contact with him

16   here and there, and there was one other

17   kid, I believe I had tried to reach out

18   to that was there.

19         Q.    You said Robert Miller is

20   your cousin?

21         A.    Yes.

22         Q.    Was he also in Liberty Ridge

23   with you?

24         A.    Yes, yes.



Page 56

1     Q.     David, we might have touched
2   on this a bit, so I apologize if this is
3   repetitive, but did your parents ever
4   tell you why they wanted you to be at
5   Liberty Ridge?
6     A.     No.
7     Q.     Did your parents -- I know
8   before, we talked about the discipline
9   that you experienced as a child, the
10  spanking and things like that, was that
11  from your adoptive parents or from your
12  birth parents or both?
13    A.     Adoptive.
14    Q.     Okay.  So, they were using
15  corporal punishment.
16    A.     Yes.
17    Q.     After leaving Liberty Ridge,
18  did you work any jobs?
19    A.     Yes.
20    Q.     What were they?
21    A.     I helped out in a motor shop
22  with the -- when I first left, I was with
23  Nelson for a little bit and then helped
24  him around the farm here and there, and



Page 57

1  then they moved me in with a family, the

2  Burkholder family from Nelson's church,

3  and I helped in their motor shop, and

4  then, I was only there for couple of

5  weeks.

6           And then, I moved back in

7  with my family, and things still weren't

8  working there, so I moved in with the --

9  a -- a fellow church member that had

10 not -- he was somebody that my parents

11 knew, unrelated to Liberty Ridge, Leroy

12 Zimmerman, and I stayed with their

13 family for remainder of 2014 until,

14 like -- I'm going to say probably, like

15 -- yeah, it was the remainder of 2014.

16 I worked for a couple of his businesses.

17      Q.    I know you said that after

18 you left, you had stayed with Nelson for

19 a while.

20           Did you keep in touch with

21 Ethan Weaver at all?

22      A.    No.   Not while I was there,

23 no.

24      Q.    Did anybody that you met at



Page 58

1    Liberty Ridge ever visit you while you
2    were in jail or in prison?
3            A.    I had a funeral that I was
4    given a -- a -- an absence of leave from
5    the jail, and Nelson Martin came to pick
6    me up.  That was the only person that I
7    had seen from Liberty Ridge.
8            Q.    Has anyone from Liberty Ridge
9    ever sent money to you while you were
10   incarcerated?
11           A.    No.  No.
12           Q.    I want to back up a little
13   bit to some of the jobs that you were
14   talking about after you left Liberty
15   Ridge.
16                 What skills did you need at
17   the jobs that you had mentioned
18   previously?
19           A.    Just basic things.  I mean,
20   just pretty much with working my hands.
21   The -- Leroy Zimmerman, where I had
22   resided for a little while after I was
23   out of Liberty Ridge and stuff, he owned
24   a -- a pumping business where they would



Page 59

1   go to coal mines and pump out coal mine

2   water and stuff like that.

3              He had -- the man for the

4   funeral that was I released to, he worked

5   with Leroy and he owned a welding

6   company.  I helped with the welding every

7   now and then.  He had a hog -- couple of

8   commercial hog farms.  I would help give

9   the pig shots and help them load them

10  out.

11             And then, he also had a

12  brush-grinding company that I would go

13  and out and help with the brush grinding.

14       Q.    Earlier, a few moments ago,

15  you mentioned you had been given a leave

16  of absence to attend a funeral and that

17  you called Nelson to pick you up and

18  bring you there.

19             Why did you call Nelson?

20       A.    I did not call him.  Him and

21  Leroy had worked something out with the

22  judge for me to get out from the

23  furlough, and I guess they just

24  designated him to come get me.  I -- at



Page 60

1    that time, I didn't have any contact with

2    Nelson about going to the funeral.  I

3    just was aware that he was there to pick

4    me up.

5          Q.    Okay.  And you said, after

6    you left Liberty Ridge, you were staying

7    with Nelson for a while.

8                Why did you stay with Nelson

9    at that point?

10         A.    Honestly, I don't even

11   real -- I don't know that my parents knew

12   that I was out of Liberty Ridge at the

13   time, and I don't know -- I don't think

14   that they knew where to put me at that

15   time.

16         Q.    After you left, why didn't

17   you contact your parents?

18         A.    I didn't have access to a

19   phone.

20         Q.    Were you allowed to go back

21   and live with your parents?

22         A.    I stayed with Nelson and his

23   family for a little bit.  I moved in with

24   this Burkholder family, and then things



Page 61

1    didn't work out there either, and then

2    they notified my parents, and they would

3    bring me home, and then, I went back to

4    my family.

5              MS. MENDEZ:  Okay.  So --

6              MS. FRANCHI:  Can you -- if I

7         can interrupt for a second.  It cut

8         out the first part of that.

9              David, could you repeat what

10        you had said.  I don't know if

11        it -- if it's for everybody.  I

12        don't know if the court reporter

13        got it, but I couldn't -- you got

14        jumbled the first little bit of

15        your answer was.

16             THE WITNESS:  When -- when I

17        moved in with the Burkholder

18        family, things didn't work out, and

19        then my parents were notified, I

20        guess, they would bring me back

21        home.

22   BY MS. MENDEZ:

23        Q.    Okay.  So, when you first

24   left Liberty Ridge in those days where



Page 62

1    you were with Nelson, did you ask Nelson

2    or anyone to contact your parents for

3    you?

4         A.    I don't recall.

5         Q.    I want to go back to some

6    comments from earlier, I think, probably

7    before the break.  You and I were talking

8    about how you learned about the lawsuit

9    and joining the lawsuit and everything

10   like that.

11             Can you tell me what were

12   some of the things that you heard in that

13   March 2021 era or whatever -- the month

14   that you mentioned?  What were some of

15   the things that you heard that made you

16   want to file a lawsuit?

17        A.    I had heard that there were

18   sexual allegations against one of the

19   board members, Ethan Weaver,

20   particularly.  And I believe I made it

21   clear that there was no sexual

22   allegations on my end to -- towards

23   Liberty Ridge.

24             But I knew I had issues with



Page 63

```
 1    Ethan Weaver and that there were things
 2    that he was doing there that definitely
 3    were not -- that they were shady, and I
 4    felt like someone needed to be held
 5    accountable for it.
 6         Q.    Okay.  And during the course
 7    of this lawsuit, of this litigation, have
 8    you ever told anybody that you would be
 9    getting money as a result of this
10    lawsuit?
11         A.    No.
12         Q.    I'm going to switch gears a
13    little bit here.
14              David, do you have any social
15    media accounts?
16         A.    I have a Facebook out there.
17         Q.    Is Facebook your only social
18    media?
19         A.    I had a -- I had a Instagram
20    long time ago and Snapchat.  Other than
21    that, no.
22         Q.    And Facebook, is it just one
23    account or do you have multiple?
24         A.    I have a couple, I believe.
```



Page 64

1        Q.      What are the names of your
2   Facebook accounts?
3        A.      David Cross and Tito
4   Garcia.
5        Q.      Who is Tito Garcia?
6        A.      Just a name I put on there
7   'cause I didn't -- I didn't want other
8   people bothering me on my accounts and
9   stuff, family, stuff like that.
10        Q.      So, you made the name up?
11        A.      Yeah.
12        Q.      Have you ever made any
13   comments on Facebook about Liberty Ridge
14   or about this lawsuit?
15        A.      I believe when I had found
16   the -- I forget what it was.  I don't
17   know if it was something from Liberty
18   Ridge or something from the lawsuit that
19   was posted online by the Mennonites.  I
20   don't know what it was, but I remember I
21   put something on there, like, that --
22   that people didn't really know who they
23   are and what they're doing is wrong.
24   Something down that line.



Page 65

```
 1          Q.      When you say you put
 2     something up there, does that mean you
 3     left a comment?
 4          A.      Yeah, just a comment.
 5     Nothing on my Facebook that I remember.
 6          Q.      I want to go back a bit.  I
 7     know that you talked about -- we talked a
 8     little bit about Robert Miller.  You told
 9     me that he was your cousin, that you were
10     in Liberty Ridge together.
11               While you were at Liberty
12     Ridge, were you close?
13          A.      Yes.
14          Q.      Did you know that he was your
15     cousin prior to him coming to Liberty
16     Ridge?
17          A.      Yes.
18          Q.      Have you spoken to him since
19     leaving Liberty Ridge?
20          A.      Yes.
21          Q.      When's the last time you had
22     contact with him?
23          A.      I believe while I was on
24     the -- while I was on the run, I had
```



Page 66

1    asked for some money from him, and we had

2    spoke a couple of times, like, about

3    Lib -- the lawsuit and stuff like that,

4    like -- just like sharing sides, pretty

5    much.

6          Q.     What do you mean by that,

7    sharing sides?

8          A.     Certain things that I

9    remember from Liberty Ridge and stuff

10   like that.

11         Q.     I'm sorry.  You were fuzzy

12   for me.  You cut off.  So, I asked you

13   what do you mean by sharing sides, and

14   then, your answer was muffled.  Could

15   you --

16         A.     He had basic -- he had

17   reached out to me a couple of times as

18   far as things that I remembered from

19   Liberty Ridge and stuff like that.  I

20   think he had asked if I was able to get

21   on -- in contact with a couple different

22   people that were there.

23              We spoke about, obviously,

24   the lawyers and that I had gotten



Page 67

1    involved, and basically, sharing, like,

2    how we were both going about it.

3          Q.    Are the two of you friends on

4    social media?

5          A.    Yes, I believe so.

6          Q.    Do you talk to him on social

7    media?

8          A.    Not very often that I can

9    remember.  I remember when I borrowed

10   money from him, I ended up blocking him

11   after that.  I don't recall if I had his

12   phone number or not.  If there was

13   anything else that I had talked to him,

14   it was over the phone and, like, not on

15   social media, though.

16         Q.    Let me just make sure that

17   I'm clear, did you say that there was a

18   time where you borrowed some money from

19   Robert and then you blocked him on social

20   media?

21         A.    Yes.

22         Q.    Why was that?

23         A.    'Cause I couldn't pay him

24   back.



Page 68

1        Q.    I'm sorry.  Can you say that

2    again?  It cut out.

3        A.    I wasn't able to pay it back.

4        Q.    Okay.  You weren't able to

5    pay him back and you blocked him.  All

6    right.

7              David, do you know anybody by

8    the name of Kyle Hoover?

9        A.    I know the name.  I do not

10   know him, no, like, personally.

11       Q.    Okay.  How do you know the

12   name?

13       A.    Through people from Liberty

14   Ridge.  I had told Ethan a couple of

15   times on the phone, like, after, like,

16   months, prob -- like years after I was

17   out of Liberty Ridge and he had stated

18   that that yeah, I think he was there or

19   he was working with him.

20       Q.    Are the two of you friends on

21   Facebook?

22       A.    I don't think so, no.

23       Q.    Have you ever talked to him

24   on social media?



Page 69

```
 1        A.    No, not that I recall.
 2              MS. MENDEZ:  I am just going
 3        to take two quick minutes.  I'll
 4        turn my camera off.  I think I may
 5        be about done.  I just want to look
 6        through my notes and make sure I've
 7        covered everything.
 8              THE WITNESS:  Okay.
 9                    -  -  -
10              (Whereupon, a brief recess
11        was taken.)
12                    -  -  -
13              MS. MENDEZ:  David, I should
14        just have a few more questions.
15        Just want to tie up some things
16        here.  We've talked quite a bit now
17        about you being with Nelson --
18        staying with Nelson for a while
19        after leaving Liberty Ridge.
20  BY MS. MENDEZ:
21        Q.    Approximately how long do you
22  think you were with Nelson?
23        A.    A month or two.
24        Q.    While you were there, who
```



Page 70

1    else was living in that house?

2         A.    I believe his wife and a

3    couple of his children.

4         Q.    Did you have a bedroom there?

5         A.    Yes.

6         Q.    Were you eating meals with

7    the family?

8         A.    Yes.

9         Q.    Going to -- excuse me.  Going

10   to go back to the jobs that you worked

11   after leaving Liberty Ridge.  I know

12   you've done quite a few things, but let's

13   start with your first job.

14              Can you tell me what that

15   was?

16        A.    Like after Nelson -- after

17   moving out of Nelson's in there or --

18        Q.    After moving out of Nelson's,

19   yes, please.

20        A.    I moved in with the

21   Burkholder family.  I was -- they had a

22   motor shop.  I worked in the motor shop a

23   little bit.  And then after moving back

24   with my family, then moving on to Leroy



Page 71

1   Zimmerman's, I don't really know how to

2   describe it better than what I already

3   have.  It was just typical work.

4         Q.    Let's backtrack a little bit

5   to the motor shop.

6               Were you paid while you

7   worked at the motor shop?

8         A.    No.

9         Q.    What was your first job after

10  Liberty Ridge where you were paid?

11        A.    I believe working with Leroy.

12        Q.    Okay.  And remind me the work

13  that you were doing with Leroy.

14        A.    He owned a commercial hog

15  farm, and he also owned a brush grinding

16  company, and he pumped out coal mines.

17        Q.    Were you paid by the hour?

18        A.    No.

19        Q.    How were you paid?

20        A.    He had set up a bank account

21  for me where any -- any money he paid me

22  would go into the bank account until I

23  was, believe, 21.  And the money was just

24  there until I was 21, but I ended up --



Page 72

1  we ended up going back and taking the

2  agreement away, and he gave me the money

3  once I moved out of there.

4        Q.    How much money was that?

5        A.    $800, not very much.

6        Q.    And how long had you been

7  working for him?

8        A.    I'm going to say probably

9  like six months, seven months.

10       Q.    And he gave you that money --

11 did he give you that money in cash?

12       A.    Eventually, yes.

13       Q.    What do you mean by

14 eventually?

15       A.    Once I moved out of there, I

16 had moved out west, like, a group of

17 Mennonites in Illinois, and I had lived

18 out there for a while, and he was paying

19 my rent when I had an apartment out

20 there.  So when I turned 18, I moved back

21 with my family.  I needed the money,

22 obviously.  And he didn't want to give me

23 the money, so I had my probation officer

24 get in contact with him, and he got the



Page 73

1   money.

2        Q.    You said that Leroy was

3   paying your rent when you had moved out

4   to Illinois?

5        A.    Yes.

6        Q.    Do you know whether he was

7   paying the rent from the account he

8   opened for you or his own account?

9        A.    No, it was -- it was his own.

10       Q.    His own account?  Okay.

11             And before I move on, really

12  quickly, again, sorry if you said this,

13  who was the owner of the motor shop?

14       A.    I can't remember if his name

15  was Melvin Burkholder.  But I know that

16  his son was co-owner of the ranch.  His

17  name was Lowell.

18       Q.    Noel?

19       A.    Lowell, yes.  L-O-W-E-L-L.

20  The company was Burkholder's Motors in

21  Myerstown, PA.  They had -- the family I

22  lived with there, they had been prior

23  house parents at Liberty Ridge.  That's

24  how they knew who I was, and I guess



Page 74

1    that's why they agreed to take me in.

2         Q.    How long were you in

3    Illinois?

4         A.    Until I was 18.  And then

5    when I turned 18, I moved back to New

6    Jersey.  I met my biological family

7    online, and then I moved through --

8    straight from Illinois to New Jersey.

9         Q.    When you were in Illinois,

10   did you work any jobs?

11        A.    Yes, I helped with a butcher

12   shop, and then I help with a metal

13   fabricating shop.

14        Q.    For the metal fabricating

15   shop, what sort of things did you have to

16   do?

17        A.    Cut sections of the metal

18   wall for -- they were building, like, I

19   guess they call them automatic crowd

20   gates for dairy farms in the milking

21   parlors.  And they would have these

22   sheets of metal come in, and it was my

23   job to cut it off at a certain line,

24   sometimes help put the metal together,



Page 75

1   weld it, stuff like that.

2        Q.    Did you have to be trained to

3   do that?

4        A.    No.

5        Q.    Did you already know how to

6   do that before you had that job?

7        A.    I mean, no, not necessarily,

8   no, but it wasn't -- didn't take a genius

9   to figure it out.

10       Q.    So after Illinois, you

11  reconnect with your biological family

12  back in New Jersey.

13             Correct?

14       A.    Yes.

15       Q.    Okay.  So take me to where

16  you were right after Illinois.

17             You go to New Jersey, and

18  then what job, if you can remember, were

19  you working when you were in New Jersey?

20       A.    I got a factory job.  I had

21  gotten a factory job at a bakery.  And

22  then I had gotten another factory job at

23  a place that did meat processing.

24       Q.    What sort of things were you



Page 76

1    doing at the factory?

2         A.    Washing the mats that came

3    off the bakery lines so they could go

4    back out for -- for the pastries to go on

5    to go through the machines.  Then, I did

6    line where I would just stand there

7    and make sure there's no defects.

8         Q.    I'm sorry.  You cut out.  If

9    you could repeat yourself.

10        A.    I wash -- I would wash the

11   mats that would come in dirty and then

12   send them back out.  And then I worked on

13   the line checking the -- the pastries

14   that would come out and make sure they

15   weren't defected.  That was at the

16   bakery.

17             And then, at the meat

18   processing place, I would just package

19   and process the steaks that came out, box

20   them, palletize them.

21        Q.    At the bakery and the meat

22   processing place, how many hours were you

23   working per week?

24        A.    Eight to four, six, seven



Page 77

```
 1  days a week.
 2          Q.    How were you paid?
 3          A.    Over the table, on the books.
 4  I was working through a temp agency at
 5  the time.
 6          Q.    Did you say over the table?
 7          A.    Yeah.  It was on the books.
 8          Q.    Okay.  So were you getting a
 9  paycheck?
10          A.    Yes.
11          Q.    And were you cashing your
12  paycheck into your personal bank account?
13          A.    No, I did not have a bank
14  account.  I was taking it to a check
15  cashing place and just receiving cash.
16          Q.    Okay.  Do you currently have
17  a bank account?
18          A.    No.
19          Q.    Switching gears a little bit.
20  David, how long -- if you know, how long
21  will you be incarcerated?
22          A.    My minimum is May of next
23  year, and then my max is May of 2026, I
24  believe, or 2025.  One of the two.  I
```



Page 78

1   believe 2026.

2        Q.    Have you learned any skills

3   or done any sort of certification classes

4   while you've been incarcerated?

5        A.    No.

6        Q.    When you are released from

7   incarceration, what sort of jobs or

8   employment do you think that you will

9   look for?

10       A.    I'm planning to go to back to

11   New Jersey.  There's a glass factory down

12   there that my family's been working in

13   for most of their lives, and I plan to go

14   back there.

15       Q.    Have you worked in that glass

16   factory before?

17       A.    I did one time, yes.

18       Q.    Okay.  What kind of work were

19   you doing there?

20       A.    Packaging glass and

21   palletizing.

22       Q.    Okay.  Were you paid?

23       A.    Yes.

24       Q.    How were you paid?



Page 79

1          A.    Check.

2          Q.    Check.  Okay.  And then you

3    would cash that check?

4          A.    Yes.

5                MS. MENDEZ:  Okay.  David,

6          That is all I have for you at the

7          moment.  Your attorney may want to

8          ask you some questions, but I am

9          all set.  Thank you.

10               MS. FRANCHI:  Before I ask

11         any questions, I was going to see

12         if we could take a bit of a break.

13         And I don't know -- again, I don't

14         know what -- because nobody from

15         the prison came back in, so I don't

16         know if you're able to go if you

17         need to use the restroom.  I don't

18         know what the situation is or if

19         you just have to sit there.

20               THE WITNESS:  No, I'm good.

21               MS. FRANCHI:  You are?  Okay.

22         I would say maybe -- I was going to

23         say 15.  You want to do -- yes,

24         we'll do like 15 minutes.  I don't



Page 80

```
 1          want to make David sit there for
 2          too long.  So, yes, if that's okay
 3          with you guys, like 15 minutes.
 4          I'm just going to take a look at
 5          everything, grab a snack, come
 6          back, and then hopefully be able to
 7          wrap this up sooner rather than
 8          later.  All right.
 9                    -  -  -
10          (Whereupon, a brief recess
11          was taken.)
12                    -  -  -
13                  EXAMINATION
14                    -  -  -
15  BY MS. FRANCHI:
16          Q.    Okay.  So David, I just have
17  a few kind of follow-up questions for you
18  on top of some of the question that
19  Jocelyn had.  I don't imagine it'll take
20  too long, but I just kind of wanted to go
21  over a few things.  So first, I want to
22  talk a little bit about leading up to you
23  going into Liberty Ridge. Tell me a
24  little bit about -- I'm just going to
```



Page 81

```
 1   generally call it your mental health
 2   background.  Tell me a little bit about
 3   what was going on before you went into
 4   Liberty Ridge and specifically like
 5   diagnoses, medication, things like that.
 6        A.    I was on medications I took
 7   for ADHD, anxiety, depression, shit --
 8   stuff like that.  That's as good as I can
 9   put it.
10        Q.    Okay.  And were you seeing a
11   psychiatrist or any sort of a therapist
12   when you were younger?
13        A.    Yes, I was seen by a
14   psychiatrist at Philhaven and a
15   psychiatrist, Dr. Walker.
16        Q.    Okay.  Now tell me a little
17   bit more just about -- you told me about
18   what medications you were on, that you
19   had seen a therapist and a psychiatrist,
20   do you have a background of any sort of
21   trauma or abuse before you came into
22   Liberty Ridge?
23        A.    Yes, as a child, younger
24   child.
```



Page 82

```
 1        Q.    Tell me about that a little
 2   bit.
 3        A.    Yes, as a younger child prior
 4   to being adopted and stuff, I guess the
 5   home situation wasn't the best, things
 6   like that.
 7        Q.    Okay.  And we can just talk
 8   about it generally.  I think that kind of
 9   the point is just to kind of let them get
10   to know you a little bit more about your
11   background and what led up to Liberty
12   Ridge.
13              So did you have any sort of
14   traumatic background, like childhood
15   sexual abuse or any physical abuse,
16   anything like that?
17        A.    Yes, sexual and physical --
18        Q.    Can you tell -- sorry.  I
19   didn't mean to interrupt you.  There's a
20   bit of a delay.
21        A.    Sexual and physical both.
22        Q.    Okay.  As a child?
23        A.    Yes.
24        Q.    Okay.  And did -- you think a
```



Page 83

1    lot of this kind of lead up to you going
2    to see the psychiatrist, going to see the
3    therapist, and being on these
4    medications?
5         A.    Yes.
6         Q.    Do you know of any other
7    diagnoses that you had or have?  You've
8    mentioned ADHD, anxiety, depression.
9         A.    I believe while I was
10   incarcerated, they diagnosed me with
11   severe mood disorder, multi-personality
12   disorder.  Those are two that I can
13   remember aside from the others.
14        Q.    Now going into Liberty Ridge,
15   did they -- when I say they, did Liberty
16   Ridge have you undergo any sort of
17   therapeutic evaluations or see a doctor
18   or anything like that?
19        A.    No.
20        Q.    Okay.  Now while you were at
21   Liberty Ridge, I know that there was a
22   note that you had seen Dr. Walker maybe
23   once or twice when you were there.
24             Did your psychiatric



Page 84

1    treatment continue throughout the entire

2    time when you were at Liberty Ridge?

3         A.    No.

4         Q.    Tell me about that.

5         A.    I believe I've seen him maybe

6    twice.  Things about my childhood started

7    coming out, and I guess my parents wanted

8    to just shut it down before it got out

9    and everything, before things went too

10   far and ended up looking bad on them.

11   And they discontinued it.

12        Q.    Were you on any sort of

13   medication when you were at Liberty

14   Ridge?

15        A.    Yes, for the duration of the

16   times I had seen Dr Walker.  I do not

17   recall what they were, though.

18        Q.    Okay.  At any point when you

19   were at Liberty Ridge, did any Liberty

20   Ridge staff or any member of Liberty

21   Ridge make any comments to you about your

22   medication or take you off it?

23        A.    Yes, yes.

24        Q.    Who was that?



Page 85

```
 1          A.    I believe Ethan Weaver had
 2    taken me off medication, and then I
 3    remember I had gone somewhere with
 4    Nelson, and Nelson -- I got in the
 5    vehicle and I fell asleep 'cause
 6    medication put me to sleep, and Nelson
 7    asked me what I was on, and I told him, I
 8    said it's my medication.  And then that
 9    was around the time they took me off of
10    it.
11          Q.    When you say they, the
12    Liberty Ridge staff took you off it?
13          A.    Yes.
14          Q.    Was this at the direction of
15    any doctor or anybody that you know of?
16          A.    Not that I recall.
17          Q.    So let's talk a little bit
18    about working when you were at Liberty
19    Ridge.  Tell me about how often you would
20    work during the day, not including
21    consequences, when you were at Liberty
22    Ridge.
23          A.    Pretty much from sunup to
24    sundown.
```



Page 86

1          Q.    And I know Jocelyn had

2     mentioned a little bit about some of the

3     farming that you would do, working in the

4     garden, tending to some of the animals,

5     and I know she talked briefly about the

6     shop but not much.  So tell me about the

7     actual labor that you did, not including

8     the garden that was used to supplement

9     the food, but the actual work that you

10    were doing.

11         A.    They had -- I guess they had,

12    like, an agreement with this sawmill

13    company, Jones's Lumber, and they had me

14    and another person that was a resident

15    there, and they would take us there and

16    drop us off.  And we would help stack the

17    lumber and -- and organize stuff there.

18    We were not paid for that.

19              They had -- when they brought

20    their 50 by 80 pole barn into the

21    picture, they had us -- me and that same

22    individual, cut down a bunch of trees

23    that were, like, in the backside of the

24    property where they could build the --



Page 87

1    where they would build the -- the

2    building.  And then -- yeah, that's

3    basically as far as, like, the hard

4    manual labor went.  That was about it.

5         Q.    Was this off site?

6         A.    When they brought the

7    building -- when they brought the -- the

8    structure to the property, we had gone to

9    that -- that property to help disassemble

10   it.  And I remember, when we were there,

11   they had made other kids there smashing

12   down this concrete.  Like -- it was like

13   -- it looked like a little small chicken

14   coop.  And I remember, we had to tear it

15   down.  Like, we just smashed all the

16   blocks down.

17             And then when they brought

18   the structure to the -- to the facility

19   there at Liberty Ridge, they did have us

20   help put the structure together.

21        Q.    Were there any other times

22   that you were taken off site to do any

23   work?

24        A.    Yes.



Page 88

```
 1              MS. MENDEZ:  Objection to
 2         form.
 3              THE WITNESS:  We went to --
 4         yes, we went to Ethan Weaver's
 5         property down in Chambersburg to
 6         help him unload chickens when they
 7         came in.
 8    BY MS. FRANCHI:
 9         Q.    And is there anything else
10    that you recall off site?
11         A.    I believe we had helped
12    Nelson Martin with a project over at one
13    of his properties in Myerstown, blowing
14    insulation into a building.
15         Q.    Okay.  And were you tied
16    for -- tied, right -- were you paid for
17    any of the work that you did off site?
18         A.    No.
19         Q.    Okay.  Tell me about the work
20    then that was performed at Liberty Ridge
21    that were at the various businesses that
22    came in that you did work for, that you
23    remember.
24              MS. MENDEZ:  Objection to
```



MAGNA
LEGAL SERVICES

Page 89

```
 1          form.
 2                  MS. FRANCHI:  You can answer.
 3                  THE WITNESS:  The -- The gate
 4          company.  We helped with the
 5          chickens there.  While I was there,
 6          they only had the gate company and
 7          the chicken companies.  The pallet
 8          company was not there at the time.
 9   BY MS. FRANCHI:
10          Q.    Okay.  And now I want to
11   shift gears a little bit.  I want to talk
12   more about consequences.  Tell me about
13   the types of consequences that you had to
14   undergo while you were at Liberty Ridge,
15   starting from, I guess, the least severe
16   to the most severe.
17          A.    The post hole digging, the
18   crushing the stones, the digging the
19   French drains.
20                  Then, there was -- I remember
21   the time when I had witnessed one
22   individual having to run laps while they
23   followed him in the truck.  I remember I
24   stuck up for him, and they gave me
```



Page 90

1  consequences for sticking up for him

2  because I thought it wasn't right how

3  they were treating him, and they made him

4  and I use a two -- two-handed saw to cut,

5  like, chunks of wood off of a log and

6  then -- and that's when I had brought it

7  up to him about running away from Liberty

8  Ridge.  So they separated us, and they

9  left him go.

10              And then for, like, egging

11  him on to want to leave the facility,

12  they made me dig a tree stump out.  And

13  then I had to write -- write a bunch of

14  sentences.  Writing sentences, Bible

15  verses, writing things like I will behave

16  at all the times and listen to my

17  mentors.  We --we were writing like 600

18  lines like that on pieces of paper.

19              Digging the French drain was

20  probably the most traumatic to me because

21  they made me stay out all night and dig

22  for hours on end, and then they brought

23  me, like, a sandwich and -- and a cup of

24  water in between.  And the next day, my



Page 91

1    behavior started getting worse after

2    that, so they -- pretty much, I just

3    would -- I would tell them I'm not going

4    to dig.  Look, I'm not going to do this.

5    So you cannot make me do this.

6              So they would -- eventually,

7    they started, like, adding the

8    consequences on to the point where that I

9    had to go to sleep, you know, and then

10   when I woke up, they would make me go

11   back and dig some more.

12             I wasn't allowed to talk to

13   the other children that were there, the

14   other boys there.  I wasn't allowed to

15   speak to them while I was dealing with

16   consequences.  Stuff like that.

17        Q.   So I want to talk a little

18   bit about the specific consequences.  So

19   when you were doing -- I guess, let's

20   focus specifically on the French drain.

21             Tell me about leading up to

22   having to dig the French drain, what

23   happened?

24        A.    I believe I had tried to



Page 92

1    leave Liberty Ridge.  I walked off the

2    property, and I told them that I was

3    going to go out to the neighbors and tell

4    them what they were doing to us there,

5    'cause it was a -- like, nobody else

6    around the town really knew what the

7    place was and what was going on behind

8    closed doors.

9            So they brought me back and

10   told me that, if I tried to run away, the

11   police -- they would turn me in to the

12   police.  The police would bring me back.

13   And then they sat down, the mentors,

14   and -- and we were sat down and discussed

15   the punishment, and they showed me where

16   I had to dig.

17            And I remember, while I was

18   digging, I ended up falling asleep while

19   I was standing in the hole trying to dig.

20   Pretty much the trying to leave the

21   facility is what led up to that.

22        Q.    So how long -- actually,

23   let's go back.  For those of us that

24   don't know exactly what a French drain is



Page 93

1    or what this scenario is like, explain to

2    us a little bit about what digging a

3    French drain means.

4              Is it like a little hole in

5    the ground or is it something more?

6         A.    No, it was more than that.

7    It was like a -- like on the backside of

8    a house where they housed the house

9    parents, where Ethan and Ruby lived.

10   There was a pipe that came out the back

11   for the washing machine and where the

12   water would drain off.

13             So instead of having the

14   water drain around the house, there was a

15   hole -- I can't recall exactly how deep

16   it was, but at the beginning of the hole,

17   it was fairly deep, and then there was a

18   narrow -- and they took stones and then

19   there was a narrow trench that went

20   around the side of the property where

21   they had a hole that was very, very deep

22   that I had to dig.  And that's where the

23   water would drain off into.

24             So I had never needed help to



Page 94

1  get out of the hole when -- by the time I

2  was done digging it, like, it wasn't --

3  it wasn't like I just dug a little bit

4  and then crawled back up out of it, you

5  know what I mean?  I was there for hours

6  on end.

7          Q.    Okay.  Now about how -- oh my

8  gosh, I'm starting to lose my voice,

9  terrible timing.

10              About how long was this

11  trench that you had to dig?

12          A.    I'm going to say 20, 30 feet

13  long.

14          Q.    And were you standing in the

15  trench?

16          A.    Yes.

17          Q.    And to the extent that you're

18  able to remember, did it come up to your

19  shoulders?  Was it over your head?

20  Somewhere in between?

21          A.    The -- the back of the house

22  where they first started digging, it was

23  probably about to my waist, and then the

24  trench at least up to my waist, and then



Page 95

1   the hole at the end by the -- by the road

2   there was I'm going to say couple feet

3   deep, but like, more than I could crawl

4   up out of by myself.

5       Q.    And how -- around what time

6   did you start this consequence?

7       A.    I can't recall exact times.

8   Like, I know I worked through the night

9   hours, though.

10      Q.    If you could approximate,

11  about how many hours were you digging

12  this trench for?

13      A.    I want to say at least two --

14  two days or so.

15      Q.    Okay.  And --

16      A.    More or less.

17      Q.    -- at any point could you

18  sleep while you were digging this trench?

19      A.    No.

20      Q.    What would happen if you fell

21  asleep while you were digging?

22      A.    They would just wake me up

23  and tell me I had to keep digging or add

24  time on.



Page 96

1        Q.    Did you get any food or water
2    during these days of digging this trench?
3        A.    A couple times.  Maybe two
4    times I got a sandwich and a cup of
5    water.
6        Q.    Were you allowed to stop at
7    any point other than when they gave you a
8    sandwich and a cup of water?
9        A.    No.
10       Q.    Who was out there?  Was
11   anybody supervising you when you were
12   doing this?
13       A.    Ethan was out there, a guy by
14   the name of Austin Martin, and a guy by
15   the name of Lynden Graham.
16       Q.    About how old were you when
17   this was happening?
18       A.    Between 14 and 17.  So
19   probably like -- it was towards the end
20   of my time there.  So I was probably 16,
21   17.
22       Q.    Okay.  Were there any other
23   times that you had to do a consequence
24   either overnight or at night?



Page 97

```
 1          A.     Plenty of them.

 2          Q.     What were they?

 3          A.     Post hole digging, digging

 4     the stump.  Next to the schoolhouse, they

 5     had this, like, area where they made me

 6     dig, and I didn't -- I don't even

 7     remember what it was for.  I just

 8     remember that it was, like, in the side

 9     of the hill, and they just made me start

10     digging into the side of the hill.  And

11     they were -- I don't know if they were

12     going to put something in there, like a

13     root cellar or something like that.  I

14     remember having to dig overnight for

15     that.

16          Q.     Were there any times that you

17     had to perform consequences off site?

18          A.     Yes.  We had gone out to Lake

19     Erie to see -- visit one of Ethan's

20     daughters that live out there with her

21     and her husband.  We went out there to

22     visit them.  And I remember I misbehaved

23     over there, and they made me dig, like,

24     three post holes.  It was, like, areas
```



Page 98

1    where they were going to dig -- plant

2    trees and stuff.

3         Q.    Whose property was it that

4    you know of?

5         A.    Darrell Martin, I believe his

6    name is.  It's Ethan's son-in-law.

7         Q.    Were there any times that you

8    were restrained in any way while you were

9    at Liberty Ridge?

10        A.    Yes, a couple of times.

11   Twice that I can at least remember.  The

12   one time they had zip tied my feet and

13   held my hands behind my back or they had

14   zip tied my hands and held -- and they --

15   and bent my feet forward and sat on top

16   of them so I couldn't move and just kept

17   me out there like that for a couple

18   hours.

19             And then another time, they

20   just put my hands behind my back and made

21   me lay face down on the ground, and

22   Robert had came out to -- they said he

23   wanted to come out and talk to me.  He

24   came out, and he appraised me.  He made



Page 99

1   sure I was okay.  I -- I was scared of

2   him.  I didn't know -- I didn't know what

3   was going to happen, you know.

4          Q.    Tell us about the time --

5   these two different incidents then where

6   you say that you were either tied up or

7   restrained.  You'd mentioned one time

8   that you were zip tied.  Explain to us a

9   little more about that situation.

10         A.    I basically refused to do

11  what they told me to do, and they told me

12  I wasn't allowed to get out -- like, get

13  out of doing the consequence, and I tried

14  to walk away.

15         Q.    And then what happened?

16         A.    I believe they had grabbed --

17  like, they gripped me up and then I tried

18  to, like -- was struggling, and then they

19  put me on the ground face down and

20  restrained me.

21         Q.    And what -- you said you

22  were -- is this the time that you were

23  tied up?

24         A.    Yes.



Page 100

1        Q.    And what part of you was
2    tied?
3        A.    My wrists.
4        Q.    And how long did you remain
5    tied up?
6        A.    A couple hours.
7        Q.    And where were you?
8        A.    I was -- remember it was out
9    in the shop where they build the gates,
10   'cause there was a tree they had cut
11   down.  They were making me dig out the
12   stump.
13       Q.    So you were outside?
14       A.    Yes.
15       Q.    Were you face down?
16       A.    Yes.
17       Q.    What were you laying on top
18   of?
19       A.    The ground.
20       Q.    What was on the ground?  Was
21   it grass?  Was it rocks, dirt?
22       A.    Stones, yeah.
23       Q.    At any point did you ever
24   lose any feeling in your hands, anything



Page 101

```
 1   like that?
 2         A.    Yes, I remember my hands had
 3   gotten numb after a while and both my
 4   feet and hands had gone numb.
 5         Q.    At what point were you
 6   released?
 7         A.    I'm going to say within,
 8   like, two hours -- two, three hours with
 9   them restraining me.
10         Q.    What time of the day was
11   this?
12         A.    It was during the middle of
13   the night.
14         Q.    And then you said there was
15   one other time that you may have been
16   restrained?
17         A.    Yes, when I was digging the
18   French drain, when I swung the digging
19   iron at Ethan, they grabbed me and put me
20   on the ground.
21         Q.    And were you tied at that
22   time or just physically restrained?
23         A.    No, just restrained.
24         Q.    And how long were you
```



Page 102

1    restrained for?

2         A.    Hour or two.

3         Q.    And then did you have to

4    continue working after that?

5         A.    Yes.

6         Q.    So we all know that you have

7    a history of mental health issues, you

8    were on medication, things like that.

9               At any point when you were at

10   Liberty Ridge, when you either became

11   angry or you -- you had said that you had

12   swung something at Ethan, anything like

13   that, did they ever take you to a crisis

14   center or to a hospital or anything like

15   that?

16        A.    No.

17        Q.    Did they ever take you for

18   psychiatric care after one of these

19   incidents?

20        A.    No.

21        Q.    Did they ever call the police

22   after one of these incidents?

23        A.    No.

24        Q.    Now I want to shift gears a



Page 103

1    little bit to schooling when you were at

2    Liberty Ridge.

3              Was this a structured school

4    setting?

5         A.    No.

6         Q.    Tell us a little bit about

7    it.

8         A.    I'd pretty much get up,

9    during the daytime whatever, at a certain

10   time, I'd have to go out to school, and

11   there would be another individual in

12   there with the schoolteacher, who was

13   also his mentor, and I would just sit

14   there for, like, couple hours, two or

15   three hours, like maybe 12 to 3, and do

16   my homework and stuff like that, and

17   they, they would let me go.

18        Q.    Was this every day?

19        A.    No, not every day, no.

20        Q.    Was there any structured

21   curriculum or anything like that?

22        A.    No.

23        Q.    Were there ever times that

24   you just didn't do the work?



Page 104

```
 1        A.    Yes, which resulted in
 2   consequences.
 3        Q.    Okay.  Now at any point did
 4   your schooling just stop?
 5        A.    Yes.
 6        Q.    When was that?
 7        A.    Towards the latter time.  Now
 8   not until about 15, 16, middle of 16.
 9        Q.    So I want to talk a little
10   bit about -- I know that Jocelyn showed
11   you a letter to your parents and that
12   remained in your Liberty Ridge file.
13              Were you aware that Liberty
14   Ridge was not sending your mail to your
15   parents?
16        A.    No.
17        Q.    Was that a little bit
18   shocking to you to see that in your
19   discovery packet?
20        A.    Yeah.  Yes.
21        Q.    Everything that you
22   communicated via writing or outwardly on
23   the phone at any point when you were at
24   Liberty Ridge, was all of your
```



Page 105

1    communication monitored by Liberty Ridge?

2         A.    Yes, phone calls, there was

3    always some -- there was always somebody

4    on the other end of the phone listening.

5    When my parents came to see me in two

6    times, there always was a mentor around

7    or Ethan and we -- Ethan and -- or

8    whoever was house parents at the time.

9              Letters, obviously they

10   monitored the letters if they kept my

11   mail from going out.  So I don't know

12   what else they did.

13        Q.    What would happen if you were

14   to write anything against Liberty Ridge

15   in any of your communications?

16        A.    I can't say that I

17   necessarily wrote anything against

18   Liberty Ridge in my communications,

19   because I was afraid that something would

20   happen, you know.

21        Q.    What do you mean by that?

22        A.    Consequences or -- pretty

23   much I was afraid that there would be

24   consequences because of it.



Page 106

```
 1        Q.    Tell me a little bit about
 2   your relationship with the mentors,
 3   specifically how you were treated by the
 4   mentors and just their behavior.
 5        A.    I remember them keeping
 6   journals about my behaviors.  The first
 7   mentor, him and I kind of got along, and
 8   then down the road, we didn't -- I didn't
 9   really get along with them.  I remember
10   having taken too long in the shower, and
11   then they would eventually stand in the
12   bathroom or stand outside the door and
13   monitor as I was getting showered and
14   that's what I was doing and -- and stuff
15   like that.  They put a strain on my
16   relationship with them.
17        Q.    Do you ever feel at any point
18   when you were at Liberty Ridge that, due
19   to your mental health, that you were
20   being instigated?
21        A.    Yes, absolutely.
22        Q.    Tell me a little bit about
23   that.
24        A.    I just felt like that pretty
```



1    much kind of think I'd put it -- if I

2    needed -- like, let's say that I didn't

3    have -- they would put, like, limits on,

4    like, consequences, and if I didn't have

5    it done in a certain time, they would add

6    consequences on to it or -- and things

7    like that.  It was like they -- they gave

8    me -- made me do things that would --

9    that would honestly bring a negative

10   reaction to me, and they would find a

11   reason to add consequences on to my

12   reactions to everything.

13        Q.    Do you think that the longer

14   that you were there without mental health

15   treatment the worst it got?

16        A.    Oh, definitely.

17        Q.    Now Counsel had asked you

18   some questions about your access to

19   Facebook, things like that.

20              So just to be clear, when was

21   the last time that you were incarcerated

22   leading up to now being incarcerated?

23   When were you first picked up for this

24   stint?


MAGNA
LEGAL SERVICES

Page 108

```
 1          A.     On this bid right now or

 2    prior offense?

 3          Q.     Yes.  This one.

 4          A.     This stint right now, I was

 5    arrested May of this year.

 6          Q.     Okay.  And you've been

 7    incarcerated that whole time?

 8          A.     Yes.

 9          Q.     Have you had any access to

10    social media or anything like that while

11    you've been incarcerated since May?

12          A.     Not in here, no.

13          Q.     Okay.

14          A.     My fiancee has my Facebook

15    and stuff, and I've had, like, her put my

16    pictures of my daughters and stuff on

17    there, but other than that, no.

18          Q.     Okay.  But you haven't had

19    access, not like one of those jails where

20    you get an iPad and you get Facebook

21    access?

22          A.     No.

23          Q.     Okay.  And so you're now at

24    SCI Somerset?
```



Page 109

```
 1          A.    Yes.

 2          Q.    Have you been in one place

 3   long enough to be able to start any

 4   programming or anything yet?

 5          A.    Yes.  I started my

 6   programming yesterday, I started.

 7          Q.    Before you were at SCI

 8   Somerset at any of the other state

 9   prisons you were at, were you in any of

10   them long enough to do any programming?

11          A.    No.  They were only

12   classification prisons.

13          MS. FRANCHI:  Okay.  All

14          right.  I'm going to ask for three

15          minutes to just take a look at my

16          notes, and then I don't think there

17          is much more that I have, but I

18          just want to take a look.  I've

19          been having issues with my

20          keyboard, and I -- when I type

21          things, all the sudden a letter

22          will just go cross the whole page.

23          So I just need to go back and take

24          a look and after that I won't have
```



Page 110

```
 1          much more, and then if Jocelyn has

 2          other questions, and then we can

 3          wrap it up.

 4                    -  -  -

 5                    (Whereupon, a brief recess

 6          was taken.)

 7                    -  -  -

 8     BY MS. FRANCHI:

 9          Q.    Tell me a little bit about

10     the incident.  You were explaining about

11     the child that was running and what

12     happened with the truck.  I know we kind

13     of glossed over it a little bit, but I

14     was hoping you could tell me a little bit

15     more about it.

16          A.    I don't remember what the

17     consequences were for that he received,

18     but we were eating lunch while it was

19     taking place.  And they made him run,

20     like, around the complete driveway, all

21     the way around.  Like, I don't know how

22     many laps, 20 laps, whatever it was, and

23     they followed him in the truck, and I

24     just basically -- I voiced my displeasure
```


MAGNA ▶
LEGAL SERVICES

Page 111

1  with how they were treating him.  They

2  were following him very close behind in

3  the truck.  Nobody was -- was out with

4  him.  It's just him running and the other

5  two were in the truck following him.

6          Q.    Was this like a leisurely jog

7  with the truck following him or was he

8  running because the truck was basically

9  making him run faster?

10         A.    I can't say for sure, but I

11 know that from seeing what I seen and

12 if -- if I was in his shoes, I'd have

13 been running because of the truck

14 following me.

15         Q.    Okay.  You weren't the one

16 who was out there running though.

17               Correct?

18         A.    No.

19         Q.    Do you remember who was in

20 the truck?

21         A.    Ethan and I believe Chris

22 Eversole.

23         Q.    So I guess to kind of wrap

24 this up and I guess after leaving Liberty



Page 112

1   Ridge and just kind of seeing how your

2   life has unfolded since then, I guess

3   kind of in your words, how do you think

4   that your experience there has affected

5   you?

6        A.   I would say, unfortunately,

7   Liberty Ridge destroyed me as an adult --

8   as becoming an adult.  And it gave me a

9   lot of hate and a lot of anger towards a

10  lot of different people and -- and led

11  over to outside of the Mennonites, and it

12  just got me into a lot of -- lot of

13  trouble and I would say destroyed me as a

14  whole.

15       Q.   Have you ever been able to

16  hold a job for any extended period of

17  time since you left Liberty Ridge?

18       A.   No, not at all.

19       Q.   Do you really have any job

20  experience or job skills other than what

21  you were saying about stacking pallets

22  and things like that?

23       A.   No.

24            MS. FRANCHI:  I think those



Page 113

```
 1           are all the questions that I have.

 2           I think I'm done.  That was longer

 3           than I intended.  I apologize.

 4                MS. MENDEZ:  All good.  Just

 5           a couple quick follow-up questions

 6           from me.  I think just one or two.

 7                     -  -  -

 8                EXAMINATION

 9                     -  -  -

10   BY MS. MENDEZ:

11        Q.   David, I want to go back to

12   the time that you were restrained in

13   response to attempting to strike Ethan

14   with a tool.  I think you mentioned it

15   was some sort of tool.

16        A.   Yes.

17        Q.   Can you think of any time

18   where you used your fists to hit Ethan?

19        A.   No.

20        Q.   How about any other person at

21   Liberty Ridge?

22        A.   One other person was my

23   mentor.  I believe it was Brenden Hoover

24   and Austin Martin were there.
```



MAGNA
LEGAL SERVICES

Page 114

1          Q.     And you -- did you hit them?

2          A.     Yeah, I hit him in his chest.

3    I remember one other time towards Ethan.

4    I was downstairs in the basement, and he

5    was approaching me.  And I don't know

6    why, but some -- sometimes fear was

7    inside of me about him approaching me and

8    I got a chair, and I told him I was going

9    to throw it at him if he came any closer.

10   Other than that, no, nothing else.

11         Q.     Okay.  Do you recall ever

12   spitting on a mentor or Ethan?

13         A.     Yeah, a couple times.

14         Q.     Going to go back a little

15   bit.  Just a couple more questions here.

16               Thinking back to your time

17   before you became a resident at Liberty

18   Ridge, were you angry or violent as a

19   child?

20         A.     Yes, in a way.

21         Q.     Had you ever been violent

22   with your dad?

23         A.     Yes, but -- I mean, yeah, as

24   a child, yes, but I was disciplined for



Page 115

1   it.

2       Q.    Okay.  And one more time, can

3   you just talk to me about what that

4   discipline was?

5       A.    I remember he held me down

6   and beat me with his belt.  Other than

7   that, corporal punishment.

8       Q.    What sorts of things -- as a

9   child, what sorts of things would you do

10  that would lead to the corporal

11  punishment?

12      A.    Just doing exact opposite of

13  what I was told to do.

14      Q.    Were you ever violent with

15  any of your siblings?

16      A.    We fought and like siblings

17  do but, like, I don't know.

18      Q.    And while you were at your

19  parents' house before -- I guess before

20  your uncle's house and then before

21  Liberty Ridge, so while you were still

22  with your parents, what chores did you

23  have to complete while you were there?

24      A.    While I was at my parents'



1   house?

2         Q.     At your parents' house, yes.

3         A.     Take the slop out at the end

4   of the day.  We had a couple horses and a

5   couple chickens growing up.  Help feed

6   the animals; help pull weed in the --

7   pull weeds in the garden.  Stuff like

8   that.  Mow the lawn.  Stuff like that.

9         Q.     Did you -- were you ever

10  punished if you didn't perform your

11  chores at home?

12        A.     Yeah.

13        Q.     And were those punishments

14  the -- some of the same things that you

15  mentioned earlier?

16        A.     Yes.

17        Q.     Including the corporal

18  punishment?

19        A.     Yes.

20              MS. MENDEZ:  Okay.  All

21        right.  David, that's all I have

22        for you.

23              THE WITNESS:  All right.

24        Thank you.



Page 117

```
 1              MS. MENDEZ:  Thank you, too.
 2              THE WITNESS:  All righty.
 3              MS. FRANCHI:  I think we're
 4         good.
 5              THE COURT REPORTER:  Great.
 6         Hi, this is the court reporter.  Is
 7         Mr. Cross reading and signing the
 8         transcript or will he be waving?
 9              MS. FRANCHI:  So getting
10         David the transcript will be
11         difficult.  So David, the question
12         is whether you would want to read a
13         copy of the transcript and make
14         sure that everything in it is
15         correct or if you agree that the
16         court reporter would have taken it
17         down correctly and waive your
18         signing.
19              THE WITNESS:  Waive my
20         signing.
21              MS. FRANCHI:  Okay.
22              THE COURT REPORTER:  Great.
23         Thank you.  And just transcript
24         orders from counsels.
```



Page 118

```
1              MS. FRANCHI:  Yes.  And --
2              MS. MENDEZ:  Ordering.
3              MS. FRANCHI:  Yes.  And I
4       only need an electronic copy.
5              THE COURT REPORTER:  Okay.
6       Is the regular -- same?  Okay.  Is
7       the regular delivery okay, 8 to 10
8       days?
9              MS. FRANCHI:  Yes.
10             MS. MENDEZ:  Works for me.
11                  -   -   -
12             (Whereupon, the Witness was
13        excused.)
14                  -   -   -
15             (Whereupon, the deposition
16        concluded at approximately 10:47
17        a.m.)
18                  -   -   -
19
20
21
22
23
24
```



Page 119

1                         CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5     Witness was duly sworn by me and that

6     the deposition is a true record of the

7     testimony given by the Witness.

8

9

10

      __*Danijela Ivanovic*_____

11    DANIJELA IVANOVIC,

      Court Reporter and Notary Public

12    Date:  December 20, 2022

13

14

15

16

17              (The foregoing certification

18    of this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24



Page 120

```
 1                      LAWYER'S NOTES

 2    PAGE    LINE

 3    _____  _____  _____

 4    _____  _____  _____

 5    _____  _____  _____

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____
```



## A

**ability**
9:5,11
**able**
6:17 38:22 39:18
46:5,21 49:9,10
51:1 66:20 68:3,4
79:16 80:6 94:18
109:3 112:15
**absconding**
17:12
**absence**
58:4 59:16
**absolutely**
106:21
**abuse**
18:5 81:21 82:15,15
**access**
60:18 107:18 108:9
108:19,21
**account**
63:23 71:20,22 73:7
73:8,10 77:12,14,17
**accountable**
63:5
**accounts**
63:15 64:2,8
**actions**
44:20
**activities**
37:13 39:9
**actual**
86:7,9
**add**
41:13 95:23 107:5,11
**added**
41:10
**adding**
91:7
**address**
13:8,13
**ADHD**
81:7 83:8
**admitting**
5:11

**adopted**
12:5,21 14:15 15:1,8
82:4
**adoption**
14:16
**adoptive**
15:6 23:5,6 40:12
56:11,13
**adult**
112:7,8
**advance**
5:10
**afraid**
45:16 105:19,23
**age**
12:21 37:9
**agency**
21:14 77:4
**ago**
23:3 39:17 59:14
63:20
**agree**
20:8 117:15
**agreed**
24:5 74:1
**agreement**
4:22 72:2 86:12
**al**
1:8
**alcohol**
10:1
**allegations**
42:15 43:16 62:18,22
**allowed**
34:8 60:20 91:12,14
96:6 99:12
**altogether**
38:16
**amended**
20:6
**ANDREOZZI**
2:3
**and/or**
119:20
**anger**
112:9

**angry**
46:24 102:11 114:18
**animals**
36:11 86:4 116:6
**Anna**
53:11
**answer**
6:9,23 7:19 8:10,12
9:21 61:15 66:14
89:2
**answering**
7:5,17
**answers**
7:6
**anticipate**
9:16
**anxiety**
81:7 83:8
**anybody**
18:19 19:1 23:17
30:17 50:1 55:11
57:24 63:8 68:7
85:15 96:11
**apartment**
13:10 72:19
**apologize**
56:2 113:3
**APPEARANCES**
2:1
**appears**
19:16
**apply**
4:24 51:9 119:18
**appraised**
98:24
**approaching**
114:5,7
**approximate**
95:10
**approximately**
16:20 18:12 33:19
69:21 118:16
**April**
43:21
**area**
14:8,9 31:5,5 38:1

97:5
**areas**
97:24
**arrest**
17:6,7
**arrested**
16:22 17:8,10 108:5
**arrived**
40:18
**aside**
17:22 83:13
**asked**
31:11,12 66:1,12,20
85:7 107:17
**asking**
6:8
**asleep**
42:10 85:5 92:18
95:21
**aspect**
35:24
**assume**
6:24
**ate**
32:16
**attempting**
113:13
**attend**
59:16
**attention**
42:9
**attorney**
4:20 8:11 11:15 21:2
21:3 43:11 79:7
**August**
18:14
**aunt**
23:9,10 24:2 25:21
26:1,14 27:19 28:8
**Austin**
96:14 113:24
**automatic**
74:19
**Avoid**
7:4,6
**aware**



30:20 31:13,16,17
31:18,22 60:3
104:13
**a.m**
1:15 118:17

_____

**B**

_____

**B**
3:12
**back**
13:16 14:4,6 25:15
27:14 31:10 32:13
39:16 40:11 44:18
53:11 57:6 58:12
60:20 61:3,20 62:5
65:6 67:24 68:3,5
70:10,23 72:1,20
74:5 75:12 76:4,12
78:10,14 79:15 80:6
91:11 92:9,12,23
93:10 94:4,21 98:13
98:20 109:23
113:11 114:14,16
**background**
8:17 11:23 21:17
22:18 26:17,21 81:2
81:20 82:11,14
**backside**
86:23 93:7
**Backtalking**
41:24
**backtrack**
71:4
**bad**
84:10
**bakery**
75:21 76:3,16,21
**bank**
71:20,22 77:12,13,17
**baptized**
27:12
**barn**
86:20
**barns**
36:8
**based**

34:9
**basement**
114:4
**basic**
51:15 58:19 66:16
**basically**
67:1 87:3 99:10
110:24 111:8
**basis**
48:2
**basketball**
37:23 38:1
**Bates**
5:14 12:14,15 14:22
14:23
**bathroom**
106:12
**beans**
40:3
**bear**
19:9
**beat**
115:6
**becoming**
27:15 112:8
**bedroom**
70:4
**beginning**
93:16
**behave**
90:15
**behavior**
34:9,10 38:11 41:22
91:1 106:4
**behaviors**
106:6
**believe**
17:17 20:2,3 28:14
28:23 29:16 30:18
34:7 39:6,11 40:19
47:17 49:1 50:22,22
51:16 52:13,24 53:5
54:10 55:17 62:20
63:24 64:15 65:23
67:5 70:2 71:11,23
77:24 78:1 83:9

84:5 85:1 88:11
91:24 98:5 99:16
111:21 113:23
**believes**
27:8
**belt**
115:6
**benefit**
51:16
**bent**
98:15
**best**
9:19 34:11 36:16
82:5
**better**
71:2
**Bible**
38:18,19 41:16 52:12
90:14
**bid**
108:1
**big**
36:15 39:23
**Bill**
15:4,5 23:7
**biological**
74:6 75:11
**birth**
56:12
**birthdate**
12:16
**bit**
14:1 16:14 24:19
27:4 28:23 35:24
40:9,14 43:8 44:19
51:20 52:8 56:2,23
58:13 60:23 61:14
63:13 65:6,8 69:16
70:23 71:4 77:19
79:12 80:22,24 81:2
81:17 82:2,10,20
85:17 86:2 89:11
91:18 93:2 94:3
103:1,6 104:10,17
106:1,22 110:9,13
110:14 114:15

**black**
19:17
**blocked**
67:19 68:5
**blocking**
67:10
**blocks**
87:16
**blowing**
88:13
**board**
48:5 55:8,9 62:19
**books**
77:3,7
**born**
12:18
**borrowed**
67:9,18
**bothering**
64:8
**box**
76:19
**boys**
49:5,23 91:14
**break**
7:13,14,16,20,24 8:2
44:3 62:7 79:12
**breakfast**
32:17
**breaks**
7:13
**Brenden**
113:23
**Bridgeton**
12:19
**brief**
6:11 44:14 69:10
80:10 110:5
**briefly**
5:24 86:5
**bring**
29:5 59:18 61:3,20
92:12 107:9
**bringing**
32:24
**brother**



**brought**
24:1 47:22 86:19
  87:6,7,17 90:6,22
  92:9
**brush**
59:13 71:15
**brush-grinding**
59:12
**bucket**
40:24 41:5,13
**buckets**
41:14
**build**
33:1,8 86:24 87:1
  100:9
**building**
74:18 87:2,7 88:14
**bunch**
86:22 90:13
**Burkholder**
14:3 28:13 57:2
  60:24 61:17 70:21
  73:15
**Burkholder's**
73:20
**business**
58:24
**businesses**
57:16 88:21
**butcher**
74:11

———————
**C**
**call**
8:3 33:23 34:8 43:15
  59:19,20 74:19 81:1
  102:21
**called**
34:7,19 59:17
**calls**
105:2
**camera**
69:4
**capabilities**
19:5
**care**

102:18
**Carlisle**
31:5
**case**
17:14
**cases**
17:10,20
**cash**
38:11 72:11 77:15
  79:3
**cashing**
77:11,15
**caught**
33:12
**cause**
9:22,23 20:19 25:6
  37:9 64:7 67:23
  85:5 92:5 100:10
**cellar**
97:13
**center**
102:14
**certain**
38:21 66:8 74:23
  103:9 107:5
**certainly**
7:15
**CERTIFICATE**
119:1
**certification**
78:3 119:17
**certifications**
22:6
**CERTIFY**
119:4
**certifying**
119:21
**chair**
25:17 114:8
**Chambersburg**
31:5 88:5
**chapters**
38:19
**charge**
21:12
**charged**

17:24
**check**
48:3,4 77:14 79:1,2,3
**checking**
76:13
**chest**
114:2
**chicken**
87:13 89:7
**chickens**
32:7,11,12 36:2,3,7
  37:3 88:6 89:5
  116:5
**child**
16:2 24:21,24 25:7
  27:12 51:4,5,7 56:9
  81:23,24 82:3,22
  110:11 114:19,24
  115:9
**childhood**
25:24 82:14 84:6
**children**
15:24 25:8,9 53:10
  70:3 91:13
**Children-like**
25:8
**Chloe**
16:6,7
**chores**
37:12 115:22 116:11
**Chris**
28:13 111:21
**Christians**
27:1
**Christmas**
16:9
**chunks**
90:5
**church**
27:20 42:2,4,6,10,10
  57:2,9
**circle**
31:10
**classes**
78:3
**classification**

109:12
**clean**
36:8
**clear**
62:21 67:17 107:20
**close**
65:12 111:2
**closed**
92:8
**closer**
114:9
**coal**
59:1,1 71:16
**come**
32:13 34:24 48:3,5,6
  59:24 74:22 76:11
  76:14 80:5 94:18
  98:23
**coming**
45:18 49:21 52:4
  53:11 65:15 84:7
**commencing**
1:15
**comment**
65:3,4
**comments**
62:6 64:13 84:21
**commercial**
59:8 71:14
**COMMON**
1:1
**Commonwealth**
1:18
**communicated**
104:22
**communication**
105:1
**communications**
105:15,18
**companies**
89:7
**company**
59:6,12 71:16 73:20
  86:13 89:4,6,8
**complaint**
20:6,7 21:10,13



42:16
**complete**
32:3 110:20 115:23
**completing**
29:15
**concluded**
118:16
**concrete**
87:12
**conditions**
9:8
**consequence**
42:21 45:14 95:6
96:23 99:13
**consequences**
44:21 85:21 89:12,13
90:1 91:8,16,18
97:17 104:2 105:22
105:24 107:4,6,11
110:17
**construction**
35:20
**contact**
43:10 55:15 60:1,17
62:2 65:22 66:21
72:24
**continue**
9:15 84:1 102:4
**control**
119:20
**conversation**
6:4,10 9:16
**Cool**
5:4
**coop**
87:14
**copy**
20:11 117:13 118:4
**corn**
40:2
**corner**
25:16
**corporal**
56:15 115:7,10
116:17
**correct**

51:6 53:20 75:13
111:17 117:15
**correctly**
117:17
**counsel**
4:23 5:9 8:7 107:17
**counsels**
117:24
**COUNTY**
1:1
**couple**
20:22 33:19,24 36:9
36:10,11 37:17 38:4
39:7 40:3 41:9 42:2
45:2 47:9 57:4,16
59:7 63:24 66:2,17
66:21 68:14 70:3
95:2 96:3 98:10,17
100:6 103:14 113:5
114:13,15 116:4,5
**course**
7:11 19:7 63:6
**court**
1:1,17 4:6,10 6:12
9:18 61:12 117:5,6
117:16,22 118:5
119:11
**cousin**
31:6 55:15,20 65:9
65:15
**covered**
69:7
**cows**
31:6
**Co-Counsel**
2:12
**co-owner**
73:16
**crawl**
95:3
**crawled**
94:4
**cream**
38:3
**created**
5:14 40:20 41:22

**crime**
18:1
**crisis**
102:13
**crops**
36:13 48:8
**cross**
1:14 3:5 4:2,9 12:2
15:4,5 64:3 109:22
117:7
**crowd**
74:19
**cruel**
49:18
**crush**
41:3
**crushing**
41:12 89:18
**cup**
90:23 96:4,8
**current**
18:24
**currently**
8:24 9:3 10:9 13:1,6
15:12 26:20 77:16
**curriculum**
103:21
**cut**
35:5 61:7 66:12 68:2
74:17,23 76:8 86:22
90:4 100:10
**Cute**
16:7
**cutting**
40:6

———————————
**D**
———————————
**D**
3:2
**dad**
28:3 114:22
**daily**
46:13,15
**dairy**
31:4 35:16 74:20
**Danijela**

1:16 119:11
**Darrell**
98:5
**date**
1:16 7:10 119:12
**dated**
46:19
**daughter**
16:3,4,10
**daughters**
97:20 108:16
**David**
1:13 3:5 4:2,15 5:24
8:18 10:8 11:24
12:2,13,15 13:1
14:15 15:11 16:16
19:7,21 20:24 21:18
24:20 25:20 27:11
29:11 30:20 32:1
37:12 44:18 46:9
48:17 50:18 52:22
54:8,15 56:1 61:9
63:14 64:3 68:7
69:13 77:20 79:5
80:1,16 113:11
116:21 117:10,11
**day**
16:9 32:2,4,20 34:5
36:7 46:16,20 48:10
48:12 53:2 85:20
90:24 101:10
103:18,19 116:4
**days**
38:7 61:24 77:1
95:14 96:2 118:8
**daytime**
31:7 103:9
**day-to-day**
48:1
**dead**
32:12
**dealing**
91:15
**Debbie**
28:13
**December**



1:11 119:12
**decided**
26:13 43:18 55:5
**deep**
93:15,17,21 95:3
**defected**
76:15
**defects**
76:7
**Defendant**
1:8 2:10
**defendants**
6:3
**definitely**
48:11 63:2 107:16
**delay**
82:20
**delivery**
118:7
**Delsea**
13:9
**depended**
32:8
**deposed**
8:19
**deposition**
1:13 4:15 5:10 6:7
    7:12 9:18 10:10,13
    118:15 119:6
**depositions**
4:17,20
**Deposition-36**
54:3
**depression**
81:7 83:8
**describe**
23:21 71:2
**DESCRIPTION**
3:14
**designated**
59:24
**destroyed**
112:7,13
**devotional**
32:14,15
**devotionals**

42:1
**diagnosed**
83:10
**diagnoses**
81:5 83:7
**different**
6:22 20:15 27:9
    28:18 66:21 99:5
    112:10
**difficult**
117:11
**dig**
40:19 41:7,8 90:12
    90:21 91:4,11,22
    92:16,19 93:22
    94:11 97:6,14,23
    98:1 100:11
**digging**
45:18 89:17,18 90:19
    92:18 93:2 94:2,22
    95:11,18,21,23 96:2
    97:3,3,10 101:17,18
**dinner**
24:1,10 25:21 26:4
**direct**
21:3 119:20
**directed**
43:4
**direction**
85:14
**dirt**
100:21
**dirty**
76:11
**disassemble**
87:9
**discipline**
40:10,14 41:23 42:16
    56:8 115:4
**disciplined**
25:11 114:24
**discontinued**
47:14 84:11
**discouraged**
50:5
**discovery**

5:7,13 11:9 20:3 34:2
    104:19
**discussed**
18:2 43:10 92:14
**disobeyed**
40:23
**disobeying**
25:3
**disorder**
83:11,12
**displeasure**
110:24
**divorce**
15:15,21
**Divorced**
15:13,14
**doctor**
83:17 85:15
**document**
19:22 29:5,11,24
    46:1,9 48:14 50:10
    50:18,21 54:8
**documents**
5:7 10:17 11:12 19:6
**doing**
31:3 33:6 37:1 41:17
    41:17 45:13 63:2
    64:23 71:13 76:1
    78:19 86:10 91:19
    92:4 96:12 99:13
    106:14 115:12
**domestic**
17:9,19,19
**domestics**
17:17
**door**
106:12
**doors**
92:8
**downstairs**
38:16 42:6 114:4
**Dr**
46:23 47:4,5 81:15
    83:22 84:16
**drain**
41:8 90:19 91:20,22

92:24 93:3,12,14,23
    101:18
**drains**
89:19
**drill**
34:23
**drilled**
41:2
**drive**
13:9 37:17
**driver's**
13:2,3
**driveway**
110:20
**drop**
86:16
**dropped**
18:9,10
**drove**
37:18
**drugs**
10:2
**due**
106:18
**dug**
94:3
**DUI**
17:10
**duly**
4:3 119:5
**duration**
84:15
**D-Cross**
54:2
**D-Cross-Depositio...**
19:19
**D-Cross-Depositio...**
29:8
**D-Cross-Depositio...**
46:4
**D-Cross-Depositio...**
48:15
**D-Cross-Depositio...**
50:12
**D-Cross-Depositio...**
52:19



**D.C/J.D.M**
1:3

E

**E**
3:2,12
**earlier**
59:14 62:6 116:15
**early**
32:9 38:7
**earn**
38:10
**eat**
39:18
**eating**
70:6 110:18
**Edelstein**
2:7 6:2
**education**
22:1
**Edward**
12:2
**effect**
28:19
**egging**
90:10
**eight**
4:17 17:1 76:24
**either**
17:11 61:1 96:24
99:6 102:10
**electronic**
5:6 118:4
**employment**
78:8
**ended**
67:10 71:24 72:1
84:10 92:18
**English**
53:12,18
**enjoy**
53:15
**enjoyed**
53:19
**enrolled**
24:11 27:15

**entering**
29:15
**entire**
84:1
**equipment**
35:13
**era**
62:13
**Erie**
97:19
**ESQUIRE**
2:3,7
**estimate**
16:19
**Et**
1:8
**Ethan**
23:17,19 25:22 27:21
28:14 32:10 33:13
33:15 38:4,18 45:17
47:17 49:16 50:23
51:14 52:2,8 55:8
57:21 62:19 63:1
68:14 85:1 88:4
93:9 96:13 101:19
102:12 105:7,7
111:21 113:13,18
114:3,12
**Ethan's**
39:21 97:19 98:6
**evaluations**
83:17
**eventually**
72:12,14 91:6 106:11
**Eversole**
28:14 111:22
**everybody**
19:12 61:11
**everyone's**
5:15 29:6 46:2
**exact**
16:19 43:14,22 55:1
95:7 115:12
**exactly**
45:6 92:24 93:15
**EXAMINATION**

5:20 80:13 113:8
**examined**
4:3
**excuse**
70:9
**excused**
118:13
**exhibit**
52:18
**exhibits**
5:12
**expect**
37:8
**experience**
22:22 35:19 112:4,20
**experienced**
56:9
**experiencing**
9:7
**explain**
93:1 99:8
**explaining**
110:10
**explicitly**
8:11
**exposure**
35:20
**extended**
112:16
**extent**
94:17
**extracurricular**
39:9
**ex-wife**
18:16

F

**fabricating**
74:13,14
**face**
98:21 99:19 100:15
**Facebook**
63:16,17,22 64:2,13
65:5 68:21 107:19
108:14,20
**facility**

87:18 90:11 92:21
**fact**
33:21
**factory**
75:20,21,22 76:1
78:11,16
**faint**
50:17 51:21
**fair**
7:2 8:13,14 54:12
**fairly**
93:17
**falling**
42:10 92:18
**familiar**
29:12 52:21
**family**
14:4 24:1 25:21
43:15 57:1,2,7,13
60:23,24 61:4,18
64:9 70:7,21,24
72:21 73:21 74:6
75:11
**family's**
78:12
**far**
30:15 39:8 45:22
66:18 84:10 87:3
**farm**
1:7 31:4 35:16 37:11
47:24 54:16 56:24
71:15
**farming**
35:24 86:3
**farms**
59:8 74:20
**fastened**
35:2
**faster**
111:9
**fear**
114:6
**feed**
31:8,8 36:12 116:5
**feeders**
36:5



**feel**
106:17
**feeling**
100:24
**feet**
94:12 95:2 98:12,15
  101:4
**fell**
85:5 95:20
**fellow**
57:9
**felt**
45:16,16 63:4 106:24
**female**
42:4
**fence**
40:20
**fences**
34:14
**fiancee**
108:14
**fiberglass**
41:1
**figure**
75:9
**file**
21:3 62:16 104:12
**filed**
20:7 21:12
**fill**
32:19 41:5
**filled**
29:16,18 30:6,6,11
**final**
15:16
**find**
107:10
**fine**
8:1,5,9 16:17 44:6
  51:24
**finished**
9:20
**firewood**
41:19
**firm**
6:1

**first**
7:20 8:21 22:24 32:6
  33:4,10 35:9,18,19
  37:20 40:17 42:17
  42:20 43:10 49:2
  56:22 61:8,14,23
  70:13 71:9 80:21
  94:22 106:6 107:23
**fists**
113:18
**fit**
41:5
**five**
12:22 15:23
**five-gallon**
40:24
**flow**
6:9
**focus**
91:20
**followed**
89:23 110:23
**following**
32:16 111:2,5,7,14
**follows**
4:4
**follow-up**
80:17 113:5
**food**
39:18,21 86:9 96:1
**foods**
40:1
**FOOTE**
2:3
**foregoing**
119:17
**forget**
64:16
**form**
8:8 88:2 89:1
**forth**
13:16
**forward**
98:15
**fought**
115:16

**found**
64:15
**four**
33:20 76:24
**fourth**
53:4
**Franchi**
2:3 3:7 4:20 5:1,17
  19:14 44:6,12 61:6
  79:10,21 80:15 88:8
  89:2,9 109:13 110:8
  112:24 117:3,9,21
  118:1,3,9
**French**
41:8 89:19 90:19
  91:20,22 92:24 93:3
  101:18
**friends**
67:3 68:20
**Front**
2:4
**full**
11:24
**fully**
4:13 9:20
**fun**
24:3
**funeral**
58:3 59:4,16 60:2
**furlough**
59:23
**fuzzy**
66:11

———————————
**G**
———————————
**Garcia**
64:4,5
**garden**
36:18,20,24 39:16
  86:4,8 116:7
**gardening**
36:18 37:2
**gate**
32:22 89:3,6
**gates**
33:2,9 34:23 35:5,7,9

74:20 100:9
**gears**
16:14 24:18 27:14
  43:8 63:12 77:19
  89:11 102:24
**GED**
21:22
**general**
8:16
**generally**
17:5 81:1 82:8
**genius**
75:8
**getting**
63:9 77:8 91:1
  106:13 117:9
**give**
16:18 48:16 50:24
  54:24 59:8 72:11,22
**given**
58:4 59:15 119:7
**gives**
53:13
**glass**
78:11,15,20
**Glenn**
28:12
**glossed**
110:13
**go**
17:4 24:4 31:7 32:10
  34:22 36:3,4,12,23
  43:18 44:8,11,18
  47:4,15 51:9 54:2
  59:1,12 60:20 62:5
  65:6 70:10 71:22
  75:17 76:3,4,5
  78:10,13 79:16
  80:20 90:9 91:9,10
  92:3,23 103:10,17
  109:22,23 113:11
  114:14
**goals**
46:20
**gods**
27:9



**goes**
45:23
**going**
6:7,24 9:17 16:13
  19:3,16 20:24 21:7
  22:19 26:9 28:1
  29:4 32:7 33:4,18
  37:20 42:2,14 44:7
  45:24 47:9 48:13
  50:3,9 52:16 53:5,9
  54:2,13 57:14 60:2
  63:12 67:2 69:2
  70:9,9 72:1,8 79:11
  79:22 80:4,23,24
  81:3 83:1,2,14 91:3
  91:4 92:3,7 94:12
  95:2 97:12 98:1
  99:3 101:7 105:11
  109:14 114:8,14
**good**
26:9 38:11 53:6,9
  79:20 81:8 113:4
  117:4
**gosh**
94:8
**gotten**
66:24 75:21,22 101:3
**governmental**
21:13
**grab**
45:11 80:5
**grabbed**
99:16 101:19
**grade**
22:2
**graduate**
21:18
**Graham**
96:15
**grass**
100:21
**Great**
4:12 5:4 7:4 8:15
  10:4,8 11:5,10
  15:11 20:23 21:8,16
  117:5,22

**grew**
26:23 39:19
**grinding**
59:13 71:15
**gripped**
99:17
**ground**
93:5 98:21 99:19
  100:19,20 101:20
**group**
42:1 72:16
**growing**
24:20 40:5 116:5
**guess**
26:11 59:23 61:20
  73:24 74:19 82:4
  84:7 86:11 89:15
  91:19 111:23,24
  112:2 115:19
**gun**
34:21
**guy**
96:13,14
**guys**
49:17 80:3

———————————————

**H**

**H**
3:12
**halfway**
28:8
**hammer**
39:7
**hand**
45:19
**hands**
58:20 98:13,14,20
  100:24 101:2,4
**happen**
95:20 99:3 105:13,20
**happened**
91:23 99:15 110:12
**happening**
96:17
**hard**
7:8,8 9:22 46:18 51:9

  87:3
**Harrisburg**
2:4
**harvest**
40:1 48:7
**harvested**
39:20 48:7
**hate**
112:9
**head**
6:17,18 94:19
**health**
81:1 102:7 106:19
  107:14
**heard**
62:12,15,17
**held**
1:14 13:3 63:4 98:13
  98:14 115:5
**help**
30:17 31:6 33:1,8,13
  33:15 36:21 59:8,9
  59:13 74:12,24
  86:16 87:9,20 88:6
  93:24 116:5,6
**helped**
36:21 56:21,23 57:3
  59:6 74:11 88:11
  89:4
**helping**
30:16,16 52:2
**Hi**
117:6
**high**
21:19
**highest**
21:24
**highlights**
47:2
**hill**
97:9,10
**history**
22:18 52:14 102:7
**hit**
113:18 114:1,2
**hitting**

45:11
**hog**
59:7,8 71:14
**hold**
13:1 112:16
**hole**
41:5 89:17 92:19
  93:4,15,16,21 94:1
  95:1 97:3
**holes**
34:23 40:19 41:2
  97:24
**home**
26:10 27:20 39:15
  42:12 61:3,21 82:5
  116:11
**homework**
103:16
**honestly**
54:24 60:10 107:9
**Hoover**
68:8 113:23
**hopefully**
80:6
**hoping**
110:14
**horses**
116:4
**hospital**
102:14
**hour**
71:17 102:2
**hours**
76:22 90:22 94:5
  95:9,11 98:18 100:6
  101:8,8 103:14,15
**house**
28:12 70:1 73:23
  93:8,8,14 94:21
  105:8 115:19,20
  116:1,2
**housed**
93:8
**human**
9:23
**husband**



97:21

**I**

**ice**
38:3
**illegal**
10:1
**Illinois**
72:17 73:4 74:3,8,9
75:10,16
**imagine**
80:19
**important**
6:13
**incarcerated**
13:6 49:1 55:14
58:10 77:21 78:4
83:10 107:21,22
108:7,11
**incarceration**
13:7 49:2 78:7
**incident**
110:10
**incidents**
17:6 99:5 102:19,22
**including**
85:20 86:7 116:17
**Independence**
2:8
**individual**
28:24 86:22 89:22
103:11
**influence**
10:1
**inhibit**
9:4,11
**initiate**
20:7
**inside**
32:13 114:7
**Instagram**
63:19
**instigated**
106:20
**insulation**
88:14

**intended**
113:3
**interact**
36:14
**interested**
42:4
**interrogatories**
11:1
**interrupt**
61:7 82:19
**introduced**
5:23 23:8
**inventory**
46:13,16
**involved**
67:1
**iPad**
108:20
**iron**
45:19 101:19
**issued**
18:6
**issues**
25:6 62:24 102:7
109:19
**it'll**
80:19
**Ivanovic**
1:16 119:11

**J**

**J**
2:13
**jail**
49:19,21 50:4 58:2,5
**jails**
108:19
**Jersey**
12:19 13:10,11,13,17
14:6 16:11 74:6,8
75:12,17,19 78:11
**jmendez@margoli...**
2:9
**Joanne**
15:4,5 23:7
**job**

36:12 70:13 71:9
74:23 75:6,18,20,21
75:22 112:16,19,20
**jobs**
22:11 56:18 58:13,17
70:10 74:10 78:7
**Jocelyn**
2:7 6:1 80:19 86:1
104:10 110:1
**jog**
111:6
**joining**
62:9
**Jones's**
86:13
**journal**
32:18
**journals**
106:6
**judge**
59:22
**jumbled**
61:14
**jump**
4:13
**juvenile**
17:7,14

**K**

**keep**
49:21 55:11 57:20
95:23
**keeping**
106:5
**kept**
41:12 98:16 105:10
**keyboard**
109:20
**kicked**
55:1
**kid**
55:17
**kids**
87:11
**kind**
27:9 34:20 35:21

78:18 80:17,20 82:8
82:9 83:1 106:7
107:1 110:12
111:23 112:1,3
**knew**
50:2 57:11 60:11,14
62:24 73:24 92:6
**know**
6:16,21 8:2 13:5
16:19 20:19 23:2
24:5 25:4,4,9,9,20
26:7,15 27:5 30:4,6
31:1 33:21 34:4
35:15 36:19 40:8
45:14 46:17 48:17
49:18 50:7,16 52:7
54:3,11 56:7 57:17
60:11,13 61:10,12
64:17,20,22 65:7,14
68:7,9,10,11 70:11
71:1 73:6,15 75:5
77:20 79:13,14,16
79:18 82:10 83:6,21
85:15 86:1,5 91:9
92:24 94:5 95:8
97:11 98:4 99:2,2,3
102:6 104:10
105:11,20 110:12
110:21 111:11
114:5 115:17
**knowledge**
18:4
**Kyle**
68:8

**L**

**labor**
86:7 87:4
**Lake**
97:18
**laps**
42:19,21 89:22
110:22,22
**larger**
36:19
**laundry**



32:20,21
**law**
6:1
**lawn**
116:8
**lawsuit**
6:3 11:16 19:1 20:8
21:4 43:11 62:8,9
62:16 63:7,10 64:14
64:18 66:3
**lawyers**
66:24
**LAWYER'S**
120:1
**lay**
98:21
**laying**
100:17
**lead**
83:1 115:10
**leading**
80:22 91:21 107:22
**learn**
51:8
**learned**
62:8 78:2
**leave**
54:23 55:2,3 58:4
59:15 90:11 92:1,20
**leaving**
56:17 65:19 69:19
70:11 111:24
**led**
29:3 44:21 45:7
82:11 92:21 112:10
**left**
13:23 28:22 54:21
55:10 56:22 57:18
58:14 60:6,16 61:24
65:3 90:9 112:17
**legal**
1:23 12:1
**leisurely**
111:6
**Leroy**
57:11 58:21 59:5,21

70:24 71:11,13 73:2
**letter**
34:6 48:24 49:22
50:14 52:1 53:2
55:13 104:11
109:21
**letters**
33:23 34:1 105:9,10
**let's**
8:15 41:11 44:10
49:7 70:12 71:4
85:17 91:19 92:23
107:2
**level**
22:1
**Lib**
66:3
**Liberty**
1:7 13:21,23 14:7
22:21 23:4,16,22
24:1,13 25:12 27:15
28:9,10 29:15 30:7
30:22,24 31:14 32:2
33:16 35:12,18,24
37:15 38:9 40:16
43:12,17 44:19,24
47:10,12 48:1 50:2
51:13 52:4,7 53:22
55:10,22 56:5,17
57:11 58:1,7,8,14
58:23 60:6,12 61:24
62:23 64:13,17
65:10,11,15,19 66:9
66:19 68:13,17
69:19 70:11 71:10
73:23 80:23 81:4,22
82:11 83:14,15,21
84:2,13,19,19,20
85:12,18,21 87:19
88:20 89:14 90:7
92:1 98:9 102:10
103:2 104:12,13,24
105:1,14,18 106:18
111:24 112:7,17
113:21 114:17
115:21

**license**
13:2,3
**licenses**
22:7
**lie**
46:23
**life**
49:24 112:2
**limits**
107:3
**line**
40:20 64:24 74:23
76:6,13 120:2
**lines**
76:3 90:18
**listen**
90:16
**listening**
105:4
**litigation**
11:16 63:7
**little**
14:1 16:14 24:6,19
27:4 28:23 35:23
40:4,9,14 43:8
44:19 46:18 50:16
51:20 52:8 56:23
58:12,22 60:23
61:14 63:13 65:8
70:23 71:4 77:19
80:22,24 81:2,16
82:1,10 85:17 86:2
87:13 89:11 91:17
93:2,4 94:3 99:9
103:1,6 104:9,17
106:1,22 110:9,13
110:14 114:14
**live**
60:21 97:20
**lived**
72:17 73:22 93:9
**lives**
78:13
**living**
13:8,22 16:11 26:1,5
26:8 31:2 70:1

**load**
59:9
**loading**
36:6
**location**
10:9
**log**
90:5
**long**
13:12 15:20 23:3
24:8 54:15 63:20
69:21 72:6 74:2
77:20,20 80:2,20
92:22 94:10,13
100:4 101:24
106:10 109:3,10
**longer**
107:13 113:2
**look**
29:12 32:4 43:18
44:4 52:21 69:5
78:9 80:4 91:4
109:15,18,24
**looked**
24:2 30:13 87:13
**looking**
84:10
**looks**
46:19
**lose**
94:8 100:24
**lot**
7:14 52:12 83:1
112:9,9,10,12,12
**Lowell**
73:17,19
**LRF**
49:12,15,20
**lumber**
86:13,17
**lunch**
38:15 110:18
**Lynden**
96:15
**L-O-W-E-L-L**
73:19



## M

**machine**
35:6 93:11
**machines**
36:15 76:5
**MAGNA**
1:23
**mail**
104:14 105:11
**making**
38:2 100:11 111:9
**Mall**
2:8
**man**
59:3
**manual**
87:4
**March**
43:21 62:13
**Margolis**
2:7 6:2
**marked**
3:16 19:18 29:7 46:3
50:11
**marriage**
18:14
**married**
15:12,21
**Martin**
13:24 23:18,19 32:23
33:10 47:18,21 58:5
88:12 96:14 98:5
113:24
**Mary**
23:12
**math**
51:15 52:3 53:13,18
**mats**
76:2,11
**max**
77:23
**ma'am**
15:7
**meals**
70:6

**mean**
26:23 58:19 65:2
66:6,13 72:13 75:7
82:19 94:5 105:21
114:23
**means**
93:3 119:19
**measure**
35:5
**meat**
75:23 76:17,21
**media**
11:19 63:15,18 67:4
67:7,15,20 68:24
108:10
**medical**
9:8 11:8
**medication**
81:5 84:13,22 85:2,6
85:8 102:8
**medications**
9:4 81:6,18 83:4
**meeting**
24:7
**meetings**
48:6
**Meghan**
2:12
**Mel**
14:2
**Melvin**
23:12 73:15
**member**
43:16 57:9 84:20
**members**
62:19
**memorize**
38:18
**Mendez**
2:7,13 3:6 4:12 5:4
5:22 6:1 19:3,12,15
19:20 21:6,9 29:4
29:10 44:1,10,17
45:24 46:7 48:13,21
50:8,15 52:16,20
53:24 54:6 61:5,22

69:2,13,20 79:5
88:1,24 113:4,10
116:20 117:1 118:2
118:10
**Mennonites**
26:24 64:19 72:17
112:11
**mental**
81:1 102:7 106:19
107:14
**mentioned**
25:20 52:2,8 58:17
59:15 62:14 83:8
86:2 99:7 113:14
116:15
**mentor**
28:13 30:15,18 32:10
32:18 33:13 42:8
45:8,12 103:13
105:6 106:7 113:23
114:12
**mentors**
49:17 51:14 52:2,9
90:17 92:13 106:2,4
**met**
23:24 24:9 25:22
27:20,21 28:8 57:24
74:6
**metal**
74:12,14,17,22,24
**middle**
101:12 104:8
**might've**
47:18,18
**mike**
44:8
**military**
22:14
**milking**
74:20
**mill**
31:8,8
**Miller**
55:14,19 65:8
**mind**
53:7

**mine**
59:1
**mines**
59:1 71:16
**minimum**
77:22
**minutes**
39:17 44:4,11 69:3
79:24 80:3 109:15
**misbehave**
36:22
**misbehaved**
97:22
**misbehaving**
41:12
**mom**
34:6 39:12 53:3
**moment**
9:24 50:24 79:7
**moments**
48:16 59:14
**money**
58:9 63:9 66:1 67:10
67:18 71:21,23 72:2
72:4,10,11,21,23
73:1
**monitor**
106:13
**monitored**
105:1,10
**month**
24:15 38:22 43:14,22
62:13 69:23
**months**
26:6 36:10 47:9
68:16 72:9,9
**mood**
83:11
**moral**
46:13,15
**morning**
32:8
**Mother's**
34:5 53:2
**motor**
56:21 57:3 70:22,22



71:5,7 73:13
**Motors**
73:20
**mountain**
37:18,19
**move**
50:10 55:5 73:11
98:16
**moved**
14:4,6 57:1,6,8 60:23
61:17 70:20 72:3,15
72:16,20 73:3 74:5
74:7
**moving**
11:22 22:19 37:10
70:17,18,23,24
**Mow**
116:8
**muffled**
66:14
**multiple**
63:23
**multi-personality**
83:11
**Myerstown**
73:21 88:13

**N**

**N**
2:4 3:2
**nailer**
34:21
**nails**
34:21
**name**
4:7 5:24 12:1,4,6,8
12:12 14:2 16:5
64:6,10 68:8,9,12
73:14,17 96:14,15
98:6
**named**
23:17
**names**
14:21 20:16 23:11
64:1
**narrow**

93:18,19
**natural**
9:15
**nature**
9:23 25:18 41:20
**necessarily**
75:7 105:17
**need**
7:14,24 8:1,6 28:4
41:22 58:16 79:17
109:23 118:4
**needed**
30:9 32:20 63:4
72:21 93:24 107:2
**negative**
107:9
**neighbors**
92:3
**Nelson**
13:24 23:18,19 47:18
47:21 55:8 56:23
57:18 58:5 59:17,19
60:2,7,8,22 62:1,1
69:17,18,22 70:16
85:4,4,6 88:12
**Nelson's**
57:2 70:17,18
**never**
34:3,3 38:24 93:24
**new**
5:14 12:19 13:10,11
13:13,16 14:6 16:11
74:5,8 75:12,17,19
78:11
**night**
90:21 95:8 96:24
101:13
**nine**
53:14
**nitty-gritty**
16:15
**nods**
6:17
**Noel**
73:18
**Nolan**

32:23 33:10
**normal**
9:15
**North**
13:9
**Notary**
1:17 119:11
**note**
6:11 83:22
**notes**
44:5 69:6 109:16
120:1
**Notice**
1:14
**noticed**
34:1
**notified**
61:2,19
**November**
24:14 27:23
**numb**
101:3,4
**number**
16:20 67:12

**O**

**oath**
8:24
**Objection**
88:1,24
**objections**
8:8
**obviously**
24:5 26:24 36:4,13
66:23 72:22 105:9
**October**
4:18 15:16 24:13
27:22 46:19
**Odin**
27:9
**Odinism**
27:1,2,5
**Odinist**
27:3
**offense**
17:15 108:2

**offenses**
17:23
**offer**
9:21
**officer**
72:23
**off-camera**
44:8
**oh**
26:3 27:24 94:7
107:16
**okay**
5:23 6:19 9:7,14 10:8
10:16 11:3,10,14,18
11:22 12:3,7,11,15
12:23 13:11,18 14:7
14:11,14,14,24 15:3
15:11,14,18,20 16:2
16:10,13 17:3,16,22
18:4,10 19:15,24
20:5,13,18,23 21:8
21:16,24 22:3,9,16
23:10,21 24:8,15
25:19 26:7 29:19
30:2,8,20 31:18,21
31:24 32:13 33:7
34:13 35:11 36:17
37:22 40:8 42:24
43:3,6 44:12 45:24
46:17 47:1,20 48:22
50:8,20 51:22,24
52:16 53:24 54:12
56:14 60:5 61:5,23
63:6 68:4,11 69:8
71:12 73:10 75:15
77:8,16 78:18,22
79:2,5,21 80:2,16
81:10,16 82:7,22,24
83:20 84:18 88:15
88:19 89:10 94:7
95:15 96:22 99:1
104:3 108:6,13,18
108:23 109:13
111:15 114:11
115:2 116:20
117:21 118:5,6,7



old
16:8 54:20 96:16
once
29:17,18 30:7 33:4
    33:11 47:13 55:2
    72:3,15 83:23
online
64:19 74:7
opened
73:8
opposite
115:12
Oral
1:13
order
18:6,19
Ordering
118:2
orders
117:24
organize
86:17
outside
100:13 106:12
    112:11
outwardly
104:22
overnight
96:24 97:14
owned
31:8 58:23 59:5
    71:14,15
owner
73:13

P

PA
2:4,9 13:16 14:8
    73:21
package
76:18
Packaging
78:20
packet
10:20 20:3 34:2
    104:19

pagan
27:7,8
page
3:5,14 5:16 109:22
    120:2
pages
5:13 50:13
paid
31:13 37:4,8 71:6,10
    71:17,19,21 77:2
    78:22,24 86:18
    88:16
painting
35:6
pallet
89:7
palletize
76:20
palletizing
78:21
pallets
112:21
paper
20:14 30:5 90:18
paperwork
10:14,16,20 28:5
paragraph
49:8,11 53:4,16
paragraphs
51:2
parents
14:18,20 15:6 23:5,6
    25:5 26:11 27:24
    28:1,7,12,22 30:6
    30:21 31:13 33:17
    39:12,13 40:11,12
    47:8 54:11 56:3,7
    56:11,12 57:10
    60:11,17,21 61:2,19
    62:2 73:23 84:7
    93:9 104:11,15
    105:5,8 115:19,22
    115:24 116:2
parlors
74:21
parole

16:23 17:2,11
part
51:19 61:8 100:1
participating
42:1
particularly
62:20
passed
24:11
pastries
76:4,13
patch
40:4
pay
30:21 31:16,23 67:23
    68:3,5
paycheck
77:9,12
paying
42:9 72:18 73:3,7
penmanship
53:12,18
Pennsylvania
1:1,18 14:9
people
15:1 33:5 39:2 50:2,6
    64:8,22 66:22 68:13
    112:10
Peppers
40:7
Percy
12:13,15 14:22
perfectly
38:23
perform
97:17 116:10
performed
88:20
period
25:23 28:7 112:16
person
9:17 30:13 40:18
    43:1 58:6 86:14
    113:20,22
personal
77:12

personally
68:10
PFA
18:5
Philadelphia
1:1 2:9
Philhaven
81:14
phone
60:19 67:12,14 68:15
    104:23 105:2,4
physical
82:15,17,21
physically
45:1 101:22
pick
28:7 36:23 58:5
    59:17 60:3
picked
28:9 107:23
picture
86:21
pictures
108:16
pieces
90:18
pig
59:9
pigs
36:11
pipe
93:10
place
24:4 28:17 49:21
    75:23 76:18,22
    77:15 92:7 109:2
    110:19
placed
23:4
placement
23:15
Plaintiff
1:4 2:5
plaintiffs
20:17
plan



78:13
**planning**
28:20 78:10
**plant**
36:21 98:1
**play**
37:22 51:11
**PLEAS**
1:1
**please**
4:7 6:21 70:19
**Plenty**
97:1
**pliers**
39:8
**point**
37:7 38:9 39:11 60:9
  82:9 84:18 91:8
  95:17 96:7 100:23
  101:5 102:9 104:3
  104:23 106:17
**points**
38:10,12
**pole**
86:20
**police**
92:11,12,12 102:21
**portion**
47:3
**pose**
7:18
**post**
40:19 89:17 97:3,24
**posted**
64:19
**posts**
11:19
**Potatoes**
40:2
**practice**
27:1
**prepare**
10:13
**present**
2:12 11:11
**pretty**

20:12 34:10 58:20
  66:4 85:23 91:2
  92:20 103:8 105:22
  106:24
**previously**
58:18
**prior**
12:6 13:7,15 18:24
  23:15 29:22 47:9
  52:4 65:15 73:22
  82:3 108:2
**prison**
58:2 79:15
**prisons**
109:9,12
**prison's**
7:23
**privileges**
34:12
**prizes**
38:12
**prob**
68:16
**probably**
7:12 43:20 44:3
  57:14 62:6 72:8
  90:20 94:23 96:19
  96:20
**probation**
72:23
**procedures**
7:23 8:3
**proceed**
10:5
**process**
27:17 76:19
**processing**
75:23 76:18,22
**professional**
22:6
**program**
27:16,22 29:1 33:5
  48:4
**programming**
109:4,6,10
**project**

32:22 88:12
**properties**
88:13
**property**
28:17 48:8 86:24
  87:8,9 88:5 92:2
  93:20 98:3
**protection**
18:5
**provide**
6:14 12:9
**psychiatric**
83:24 102:18
**psychiatrist**
47:7 81:11,14,15,19
  83:2
**Public**
1:17 119:11
**pull**
36:21 46:1 116:6,7
**pulling**
19:5
**pump**
59:1
**pumped**
71:16
**pumping**
58:24
**punished**
116:10
**punishment**
56:15 92:15 115:7,11
  116:18
**punishments**
41:20 116:13
**pursuant**
1:14
**pushing**
35:8
**put**
4:14,20 5:5 26:13
  34:24 36:4,16 40:24
  41:1 60:14 64:6,21
  65:1 74:24 81:9
  85:6 87:20 97:12
  98:20 99:19 101:19

106:15 107:1,3
108:15

---
**Q**
---
**quarter**
41:3
**question**
6:9,14,21,23 7:1,19
  7:19 8:8,10 9:21
  22:24 31:11 42:17
  47:21 80:18 117:11
**questionnaire**
29:23 30:12
**questions**
6:8 7:5,17 8:17 11:23
  16:15,18 21:17
  22:18 69:14 79:8,11
  80:17 107:18 110:2
  113:1,5 114:15
**quick**
47:20 69:3 113:5
**quickly**
29:6 31:11 46:2
  52:17 54:1 73:12
**quite**
7:13 23:3 69:16
  70:12

---
**R**
---
**rails**
35:7,8
**raised**
14:17 36:2
**ran**
35:6
**ranch**
73:16
**reach**
55:17
**reached**
43:17 66:17
**reaction**
107:10
**reactions**
107:12
**read**



10:14 11:7 46:14,21
47:1 49:10,14 51:1
51:23 117:12
**reading**
53:7,13,18 117:7
**real**
60:11
**really**
26:23 33:3 34:11
36:14 37:19 45:22
50:1 51:10,19 52:5
53:15,19 64:22 71:1
73:11 92:6 106:9
112:19
**reason**
7:15 10:5 22:20
45:17 55:1 107:11
**rebellious**
25:5
**recall**
12:7,11,20 13:19,21
16:16 17:13 23:1,4
27:12 29:14 34:15
38:6,8 39:13,18
43:3,5 47:23 62:4
67:11 69:1 84:17
85:16 88:10 93:15
95:7 114:11
**received**
11:8 22:9 39:6,14
40:15 110:17
**receiving**
7:10 39:5 43:15
53:21 77:15
**recess**
44:14 69:10 80:10
110:5
**recite**
38:22
**recognize**
19:8,21,24 46:8,11
46:15 48:18,20,22
50:17,20 54:7
**reconnect**
75:11
**record**

4:8,15,21 5:6 119:6
**records**
11:8
**recreational**
37:13
**reference**
19:18 29:7 46:3
48:14 52:17
**referenced**
5:8
**referring**
5:12 17:18
**refusal**
41:9
**refused**
41:11 99:10
**regarding**
43:11
**regular**
118:6,7
**reiterate**
5:2
**relationship**
23:17,22 106:2,16
**released**
59:4 78:6 101:6
**religion**
27:8
**religious**
26:16,21
**remain**
100:4
**remainder**
57:13,15
**remained**
104:12
**remember**
10:18 14:17 24:24
25:10 27:17 35:4,8
38:2,14 39:1,5,10
40:5 41:7,8,15,18
41:23 42:2,22 43:14
43:15,21 45:3,6,7,8
45:11,15,16,17,19
45:22 47:5 49:3
54:9 64:20 65:5

66:9 67:9,9 73:14
75:18 83:13 85:3
87:10,14 88:23
89:20,23 92:17
94:18 97:7,8,14,22
98:11 100:8 101:2
106:5,9 110:16
111:19 114:3 115:5
**remembered**
66:18
**remind**
71:12
**remove**
32:11
**RENEE**
2:3
**rent**
72:19 73:3,7
**repeat**
61:9 76:9
**repetitive**
56:3
**rephrase**
6:22
**reporter**
1:17 4:6,10 6:12 9:19
61:12 117:5,6,16,22
118:5 119:11,21
**represent**
6:2 20:5
**Representing**
2:5,10
**reproduction**
119:19
**requested**
18:18
**required**
8:10
**resided**
58:22
**resident**
30:12 86:14 114:17
**response**
6:15 10:23 113:13
**rest**
50:13 55:9

**restrained**
98:8 99:7,20 101:16
101:22,23 102:1
113:12
**restraining**
18:6,19 101:9
**restroom**
7:24 79:17
**result**
63:9
**resulted**
104:1
**review**
10:17 11:5
**reviewed**
11:11
**Ridge**
1:7 13:21,23 14:8
22:21 23:4,16,23
24:2,14 25:13 27:15
28:9,10 29:15 30:7
30:22 31:1,14 32:3
33:17 35:12,18 36:1
37:15 38:10 40:16
43:12,17 44:19,24
47:10,12 48:1 50:3
51:14 52:4,7 53:22
55:10,22 56:5,17
57:11 58:1,7,8,15
58:23 60:6,12 61:24
62:23 64:13,18
65:10,12,16,19 66:9
66:19 68:14,17
69:19 70:11 71:10
73:23 80:23 81:4,22
82:12 83:14,16,21
84:2,14,19,20,21
85:12,19,22 87:19
88:20 89:14 90:8
92:1 98:9 102:10
103:2 104:12,14,24
105:1,14,18 106:18
112:1,7,17 113:21
114:18 115:21
**right**
7:21 13:5,22 16:11



16:13 18:13 19:11
24:18 35:5 39:24
43:7 44:2 49:20
54:13 68:6 75:16
80:8 88:16 90:2
108:1,4 109:14
116:21,23
**righty**
117:2
**rip**
34:19,20
**rivets**
34:22,24
**road**
95:1 106:8
**Robert**
55:14,19 65:8 67:19
98:22
**rocks**
100:21
**Romero**
16:6
**room**
8:4 28:21
**root**
97:13
**rotate**
54:4
**rough**
49:16
**rows**
40:3
**Rubin**
28:15
**Ruby**
93:9
**run**
42:21 43:1,4 65:24
89:22 92:10 110:19
111:9
**running**
42:19,19 48:5 90:7
110:11 111:4,8,13
111:16

—————— **S** ——————

**S**
2:8 3:12
**safe**
48:9
**sandwich**
90:23 96:4,8
**sat**
32:17 92:13,14 98:15
**saw**
35:4 90:4
**sawmill**
86:12
**saying**
53:20 112:21
**says**
8:11 46:14,21,23
47:2 49:11
**scared**
99:1
**scenario**
93:1
**schedule**
53:14
**school**
21:19 25:5 26:12
51:8,10 52:5 53:5,9
53:10,15,19,21
103:3,10
**schoolhouse**
97:4
**schooling**
52:7 103:1 104:4
**schoolteacher**
103:12
**SCI**
10:11 108:24 109:7
**screen**
19:4,17 52:18 54:1
54:13
**screens**
19:16
**screenshare**
21:7
**screwdrivers**
39:7
**scroll**

20:9 29:9 51:20
**scrolling**
29:21
**second**
40:18 55:3 61:7
**sections**
74:17
**see**
19:13 20:10 26:14
28:1 46:5,18,22
47:4,15 49:7,9
51:19 79:11 83:2,2
83:17 97:19 104:18
105:5
**seeing**
47:8,11,24 54:9
81:10 111:11 112:1
**seen**
20:18 30:3 47:13
58:7 81:13,19 83:22
84:5,16 111:11
**send**
76:12
**sending**
104:14
**Sensting**
23:13
**sent**
34:4,5 49:3 54:10
58:9
**sentences**
41:16 42:11 90:14,14
**separated**
90:8
**series**
4:16 6:8
**seriously**
52:5
**serve**
22:13
**service**
42:6
**SERVICES**
1:23
**set**
16:17 28:12 71:20

79:9
**setting**
103:4
**seven**
4:17 72:9 76:24
**Seventeen**
54:22
**seventh**
22:2,3
**severe**
83:11 89:15,16
**sex**
17:15
**sexual**
62:18,21 82:15,17,21
**shady**
63:3
**shakes**
6:18
**shared**
5:9
**sharing**
19:4 30:10 54:13
66:4,7,13 67:1
**sheets**
74:22
**She'll**
16:9
**shift**
89:11 102:24
**shit**
81:7
**shocking**
104:18
**shoes**
111:12
**shop**
34:14 45:9 56:21
57:3 70:22,22 71:5
71:7 73:13 74:12,13
74:15 86:6 100:9
**short**
14:5,10,11
**shots**
59:9
**shoulders**



94:19
**show**
33:1,11
**showed**
28:16,17,20 92:15
104:10
**shower**
106:10
**showered**
106:13
**shown**
21:11
**shut**
44:8 84:8
**siblings**
115:15,16
**side**
10:22 93:20 97:8,10
**sides**
66:4,7,13
**sign**
28:4
**signature**
30:5
**signed**
28:5 29:23
**signing**
117:7,18,20
**simple**
25:3
**Sister**
53:11
**sisters**
26:10
**sit**
25:17 38:15 42:6
79:19 80:1 103:13
**site**
87:5,22 88:10,17
97:17
**situation**
79:18 82:5 99:9
**six**
16:23 17:1 26:5 72:9
76:24
**Sixth**

22:2,3
**size**
41:2
**skills**
35:20 51:16 58:16
78:2 112:20
**slanted**
54:4
**sleep**
85:6 91:9 95:18
**sleeping**
28:21
**slop**
116:3
**small**
25:7 36:18,20 37:24
39:16 52:15 87:13
**smashed**
87:15
**smashing**
87:11
**snack**
80:5
**Snapchat**
63:20
**social**
11:19 52:13 63:14,17
67:4,6,15,19 68:24
108:10
**somebody**
8:4 30:16 42:22
57:10 105:3
**Somerset**
10:11 108:24 109:8
**son**
16:3 73:16
**son-in-law**
98:6
**sooner**
80:7
**sorry**
35:19 66:11 68:1
73:12 76:8 82:18
**sort**
6:9 7:7 8:16 9:8
17:23 21:12 22:5,10

22:17 32:1,4 34:16
34:16 35:18,20
37:10 42:13,17
44:20 48:1 49:10
74:15 75:24 78:3,7
81:11,20 82:13
83:16 84:12 113:15
**sorts**
24:22 37:3 41:21,22
115:8,9
**Sounds**
10:24
**Spanked**
25:16
**spanking**
56:10
**speak**
91:15
**specialized**
22:10
**specific**
17:4 42:15 91:18
**specifically**
24:22 42:18 44:20
81:4 91:20 106:3
**specifics**
13:20 21:1
**spitting**
114:12
**split**
41:19
**spoke**
27:21 66:2,23
**spoken**
11:14 65:18
**spot**
40:5
**stack**
86:16
**stacking**
112:21
**staff**
84:20 85:12
**stamp**
5:14
**stand**

25:16 76:6 106:11,12
**standing**
92:19 94:14
**start**
4:19 70:13 95:6 97:9
109:3
**started**
8:15 29:2 32:22 33:5
35:10 84:6 91:1,7
94:22 109:5,6
**starting**
89:15 94:8
**starts**
51:3 53:5
**state**
4:7 13:2,3 17:12
109:8
**stated**
68:17
**stating**
43:16
**stay**
27:20 30:22 31:14
54:15 60:8 90:21
**stayed**
13:24 55:15 57:12,18
60:22
**staying**
60:6 69:18
**steaks**
76:19
**steers**
36:11 40:21
**Stella**
14:22
**step**
39:10
**stepstools**
39:11
**sticking**
90:1
**stint**
107:24 108:4
**stipulations**
4:14,21,24
**stone**



45:8
**stones**
36:23 41:3,4,13
  89:18 93:18 100:22
**stool**
39:10
**stools**
39:14
**stop**
21:7 30:10 54:13
  96:6 104:4
**story**
10:22
**straight**
74:8
**strain**
106:15
**strawberries**
40:4
**Street**
2:4
**strike**
50:9 113:13
**structure**
87:8,18,20
**structured**
103:3,20
**struggling**
99:18
**stuck**
89:24
**students**
25:6
**studies**
52:14
**study**
38:17
**stuff**
10:15,23 25:7,17
  36:24 38:20 39:7,22
  40:6 42:12 52:12,14
  58:23 59:2 64:9,9
  66:3,9,19 75:1 81:8
  82:4 86:17 91:16
  98:2 103:16 106:14
  108:15,16 116:7,8

**stump**
90:12 97:4 100:12
**stumps**
41:9
**subjects**
52:3,10
**sudden**
109:21
**sued**
18:21 19:1
**Suite**
2:8
**sundown**
85:24
**sunup**
85:23
**supervising**
96:11
**supervision**
119:21
**supplement**
86:8
**sure**
7:22 9:20 14:3 20:4
  20:12 32:12 35:1
  41:4 43:13 51:18
  67:16 69:6 76:7,14
  99:1 111:10 117:14
**sweet**
40:2
**swinging**
45:19
**switch**
16:14 63:12
**Switching**
24:18 27:14 43:7
  77:19
**sworn**
4:3 119:5
**swung**
101:18 102:12
**system**
38:9

———————————
**T**
**T**

3:12
**table**
77:3,6
**take**
6:6 7:14,16,20,24 8:1
  25:2 28:2 43:19
  44:3 52:5 69:3 74:1
  75:8,15 79:12 80:4
  80:19 84:22 86:15
  102:13,17 109:15
  109:18,23 116:3
**taken**
1:14 4:18 44:15
  47:18 69:11 80:11
  85:2 87:22 106:10
  110:6 117:16
**talk**
24:19 26:22 27:4
  35:23 37:12 44:23
  45:4 52:6,9 67:6
  80:22 82:7 85:17
  89:11 91:12,17
  98:23 104:9 115:3
**talked**
21:2 24:6 28:18
  39:17 40:9 56:8
  65:7,7 67:13 68:23
  69:16 86:5
**talking**
22:21 23:2 40:14
  53:17,20 55:7 58:14
  62:7
**tasks**
32:3 37:3,11
**taught**
52:11
**tea**
40:5,6
**teach**
51:15
**tear**
87:14
**tell**
26:19 49:20 56:4
  62:11 70:14 80:23
  81:2,16 82:1,18

84:4 85:19 86:6
  88:19 89:12 91:3,21
  92:3 95:23 99:4
  103:6 106:1,22
  110:9,14
**telling**
43:9
**temp**
77:4
**tending**
37:2,11 86:4
**terrible**
94:9
**test**
19:4
**testified**
4:4
**testify**
8:24 9:5,12
**testimony**
3:5 10:6 119:7
**Thank**
4:10 11:22 13:18
  14:14 17:22 20:23
  21:6,16 22:16 23:14
  25:19 27:11 30:8
  31:19,24 33:7,15
  40:8 42:13 43:6
  51:24 79:9 116:24
  117:1,23
**theft**
17:8
**therapeutic**
83:17
**therapist**
81:11,19 83:3
**they'd**
42:11
**thing**
32:15,19 35:21 40:22
**things**
19:9 24:20,23 25:4,7
  25:8 26:9 28:18
  33:6 39:3 41:20,21
  44:21 50:4 52:15
  56:10 57:7 58:19



60:24 61:18 62:12
62:15 63:1 66:8,18
69:19 70:12 74:15
75:24 80:21 81:5
82:5 84:6,9 90:15
102:8 107:6,8,19
109:21 112:22
115:8,9 116:14
**think**
4:16 10:19 11:4 14:2
24:12,13 25:1 50:6
60:13 62:6 66:20
68:18,22 69:4,22
78:8 82:8,24 107:1
107:13 109:16
112:3,24 113:2,6,14
113:17 117:3
**Thinking**
114:16
**third**
49:7,11
**Thor**
27:9
**thought**
49:15 90:2
**three**
44:4 54:19 97:24
101:8 103:15
109:14
**threw**
45:8
**throw**
114:9
**tie**
69:15
**tied**
88:15,16 98:12,14
99:6,8,23 100:2,5
101:21
**tight**
53:13
**time**
7:15,16 8:21 14:5,10
14:11,16 22:22 23:3
23:24 24:7,9,10,11
25:2,24 26:14 31:21

35:4 38:14,21 41:10
44:19,24,24 45:9,13
47:19 48:7 49:19,24
55:4 60:1,13,15
63:20 65:21 67:18
77:5 78:17 84:2
85:9 89:8,21 94:1
95:5,24 96:20 98:12
98:19 99:4,7,22
101:10,15,22
103:10 104:7 105:8
107:5,21 108:7
112:17 113:12,17
114:3,16 115:2
**timeout**
25:17
**times**
16:20,21 17:1 33:21
37:17 38:5 42:3
45:2,5 66:2,17
68:15 84:16 87:21
90:16 95:7 96:3,4
96:23 97:16 98:7,10
103:23 105:6
114:13
**timing**
94:9
**Tito**
64:3,5
**today**
4:24 5:8 6:5 9:5 10:5
10:13 19:7 22:21
**told**
37:4 63:8 65:8 68:14
81:17 85:7 92:2,10
99:11,11 114:8
115:13
**tool**
113:14,15
**toolbox**
39:6
**tools**
34:16,16
**top**
17:1 41:1 80:18
98:15 100:17

**touch**
55:11 57:20
**touched**
56:1
**town**
92:6
**trade**
22:5
**trained**
75:2
**training**
22:10
**transcript**
7:9 117:8,10,13,23
119:18
**transition**
40:13 42:14
**trauma**
81:21
**traumatic**
82:14 90:20
**treated**
106:3
**treating**
90:3 111:1
**treatment**
84:1 107:15
**tree**
90:12 100:10
**trees**
86:22 98:2
**trench**
93:19 94:11,15,24
95:12,18 96:2
**tried**
45:10 55:2,3,17
91:24 92:10 99:13
99:17
**trouble**
24:23 25:11 112:13
**truck**
89:23 110:12,23
111:3,5,7,8,13,20
**true**
119:6
**truthfully**

9:1,5,12
**try**
9:19 54:4
**trying**
25:1 46:14 51:15
92:19,20
**TUESDAY**
1:11
**turn**
69:4 92:11
**turned**
14:5 72:20 74:5
**twelve**
53:14
**twice**
33:19 34:8,9 47:14
83:23 84:6 98:11
**two**
17:9,17 20:15,16,16
51:2 67:3 68:20
69:3,23 77:24 83:12
90:4 95:13,14 96:3
99:5 101:8,8 102:2
103:14 105:5 111:5
113:6
**two-handed**
90:4
**two-hour**
38:17
**type**
6:17 7:8 32:19
109:20
**types**
89:13
**typical**
32:2,4 71:3
**typing**
6:12

_____
U
_____

**uh-huh**
7:7
**uh-uh**
7:7
**uncle**
23:9,10 24:2 25:21



26:1,13 27:19 28:8
31:2 35:17
**uncle's**
115:20
**undergo**
83:16 89:14
**understand**
6:20 7:9 8:23
**understanding**
29:22
**understood**
6:24
**unfair**
49:17,19
**unfolded**
112:2
**unfortunately**
112:6
**unlawful**
17:9
**unload**
88:6
**unrelated**
57:11
**use**
34:19 79:17 90:4

**V**

**various**
22:11 88:21
**vehicle**
85:5
**verbal**
6:15 7:6
**verses**
90:15
**version**
5:7 20:19
**versions**
20:22
**victories**
47:3
**video**
10:10
**Vineland**
13:10

**violations**
16:23 17:2,11
**violence**
17:19,20
**violent**
45:1 114:18,21
115:14
**visit**
33:17 58:1 97:19,22
**vocabulary**
53:12,17
**voice**
94:8
**voiced**
110:24
**vs**
1:6

**W**

**W**
2:8
**waist**
94:23,24
**waive**
117:17,19
**wake**
95:22
**walk**
32:1,11 37:16 99:14
**walked**
92:1
**Walker**
46:23 47:4,6 81:15
83:22 84:16
**wall**
74:18
**want**
4:13 28:1 32:1 42:17
44:3,18 58:12 62:5
62:16 64:7 65:6
69:5,15 72:22 79:7
79:23 80:1,21 89:10
89:11 90:11 91:17
95:13 102:24 104:9
109:18 113:11
117:12

**wanted**
56:4 80:20 84:7
98:23
**wash**
76:10,10
**washing**
76:2 93:11
**wasn't**
34:5,10 39:22 48:10
68:3 75:8 82:5 90:2
91:12,14 94:2,3
99:12
**water**
59:2 90:24 93:12,14
93:23 96:1,5,8
**waters**
36:5
**waving**
117:8
**way**
5:15 6:22 98:8
110:21 114:20
**Weaver**
23:18,20 25:22 47:17
51:14 57:21 62:19
63:1 85:1
**Weaver's**
88:4
**weed**
116:6
**weeds**
36:21 116:7
**week**
76:23 77:1
**weeks**
57:5
**weld**
75:1
**welding**
59:5,6
**went**
17:24 24:13 26:15
28:2 32:18 39:9
42:7 45:9 51:7,10
61:3 81:3 84:9 87:4
88:3,4 93:19 97:21

**weren't**
26:9 42:5 55:4 57:7
68:4 76:15 111:15
**west**
72:16
**we'll**
7:9 13:19 79:24
**we're**
6:6 9:18 22:19,20
23:2 28:1 117:3
**We've**
69:16
**When's**
65:21
**wife**
39:21 70:2
**witness**
4:5,9 19:11 42:24
46:6 48:19 61:16
69:8 79:20 88:3
89:3 116:23 117:2
117:19 118:12
119:5,7
**witnessed**
89:21
**witnessed**
89:21
**woke**
91:10
**wood**
90:5
**woods**
37:16
**words**
49:18 112:3
**work**
31:3 35:16 56:18
61:1,18 71:3,12
74:10 78:18 85:20
86:9 87:23 88:17,19
88:22 103:24
**worked**
30:14 57:16 59:4,21
70:10,22 71:7 76:12
78:15 95:8
**working**
29:2 31:1 33:9 34:14
57:8 58:20 68:19


MAGNA
LEGAL SERVICES

71:11 72:7 75:19
76:23 77:4 78:12
85:18 86:3 102:4
**works**
5:17 21:8 118:10
**worse**
91:1
**worst**
107:15
**wouldn't**
24:3
**wrap**
80:7 110:3 111:23
**wrists**
100:3
**write**
33:23,24 41:15 42:11
49:22 50:7,23 90:13
90:13 105:14
**writing**
90:14,15,17 104:22
**written**
48:24
**wrong**
64:23
**wrote**
55:13 105:17
**Wynkoop**
2:12

**X**

**X**
3:2,12

**Y**

**yeah**
11:2 24:17 27:3
39:22 45:2 46:14,22
51:20,23 57:15
64:11 65:4 68:18
77:7 87:2 100:22
104:20 114:2,13,23
116:12
**year**
15:17,18 43:23 51:17
77:23 108:5

**years**
15:23 51:17 54:19
68:16
**yesterday**
109:6
**young**
24:4
**younger**
51:4,5,7 81:12,23
82:3

**Z**

**Zimmerman**
57:12 58:21
**Zimmerman's**
71:1
**zip**
98:12,14 99:8
**Zoom**
1:15 2:1

**$**

**$800**
72:5

**0**

**05**
3:6

**1**

**1**
16:9
**10**
118:7
**10:47**
118:16
**113**
3:6
**12**
103:15
**14**
96:18
**15**
40:19 79:23,24 80:3
104:8
**16**

16:24 96:20 104:8,8
**17**
16:24 96:18,21
**170**
2:8
**17110**
2:4
**18**
14:5,12 16:24 72:20
74:4,5
**18th**
46:19
**19**
16:24
**19106**
2:9

**2**

**2**
13:10
**20**
1:11 17:1 94:12
110:22 119:12
**2000**
18:13
**2011**
54:17
**2013**
46:20
**2014**
16:24 54:18 57:13,15
**2015**
16:24
**2017**
15:22 18:14,14
**2020**
15:17
**2021**
13:15 43:24 44:1
62:13
**2022**
1:11 15:18 119:12
**2025**
77:24
**2026**
77:23 78:1

**21**
71:23,24
**21st**
15:16

**3**

**3**
103:15
**30**
94:12

**4**

**400E**
2:8
**4503**
2:4

**5**

**5**
12:23 15:9
**50**
86:20

**6**

**600**
90:17
**6221**
1:24
**624**
1:24
**694-2307**
2:5

**8**

**8**
118:7
**8/19/96**
12:17
**8:34**
1:15
**80**
3:7 86:20
**866**
1:24 2:5

**9**

**985**



13:9



# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

--------------------------------------------------------

D.C. and R.M.,

              Plaintiffs,

    -vs-                          Case No. 21 CV 5070

NELSON MARTIN d/b/a LIBERTY RIDGE

FARM, LIBERTY RIDGE FARM, EASTERN

PENNSYLVANIA MENNONITE CHURCH AND

RELATED AREAS, and MENNONITE

MESSIANIC MISSION OF THE EASTERN

PENNSYLVANIA MENNONITE CHURCH,

              Defendants.

--------------------------------------------------------

              Video deposition of ROBERT H. MILLER,
taken at the instance of the Defendants, pursuant to
the Federal Rules of Civil Procedure, pursuant to
notice, before Debbie A. Harnen, Registered
Professional Reporter and Notary Public in and for the
State of Wisconsin, VIA ZOOM VIDEOCONFERENCE, on
October 21, 2022, commencing at 10:03 a.m. and
concluding at 12:16 p.m.

              Reported by:  Debbie A. Harnen, RPR



```
 1                A P P E A R A N C E S:
 2
    APPEARED REMOTELY ON BEHALF OF THE PLAINTIFFS:
 3
         ANDREOZZI & FOOTE, P.C., by
 4           Ms. Renee E. Franchi
             4503 North Front Street
 5           Harrisburg, Pennsylvania 17110
             renee@vca.law
 6           717.686.9936
 7
    APPEARED REMOTELY ON BEHALF OF THE DEFENDANTS:
 8
         MARGOLIS EDELSTEIN, by
 9           Ms. Meghan Wynkoop
             Ms. Jocelyn M. Mendez
10           170 South Independence Mall W, Suite 400E
             Philadelphia, Pennsylvania 19106
11           mwynkoop@margolisedelstein.com
             jmendez@margolisedelstein.com
12           215.922.1100
13
14   ALSO PRESENT:  Solange Tran
                        Videographer
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

1                       I N D E X

2    EXAMINATION                                         PAGE

3          By Ms. Wynkoop  . . . . . . . . . . . . . . 5

4          By Ms. Franchi  . . . . . . . . . . . . . .54

5          By Ms. Wynkoop  . . . . . . . . . . . . . .72

6

7

8

9                       E X H I B I T S

10

11           NO EXHIBITS MARKED OR REFERENCED

12

13

14

15

16                      R E Q U E S T S

17   ITEM REQUESTED                                      PAGE

18           Text messages between Miller and       42

             Kyle Hoover

19

20

21

22

23

24

25



Page 4

1             TRANSCRIPT OF PROCEEDINGS

2             THE VIDEOGRAPHER:  We are now on the

3    record.  This begins Media No. 1 in the deposition

4    of Robert Miller in the matter of D.C. and R.M.

5    versus Liberty Ridge Farm, et al., in the United

6    States District Court for the Eastern District of

7    Pennsylvania.

8                    Today is Friday, October 21st,

9    2022, and the time is 10:03 a.m. Central Time.

10   This deposition is being held remotely at the

11   request of Margolis Edelstein.  The videographer

12   is Solange Tran, and the court reporter is Debbie

13   Harnen, both of Magna Legal Services.

14                    Will counsel and all parties

15   present please state their appearances and whom

16   they represent?

17             MS. FRANCHI:  My name is Renee Franchi.

18   I'm with the law firm of Andreozzi & Foote, and I

19   represent the plaintiffs in the matter including

20   Mr. Miller, who is here with us today.

21             MS. WYNKOOP:  Good morning, everyone.

22   Meghan Wynkoop from Margolis Edelstein, and I

23   represent the defendants in this matter.

24             MS. MENDEZ:  Hello.  Jocelyn Mendez,

25   Margolis Edelstein, and I represent the defendants



Page 5

1          in this matter.

2                    THE VIDEOGRAPHER:  Will the court

3          reporter please swear in the witness?

4                    (Witness sworn.)

5                    THE WITNESS:  I do.

6                    MS. WYNKOOP:  All right.  So first, I'll

7          just make note -- I know this is my first

8          deposition of the week, but we've been here all

9          week.  We've made a couple agreements on the

10         record regarding usual stipulations, things of

11         that nature, which can be referenced in the first

12         deposition on Tuesday of this week.

13                    Counsel, are we still all in

14         agreement about those issues?

15                    MS. FRANCHI:  Yes.

16                    MS. WYNKOOP:  All right.

17            ROBERT H. MILLER, called as a witness

18          herein, having been first duly sworn on oath,

19          was examined and testified as follows:

20                    E X A M I N A T I O N

21     BY MS. WYNKOOP:

22     Q   Good morning, Mr. Miller.  My name is Meghan

23         Wynkoop.  I'm with the firm Margolis Edelstein, as

24         you just heard; and I represent Liberty Ridge

25         Farm, Nelson Martin -- the Mennonite Messianic



Page 6

```
 1        Mission and Eastern Pennsylvania Mennonite Church
 2        in the matter that was filed.  I appreciate you
 3        being here today.
 4                    Have you ever been deposed before?
 5   A    I have not, no.
 6   Q    All right.  So I'm just going to start by going to
 7        over a few procedural things, kind of make this
 8        run smoothly.  I don't imagine we'll be here that
 9        long today; I'm pretty quick.
10                    So -- but if at any point you need
11        to take a break, please do so.  I just ask that
12        you answer any questions that are pending first.
13        I imagine I'll also ask for some breaks, so you
14        know, this isn't a marathon.  We'll just get
15        through this all together.
16   A    Sure.
17   Q    I'll be asking you a series of questions today.
18        It's pretty informal, especially since we're over
19        Zoom.  There's a court reporter as you can see on
20        the screen.  There's also a videographer.  The
21        court reporter is taking down everything that we
22        all say.  So I will just ask that all of your
23        responses are verbal.
24   A    Okay.
25   Q    And that means a yes, no answer.  The court
```



Page 7

```
 1          reporter can't really take down an "unh-huh" or a
 2          head shake, things like that, because the
 3          transcript won't really be clear.
 4                       I'll also ask that you wait until I
 5          ask the entire question before answering just so
 6          that the court reporter has an easier time trying
 7          to take everything down.  Does that sound good?
 8    A     Yes.
 9    Q     Okay.  If you don't understand one of my
10          questions, if it's, you know, phrased poorly, if
11          you don't hear me, please let me know.  I'm not
12          trying to confuse you at all today.
13                       So if you answer my question, I'm
14          just going to assume that you understood it.  Does
15          that make sense?
16    A     Yes.
17    Q     Okay.  Is there any reason why you would not be
18          able to testify truthfully today?
19    A     No.
20    Q     All right.  So aside from speaking with your
21          attorney -- I don't want to hear anything about
22          that -- what have you done to prepare for this
23          deposition today?
24    A     I -- nothing really other than -- yeah, I know --
25          I know what I went through, and that's pretty much
```



Page 8

```
 1        it, so...
 2   Q    Did you review any documents?
 3   A    No, not really.
 4   Q    Did you speak with anyone besides your attorney?
 5   A    No.
 6   Q    Do you know David Cross?
 7   A    Yes.
 8   Q    Do you know Kyle Hoover?
 9   A    Yes.
10   Q    Have you met Kyle Hoover before in person?
11   A    Once or twice, yes.
12   Q    What is your full legal name?
13   A    Robert Harvey Miller.
14   Q    And I meant to say this at the beginning.  I
15        apologize.  I am dealing with a bit of a cold.  So
16        if you hear me coughing or anything, I do
17        apologize.
18                     Have you gone by any other names?
19   A    They sometimes call me Bob for short.  Other than
20        that, no.
21   Q    When's your birthday?
22   A    03/20/1995.
23   Q    And where were you born?
24   A    Phoenix, Arizona.
25   Q    Were you adopted?
```



Page 9

```
1   A    Yes.

2   Q    What year were you adopted?

3   A    I would have to look -- look back on records for

4        that.  I'm not exactly sure.  I think it was

5        around age five, but I would have to look at

6        records.

7   Q    What were the names of your birth parents, if you

8        know?

9   A    I have no clue right off.  I would have to look at

10       the records.

11  Q    Sure.  What about your adoptive parents?

12  A    Alan and Virginia Miller.

13  Q    Do you consider -- if I were to say your parents,

14       would you consider that to be Alan and Virginia

15       Miller?

16  A    Yes, yep.

17  Q    Okay.  So if at any point moving forward I say mom

18       or dad, do you understand that that's who I'm

19       referencing?

20  A    Yes, yep.

21  Q    Okay.  Did you ever live with any other families

22       other than with your parents?

23  A    Yes.

24  Q    And who would that be?

25  A    Do we want to start back at the beginning or where
```



Page 10

```
 1          are we starting that?
 2     Q    Sure.  Let's start at the beginning.
 3     A    So at the beginning I was with my birth mom; and
 4          then from there, somewhere along the line, I got
 5          taken out by child services, got put in a foster
 6          family, which -- and then from there, I was
 7          adopted over to Alan and Virginia Miller.
 8                     From there, I lived there until
 9          about -- somewhere between nine and ten.  It was
10          kind of around age -- I think it was nine.  I'd
11          have to look back on records for all this.
12                     But I went over to Arizona for
13          about a year, which was -- which used to be my
14          foster parents are now my grandparents.  I went
15          there for a year, went back, still didn't work out
16          and then went to a family in Illinois; and then
17          from there to the boys farm, and then from the
18          boys farm back to Illinois, from Illinois; bounced
19          around several families around there and then to a
20          family in Pennsylvania and then -- yeah.  Then I
21          turned 18, and I'm now on my own.
22     Q    All right.  So I'm going to try to break that down
23          a little bit.  So you had mentioned foster
24          parents, and did I hear you correctly that you say
25          those are now your grandparents?
```



Page 11

```
1    A      Yes, yep.
2    Q      So would that be either Alan or Virginia Miller's
3           parents?
4    A      It would be Virginia Miller's parents, yep.
5    Q      Okay.  And then when you referenced a family in
6           Illinois, who were you talking about?  What were
7           their names?
8    A      Steven and Bonita Martin.
9    Q      Do you know why you were sent to live with them?
10   A      Because I wasn't -- this is in, like,
11          understanding it from, you know, my childhood
12          memory.  But basically I wasn't building a good
13          relationship with my parents, and my parents kind
14          of were at their wits' end, so it was to the point
15          where, you know, they couldn't really help me,
16          so...
17   Q      Okay.  So you went from -- you went from Illinois.
18          Did you go back to your parents' house after you
19          left Steven and Bonita Miller or did you go right
20          from -- or I'm sorry -- Steven and Bonita Martin
21          or did you go right from the Martins to Liberty
22          Ridge Farm?
23   A      I'm trying to think.  So I think I'm -- this is
24          kind of where -- my memory's not that great.  I'm
25          thinking I went from Steven and Bonita's; and then
```



MAGNA
LEGAL SERVICES

Page 12

```
 1        from there, the Church decided that I wasn't --
 2        you know, it wasn't working out.
 3                    So there was a little -- I don't
 4        know how long.  It was only like -- if I remember
 5        right, only a few months' time span where I think
 6        I bounced down to, you know, the Bishops family,
 7        James Sensenig, I bounced down to his farm in
 8        Orchardville; and then from there, they sent me
 9        out to Liberty Ridge.  So yeah.
10    Q   Okay.  And then after Liberty Ridge, did you end
11        up going back to your parents or did you go back
12        to the Martins?
13    A   Steven and Bonita Martin, yep.
14    Q   Okay.  And then you said you ended up with a
15        family in Pennsylvania at some point?
16    A   And I cannot think of his name right off the bat.
17        Older guy.
18    Q   That would have been after you left Liberty Ridge
19        Farm?
20    A   Yes.
21    Q   Okay.
22    A   Hold on.  So let's go back a minute.
23                    So I went to Steven and Bonita's
24        after -- after Liberty Ridge Farm; and then from
25        there, I went to another family in Pennsylvania.
```



MAGNA
LEGAL SERVICES

Page 13

```
 1          So I was at Steven and Bonita's for, I'm thinking
 2          close to a year, somewhere around there.
 3   Q      After Liberty Ridge Farm, did you ever go back to
 4          live with your parents?
 5   A      No, nope.
 6   Q      Are your parents -- and I'm not being rude by
 7          asking this, I'm sorry.
 8   A      No.  That's fine.  Go ahead.
 9   Q      But are your parents still alive?
10   A      Yes.  One of them is, Virginia Miller is.
11   Q      Where do you currently live?
12   A      I live in Wautoma, Wisconsin.
13   Q      And do you own or rent?
14   A      I rent.
15   Q      Is it an apartment?
16   A      Yes.
17   Q      Do you currently have a driver's license?
18   A      Yes.
19   Q      And what --
20   A      Actually, I have a CDL, so...
21   Q      Okay.  What state is your -- are your licenses in?
22   A      State of Wisconsin.
23   Q      How long have you lived at your current address?
24   A      Probably three to five years, somewhere in there.
25          I would have to look at the record.  I don't know
```



Page 14

```
 1        exactly.
 2   Q    And where did you live immediately before then?
 3                    (Zoom technical interruption.)
 4                    MS. WYNKOOP:  Okay.  We're back.
 5                    THE WITNESS:  Sorry about that.
 6   BY MS. WYNKOOP:
 7   Q    That's okay.  Did you hear my question?
 8   A    No.  I might have to connect to my Wi-Fi hotspot
 9        on my phone if this keeps happening.  We'll see.
10   Q    Okay.  Do you want to take a second now or you
11        want to keep moving?
12   A    We can keep moving.  It was really clear
13        otherwise, so...
14   Q    Okay.  My question was, where did you live
15        immediately preceding this current apartment?
16   A    So right before that, I stayed at Gabriel, Gabe
17        and Sam's house, Boersma, Gabe Boersma, Sam
18        Boersma.
19                    I crashed there for a little bit
20        until I had enough -- I was kind of getting back
21        on my feet.  So then I got an apartment.
22   Q    How long did you stay with them?
23   A    I think nine weeks maybe, something like that.
24   Q    And what about --
25   A    It actually might be longer than that.  I would
```



Page 15

```
 1            have to look.  I'm not sure.
 2    Q       Where were you living before staying with Gabe and
 3            Sam?
 4    A       I lived in an apartment in Neenah, Wisconsin; and
 5            then from there, I lived in an apartment in
 6            Berlin, Wisconsin.  And from there, I was in --
 7            oh, no.  I was in a camper a little bit until I,
 8            you know, found an apartment in Wisconsin.
 9                       Before that, I was in Ohio.  So I
10            mean, there's all kinds of places.
11    Q       I guess I'm trying to figure out why you ended up
12            moving from, you know, Illinois to Wisconsin.
13    A       Oh, no.  No, no, no.
14                       So I moved from Illinois to that
15            family in Pennsylvania; and then from that family
16            in Pennsylvania, as soon as I turned age 18, I
17            said -- I was done with that whole religion; and
18            from there, I found an apartment in Ohio and moved
19            to Ohio, so...
20    Q       Why did you pick Ohio?
21    A       Because I had a sister living there.
22    Q       And then from Ohio, why did you pick Wisconsin?
23    A       Job opportunity up here.
24    Q       What is that job opportunity?
25    A       It was a job opportunity.  I was doing roofing at
```



Page 16

```
 1              the time.  Obviously, I don't do that anymore, but
 2              yeah.
 3    Q    Well, what do you do now?
 4    A    Crane operator.
 5    Q    What is the company that you presently work for?
 6    A    Gabe's Top It or Drop Tree Service out of Wild
 7              Rose, Wisconsin.
 8    Q    And other than operating a crane, what are your
 9              other kind of job duties there?
10    A    I cut trees.  I was site superintendent.  I'm
11              not -- I'd have to kind of see -- I still am kind
12              of senior leader, but kind of more opted out of
13              that role for the crane -- operating crane role,
14              but I still have some site, quite a bit of site
15              actually.
16    Q    How long have you been at Gabe's?
17    A    Going on five years.  I would have to look when I
18              exactly started, but it's going on five years.
19    Q    Do you have to maintain -- and I know you had said
20              a CDL.  But do you have to maintain any sort of
21              occupational license for your job?
22    A    Yeah.  So I have CCL certs for operating the
23              crane; and then I also have the CDL and then,
24              yeah.  I'm working on getting my arborist
25              certification too, so...
```



Page 17

```
 1   Q    Did you say arborist certification?

 2   A    Yes, yep.

 3   Q    What does that entail?

 4   A    It's a -- basically it's a certification that

 5        shows that you know about trees and what you're

 6        doing with trees more or less.

 7   Q    Do you have to learn any -- how to use any

 8        particular tools to be able to get that

 9        certification?

10   A    Yes, yes.  You have to -- pretty much you have to

11        know the tricks and trades of the -- or the tricks

12        of the job pretty much.

13                    As far as learning about this job,

14        there's quite a bit to learn.  I started off as

15        groundsman and worked my way up to climber; and

16        from there, worked my way up into a crane

17        operator, so there was definitely a lot of

18        on-the-job training, et cetera.

19   Q    What type of tools do you use in that sort of

20        position, I mean, prior to being a crane operator?

21   A    Chain saws, wood chippers, skid steers,

22        excavators.  That's the majority of it.

23   Q    All right.  Are you currently married?

24   A    Nope.

25   Q    Have you ever been married?
```



```
 1   A    Nope.

 2   Q    Do you have any children?

 3   A    Nope.

 4   Q    And I am not being rude by asking this, but have

 5        you ever been charged with a crime?

 6   A    No -- well, other than traffic citations, stuff

 7        like that.

 8   Q    Sure.  Have you ever -- other than the reason

 9        we're here today, have you ever been a part of a

10        lawsuit?

11   A    No.

12   Q    All right.  I'm going to -- we're going to test

13        out the screen sharing and see how good it does.

14                  MS. WYNKOOP:  Can everyone see that?

15                  MS. FRANCHI:  Yes.

16                  THE WITNESS:  Yes.

17                  MS. WYNKOOP:  Perfect.

18   BY MS. WYNKOOP:

19   Q    Mr. Miller, I just put up a document on our

20        screen.  Do you recognize what I just put up?

21   A    Yes, yep.

22   Q    And have you seen this first amended complaint

23        before?

24   A    I'm sure I've seen it in passing, yes.

25   Q    Okay.
```



```
                                                     Page 19
 1   A     Yep.  Yes, I have.
 2   Q     Perfect.  I mostly just wanted to test the screen
 3         sharing.  I didn't have anything to add about
 4         that, but all right.
 5   A     Sure.
 6   Q     What is your educational history?
 7   A     Got a GED with a little bit of college --
 8         actually, I think I have -- I'm not -- don't quote
 9         me for sure on this, somewhere around 17 college
10         credits, I think, something like that, but yeah.
11   Q     What college did you get those credits from?
12   A     Eastern Gateway Community College.
13   Q     Where is that located?
14   A     Steubenville, Ohio.
15   Q     When did you get your GED?
16   A     That would have been, I think -- and I would have
17         to look again at the dates, but I think it was
18         around year 2015, something like that.
19   Q     Did you ever serve in the military?
20   A     No.
21   Q     All right.  So those are all my background
22         questions.  I tried to get through them quickly.
23         So I'm going to kind of switch gears and talk
24         about the reason we're here today.
25                      So first, we had talked a little
```



Page 20

```
 1        bit about your history of moving from your
 2        parents' house to Steven and Bonita's, and then
 3        you referenced that at some point you moved to a
 4        farm.
 5   A    Uhm-hm.
 6   Q    By that, we're referencing Liberty Ridge Farm,
 7        which is --
 8   A    Yes.
 9   Q    -- a defendant in this lawsuit.
10                      Have you ever been a resident of
11        any other what I will call a troubled teen
12        facility?
13   A    No.
14   Q    Were you ever a resident at Teen Boys Ranch?
15   A    No.
16   Q    Okay.  Do you know who placed you at Liberty Ridge
17        Farm?
18   A    According to the documents that were sent over to
19        me, it was -- the guardians that are on that
20        document was Steven -- I think Steven Martin.
21                      I -- what I remember, though, I'm
22        pretty sure it was the Bishops that were -- kind
23        of had more or less say in the whole situation.
24   Q    Prior to becoming a resident of Liberty Ridge
25        Farm, did you know anyone by the name of Nelson
```



Page 21

```
 1        Martin?
 2    A   No.
 3    Q   Did you know anyone by the name of Ethan Weaver?
 4    A   Not that I can recall, no.
 5    Q   Do you -- what were you told as to why you were
 6        being placed at Liberty Ridge Farm?
 7    A   It was to -- I forget exactly what all they were
 8        saying, but it was to help me, number one, grow
 9        with my spiritual walk; number two -- that was the
10        main reason, but then two was to maybe build
11        better relationships, something like that.  I'm
12        not sure exactly, but yeah.
13                       That's what I can recall from the
14        meetings because I wasn't bonding with families or
15        something, yeah, something to that extent.
16    Q   At that time -- and by "that time," I mean
17        immediately prior to you residing at Liberty Ridge
18        Farm, what was your relationship like with your
19        parents?
20    A   Not great.
21    Q   Were you getting in a lot of trouble?
22    A   No.  They -- well, yes.  They considered me
23        rebellious.  I guess I tended to -- in their eyes
24        had an attachment disorder, like, I couldn't
25        attach to them which, yeah, at the time I didn't
```



Page 22

```
 1          know anything about or yeah, so, yep.
 2    Q     You had referenced some meetings prior to you
 3          being placed at Liberty Ridge Farm.  Did I hear
 4          that correctly?
 5    A     Yes, yep.
 6    Q     What can you tell me about those meetings?
 7    A     It's basically where the Bishops/preachers brought
 8          me into a room, were talking -- because Steven was
 9          talking to them as far as how I, you know, wasn't
10          conforming or fitting in or being, I guess,
11          rebellious; and they had a meeting with them.
12                     I don't know what all was said on
13          their end, but I do know they had -- you know,
14          they said I was rebellious and didn't really fit
15          in with the family.  That's basically what I can
16          remember.  And then also my spiritual walk wasn't
17          great in their eyes, which yeah, whatever.
18    Q     You referenced Bishops.  Do you happen to know any
19          of their names?
20    A     James Sensenig, and I think that was the only one
21          till I got to Liberty Ridge; and then I don't know
22          what all -- there was a bunch of people I didn't
23          really recognize right at the moment.  But there
24          was kind of a panel that I sat down with that
25          night, and we went over paperwork as far as
```



MAGNA
LEGAL SERVICES

Page 23

```
 1          getting into Liberty Ridge, so yeah.
 2   Q      Do you know how your parents knew Steven and
 3          Bonita?
 4   A      I have no clue.
 5                     I think the preachers -- and I
 6          could be -- I could be wrong on this.  That was
 7          all pretty -- pretty top secret stuff.  But I'm
 8          pretty sure somehow the preachers out in New
 9          Mexico at the time knew of James Sensenig
10          somewhere because they're kind of like sister
11          churches.  I forget what the other church group
12          is.
13                     But the Eastern Pennsylvania
14          Mennonite Church and the -- I think it's Southwest
15          Fellowship, they're both kind of sistering in
16          that, you know, as far as their -- they're kind of
17          both conservative.  They kind of cross paths
18          sometimes.
19                     I think somewhere one of the
20          preachers knew about their pastor, and that's kind
21          of where they, you know -- that's kind of -- I'm
22          thinking that's how it all happened.  I'm not
23          exactly sure.  I was pretty young at the time,
24          so...
25   Q      How old were you at the time?
```



MAGNA
LEGAL SERVICES

Page 24

```
 1   A    I'm thinking between 13 and 14, somewhere around
 2        there.
 3   Q    And immediately prior to residing at Liberty Ridge
 4        Farm, do you remember how long you were living
 5        with Steven and Bonita?
 6   A    I think it was two or three years, something like
 7        that.  I could be wrong on that.  It's been a
 8        while.
 9   Q    Are you still in contact with them?
10   A    No.
11   Q    Did you get into a lot of trouble at Steven and
12        Bonita's?
13   A    One -- okay.  Back on the previous question, they
14        did email me once.  They were trying to look me up
15        in Wisconsin, and that was last year, I think.
16                    They were up visiting his brother
17        up here, and they were, you know -- and then every
18        now and then, you know, emails, that's in the
19        spacing of about a year, but other than that, no.
20        I don't talk to them.
21   Q    I appreciate you clarifying.
22                    So I think I had asked, were you at
23        that time, meaning immediately prior to being
24        placed at Liberty Ridge Farm, were you getting
25        into a lot of trouble at Steven and Bonita's
```



```
 1          house?
 2   A      Yeah.  I can't lay my finger on exactly anything
 3          right off the bat.  I was just kind of rebellious
 4          in nature, if I remember right, just kind of
 5          bucked everything they said.
 6                        I knew how to -- and this was my
 7          form of, you know, figuring out people or
 8          something like that, but I knew how to read
 9          people; and I knew how to push buttons to figure
10          out -- and obviously there's a whole, you know --
11          there's a term for that too.
12                        But in my mind, I didn't know what
13          was happening, and that was just my form of
14          security or figuring out if these people are
15          trustworthy, who they are, you know.
16   Q      I know you had mentioned that you left the church
17          at 18.  But prior to that, what was kind of your
18          religious background?
19   A      Prior to 18?
20   Q      Yeah.
21   A      I don't know.  You'd probably call it a Christian,
22          whatever, you know, you conform to church
23          standards.  That's what I would call it maybe.  In
24          their eyes, they thought I was Christian because,
25          you know, I was doing everything perfect, but I
```



Page 26

```
 1           wouldn't necessarily say I was a Christian, but...
 2    Q      Were you baptized?
 3    A      Yes.
 4    Q      How old were you when you were baptized?
 5    A      Shoot.  I was young.
 6                        I think ten.  I'm not exactly sure.
 7           I'd have to -- I'd have to actually talk to --
 8           that was actually at the church in New Mexico, if
 9           I remember right, that I was baptized at.
10    Q      So that was when you were living with your
11           parents?
12    A      Yes, yep.
13    Q      Okay.  How old were you when you were initially
14           first residing at Liberty Ridge Farm?
15    A      I'm not sure exactly.  I would have to -- yeah.  I
16           don't know for sure exactly on that.  I think it's
17           between 16 and 17.  I think it would have been 16.
18                        Actually maybe -- maybe even
19           earlier than that.  Somewhere around there, 15,
20           16, I think.  I'm not sure exactly.
21    Q      Okay.
22    A      I would have to -- I mean, if they have the --
23           they might have it dated on those documents.  It
24           would be on there.
25    Q      Yeah.  I hear you, and I have documents.  I'm not
```



Page 27

```
 1          going to hold you to it.

 2    A     Okay.  All right.

 3    Q     I didn't know if you remembered.

 4    A     Okay.

 5    Q     All right.  So we were talking about meetings, and

 6          you had referenced paperwork prior to being placed

 7          at Liberty Ridge Farm.  Do you remember what any

 8          of that paperwork was like?

 9    A     I just -- Renee actually sent over that paperwork,

10          and I glanced at it.  I didn't really have a

11          chance to read through it too much.

12                    That was more or less what it was.

13          I didn't recall exactly until she sent it over,

14          but yeah.  That's kind of more or less what it

15          was.

16    Q     I'm going to share my screen again.  Can we see

17          that?

18    A     Yep.

19    Q     All right.  I'm going to apologize in advance that

20          the quality on this is just absolutely terrible,

21          but it's what I have so we're working with it.

22                    Do you recognize the document that

23          I placed on the screen, which is being

24          Bates-stamped as LRF98?

25    A     Yes.  I had looked over this document.  I'm just
```



Page 28

```
 1          trying to -- all right.  Hm.  Okay.
 2   Q      Okay.  I'm going to scroll down maybe to get to a
 3          point where I can read it.
 4                    Do you have any independent
 5          recollection of filling out an application prior
 6          to residing at Liberty Ridge Farm?
 7   A      Not that I am aware of, no.
 8   Q      Do you recall any sort of application process that
 9          took place during that time?
10   A      The only thing I remember as far as doing
11          paperwork would have been at the Liberty Ridge
12          Farm when I showed up there that night -- that
13          night, yeah.
14   Q      I'm going to keep scrolling down to -- right now
15          I'm at LRF101.  Is that your handwriting next to
16          name where it says Robert Miller?
17   A      Yes.
18   Q      Do you remember --
19   A      That looks like my handwriting, yes.
20   Q      Sorry.  Do you remember filling out this
21          paperwork?
22   A      I remember doing paperwork at the farm.  I don't
23          remember if it was -- yeah.  I don't remember
24          exactly filling out all this to this detail, but
25          I'm sure -- I'm sure I did.
```



Page 29

```
 1   Q    Okay.  No. 9 it says, What happened when you did
 2        wrong as a child?  Did you write this, "get
 3        whipped"?
 4   A    Yeah, yeah, probably.  Yes.
 5   Q    Sorry.  Let me know if I'm scrolling too fast.
 6        The quality is just -- it's really difficult to
 7        read on a screen.  So I don't want to try to read.
 8                  Is this your signature down here
 9        where it says Robert H. Miller?
10   A    Yes, yep.
11   Q    And the date next to it, do you remember writing
12        March 24th?
13   A    I mean, if it's there, yeah, I probably wrote the
14        date.  I don't remember writing it.
15   Q    Okay.  Do you happen to know who else filled out
16        application paperwork?
17   A    No.  I wouldn't know, no.
18   Q    Okay.  When you were living with Steven and
19        Bonita, do you know whether they were your legal
20        guardian at the time?
21   A    As far as legal as far as court documents or what?
22   Q    Yeah.
23   A    No.  I -- at the time, I did not know anything
24        really.
25   Q    Okay.
```



Page 30

1   A   So...

2   Q   Do you remember having any conversations with your

3       parents about going to Liberty Ridge Farm?

4   A   I'm sure I maybe had a conversation or two, but

5       that's -- not that I can recall off the top of my

6       head.

7   Q   How long were you at Liberty Ridge Farm?

8   A   For about a year.

9   Q   Do you know if your parents had to pay for you to

10      stay at the farm?

11  A   Yes.  If I can recall, yes.

12  Q   Do you recall about how much?

13  A   I don't know.  I heard the rumor it was around

14      2300 bucks, somewhere around there, but...

15  Q   Did you ever have a job before residing at Liberty

16      Ridge Farm?

17  A   Yes.  I worked for Steven and Bonita Martin.

18  Q   What did you do for them?

19  A   I worked -- I helped them do roofing there, so

20      yes.

21  Q   What kind of roofing?  What did that entail?

22  A   Residential roofs.  For the most part, residential

23      roofs, but going up, stripping off the shingles,

24      putting on a new roof, yeah.

25  Q   Were you paid for any of that?



Page 31

```
 1   A     Yes, I think so.  I think my parents got most of
 2         the money for that, though.
 3   Q     Do you recall whether you were given a sort of --
 4   A     I think I was given a percentage, but I don't
 5         recall right off the bat exactly what I was given.
 6   Q     Do you know whether it was like a paycheck or more
 7         of allowance?
 8   A     I think it was a paycheck, yeah.
 9   Q     When you first moved to Liberty Ridge Farm, do you
10         recall how many other residents were there?
11   A     Just one other.
12   Q     Was that David Cross?
13   A     Yes, yep.
14   Q     How long was it just you two as the residents?
15   A     It would have been -- I'm pretty sure it would
16         have been the majority of the time I was there.
17   Q     How many mentors were there?
18   A     Two.
19   Q     And do you know their names?
20   A     They kind of switched out.  There's an Ebersol
21         there once, he was often David's mentor; and then
22         mine was Linden Graham for the most part.  And
23         then sometimes they rotated out, and then it would
24         have been Daryn Nolt and Austin -- and I forget
25         his last name, Austin somebody, but yeah.
```



Page 32

```
 1                          That's the majority of the ones I
 2          remember.  There was another fill-in one.  I can't
 3          remember his name.  Yeah, that's basically what I
 4          remember.
 5     Q    Was there a house parent when you were there?
 6     A    Yes, yep.
 7     Q    And who was that?
 8     A    Ethan Weaver the majority of the time; and then if
 9          I remember right at the end -- sometimes they
10          rotated out, sometimes they had fill-ins.  But at
11          the end, they switched out and I can't think of
12          the other guy's name, but yeah.
13     Q    Okay.  What was your daily schedule, so to say, at
14          the farm?
15     A    So we would get up.  We had a little bit of time
16          in the morning to get dressed.  Then you get down.
17          I'm pretty sure we went out and did chores.  It's
18          a quite foggy memory on that.
19                          But I'm pretty sure we went out,
20          did chores, came back, had bible worship or
21          something like that; and then we would have
22          breakfast, figure out what we were doing for the
23          day, whether it was milling logs -- the majority
24          of it was milling logs, blast gates, and then,
25          yeah, doing those wood -- bundles of wood and
```



Page 33

```
 1          then -- yeah.
 2   Q      As someone with zero construction background, what
 3          do you mean by milling logs?
 4   A      So we would go out, fell the trees and then drag
 5          them out of the woods, split 'em up, and then save
 6          the logs to get milled up, so...
 7   Q      All right.  You talked about chores.  What other
 8          kind of chores did you do?
 9   A      So we had -- okay, what type of chores?  There
10          were chickens that we were raising for, I don't
11          know, some market -- I'm pretty sure it was a live
12          market out of New York City, something like that.
13                    So yeah, that's the majority of it.
14          Then there was, you know, some hobby animals up
15          top.  If I remember right, there was some hogs
16          that we took care of at one point.  There might
17          have been one or two other animals, but that's
18          pretty much all I can recall.
19   Q      Did your parents ever visit you at the farm?
20   A      Not that I can recall, no.
21   Q      Did Steven and Bonita?
22   A      They came to pick me up if I remember, yeah.
23   Q      Did you ever write letters when you lived there?
24   A      Yes.  Actually, hang on one second.  Let me try to
25          get back on the screen.  There we go.
```



Page 34

```
 1                       All right.  Yes, I think they did,
 2       yes.
 3   Q   You said they.  Who is they?
 4   A   As far as -- okay.  Rephrase that question again.
 5   Q   Sorry.  I was asking if you ever wrote letters.
 6   A   Sorry.  Yes, I did write letters, yes.
 7   Q   Who did you write letters to?
 8   A   I'm pretty sure I wrote some to my family, Jake
 9       Derstein, I wrote some to them.  There would have
10       been some other people.  I would have to -- I
11       don't know exactly right off the bat.
12                       I definitely know I did write
13       letters, and they were definitely mon- -- they had
14       to be proofread before I sent them out.
15   Q   Do you recall your family ever writing letters to
16       you?
17   A   I'm pretty sure they did, yeah.  I'm pretty sure I
18       received some mail there, but yeah.
19                       MS. WYNKOOP:  All right.  Sorry.  Can we
20       just go off for two seconds?
21                       THE VIDEOGRAPHER:  The time is
22       10:45 a.m.  We're going off the record.
23                       (Discussion off the record.)
24                       MS. FRANCHI:  Can we take, like, three
25       minutes?
```



Page 35

```
 1                    (Recess taken from 10:45 a.m.
 2                     until 10:55 a.m.)
 3                    THE VIDEOGRAPHER:  The time is
 4          10:55 a.m.  We're back on the record.
 5     BY MS. WYNKOOP:
 6     Q    All right.  So before the break, we were talking
 7          about some of, like, the day-to-day stuff when you
 8          were a resident at Liberty Ridge.  We were just
 9          talking about letters.  But before that, we were
10          talking about some of the chores.
11                    And you were talking about things
12          like milling logs and tending to chickens and
13          things of that nature.  When it came to milling
14          logs, what types of tools would you have to use?
15     A    We used a chain saw and, then there was -- okay,
16          Linden Graham, the mentor there, he actually
17          milled the logs.  We just handled them and did
18          stuff like that.  He actually ran the machinery as
19          far as the saw mill, the portable saw mill.  He
20          ran that.
21     Q    What other types of chores would you complete?
22     A    As far as, okay, maybe on Saturdays, we cleaned,
23          yeah.
24     Q    Okay.
25     A    That was more or less the gist of it.
```



Page 36

```
 1                         Can I also -- on that other
 2         question as far as that paperwork, I was thinking
 3         maybe I was a little bit younger than the age that
 4         was put on there, but I could be wrong on that.
 5         I'd like to do some research on that if I can.
 6    Q    Sure, yeah.
 7    A    Okay.  Just fyi.
 8    Q    Appreciate it.
 9                   MS. FRANCHI:  Yeah.  And that's
10         something we can always -- you know, I saw there
11         was a couple of different -- just kind of going on
12         a tangent, there was a few different ages on the
13         paper.  One said 17, one said 16.
14                         So we can try to, you know, clarify
15         to the extent that if it's something that you're
16         looking for specifically, but if not, then we
17         can --
18    BY THE WITNESS:
19    A    Because if I remember, in Ohio -- or in
20         Pennsylvania, as soon as I left, I turned 18 and
21         then -- so it wouldn't make sense as far as the
22         timeline for that paperwork there if you know what
23         I mean.
24    BY MS. WYNKOOP:
25    Q    Uhm-hm.  Okay.  I appreciate it.
```



Page 37

```
 1                    Do you remember any sort of, you
 2        know, point system at the farm for good behavior?
 3   A    Can you explain what you're asking about?
 4   Q    Sure.  So I'm thinking of, you know, could you all
 5        earn sort of points which could later be redeemed
 6        to get sort of prizes or different kinds of snacks
 7        and things like that?
 8   A    I don't recall anything.
 9   Q    Okay.  Was there an actual farm on the property?
10   A    As far as?
11   Q    Like crops.
12   A    Crops were grown on the property, yes.
13   Q    Do you remember what those crops were?
14   A    It was corn and beans if I remember right.
15   Q    Was anything else grown on the property?
16   A    We had a small garden there that we grew some of
17        the food at, yes.
18   Q    What types of food would you grow?
19   A    Tomatoes, sweet corn, habanero plant.  I had one
20        habanero plant in there.  And then there was other
21        stuff, but yeah, I can't recall.  I think
22        cucumbers, yeah, stuff like that.
23   Q    And did they -- did the house parents -- or I'm
24        sorry -- the mentors, like, teach you how to tend
25        to those crops?
```


MAGNA
LEGAL SERVICES

Page 38

```
 1  A   Yes and no.  It was more the housemate that kind
 2      of said that, hey, we need to do this.  They went
 3      in there and pulled weeds sometimes or stuff like
 4      that.  Yeah, I don't know.
 5                     As far as teaching, I mean, it was
 6      kind of -- I guess the Mennonite culture, you have
 7      that -- or at least I grew up anyways gardening as
 8      a kid.  So I kind of knew what was going on more
 9      or less.
10  Q   And you said that you had a habanero plant?
11  A   Yes, yep.
12  Q   So was that the plant that you were responsible
13      for growing and keeping?
14  A   Uhm-hm, yes, yep.
15  Q   Did you ever get to play, like, recreational games
16      while you were at the farm?
17  A   On Sundays, yeah, we would have had recreational
18      time where we would've -- I think we would've done
19      something like that, yeah.  I don't recall
20      anything right off the bat, but yeah, we would've,
21      yeah, done something.
22  Q   Did you get to play basketball?
23  A   No.  I don't recall that, no.
24                     They might have had it, but I don't
25      recall us really using it.
```



Page 39

```
 1   Q    Other than the chain saws, what types of tools
 2        were you taught to use while you were at the farm?
 3   A    Skid steer.  I learned how to run a skid steer.
 4        There was mini tractors we used to clean out the
 5        chicken barn with.  Saws, any basic equipment to
 6        either paint the fence rails or anything like
 7        that, you know.
 8   Q    Did anyone ever tell you that you'd be paid for
 9        doing chores?
10   A    No.
11   Q    So we had seen in your paperwork it says that when
12        you got in trouble, you got whipped.  What did you
13        really mean by that?
14   A    Corporal punishment, yeah.
15   Q    What type of things would you be whipped with?
16   A    As far as as a kid or what?
17   Q    As a kid.
18   A    Okay.  Kind of basically what was around normally
19        was some type of wooden -- my mom always used a
20        wooden stick, but then there was times where my
21        dad used PVC pipe, a concrete stake.  That's
22        mostly what I remember was the two big ones that
23        kind of hurt.
24   Q    Were you ever whipped while you were at Liberty
25        Ridge Farm?
```



Page 40

```
 1   A    No, nope.

 2   Q    Did you ever meet anyone from the Mennonite

 3        Messianic Mission if you can remember?

 4   A    So I met people that I knew that were on the

 5        farm's panel, but I didn't know exactly what -- I

 6        didn't hear all the proper terms as far as what

 7        all -- who's everybody's title was exactly.

 8                       I definitely met Nelson Martin, and

 9        I think it was Joe Martin, taller white-haired

10        guy; and then there was a pastor that came in and

11        did some stuff, Ethan Weaver, the mentors.

12                       I'm trying to think.  It was pretty

13        fuzzy who all was there that night whenever I

14        first showed up.  That's kind of a blur, but yeah.

15        That was kind of the important meeting and yeah, I

16        kind of don't remember that that great, yeah.

17   Q    You had mentioned that in the morning you had kind

18        of a class of some sort.  Do you remember who was

19        responsible for teaching?

20   A    As far as class, we had a devotion in the morning

21        if that's what you're talking about.

22   Q    Did you have a bible study?

23   A    Okay.  So we had family worship in the morning

24        after we got up from chores.  That was led by the

25        house parent.  The class was later in the day.
```



Page 41

```
 1                     I'm not sure which one you're
 2        talking about, if you're talking about family
 3        worship or the class.  The bible study class was
 4        later.  It was after lunch for about an hour,
 5        yeah, something like that.
 6   Q    And who taught that?
 7   A    That would have been -- can't think of his name
 8        right off the bat, but it's on the paperwork
 9        there.  Super chill guy, yeah.  I can't think of
10        his name.  I'd have to look.
11   Q    So you brought up Nelson Martin.  How many times
12        do you think that you've met Nelson Martin?
13   A    It would have been a total of two or three times,
14        wasn't much.  He was more of a behind-the-scenes
15        guy.
16   Q    So Nelson Martin didn't have much to do with your
17        day-to-day life at Liberty Ridge Farm?
18   A    No, no.
19   Q    I know we had talked a little bit about Kyle
20        Hoover.  I had asked you if you knew him.
21   A    Okay.
22   Q    Have you spoken to Kyle Hoover about this
23        lawsuit?
24   A    We may have talked in text, but I don't really --
25        yeah, we didn't talk in person.
```



Page 42

```
 1   Q    Okay.  I'm going to make a note on the record if
 2        we could obtain those text messages if possible.
 3   A    Okay.
 4   Q    Okay.  I digress.
 5                  Can you tell me about some
 6        consequences that you experienced on the farm for
 7        poor behavior?
 8   A    Okay.  Yeah.
 9                  And then could I go back to that
10        note?  I'm not sure if I did text him or not, so
11        I'm going to have to go back and look in my
12        messages.
13   Q    That's fine.  If they exist, great.  If not, no
14        big deal.
15   A    Okay, all right.
16             MS. FRANCHI:  And just for the record,
17        when we're done with all the depositions, Meghan,
18        we can -- I have a few items also that I was
19        hoping to look into.  So if you want, just
20        whenever we're done with everything, let me know;
21        and I don't need it in a formal request.  I don't
22        know if you do either.  We can just exchange an
23        email of all the items we're looking for.
24             MS. WYNKOOP:  That's fine.  That was
25        mostly so I didn't forget.
```



Page 43

```
 1    BY MS. WYNKOOP:

 2    Q    Okay.

 3    A    Okay.  So you were looking for the -- what type of

 4         trouble I got in at the Liberty Ridge Farm?

 5    Q    Yeah.

 6    A    Okay.  I wasn't there that long, and I started

 7         pressuring -- once again, pushing -- pushing

 8         buttons seeing where -- you know, seeing how

 9         people reacted.

10                   But I brought up the whole thing

11         about the sports car, and they kind of took it out

12         as being rebellious because obviously I did not

13         have those convictions that they had, which --

14         yeah, it was to a whole different story.

15                   But they took it I was being

16         rebellious, and I just kept pushing on it, and

17         they finally decided to make me dig postholes.  So

18         I started digging, I got really mad.

19                   And me just, you know, being that,

20         I said I hope -- I said if I -- either if I -- I

21         might have said, if I got out of this place, I'll

22         come back and bomb it or -- I was pretty mad at

23         the time, but yeah.  It was a pretty violent

24         statement I said.  And yeah, they got really mad

25         at that and made me dig stump holes most of the
```



Page 44

```
 1        night.
 2                        And then I think in the morning
 3        hours, I was writing -- I had to write, like, a
 4        hundred-some sentences.  I was furious at that
 5        point, but yeah.
 6   Q    When you say "they," who directed you to do that?
 7   A    So Ethan Weaver was the main guy that -- he was
 8        the instigator.  He was the one that decided what
 9        type of punishment I was going to get.
10                        And then I had mentors there that
11        were, you know, watching over me, making sure I,
12        you know, was doing that.  And then during the
13        punishment when I said that other thing, he was
14        the one that got really mad and said that I was
15        going to be digging more stump holes -- or sorry,
16        not stump holes -- postholes.  And yeah so -- he
17        was the main -- he was the main guy.
18   Q    Were you on any medication when you were at the
19        farm?
20   A    Nope -- no, no.  Sorry.
21   Q    Have you spoken to your parents about this
22        lawsuit?
23   A    I'm kind of trying to avoid that.
24                        I think I may have talked to
25        them -- talked to my mom a little bit -- actually,
```



Page 45

```
 1              no.  I don't even know if I did, no.  Because I
 2              talked to my brother Richard about it, and I think
 3              she heard about it through him.
 4                             So no, I don't think I really
 5              recall bringing it up.  It's kind of a touchy
 6              subject because she's still within the whole
 7              organization.  So yeah, I don't -- I don't really
 8              want to open that can of worms.
 9      Q       Understood.
10                             Do you remember having to fill out
11              daily moral inventories?
12      A       Yes.
13      Q       How often -- I know it sounds self-explanatory,
14              but was that every single day?
15      A       Yes.
16      Q       And what type of things would you put in those
17              inventories?
18      A       So I just glanced over one Renee sent over because
19              I was curious, but I was looking at it -- or what
20              I did, even, just really fast; and it looks like I
21              was really sloppy when I filled them out, like I
22              hated them and didn't really care about them.
23                             But I filled out basically, you
24              know, what the highlights of the day were,
25              basically what stood out to me, what I could have
```



Page 46

```
 1          worked on to -- you know, worked on to make my day
 2          go better, whatever, bad attitudes or whatever.  I
 3          don't know.  But I just kind of flew through them.
 4          I didn't really fill them out to -- I just filled
 5          them out to appease them actually, so yeah.
 6   Q      You had mentioned that one of your consequences
 7          was writing sentences.  Do you remember what those
 8          sentences were?
 9   A      No, nope.
10   Q      Do you remember writing any sort of essay?
11   A      Actually, that might have been one time.  I don't
12          recall that.  That -- that maybe rings a bell in
13          my memory maybe a bit, but nothing, yeah.
14   Q      I'm just going to pull it up mostly to confirm
15          some things here are your handwriting.  I'm not
16          going to sit here and force you to read.
17   A      Oh, that's fine.  I don't care.
18   Q      Okay.  I just put up on the screen what starts
19          at -- oh, I guess it starts at LRF273.  Do you
20          recognize that handwriting?
21   A      Yeah.  Give me a second.  I can probably remember
22          it.
23                         Can you go down farther?
24   Q      Yep.
25   A      Can you scroll down?
```



Page 47

```
1    Q    Let me know when to stop or if you want the next
2         page.
3    A    Go down to the next page.
4    Q    Sure.
5    A    And right there.  Was there multiple pages to
6         this?
7    Q    Yeah.  I can keep going if you want.
8    A    Yeah, keep going, and hold right there.
9    Q    I'm sorry.  I wish there was a better way to do
10        this.
11   A    Keep scrolling down.
12   Q    Yeah.
13   A    Hold right there.
14                        I don't know if this was
15        actually -- I don't know if this one was a
16        punishment or if this was just something I was
17        just writing, yeah.  But I definitely wrote it,
18        yes.
19   Q    Okay.  That's pretty much all I needed to know
20        from that.
21   A    Okay.
22   Q    Great.
23                        So you had mentioned that you
24        stayed at the farm like less than a year.  Does
25        that sound right?
```



Page 48

```
 1   A     I think I was actually there a full year, but I'm
 2         not totally sure.
 3   Q     Do you remember any of the conversations or who
 4         determined that you had essentially graduated from
 5         the farm?
 6   A     Ethan Weaver would have been the one that talked
 7         to other people about it.
 8                    He would have talked to other
 9         people about it, but it -- he would have been the
10         main guy that would have decided or felt that, you
11         know, it would -- yeah, that I was good.
12   Q     Do you remember having any conversations about
13         whether you were ready to be back out in society?
14   A     Yeah.  We had some, yes, yep.
15   Q     Do you remember any specifics about those
16         conversations?
17   A     No, nope.  No.
18   Q     Do you remember who those conversations were
19         with?
20   A     It would have been Ethan Weaver, some of the
21         mentors.  It was more or less in passing.  I don't
22         remember anything -- you know, any formal
23         sit-downs, this-is-what-it's-going-to-be-like, you
24         know, conversations, but yeah.
25   Q     And then you said before -- and correct me if I'm
```



Page 49

```
 1          wrong -- that Steven and Bonita came and picked
 2          you up?
 3    A     Yes, yep.
 4    Q     And where did you go from there?
 5    A     Back out to Illinois.
 6    Q     After leaving Liberty Ridge Farm, did you keep in
 7          touch with anyone that either resided or worked
 8          there?
 9    A     In passing, I would have.  Not really, you know --
10          not really, you know, consistent communication.
11          It was maybe in passing.
12    Q     Have you seen Ethan Weaver since then?
13    A     Yes.  I met him a few times.  I was visiting the
14          church or whatever, you know, in passing again.
15    Q     Do you remember how many times?
16    A     It would have been two or three times if I
17          remember right, yeah.
18    Q     Did Ethan Weaver ever come out to visit you in
19          Illinois?
20    A     Not that I can recall.
21    Q     After you left Liberty Ridge Farm, how long did
22          you stay at Steven and Bonita's?
23    A     I was thinking several months.  I'm not exactly
24          sure.
25                          Those dates kind of threw me off on
```



Page 50

```
 1         that paperwork that I was looking at.  I know for

 2         a fact I was out there for a little bit before I

 3         went to Pennsylvania.

 4     Q   And you said you couldn't really remember the

 5         names of the people you lived with in

 6         Pennsylvania?

 7     A   No, I can't remember it, no.  I would have to

 8         look.

 9                      I'm pretty sure I had a joint bank

10         account or something like that set up with them,

11         but I'm not sure.

12     Q   When you went back to Steven and Bonita's after

13         leaving Liberty Ridge, did you get a job?

14     A   Yes.  I worked at the feed mill.

15     Q   And what were you doing at the feed mill?

16     A   I mixed feed.  So a feed mixer/cleaned up around

17         there, you know, stuff like that.

18     Q   When you moved to Pennsylvania, did you have a job

19         when you were living with that family?

20     A   Yes.  I worked at Martin Farm Trucks, I think.  I

21         worked there, and -- yeah.  So worked there a

22         little bit and then, yeah, turned 18 and left.

23     Q   And when you turned 18, I know you left, and you

24         said you went to Ohio because you had a sister

25         there?
```



Page 51

1  A    Yes, yep.

2  Q    And what type of work, if any, were you doing in

3       Ohio?

4  A    I started off doing concrete work for Ohio Valley

5       Concrete; and then from there, I started doing

6       construction.  I think it was Hearst Builders,

7       something like that.  Actually, no.  That's not

8       what it was -- I forget what the name was, but it

9       was Mike Hearst out there, so...

10 Q    And then from there, you ended up going and moving

11      to Wisconsin because of the tree company?

12 A    No.  I started working for a roofing company in

13      Wisconsin, so...

14 Q    Okay.  So obviously --

15 A    Which --

16 Q    Sorry.  Go ahead.

17 A    Side note, that guy that I used to work for is now

18      out of business, FYI.

19 Q    Fair enough.

20                  So obviously we're here today

21      because a lawsuit was filed in the Eastern

22      District of Pennsylvania.  When did you first

23      discuss a lawsuit with David Cross?  And if it was

24      in the presence of an attorney, I do not want to

25      hear about it.



Page 52

```
 1   A    I think I saw it on the news -- either saw it on

 2        the news or something; and that's when I started

 3        talking to him about it.  Well, actually, hold on.

 4                      Before that, he had mentioned --

 5        there was several times before that he had

 6        actually mentioned he was going to talk to a

 7        lawyer; didn't really go anywhere.  And then

 8        somewhere I saw it on the news here recently and

 9        got ahold of Renee.

10   Q    How often do you talk to David Cross?

11   A    Not often.  It's kind of more in passing.  He'll

12        hit me up every now and then, we'll talk, but

13        yeah, not consistent.

14   Q    Did you stay in contact when you left Liberty

15        Ridge Farm or did it come after?

16   A    It would have came after.  He was under pretty

17        strict communication there or communication --

18        they monitored everything really closely.

19   Q    So I won't pull up discovery because the screen

20        sharing is a nightmare, but we had sent over some

21        written questions for discovery purposes, and one

22        of those questions was regarding whether you had

23        given any statements about this case.

24                      Do you remember answering a

25        question to that extent?
```



Page 53

```
 1   A     As far as -- statements as far as?

 2   Q     I'll ask a better question.

 3   A     Okay.

 4   Q     Do you remember giving a statement to the police

 5         with regards to Liberty Ridge Farm?

 6   A     No.  I had not given any written statements for

 7         it, no.

 8   Q     Okay.  Did you give any verbal statements to the

 9         police?

10   A     I talked to -- no, I don't think it would be

11         admissible, no.

12               MS. WYNKOOP:  Honestly, I think I'm

13         almost done.  Do you mind if we just take five so

14         I can go through my notes?

15               MS. FRANCHI:  Yeah, that's fine.

16               MS. WYNKOOP:  I did tell you I was

17         quick.

18               THE VIDEOGRAPHER:  The time is

19         11:22 a.m.  We're going off the record.

20               (Discussion off the record.)

21               THE VIDEOGRAPHER:  The time is

22         11:47 a.m.  We're back on the record.

23               MS. WYNKOOP:  All right.  So I'm about

24         done with my questions.  Obviously after your

25         counsel goes, I might have a few more, but for
```



Page 54

```
 1       now, I'll pass it over to Renee.
 2  BY THE WITNESS:
 3  A    Can I say that -- did you want anything on that
 4       one statement question?  Because I did provide a
 5       statement to -- it was a recording, a podcast with
 6       The Plain People's podcast.  I kind of gave my
 7       life story, slash, and then there was stuff in
 8       there about Liberty Ridge Farm too.
 9  BY MS. WYNKOOP:
10  Q    Okay.
11  A    FYI, so.
12  Q    Okay.  Thank you.
13             MS. FRANCHI:  All right.  So my turn.
14                    EXAMINATION
15  BY MS. FRANCHI:
16  Q    All right.  So there's just a few -- some
17       background things, Robert that I wanted to ask you
18       about just to provide a little bit of
19       clarification on some of the discussion that you
20       had with Meghan earlier.
21             So I want to take you back to your
22       early childhood.  Tell me a little bit about your
23       general background starting with your birth
24       parents.  Do you know them at all?
25  A    No.
```



Page 55

```
 1   Q    Do you know what their -- what their background
 2        is, like their ethnicity or anything like that?
 3   A    I think they're Hispanic from what I recall
 4        hearing anyways.
 5   Q    Otherwise, though, you had no contact with them,
 6        no knowledge really about them?
 7   A    No, nope.
 8   Q    Okay.  So tell me a little bit about just your
 9        childhood and growing up and some of the
10        experiences that you had that led you ultimately
11        up to Liberty Ridge.
12                   I'm assuming that being bounced
13        around a lot, it wasn't necessarily happy and that
14        there was probably some trauma there.
15   A    Yeah.  So I think the biggest one was obviously,
16        you know, the childhood trauma I got when I was
17        super young.
18                   I was -- this is what I was told
19        from my foster and birth -- sorry -- from my
20        foster and my adopted parents.  Obviously, I don't
21        have -- I didn't have access to medical records.
22        But this is kind of what I'm hearing, that I was
23        an alcohol -- or I'm not sure exactly what they
24        call it.  But my mom drank before she had me, so
25        there was definitely some alcohol involved.
```



Page 56

```
 1                    I was also a malnutrition baby.
 2       They failed to feed me, stuff like that.  And then
 3       I think somewhere along the line doctors labeled
 4       me failure to thrive, if I remember right, and
 5       then -- let's see here.  That's more or less kind
 6       of my super -- you know, when I was super young.
 7       I really don't remember any of that honestly.
 8                    Oh, yeah, there's one other big
 9       one.  Supposedly there was shaken baby syndrome
10       somewhere along the line.  My parents -- or my
11       birth parents did that to me.
12                    And then from there, I went to my
13       foster parents, and that's kind of where I really
14       started thriving there according to my foster
15       parents.  Now they're dead, so really can't go
16       back and ask them, but that's what I remember
17       hearing from them anyways.  That's kind of really
18       where I started thriving.  I kind of went from
19       there.
20                    And then from that point, I went
21       over to -- I got adopted; and then I was sexually
22       abused at a very young age there.  And then from
23       there, it was kind of just a really rocky
24       challenge because I couldn't really -- yeah -- I
25       couldn't really fit in, you know, just a very
```



Page 57

```
 1        violent child/rebellious or whatever they called
 2        it, and that's the reason I kind of got moved
 3        around, you know.  So that's kind of, you know, in
 4        a nutshell what all happened.
 5   Q    About how old were you when you were sexually
 6        abused?
 7   A    If I remember right, I was five or six, somewhere
 8        around there.
 9   Q    Do you remember who --
10   A    It was shortly after I was adopted.
11   Q    Okay.  Do you recall who the perpetrator was?
12   A    Yes.  It was my older brother.  I think he was 18,
13        17 or 18 at the time, but yeah.
14                    Do I say his name?  I don't care.
15   Q    You can if you want to.
16   A    Stanley -- Stanley Miller, yep.
17   Q    Did anybody know this was going on?
18   A    Yes.  I told my parents, and I got punished for
19        it.
20   Q    You got punished?
21   A    Yep.
22   Q    Was there anybody else you're aware of that found
23        out?
24   A    I didn't really -- not at the time.
25                    I didn't really -- I didn't really
```



Page 58

```
 1            bring anything else up at the time till I was
 2            age -- I was really having a lot of the struggles
 3            with Steven and Bonita at their place, and I
 4            wasn't fitting in.  I'm not sure whether it was
 5            before or after I went to Liberty Ridge Farm.
 6            Somewhere along the line I brought it up and said,
 7            Hey, this is what happened and -- or I mentioned
 8            it in passing to one of my then mentors.  His name
 9            was Dale Martin, Dale Eugene Martin.  He was kind
10            of labeled a mentor.  And I kind of mentioned --
11            or brought something up to him, like, hey, this
12            is, you know, kind of what happened; and that's
13            kind of like where he was, like, that's sexual
14            assault, sexual abuse.  So that's kind of where I
15            learned about it and yeah.
16     Q      Why did you get punished?
17     A      Because -- okay.  So my dad punished me, and I'm
18            pretty sure that one was because -- I'm not sure
19            exactly why.
20                        But I'm pretty sure that one -- in
21            my childhood's memory, I remember it as I was the
22            one doing the wrong, and yeah.
23     Q      What was the punishment?
24     A      He gave me a whipping, corporal punishment, yep.
25     Q      So I'm sure getting bounced around from home to
```



Page 59

```
 1            home was pretty difficult for you growing up, not
 2            to put words in your mouth, but I can imagine.
 3      A     Yes, yeah.
 4      Q     Tell me about how it made you feel as a child at
 5            that time when you kept getting moved from place
 6            to place.
 7      A     After a while, you just kind of get the instinct
 8            or the thing -- the fight to survive instinct.
 9            That kicks in.
10                        However, when I went and moved to
11            Illinois, I guess that's kind of where I felt like
12            I like the place, I kind of liked the people at
13            the time, you know.  I kind of in my young --
14            being a young child, that's kind of where I, you
15            know, dreamed, like, okay, maybe I'll at least
16            have a shot at maybe a normal life, you know.
17                        But I do remember somewhere along
18            the line, I got told I was going to have to move
19            and that just -- yeah.  That definitely was kind
20            of quite heartbreaking.  After that, I just kind
21            of shelled up into my own shell and, yeah, pretty
22            much survived after that.
23      Q     Did it feel like you just didn't have a place?
24      A     How was that?
25      Q     I said, Did it just kind of feel like you didn't
```



Page 60

```
 1        really have a place after that?
 2   A    Yes, yes.
 3   Q    Now, growing up before you went to Liberty Ridge,
 4        did you ever get any, I guess, traditional therapy
 5        or did your parents try to, like, do any type of
 6        medical treatment to -- you know, to help you with
 7        your trauma or, you know, work through your
 8        behaviors?
 9   A    No.  Chiropractors was probably their biggest
10        therapy.  There was one point we went up to
11        Colorado -- well, first they tried sending me over
12        to my foster parents because they figured maybe,
13        you know, that younger connection with me, maybe,
14        you know, they could connect with me.  Obviously,
15        that didn't work.
16                  From there, they went up to a
17        doctor -- or a so-called doctor in Colorado; and
18        I'm not sure exactly what the treatment was
19        called, but it was where they stuck balloons up
20        your nose to try to address the -- some front bone
21        on your -- this is what the doctor claimed.
22                  Some front bone on your skull,
23        supposedly that bone could put pressure on parts
24        of your brain that affect behavioral health, stuff
25        like that.  News to me, but yeah, anyways, that's
```



```
 1            what they told me.
 2     Q      Was that the only time that you had this procedure
 3            done where they tried to move the bones in your
 4            face?
 5     A      No.  We went up there several times where they did
 6            that; and then that was more or less kind of the
 7            extent of that treatment, and then yeah.  I
 8            haven't had any other treatment after.
 9     Q      Did it make you feel any better?
10     A      No.  It was painful.  It was extremely painful.
11     Q      I'm assuming it didn't change your -- your
12            behaviors?
13     A      Oh, absolutely not, nope.
14     Q      So once you got to Liberty Ridge and you were
15            moved from, you know, place to place and you kind
16            of settled there, how did you feel?
17     A      At Liberty Ridge or --
18     Q      Just with the idea of just having to go somewhere
19            else, getting removed from your different families
20            and then, I guess in your brain at the time, you
21            know, what was the feeling when you first got
22            there?
23     A      I guess a lot of it was subconscious.  I was quite
24            terrified at first.
25                         Like I said, I was in a fight to
```



Page 62

```
 1          survive instinct mode then.  That's why I said I
 2          don't remember everything.  I kind of pushed
 3          everybody out and, you know, didn't really -- you
 4          know, it was more or less fight to survive.
 5                    I don't really remember much,
 6          but -- other than that's where I kind of also, you
 7          know, pushed buttons there, you know, figured out
 8          what they would react on, what would cause them to
 9          make me do my punishment, stuff like that.
10                    When I realized that, that it was a
11          super sensitive place, that's kind of where I
12          hunkered down and survived, and I knew I was going
13          to be there for a year.  So you play happy or
14          play -- you know, you kind of learn to, like,
15          mentally be okay with your surroundings while
16          you're in there.  Another instinct mode, yes.
17    Q     So you were kind of on autopilot?
18    A     More or less, yes.
19                    I would even -- I would go as far
20          even to how long David -- get him in trouble
21          before I would get in trouble.  That way, I was on
22          the moral high ground, you know, so...
23    Q     Was that the type of atmosphere they put you in,
24          to make sure that you were the one that was on the
25          moral high ground?
```



Page 63

```
 1   A     I would say yes.

 2                   They also instigated it kind of

 3         too.  You could kind of tell when David had his

 4         good days and when he had his bad days; and then

 5         when he had his bad days, it was like, number one,

 6         I was supposed to be able to -- I was supposed to

 7         tell if something bad was -- or something was out

 8         of line.  Two, they kind of instigated or they

 9         would push his buttons kind of to get him to

10         react; and then once he reacted, then it was

11         hands -- you know, let's go hands-on with the guy,

12         you know, so...

13   Q     And when you say "they," who would that be?

14   A     Ethan Weaver was the main instigator as far as

15         pushing the buttons.  The Ebersol guy was another

16         big one.  It was mainly the house parent and the

17         mentors -- the two mentors there at the time.

18                   We had some very by-the-book

19         mentors that were there, and they would also do

20         their fair share of pushing buttons too.

21   Q     What were some of the things you observed when you

22         say, like, pushing buttons and instigating?  What

23         do you mean?

24   A     As far as?

25   Q     When it comes to David and his mental illness and
```



Page 64

```
 1        behaviors.
 2   A    So basically, they would -- their whole idea --
 3        and this is kind of a little bit of background on
 4        them.  Their whole idea is to work out rebellion,
 5        you gotta bring it to the surface.  And I kind of
 6        felt that they would -- they would sit there and
 7        start talking to him, you know, like as far as
 8        their beliefs, for example.
 9                    If they had a belief, a
10        conversation on, you know, beliefs or something
11        like that, they would really push their side of
12        thinking; and that would just irritate him to the
13        point where he was -- he would get violent, you
14        know, because he wasn't thinking rationally, and
15        then it would go from there, you know.
16   Q    Was it your --
17   A    Whether he was doing --
18   Q    Oh, sorry.  No, no.  You can finish.
19   A    Whether he was doing punishments or -- and
20        oftentimes, once he got violent, he was doing
21        punishments, then he'd get disrespectful; and then
22        they would just keep pushing him on from there
23        sometimes to the point of violence, like, where
24        they would have to hold him down.  There was
25        multiple times they had to do that, so...
```



Page 65

```
 1   Q    Was it your understanding when you were there that
 2        David had some pretty serious mental illnesses?
 3   A    Yes, yes.
 4   Q    Did you or David or any of the other residents
 5        ever receive any, like, therapy or treatment while
 6        you were at Liberty Ridge?  Like did they bring
 7        anybody in to address those issues?
 8   A    No.
 9   Q    Did anybody speak to you about any treatment for
10        your history of trauma?
11   A    No.
12   Q    So you had mentioned that you did have one
13        consequence, that you worked overnight, correct?
14   A    Uhm-hm, yes.
15   Q    Was your food or water ever restricted during that
16        time?
17   A    Yes.  I had one glass of water and then -- yeah,
18        that was it.
19   Q    About how long were you doing this work for during
20        your consequence?
21   A    If I recall, it was all night I was doing it.  I
22        got the glass of water probably three or four
23        hours into it, something like that.
24                   And it wasn't easy digging either.
25        It was super rocky.  So yeah, that was fun.
```



Page 66

1    Q    I'm assuming that's sarcasm?

2    A    Yeah.  That's definitely sarcasm.

3    Q    There was some talk earlier when Meghan was asking

4         you questions about -- about chores and then work.

5                        Explain to me your experience

6         there, that there was a difference between, you

7         know, the household chores in the morning and the

8         actual work that you were performing.

9    A    So your household chores was, you know, cleaning

10        dishes, stuff like that.  That didn't -- the

11        biggest one was, like, raising the chickens for

12        the live market.  That was more or less work.

13                       Yeah.  Household chores, you just

14        do your normally daily duties as far as, you know,

15        washing the dishes or, you know, just normal small

16        stuff, but everything else had a purpose.

17   Q    And everything else would include, like, the

18        lumber work, any of the other -- basically the

19        actual, like, labor that you did, correct?

20   A    Yes, yep.

21   Q    Okay.  I'm almost done, I swear.

22                       What was your understanding when

23        you were at Liberty Ridge of what would happen if

24        you, you know, spoke out or voiced any, you know,

25        concerns about your treatment or anything like



Page 67

```
 1        that?
 2   A    I felt that I would either -- okay.
 3                  So the big narrative in the Eastern
 4        Mennonite church or in the plain churches in
 5        general, the big narrative is -- and they'll
 6        preach this across their pulpit, that law
 7        enforcement looks up to them.
 8                  And I guess I felt like -- and
 9        Ethan Weaver went as far as to say that too,
10        where, you know, if we -- if we ever ran away or
11        whatever, law enforcement would bring us back to
12        the place or -- it was either that or punishments.
13        Those two things I was worried about.
14   Q    Would this also include if you -- you know, if you
15        didn't want to work or basically do what they had
16        said?
17   A    You would get punishments, yes, yes.
18                  And I guess my other biggest fear
19        was, is if I did end up leaving or whatever, I
20        would have no support system outside of, you know,
21        that culture.  So I'd be pretty much homeless at
22        that point.
23   Q    As a teenager?
24   A    Yes, yeah.
25   Q    Do you remember seeing any times -- I know that
```



Page 68

```
 1        you had mentioned David being physically
 2        restrained.
 3                      Do you remember seeing any times
 4        where he was physically restrained for, you know,
 5        long periods of time?
 6   A    Yes.  One time was downstairs, and I heard him
 7        down there.  He was hollering around making a
 8        bunch of ruckus down there because -- I don't know
 9        exactly what happened, he told me what happened,
10        but I know he was held inside the building
11        downstairs.
12                      The other time I saw was when he
13        was three-quarter away from -- and they may have
14        changed the property.  But at that time there was
15        like a small building down below closer to the
16        driveway, and then the main house was up higher,
17        and there was kind of a small hill going down to
18        it, and he was about three-quarter way down here.
19        And they went hands-on with the guy and tied him
20        up, put him on the ground, you know, so yep.
21   Q    How long was he tied up for?
22   A    Hours.
23   Q    And he was outside?
24   A    Yes.  That was --
25   Q    Do you remember --
```



Page 69

1    A      -- 9:00 at night, something like that.

2    Q      And how was he tied?

3    A      I don't know.  I didn't see it.

4                    He told me he was tied up with

5           bands of some sort, but I don't know.

6    Q      Did you -- did you see him when he was out there?

7    A      Yes.  Yes, I saw him.  I saw -- it took, like,

8           three guys to hold him down.

9    Q      And did you see him when they tied him up and left

10          him out there?

11   A      No.  They stayed out there with him, but yeah.  I

12          didn't pay attention the whole time.  I was

13          upstairs via --

14   Q      Just trying to keep to yourself?

15   A      Yeah.  There was definitely times I got glimpses

16          of it, yes.

17   Q      Okay.  I think those are all the follow-up

18          questions that I have unless there's anything

19          else, Robert, that you feel to -- you know, that

20          you want to say or that there's anything else

21          important to you.

22   A      Yeah.  Those weren't the only circumstances.

23                   There was other times too, like,

24          you could hear the guy like obviously was, A, in

25          distress or, you know, stuff was happening.  There



Page 70

```
 1        was at one point, yeah -- I can't really say much
 2        other than that.
 3   Q    Did you see times where David had to work
 4        overnight?
 5   A    Yes.  Oh, yeah, yep.  He worked quite a bit.  He
 6        pushed that -- he pushed their buttons quite a bit
 7        more than I did.
 8   Q    About how many times, if you recall, was he
 9        working overnight?
10   A    More than five or six.  I can't really recall, but
11        definitely more than five or six.
12   Q    Enough that you remember that --
13   A    Oh, yeah, yeah.
14   Q    -- happened?
15   A    Yep.
16   Q    And when this is going on, you know, at some point
17        do you just go to bed or where were you?
18   A    Yes.  Most times I was in bed, yes.
19   Q    All right.  I think that's everything from me.
20   A    And then can I also bring in one other point?
21   Q    Sure.
22   A    Joel Nolt -- I think it was Joel Nolt or was it --
23        sorry.  Okay.
24                    Here's one -- I think I figured out
25        the guys that was downstairs that gave us those
```



Page 71

```
 1        glasses.  His name was Eugene Nolt if I remember
 2        right, and there was a guy named Joel something.
 3        And I could -- I could have these names kind of
 4        screwed up too.
 5                      But he was a guy that came over and
 6        helped restrain David at one of those points.  It
 7        was the one where they were, like, three-quarter
 8        way down to that other house or building.  I know
 9        he was definitely there.  So yep.
10   Q    At any point when David was really in -- you know,
11        in distress from his mental health, did they ever
12        take him, you know, to the hospital or to a crisis
13        center or anything like that?
14   A    No, absolutely not.  They didn't even get
15        emergency services there for any of that.
16                      MS. FRANCHI:  All right.  Thank you,
17        Robert.  I think that's everything we have now.
18                      Sorry I went a little bit longer
19        than I was -- I was planning, but I felt like we
20        had a good dialogue going.  So I appreciate it.  I
21        don't know if Meghan has any more follow-up
22        questions.
23                      MS. WYNKOOP:  I do, just a couple.
24
25
```



Page 72

                         FURTHER EXAMINATION
2   BY MS. WYNKOOP:
3   Q    So before your attorney started asking you some
4        questions, we had a pretty extended break and then
5        when we came back on the record, you provided some
6        clarification about an answer.
7                    During the break -- and I don't
8        want to know anything about conversations before
9        this deposition -- but during the break, were you
10       asked to provide any clarification on your prior
11       testimony?
12  A    As far as?
13  Q    From your attorney.
14                   MS. FRANCHI:  I'm going to object.
15                   MS. WYNKOOP:  So I have a case any
16       conversations about -- related to clarification or
17       coaching during the course of a deposition are not
18       privileged.
19                   THE WITNESS:  Okay.  What are we talking
20       about as far as clarification I want to know?
21  BY MS. WYNKOOP:
22  Q    Were you asked to provide any clarification on the
23       record about your answers?
24  A    Not that I can recall, no.
25                   I tried to get -- figure out what



Page 73

1    you're talking as far as clarification goes.  Like
2    I cleared up a little bit more as far as my
3    childhood.
4              MS. FRANCHI:  Here.  I'm going to stop
5    at this second.  Can we just go off the record for
6    a moment?
7              MS. WYNKOOP:  Sure.
8              THE VIDEOGRAPHER:  The time is
9    12:11 p.m.  We're going off the record.
10              (Discussion off the record.)
11              THE VIDEOGRAPHER:  The time is
12    12:12 p.m.  We're back on the record.
13              MS. WYNKOOP:  So we just got off the
14    record to give some context to my question.  So
15    now that we're back on the record, I'll ask
16    because -- and just for your information that --
17    there is no privilege during a deposition.  As
18    soon as the deposition starts, privilege is out
19    the window other than you're discussing whether to
20    assert privilege.
21  BY MS. WYNKOOP:
22  Q    So during that extended break, were you asked by
23    your attorney to clarify any of your prior
24    testimony?
25  A    No.



Page 74

1   Q    Were you directed to answer questions in a certain
2        way moving forward?
3   A    No.
4   Q    Were you told what the questions were going to be
5        asking about and seeking clarification about them?
6   A    Okay.  How was that again?
7   Q    So were you asked what -- or were you told which
8        questions, in particular, were going to be asked?
9   A    We talked about some of the questions coming up,
10       yes, that she was gonna, you know, talk about.
11  Q    Okay.  So I'm going to take you back to some of
12       the testimony that we just got from you, and I
13       believe that you have referenced David Cross
14       getting violent while he was there.
15                      Do you remember saying that?
16  A    Yes, yep.
17  Q    Can you explain what you meant by that or what you
18       observed?
19  A    I just explained it as far as --
20  Q    I'm sorry.  As far as what his behavior was, what
21       did he do that you could consider to be violent?
22  A    He would try to physically assault them, yeah.
23  Q    Who is "them"?
24  A    The mentors and the house parent.
25  Q    Did you ever see David punch or strike any of the



Page 75

```
 1          mentors or the house parents?
 2    A     If I recall, yes, once, yes.
 3    Q     Did you ever see him try to hit anyone with a
 4          shovel?
 5    A     Heard of that; didn't see it.
 6    Q     We talked a little bit about the physical
 7          restraint.  By physical restraint that you saw,
 8          was it mostly just either the mentors or the house
 9          parents kind of holding David with their hands?
10    A     Yes, yes.  It took, like, three of them to -- for
11          the most part, they held him down with their
12          hands.  Every now and then I heard that he was
13          tied up.
14    Q     Did you ever see any of the actual ties or did
15          David just tell you about it?
16    A     He told me about it.
17    Q     Was the physical restraining, did that ever
18          occur -- strike that.
19                    Was the physical restraining in
20          response to the violence?
21    A     Yes, yes.
22                    It is important, though, that
23          they -- to bring up, that they -- there's a thing
24          of deescalation to a situation that definitely was
25          not used in that situation.
```



Page 76

```
 1                        It was more of an escalation
 2         through words; and then from there -- they knew
 3         obviously he was weak-minded.  So from there, he
 4         was the -- he instigated the violence -- or sorry.
 5         He was the first one that was the violent person,
 6         and then they were able to restrain them then.  So
 7         they definitely instigated it through words,
 8         though.
 9    Q    David was a resident there before you became a
10         resident, right?
11    A    Yes, yes.
12    Q    And was he a resident there after you became a
13         resident?
14    A    Yes.
15    Q    Do you know about how long he was there before and
16         after you?
17    A    I'm not sure exactly.  I think it was around a
18         year, maybe longer.  I'm not sure.
19    Q    Okay.  So you only saw about a year of his time as
20         a resident?
21    A    Yes, yes.
22               MS. WYNKOOP:  That's it for me.
23               MS. FRANCHI:  Okay.  I have no further
24         questions.  We can go off the record.
25               THE COURT REPORTER:  I do need to get
```



Page 77

```
 1      orders on the record.
 2                MS. FRANCHI:  Sure.
 3                MS. WYNKOOP:  I'm sorry.  Orders?
 4                THE COURT REPORTER:  Orders of the
 5      transcript.
 6                MS. WYNKOOP:  Oh.
 7                MS. FRANCHI:  Oh, ho.  I was like okay.
 8                    I would just like an electronic
 9      copy.  I don't need a physical, like, hard copy of
10      it.
11                MS. WYNKOOP:  I will also just like an
12      electronic copy.
13                THE VIDEOGRAPHER:  And for video orders,
14      you both need MP4s, right?
15                MS. WYNKOOP:  Yes, please.
16                MS. FRANCHI:  Yes.
17                THE VIDEOGRAPHER:  Thank you.  All
18      right.  The time is 12:16 p.m.  This concludes the
19      deposition of Robert Miller.  We're off the
20      record.
21                MS. FRANCHI:  So he'll waive.
22                    (Proceedings concluded at 12:16 p.m.)
23
24
25
```



Page 78

```
 1   STATE OF WISCONSIN    )

                          )  SS:

 2   COUNTY OF MILWAUKEE   )

 3                I, Debbie A. Harnen, a Registered

 4   Professional Reporter and Notary Public in and for the

 5   State of Wisconsin, do hereby certify that the

 6   deposition of ROBERT H. MILLER was reported by me and

 7   reduced to writing under my personal direction.

 8                I further certify that said deposition

 9   was taken VIA ZOOM VIDEOCONFERENCE, on October 21,

10   2022, commencing at 10:03 a.m. and concluding at

11   12:16 p.m.

12                I further certify that I am not a relative

13   or employee or attorney or counsel of any of the

14   parties, or a relative or employee of such attorney or

15   counsel, or financially interested directly or

16   indirectly in this action.

17                In witness whereof, I have hereunto set my

18   hand and affixed my seal of office at Milwaukee,

19   Wisconsin, on November 1, 2022.

20

21                       Debbie A. Harnen

22                    Debbie A. Harnen - Notary Public

                      In and for the State of Wisconsin

23

     My Commission Expires:  July 27, 2026.

24

25
```



**A**

**a.m**
1:20 4:9 34:22 35:1,2
35:4 53:19,22 78:10
**able**
7:18 17:8 63:6 76:6
**absolutely**
27:20 61:13 71:14
**abuse**
58:14
**abused**
56:22 57:6
**access**
55:21
**account**
50:10
**action**
78:16
**actual**
37:9 66:8,19 75:14
**add**
19:3
**address**
13:23 60:20 65:7
**admissible**
53:11
**adopted**
8:25 9:2 10:7 55:20
56:21 57:10
**adoptive**
9:11
**advance**
27:19
**affect**
60:24
**affixed**
78:18
**age**
9:5 10:10 15:16 36:3
56:22 58:2
**ages**
36:12
**agreement**
5:14
**agreements**

5:9
**ahead**
13:8 51:16
**ahold**
52:9
**al**
4:5
**Alan**
9:12,14 10:7 11:2
**alcohol**
55:23,25
**alive**
13:9
**allowance**
31:7
**amended**
18:22
**Andreozzi**
2:3 4:18
**animals**
33:14,17
**answer**
6:12,25 7:13 72:6
74:1
**answering**
7:5 52:24
**answers**
72:23
**anybody**
57:17,22 65:7,9
**anymore**
16:1
**anyways**
38:7 55:4 56:17
60:25
**apartment**
13:15 14:15,21 15:4
15:5,8,18
**apologize**
8:15,17 27:19
**appearances**
4:15
**APPEARED**
2:2,7
**appease**
46:5

**application**
28:5,8 29:16
**appreciate**
6:2 24:21 36:8,25
71:20
**arborist**
16:24 17:1
**AREAS**
1:8
**Arizona**
8:24 10:12
**aside**
7:20
**asked**
24:22 41:20 72:10,22
73:22 74:7,8
**asking**
6:17 13:7 18:4 34:5
37:3 66:3 72:3 74:5
**assault**
58:14 74:22
**assert**
73:20
**assume**
7:14
**assuming**
55:12 61:11 66:1
**atmosphere**
62:23
**attach**
21:25
**attachment**
21:24
**attention**
69:12
**attitudes**
46:2
**attorney**
7:21 8:4 51:24 72:3
72:13 73:23 78:13
78:14
**Austin**
31:24,25
**autopilot**
62:17
**avoid**

44:23
**aware**
28:7 57:22

**B**

**B**
3:9
**baby**
56:1,9
**back**
9:3,25 10:11,15,18
11:18 12:11,11,22
13:3 14:4,20 24:13
32:20 33:25 35:4
42:9,11 43:22 48:13
49:5 50:12 53:22
54:21 56:16 67:11
72:5 73:12,15 74:11
**background**
19:21 25:18 33:2
54:17,23 55:1 64:3
**bad**
46:2 63:4,5,7
**balloons**
60:19
**bands**
69:5
**bank**
50:9
**baptized**
26:2,4,9
**barn**
39:5
**basic**
39:5
**basically**
11:12 17:4 22:7,15
32:3 39:18 45:23,25
64:2 66:18 67:15
**basketball**
38:22
**bat**
12:16 25:3 31:5
34:11 38:20 41:8
**Bates-stamped**
27:24



beans
37:14
becoming
20:24
bed
70:17,18
beginning
8:14 9:25 10:2,3
begins
4:3
BEHALF
2:2,7
behavior
37:2 42:7 74:20
behavioral
60:24
behaviors
60:8 61:12 64:1
behind-the-scenes
41:14
belief
64:9
beliefs
64:8,10
believe
74:13
bell
46:12
Berlin
15:6
better
21:11 46:2 47:9 53:2
61:9
bible
32:20 40:22 41:3
big
39:22 42:14 56:8
63:16 67:3,5
biggest
55:15 60:9 66:11
67:18
birth
9:7 10:3 54:23 55:19
56:11
birthday
8:21

Bishops
12:6 20:22 22:18
Bishops/preachers
22:7
bit
8:15 10:23 14:19
15:7 16:14 17:14
19:7 20:1 32:15
36:3 41:19 44:25
46:13 50:2,22 54:18
54:22 55:8 64:3
70:5,6 71:18 73:2
75:6
blast
32:24
blur
40:14
Bob
8:19
Boersma
14:17,17,18
bomb
43:22
bonding
21:14
bone
60:20,22,23
bones
61:3
Bonita
11:8,19,20 12:13
23:3 24:5 29:19
30:17 33:21 49:1
58:3
Bonita's
11:25 12:23 13:1
20:2 24:12,25 49:22
50:12
born
8:23
bounced
10:18 12:6,7 55:12
58:25
boys
10:17,18 20:14
brain

60:24 61:20
break
6:11 10:22 35:6 72:4
72:7,9 73:22
breakfast
32:22
breaks
6:13
bring
58:1 64:5 65:6 67:11
70:20 75:23
bringing
45:5
brother
24:16 45:2 57:12
brought
22:7 41:11 43:10
58:6,11
bucked
25:5
bucks
30:14
build
21:10
Builders
51:6
building
11:12 68:10,15 71:8
bunch
22:22 68:8
bundles
32:25
business
51:18
buttons
25:9 43:8 62:7 63:9
63:15,20,22 70:6
by-the-book
63:18

_____

C

C
2:1
call
8:19 20:11 25:21,23
55:24

called
5:17 57:1 60:19
camper
15:7
car
43:11
care
33:16 45:22 46:17
57:14
case
1:6 52:23 72:15
cause
62:8
CCL
16:22
CDL
13:20 16:20,23
center
71:13
Central
4:9
certain
74:1
certification
16:25 17:1,4,9
certify
78:5,8,12
certs
16:22
cetera
17:18
chain
17:21 35:15 39:1
challenge
56:24
chance
27:11
change
61:11
changed
68:14
charged
18:5
chicken
39:5
chickens



33:10 35:12 66:11
**child**
10:5 29:2 59:4,14
**child/rebellious**
57:1
**childhood**
11:11 54:22 55:9,16
73:3
**childhood's**
58:21
**children**
18:2
**chill**
41:9
**chippers**
17:21
**Chiropractors**
60:9
**chores**
32:17,20 33:7,8,9
35:10,21 39:9 40:24
66:4,7,9,13
**Christian**
25:21,24 26:1
**church**
1:8,9 6:1 12:1 23:11
23:14 25:16,22 26:8
49:14 67:4
**churches**
23:11 67:4
**circumstances**
69:22
**citations**
18:6
**City**
33:12
**Civil**
1:16
**claimed**
60:21
**clarification**
54:19 72:6,10,16,20
72:22 73:1 74:5
**clarify**
36:14 73:23
**clarifying**

24:21
**class**
40:18,20,25 41:3,3
**clean**
39:4
**cleaned**
35:22
**cleaning**
66:9
**clear**
7:3 14:12
**cleared**
73:2
**climber**
17:15
**close**
13:2
**closely**
52:18
**closer**
68:15
**clue**
9:9 23:4
**coaching**
72:17
**cold**
8:15
**college**
19:7,9,11,12
**Colorado**
60:11,17
**come**
43:22 49:18 52:15
**comes**
63:25
**coming**
74:9
**commencing**
1:20 78:10
**Commission**
78:23
**communication**
49:10 52:17,17
**Community**
19:12
**company**

16:5 51:11,12
**complaint**
18:22
**complete**
35:21
**concerns**
66:25
**concluded**
77:22
**concludes**
77:18
**concluding**
1:21 78:10
**concrete**
39:21 51:4,5
**confirm**
46:14
**conform**
25:22
**conforming**
22:10
**confuse**
7:12
**connect**
14:8 60:14
**connection**
60:13
**consequence**
65:13,20
**consequences**
42:6 46:6
**conservative**
23:17
**consider**
9:13,14 74:21
**considered**
21:22
**consistent**
49:10 52:13
**construction**
33:2 51:6
**contact**
24:9 52:14 55:5
**context**
73:14
**conversation**

30:4 64:10
**conversations**
30:2 48:3,12,16,18
48:24 72:8,16
**convictions**
43:13
**copy**
77:9,9,12
**corn**
37:14,19
**corporal**
39:14 58:24
**correct**
48:25 65:13 66:19
**correctly**
10:24 22:4
**coughing**
8:16
**counsel**
4:14 5:13 53:25
78:13,15
**COUNTY**
78:2
**couple**
5:9 36:11 71:23
**course**
72:17
**court**
1:1 4:6,12 5:2 6:19
6:21,25 7:6 29:21
76:25 77:4
**crane**
16:4,8,13,13,23
17:16,20
**crashed**
14:19
**credits**
19:10,11
**crime**
18:5
**crisis**
71:12
**crops**
37:11,12,13,25
**cross**
8:6 23:17 31:12



51:23 52:10 74:13
**cucumbers**
37:22
**culture**
38:6 67:21
**curious**
45:19
**current**
13:23 14:15
**currently**
13:11,17 17:23
**cut**
16:10
**CV**
1:6

---

**D**

**D**
3:1
**D.C**
1:4 4:4
**d/b/a**
1:7
**dad**
9:18 39:21 58:17
**daily**
32:13 45:11 66:14
**Dale**
58:9,9
**Daryn**
31:24
**date**
29:11,14
**dated**
26:23
**dates**
19:17 49:25
**David**
8:6 31:12 51:23
52:10 62:20 63:3,25
65:2,4 68:1 70:3
71:6,10 74:13,25
75:9,15 76:9
**David's**
31:21
**day**

32:23 40:25 45:14,24
46:1
**day-to-day**
35:7 41:17
**days**
63:4,4,5
**dead**
56:15
**deal**
42:14
**dealing**
8:15
**Debbie**
1:17,24 4:12 78:3,22
**decided**
12:1 43:17 44:8
48:10
**deescalation**
75:24
**defendant**
20:9
**defendants**
1:10,15 2:7 4:23,25
**definitely**
17:17 34:12,13 40:8
47:17 55:25 59:19
66:2 69:15 70:11
71:9 75:24 76:7
**deposed**
6:4
**deposition**
1:14 4:3,10 5:8,12
7:23 72:9,17 73:17
73:18 77:19 78:6,8
**depositions**
42:17
**Derstein**
34:9
**detail**
28:24
**determined**
48:4
**devotion**
40:20
**dialogue**
71:20

**difference**
66:6
**different**
36:11,12 37:6 43:14
61:19
**difficult**
29:6 59:1
**dig**
43:17,25
**digging**
43:18 44:15 65:24
**digress**
42:4
**directed**
44:6 74:1
**direction**
78:7
**directly**
78:15
**discovery**
52:19,21
**discuss**
51:23
**discussing**
73:19
**discussion**
34:23 53:20 54:19
73:10
**dishes**
66:10,15
**disorder**
21:24
**disrespectful**
64:21
**distress**
69:25 71:11
**District**
1:1,2 4:6,6 51:22
**doctor**
60:17,17,21
**doctors**
56:3
**document**
18:19 20:20 27:22,25
**documents**
8:2 20:18 26:23,25

29:21
**doing**
15:25 17:6 25:25
28:10,22 32:22,25
39:9 44:12 50:15
51:2,4,5 58:22
64:17,19,20 65:19
65:21
**downstairs**
68:6,11 70:25
**drag**
33:4
**drank**
55:24
**dreamed**
59:15
**dressed**
32:16
**driver's**
13:17
**driveway**
68:16
**Drop**
16:6
**duly**
5:18
**duties**
16:9 66:14

---

**E**

**E**
2:1,1,4 3:1,9,16,16
5:20
**earlier**
26:19 54:20 66:3
**early**
54:22
**earn**
37:5
**easier**
7:6
**Eastern**
1:2,7,9 4:6 6:1 19:12
23:13 51:21 67:3
**easy**
65:24



**Ebersol**
31:20 63:15
**Edelstein**
2:8 4:11,22,25 5:23
**educational**
19:6
**either**
11:2 39:6 42:22
  43:20 49:7 52:1
  65:24 67:2,12 75:8
**electronic**
77:8,12
**em**
33:5
**email**
24:14 42:23
**emails**
24:18
**emergency**
71:15
**employee**
78:13,14
**ended**
12:14 15:11 51:10
**enforcement**
67:7,11
**entail**
17:3 30:21
**entire**
7:5
**equipment**
39:5
**escalation**
76:1
**especially**
6:18
**essay**
46:10
**essentially**
48:4
**et**
4:5 17:18
**Ethan**
21:3 32:8 40:11 44:7
  48:6,20 49:12,18
  63:14 67:9

**ethnicity**
55:2
**Eugene**
58:9 71:1
**everybody**
62:3
**everybody's**
40:7
**exactly**
9:4 14:1 16:18 21:7
  21:12 23:23 25:2
  26:6,15,16,20 27:13
  28:24 31:5 34:11
  40:5,7 49:23 55:23
  58:19 60:18 68:9
  76:17
**EXAMINATION**
3:2 54:14 72:1
**examined**
5:19
**example**
64:8
**excavators**
17:22
**exchange**
42:22
**EXHIBITS**
3:11
**exist**
42:13
**experience**
66:5
**experienced**
42:6
**experiences**
55:10
**Expires**
78:23
**explain**
37:3 66:5 74:17
**explained**
74:19
**extended**
72:4 73:22
**extent**
21:15 36:15 52:25

61:7
**extremely**
61:10
**eyes**
21:23 22:17 25:24

---
**F**
---

**face**
61:4
**facility**
20:12
**fact**
50:2
**failed**
56:2
**failure**
56:4
**fair**
51:19 63:20
**families**
9:21 10:19 21:14
  61:19
**family**
10:6,16,20 11:5 12:6
  12:15,25 15:15,15
  22:15 34:8,15 40:23
  41:2 50:19
**far**
17:13 22:9,25 23:16
  28:10 29:21,21 34:4
  35:19,22 36:2,21
  37:10 38:5 39:16
  40:6,20 53:1,1
  62:19 63:14,24 64:7
  66:14 67:9 72:12,20
  73:1,2 74:19,20
**farm**
1:7,7 4:5 5:25 10:17
  10:18 11:22 12:7,19
  12:24 13:3 20:4,6
  20:17,25 21:6,18
  22:3 24:4,24 26:14
  27:7 28:6,12,22
  30:3,7,10,16 31:9
  32:14 33:19 37:2,9
  38:16 39:2,25 41:17

42:6 43:4 44:19
47:24 48:5 49:6,21
50:20 52:15 53:5
54:8 58:5
**farm's**
40:5
**farther**
46:23
**fast**
29:5 45:20
**fear**
67:18
**Federal**
1:16
**feed**
50:14,15,16,16 56:2
**feel**
59:4,23,25 61:9,16
  69:19
**feeling**
61:21
**feet**
14:21
**fell**
33:4
**Fellowship**
23:15
**felt**
48:10 59:11 64:6
  67:2,8 71:19
**fence**
39:6
**fight**
59:8 61:25 62:4
**figure**
15:11 25:9 32:22
  72:25
**figured**
60:12 62:7 70:24
**figuring**
25:7,14
**filed**
6:2 51:21
**fill**
45:10 46:4
**fill-in**



MAGNA
LEGAL SERVICES

32:2
**fill-ins**
32:10
**filled**
29:15 45:21,23 46:4
**filling**
28:5,20,24
**finally**
43:17
**financially**
78:15
**fine**
13:8 42:13,24 46:17
53:15
**finger**
25:2
**finish**
64:18
**firm**
4:18 5:23
**first**
5:6,7,11,18 6:12
18:22 19:25 26:14
31:9 40:14 51:22
60:11 61:21,24 76:5
**fit**
22:14 56:25
**fitting**
22:10 58:4
**five**
9:5 13:24 16:17,18
53:13 57:7 70:10,11
**flew**
46:3
**foggy**
32:18
**follow-up**
69:17 71:21
**follows**
5:19
**food**
37:17,18 65:15
**Foote**
2:3 4:18
**force**
46:16

**forget**
21:7 23:11 31:24
42:25 51:8
**form**
25:7,13
**formal**
42:21 48:22
**forward**
9:17 74:2
**foster**
10:5,14,23 55:19,20
56:13,14 60:12
**found**
15:8,18 57:22
**four**
65:22
**Franchi**
2:4 3:4 4:17,17 5:15
18:15 34:24 36:9
42:16 53:15 54:13
54:15 71:16 72:14
73:4 76:23 77:2,7
77:16,21
**Friday**
4:8
**front**
2:4 60:20,22
**full**
8:12 48:1
**fun**
65:25
**furious**
44:4
**further**
72:1 76:23 78:8,12
**fuzzy**
40:13
**fyi**
36:7 51:18 54:11

---
**G**

**Gabe**
14:16,17 15:2
**Gabe's**
16:6,16
**Gabriel**

14:16
**games**
38:15
**garden**
37:16
**gardening**
38:7
**gates**
32:24
**Gateway**
19:12
**gears**
19:23
**GED**
19:7,15
**general**
54:23 67:5
**getting**
14:20 16:24 21:21
23:1 24:24 58:25
59:5 61:19 74:14
**gist**
35:25
**give**
46:21 53:8 73:14
**given**
31:3,4,5 52:23 53:6
**giving**
53:4
**glanced**
27:10 45:18
**glass**
65:17,22
**glasses**
71:1
**glimpses**
69:15
**go**
11:18,19,21 12:11,22
13:3,8 33:4,25
34:20 42:9,11 46:2
46:23 47:3 49:4
51:16 52:7 53:14
56:15 61:18 62:19
63:11 64:15 70:17
73:5 76:24

**goes**
53:25 73:1
**going**
6:6,6 7:14 10:22
12:11 16:17,18
18:12,12 19:23 27:1
27:16,19 28:2,14
30:3,23 34:22 36:11
38:8 42:1,11 44:9
44:15 46:14,16 47:7
47:8 51:10 52:6
53:19 57:17 59:18
62:12 68:17 70:16
71:20 72:14 73:4,9
74:4,8,11
**gonna**
74:10
**good**
4:21 5:22 7:7 11:12
18:13 37:2 48:11
63:4 71:20
**gotta**
64:5
**graduated**
48:4
**Graham**
31:22 35:16
**grandparents**
10:14,25
**great**
11:24 21:20 22:17
40:16 42:13 47:22
**grew**
37:16 38:7
**ground**
62:22,25 68:20
**groundsman**
17:15
**group**
23:11
**grow**
21:8 37:18
**growing**
38:13 55:9 59:1 60:3
**grown**
37:12,15



guardian
29:20
guardians
20:19
guess
15:11 21:23 22:10
38:6 46:19 59:11
60:4 61:20,23 67:8
67:18
guy
12:17 40:10 41:9,15
44:7,17 48:10 51:17
63:11,15 68:19
69:24 71:2,5
guy's
32:12
guys
69:8 70:25

**H**

H
1:14 3:9 5:17 29:9
78:6
habanero
37:19,20 38:10
hand
78:18
handled
35:17
hands
63:11 75:9,12
hands-on
63:11 68:19
handwriting
28:15,19 46:15,20
hang
33:24
happen
22:18 29:15 66:23
happened
23:22 29:1 57:4 58:7
58:12 68:9,9 70:14
happening
14:9 25:13 69:25
happy
55:13 62:13

hard
77:9
Harnen
1:17,24 4:13 78:3,22
Harrisburg
2:5
Harvey
8:13
hated
45:22
he'll
52:11 77:21
head
7:2 30:6
health
60:24 71:11
hear
7:11,21 8:16 10:24
14:7 22:3 26:25
40:6 51:25 69:24
heard
5:24 30:13 45:3 68:6
75:5,12
hearing
55:4,22 56:17
Hearst
51:6,9
heartbreaking
59:20
held
4:10 68:10 75:11
Hello
4:24
help
11:15 21:8 60:6
helped
30:19 71:6
hereunto
78:17
hey
38:2 58:7,11
high
62:22,25
higher
68:16
highlights

45:24
hill
68:17
Hispanic
55:3
history
19:6 20:1 65:10
hit
52:12 75:3
Hm
28:1
ho
77:7
hobby
33:14
hogs
33:15
hold
12:22 27:1 47:8,13
52:3 64:24 69:8
holding
75:9
holes
43:25 44:15,16
hollering
68:7
home
58:25 59:1
homeless
67:21
honestly
53:12 56:7
Hoover
3:18 8:8,10 41:20,22
hope
43:20
hoping
42:19
hospital
71:12
hotspot
14:8
hour
41:4
hours
44:3 65:23 68:22

house
11:18 14:17 20:2
25:1 32:5 37:23
40:25 63:16 68:16
71:8 74:24 75:1,8
household
66:7,9,13
housemate
38:1
hundred-some
44:4
hunkered
62:12
hurt
39:23

**I**

idea
61:18 64:2,4
Illinois
10:16,18,18 11:6,17
15:12,14 49:5,19
59:11
illness
63:25
illnesses
65:2
imagine
6:8,13 59:2
immediately
14:2,15 21:17 24:3
24:23
important
40:15 69:21 75:22
include
66:17 67:14
including
4:19
Independence
2:10
independent
28:4
indirectly
78:16
informal
6:18



**information**
73:16
**initially**
26:13
**inside**
68:10
**instance**
1:15
**instigated**
63:2,8 76:4,7
**instigating**
63:22
**instigator**
44:8 63:14
**instinct**
59:7,8 62:1,16
**interested**
78:15
**interruption**
14:3
**inventories**
45:11,17
**involved**
55:25
**irritate**
64:12
**issues**
5:14 65:7
**ITEM**
3:17
**items**
42:18,23

**J**

**Jake**
34:8
**James**
12:7 22:20 23:9
**jmendez@margoli...**
2:11
**job**
15:23,24,25 16:9,21
17:12,13 30:15
50:13,18
**Jocelyn**
2:9 4:24

**Joe**
40:9
**Joel**
70:22,22 71:2
**joint**
50:9
**July**
78:23

**K**

**keep**
14:11,12 28:14 47:7
47:8,11 49:6 64:22
69:14
**keeping**
38:13
**keeps**
14:9
**kept**
43:16 59:5
**kicks**
59:9
**kid**
38:8 39:16,17
**kind**
6:7 10:10 11:13,24
14:20 16:9,11,11,12
19:23 20:22 22:24
23:10,15,16,17,20
23:21 25:3,4,17
27:14 30:21 31:20
33:8 36:11 38:1,6,8
39:18,23 40:14,15
40:16,17 43:11
44:23 45:5 46:3
49:25 52:11 54:6
55:22 56:5,13,17,18
56:23 57:2,3 58:9
58:10,12,13,14 59:7
59:11,12,13,14,19
59:20,25 61:6,15
62:2,6,11,14,17
63:2,3,8,9 64:3,5
68:17 71:3 75:9
**kinds**
15:10 37:6

**knew**
23:2,9,20 25:6,8,9
38:8 40:4 41:20
62:12 76:2
**know**
5:7 6:14 7:10,11,24
7:25 8:6,8 9:8 11:9
11:11,15 12:2,4,6
13:25 15:8,12 16:19
17:5,11 20:16,25
21:3 22:1,9,12,13
22:13,18,21 23:2,16
23:21 24:17,18 25:7
25:10,12,15,16,21
25:22,25 26:16 27:3
29:5,15,17,19,23
30:9,13 31:6,19
33:11,14 34:11,12
36:10,14,22 37:2,4
38:4 39:7 40:5
41:19 42:20,22 43:8
43:19 44:11,12 45:1
45:13,24 46:1,3
47:1,14,15,19 48:11
48:22,24 49:9,10,14
50:1,17,23 54:24
55:1,16 56:6,25
57:3,3,17 58:12
59:13,15,16 60:6,7
60:13,14 61:15,21
62:3,4,7,7,14,22
63:11,12 64:7,10,14
64:15 66:7,9,14,15
66:24,24 67:10,14
67:20,25 68:4,8,10
68:20 69:3,5,19,25
70:16 71:8,10,12,21
72:8,20 74:10 76:15
**knowledge**
55:6
**Kyle**
3:18 8:8,10 41:19,22

**L**

**labeled**
56:3 58:10

**labor**
66:19
**law**
4:18 67:6,11
**lawsuit**
18:10 20:9 41:23
44:22 51:21,23
**lawyer**
52:7
**lay**
25:2
**leader**
16:12
**learn**
17:7,14 62:14
**learned**
39:3 58:15
**learning**
17:13
**leaving**
49:6 50:13 67:19
**led**
40:24 55:10
**left**
11:19 12:18 25:16
36:20 49:21 50:22
50:23 52:14 69:9
**legal**
4:13 8:12 29:19,21
**let's**
10:2 12:22 56:5
63:11
**letters**
33:23 34:5,6,7,13,15
35:9
**Liberty**
1:7,7 4:5 5:24 11:21
12:9,10,18,24 13:3
20:6,16,24 21:6,17
22:3,21 23:1 24:3
24:24 26:14 27:7
28:6,11 30:3,7,15
31:9 35:8 39:24
41:17 43:4 49:6,21
50:13 52:14 53:5
54:8 55:11 58:5



60:3 61:14,17 65:6
66:23
**license**
13:17 16:21
**licenses**
13:21
**life**
41:17 54:7 59:16
**liked**
59:12
**Linden**
31:22 35:16
**line**
10:4 56:3,10 58:6
59:18 63:8
**little**
10:23 12:3 14:19
15:7 19:7,25 32:15
36:3 41:19 44:25
50:2,22 54:18,22
55:8 64:3 71:18
73:2 75:6
**live**
9:21 11:9 13:4,11,12
14:2,14 33:11 66:12
**lived**
10:8 13:23 15:4,5
33:23 50:5
**living**
15:2,21 24:4 26:10
29:18 50:19
**located**
19:13
**logs**
32:23,24 33:3,6
35:12,14,17
**long**
6:9 12:4 13:23 14:22
16:16 24:4 30:7
31:14 43:6 49:21
62:20 65:19 68:5,21
76:15
**longer**
14:25 71:18 76:18
**look**
9:3,3,5,9 10:11 13:25

15:1 16:17 19:17
24:14 41:10 42:11
42:19 50:8
**looked**
27:25
**looking**
36:16 42:23 43:3
45:19 50:1
**looks**
28:19 45:20 67:7
**lot**
17:17 21:21 24:11,25
55:13 58:2 61:23
**LRF101**
28:15
**LRF273**
46:19
**LRF98**
27:24
**lumber**
66:18
**lunch**
41:4

—————————————
**M**

**M**
2:9 5:20
**machinery**
35:18
**mad**
43:18,22,24 44:14
**Magna**
4:13
**mail**
34:18
**main**
21:10 44:7,17,17
48:10 63:14 68:16
**maintain**
16:19,20
**majority**
17:22 31:16 32:1,8
32:23 33:13
**making**
44:11 68:7
**Mall**

2:10
**malnutrition**
56:1
**marathon**
6:14
**March**
29:12
**Margolis**
2:8 4:11,22,25 5:23
**MARKED**
3:11
**market**
33:11,12 66:12
**married**
17:23,25
**Martin**
1:7 5:25 11:8,20
12:13 20:20 21:1
30:17 40:8,9 41:11
41:12,16 50:20 58:9
58:9
**Martins**
11:21 12:12
**matter**
4:4,19,23 5:1 6:2
**mean**
15:10 17:20 21:16
26:22 29:13 33:3
36:23 38:5 39:13
63:23
**meaning**
24:23
**means**
6:25
**meant**
8:14 74:17
**Media**
4:3
**medical**
55:21 60:6
**medication**
44:18
**meet**
40:2
**meeting**
22:11 40:15

**meetings**
21:14 22:2,6 27:5
**Meghan**
2:9 4:22 5:22 42:17
54:20 66:3 71:21
**memory**
11:12 32:18 46:13
58:21
**memory's**
11:24
**Mendez**
2:9 4:24,24
**Mennonite**
1:8,8,9 5:25 6:1
23:14 38:6 40:2
67:4
**mental**
63:25 65:2 71:11
**mentally**
62:15
**mentioned**
10:23 25:16 40:17
46:6 47:23 52:4,6
58:7,10 65:12 68:1
**mentor**
31:21 35:16 58:10
**mentors**
31:17 37:24 40:11
44:10 48:21 58:8
63:17,17,19 74:24
75:1,8
**messages**
3:18 42:2,12
**Messianic**
1:9 5:25 40:3
**met**
8:10 40:4,8 41:12
49:13
**Mexico**
23:9 26:8
**Mike**
51:9
**military**
19:19
**mill**
35:19,19 50:14,15



milled
33:6 35:17
Miller
1:14 3:18 4:4,20 5:17
  5:22 8:13 9:12,15
  10:7 11:19 13:10
  18:19 28:16 29:9
  57:16 77:19 78:6
Miller's
11:2,4
milling
32:23,24 33:3 35:12
  35:13
Milwaukee
78:2,18
mind
25:12 53:13
mine
31:22
mini
39:4
minute
12:22
minutes
34:25
Mission
1:9 6:1 40:3
mixed
50:16
mixer/cleaned
50:16
mode
62:1,16
mom
9:17 10:3 39:19
  44:25 55:24
moment
22:23 73:6
mon-
34:13
money
31:2
monitored
52:18
months
49:23

months'
12:5
moral
45:11 62:22,25
morning
4:21 5:22 32:16
  40:17,20,23 44:2
  66:7
mouth
59:2
move
59:18 61:3
moved
15:14,18 20:3 31:9
  50:18 57:2 59:5,10
  61:15
moving
9:17 14:11,12 15:12
  20:1 51:10 74:2
MP4s
77:14
multiple
47:5 64:25
mwynkoop@marg...
2:11

_____
                 N
N
2:1 3:1 5:20,20
name
4:17 5:22 8:12 12:16
  20:25 21:3 28:16
  31:25 32:3,12 41:7
  41:10 51:8 57:14
  58:8 71:1
named
71:2
names
8:18 9:7 11:7 22:19
  31:19 50:5 71:3
narrative
67:3,5
nature
5:11 25:4 35:13
necessarily
26:1 55:13

need
6:10 38:2 42:21
  76:25 77:9,14
needed
47:19
Neenah
15:4
Nelson
1:7 5:25 20:25 40:8
  41:11,12,16
new
23:8 26:8 30:24
  33:12
news
52:1,2,8 60:25
night
22:25 28:12,13 40:13
  44:1 65:21 69:1
nightmare
52:20
nine
10:9,10 14:23
Nolt
31:24 70:22,22 71:1
nope
13:5 17:24 18:1,3
  40:1 44:20 46:9
  48:17 55:7 61:13
normal
59:16 66:15
normally
39:18 66:14
North
2:4
nose
60:20
Notary
1:18 78:4,22
note
5:7 42:1,10 51:17
notes
53:14
notice
1:17
November
78:19

number
21:8,9 63:5
nutshell
57:4

_____
                 O
O
5:20
oath
5:18
object
72:14
observed
63:21 74:18
obtain
42:2
obviously
16:1 25:10 43:12
  51:14,20 53:24
  55:15,20 60:14
  69:24 76:3
occupational
16:21
occur
75:18
October
1:20 4:8 78:9
office
78:18
oftentimes
64:20
oh
15:7,13 46:17,19
  56:8 61:13 64:18
  70:5,13 77:6,7
Ohio
15:9,18,19,20,22
  19:14 36:19 50:24
  51:3,4
okay
6:24 7:9,17 9:17,21
  11:5,17 12:10,14,21
  13:21 14:4,7,10,14
  18:25 20:16 24:13
  26:13,21 27:2,4
  28:1,2 29:1,15,18



29:25 32:13 33:9
34:4 35:15,22,24
36:7,25 37:9 39:18
40:23 41:21 42:1,3
42:4,8,15 43:2,3,6
46:18 47:19,21
51:14 53:3,8 54:10
54:12 55:8 57:11
58:17 59:15 62:15
66:21 67:2 69:17
70:23 72:19 74:6,11
76:19,23 77:7
**old**
23:25 26:4,13 57:5
**older**
12:17 57:12
**on-the-job**
17:18
**once**
8:11 24:14 31:21
43:7 61:14 63:10
64:20 75:2
**ones**
32:1 39:22
**open**
45:8
**operating**
16:8,13,22
**operator**
16:4 17:17,20
**opportunity**
15:23,24,25
**opted**
16:12
**Orchardville**
12:8
**orders**
77:1,3,4,13
**organization**
45:7
**outside**
67:20 68:23
**overnight**
65:13 70:4,9

——————————
**P**
——————————

**P**
2:1,1
**P.C**
2:3
**p.m**
1:21 73:9,12 77:18
77:22 78:11
**page**
3:2,17 47:2,3
**pages**
47:5
**paid**
30:25 39:8
**painful**
61:10,10
**paint**
39:6
**panel**
22:24 40:5
**paper**
36:13
**paperwork**
22:25 27:6,8,9 28:11
28:21,22 29:16 36:2
36:22 39:11 41:8
50:1
**parent**
32:5 40:25 63:16
74:24
**parents**
9:7,11,13,22 10:14
10:24 11:3,4,13,13
12:11 13:4,6,9
21:19 23:2 26:11
30:3,9 31:1 33:19
37:23 44:21 54:24
55:20 56:10,11,13
56:15 57:18 60:5,12
75:1,9
**parents'**
11:18 20:2
**part**
18:9 30:22 31:22
75:11
**particular**
17:8 74:8

**parties**
4:14 78:14
**parts**
60:23
**pass**
54:1
**passing**
18:24 48:21 49:9,11
49:14 52:11 58:8
**pastor**
23:20 40:10
**paths**
23:17
**pay**
30:9 69:12
**paycheck**
31:6,8
**pending**
6:12
**Pennsylvania**
1:2,8,9 2:5,10 4:7 6:1
10:20 12:15,25
15:15,16 23:13
36:20 50:3,6,18
51:22
**people**
22:22 25:7,9,14
34:10 40:4 43:9
48:7,9 50:5 59:12
**People's**
54:6
**percentage**
31:4
**perfect**
18:17 19:2 25:25
**performing**
66:8
**periods**
68:5
**perpetrator**
57:11
**person**
8:10 41:25 76:5
**personal**
78:7
**Philadelphia**

2:10
**Phoenix**
8:24
**phone**
14:9
**phrased**
7:10
**physical**
75:6,7,17,19 77:9
**physically**
68:1,4 74:22
**pick**
15:20,22 33:22
**picked**
49:1
**pipe**
39:21
**place**
28:9 43:21 58:3 59:5
59:6,12,23 60:1
61:15,15 62:11
67:12
**placed**
20:16 21:6 22:3
24:24 27:6,23
**places**
15:10
**plain**
54:6 67:4
**plaintiffs**
1:5 2:2 4:19
**planning**
71:19
**plant**
37:19,20 38:10,12
**play**
38:15,22 62:13,14
**please**
4:15 5:3 6:11 7:11
77:15
**podcast**
54:5,6
**point**
6:10 9:17 11:14
12:15 20:3 28:3
33:16 37:2 44:5



56:20 60:10 64:13
64:23 67:22 70:1,16
70:20 71:10
**points**
37:5 71:6
**police**
53:4,9
**poor**
42:7
**poorly**
7:10
**portable**
35:19
**position**
17:20
**possible**
42:2
**postholes**
43:17 44:16
**preach**
67:6
**preachers**
23:5,8,20
**preceding**
14:15
**prepare**
7:22
**presence**
51:24
**present**
2:14 4:15
**presently**
16:5
**pressure**
60:23
**pressuring**
43:7
**pretty**
6:9,18 7:25 17:10,12
20:22 23:7,7,8,23
31:15 32:17,19
33:11,18 34:8,17,17
40:12 43:22,23
47:19 50:9 52:16
58:18,20 59:1,21
65:2 67:21 72:4

**previous**
24:13
**prior**
17:20 20:24 21:17
22:2 24:3,23 25:17
25:19 27:6 28:5
72:10 73:23
**privilege**
73:17,18,20
**privileged**
72:18
**prizes**
37:6
**probably**
13:24 25:21 29:4,13
46:21 55:14 60:9
65:22
**procedural**
6:7
**procedure**
1:16 61:2
**Proceedings**
4:1 77:22
**process**
28:8
**Professional**
1:18 78:4
**proofread**
34:14
**proper**
40:6
**property**
37:9,12,15 68:14
**provide**
54:4,18 72:10,22
**provided**
72:5
**Public**
1:18 78:4,22
**pull**
46:14 52:19
**pulled**
38:3
**pulpit**
67:6
**punch**

74:25
**punished**
57:18,20 58:16,17
**punishment**
39:14 44:9,13 47:16
58:23,24 62:9
**punishments**
64:19,21 67:12,17
**purpose**
66:16
**purposes**
52:21
**pursuant**
1:15,16
**push**
25:9 63:9 64:11
**pushed**
62:2,7 70:6,6
**pushing**
43:7,7,16 63:15,20
63:22 64:22
**put**
10:5 18:19,20 36:4
45:16 46:18 59:2
60:23 62:23 68:20
**putting**
30:24
**PVC**
39:21

_____

**Q**
_____

**quality**
27:20 29:6
**question**
7:5,13 14:7,14 24:13
34:4 36:2 52:25
53:2 54:4 73:14
**questions**
6:12,17 7:10 19:22
52:21,22 53:24 66:4
69:18 71:22 72:4
74:1,4,8,9 76:24
**quick**
6:9 53:17
**quickly**
19:22

**quite**
16:14 17:14 32:18
59:20 61:23 70:5,6
**quote**
19:8

_____

**R**
_____

**R**
2:1 3:16
**R.M**
1:4 4:4
**rails**
39:6
**raising**
33:10 66:11
**ran**
35:18,20 67:10
**Ranch**
20:14
**rationally**
64:14
**react**
62:8 63:10
**reacted**
43:9 63:10
**read**
25:8 27:11 28:3 29:7
29:7 46:16
**ready**
48:13
**realized**
62:10
**really**
7:1,3,24 8:3 11:15
14:12 22:14,23
27:10 29:6,24 38:25
39:13 41:24 43:18
43:24 44:14 45:4,7
45:20,21,22 46:4
49:9,10 50:4 52:7
52:18 55:6 56:7,13
56:15,17,23,24,25
57:24,25,25 58:2
60:1 62:3,5 64:11
70:1,10 71:10
**reason**



7:17 18:8 19:24
21:10 57:2
**rebellion**
64:4
**rebellious**
21:23 22:11,14 25:3
43:12,16
**recall**
21:4,13 27:13 28:8
30:5,11,12 31:3,5
31:10 33:18,20
34:15 37:8,21 38:19
38:23,25 45:5 46:12
49:20 55:3 57:11
65:21 70:8,10 72:24
75:2
**receive**
65:5
**received**
34:18
**Recess**
35:1
**recognize**
18:20 22:23 27:22
46:20
**recollection**
28:5
**record**
4:3 5:10 13:25 34:22
34:23 35:4 42:1,16
53:19,20,22 72:5,23
73:5,9,10,12,14,15
76:24 77:1,20
**recording**
54:5
**records**
9:3,6,10 10:11 55:21
**recreational**
38:15,17
**redeemed**
37:5
**reduced**
78:7
**referenced**
3:11 5:11 11:5 20:3
22:2,18 27:6 74:13

**referencing**
9:19 20:6
**regarding**
5:10 52:22
**regards**
53:5
**Registered**
1:17 78:3
**related**
1:8 72:16
**relationship**
11:13 21:18
**relationships**
21:11
**relative**
78:12,14
**religion**
15:17
**religious**
25:18
**remember**
12:4 20:21 22:16
24:4 25:4 26:9 27:7
28:10,18,20,22,23
28:23 29:11,14 30:2
32:2,3,4,9 33:15,22
36:19 37:1,13,14
39:22 40:3,16,18
45:10 46:7,10,21
48:3,12,15,18,22
49:15,17 50:4,7
52:24 53:4 56:4,7
56:16 57:7,9 58:21
59:17 62:2,5 67:25
68:3,25 70:12 71:1
74:15
**remembered**
27:3
**remotely**
2:2,7 4:10
**removed**
61:19
**Renee**
2:4 4:17 27:9 45:18
52:9 54:1
**renee@vca.law**

2:5
**rent**
13:13,14
**Rephrase**
34:4
**reported**
1:24 78:6
**reporter**
1:18 4:12 5:3 6:19,21
7:1,6 76:25 77:4
78:4
**represent**
4:16,19,23,25 5:24
**request**
4:11 42:21
**REQUESTED**
3:17
**research**
36:5
**resided**
49:7
**resident**
20:10,14,24 35:8
76:9,10,12,13,20
**residential**
30:22,22
**residents**
31:10,14 65:4
**residing**
21:17 24:3 26:14
28:6 30:15
**response**
75:20
**responses**
6:23
**responsible**
38:12 40:19
**restrain**
71:6 76:6
**restrained**
68:2,4
**restraining**
75:17,19
**restraint**
75:7,7
**restricted**

65:15
**review**
8:2
**Richard**
45:2
**Ridge**
1:7,7 4:5 5:24 11:22
12:9,10,18,24 13:3
20:6,16,24 21:6,17
22:3,21 23:1 24:3
24:24 26:14 27:7
28:6,11 30:3,7,16
31:9 35:8 39:25
41:17 43:4 49:6,21
50:13 52:15 53:5
54:8 55:11 58:5
60:3 61:14,17 65:6
66:23
**right**
5:6,16 6:6 7:20 9:9
10:22 11:19,21 12:5
12:16 14:16 17:23
18:12 19:4,21 22:23
25:3,4 26:9 27:2,5
27:19 28:1,14 31:5
32:9 33:7,15 34:1
34:11,19 35:6 37:14
38:20 41:8 42:15
47:5,8,13,25 49:17
53:23 54:13,16 56:4
57:7 70:19 71:2,16
76:10 77:14,18
**rings**
46:12
**Robert**
1:14 4:4 5:17 8:13
28:16 29:9 54:17
69:19 71:17 77:19
78:6
**rocky**
56:23 65:25
**role**
16:13,13
**roof**
30:24
**roofing**



15:25 30:19,21
51:12
**roofs**
30:22,23
**room**
22:8
**Rose**
16:7
**rotated**
31:23 32:10
**RPR**
1:24
**ruckus**
68:8
**rude**
13:6 18:4
**Rules**
1:16
**rumor**
30:13
**run**
6:8 39:3

___ S ___

**S**
2:1 3:9,16,16
**Sam**
14:17 15:3
**Sam's**
14:17
**sarcasm**
66:1,2
**sat**
22:24
**Saturdays**
35:22
**save**
33:5
**saw**
35:15,19,19 36:10
52:1,1,8 68:12 69:7
69:7 75:7 76:19
**saws**
17:21 39:1,5
**saying**
21:8 74:15

**says**
28:16 29:1,9 39:11
**schedule**
32:13
**screen**
6:20 18:13,20 19:2
27:16,23 29:7 33:25
46:18 52:19
**screwed**
71:4
**scroll**
28:2 46:25
**scrolling**
28:14 29:5 47:11
**seal**
78:18
**second**
14:10 33:24 46:21
73:5
**seconds**
34:20
**secret**
23:7
**security**
25:14
**see**
6:19 14:9 16:11
18:13,14 27:16 56:5
69:3,6,9 70:3 74:25
75:3,5,14
**seeing**
43:8,8 67:25 68:3
**seeking**
74:5
**seen**
18:22,24 39:11 49:12
**self-explanatory**
45:13
**sending**
60:11
**senior**
16:12
**sense**
7:15 36:21
**Sensenig**
12:7 22:20 23:9

**sensitive**
62:11
**sent**
11:9 12:8 20:18 27:9
27:13 34:14 45:18
52:20
**sentences**
44:4 46:7,8
**series**
6:17
**serious**
65:2
**serve**
19:19
**Service**
16:6
**services**
4:13 10:5 71:15
**set**
50:10 78:17
**settled**
61:16
**sexual**
58:13,14
**sexually**
56:21 57:5
**shake**
7:2
**shaken**
56:9
**share**
27:16 63:20
**sharing**
18:13 19:3 52:20
**shell**
59:21
**shelled**
59:21
**shingles**
30:23
**Shoot**
26:5
**short**
8:19
**shortly**
57:10

**shot**
59:16
**shovel**
75:4
**showed**
28:12 40:14
**shows**
17:5
**side**
51:17 64:11
**signature**
29:8
**single**
45:14
**sister**
15:21 23:10 50:24
**sistering**
23:15
**sit**
46:16 64:6
**sit-downs**
48:23
**site**
16:10,14,14
**situation**
20:23 75:24,25
**six**
57:7 70:10,11
**skid**
17:21 39:3,3
**skull**
60:22
**slash**
54:7
**sloppy**
45:21
**small**
37:16 66:15 68:15,17
**smoothly**
6:8
**snacks**
37:6
**so-called**
60:17
**society**
48:13



2:14 4:12
**somebody**
31:25
**soon**
15:16 36:20 73:18
**sorry**
11:20 13:7 14:5
    28:20 29:5 34:5,6
    34:19 37:24 44:15
    44:20 47:9 51:16
    55:19 64:18 70:23
    71:18 74:20 76:4
    77:3
**sort**
16:20 17:19 28:8
    31:3 37:1,5,6 40:18
    46:10 69:5
**sound**
7:7 47:25
**sounds**
45:13
**South**
2:10
**Southwest**
23:14
**spacing**
24:19
**span**
12:5
**speak**
8:4 65:9
**speaking**
7:20
**specifically**
36:16
**specifics**
48:15
**spiritual**
21:9 22:16
**split**
33:5
**spoke**
66:24
**spoken**
41:22 44:21
**sports**

43:11
**SS**
78:1
**stake**
39:21
**standards**
25:23
**Stanley**
57:16,16
**start**
6:6 9:25 10:2 64:7
**started**
16:18 17:14 43:6,18
    51:4,5,12 52:2
    56:14,18 72:3
**starting**
10:1 54:23
**starts**
46:18,19 73:18
**state**
1:19 4:15 13:21,22
    78:1,5,22
**statement**
43:24 53:4 54:4,5
**statements**
52:23 53:1,6,8
**States**
1:1 4:6
**stay**
14:22 30:10 49:22
    52:14
**stayed**
14:16 47:24 69:11
**staying**
15:2
**steer**
39:3,3
**steers**
17:21
**Steubenville**
19:14
**Steven**
11:8,19,20,25 12:13
    12:23 13:1 20:2,20
    20:20 22:8 23:2
    24:5,11,25 29:18

30:17 33:21 49:1,22
    50:12 58:3
**stick**
39:20
**stipulations**
5:10
**stood**
45:25
**stop**
47:1 73:4
**story**
43:14 54:7
**Street**
2:4
**strict**
52:17
**strike**
74:25 75:18
**stripping**
30:23
**struggles**
58:2
**stuck**
60:19
**study**
40:22 41:3
**stuff**
18:6 23:7 35:7,18
    37:21,22 38:3 40:11
    50:17 54:7 56:2
    60:24 62:9 66:10,16
    69:25
**stump**
43:25 44:15,16
**subconscious**
61:23
**subject**
45:6
**Suite**
2:10
**Sundays**
38:17
**super**
41:9 55:17 56:6,6
    62:11 65:25
**superintendent**

16:10
**support**
67:20
**supposed**
63:6,6
**supposedly**
56:9 60:23
**sure**
6:16 9:4,11 10:2 15:1
    18:8,24 19:5,9
    20:22 21:12 23:8,23
    26:6,15,16,20 28:25
    28:25 30:4 31:15
    32:17,19 33:11 34:8
    34:17,17 36:6 37:4
    41:1 42:10 44:11
    47:4 48:2 49:24
    50:9,11 55:23 58:4
    58:18,18,20,25
    60:18 62:24 70:21
    73:7 76:17,18 77:2
**surface**
64:5
**surroundings**
62:15
**survive**
59:8 62:1,4
**survived**
59:22 62:12
**swear**
5:3 66:21
**sweet**
37:19
**switch**
19:23
**switched**
31:20 32:11
**sworn**
5:4,18
**syndrome**
56:9
**system**
37:2 67:20

---

**T**

T



3:9,16 5:20
**take**
6:11 7:1,7 14:10
34:24 53:13 54:21
71:12 74:11
**taken**
1:15 10:5 35:1 78:9
**talk**
19:23 24:20 26:7
41:25 52:6,10,12
66:3 74:10
**talked**
19:25 33:7 41:19,24
44:24,25 45:2 48:6
48:8 53:10 74:9
75:6
**talking**
11:6 22:8,9 27:5 35:6
35:9,10,11 40:21
41:2,2 52:3 64:7
72:19 73:1
**taller**
40:9
**tangent**
36:12
**taught**
39:2 41:6
**teach**
37:24
**teaching**
38:5 40:19
**technical**
14:3
**teen**
20:11,14
**teenager**
67:23
**tell**
22:6 39:8 42:5 53:16
54:22 55:8 59:4
63:3,7 75:15
**ten**
10:9 26:6
**tend**
37:24
**tended**

21:23
**tending**
35:12
**term**
25:11
**terms**
40:6
**terrible**
27:20
**terrified**
61:24
**test**
18:12 19:2
**testified**
5:19
**testify**
7:18
**testimony**
72:11 73:24 74:12
**text**
3:18 41:24 42:2,10
**Thank**
54:12 71:16 77:17
**therapy**
60:4,10 65:5
**thing**
28:10 43:10 44:13
59:8 75:23
**things**
5:10 6:7 7:2 35:11,13
37:7 39:15 45:16
46:15 54:17 63:21
67:13
**think**
9:4 10:10 11:23,23
12:5,16 14:23 19:8
19:10,16,17 20:20
22:20 23:5,14,19
24:6,15,22 26:6,16
26:17,20 31:1,1,4,8
32:11 34:1 37:21
38:18 40:9,12 41:7
41:9,12 44:2,24
45:2,4 48:1 50:20
51:6 52:1 53:10,12
55:3,15 56:3 57:12

69:17 70:19,22,24
71:17 76:17
**thinking**
11:25 13:1 23:22
24:1 36:2 37:4
49:23 64:12,14
**this-is-what-it's-go...**
48:23
**thought**
25:24
**three**
13:24 24:6 34:24
41:13 49:16 65:22
69:8 75:10
**three-quarter**
68:13,18 71:7
**threw**
49:25
**thrive**
56:4
**thriving**
56:14,18
**tied**
68:19,21 69:2,4,9
75:13
**ties**
75:14
**till**
22:21 58:1
**time**
4:9,9 7:6 12:5 16:1
21:16,16,25 23:9,23
23:25 24:23 28:9
29:20,23 31:16 32:8
32:15 34:21 35:3
38:18 43:23 46:11
53:18,21 57:13,24
58:1 59:5,13 61:2
61:20 63:17 65:16
68:5,6,12,14 69:12
73:8,11 76:19 77:18
**timeline**
36:22
**times**
39:20 41:11,13 49:13
49:15,16 52:5 61:5

64:25 67:25 68:3
69:15,23 70:3,8,18
**title**
40:7
**today**
4:8,20 6:3,9,17 7:12
7:18,23 18:9 19:24
51:20
**told**
21:5 55:18 57:18
59:18 61:1 68:9
69:4 74:4,7 75:16
**Tomatoes**
37:19
**tools**
17:8,19 35:14 39:1
**top**
16:6 23:7 30:5 33:15
**total**
41:13
**totally**
48:2
**touch**
49:7
**touchy**
45:5
**tractors**
39:4
**trades**
17:11
**traditional**
60:4
**traffic**
18:6
**training**
17:18
**Tran**
2:14 4:12
**transcript**
4:1 7:3 77:5
**trauma**
55:14,16 60:7 65:10
**treatment**
60:6,18 61:7,8 65:5,9
66:25
**tree**



16:6 51:11
**trees**
16:10 17:5,6 33:4
**tricks**
17:11,11
**tried**
19:22 60:11 61:3
72:25
**trouble**
21:21 24:11,25 39:12
43:4 62:20,21
**troubled**
20:11
**Trucks**
50:20
**trustworthy**
25:15
**truthfully**
7:18
**try**
10:22 29:7 33:24
36:14 60:5,20 74:22
75:3
**trying**
7:6,12 11:23 15:11
24:14 28:1 40:12
44:23 69:14
**Tuesday**
5:12
**turn**
54:13
**turned**
10:21 15:16 36:20
50:22,23
**twice**
8:11
**two**
21:9,10 24:6 30:4
31:14,18 33:17
34:20 39:22 41:13
49:16 63:8,17 67:13
**type**
17:19 33:9 39:15,19
43:3 44:9 45:16
51:2 60:5 62:23
**types**

35:14,21 37:18 39:1

--- **U** ---

**U**
3:16
**Uhm-hm**
20:5 36:25 38:14
65:14
**ultimately**
55:10
**understand**
7:9 9:18
**understanding**
11:11 65:1 66:22
**understood**
7:14 45:9
**unh-huh**
7:1
**United**
1:1 4:5
**upstairs**
69:13
**use**
17:7,19 35:14 39:2
**usual**
5:10

--- **V** ---

**Valley**
51:4
**verbal**
6:23 53:8
**versus**
4:5
**video**
1:14 77:13
**VIDEOCONFER...**
1:19 78:9
**videographer**
2:14 4:2,11 5:2 6:20
34:21 35:3 53:18,21
73:8,11 77:13,17
**violence**
64:23 75:20 76:4
**violent**
43:23 57:1 64:13,20

74:14,21 76:5
**Virginia**
9:12,14 10:7 11:2,4
13:10
**visit**
33:19 49:18
**visiting**
24:16 49:13
**voiced**
66:24
**vs-**
1:6

--- **W** ---

**W**
2:10
**wait**
7:4
**waive**
77:21
**walk**
21:9 22:16
**want**
7:21 9:25 14:10,11
29:7 42:19 45:8
47:1,7 51:24 54:3
54:21 57:15 67:15
69:20 72:8,20
**wanted**
19:2 54:17
**washing**
66:15
**wasn't**
11:10,12 12:1,2
21:14 22:9,16 41:14
43:6 55:13 58:4
64:14 65:24
**watching**
44:11
**water**
65:15,17,22
**Wautoma**
13:12
**way**
17:15,16 47:9 62:21
68:18 71:8 74:2

**we'll**
6:8,14 14:9 52:12
**we're**
6:18 14:4 18:9,12
19:24 20:6 27:21
34:22 35:4 42:17,20
42:23 51:20 53:19
53:22 73:9,12,15
77:19
**we've**
5:8,9
**weak-minded**
76:3
**Weaver**
21:3 32:8 40:11 44:7
48:6,20 49:12,18
63:14 67:9
**weeds**
38:3
**week**
5:8,9,12
**weeks**
14:23
**went**
7:25 10:12,14,15,16
11:17,17,25 12:23
12:25 22:25 32:17
32:19 38:2 50:3,12
50:24 56:12,18,20
58:5 59:10 60:3,10
60:16 61:5 67:9
68:19 71:18
**weren't**
69:22
**When's**
8:21
**whereof**
78:17
**whipped**
29:3 39:12,15,24
**whipping**
58:24
**white-haired**
40:9
**Wi-Fi**
14:8



**Wild**
16:6
**window**
73:19
**Wisconsin**
1:19 13:12,22 15:4,6
    15:8,12,22 16:7
    24:15 51:11,13 78:1
    78:5,19,22
**wish**
47:9
**witness**
5:3,4,5,17 14:5 18:16
    36:18 54:2 72:19
    78:17
**wits'**
11:14
**wood**
17:21 32:25,25
**wooden**
39:19,20
**woods**
33:5
**words**
59:2 76:2,7
**work**
10:15 16:5 51:2,4,17
    60:7,15 64:4 65:19
    66:4,8,12,18 67:15
    70:3
**worked**
17:15,16 30:17,19
    46:1,1 49:7 50:14
    50:20,21,21 65:13
    70:5
**working**
12:2 16:24 27:21
    51:12 70:9
**worms**
45:8
**worried**
67:13
**worship**
32:20 40:23 41:3
**would've**
38:18,18,20

**wouldn't**
26:1 29:17 36:21
**write**
29:2 33:23 34:6,7,12
    44:3
**writing**
29:11,14 34:15 44:3
    46:7,10 47:17 78:7
**written**
52:21 53:6
**wrong**
23:6 24:7 29:2 36:4
    49:1 58:22
**wrote**
29:13 34:5,8,9 47:17
**Wynkoop**
2:9 3:3,5 4:21,22 5:6
    5:16,21,23 14:4,6
    18:14,17,18 34:19
    35:5 36:24 42:24
    43:1 53:12,16,23
    54:9 71:23 72:2,15
    72:21 73:7,13,21
    76:22 77:3,6,11,15

———————————
                    **X**
———————————
**X**
3:1,9 5:20

———————————
                    **Y**
———————————
**yeah**
7:24 10:20 12:9 16:2
    16:22,24 19:10
    21:12,15,25 22:1,17
    23:1 25:2,20 26:15
    26:25 27:14 28:13
    28:23 29:4,4,13,22
    30:24 31:8,25 32:3
    32:12,25 33:1,13,22
    34:17,18 35:23 36:6
    36:9 37:21,22 38:4
    38:17,19,20,21
    39:14 40:14,15,16
    41:5,9,25 42:8 43:5
    43:14,23,24 44:5,16
    45:7 46:5,13,21

47:7,8,12,17 48:11
    48:14,24 49:17
    50:21,22 52:13
    53:15 55:15 56:8,24
    57:13 58:15,22 59:3
    59:19,21 60:25 61:7
    65:17,25 66:2,13
    67:24 69:11,15,22
    70:1,5,13,13 74:22
**year**
9:2 10:13,15 13:2
    19:18 24:15,19 30:8
    47:24 48:1 62:13
    76:18,19
**years**
13:24 16:17,18 24:6
**yep**
9:16,20 11:1,4 12:13
    17:2 18:21 19:1
    22:1,5 26:12 27:18
    29:10 31:13 32:6
    38:11,14 46:24
    48:14 49:3 51:1
    57:16,21 58:24
    66:20 68:20 70:5,15
    71:9 74:16
**York**
33:12
**young**
23:23 26:5 55:17
    56:6,22 59:13,14
**younger**
36:3 60:13

———————————
                    **Z**
———————————
**zero**
33:2
**Zoom**
1:19 6:19 14:3 78:9

———————————
                    **0**
———————————
**03/20/1995**
8:22

———————————
                    **1**
———————————
**1**

4:3 78:19
**10:03**
1:20 4:9 78:10
**10:45**
34:22 35:1
**10:55**
35:2,4
**11:22**
53:19
**11:47**
53:22
**12:11**
73:9
**12:12**
73:12
**12:16**
1:21 77:18,22 78:11
**13**
24:1
**14**
24:1
**15**
26:19
**16**
26:17,17,20 36:13
**17**
19:9 26:17 36:13
    57:13
**170**
2:10
**17110**
2:5
**18**
10:21 15:16 25:17,19
    36:20 50:22,23
    57:12,13
**19106**
2:10

———————————
                    **2**
———————————
**2015**
19:18
**2022**
1:20 4:9 78:10,19
**2026**
78:23



**21**
1:6,20 78:9
**215.922.1100**
2:12
**21st**
4:8
**2300**
30:14
**24th**
29:12
**27**
78:23

**3**

**4**

**400E**
2:10
**42**
3:18
**4503**
2:4

**5**

**5**
3:3
**5070**
1:6
**54**
3:4

**6**

**7**

**717.686.9936**
2:6
**72**
3:5

**8**

**9**

**9**
29:1
**9:00**
69:1



# EXHIBIT C

**In the Matter Of:**

D.C. AND R.M. vs.

NELSON MARTIN, et al.

Nelson Martin

October 20, 2022

**HKW, LLC**
764 Corporate Circle, Suite 200
New Cumberland, PA  17070
717.214.1182
Schedule@hkwllc.com



**Witness Nelson Martin**

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA


D.C. AND R.M.,                 :
          Plaintiffs           :
                               :
          vs.                  :
                               :
NELSON MARTIN D/B/A            :
LIBERTY RIDGE FARM,            :        CIVIL ACTION
LIBERTY RIDGE FARM,            :  NO: 5:21-CV-05070-JMG
EASTERN PENNSYLVANIA           :
MENNONITE CHURCH AND           :
RELATED AREAS, AND             :
MENNONITE MESSIANIC            :
MISSION OF THE EASTERN         :
PENNSYLVANIA MENNONITE         :
CHURCH,                        :
          Defendants           :




    DEPOSITION OF:    NELSON MARTIN

    TAKEN BY:         PLAINTIFFS

    REPORTER:         TRACY L. LLOYD, RPR
                      NOTARY PUBLIC

                      KEN HAAS, VIDEOGRAPHER

    DATE:             OCTOBER 20, 2022, 9:04 A.M.

    PLACE:            MARGOLIS EDELSTEIN
                      214 SENATE AVENUE, SUITE 402
                      CAMP HILL, PENNSYLVANIA
```

2

```
1   APPEARANCES:

2           ANDREOZZI & FOOTE
            BY: RENEE E. FRANCHI, ESQUIRE
3               4503 NORTH FRONT STREET
                HARRISBURG, PENNSYLVANIA  17110
4               (717) 686-9936
                Renee@vca.law
5
                -- For the Plaintiffs
6
            MARGOLIS EDELSTEIN
7           BY: MEGHAN WYNKOOP, ESQUIRE
                JOCELYN MENDEZ, ESQUIRE
8               THE CURTIS CENTER, SUITE 400E
                170 SOUTH INDEPENDENCE MALL W.
9               PHILADELPHIA, PENNSYLVANIA  19106
                (215) 922-1100
10              mwynkoop@margolisedelstein.com

11
                -- For the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Witness Nelson Martin**

3

1                    INDEX OF WITNESSES

2   EXAMINATION                                   PAGE

3   NELSON MARTIN

4        By Ms. Franchi                            5

5        By Ms. Wynkoop                           --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Nelson Martin**

4

1               STIPULATIONS

2          It is stipulated and agreed by and between

3    counsel for the respective parties that the reading,

4    signing, sealing, and filing of the transcript is

5    waived and that all objections, except as to the

6    form of the question, are reserved to the time of

7    trial.

8

9               THE VIDEOGRAPHER:  The date today is

10   October 20th, 2022, and the time is 9:04 a.m.  This is

11   the videotaped deposition of Nelson Martin taken in

12   the matter of D.C. and R.M. v. Nelson Martin, et al.,

13   which is filed in the United States District Court for

14   the Eastern District of Pennsylvania, Case Number

15   5:21-CV-05070-JMG.

16               This deposition is being held at Margolis

17   Edelstein, 214 Senate Ave, Suite 402, Camp Hill,

18   Pennsylvania.  My name is Ken Haas, and I am the

19   videographer.  The court reporter is Tracy Lloyd.  At

20   this time will counsel please state their appearances.

21               MS. FRANCHI:  My name is Renee Franchi

22   with the law firm of Andreozzi and Foote, and I am the

23   attorney for the Plaintiffs.

24               MS. WYNKOOP:  Meghan Wynkoop, Margolis

25   Edelstein, and I represent the Defendants.

**Witness Nelson Martin**

5

1          MR. MENDEZ:  Jocelyn Mendez, Margolis

2    Edelstein, and I represent the Defendants.

3          THE VIDEOGRAPHER:  Will the court

4    reporter please swear in the deponent.

5

6          NELSON MARTIN, called as a witness, being

7    affirmed, testified as follows:

8

9          THE VIDEOGRAPHER:  Please begin.

10

11                    EXAMINATION

12

13   BY MS. FRANCHI:

14      Q.   Good morning, Mr. Martin.  Thank you for

15   coming in today.  Off the bat, my name is Renee

16   Franchi.  I know we introduced ourselves briefly

17   earlier.  I represent the Plaintiffs David Cross and

18   Robert Miller in this case.

19          Before we start with the questions about

20   the case matter, there are some preliminary matters

21   that we just need to go over expectations and rules

22   for today.

23          I did forget before we begin that two

24   days ago when we started, counsel and I put several

25   preliminary matters that we agreed on onto the record

Witness Nelson Martin

6

1   so that we don't need to repeat them again.  We agree

2   to the same preliminary issues?

3                MS. WYNKOOP:  Agree.

4   BY MS. FRANCHI:

5        Q.    So the first thing that I would like to

6   go over is that when I or your attorney, if she does

7   ask you any questions, when you answer, you do have to

8   give a verbal answer.  This is not just a non-verbal

9   response such as uh-huh or a head nod or a head shake.

10               Even though we do have a videographer

11  here, we do have a stenographer who is typing down all

12  the words, so she can only type down verbal responses.

13  So I just want to make sure that you will be able to

14  give verbal responses today.  Will you be able to do

15  that?

16       A.    Yes.

17       Q.    Okay.  Next, if you're asked a question

18  that you don't understand or it doesn't make sense

19  whether it be because I worded it confusingly, spoke

20  too fast, or for any other reason, please feel free to

21  say that you do not understand the question or that

22  you would like for me to repeat the question just to

23  make sure that you do fully understand what is being

24  asked.  Can you do that today?

25       A.    Yes.

7

1      Q.      In that same light, if you're asked a

2  question and you do answer with a verbal response,

3  then I will assume that you understood the question.

4  Is that fair?

5      A.      Yes.

6      Q.      Now, I expect that we will be here for a

7  few hours today.  We might need to take a break for

8  lunch.  But if at any point during the day and during

9  your deposition you do need to take a break to use the

10  restroom or get something to drink, stretch your legs,

11  or for any other reason, that's perfectly fine.  You

12  can do so.  Just let me know or let your attorney

13  know.

14          The only restriction is that if there is

15  an answer pending.  So say that I ask you a question

16  and then you haven't answered yet, you just have to

17  answer the question before we can take a break.  Does

18  that make sense?

19      A.      Yes.

20      Q.      Okay.  Now, during this deposition I may

21  ask you to estimate or approximate a number or a date

22  or a time if you do not recall something specifically.

23  Please do not take a guess or a stab in the dark.  But

24  if you do think that you can give a fair estimate or

25  approximation, please do so.

**Witness Nelson Martin**

8

1              For example, if I ask you when a specific

2    event happened and you say that you don't know

3    specifically, but you think or you believe that it

4    occurred between the years of 1999 and 2004, that's

5    perfectly fine.  Just let us know that you are

6    estimating or approximating.  But if you simply do not

7    know or do not remember or you're uncertain, please

8    say so.  Is that fair?

9         A.    Yes.

10        Q.    Now, the last and most important thing

11   today is that you just tell the truth.  That's what

12   we're here for.  So if there's anything that would

13   prevent you from being able to fully testify to the

14   truth today, will you let us know?

15        A.    Yes.

16        Q.    Okay.  So first, I will be starting with

17   just some general background questions just to get to

18   know you a little bit.  Obviously, we've never spoken

19   aside from a few minutes before the deposition today.

20   And then we will move on to some more targeted and

21   specific questions.

22              You do have a binder in front of you with

23   documents in it.  They are now all numbered.  So when

24   I refer to a page, if I do, I will refer to the page

25   number.  I will give you time to turn to it.  Let me

**Witness Nelson Martin**

9

1    know if you need more time to look at it or get to the

2    page.  I'll wait for you to make sure that you have

3    what you need in front of you.

4                Your attorney may have questions for you

5    after I am finished at the end of the day today.  Do

6    you have any questions before we get started?

7        A.    No.

8        Q.    Okay.  So right off the bat, what did you

9    do, if anything, to prepare for your deposition today

10   other than speaking with your attorney?  I don't need

11   to know about that.

12       A.    I basically just reviewed the ledger a

13   little bit.

14       Q.    So you reviewed some documents?

15       A.    Mm-hmm.

16       Q.    Okay.  So obviously we know your name.

17   But if you could just for the record one more time,

18   what is your full name?

19       A.    Nelson G. Martin.

20       Q.    And how do you spell your last name?

21       A.    M-a-r-t-i-n.

22       Q.    What's your date of birth?

23       A.    12/10/63.

24       Q.    And where were you born?

25       A.    Lebanon County.

**Witness Nelson Martin**

10

1    Q.    Lebanon County, Pennsylvania?

2    A.    Yes.

3    Q.    And that's where you live now?

4    A.    Yes.

5    Q.    Have you always lived in Lebanon County?

6    A.    Yes.

7    Q.    And what do you do for a full-time job?

8    A.    I farm and do a little bit of sideline

9    truck driving for myself.

10   Q.    And where do you farm at?

11   A.    Myerstown, PA.

12   Q.    Do you use your home property?

13   A.    Yes.

14   Q.    Okay.  And do you own the business?

15   A.    Yes.

16   Q.    What's it called?

17   A.    It's Nel-Ray Farms.

18   Q.    And how long have you owned this company?

19   A.    It started in 1988.

20   Q.    And did you start it?

21   A.    Yes, with my brother.

22   Q.    Okay.  What's your brother's name?

23   A.    Glen.

24   Q.    Same last name?

25   A.    Yes.

**Witness Nelson Martin**

11

1    Q.    Does he also live in Myerstown?

2    A.    Yes.

3    Q.    And you said you also do some trucking on

4    the side.  What company do you work for?

5    A.    Nel-Ray Farms.

6    Q.    Okay.  It's through the same operation?

7    A.    Mm-hmm.

8    Q.    Is the trucking related to the products

9    from your farm or --

10   A.    Yes.

11   Q.    Okay.  So are you contracted ever for

12   other items?

13   A.    Yes.  Sometimes for my neighbor I haul

14   containers out of New Jersey.

15   Q.    Okay.  So occasionally you do interstate.

16   What's your neighbor's name?

17   A.    James Huber.

18   Q.    What's your education level?

19   A.    8th grade.

20   Q.    And then what did you do after 8th grade?

21   A.    Worked on the farm.

22   Q.    Were your parents farmers?

23   A.    Yes.

24   Q.    So was this on the same property that you

25   are on now or were they located somewhere else?

**Witness Nelson Martin**

12

1      A.     It's some of the same, some on the same

2   property and some other places, but all in the same

3   area.

4      Q.     Okay.  Are your parents still alive?

5      A.     No.

6      Q.     What were their names?

7      A.     David and Lavina Martin.

8      Q.     And did they have a business as a farm or

9   was it just their home farm?

10     A.     It was their home farm.

11     Q.     Okay.  Was it registered as a business?

12     A.     Yes.  Dutch-Way Farms would have been

13   his.

14     Q.     When did your parents pass?

15     A.     2014 and '18.

16     Q.     So Dutch-Way Farms, is it still in

17   existence or did it end when they passed?

18     A.     It's not in existence anymore.

19     Q.     Okay.  Are you married?

20     A.     Yes.

21     Q.     What's your wife's name?

22     A.     Eva Jane Martin.

23     Q.     I'm assuming you live together?

24     A.     Yes.

25     Q.     Is there anybody else that lives with

**Witness Nelson Martin**

13

1    you?

2          A.     Our two youngest sons.

3          Q.     **How many children do you have?**

4          A.     Six boys, one girl, and one foster son.

5          Q.     **So all the rest of the children have**

6    **already moved out?**

7          A.     Mm-hmm.  Yes.

8          Q.     **Do they live in the area?**

9          A.     For the most part.  One lives in New

10   Jersey and married.  The foster son lives in Florida

11   and runs a shed manufacturing plant.

12         Q.     **Okay.  Do you have any grandkids?**

13         A.     20.

14         Q.     **Do you remember all their birthdays?**

15         A.     No.

16         Q.     **So other than Nel-Ray Farms and the other**

17   **Dutch-Way Farms that we had spoken about with your**

18   **parents, do you have any ownership interests in any**

19   **other businesses other than Liberty Ridge, just**

20   **anything else?**

21         A.     No.

22         Q.     **Okay.  Do you have any financial**

23   **interests in any other businesses other than the ones**

24   **we spoke about or Liberty Ridge?**

25         A.     No.

Witness Nelson Martin

14

1   Q.   Where do you do your banking for your
2   business?  Is it somewhere local or is it a national
3   bank?
4   A.   It's a local bank.
5   Q.   Which one do you use?
6   A.   Ephrata National Bank.
7   Q.   Is that where your personal accounts are
8   as well?
9   A.   Yes.
10   Q.   So I know you said that you have a farm.
11   I'm assuming you own the property that your farm is
12   on?
13   A.   Yes.
14   Q.   Is it in your name or a business name?
15   A.   It's in personal name.
16   Q.   Okay.  Do you own any other properties?
17   A.   Yes.  There's a few.
18   Q.   Okay.  If you can, where generally?
19   A.   All in the Myerstown area.
20   Q.   Okay.  Are they farm plots?  Are they
21   just residential business combination?
22   A.   Farm plots within -- yeah, just farm
23   plots basically.
24   Q.   Okay.  And is that where you do a lot of
25   your farming for your business?

**Witness Nelson Martin**

15

```
1        A.      Yes.
2        Q.      Do you use any other properties for your
3    business other than the ones that you own?
4        A.      Yes.
5        Q.      And what type of farming do you do?  I
6    know we're talking generally about farming, but
7    obviously there's a whole lot of different things that
8    you can do.
9        A.      Grain.
10       Q.      What kind?
11       A.      Corn and soybeans.
12       Q.      Does it rotate?
13       A.      Wheat.  Yes.
14       Q.      Do you have any employees?
15       A.      No.
16       Q.      Just you?
17       A.      Yes.
18       Q.      Do any of your family members have an
19   ownership or financial interest in your business or
20   any business that you own?
21       A.      No.
22       Q.      So I'm going to jump ahead a little bit.
23   Again, there's really no easy way to transition from
24   one subject to the other other than just jumping right
25   in.
```

**717.214.1182     Reporter@hkwllc.com**

16

1        So I kind of want to start a little bit
2   at the beginning before Liberty Ridge was created, I
3   guess when the idea became more a concept that was
4   being discussed.
5        Were you in any way involved with the
6   Mennonite Messianic Mission -- I'll just call it the
7   Mission from now on.  It will be easier.  Were you
8   involved with the Mission in any way prior to the idea
9   of Liberty Ridge being discussed?
10       A.     My only involvement -- I was really not
11  involved with the Mission.  I was on the committee for
12  South America for one of our church missions down
13  there, so I would get to some of their Mission Board
14  meetings, but I was not part of the Mission Board
15  never.
16       Q.     Did you get to travel in that position?
17       A.     Yes.
18       Q.     Where did you go?
19       A.     Paraguay.
20       Q.     For how long?
21       A.     Up to ten days to two weeks sometimes.
22       Q.     Okay.  And that was your only involvement
23  with the Mission prior to that?
24       A.     Yes.
25       Q.     Was that a paid position or volunteer?

**Witness Nelson Martin**

17

1      A.      Volunteer.

2      Q.      Do you remember about when that was?

3      A.      2004.

4      Q.      Were you involved in any of the Mission's

5  discussions about starting a boys home prior to being

6  placed on the Liberty Ridge committee?

7      A.      No.

8      Q.      So how did you first become involved with

9  the Liberty Ridge or the boys home committee?

10     A.      The church asked me if I would want to

11 serve on the committee.

12     Q.      When you say the church, who do you mean

13 by that?

14     A.      The Mission Board, the Mission.

15     Q.      The Mission Board, okay.  Do you remember

16 who it was specifically?

17     A.      No.

18     Q.      And do you recall when about that was?

19     A.      Approximately 2008, give or take.

20     Q.      So when you were approached by someone on

21 the Mission Board, did they tell you what exactly it

22 was they wanted you to do?

23     A.      Yes.

24     Q.      What was that discussion?

25     A.      It was to support families with troubled

**Witness Nelson Martin**

18

1    boys.

2        Q.    And was it discussed that they wanted to

3    do so by opening either a group home or placing the

4    boys somewhere?

5        A.    No.

6        Q.    Okay.  How were they planning on

7    facilitating the help for these boys?

8        A.    We would just give the parents support.

9        Q.    Okay.

10        A.    As far as, you know, how to work with the

11    boys and that kind of thing.

12        Q.    So it was a little less organized than it

13    became?

14        A.    Yes.

15        Q.    Okay.  And how long was that going on

16    for?

17        A.    A couple years.

18        Q.    At what point did your work with the

19    Mission turn into the more organized boys home

20    committee?

21        A.    Maybe 2009.

22        Q.    Okay.  Do you recall how that transition

23    occurred from individually helping families to

24    deciding that there may be a boys home implemented?

25        A.    It was basically from the standpoint of

**Witness Nelson Martin**

19

1    it just wasn't working to have these boys in the home,

2    and the parents were up against, and so we looked into

3    starting a facility where we could help the boys.

4         **Q.    In the families that were targeted to**

5    **help, these were all families that were within the**

6    **Eastern Pennsylvania community?**

7         A.    Yes.

8         **Q.    Okay.  Did you have any relatives on the**

9    **Mission Board or anybody that you were related to?**

10        A.    There's a cousin that would -- all the

11   bishops of the Eastern Pennsylvania Mennonite Church

12   are -- they're the members of the Mission Board, so I

13   guess no.

14        **Q.    So when you say they're not members, it's**

15   **my understanding they're more like advisors when it's**

16   **needed?**

17        A.    Correct.

18        **Q.    Okay.  We learned a few days ago about**

19   **the structure of what we call the church is more of a**

20   **nebulous association of congregations that advise the**

21   **board, correct, and the congregations?**

22        A.    Yes.

23        **Q.    Okay.  So once the boys home committee**

24   **was starting to be established, did your duties and**

25   **responsibilities change at all?**

**Witness Nelson Martin**

20

1      A.     Not really.

2      Q.     Okay.  Do you recall when about the

3   Mission Board began to bring in other individuals to

4   serve on the committee with you?

5      A.     In that 2010 to '12.

6      Q.     Okay.  Excuse me.  When you were on this

7   boys home committee, which I believe it was the boys

8   home committee before Liberty Ridge name was chosen;

9   correct?

10     A.     Yes.

11     Q.     Okay.  When you were on this boys home

12  committee, did you attend any Mission meetings?

13     A.     Yes.

14     Q.     Would it be every meeting?  Just

15  sporadically?  Was there any structure to it?

16     A.     There was no structure to it.

17     Q.     Okay.  Tell me about the committee's

18  relationship with the Mission Board while it was still

19  kind of investigating the concept of a boys home.

20            And if you'd like more clarification, I'm

21  kind of looking in the direction of did the Mission

22  Board provide guidance?  Did they ask you to do

23  things?  Did you act on your own and report back or

24  was it a combination?

25     A.     It was basically we, as a committee,

Witness Nelson Martin

21

1   would report to them what our goals are.

2       Q.    Okay.  What I'm going to do -- oh, gosh.

3   There goes my voice.  Excuse me.  This is what happens

4   when you talk for two days, so I apologize if my voice

5   comes in and out for a bit.  I'm going to turn you to

6   Page LRF-36.  It's about halfway through.  I'll give

7   you a few seconds to get there.

8               THE VIDEOGRAPHER:  Off camera time is

9   9:24.

10              (Discussion held off the record.)

11              THE VIDEOGRAPHER:  On camera time is

12  9:25.  Please continue.

13  BY MS. FRANCHI:

14      Q.    All right.  Mr. Martin, so before we took

15  a brief break, I had asked that you turn to Page 86.

16  Have you reached the page?

17      A.    Yes.

18      Q.    Okay.  So in front of you is the first of

19  several pages of meeting minutes from the Mission

20  Board.  It goes from Page 86 to 95.  So you had told

21  me that you had kind of loosely became involved with

22  the Mission maybe around 2008 or 9 you said; correct?

23      A.    2004 when I was on the Paraguay.  Oh, you

24  mean with this?

25      Q.    Yes, yes.

**Witness Nelson Martin**

22

1        A.      Yes, with this, yes.

2        Q.      So the first page where it talks about

3    the June 2nd meeting minutes, that would be Page 86,

4    I'll take your attention down to Number 13 at the

5    bottom, close to the bottom of the page where it says

6    boys home.

7        A.      Yes.

8        Q.      Where it was reported that the committee

9    working on this interest will be at the next MMM

10   meeting.  Would that be referring to you and then

11   maybe some of the new members that were assigned to

12   the task?

13       A.      Yes.

14       Q.      Okay.  The next page, Page 87, are

15   meeting minutes from June 29th, 2010, and this time

16   it's about halfway down the page, boys home committee.

17   Do you recall if you were at this meeting?

18       A.      I can't say for sure that I was.

19       Q.      Okay.  So I see here that it mentions

20   various questions were addressed to committee, what

21   age boys will be eligible, what might be the operating

22   cost, what is the next step, and then that there was

23   discussion afterwards, and the board would go on

24   record approving the work based on the overall outline

25   presented to the board.

Witness Nelson Martin

23

1          So do you recall whether or not you were
2   involved in presenting any of this information to the
3   Mission Board?

4          A.    Yes.  I would have been involved in some
5   of these questions.

6          Q.    Okay.  How did you go about determining
7   what might be the operating cost of a facility such as
8   what became Liberty Ridge?

9          A.    It was just a projected cost.  We had no
10  idea.

11         Q.    You just kind of started from nothing and
12  worked your way up?

13         A.    Yes.

14         Q.    Okay.  Did you begin to research other
15  facilities to try to figure out how Liberty Ridge
16  would be run?

17         A.    Yes.

18         Q.    Okay.  Did you travel to any other
19  facilities?

20         A.    Yes.

21         Q.    Where did you go?

22         A.    Fresh Start in Indiana.  Team Ranch in
23  Missouri.  Lives Under Construction in Missouri.

24         Q.    And are these all boys homes that are run
25  by other Mennonite organizations?

**Witness Nelson Martin**

24

1        A.      No.

2        Q.      **Do you know who runs the different homes**

3  **that you went to?**

4        A.      Fresh Start and Team Ranch would have

5  been run by Mennonite organizations.  Lives Under

6  Construction was more of a secular.  They work with

7  inmates out of prison and things like that.

8        Q.      **Okay.  How much time did you spend**

9  **traveling to different facilities to learn from them?**

10       A.      A couple days.

11       Q.      **Just here or there?**

12       A.      Yes.

13       Q.      **Were there any consistencies that you**

14  **recall between the different places that you went to?**

15       A.      Yes.

16       Q.      **Were these things that you drew from when**

17  **helping to create Liberty Ridge?**

18       A.      Somewhat.

19       Q.      **Okay.  What were the main concepts that**

20  **you were looking for when you traveled to these**

21  **different places?**

22       A.      Procedure of operation.

23       Q.      **How many times did you go down to the**

24  **Team Boys Ranch in Missouri?**

25       A.      Once.

25

1       Q.      Do you remember when that was?

2       A.      No.

3       Q.      Excuse me.  I do apologize.  So I will

4  move your attention to the next page, Page 88, about

5  two thirds of the way down where it says the boys home

6  item, where it talks about the committee members being

7  Ethan Weaver, Lamar Garman, Nelson Martin, Scott

8  Martin, and Jacob Brubaker.

9               Is this about the time that you recall

10 when the committee became more than just you and maybe

11 one other person, that there are several of you now

12 working on the project?

13      A.      I should clarify something, and that was

14 that from the start when I was involved it was four of

15 us.

16      Q.      Oh, okay.

17      A.      It wasn't just me.

18      Q.      Okay.  Who was it?

19      A.      It was Jacob Brubaker, Lamar Garman,

20 Ethan Weaver, and myself.

21      Q.      When the four of you were working on it

22 before it was kind of established as an official

23 committee, were there any duties that you each had

24 individually or did you kind of share the

25 responsibility?

**Witness Nelson Martin**

26

1        A.     It always was an established committee --

2        **Q.     Okay.**

3        A.     -- when we started, and Jacob Brubaker

4    would have been chairman and Ethan Weaver secretary.

5        **Q.     Okay.**

6        A.     But that was as far as any kind of an

7    established plan.

8        **Q.     Okay.  I'll turn your attention to the**

9    **next page, Page 89.  This time it's at the bottom of**

10   **the page, the boys home line item where it says all**

11   **five parcels of the Thompsontown property have been**

12   **purchased for $795,000.**

13           **Were you involved in the purchase of the**

14   **Liberty Ridge property at all?**

15       A.     Not from a monetary standpoint.

16       **Q.     Okay.  What was your involvement?**

17       A.     My involvement was that I seen the

18   property.  I looked at the property.  Took the rest of

19   the committee to the property and would have went

20   along to settlement, but I had nothing to do with the

21   settlement.

22       **Q.     Was the property purchased by the**

23   **Mission?**

24       A.     Yes.

25       **Q.     Okay.  Does it still remain in the**

**Witness Nelson Martin**

27

1    Mission's name?

2         A.    Yes.

3         Q.    And correct me if I'm wrong, the Liberty

4    Ridge property is in Juniata County?

5         A.    Yes.

6         Q.    About how far is that from where you

7    reside in Myerstown?

8         A.    75 miles.

9         Q.    Okay.  Moving on to the next page, Page

10   90, for the boys home line item, it mentions township

11   approvals for the Liberty Ridge residents.  Were you

12   involved in obtaining any township approvals or any

13   government approvals in any way?

14        A.    Yes.

15        Q.    So tell me a little bit about what it was

16   you were involved with.

17        A.    Because this was a farm, we had to get

18   township approval to have a boys home.

19        Q.    Okay.

20        A.    So we had a hearing.

21        Q.    Okay.

22        A.    At the township.

23        Q.    Do you have any paperwork or documents

24   reflecting any of the approvals with the township?

25   Anything like that?

**Witness Nelson Martin**

28

1    A.    Yes.

2    Q.    Do you personally have them or are they

3    maintained somewhere else?

4    A.    Not sure.

5    Q.    If they were maintained somewhere, do you

6    know where they may be?

7    A.    Yes.

8    Q.    Where may they be?

9    A.    It's either I have them or they're at the

10   farm or one of the MMM representatives.  I just -- I'm

11   not sure.

12   Q.    They exist somewhere in space.

13   A.    Yeah.

14   Q.    Okay.  Do you maintain any sort of an

15   office or anything like that at Liberty Ridge?

16   A.    No.

17   Q.    Turning to the next page, Page 91, where

18   it talks about the personnel for approval for house

19   parents and mentors, were you involved at all with

20   the, I guess, recruitment of house parents or mentors?

21   A.    I'm not sure I'm following you.  On which

22   page again?

23   Q.    It would be Page 91, and it's close to

24   the top where it says Line Item F.  There's no header

25   for boys home or anything.  It seems like it's cut

29

1   off.  Were you involved in the recruitment of any of

2   the mentors or house parents?

3                MS. WYNKOOP:  Objection to form.  You can

4   answer.

5        A.    No.

6   BY MS. FRANCHI:

7        Q.    Okay.

8        A.    Let me clarify that.  You're asking if --

9   I did not ever ask any house parents or mentors to

10  serve.

11       Q.    Okay.  Was there any sort of a screening

12  process or anything of that nature that you recall?

13       A.    Yes.

14       Q.    Were you involved in it at all?

15       A.    Yes.

16       Q.    Okay.  Tell me a little bit about that.

17       A.    We would've had -- the screening side of

18  it was that any individual that was asked to serve

19  voluntary here were to serve would have been -- we

20  would have ran it past their ministry, and then for

21  mentors we would have had an interview with them and

22  an orientation.

23       Q.    Were there any certain characteristics or

24  traits that you were looking for in the mentors that

25  would then serve at Liberty Ridge?

**Witness Nelson Martin**

30

1    A.    God honoring, God fearing young men that
2 were responsible.
3    **Q.    And did the individual congregations**
4 **present these mentors to you or -- when I say you, I**
5 **mean the committee -- or did the committee identify**
6 **these individuals on their own and go seek them out?**
7    A.    Some of both.
8    **Q.    Okay.  Was there any type of background**
9 **screening or anything to that extent when interviewing**
10 **these mentors?**
11    A.    No.
12    **Q.    Okay.  Were the mentors given any sort of**
13 **training?  I know you had mentioned an orientation, so**
14 **I guess what I'm asking is what did that orientation**
15 **include and what did it entail?**
16    A.    I can't answer that in full because I'm
17 not sure I know the whole details.
18    **Q.    Okay.**
19    A.    But it was basically to give them what
20 their responsibilities would be and also questioning
21 their life, their time with God, and their
22 relationship with God, and also their relationship to
23 their brothers and sisters and their parents.  So
24 those kinds of things that we were looking for.
25    **Q.    Did the committee interview family**

**Witness Nelson Martin**

31

1    members or siblings or anyone who is, I guess,

2    involved in any way with these mentors?

3          A.    No.

4          Q.    Okay.  Did any of the mentors that you

5    know of have any specific training in dealing with or

6    handling high risk youth?

7          A.    No.

8          Q.    Okay.  No training in dealing with, you

9    know, certain therapeutic aspects of children with

10   mental health disorders or anything like that?

11         A.    Not more than living in a family with

12   their brothers and sisters, yes.

13         Q.    Okay.  So I'm going to skip a page, and

14   then we can go to Page 93.  I believe these are the

15   meeting minutes from May 4th of 2011.  I'll take you

16   down, boys home is Line Item 13 and specifically Item

17   E which is close to the bottom of the page.

18               The minutes here note that the boys home

19   committee presented a proposal from Snyder Gates, LLC,

20   that would allow them to set up the shop to

21   manufacture fiberglass farm gates incorporating the

22   labor of the Liberty Farm residents.

23               Were you involved in the discussions with

24   Snyder Gates?

25         A.    Yes.

32

1    Q.    I guess skipping back a little bit, did
2  the committee discuss bringing in third-party
3  businesses to do work with Liberty Ridge?
4    A.    We were basically looking for something
5  that where we would teach these boys vocational
6  skills and also wanted to work with anybody, a
7  company, that would also be interested in this kind of
8  vocational skills because anything in this -- in this
9  particular -- there's nothing in it for anybody to --
10  in other words, if we wanted to make a high profit, we
11  wouldn't choose something like this.
12    Q.    So when you were talking to Snyder Gates,
13  do you recall who it was specifically that you were
14  speaking with from their company?
15    A.    Nolan Snyder and his mother, and I don't
16  know what her name is.
17    Q.    Were these people who you were familiar
18  with prior?
19    A.    No.
20    Q.    Okay.  Did you seek Snyder Gates out or
21  did they seek you out?
22    A.    They sought us out.
23    Q.    Okay.  Do you recall what, if anything,
24  they said when they did seek you or the committee out
25  or, I guess, why?

**Witness Nelson Martin**

33

1      A.      Her son, Nolan, was part of this, and
2  they were just -- he was kind of looking to retire
3  from it or get less involved, and so he thought it
4  would be a good thing to teach these boys vocational
5  skills.
6      Q.      Did they have any employees?
7      A.      No.
8      Q.      So, if you know, you had said that Nolan
9  was looking to retire, and they didn't have employees,
10 so was Nolan doing the work himself prior?
11     A.      Yes.
12     Q.      Okay.  So the proposal that is mentioned
13 from Snyder Gates, would this be something that was in
14 writing or was this verbal?
15     A.      Not sure.
16     Q.      Okay.  Do you recall if there was any
17 paperwork, contracts, anything like that between the
18 Mission, Liberty Ridge, or anything with Snyder
19 Gates?
20     A.      No.
21     Q.      So when it talks here about Snyder Gates
22 providing training and management, at that point a
23 decision would need to be made whether the farm would
24 purchase the manufacturing machinery or discontinue
25 the contract.  So when it mentions the contract, you

34

1  don't remember if it was written down or verbal?

2      A.    The only thing I remember is there was --

3  I guess you could call it a contract.  There was what

4  the working relationship was going to be between the

5  two of us.

6      Q.    Okay.

7      A.    But I don't -- I don't know where that

8  contract is.

9      Q.    Do you recall or do you have any

10  knowledge of where Snyder Gates used to build their

11  products before moving over to Liberty Ridge?

12     A.    It was in Snyder County, the next county

13  over.

14     Q.    Are you aware of whether they relocated

15  all of their equipment to Liberty Ridge?  Just some of

16  it?  I guess was it the whole operation or just a part

17  of it?

18     A.    I'm not sure.

19     Q.    Okay.  Was there any discussion with

20  Nolan Snyder or his mother about paying the children

21  for their work?

22     A.    Not that I can recall.

23     Q.    So I want to jump around a bit.  Going

24  back to Team Boys Ranch in Missouri, do you recall

25  ever encountering an individual named Kyle Hoover when

**Witness Nelson Martin**

35

1    you were there?

2        A.    I remember seeing him, but I don't know

3    that I had any contact with him while we were there.

4        Q.    Okay.  Do you recall whether you ever

5    encountered Kyle Hoover back up in Pennsylvania when

6    Liberty Ridge was being built?

7        A.    Yes.

8        Q.    Okay.  Tell me about that.

9        A.    He went to -- his mother went to one of

10   our churches there in our district, and Kyle would

11   have been at our place some.

12       Q.    When Liberty Ridge was first being

13   created, was it just an empty farm plot or were there

14   any structures on it?

15       A.    The chicken houses were there.

16       Q.    No residence?

17       A.    No.

18       Q.    Who --

19       A.    The farmhouse, but I mean but no -- yeah.

20       Q.    And I know that Liberty Ridge has kind of

21   expanded since 2011.  When the property was first

22   purchased and Liberty Ridge was first being opened, so

23   there was a farmhouse and then you said the chicken

24   house.  Were there any other structures?

25       A.    A small shop.

Witness Nelson Martin

36

1    Q.    Okay.  Were any other structures built, I
2    guess, after the purchase, but before the Liberty
3    Ridge boys home was opened?
4    A.    No.
5    Q.    Were there any other renovations or work
6    done to the property in preparation for there being
7    residents at Liberty Ridge?
8    A.    Yes.
9    Q.    Tell me about that work a little bit.
10   A.    There was preparation made for the house
11   parents.  A little remodeling in the house for that
12   and a remodeling of the chicken houses.
13   Q.    Okay.  Since that time, tell me a little
14   bit about kind of how the property has changed and
15   developed since, I guess, its inception in 2011 to the
16   present?
17   A.    We expanded the main house to make some
18   nice sleeping quarters and a nice kitchen to provide
19   for these boys.  We added on to the small shop one
20   time, and we also added another shop beside that.
21   Again, to give more place for vocational skills,
22   woodworking for the boys.  And we added a third house
23   for the administration.
24   Q.    Was there ever a sawmill or anything like
25   that on the property?

**Witness Nelson Martin**

37

1     A.     No.  We never had a sawmill.

2     Q.     Okay.  So once Liberty Ridge kind of

3  moved from being a concept to being an actual business

4  and a home, whose decision was it to put your name on

5  the registration paperwork for Liberty Ridge?

6     A.     I was asked by the committee to get the

7  legal work done.

8     Q.     Okay.  What kind of work did you do to

9  prepare the paperwork?  Was it just the fictitious

10  name or were there other documents involved?

11     A.     Just the fictitious name, and I asked my

12  accountant to do that, so.

13     Q.     Okay.  Who's your accountant?

14     A.     Martin Accounting.

15     Q.     Do you still use them?

16     A.     Yes.

17     Q.     Where are they out of?

18     A.     Myerstown.

19     Q.     I'm going to turn you to closer to the

20  beginning.  It will be PLS-56.  It goes PLS first and

21  then LRF after that, so it would be the first set of

22  documents.  I want to make sure that you're done

23  looking for it before I start asking questions.  Okay.

24  Mr. Martin, do you recognize this document?

25     A.     Yes.

Witness Nelson Martin

38

1    Q.    And then I'll just have you take a look

2  at the back half of that Page 57.  Is that the

3  backside of the same form that you recall?

4    A.    Not sure.

5    Q.    So looking at the first page, Page 56,

6  where it says Nelson Martin, 152 Flanagan Road,

7  Richland, PA, 17087, what -- whose address is that?

8  Is that your personal address?

9    A.    That's my personal address.  That's where

10  I lived.

11    Q.    Okay.  Is that where you live now?

12    A.    No.

13    Q.    Okay.  So different location.  This

14  wouldn't be the Myerstown address you've been talking

15  about?

16    A.    Yes.  It's just -- it is actually my

17  farm.

18    Q.    Okay.

19    A.    And it's still my personal -- I mean it's

20  still my property.

21    Q.    Okay.

22    A.    But it's just a mile and a half down the

23  road.

24    Q.    Gotcha.  Okay.

25    A.    That's where I milked cows all my life.

**Witness Nelson Martin**

39

1    Not all my life, but.

2          Q.     Most of it?

3          A.     Yeah.

4          Q.     So you said it was at the direction of

5    the Mission Board that it be put in your name?

6          A.     Well, it was actually put into Liberty

7    Ridge Farms name, the fictitious name.  I was just the

8    one that made the -- applied for the -- through my

9    accountant for the fictitious name.

10         Q.     Okay.  Where it says on Number 2

11   church-operated home for boys, what exactly is it

12   referring to by church operated?  Is that referring

13   to the Mission or just the general under the kind of

14   guidance of the Eastern Pennsylvania Mennonite

15   Church?

16         A.     Not sure why they have used that term.

17         Q.     Okay.  Do you recall if you filled this

18   form out or if somebody else did?

19         A.     Martin Accounting did as far as I know.

20         Q.     And Number 3 where it says 583 Varner

21   Lane, McAlisterville, PA, 17049, is that the physical

22   address for Liberty Ridge?

23         A.     Yes.

24         Q.     And that would be the property owned by

25   the Mission?

**Witness Nelson Martin**

40

1      A.      Yes.

2      Q.      So I'll turn you to Page 57 now.  I know

3   you said you weren't sure if it was the back of the

4   form, but I'll take you down to the bottom where it

5   has a signature.  Is that your signature?

6      A.      Yes.

7             MS. FRANCHI:  Can we take a break and go

8   off the record?

9             THE VIDEOGRAPHER:  Off camera time is

10   9:52.

11             (Recess)

12             THE VIDEOGRAPHER:  On camera time is

13   10:00.  Please continue.

14   BY MS. FRANCHI:

15      Q.      Okay.  Before we took a break, I believe

16   we had just finished looking at the application for

17   registration of fictitious name.  I'm going to have

18   you turn just a couple of pages forward to Page

19   PLS-62.  Just let me know when you get there.

20      A.      I'm there.

21      Q.      Okay.  So this here is from the

22   Pennsylvania Corporations website.  When it lists

23   business entity details under officers, the name that

24   I see here is name, Nelson Martin.  Title, owner.

25             So if you can tell me a little bit about

**Witness Nelson Martin**

41

1   what your involvement is then with the actual business
2   entity of Liberty Ridge.
3           A.      There is no involvement.
4           Q.      Okay.  So when it lists you as the owner,
5   is there anybody else that acts as the owner or
6   anything to that extent?  I guess what I'm getting at
7   is where it lists you as the owner, but I know that
8   you said that you aren't the owner, explain why.
9           A.      I'm not the owner because I never -- I
10  never signed any of the -- the only thing I signed for
11  was to get the fictitious name which we talked about
12  earlier.  I'm not sure why the state put owner in
13  there.
14          Q.      Okay.  To your knowledge, Liberty Ridge
15  is only a fictitious name; correct?
16          A.      Yes.
17          Q.      Is there any other entity that Liberty
18  Ridge could be like an LLC or a corporation or, to
19  your knowledge, it is only just a fictitious name?
20          A.      It's just a fictitious name.
21          Q.      Okay.  Who holds the bank accounts for
22  Liberty Ridge?
23          A.      I do as the treasurer.
24          Q.      Okay.  Is there anybody else that can
25  access them like as a signatory or an alternate user?

**Witness Nelson Martin**

42

1    A.    Yes.

2    Q.    Who?

3    A.    Gerald Nolt.

4    Q.    And pardon me.  I know I spoke with him,

5    and I cannot remember.  What is his position with

6    Liberty Ridge?

7    A.    Assistant treasurer.

8    Q.    Okay.  And were you the treasurer when

9    Liberty Ridge first opened?

10   A.    Yes.

11   Q.    Have you been the entire time?

12   A.    Yes.

13   Q.    Okay.  So the Liberty Ridge bank

14   accounts, are they under -- then would they be under

15   your Social Security number or is there like an EIN or

16   a tax number that they're under?

17   A.    There's an EIN number.

18   Q.    There is, okay.  I'm assuming you don't

19   know that off the top of your head?

20   A.    I know it starts with 27, but that's all.

21   Q.    You got a few.

22   A.    Yeah.

23   Q.    Is there only one bank account held by

24   Liberty Ridge?

25   A.    Yes.

**Witness Nelson Martin**

43

1    Q.    Okay.  And where is that bank account
2  held?
3    A.    Ephrata National Bank.  It started out
4  under Fredericksburg National Bank.
5    Q.    And then moved?
6    A.    (Nodding head.)
7    Q.    Do you remember when that move happened?
8    A.    2000 -- I can tell you real quick.
9    Q.    I recall that I saw in the ledgers there
10  was a notation about a new checking account.
11    A.    Yes.  I think it was 2013, but I'm not a
12  hundred percent sure on that, but it's in your ledger,
13  yes.
14    Q.    Okay.  So that would have just been kind
15  of migrating everything over?
16    A.    Correct, and you can see the dollar
17  amounts came straight over.
18    Q.    What was the reason for the change?
19    A.    Convenience.  Ephrata National Bank put a
20  branch in Myerstown half a mile from my house.
21    Q.    That makes sense.  So you said you have
22  an accountant Martin Accounting?
23    A.    Yes.
24    Q.    Did they also do the taxes related to
25  Liberty Ridge?

**Witness Nelson Martin**

44

1      A.     We file no taxes because we're a 501(c).

2      **Q.     It is a 501(c), okay.  Who filed the**

3  **501(c) paperwork?**

4      A.     Martin Accounting I'm pretty sure, but

5  I'd have to look.

6             MS. FRANCHI:  Okay.  Can we pause for

7  just a second and go off the record?

8             THE VIDEOGRAPHER:  Off camera time is

9  10:05.

10             (Discussion held off the record.)

11             THE VIDEOGRAPHER:  On camera time is

12  10:06.

13  BY MS. FRANCHI:

14      **Q.     Okay.  So you had said it's your belief**

15  **that Liberty Ridge is filed as a 501(c)(3)?**

16      A.     Yes.

17      **Q.     Okay.  So just to be clear, the only**

18  **documents that I have received in discovery and that**

19  **we have talked about is the registration of the**

20  **fictitious name and the business entity details that**

21  **Liberty Ridge Farm is a fictitious name with you as**

22  **the owner, but you are indicating there may be other**

23  **paperwork that you believe?**

24      A.     I don't know.

25      **Q.     Okay.  Is there anybody that you believe**

**Witness Nelson Martin**

45

1    may know?

2          A.     I can't think of anybody.  Well, let me

3    back up.  We could ask Martin Accounting.

4          Q.     Okay.  So as it relates to your personal

5    tax returns, do you make any claims to Liberty Ridge

6    on your tax returns personally?

7          A.     No.

8          Q.     Okay.  Are you involved in the preparing

9    of the tax returns with your accountant for Liberty

10   Ridge?  Like are you the one who submits

11   documentation?

12         A.     Yes.

13         Q.     Okay.  So looking at the actual opening

14   of Liberty Ridge, do you recall when Liberty Ridge

15   first accepted its first resident which I believe was

16   Mr. Cross?

17         A.     November of 2011 is as close as I can

18   get.

19         Q.     Okay.  So Liberty Ridge had been

20   established as a business or at least in name in

21   February of 2011?

22         A.     Yes.

23         Q.     And then the first resident didn't come

24   in until later on that year?

25         A.     Yes.

Witness Nelson Martin

46

1    Q.    Do you recall what was done during that
2  time before the first resident came in but after the
3  entity was established?
4    A.    Preparation, remodel, and chicken
5  contract.
6    Q.    Okay.  So all of the work that you were
7  talking about before was during those few months?
8    A.    Yes.
9    Q.    Okay.  So what is the current, I guess,
10 leadership structure of Liberty Ridge kind of from the
11 top down?
12   A.    You're asking for current as of 2022?
13   Q.    Yes, and then we'll go backwards from
14 there.
15   A.    It is the committee.  Then it comes down
16 to a contact committee.  And then from there it goes
17 down the contact committee is responsible for
18 administrative people and then mentors and residents.
19   Q.    So I know we had mentioned that's the
20 structure now.  Was the structure different back when
21 Liberty Ridge first opened?
22   A.    Yes.
23   Q.    What was it or I guess how was it
24 structured in 2011 when it first opened and accepted
25 its first resident?

**Witness Nelson Martin**

47

1        A.      It was basically structured by the

2   committee.

3        Q.      Okay.

4        A.      And we just operated as a committee.

5        Q.      Okay.  Is the committee -- I think we've

6   actually kind of used the term committee and then

7   board kind of interchangeably, but does the committee

8   act as a traditional board of directors or is it

9   still -- I guess what is the structure of the

10  committee or the board since those terms have kind of

11  been used both ways?

12       A.      It operates more as a board than actually

13  a committee.

14       Q.      Okay.  With the traditional like

15  president, vice president, secretary, assistant

16  secretary type structure?

17       A.      Yeah.  Basically a chairman.

18       Q.      Okay.

19       A.      Assistant chairman and on down.

20       Q.      Okay.  Is there any oversight to the

21  committee of Liberty Ridge?  Like is there anybody

22  that oversees the committee like the Mission or any

23  other entity?

24       A.      Not necessarily.  The reports would be

25  given to the Mission.

**Witness Nelson Martin**

48

1      Q.      How often?

2      A.      Once a year.

3      Q.      Okay.  What types --

4      A.      Or once a year for the financial, and

5   then whenever we need new house parents or mentors

6   that gets recorded.

7      Q.      Okay.  So is it safe to say that it

8   goes -- the reporting is generally from Liberty Ridge

9   to the Mission, but the Mission doesn't necessarily

10  tell Liberty Ridge what to do or is that not correct?

11     A.      That would be correct.

12     Q.      Is there ever a time in your experience

13  that the Mission has given direction to Liberty Ridge

14  or asked the committee to do any certain things?

15     A.      I don't recall.

16     Q.      Okay.  Are you aware of whether any of

17  the Mission Board members go to the physical property

18  of Liberty Ridge either to observe or to participate

19  in any way?

20     A.      Yes.

21     Q.      Who that you know of has done that?

22     A.      Jacob Brubaker.

23     Q.      Okay.  And he is with the Mission Board?

24     A.      Yes.

25     Q.      Okay.  Is this the same Mr. Brubaker

**Witness Nelson Martin**

49

1    that's on Liberty Ridge committee?

2         A.    Yes.

3         Q.    Okay.  So it's the same person on both?

4         A.    Yes.

5         Q.    Okay.  Are you aware of whether

6    Mr. Brubaker is making other reports to the Mission

7    about Liberty Ridge during their own meetings?  I

8    guess not during the once a year reporting time.

9         A.    Jacob, but he would take names for

10   mentors or administrators for approval to the Mission

11   Board.

12        Q.    Okay.  When Mr. Brubaker would visit the

13   property of Liberty Ridge, are you aware of whether he

14   would give any directions or tell anybody what to do

15   when he was on the property?

16        A.    Very little.

17        Q.    Was it more just passive observation?

18        A.    Yes.

19        Q.    Okay.  Do you know if Mr. Brubaker has

20   any business interest with anything going on at

21   Liberty Ridge?

22        A.    No.

23        Q.    Okay.  Does the Liberty Ridge committee

24   have any guiding documents or bylaws or any type of

25   governing documents that you're aware of?

**Witness Nelson Martin**

50

1        A.      Yes.

2        Q.      Okay.  Do you know what these documents

3    are?

4        A.      It's in the hand -- what our handbook

5    says.

6        Q.      Just in the policy book?

7        A.      Policy book.

8        Q.      Okay.  My understanding that the current

9    policy book that was provided in discovery was not the

10   policy book that was in place back when Liberty Ridge

11   began in 2011, is that correct?

12       A.      Correct.

13       Q.      Okay.  Do you recall when the new set of

14   policies were made?

15       A.      Somewhere between 2014 and '16 maybe.

16       Q.      Okay.  Are you aware of whether there is

17   a copy of the old policies anywhere in existence?

18       A.      No.

19       Q.      Okay.  So you wouldn't have them?

20       A.      Not that I know of.

21       Q.      Okay.  What are your duties and

22   responsibilities when you're acting as the treasurer

23   for Liberty Ridge?

24       A.      Pay the bills.

25       Q.      Can you expand on that a little bit?

**Witness Nelson Martin**

51

1       A.      Yeah.  No.  I -- I'm responsible for
2    the -- yeah, basically the income and see that the
3    bills get paid.
4       Q.      Are you the individual who is involved
5    with organizing the different businesses that either
6    come in or go out of Liberty Ridge or, I guess,
7    generally do business with Liberty Ridge?
8       A.      I'm involved, but it's always a committee
9    decision.
10      Q.      Okay.  Are you kind of like the point
11   person of contact?
12      A.      Yes.
13      Q.      Okay.  Do you know if Liberty Ridge is
14   affiliated specifically with any Eastern Pennsylvania
15   Mennonite congregation?
16      A.      No.
17      Q.      Okay.  Did you receive any specific
18   training prior to your work with Liberty Ridge
19   relating to either dealing with at risk teens or those
20   with mental health disorders or anything like that?
21      A.      No.
22      Q.      When creating the programing for Liberty
23   Ridge, are you aware of whether the committee
24   consulted with any Department of Labor regulations or
25   anything to that extent as it relates to the amount of

52

1   hours worked by the boys or the type of work being
2   done?
3       A.    No.
4       Q.    Do you receive any compensation from
5   Liberty Ridge for your work?
6       A.    Not from a labor standpoint because it's
7   all voluntary, but I have used my equipment sometimes
8   for remodel and got paid for the fuel that it used,
9   but nothing for time on the machinery or anything like
10  that.
11      Q.    Okay.  So you're not compensated for
12  being the treasurer?
13      A.    No.
14      Q.    Are any of the committee members
15  compensated?
16      A.    No.  We're all voluntary.
17      Q.    About how many hours of your time, I
18  guess, a week, to the extent that you can estimate,
19  are you involved in your work as treasurer for Liberty
20  Ridge?
21      A.    As treasurer, two.
22      Q.    Is that about average for any of the
23  committee members for how much time they spend working
24  on Liberty Ridge projects or just involvement in the
25  committee?

**Witness Nelson Martin**

53

1      A.      Clarify your question just a little bit.

2   When you say involvement, is this just as a treasurer

3   or is this involvement as a whole?

4      **Q.      As a committee member.**

5      A.      As a committee member.  As a committee

6   member, it's more like ten hours a week.

7      **Q.      Oh, okay.  Is it more than everybody**

8   **else?**

9      A.      Not necessarily.  We each have our -- we

10  each have our place that we fill.

11     **Q.      Okay.**

12     A.      And it's all voluntary.

13     **Q.      What are the -- some of the other roles**

14  **that are filled by the committee members?  It sounds**

15  **like everybody has kind of their own little niche of**

16  **what they do on the committee.**

17     A.      So for some of them it's making sure that

18  there's house parents there and mentors and that kind

19  of thing.

20     **Q.      So it's a lot of just organizing a lot of**

21  **the moving parts?**

22     A.      Organizing, yes.

23     **Q.      Okay.  During all your time as being**

24  **associated with Liberty Ridge from 2011 on, were you**

25  **still running your own farm business?**

**Witness Nelson Martin**

54

1       A.      Yes.

2       Q.      Okay.  And I think during part of that

3   time, your parents were still operating their farm

4   until you said about 2014?

5       A.      Yes, yes.

6       Q.      Okay.  Around 2014, did -- when your

7   parents passed, did the company get sold or did it

8   just cease to exist?

9       A.      My brother and I would have took over the

10  milk processing plant.

11      Q.      Okay.  Did you take it over under the

12  name of Dutch-Way or did it kind of get absorbed into

13  your farm?

14      A.      Dutch-Way Farms.

15      Q.      Okay.  So is Dutch-Way Farms still being

16  operated?

17      A.      No.

18      Q.      Okay.  How long did that go on then where

19  you were operating the dairy out of Dutch-Way with

20  your brother?

21      A.      I'm not sure how many years it was, and

22  I'm not sure which year we took it over.

23      Q.      Okay.

24      A.      But it went for a number of years.

25      Q.      Okay.  So it would have been after 2014?

**Witness Nelson Martin**

55

1        A.      Yes.

2        Q.      And then if you could approximate when

3    about or within a few years of when you ceased that

4    work?

5        A.      2019.

6        Q.      Okay.  So a few years ago?

7        A.      (Nodding head.)

8        Q.      Okay.  From 2011 to 2014, I guess we'll

9    just keep referring kind of to the time period

10   encompassed in this case -- excuse me, give me one

11   moment -- I am assuming you physically were on the

12   Liberty Ridge property during that time?

13       A.      Yes.

14       Q.      About how often?

15       A.      Average of once a week.

16       Q.      For what purpose?

17       A.      To -- for staff meetings.  And also when

18   we were doing remodel and stuff, I would help with

19   some of that.

20       Q.      Okay.  Did you have any interaction with

21   the residents during that time?

22       A.      Yes.

23       Q.      Were you giving them any direction or was

24   it just more casual interaction?

25       A.      It was more casual.  But if we were

**Witness Nelson Martin**

56

1  remodeling something and I needed a board over there,

2  yeah, go pick up the board and bring it here.

3      Q.    Were there any times during your visits

4  to Liberty Ridge during the time period that we're

5  talking about did you ever give any of the residents

6  direction as to, you know, go work on this task or on

7  this job, anything to that extent?

8      A.    Yes.

9      Q.    Occasionally?

10     A.    Occasionally.

11     Q.    When it came to kind of coordinating the

12  different -- I want to say the different jobs on

13  Liberty Ridge, did that kind of fall under your

14  umbrella?

15     A.    I was responsible for the outside of the

16  house vocational skills.

17     Q.    Okay.  When Liberty Ridge first opened in

18  2011, to your knowledge, off the top of your head, how

19  many different businesses were associated with the

20  work of the residents?

21          I know we had talked about the gate

22  company.  But if you can recall, how many other

23  businesses were kind of under the header of either

24  receiving products from Liberty Ridge or having the

25  boys do work for them?

**Witness Nelson Martin**

57

```
1              MS. WYNKOOP:  Objection to form.
2        A.      Basically the chicken work.
3   BY MS. FRANCHI:
4        Q.      Okay.  Do you recall the name of the
5   company involved with the chicken house and the
6   chicken work?
7        A.      Clark's Feed.
8        Q.      Tell me a little bit about how Clark's
9   Feed got involved with Liberty Ridge.
10       A.      Basically there were -- there were houses
11  there, and we were looking for somebody to put the
12  birds there and give the -- teach the boys how to take
13  care of animals and work together as a team, so yeah,
14  they were willing to do that.
15       Q.      Okay.  Do you know where Clark's Feed is
16  based out of?
17       A.      It's north of there a little bit.
18       Q.      So it's local enough?
19       A.      It's local, yeah.
20       Q.      Are you aware of how big the company is?
21  Is it one man like the gate company or is it a bigger
22  operation?
23       A.      It's a bigger operation.
24       Q.      Do they have paid employees?
25       A.      Yes.
```

**Witness Nelson Martin**

58

1    Q.    Okay.  So I guess what benefit was
2  Clark's Feed getting from the Liberty Ridge work?
3              MS. WYNKOOP:  Objection to form.  You can
4  answer.
5    A.    Basically, I guess I would say birds to
6  market.
7  BY MS. FRANCHI:
8    Q.    Okay.  Were -- I know there is all sorts
9  of different steps in processing chickens.  What work
10 was being done then at Liberty Ridge?  Like were the
11 birds being slaughtered then and the slaughtered birds
12 were going to Clark's or was it just the live birds
13 that were going out?
14   A.    It was the live birds.  They come as
15 little peeps, and we raise them up until -- it was
16 just the live birds.
17   Q.    Okay.  Is this the only place that
18 Clark's Feed had their live birds being raised that
19 you know of?
20   A.    No.
21   Q.    Okay.  So they had other locations?
22   A.    Yes.
23   Q.    Okay.  About how many birds were there on
24 the property at least from 2011 to 2014 at any given
25 time?

**Witness Nelson Martin**

59

```
1        A.    30,000.
2        Q.    Okay.  How big was the chicken barn?
3        A.    300 feet -- basically it's 600 feet.  It
4   was a double story, so.
5        Q.    Okay.  So it was pretty substantial?
6        A.    Yeah.
7        Q.    Okay.
8        A.    Small in today's terms.
9        Q.    Substantial for one piece of property.
10  So was this relationship with Clark's Feed, was there
11  a written contract?
12       A.    I think so, but I could not locate it.
13       Q.    Okay.  How often would a representative
14  from Clark's Feed be on the Liberty Ridge property?
15       A.    One -- one -- one time a week.  Sometimes
16  it went two -- every other week.
17       Q.    Okay.  And what would they do when they
18  were on the property?
19       A.    They would just come evaluate how we were
20  taking care of the birds and --
21       Q.    Did they ever come to the property then
22  to remove any of the birds?
23       A.    Yes.
24       Q.    Okay.  Were they the only ones who came
25  to remove or bring birds in?
```

**Witness Nelson Martin**

60

1      A.      Whoever they assigned.

2      Q.      Okay.  So it wasn't the duties of you or

3   anybody at Liberty Ridge --

4      A.      No, no.

5      Q.      -- to bring them off the property?

6      A.      No.

7      Q.      Okay.  And you had said that they have --

8   Clark's Feed has other locations where they would do

9   the same?

10      A.      Yes.

11      Q.      Okay.  And they were being run, though,

12   by paid employees?

13      A.      Farmers.

14      Q.      Okay.  Was there any money going back and

15   forth between Liberty Ridge and Clark's Feed either

16   for rent or payment for services otherwise?

17      A.      Not other than that, no.

18      Q.      Okay.  Were they paying rent for use of

19   the chicken house?

20      A.      No.

21      Q.      Okay.  I'm assuming then once Clark's

22   Feed -- the chickens would be raised to the

23   appropriate age, they would remove them and then sell

24   them or, I guess, process them elsewhere?

25      A.      Yes.  We had nothing to say what happened

**Witness Nelson Martin**

61

1  from that point.  They would -- yeah.  They would just

2  give us so much a pound.

3      Q.    Okay.  When you say give us, it would be

4  back to Liberty Ridge?

5      A.    Liberty Ridge.

6      Q.    Okay.  As it relates to Snyder Gates, I

7  know we talked about them a little bit, but I have a

8  few more follow-up questions, and then we'll kind of

9  move on from that.

10         Along the same lines as what we were just

11  talking about with Clark's, so tell me where the work

12  was being done for Snyder Gates on Liberty Ridge

13  property?

14      A.    In the small shop.

15      Q.    Okay.  And when you say the small shop,

16  how small are we talking?

17      A.    25 by 40 I think it was.

18      Q.    Okay.  Tell me a little bit about the

19  arrangement, I guess starting with where the materials

20  came from and then kind of moving forward to a

21  finished product.

22      A.    Materials came from Nolan Snyder.  He

23  made sure they were there.

24      Q.    Okay.

25      A.    And then as a team, we would paint the

**Witness Nelson Martin**

62

1    rail with a machine.  It just slit -- you just pushed

2    it through the machine.  It did all its own painting.

3         Q.    Okay.

4         A.    And assembled them.

5         Q.    Okay.  What material were the gates made

6    out of?

7         A.    Like a fiberglass rail.

8         Q.    Okay.  So this wasn't associated with

9    like the cutting of wood.  They weren't wooden gates

10   that were being built?

11        A.    No.

12        Q.    Okay.  So --

13        A.    And not metal gates either.  A lot of

14   people think metal gates, but no welding or anything

15   like that.

16        Q.    Okay.  So I guess kind of start from the

17   beginning of construction of these gates.  You said

18   you could put them through a machine that will get

19   painted.  What else did the boys do in constructing

20   the gates?

21        A.    Basically what the boys would've help do

22   is just handle the rails.  Like put them on a table so

23   they could go through the paint machine and take them

24   off the other end and put them on a rack.

25        Q.    Okay.

**Witness Nelson Martin**

63

1    A.    And then lay the rails in a jig to
2    populate them together, and that the mentors always
3    did.
4    Q.    Okay.  How often was Mr. Snyder on the
5    property?
6    A.    I'm not sure.
7    Q.    Okay.  Did you ever see him there?
8    A.    Yes.
9    Q.    Was he ever there supervising or would he
10    just come in to move products around?
11    A.    In the beginning he was there to
12    supervise to help show how it's done.
13    Q.    Okay.
14    A.    But mostly to move product around.
15    Q.    Was there any sort of like sales quota or
16    anything like that for how many gates needed to be
17    built?
18    A.    No.
19    Q.    Okay.  After the gates were built, what
20    happened to them?
21    A.    Nolan would pick them up and wherever he
22    had them sold.
23    Q.    Okay.  You weren't involved in the sale?
24    A.    No.  Only -- only the sale would have
25    been if it would have been to somebody in our church

**Witness Nelson Martin**

64

1    group that wanted a gate.

2         **Q.**    **Okay.  Were any of those gates then used**

3    **on Liberty Ridge property?**

4         A.    Yes.

5         **Q.**    **Okay.  Did Liberty Ridge buy the gates**

6    **from Snyder or were they, I guess, given or --**

7         A.    I don't remember.

8         **Q.**    **Okay.  And after Mr. Snyder sold these**

9    **however many gates there were, are you aware of how**

10   **the profit was split or did he retain all the**

11   **profits?**

12        A.    He retained all the profits.  He just

13   gave us a fee to assemble.

14        **Q.**    **What was that fee?**

15        A.    I forget.  I have no idea anymore.

16        **Q.**    **There was a fee?**

17        A.    Yeah.  It was so much a gate.

18        **Q.**    **Okay.  And was it paid directly to**

19   **Liberty Ridge?**

20        A.    Yes.

21        **Q.**    **Okay.  How long did Snyder Gates work out**

22   **of Liberty Ridge, if you remember?**

23        A.    Two years.

24        **Q.**    **Okay.  So sometime within the 2011 to**

25   **2014 time?**

**Witness Nelson Martin**

65

1    A.    Yeah.

2    Q.    Okay.  What about Clark's?

3    A.    So 2020 or somewhere around there.

4    Q.    So it would have been from 2011 to 2020?

5    A.    Yeah.

6    Q.    Okay.  Were there any other companies

7  that would come into Liberty Ridge for the purpose of

8  just the chickens?

9    A.    Not -- nothing that we were responsible

10  for.

11    Q.    Okay.  Did -- to the extent that you are

12  aware or noticed, did Clark's ever send any other

13  trucks or any other companies to Liberty Ridge to pick

14  up the chickens or was that outside of your

15  wheelhouse?

16    A.    That we had no say in that.

17    Q.    Are there any other livestock that were

18  on the Liberty Ridge property from 2011 to 2014?

19    A.    Just for household.  Just for the family.

20    Q.    Okay.  What were they?

21    A.    Pigs and beef.

22    Q.    About how many, if you know?

23    A.    One or two beef a year and three or four

24  pigs a year.

25    Q.    And this was purely for use within the

66

1    home?

2          A.      Yes.

3          Q.      Okay.  Were they sent out to slaughter

4    somewhere else?

5          A.      Yes.

6          Q.      Where was that, if you know?

7          A.      It was different places.  I tried to use

8    local.

9          Q.      Okay.  And were the boys responsible for

10   taking care of the cattle and the pigs?

11         A.      Yes.

12         Q.      Was it purely for beef?  There were no

13   dairy?

14         A.      No dairy.

15         Q.      Okay.  Are you aware of any other

16   businesses during those few years that were operating

17   out of Liberty Ridge at least off the top of your

18   head?

19         A.      No.

20         Q.      Okay.  What is your knowledge about the

21   Department of Transportation registration out of

22   Liberty Ridge?

23         A.      We would have had some vehicles under --

24   in the Liberty Ridge name.

25         Q.      Okay.  Do you recall at least from 2011

67

1    to 2014 what those vehicles would be?

2         A.      A van and a pickup.

3         Q.      Okay.  And was that just for use on the

4    farm?

5         A.      On the farm, yes.

6         Q.      Was there any transportation of products

7    back in and out of Liberty Ridge from any vehicles

8    registered with the D.O.T.?

9         A.      Not that Liberty Ridge was responsible

10   for.  And, again, to clarify that, the ones that came

11   in to pick up the live birds, I don't know what all --

12   that was their -- that was their problem.

13        Q.      Okay.

14        A.      But nothing -- nothing that we were

15   responsible for.

16        Q.      Okay.  So I'm going to throw a few names

17   of companies out there that have kind of showed up

18   around this case.  And to the extent that you

19   remember them, you know, let me know.  If you don't,

20   we'll go from there.  Are you aware of the Sensenig

21   Chair Shop?

22        A.      Yes.

23        Q.      Am I saying that name wrong?

24        A.      No.  Sensenig Chair Shop.

25        Q.      Okay.  What is their involvement with

68

1    Liberty Ridge either current or past?

2         A.    They would have -- they would have made

3    some furniture that they donated to the farm for the

4    house, bedroom furniture.

5         Q.    Was any of that furniture ever sold for

6    profit elsewhere?

7         A.    No.

8         Q.    So that was all internal?

9         A.    Yes.

10        Q.    Okay.  Was there any money exchanged

11   between Liberty Ridge and the chair shop that you

12   recall?

13        A.    Yes, yes.  In that time frame they may

14   have done a little bit of firewood as well.

15        Q.    Okay.  And what do you mean by that?

16        A.    It's -- we would split logs and make some

17   firewood.

18        Q.    Okay.  And how is the chair shop involved

19   in the firewood?

20        A.    They're local there, so they would sell

21   it at their store.

22        Q.    Okay.  Did they retain any of the

23   profits?

24        A.    They just paid us so much --

25        Q.    Okay.

**Witness Nelson Martin**

69

1      A.      -- for it, and what they did after that
2   that's --
3      Q.      Okay.
4      A.      I mean they paid Liberty Ridge so much
5   for it, not us.  Liberty Ridge.
6      Q.      Understood.  What about Wengerd Pallet
7   Company?  What was their involvement?
8      A.      They were not involved in that time
9   frame.
10     Q.      They weren't?  Okay.  When did they
11  become involved?
12     A.      It would have been -- you say 2011 to
13  '13?
14     Q.      We've been encompassing 2014.  There
15  isn't a specific date within that time, but we'll just
16  say until the end of 2014.
17     A.      They might have -- they might have
18  started the middle of '14.
19     Q.      Okay.
20     A.      Assembling -- got rid of the gates and
21  started assembling pallets.
22     Q.      So it kind of took the place in the shop
23  of the gates?
24     A.      Correct.
25     Q.      Okay.  Tell me a little bit about the

Witness Nelson Martin

70

1   arrangement between the pallet company and Liberty
2   Ridge.
3        A.    We were just assembling pallets for them,
4   and they would give us so much a skid.
5        Q.    Okay.
6        A.    A pallet.
7        Q.    Did the pallet company provide the
8   materials?
9        A.    Yes.
10        Q.    Okay.  Where is Wengerd Pallet Company
11   based out of, if you know?
12        A.    McAlisterville, just five miles from
13   there.
14        Q.    Somewhere local?
15        A.    Local.
16        Q.    Okay.  Are they a large operation?
17        A.    A few employees.
18        Q.    Okay.  So they do have some paid
19   employees?
20        A.    Oh, yes.
21        Q.    Okay.  Who was your point of contact with
22   them?
23        A.    Wayne Wengerd.
24        Q.    Okay.  And he would be the owner?
25        A.    Yes.

**Witness Nelson Martin**

71

1      Q.      Were they in existence, to your

2  knowledge, as a company before they came to Liberty

3  Ridge?

4      A.      Yes.

5      Q.      Okay.  So I'm assuming, and you can

6  correct me if I'm wrong, that they had paid employees

7  building the pallets and selling them elsewhere before

8  some of it was --

9      A.      Yes.

10     Q.      Okay.  Was there any sort of sales quota

11  or anything that was required to be done at Liberty

12  Ridge?

13     A.      No, no.  It was just -- he was an Amish

14  minister, and his company is an Amish -- a lot of

15  Amish people, and he just -- he wanted to help us

16  with these boys on vocational calls -- vocational

17  skills.

18          MS. FRANCHI:  Okay.  Let's pause for a

19  second.

20          THE VIDEOGRAPHER:  Off camera time is

21  10:41.

22          (Recess)

23          THE VIDEOGRAPHER:  This begins Media

24  Number 2 in today's deposition.  The time is now

25  10:49.

**Witness Nelson Martin**

72

1   BY MS. FRANCHI:

2       Q.    All right.  So we were just talking about

3   Wengerd Pallet Company.  You had said that you believe

4   they may have started working with Liberty Ridge

5   sometime maybe in 2014, give or take?

6       A.    Yes.

7       Q.    Okay.  So, like I said, there's kind of a

8   list of businesses that names have come up so just

9   kind of go through each of them, and then you can let

10  me know the same kind of information.

11            So are you familiar with a company either

12  called Jones Lumber or involving an individual named

13  Jason Jones?

14      A.    Yes.

15      Q.    Was this somebody who had any affiliation

16  with Liberty Ridge?

17      A.    No.

18      Q.    Okay.  Are you aware of whether any

19  residents from Liberty Ridge were brought to the Jones

20  Lumber property to do any work?

21      A.    Yes.

22      Q.    Okay.  Do you recall when that was?

23      A.    End of 2013 into '14.

24      Q.    Okay.  And am I correct with the name of

25  the company?

**Witness Nelson Martin**

73

1      A.      Yes.

2      Q.      Okay.  And is the owner Jason Jones?

3      A.      Yes.

4      Q.      Okay.  Again, a lot of these names have

5   just kind of come up in discovery.  So if there's

6   anything that I have incorrect, though, please correct

7   me.  Where is this company located, if you know?

8      A.      Local.

9      Q.      Okay.  Is it just one owner or do you

10  know if there's any employees?

11     A.      There was employees, but I have no

12  idea --

13     Q.      Okay.

14     A.      -- on ownership.

15     Q.      So I'm assuming then, and, again, correct

16  me if I'm wrong, this company was not coming to

17  Liberty Ridge to do work like the pallet company or

18  the gate company; correct?

19     A.      Correct.

20     Q.      Okay.  Are you aware of the arrangement

21  between Liberty Ridge and Jones Lumber for bringing

22  the residents to their location to do work?

23     A.      Yes.

24     Q.      Okay.  What was that?

25     A.      It was for residents that were about

1   through the program, and we felt we wanted to give

2   them -- to help them to fit back into society when

3   they leave Liberty Ridge as a work vocation.

4       Q.      What type of work were the Liberty

5   Ridge residents doing at Jones Lumber, if you are

6   aware?

7       A.      It was basically a mentor and a resident

8   that would go, and they would -- they would be on the

9   end product of where they would just sort lumber.

10      Q.      Okay.  Are you aware of any other type of

11  work that was being done when they were at Jones

12  Lumber?

13      A.      No.

14      Q.      Were you ever present when the work was

15  being done?

16      A.      No.

17      Q.      Okay.  Did Liberty Ridge receive any

18  payment or any compensation from them?

19      A.      Yes.

20      Q.      Okay.  Was the -- to your knowledge, was

21  the work being performed at Jones Lumber simply for

22  the benefit of Jones Lumber on site or did they build

23  any products or do any work that was then sold for a

24  profit?

25              MS. WYNKOOP:  Objection to form.

**Witness Nelson Martin**

75

1       A.      I don't know what they did with their --

2   BY MS. FRANCHI:

3       Q.      Okay.

4       A.      With their product.

5       Q.      Okay.  I'm going to take a quick break

6   from going through some of these companies, and then

7   we'll go back.  I might need a reminder of where we

8   were at, but I'll make a note.

9               You had mentioned it was for residents

10  who were a certain way through the program and needed

11  to kind of re-acclimate with the -- you know, back in

12  society.  I don't know exactly what word you used, but

13  that's what you meant; correct?

14      A.      Correct.

15      Q.      Okay.  Are you aware of who determined, I

16  guess, at what point in the programing each resident

17  was?  Like how did that work?

18      A.      That was pretty much a committee

19  decision.

20      Q.      Okay.  Was the committee involved in the

21  programing of each individual resident?

22      A.      Yes.  It was always by committee

23  approval as to any resident that would come to

24  Liberty Ridge.

25      Q.      Okay.  So we'll just use a hypothetical

76

1    resident.  I don't need you to recall specifics about

2    anybody off the top of your head, but say a

3    hypothetical resident first came to Liberty Ridge.

4    What was the process for determining what therapy or

5    programing the child needed at least from 2011 to

6    2014?

7         A.    Well, they all -- all residents would be

8    involved in our Bible classes.  That was -- that was a

9    given.  When it came back to vocational skills or

10   skills, we would try and make that match what they

11   liked to do.  Not -- they didn't get to do everything

12   they liked to do all day.

13        But so if somebody had mechanical

14   interests, we would do some of that, teach some of

15   that.  So yeah, we just matched what they were capable

16   of and helping them to develop that skill.

17        Q.    Who determined how long each resident

18   spent at Liberty Ridge?

19        A.    The committee.

20        Q.    Okay.  Because as we know, our client,

21   Robert Miller, was at Liberty Ridge for a much shorter

22   amount of time than David Cross; correct?

23        A.    Correct.

24        Q.    Okay.  So for this hypothetical resident

25   that we're talking about, how would the progress be, I

77

1    guess, calculated or determined through their time at

2    Liberty Ridge?

3         A.    On their progress and also how they were

4    relating to individuals.

5         Q.    So it was more subjective?

6         A.    Yes.

7         Q.    Okay.  Were there any benchmarks or

8    certain tasks or behaviors or I guess what were like

9    the milestone markers to determining how this

10   hypothetical resident would get through, I guess we'll

11   call it the program?

12        A.    For one illustration is their respect for

13   those in authority.

14        Q.    Okay.  And, again, that was more on a

15   subjective basis?

16        A.    Correct.

17        Q.    There wasn't like a list that you checked

18   off?

19        A.    Correct.

20        Q.    Okay.  Who generally interacted with the

21   residents the most on a day-to-day basis?

22        A.    Department heads, house parents, and

23   mentors.

24        Q.    Okay.  I guess would the mentors kind of

25   be the first -- the first line of communication for

**Witness Nelson Martin**

78

1   the residents?

2          A.     Not necessarily.  They were there as big

3   brothers.

4          Q.     Okay.  But they would give the residents

5   direction?

6          A.     Some.

7          Q.     Okay.  All right.  So I'm going to try

8   to -- now that we've gone down that thought, I'm going

9   to jump back to when we were talking about the

10  different companies.

11              So I have seen some notation in the

12  discovery that there was some type of trucking company

13  or a garage that could have been in the Mechanicsburg

14  area that residents may have been taken to to do work.

15  Are you familiar with that?

16         A.     No.

17         Q.     Okay.  So you wouldn't know what that's

18  referring to?

19         A.     No.

20         Q.     Okay.  Are you aware of any other

21  businesses or properties off of Liberty Ridge that

22  residents would be taken to to do any sort of work?

23         A.     Not more than that Jones -- Jason Jones.

24         Q.     Were any residents brought to any

25  individual's personal properties to do work that

79

1   you're aware of?

2        A.    Yes.

3        Q.    Okay.  Tell me about that.

4        A.    They would -- sometimes they would go to

5   maybe the house parents, back to their residence.

6   Clean up leaves, something like that.

7        Q.    Okay.  Who would make that determination?

8   Would that be you or someone else?

9        A.    That was always by board approval.

10        Q.    Okay.  Who would bring the proposal to

11   the board?

12        A.    The house parents or one of the board

13   members.

14        Q.    Okay.  Were any of the residents

15   transported to any of the board members' homes to do

16   any sort of work, whatever it may be?

17        A.    No.  It was more of a day off from the

18   farm, more of a picnic type thing maybe you might say,

19   but they would have done some, like I say, clean up

20   leaves or something like that.

21        Q.    Okay.

22        A.    But nothing where they made any kind of

23   product to sell or anything like that.

24        Q.    Okay.  Did any of the residents while

25   they were still within the Liberty Ridge program come

**Witness Nelson Martin**

80

1    to your home or your business to do any sort of work

2    that you can recall?

3         A.    Yes.

4         Q.    Okay.  Was any of that during the 2011 to

5    2014 period, if you remember?

6         A.    No.

7         Q.    Okay.  I'd also seen in some of the

8    paperwork and notated in some of the daily

9    inventories that there had been mention of a sawmill.

10   So you said there was no sawmill on the property of

11   Liberty Ridge?

12        A.    No.  I don't know what they're calling a

13   sawmill.

14        Q.    Okay.  Are you aware of whether there was

15   an operating sawmill anywhere that the boys were

16   brought to to do work?

17        A.    That Jones -- Jason Jones would be the

18   only one that I can think of.

19        Q.    Okay.  Have you been to that property

20   before?

21        A.    No, I haven't.

22        Q.    So you don't know what's on it?

23        A.    No.

24        Q.    Okay.  And, again, you can tell me if you

25   know this or don't know this.  Is Jones Lumber, is it

**Witness Nelson Martin**

81

1  like a lumber processing business or do they build

2  items?

3          A.      It's more of a processing.  Yeah, it's

4  more of a processing.

5          Q.      Okay.  So like basically like take the

6  tree, planing, make it into boards, whatever?

7          A.      Yeah, yeah.  Into boards or I forget what

8  they call it.

9          Q.      Yeah.

10         A.      Yeah.

11         Q.      I can picture it, and I can't remember

12  what it's called.

13         A.      Yeah.

14         Q.      Okay.  Okay.  So it's likely they were

15  talking about Jones Lumber?

16         A.      I would think.

17         Q.      Okay.  At least to your knowledge?

18         A.      To my knowledge, yes.

19         Q.      Okay.  What about the crops that were

20  grown on Liberty Ridge?  It is my understanding there

21  was a small like garden food plot that the home would

22  use; correct?

23         A.      Correct.

24         Q.      Then there was a larger field or fields

25  where actual crops were grown?

**Witness Nelson Martin**

82

1    A.    Correct.

2    Q.    Okay.  The small food plot aside, we

3  won't deal with that now.  The larger field or fields

4  of crops, were those crops being grown and harvested

5  in 2011 onward?

6    A.    Yes.

7    Q.    Okay.  About how many acres of crops were

8  on the property at that time?

9    A.    30.

10    Q.    Okay.  Do you know what types of crops

11  were grown or harvested on those 30 acres?

12    A.    Yes.

13    Q.    Okay.  What were they?

14    A.    Corn one year.  Soybeans the next.

15    Q.    So it would just rotate back and forth?

16    A.    Right.

17    Q.    Okay.  Did the boys work on those

18  particular crops while they were at Liberty Ridge?

19    A.    No.

20    Q.    Okay.

21    A.    The only thing -- no.  They would have

22  got a ride in the combine when we harvested it, so.

23    Q.    So was there any other involvement with

24  the residents and those particular crops?

25    A.    No.

Witness Nelson Martin

83

1      Q.     Okay.   Was there any involvement with the
2   residents and any of the equipment used for those
3   particular crops?
4      A.     No.
5      Q.     Okay.   Who maintained those crops?
6      A.     I was responsible for that.
7      Q.     Okay.   You personally or under like the
8   umbrella of your business?
9      A.     Personally for Liberty Ridge.
10     Q.     Okay.   What happened after those crops
11  were then -- who would remove them from -- like
12  harvest them and remove them from Liberty Ridge?
13     A.     Liberty Ridge would hire a -- Liberty
14  Ridge paid for all input and for all equipment to
15  remove the crop.
16     Q.     Okay.   So it was -- so Liberty Ridge as
17  an entity was involved, but the residents were not?
18     A.     The residents were not.
19     Q.     Okay.   So I just want -- I want to make
20  sure I'm understanding kind of how it was involved.
21  So was this -- your -- let me go back.
22            Was this Dutch-Way that was involved in
23  the crops or was it your other business or both?
24     A.     This would have been -- in the crops
25  Nel-Ray would have been involved from the standpoint

**Witness Nelson Martin**

84

1  that we would transfer the crops from Liberty Ridge to
2  our farm because we had no storage at Liberty Ridge.
3  We would store the crops on my farm until we would
4  market them in Lancaster County or neighboring areas.
5          And the reason for that was so that
6  Liberty Ridge could get more for that grain than at
7  market.  Your price at market is always the lowest
8  because there's more coming in.
9      Q.    Right.
10     A.    So we would store it for nothing, and
11 then I would transport it to the feed mills, and
12 Liberty Ridge would get the money.
13     Q.    Okay.  So it would be sold in bulk?
14     A.    Yes.
15     Q.    Okay.  So it was all -- it was all feed
16 grain?
17     A.    All feed grain, yes.
18     Q.    Okay.  So nobody wants to eat cow corn?
19     A.    No.
20     Q.    So who would -- starting from the
21 beginning like the beginning of the season, who would
22 first plant the crops?
23     A.    Seven Stars Dairy.
24     Q.    Okay.  Were they paid anything to plant
25 the crops?  I guess I'm assuming it was the seed or

85

1  whatever was purchased, and they would put it in the
2  ground?

3       A.     Correct.

4       Q.     Okay.  Did they rent or did anybody pay
5  rent for use of the fields?

6       A.     No.

7       Q.     Okay.  So whatever seed it was that year
8  was purchased.  This company would first lay it.
9  They'd go about their business?

10      A.     Correct.

11      Q.     Were they involved ever again or was that
12 the extent of their involvement?

13      A.     They would be involved again at the
14 harvesting side.

15      Q.     Okay.  So I'm assuming corn and soybeans,
16 they're pretty low maintenance while they're actually
17 growing?

18      A.     Correct.

19      Q.     Yeah.  So aside from just, I'm assuming,
20 checking on them occasionally, there really wasn't
21 much that needed to be done until it was harvest time?

22      A.     Correct.

23      Q.     And that's a pretty long harvest.  So
24 they'd be harvested once at the end of the season?

25      A.     Correct.

**Witness Nelson Martin**

86

1        Q.      And who would -- I guess whose combine

2    would be used to kind of go through and get the

3    harvest done?  Was that yours?

4        A.      No.  Seven Stars.

5        Q.      It was Seven Stars?

6        A.      Yes.

7        Q.      Okay.  So Seven Stars would harvest

8    whatever crop it was that year?

9        A.      Correct.

10       Q.      Would Liberty Ridge pay them for their

11   labor to harvest whatever it was?

12       A.      Whenever we got a bill.

13       Q.      Okay.  Once they were harvested, would

14   Seven Stars take the crops to your place or did you

15   come in and take what was harvested and then bring it

16   to the holding area?

17       A.      I came in --

18       Q.      Okay.

19       A.      -- with my trucks, and I would get other

20   church people to come with their trucks --

21       Q.      Okay.

22       A.      -- and just haul it down.

23       Q.      So it was just kind of a group effort?

24       A.      Group effort, yes.

25       Q.      Okay.  Did anybody get paid for that

87

1  removal and help or was it all volunteer?

2       A.    Most was volunteer.  Nel-Ray would have

3  got 20 cents a bushel to transfer it which is -- don't

4  even cover the cost.

5       Q.    I was going to say I know the price of

6  feed has gone up significantly since then.

7       A.    Yeah, yeah.

8       Q.    But it's still pretty low?

9       A.    Yeah.

10      Q.    Okay.  So it wasn't like markup for --

11      A.    No.  There was no markup.

12      Q.    Okay.

13      A.    It was basically, again, volunteer.

14      Q.    Okay.

15      A.    Volunteer help, volunteer work.

16      Q.    Okay.  So that would have been the only

17  involvement that your business had with Liberty

18  Ridge?

19      A.    Correct, except for some of the

20  remodeling.

21      Q.    Right.

22      A.    I brought my bulldozer up there and did

23  some work.  Again, just got paid for my fuel costs.

24      Q.    Okay.  But as it relates to like product

25  or crops, that's it?

**Witness Nelson Martin**

88

1      A.     That's it.

2      Q.     **Okay.  What about Dutch-Way?**

3      A.     No involvement.

4      Q.     **Were those trucks ever used to help**

5  **transport the grain or the feed?**

6      A.     We would have used a truck that was

7  owned by Nel-Ray Farms but had a Dutch-Way Farms logo

8  on it.

9      Q.     **Okay.  So that's how this name came up?**

10     A.     Yes.

11     Q.     **Okay.  So it would have been there just**

12  **to move things off the property?**

13     A.     Just to move things off.

14     Q.     **Okay.  Off the top of your head, are**

15  **there any other businesses that you can recall without**

16  **looking specifically into the records or did we kind**

17  **of cover everything that would have been during the**

18  **2011 to 2014 time period?**

19     A.     I would say we covered -- there were a

20  few others things involved with the chickens that a

21  different business would have brought things in, but

22  nothing -- nothing for Liberty Ridge.

23     Q.     **Okay.  Did Liberty Ridge make any**

24  **payments to or, I guess, give any sort of compensation**

25  **to the Mission?**

**Witness Nelson Martin**

89

1    A.    Yes.

2    Q.    In what capacity?

3    A.    The Mission bought the property, so there

4    would be -- I'm going to call it church offerings

5    which you'll see in your ledger.  And anything that

6    came through on church offerings we did not use for

7    operating expense.  That all went back to the Mission

8    toward the property.

9    Q.    Okay.  So Liberty Ridge never directly

10   solicited the congregations?

11   A.    Correct.

12   Q.    Okay.  How, if you know, how did the

13   individual congregations go about -- I forget the

14   term.  It was used for two days, and I know that it

15   wasn't soliciting and offering, but it was another

16   term.

17              MS. WYNKOOP:  Lifting an offer.

18              MS. FRANCHI:  Was it lifting an offer?

19   A.    Yeah.

20   BY MS. FRANCHI:

21   Q.    Okay.  I don't want to use the wrong term

22   because soliciting and offer does sound quite

23   different.  So, okay.  So when the individual

24   congregations would lift --

25   A.    Lift an offering.

90

1    Q.    Lift an offering, that wasn't at the
2  direction of Liberty Ridge?
3        A.    Correct.
4        Q.    Okay.  Or at the direction of the
5  Mission?
6        A.    Correct.
7        Q.    Okay.  It would just be on their own.
8  They would decide one day this is what they're lifting
9  an offering for?
10       A.    They knew there was -- there was debt
11 there to be paid, and so yeah.
12       Q.    Okay.  And then those offerings would
13 then go -- instead of directly to Liberty Ridge would
14 go to the Mission?
15       A.    Some went straight to the Mission.  Some
16 would come through Liberty Ridge, and then I would
17 forward it back to the Mission.
18       Q.    Okay.  So --
19       A.    Penny for penny.
20       Q.    It always ended up at the Mission at some
21 point?
22       A.    Correct.  Yeah.
23       Q.    Okay.  And that was all going towards the
24 cost of the property?
25       A.    Correct.

**Witness Nelson Martin**

91

1    Q.    So what was the arrangement for paying
2  back the property costs?  I'm assuming then there was
3  a payment made to the Mission for the cost of buying
4  the land, correct, or was it more like rent?
5    A.    Liberty Ridge never -- never paid nothing
6  out of the operation --
7    Q.    Okay.
8    A.    -- for the property.
9    Q.    Okay.  So there wasn't like a formal
10 arrangement?
11   A.    No.
12   Q.    So it would basically be, and, again,
13 please correct me if I'm wrong, that if offerings came
14 in for Liberty Ridge, they would just go to the
15 Mission to pay for the property, but otherwise that
16 was it?
17   A.    That's correct.
18   Q.    Okay.  So it's my understanding that the
19 kind of general stated goal for Liberty Ridge for
20 residents to perform work or activities in a
21 structured schedule to improve their, quote, spiritual
22 and behavioral growth; correct?
23   A.    And to develop their -- their skills.
24   Q.    Okay.  And when you talk about developing
25 their skills, I'm assuming that means to be gainfully

92

1    employed?

2           A.    Correct.

3           Q.    Okay.  Like --

4           A.    Well, not at Liberty Ridge.  But as they

5    leave Liberty Ridge, that they can take those skills

6    and be an asset to society.

7           Q.    Like a functioning member of society?

8           A.    Right.  Right.

9           Q.    Okay.  So I know the terms of spiritual

10   and behavioral growth is a little vague and could mean

11   a lot of different things depending on the context.

12   But within your work with the committee, what does

13   that mean to you and to Liberty Ridge spiritual and

14   behavioral growth?

15          A.    Well, we think of behavioral growth, we

16   know that these boys came to us by their parents

17   because of not getting along with their parents at

18   home.  So our goal always was to return the boys back

19   to their parents.  That was our goal.

20          Q.    Okay.

21          A.    And along with that, teach them some,

22   again, vocational skills while they were there.

23   Develop that as much as we could, and then, of course,

24   our program is very faith based.  And so we also

25   taught from the Bible, and it was up to the boys to

93

1    accept it or reject it.

2        Q.    Were you ever involved in any of the like

3    Bible study or school studies with the boys?

4        A.    Not sure.  I think I was -- I mean, but

5    it wasn't my -- it wasn't my responsibility.

6        Q.    Right.  So you may have participated here

7    and there?

8        A.    Correct.

9        Q.    Okay.  But you weren't the one every day

10   sitting down with them?

11       A.    Correct.

12       Q.    Okay.  That would take a lot of patience

13   I'm sure.

14       A.    Yeah.

15       Q.    So I'm aware that the parents or whoever

16   the guardian was for the boys would pay to send their

17   children to Liberty Ridge?

18       A.    Correct.

19       Q.    Was there a specific amount that

20   everybody paid or did it depend?

21       A.    We had a suggested donation to the farm

22   while their child was there to Liberty Ridge, and we

23   never charged them interest or anything like that.  If

24   they could pay it, fine.  And if not.

25       Q.    So I'm assuming when you say that there's

Witness Nelson Martin

94

1    a suggested donation, there wasn't like a written

2    contract that said every month on the 15th you owe me

3    this much?

4         A.     No.

5         Q.     Okay.  What would happen if a parent

6    didn't pay one month?

7         A.     We just kept working with the boy just

8    like we would if they would have paid.

9         Q.     Was there ever a time that you recall

10   where one of the residents was either removed from the

11   program or asked to leave for failure to pay by their

12   parents?

13        A.     No.

14        Q.     Okay.  What did those payments from the

15   parents cover?  Like I guess when they're donating the

16   money, what would that go to?

17        A.     Operating expense.  Help to cover for --

18   it just cost a lot for the food, for the -- yeah,

19   operating expense.

20        Q.     Does Liberty Ridge currently have any

21   paid employees?

22        A.     Our administrators would be -- would get

23   a salary or --

24        Q.     I know -- and, again, I know the

25   structure has changed since the beginning.  Who

**Witness Nelson Martin**

95

1    currently now is being paid a salary or being paid as

2    an administrator?

3         A.    There's -- you want individuals' names?

4         Q.    **Yeah, I mean if you know them all**

5    **offhand.**

6         A.    Yeah, I do.  Melvin Rohrer and Marvin

7    Gehman and Vernon Weaver which is our school teacher,

8    and Philip Denner.

9         Q.    **I want to go back when Liberty Ridge**

10   **started.  Were there any salaried employees?**

11        A.    House parents would have got a monthly

12   allowance for their time there, yes.

13        Q.    **Okay.  So it was a little bit less**

14   **structured than --**

15        A.    Correct.

16        Q.    **Than it is now?**

17        A.    Correct.

18        Q.    **Okay.  From 2011 to 2014, to your**

19   **knowledge, the main house parent was Mr. Weaver and**

20   **his wife Ruby; correct?**

21        A.    Correct.

22        Q.    **Okay.  There were other house parents who**

23   **would fill in?**

24        A.    Correct.

25        Q.    **Were they on any like rotating schedule**

96

1    or was it just whoever was available?

2         A.    It's whoever was available.

3         Q.    To give Mr. Weaver a break?

4         A.    Correct.

5         Q.    Okay.  Was there a specific amount that

6    the house parents were compensated?  Like was it $55 a

7    day or was it a little more fluid than that?

8         A.    The full-time house parents were so much

9    a month.

10        Q.    Okay.

11        A.    And then fill-in house parents were so

12   much a day.

13        Q.    Okay.  What about the mentors?

14        A.    They got a monthly allowance for very

15   little, just to pay some of their gas to go back and

16   forth.

17        Q.    All of the individuals that were, I

18   guess, the, quote, unquote, staff at Liberty Ridge at

19   least from 2011 to 2014, they all had primary

20   residences elsewhere?

21        A.    Correct.

22        Q.    Okay.  And it's my understanding that the

23   mentors were all unmarried?

24        A.    Correct.

25        Q.    Okay.  So they didn't have families that

**Witness Nelson Martin**

97

1    they were supporting?

2         A.    Right.

3         Q.    Did they have other full-time jobs?

4         A.    Before they came to Liberty Ridge, yes.

5    And so they came as volunteers, and then most of them

6    would just go back to their employees -- employers

7    after they were done at Liberty Ridge.

8         Q.    Okay.  So they weren't maintaining

9    full-time jobs while they were at Liberty Ridge?

10        A.    No.  They were mentors.  They were at

11   Liberty Ridge.

12        Q.    Okay.  And they were living there?

13        A.    Correct.

14        Q.    And from what I understand, they were

15   with the boys pretty much 24 hours a day except for

16   like bathrooms and showers basically?

17        A.    Correct.

18        Q.    Okay.  Were there times that you saw any

19   of the boys kind of on their own at their own -- like

20   their own direction or were they usually always guided

21   to some extent where they were supposed to be?

22        A.    Clarify your question.

23        Q.    I mean they weren't just like roaming

24   around aimlessly?

25        A.    When you say boys, are you talking

98

1    about --

2        **Q.      Sorry.  The residents.**

3        A.      Okay.  Yeah.  No.  They were under

4    supervision pretty much if not the mentor, it would be

5    the house parent.

6        **Q.      So by some adult?**

7        A.      By some adult, yes.

8        **Q.      Did you ever have any like sit-downs or**

9    **I'm going to say trainings, but I'm talking about**

10   **trainings in a different context from like training to**

11   **work with youth.  I mean did you ever have any**

12   **sit-downs or trainings with the mentors about the**

13   **different business operations or different**

14   **occupational exercises that were going on at Liberty**

15   **Ridge?**

16       A.      We would have talked about that in our

17   staff meetings as a group about the skills and any

18   safety.

19       **Q.      Okay.  And then the mentors would then**

20   **communicate that information to the residents?**

21       A.      Most times that was communicated through

22   the department heads.

23       **Q.      Okay.**

24       A.      Or house parents.

25       **Q.      Were there ever any directions given to**

99

1    the mentors such as you need to spend five hours

2    building pallets today or, you know, two hours with

3    the chickens today, anything like that?

4         A.     No.  It was basically on a day-to-day

5    basis as to what -- whatever -- whatever needed to be

6    done, and the vocational skills are always secondary.

7         Q.     Okay.

8         A.     The boys' needs were first.

9         Q.     Okay.  So I guess the overarching

10   question is who kind of made the -- I don't want to

11   say made the schedule, but kind of determined that

12   there needed to be so much done with the chickens, and

13   there had to be so much done with all these things

14   before they got to working with the pallets or the

15   gates?

16        A.     Well, there we had a daily schedule, so

17   it was the chickens, of course, because of there being

18   animal welfare, they needed a certain amount of care.

19        Q.     Right.

20        A.     And some days it meant more than others.

21   So, again, it was very flexible.  And everything else,

22   gate making or whatever came, again, secondary.

23   Whatever we had time for.

24        Q.     So alive things first, everything else

25   after?

100

1      A.      Correct.

2      Q.      **Okay.  What were some of the other tasks**

3   **that the boys had about the property other than the**

4   **businesses that we were talking about that you're**

5   **aware of?**

6      A.      Property maintenance.  They would --

7   yeah.  Mow the yard.  And, of course, they all had

8   their house chores to do.

9      Q.      **I guess outside of the home, other than**

10  **mowing the yard, what were some of the other tasks**

11  **that you recall?**

12     A.      Oh, they would sometimes go out into the

13  wooded area and make trails for them to hike on.  And,

14  again, that wasn't -- that was kind of a sideline

15  thing.

16     Q.      **That was kind of outside of the normal**

17  **daily schedule?**

18     A.      Outside the normal, yeah.  That was just

19  for something different.

20     Q.      **In your estimation, about how much of**

21  **the property is like wooded versus cleared or**

22  **structures?**

23     A.      It's -- I think it's 50 acres of wooded.

24     Q.      **Oh, okay.**

25     A.      And maybe 10 acres of structure and 30

Witness Nelson Martin

101

1   acres of farm land.

2       Q.      Okay.  So when there's been talk about

3   the boys either felling trees or cutting any firewood

4   or anything like that, that would come from the woods

5   that you're talking about?

6       A.      Some.  Some would be from the woods, yes.

7       Q.      Okay.  What would the other be?  When you

8   say some would be, what would the other be?

9       A.      Well, we burn firewood there on the farm

10  for heat.

11      Q.      Okay.

12      A.      So we would bring triaxials of logs in.

13  I mean they would deliver logs there, and then they

14  would cut that up and split that for --

15      Q.      Oh, okay.

16      A.      -- firewood as well.

17      Q.      Were those logs that were brought in,

18  were they donated or were they paid for?

19      A.      Some were donated.  Some were paid for.

20      Q.      Okay.  Were the boys ever involved in the

21  selling of the trees or was that not --

22      A.      No.

23      Q.      Okay.

24      A.      No.

25      Q.      When -- with the firewood that was taken

102

1    from the actual property, would that have been trees
2    that were already down?
3        A.    Yes.  Well, for the most part or a dead
4    tree.
5        Q.    Okay.  When it came to actually taking
6    the trees down, if that were required, it would be one
7    of the adults?
8        A.    Correct.
9        Q.    Okay.  And then would be dragged out of
10   the woods one way or the other?
11       A.    Correct.
12       Q.    Would the boys do that or was that, I'm
13   assuming, some type of equipment?
14       A.    That's always a mentor or department
15   head.
16       Q.    Okay.
17       A.    The boys were not allowed to operate
18   equipment.
19       Q.    Like the actual rideable farm equipment?
20       A.    Correct.
21       Q.    Okay.  When it came to splitting the
22   wood, obviously it would be a full tree first.  How
23   was it then processed?
24       A.    They would -- the mentors would, of
25   course, cut it to length with a saw, and then the

**Witness Nelson Martin**

103

1   mentors and the residents would split it with a maul.

2        Q.    Okay.  Was there -- like the splitter

3   that was used, I know there's all sorts.  There's

4   the -- you can either use an ax or you can go --

5   there's very fancy splitters that you can attach to

6   tractors.  What was used, to your knowledge?

7        A.    It was the manual.  They call it a

8   splitting maul.

9        Q.    Okay.

10       A.    Where they use a hammer to hit it and

11  split it.

12       Q.    Okay.  Are you aware of whether any of

13  the residents used any chain saws or any of that

14  equipment?

15       A.    Not that I'm aware of.

16       Q.    Okay.  Was it --

17       A.    Unless -- not that I'm aware of unless

18  they were of age.

19       Q.    Okay.  What would be of age?

20       A.    18 and older.

21       Q.    Okay.  So it's your understanding that

22  just the mentors should have been using --

23       A.    Correct.

24       Q.    -- the chain saws?

25       A.    Correct.

Witness Nelson Martin

104

1    Q.    Okay.  Are you aware of what was
2  communicated to the residents' parents upon the
3  residents coming to reside at Liberty Ridge?  And what
4  I mean by that is are you aware of what was told to
5  them of what their stay would entail like their
6  schedule, what the goals were, and things like that?
7    A.    That was really not my field.
8    Q.    Okay.
9    A.    I know what, you know, some things the
10  committee would agree upon, but I -- that was not
11  my -- that's not my field.
12    Q.    You weren't involved in those
13  conversations?
14    A.    I mean very little, if at all.
15    Q.    So if somebody from, you know, from the
16  community asked you, you would say this is what
17  Liberty Ridge is, but you weren't involved in the
18  actual like recruitment or assessment of the boys?
19          MS. WYNKOOP:  Objection to form.
20    A.    Correct.
21  BY MS. FRANCHI:
22    Q.    Okay.  When you were at Liberty Ridge for
23  any reason, were you ever involved in like the
24  administering or evaluating of consequences for
25  residents?

**Witness Nelson Martin**

105

1    A.    Yes.

2    Q.    **Okay.  How often?**

3    A.    I don't know.

4    Q.    **Okay.  So would it be safe to say on**

5    **occasion, but that wasn't your role?**

6    A.    Correct.  It wasn't -- anybody on the

7    committee, it was their role to help if they were

8    there.

9    Q.    **Okay.  So when you were on the property,**

10    **you don't need to give names of any of the residents**

11    **unless it was one of my clients, you can certainly**

12    **do that, but you don't need to name names of any other**

13    **children.  Give me some examples of the times that you**

14    **recall being involved in any consequences.**

15    A.    Oh, there was one time maybe I can think

16    of where a resident was -- sometimes we would have

17    them work at a stump that we wanted removed, and they

18    would work at digging some of the dirt away, some of

19    that.

20    Q.    **Okay.  Do you remember what precipitated**

21    **the need or the giving the direction to do that?  Like**

22    **what the behavior was?**

23    A.    That varied, but a lot of times it was,

24    you know, disrespect or not listening or the list can

25    go on.

106

1           MS. FRANCHI:  I'll pause for just a

2    second.

3           MS. WYNKOOP:  Can we actually go off so I

4    can --

5           MS. FRANCHI:  Yes.

6           THE VIDEOGRAPHER:  Off camera time is

7    11:29.

8           (Recess)

9           THE VIDEOGRAPHER:  On camera time is

10   12:08.

11   BY MS. FRANCHI:

12        Q.    All right.  So we are back.  The last I

13   think few questions we were talking about had to do

14   with whether you were ever involved in children or

15   residents and their consequences, things like that.

16           Generally speaking, though, is it your

17   understanding that the day-to-day discipline,

18   etcetera, for residents was taken care of by the

19   mentors and/or the house parents?

20        A.    Correct.

21        Q.    Okay.  Was it an understanding that when

22   either the committee members or anybody from the

23   Mission came to the property for whatever reason, that

24   they had some semblance of control over the situation?

25   Like you were able to discipline the child for, you

**Witness Nelson Martin**

107

1  know, disrespect or something like that?

2       A.    From the Mission, probably I don't know

3  that that ever would have happened.  From the Liberty

4  Ridge committee, again, we wouldn't just take things

5  into our own hands.  We would work together as a

6  team.

7       Q.    Okay.  Were you ever on the property when

8  any of the children were ever physically restrained

9  for any reason?

10      A.    Not that I can remember.

11      Q.    Okay.  Were you ever on the property

12 after like general work hours like into the evening or

13 anything like that?

14      A.    Yes.

15      Q.    Okay.  When you were there on the

16 property after, let's say, normal work hours, did you

17 ever observe any of the residents having to do or

18 perform any consequences during that time?

19      A.    Yes.

20      Q.    Were they -- I know there are different

21 kind of levels.  There was it started with a talking

22 to.  Having to maybe write some sentences or writing

23 some essays and kind of went from there.

24            When you observed any of the consequences

25 after hours, was it any of the physical consequences

**Witness Nelson Martin**

108

1    like running or doing work?

2         A.    Yes.

3         Q.    Okay.  What are those -- what events do

4    you recall?

5         A.    One would have been, I think, when they

6    were digging a stump.

7              MS. FRANCHI:  We can go off the record

8    for just a second.  You can leave that on.

9              (Discussion held off the record.)

10   BY MS. FRANCHI:

11        Q.    During your time working with Liberty

12   Ridge, did you ever encounter either of my clients,

13   David Cross or Robert Miller?

14        A.    You mean that I would have been with

15   them?

16        Q.    Just I think just generally first do you

17   recall being around them or encountering them?

18        A.    Sure.

19        Q.    Okay.  Did you know either of them before

20   they were placed at Liberty Ridge?

21        A.    No.

22        Q.    Okay.  Did you ever give -- start with

23   David actually because I know David was there before

24   Robert and also after Robert.

25              When you encountered David at Liberty

Witness Nelson Martin

109

1   Ridge, did you ever give him direction to do any work,
2   anything like that, or was it more just kind of a
3   mere -- I would say mere encounter has a legal meaning
4   in the criminal context, but did you just encounter
5   and interact with him?
6       A.   I'm sure I told him to do this or do that
7   along the way.
8       Q.   Okay.  And I know that you had said
9   generally you weren't involved with the recruitment or
10  kind of bringing in any of the residents, so would I
11  be correct in saying you weren't involved with
12  bringing David into Liberty Ridge?
13           MS. WYNKOOP:  Objection to form.
14      A.   Not that I remember.
15  BY MS. FRANCHI:
16      Q.   Okay.  Were you ever involved in either
17  redirecting, correcting, or administering any
18  consequences to David when he was at Liberty Ridge?
19      A.   I can't recall.
20      Q.   Okay.  Do you ever recall having any
21  conversations with or discussions with David about his
22  either mental health condition or his prescription
23  medication?
24      A.   No.
25      Q.   Were you involved in any way with David

**Witness Nelson Martin**

110

1  leaving Liberty Ridge?  And I'm not talking about him

2  running away.  I'm talking about him actually

3  physically being done with the program.

4       A.    I would have -- I would have known when

5  he left -- when he left the program, but I can't

6  recall for sure.  I kind of think it's when he walked

7  away, I think so, but I might be -- I'm not sure.

8       Q.    Okay.  Do you recall whether after David

9  left the program, I guess, for good, did he come to

10 your home at any point after that, if you remember?

11      A.    I know he came to my home, but I was

12 thinking that was -- yes, he did.  Yes, he did.

13      Q.    Okay.  How long did he stay?

14      A.    It was basically for a day when where he

15 were staying, they wanted to go away, so he came to my

16 place.

17      Q.    Okay.  So it was just kind of temporary?

18      A.    Temporary.

19      Q.    Okay.  Do you recall what happened after

20 that?

21      A.    No.

22      Q.    Okay.  Did you bring him back wherever he

23 needed to go or did somebody pick him up?

24      A.    Somebody always picked him up.

25      Q.    Okay.  And that was kind of the end of

**Witness Nelson Martin**

111

1   your involvement with him?

2       A.     No.  I've been in -- I've been in David

3   Cross's life a good bit after he was done at Liberty

4   Ridge.

5       Q.     Okay.

6       A.     I was -- I was on his visitor list in the

7   prison.  I actually picked him up at prison as an

8   inmate and took him to a funeral.

9       Q.     Okay.

10      A.     Yeah.

11      Q.     So you've been kind of aware of what has

12  gone on as he became an adult in the last few years?

13      A.     Yes.

14      Q.     Okay.  What about Robert Miller?  Were

15  you familiar with him prior to him coming to Liberty

16  Ridge?

17      A.     No.

18      Q.     Okay.  So, again, it would be safe to say

19  you weren't involved with bringing him to Liberty

20  Ridge?

21      A.     No, because I remember coming to Liberty

22  Ridge, the first time I seen him is when he was there.

23      Q.     Okay.  Tell me about that, the first time

24  you encountered him.

25      A.     I just seen him going with his mentor.

**Witness Nelson Martin**

112

1    That's all I remember.

2        Q.     Okay.  Didn't have much interaction with

3    him?

4        A.     Not with Robert, no.

5        Q.     Okay.  You don't recall ever, you know,

6    directing him to do anything?

7        A.     Again, maybe a day-to-day something, but

8    nothing --

9        Q.     Nothing that stands out?

10       A.     No.

11       Q.     You don't recall any behavioral issues,

12   anything like that?

13       A.     No.  Robert's pretty vague in my mind.

14       Q.     Okay.  I guess that can be a good thing

15   sometimes.

16       A.     Yeah.

17       Q.     Okay.  I think I'm going to kind of

18   switch gears a little bit.  I want to look a little

19   bit into the ledgers that were provided to me.  I

20   believe yesterday or the day before were emailed over.

21   So I believe you have them there actually Bates

22   stamped.  They're not in the binder, but they're in

23   front of you.

24            So I think what I'll do is just generally

25   go over the creation of the ledgers, and then I will

**Witness Nelson Martin**

113

1    ask you some specific questions.  So in your role as

2    treasurer, is it your responsibility to prepare and

3    maintain the account activity and the ledgers for

4    Liberty Ridge?

5        A.    Yes.

6        Q.    Okay.  So these three ledgers that were

7    provided to me for the years of 2011, 2012, and 2013

8    were prepared by you?

9        A.    Correct.

10       Q.    Okay.  Tell me about just generally your

11   preparation of these ledgers.  And I guess what I'm

12   looking for mainly is like is it -- do you take

13   information from other sources and input it?  Is this

14   something that you retrieve and just download from

15   somewhere else?  Tell me about that a little bit.

16       A.    What this is is I have a software that I

17   do all my checking account on, and so it's all in my

18   laptop.  So it's just a matter like when I pay my

19   bills, you'll see that right here, everything, so I

20   can go there and retrieve it --

21       Q.    Okay.

22       A.    -- right out, and this is -- this is what

23   you get.

24       Q.    So not too much interaction?

25       A.    No.

**Witness Nelson Martin**

114

1    Q.    Okay.

2    A.    No.  And this is all -- this was all

3    my -- on a yearly basis we have auditors that audit my

4    books.

5    Q.    Okay.

6    A.    To make sure everything holds out, so.

7    Q.    Okay.  And would this include having the

8    Liberty Ridge books audited, also?

9    A.    Yes.

10   Q.    Okay.  So not just personal, your

11   business?

12   A.    No.  That's what I'm talking about,

13   Liberty Ridge.

14   Q.    Okay.  So tell me about the process of

15   just keeping track of the day-to-day expenses from

16   Liberty Ridge.  Are you inputting all the receipts in

17   or is this -- you know, are the debits and credits

18   coming from another account and being uploaded into

19   your software?

20   A.    No.  I'm actually working right off this

21   software, and I pay the -- pay the bills right with my

22   laptop.  Prints the checks.  Puts it right in here.

23   So it's -- there's nothing else that I'm downloading

24   into it.  It's actual work.

25   Q.    Okay.  So we'll start with the 2011,

**Witness Nelson Martin**

115

1   which I think is actually the smallest one of these,

2   which I believe goes from Numbers 287 through 293.

3   Does that look about right?

4          A.     Yep.

5          Q.     Okay.  So when looking at this ledger, I

6   see it says accounts payable, accounts receivable,

7   administrative expense, and then checking.  Under

8   where it says checking, does that encompass every

9   transaction that is contained in the ledger?

10         A.     Yes.

11         Q.     Okay.  So then when you flip through and

12  go to the individual line items of chicken house,

13  chicken income, etcetera, etcetera, all of those items

14  would be contained in the general checking part of the

15  ledger, but then they're just itemized separately?

16         A.     Correct.

17         Q.     Okay.

18         A.     Correct.  You should be able to find

19  those amounts back here in the checking.

20         Q.     Okay.  Do you have anybody else that

21  helps you compile any of these expenses or maintain

22  any of the books or is that all your job?

23         A.     It's basically my job.  My wife will help

24  with some of the book work.  She'll put the checks in

25  envelopes, but no, I'm pretty much responsible for

116

1   this.

2        Q.     Okay.  So, and I think that we probably

3   won't need to go over each of these in excruciating

4   detail once we get the idea of what is contained

5   herein, but just walk me through it right now.

6             So the invoices contained at the top, the

7   Nel-Ray Farms, where it says accounts payable, what

8   would that be from?  I see one debit for a thousand

9   and one credit for a thousand.  Do you recall what

10  those transactions would be and what that kind of

11  portrays?

12       A.     To the best of my knowledge, that was a

13  thousand dollar loan from Nel-Ray to Liberty Ridge to

14  pay bills until Liberty Ridge had money to pay me

15  back.

16       Q.     Okay.  And where it says here accounts

17  receivable from Bill Cross, would that have been one

18  of the like monthly donations from David's father

19  paying for his stay at Liberty Ridge?

20       A.     Correct.

21       Q.     Okay.  So generally throughout the

22  ledgers then where it says the accounts receivable and

23  the accounts payable, those would -- would those

24  generally reflect just the incoming checks from

25  parents or any loans, anything to that effect?

**Witness Nelson Martin**

117

1    A.    Yeah.   And that should be broke down more

2    as you get back through further.

3    Q.    Okay.

4    A.    On some of the -- on all of them.

5    Q.    So accounts receivable, administrative

6    expenses, and accounts payable would also be contained

7    elsewhere?

8    A.    Correct.

9    Q.    Okay.   That's what I was getting at.   I

10   just want to make sure that it is reflected somewhere

11   else in the document.   Okay.   So, and, again, I

12   understand that some of these transactions occurred

13   before there were residents at the program, but I

14   figured we'd start from the beginning.   They're all

15   kind of set up the same way and get an idea of what

16   there is.

17            So where it says here the chicken house

18   expenses, are these all just operating costs that go

19   along with maintaining the chicken house on the

20   property?

21   A.    Yes.

22   Q.    Okay.   So, say, like signs would be for?

23   A.    That was for a sign to direct the trucks.

24            MS. FRANCHI:   Okay.   Can I go off the

25   record just a second?

118

1    THE VIDEOGRAPHER:  Off camera time is

2    12:22.

3            (Discussion held off the record.)

4            THE VIDEOGRAPHER:  On camera time is

5    12:30.

6    BY MS. FRANCHI:

7    Q.    Okay.  So I had started to go down a line

8    of questioning with Mr. Martin having to do with just

9    the ledger account generally starting to go through

10   the different -- the items indicated such as checking,

11   the chicken house, etcetera?

12            We went off the record and took a brief

13   break at which time I had a conversation with defense

14   counsel about how to handle the records that we have

15   here.  It was agreed that instead of going

16   line-by-line through each item, the main takeaway was

17   that we wanted to have Mr. Martin take a look through

18   the records and see if he identifies any other

19   businesses that weren't otherwise talked about earlier

20   in his testimony, meaning not necessarily a business

21   that provided a service to Liberty Ridge like

22   supplying a sign or paving a driveway, but more to the

23   effect of whether there are any other businesses to

24   which any of the residents contributed labor or

25   services or anything of that nature.

Witness Nelson Martin

119

1          So we have given Mr. Martin an

2    opportunity to look through everything, so I guess the

3    question that I will ask is, Mr. Martin, after looking

4    through the records for a little while, are there any

5    other businesses that you have identified during that

6    time?

7          A.     No, there is not that I could come up

8    with.

9                MS. FRANCHI:  Okay.  Attorney Wynkoop,

10   does that fairly summarize what we had talked about

11   when we were off the record?

12               MS. WYNKOOP:  That's correct.

13               MS. FRANCHI:  Okay.  So with that, it was

14   also discussed and agreed that if we have any

15   line-by-line questions about any of these specific

16   items, that we will be able to deal with them in

17   written form or off the record at this point going

18   forward.

19               Obviously, we agreed that any witness

20   including Mr. Martin will be subject to recall if we

21   need, but at this point we just don't see that it

22   would be productive to kind of go through every

23   individual entry in the ledgers, is that correct?

24               MS. WYNKOOP:  That's correct.

25               MS. FRANCHI:  Okay.  So with that, I

**Witness Nelson Martin**

120

1  actually do not think that I have any more questions

2  at this time.  I'm not sure if counsel has any

3  follow-up questions for Mr. Martin.

4          MS. WYNKOOP:  I do not have any

5  questions.

6          MS. FRANCHI:  Okay.

7          THE VIDEOGRAPHER:  All right.  This

8  concludes today's deposition.  The time on the monitor

9  is 12:43.

10          (The deposition was concluded at 12:43

11  p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Nelson Martin**

121

```
1    COMMONWEALTH OF PENNSYLVANIA    )
                                     )  SS.
2    COUNTY OF YORK                  )

3

4            I, Tracy L. Lloyd, a Registered
     Professional Reporter and Notary Public in and for
     the Commonwealth of Pennsylvania and County of
5    York, do hereby certify that the foregoing
     testimony was taken before me at the time and place
6    hereinbefore set forth, and that it is the
     testimony of:

7

8                  NELSON MARTIN

9

10           I further certify that said witness
     was by me duly sworn to testify the whole and
     complete truth in said cause; that the testimony
11   then given was reported by me stenographically, and
     subsequently transcribed under my direction and
12   supervision; and that the foregoing is a full, true
     and correct transcript of my original shorthand
13   notes.

14           I further certify that I am not
     counsel for nor related to any of the parties to
15   the foregoing cause, nor employed by them or their
     attorneys, and am not interested in the subject
16   matter or outcome thereof.

17           Dated at York, Pennsylvania, this 2nd
     day of November, 2022.
18

19

20           _____
             Tracy L. Lloyd, Notary Public
21           Registered Professional Reporter

22
     (The foregoing certification does not apply to any
23   reproduction of the same by any means unless under
     the direct control and/or supervision of the
24   certifying reporter.)

25   My Commission expires:
     April 21, 2023
```

**$**

**$55** 96:6

**$795,000** 26:12

**1**

**10** 100:25

**10:00** 40:13

**10:05** 44:9

**10:06** 44:12

**10:41** 71:21

**10:49** 71:25

**11:29** 106:7

**12** 20:5

**12/10/63** 9:23

**12:08** 106:10

**12:22** 118:2

**12:30** 118:5

**12:43** 120:9,10

**13** 22:4 31:16 69:13

**14** 69:18 72:23

**152** 38:6

**15th** 94:2

**16** 50:15

**17049** 39:21

**17087** 38:7

**18** 12:15 103:20

**1988** 10:19

**1999** 8:4

**2**

**2** 39:10 71:24

**20** 13:13 87:3

**2000** 43:8

**2004** 8:4 17:3 21:23

**2008** 17:19 21:22

**2009** 18:21

**2010** 20:5 22:15

**2011** 31:15 35:21 36:15 45:17,21 46:24 50:11 53:24 55:8 56:18 58:24 64:24 65:4,18 66:25 69:12 76:5 80:4 82:5 88:18 95:18 96:19 113:7 114:25

**2012** 113:7

**2013** 43:11 72:23 113:7

**2014** 12:15 50:15 54:4,6,25 55:8 58:24 64:25 65:18 67:1 69:14,16 72:5 76:6 80:5 88:18 95:18 96:19

**2019** 55:5

**2020** 65:3,4

**2022** 4:10 46:12

**20th** 4:10

**214** 4:17

**24** 97:15

**25** 61:17

**27** 42:20

**287** 115:2

**293** 115:2

**29th** 22:15

**2nd** 22:3

**3**

**3** 39:20

**30** 82:9,11 100:25

**30,000** 59:1

**300** 59:3

**4**

**40** 61:17

**402** 4:17

**4th** 31:15

**5**

**50** 100:23

**501(c)** 44:1,2,3

**501(c)(3)** 44:15

**56** 38:5

**57** 38:2 40:2

**583** 39:20

**5:21-CV-05070-JMG** 4:15

**6**

**600** 59:3

**7**

**75** 27:8

**8**

**86** 21:15,20 22:3

**87** 22:14

**88** 25:4

**89** 26:9

**8th** 11:19,20

**9**

**9** 21:22

**90** 27:10

**91** 28:17,23

**93** 31:14

**95** 21:20

**9:04** 4:10

**9:24** 21:9

**9:25** 21:12

**9:52** 40:10

**A**

**a.m.** 4:10

**absorbed** 54:12

**accept** 93:1

**accepted** 45:15 46:24

**access** 41:25

**account** 42:23 43:1,10 113:3,17 114:18 118:9

**accountant** 37:12,13 39:9 43:22 45:9

**Accounting** 37:14 39:19 43:22 44:4 45:3

**accounts** 14:7 41:21 42:14 115:6 116:7,16,22,23 117:5,6

**acres** 82:7,11 100:23,25 101:1

**act** 20:23 47:8

**acting** 50:22

**activities** 91:20

**activity** 113:3

**acts** 41:5

**actual** 37:3 41:1 45:13 81:25 102:1,19 104:18 114:24

**added** 36:19,20, 22

**address** 38:7,8,9, 14 39:22

**addressed** 22:20

**administering** 104:24 109:17

**administration** 36:23

**administrative** 46:18 115:7 117:5

**administrator** 95:2

**administrators** 49:10 94:22

**adult** 98:6,7

**111:12**

**adults** 102:7

**advise** 19:20

**advisors** 19:15

**affiliated** 51:14

**affiliation** 72:15

**affirmed** 5:7

**age** 22:21 60:23 103:18,19

**agree** 6:1,3 104:10

**agreed** 4:2 5:25 118:15 119:14,19

**ahead** 15:22

**aimlessly** 97:24

**alive** 12:4 99:24

**allowance** 95:12 96:14

**allowed** 102:17

**alternate** 41:25

**America** 16:12

**Amish** 71:13,14, 15

**amount** 51:25 76:22 93:19 96:5 99:18

**amounts** 43:17 115:19

**and/or** 106:19

**Andreozzi** 4:22

**animal** 99:18

**animals** 57:13

**anymore** 12:18 64:15

**apologize** 21:4 25:3

**appearances** 4:20

**application** 40:16

**applied** 39:8

**approached** 17:20

**approval** 27:18 28:18 49:10 75:23 79:9

**approvals** 27:11, 12,13,24

**approving** 22:24

**approximate** 7:21 55:2

**Approximately** 17:19

**approximating** 8:6

**approximation** 7:25

**area** 12:3 13:8 14:19 78:14 86:16 100:13

**areas** 84:4

**arrangement** 61:19 70:1 73:20 91:1,10

**aspects** 31:9

**assemble** 64:13

**assembled** 62:4

**assembling** 69:20,21 70:3

**assessment** 104:18

**asset** 92:6

**assigned** 22:11 60:1

**assistant** 42:7 47:15,19

**association** 19:20

**assume** 7:3

**assuming** 12:23 14:11 42:18 55:11 60:21 71:5 73:15 84:25 85:15,19 91:2,25 93:25 102:13

**attach** 103:5

**attend** 20:12

**attention** 22:4 25:4 26:8

**attorney** 4:23 6:6 7:12 9:4,10 119:9

**audit** 114:3

**audited** 114:8

**auditors** 114:3

**authority** 77:13

**Ave** 4:17

**average** 52:22 55:15

**aware** 34:14 48:16 49:5,13,25 50:16 51:23 57:20 64:9 65:12 66:15 67:20 72:18 73:20 74:6,10 75:15 78:20 79:1 80:14 93:15 100:5 103:12,15,17 104:1,4 111:11

**ax** 103:4

**B**

**back** 20:23 32:1 34:24 35:5 38:2 40:3 45:3 46:20 50:10 60:14 61:4 67:7 74:2 75:7,11 76:9 78:9 79:5 82:15 83:21 89:7 90:17 91:2 92:18 95:9 96:15 97:6 106:12 110:22 115:19 116:15 117:2

**background** 8:17 30:8

**backside** 38:3

**backwards** 46:13

**bank** 14:3,4,6 41:21 42:13,23 43:1,3,4,19

**banking** 14:1

**barn** 59:2

**based** 22:24 57:16 70:11 92:24

**basically** 9:12 14:23 18:25 20:25 30:19 32:4 47:1, 17 51:2 57:2,10 58:5 59:3 62:21 74:7 81:5 87:13 91:12 97:16 99:4 110:14 115:23

**basis** 77:15,21 99:5 114:3

**bat** 5:15 9:8

**Bates** 112:21

**bathrooms** 97:16

**bedroom** 68:4

**beef** 65:21,23 66:12

**began** 20:3 50:11

**begin** 5:9,23 23:14

**beginning** 16:2 37:20 62:17 63:11 84:21 94:25 117:14

**begins** 71:23

**behavior** 105:22

**behavioral** 91:22 92:10,14,15 112:11

**behaviors** 77:8

**belief** 44:14

**benchmarks** 77:7

**benefit** 58:1 74:22

**Bible** 76:8 92:25 93:3

**big** 57:20 59:2 78:2

**bigger** 57:21,23

**bill** 86:12 116:17

**bills** 50:24 51:3 113:19 114:21 116:14

**binder** 8:22 112:22

**birds** 57:12 58:5, 11,12,14,16,18,23 59:20,22,25 67:11

**birth** 9:22

**birthdays** 13:14

**bishops** 19:11

**bit** 8:18 9:13 10:8 15:22 16:1 21:5 27:15 29:16 32:1 34:23 36:9,14 40:25 50:25 53:1 57:8,17 61:7,18 68:14 69:25 95:13 111:3 112:18,19 113:15

**board** 16:13,14 17:14,15,21 19:9, 12,21 20:3,18,22 21:20 22:23,25 23:3 39:5 47:7,8, 10,12 48:17,23 49:11 56:1,2 79:9, 11,12,15

**boards** 81:6,7

**book** 50:6,7,9,10 115:24

**books** 114:4,8 115:22

**born** 9:24

**bottom** 22:5 26:9 31:17 40:4

**bought** 89:3

**boy** 94:7

**boys** 13:4 17:5,9 18:1,4,7,11,19,24 19:1,3,23 20:7,11, 19 22:6,16,21 23:24 24:24 25:5 26:10 27:10,18 28:25 31:16,18 32:5 33:4 34:24 36:3,19,22 39:11 52:1 56:25 57:12 62:19,21 66:9 71:16 80:15 82:17 92:16,18,25 93:3, 16 97:15,19,25 100:3 101:3,20

102:12,17 104:18

**boys'** 99:8

**branch** 43:20

**break** 7:7,9,17 21:15 40:7,15 75:5 96:3 118:13

**briefly** 5:16

**bring** 20:3 56:2 59:25 60:5 79:10 86:15 101:12 110:22

**bringing** 32:2 73:21 109:10,12 111:19

**broke** 117:1

**brother** 10:21 54:9,20

**brother's** 10:22

**brothers** 30:23 31:12 78:3

**brought** 72:19 78:24 80:16 87:22 88:21 101:17

**Brubaker** 25:8, 19 26:3 48:22,25 49:6,12,19

**build** 34:10 74:22 81:1

**building** 71:7 99:2

**built** 35:6 36:1 62:10 63:17,19

**bulk** 84:13

**bulldozer** 87:22

**burn** 101:9

**bushel** 87:3

**business** 10:14 12:8,11 14:2,14, 21,25 15:3,19,20 37:3 40:23 41:1 44:20 45:20 49:20 51:7 53:25 80:1 81:1 83:8,23 85:9 87:17 88:21 98:13 114:11 118:20

**businesses**

13:19,23 32:3
51:5 56:19,23
66:16 72:8 78:21
88:15 100:4
118:19,23 119:5

**buy** 64:5

**buying** 91:3

**bylaws** 49:24

---

**C**

**calculated** 77:1

**call** 16:6 19:19
34:3 77:11 81:8
89:4 103:7

**called** 5:6 10:16
72:12 81:12

**calling** 80:12

**calls** 71:16

**camera** 21:8,11
40:9,12 44:8,11
71:20 106:6,9
118:1,4

**Camp** 4:17

**capable** 76:15

**capacity** 89:2

**care** 57:13 59:20
66:10 99:18
106:18

**case** 4:14 5:18,20
55:10 67:18

**casual** 55:24,25

**cattle** 66:10

**cease** 54:8

**ceased** 55:3

**cents** 87:3

**chain** 103:13,24

**chair** 67:21,24
68:11,18

**chairman** 26:4
47:17,19

**change** 19:25
43:18

**changed** 36:14
94:25

**characteristics**
29:23

**charged** 93:23

**checked** 77:17

**checking** 43:10
85:20 113:17
115:7,8,14,19
118:10

**checks** 114:22
115:24 116:24

**chicken** 35:15,23
36:12 46:4 57:2,5,
6 59:2 60:19
115:12,13 117:17,
19 118:11

**chickens** 58:9
60:22 65:8,14
88:20 99:3,12,17

**child** 76:5 93:22
106:25

**children** 13:3,5
31:9 34:20 93:17
105:13 106:14
107:8

**choose** 32:11

**chores** 100:8

**chosen** 20:8

**church** 16:12
17:10,12 19:11,19
39:12,15 63:25
86:20 89:4,6

**church-operated**
39:11

**churches** 35:10

**claims** 45:5

**clarification**
20:20

**clarify** 25:13 29:8
53:1 67:10 97:22

**Clark's** 57:7,8,15
58:2,12,18 59:10,
14 60:8,15,21
61:11 65:2,12

**classes** 76:8

**clean** 79:6,19

**clear** 44:17

**cleared** 100:21

**client** 76:20

**clients** 105:11
108:12

**close** 22:5 28:23
31:17 45:17

**closer** 37:19

**combination**
14:21 20:24

**combine** 82:22
86:1

**committee** 16:11
17:6,9,11 18:20
19:23 20:4,7,8,12,
25 22:8,16,20
25:6,10,23 26:1,
19 30:5,25 31:19
32:2,24 37:6
46:15,16,17 47:2,
4,5,6,7,10,13,21,
22 48:14 49:1,23
51:8,23 52:14,23,
25 53:4,5,14,16
75:18,20,22 76:19
92:12 104:10
105:7 106:22
107:4

**committee's**
20:17

**communicate**
98:20

**communicated**
98:21 104:2

**communication**
77:25

**community** 19:6
104:16

**companies** 65:6,
13 67:17 75:6
78:10

**company** 10:18
11:4 32:7,14 54:7
56:22 57:5,20,21
69:7 70:1,7,10
71:2,14 72:3,11,
25 73:7,16,17,18
78:12 85:8

**compensated**
52:11,15 96:6

**compensation**
52:4 74:18 88:24

**compile** 115:21

**concept** 16:3
20:19 37:3

**concepts** 24:19

**concluded**
120:10

**concludes** 120:8

**condition** 109:22

**confusingly** 6:19

**congregation**
51:15

**congregations**
19:20,21 30:3
89:10,13,24

**consequences**
104:24 105:14
106:15 107:18,24,
25 109:18

**consistencies**
24:13

**constructing**
62:19

**construction**
23:23 24:6 62:17

**consulted** 51:24

**contact** 35:3
46:16,17 51:11
70:21

**contained** 115:9,
14 116:4,6 117:6

**containers** 11:14

**context** 92:11
98:10 109:4

**continue** 21:12
40:13

**contract** 33:25
34:3,8 46:5 59:11
94:2

**contracted** 11:11

**contracts** 33:17

**contributed**
118:24

**control** 106:24

**Convenience**
43:19

**conversation**
118:13

**conversations**
104:13 109:21

**coordinating**
56:11

**copy** 50:17

**corn** 15:11 82:14
84:18 85:15

**corporation**
41:18

**Corporations**
40:22

**correct** 19:17,21
20:9 21:22 27:3
41:15 43:16
48:10,11 50:11,12
69:24 71:6 72:24
73:6,15,18,19
75:13,14 76:22,23
77:16,19 81:22,23
82:1 85:3,10,18,
22,25 86:9 87:19
89:11 90:3,6,22,
25 91:4,13,17,22
92:2 93:8,11,18
95:15,17,20,21,24
96:4,21,24 97:13,
17 100:1 102:8,
11,20 103:23,25
104:20 105:6
106:20 109:11
113:9 115:16,18
116:20 117:8
119:12,23,24

**correcting**
109:17

**cost** 22:22 23:7,9
87:4 90:24 91:3
94:18

**costs** 87:23 91:2
117:18

**counsel** 4:3,20
5:24 118:14 120:2

**county** 9:25 10:1,
5 27:4 34:12 84:4

**couple** 18:17 24:10 40:18

**court** 4:13,19 5:3

**cousin** 19:10

**cover** 87:4 88:17 94:15,17

**covered** 88:19

**cow** 84:18

**cows** 38:25

**create** 24:17

**created** 16:2 35:13

**creating** 51:22

**creation** 112:25

**credit** 116:9

**credits** 114:17

**criminal** 109:4

**crop** 83:15 86:8

**crops** 81:19,25 82:4,7,10,18,24 83:3,5,10,23,24 84:1,3,22,25 86:14 87:25

**Cross** 5:17 45:16 76:22 108:13 116:17

**Cross's** 111:3

**current** 46:9,12 50:8 68:1

**cut** 28:25 101:14 102:25

**cutting** 62:9 101:3

— D —

**D.C.** 4:12

**D.O.T.** 67:8

**daily** 80:8 99:16 100:17

**dairy** 54:19 66:13,14 84:23

**dark** 7:23

**date** 4:9 7:21 9:22 69:15

**David** 5:17 12:7 76:22 108:13,23, 25 109:12,18,21, 25 110:8 111:2

**David's** 116:18

**day** 7:8 9:5 76:12 79:17 90:8 93:9 96:7,12 97:15 110:14 112:20

**day-to-day** 77:21 99:4 106:17 112:7 114:15

**days** 5:24 16:21 19:18 21:4 24:10 89:14 99:20

**dead** 102:3

**deal** 82:3 119:16

**dealing** 31:5,8 51:19

**debit** 116:8

**debits** 114:17

**debt** 90:10

**decide** 90:8

**deciding** 18:24

**decision** 33:23 37:4 51:9 75:19

**Defendants** 4:25 5:2

**defense** 118:13

**deliver** 101:13

**Denner** 95:8

**department** 51:24 66:21 77:22 98:22 102:14

**depend** 93:20

**depending** 92:11

**deponent** 5:4

**deposition** 4:11, 16 7:9,20 8:19 9:9 71:24 120:8,10

**detail** 116:4

**details** 30:17

40:23 44:20

**determination** 79:7

**determined** 75:15 76:17 77:1 99:11

**determining** 23:6 76:4 77:9

**develop** 76:16 91:23 92:23

**developed** 36:15

**developing** 91:24

**digging** 105:18 108:6

**direct** 117:23

**directing** 112:6

**direction** 20:21 39:4 48:13 55:23 56:6 78:5 90:2,4 97:20 105:21 109:1

**directions** 49:14 98:25

**directly** 64:18 89:9 90:13

**directors** 47:8

**dirt** 105:18

**discipline** 106:17,25

**discontinue** 33:24

**discovery** 44:18 50:9 73:5 78:12

**discuss** 32:2

**discussed** 16:4, 9 18:2 119:14

**discussion** 17:24 21:10 22:23 34:19 44:10 108:9 118:3

**discussions** 17:5 31:23 109:21

**disorders** 31:10 51:20

**disrespect** 105:24 107:1

**district** 4:13,14 35:10

**document** 37:24 117:11

**documentation** 45:11

**documents** 8:23 9:14 27:23 37:10, 22 44:18 49:24,25 50:2

**dollar** 43:16 116:13

**donated** 68:3 101:18,19

**donating** 94:15

**donation** 93:21 94:1

**donations** 116:18

**double** 59:4

**download** 113:14

**downloading** 114:23

**dragged** 102:9

**drew** 24:16

**drink** 7:10

**driveway** 118:22

**driving** 10:9

**Dutch-way** 12:12,16 13:17 54:12,14,15,19 83:22 88:2,7

**duties** 19:24 25:23 50:21 60:2

— E —

**earlier** 5:17 41:12 118:19

**easier** 16:7

**Eastern** 4:14 19:6,11 39:14 51:14

**easy** 15:23

**eat** 84:18

**Edelstein** 4:17, 25 5:2

**education** 11:18

**effect** 116:25 118:23

**effort** 86:23,24

**EIN** 42:15,17

**eligible** 22:21

**emailed** 112:20

**employed** 92:1

**employees** 15:14 33:6,9 57:24 60:12 70:17,19 71:6 73:10,11 94:21 95:10 97:6

**employers** 97:6

**empty** 35:13

**encompass** 115:8

**encompassed** 55:10

**encompassing** 69:14

**encounter** 108:12 109:3,4

**encountered** 35:5 108:25 111:24

**encountering** 34:25 108:17

**end** 9:5 12:17 62:24 69:16 72:23 74:9 85:24 110:25

**ended** 90:20

**entail** 30:15 104:5

**entire** 42:11

**entity** 40:23 41:2, 17 44:20 46:3 47:23 83:17

**entry** 119:23

**envelopes**

115:25

**Ephrata** 14:6
43:3,19

**equipment** 34:15
52:7 83:2,14
102:13,18,19
103:14

**essays** 107:23

**established**
19:24 25:22 26:1,
7 45:20 46:3

**estimate** 7:21,24
52:18

**estimating** 8:6

**estimation**
100:20

**et al** 4:12

**etcetera** 106:18
115:13 118:11

**Ethan** 25:7,20
26:4

**Eva** 12:22

**evaluate** 59:19

**evaluating**
104:24

**evening** 107:12

**event** 8:2

**events** 108:3

**EXAMINATION**
5:11

**examples** 105:13

**exchanged**
68:10

**excruciating**
116:3

**excuse** 20:6 21:3
25:3 55:10

**exercises** 98:14

**exist** 28:12 54:8

**existence** 12:17,
18 50:17 71:1

**expand** 50:25

**expanded** 35:21
36:17

**expect** 7:6

**expectations**
5:21

**expense** 89:7
94:17,19 115:7

**expenses** 114:15
115:21 117:6,18

**experience**
48:12

**explain** 41:8

**extent** 30:9 41:6
51:25 52:18 56:7
65:11 67:18 85:12
97:21

---

**F**

**facilitating** 18:7

**facilities** 23:15,
19 24:9

**facility** 19:3 23:7

**failure** 94:11

**fair** 7:4,24 8:8

**fairly** 119:10

**faith** 92:24

**fall** 56:13

**familiar** 32:17
72:11 78:15
111:15

**families** 17:25
18:23 19:4,5
96:25

**family** 15:18
30:25 31:11 65:19

**fancy** 103:5

**farm** 10:8,10
11:9,21 12:8,9,10
14:10,11,20,22
27:17 28:10
31:21,22 33:23
35:13 38:17 44:21
53:25 54:3,13
67:4,5 68:3 79:18
84:2,3 93:21
101:1,9 102:19

**farmers** 11:22
60:13

**farmhouse**
35:19,23

**farming** 14:25
15:5,6

**Farms** 10:17 11:5
12:12,16 13:16,17
39:7 54:14,15
88:7 116:7

**fast** 6:20

**father** 116:18

**fearing** 30:1

**February** 45:21

**fee** 64:13,14,16

**feed** 57:7,9,15
58:2,18 59:10,14
60:8,15,22 84:11,
15,17 87:6 88:5

**feel** 6:20

**feet** 59:3

**felling** 101:3

**felt** 74:1

**fiberglass** 31:21
62:7

**fictitious** 37:9,11
39:7,9 40:17
41:11,15,19,20
44:20,21

**field** 81:24 82:3
104:7,11

**fields** 81:24 82:3
85:5

**figure** 23:15

**figured** 117:14

**file** 44:1

**filed** 4:13 44:2,15

**filing** 4:4

**fill** 53:10 95:23

**fill-in** 96:11

**filled** 39:17 53:14

**financial** 13:22
15:19 48:4

**find** 115:18

**fine** 7:11 8:5
93:24

**finished** 9:5
40:16 61:21

**firewood** 68:14,
17,19 101:3,9,16,
25

**firm** 4:22

**fit** 74:2

**Flanagan** 38:6

**flexible** 99:21

**flip** 115:11

**Florida** 13:10

**fluid** 96:7

**follow-up** 61:8
120:3

**food** 81:21 82:2
94:18

**Foote** 4:22

**forget** 5:23 64:15
81:7 89:13

**form** 4:6 29:3
38:3 39:18 40:4
57:1 58:3 74:25
104:19 109:13
119:17

**formal** 91:9

**forward** 40:18
61:20 90:17
119:18

**foster** 13:4,10

**frame** 68:13 69:9

**Franchi** 4:21
5:13,16 6:4 21:13
29:6 40:7,14 44:6,
13 57:3 58:7
71:18 72:1 75:2
89:18,20 104:21
106:1,5,11 108:7,
10 109:15 117:24
118:6 119:9,13,25
120:6

**Fredericksburg**
43:4

**free** 6:20

**Fresh** 23:22 24:4

**front** 8:22 9:3
21:18 112:23

**fuel** 52:8 87:23

**full** 9:18 30:16
102:22

**full-time** 10:7
96:8 97:3,9

**fully** 6:23 8:13

**functioning** 92:7

**funeral** 111:8

**furniture** 68:3,4,5

---

**G**

**gainfully** 91:25

**garage** 78:13

**garden** 81:21

**Garman** 25:7,19

**gas** 96:15

**gate** 56:21 57:21
64:1,17 73:18
99:22

**gates** 31:19,21,24
32:12,20 33:13,
19,21 34:10 61:6,
12 62:5,9,13,14,
17,20 63:16,19
64:2,5,9,21 69:20,
23 99:15

**gave** 64:13

**gears** 112:18

**Gehman** 95:7

**general** 8:17
39:13 91:19
107:12 115:14

**generally** 14:18
15:6 48:8 51:7
77:20 106:16
108:16 109:9
112:24 113:10
116:21,24 118:9

**Gerald** 42:3

**girl** 13:4

**give** 6:8,14 7:24

8:25 17:19 18:8 21:6 30:19 36:21 49:14 55:10 56:5 57:12 61:2,3 70:4 72:5 74:1 78:4 88:24 96:3 105:10,13 108:22 109:1

**giving** 55:23 105:21

**Glen** 10:23

**goal** 91:19 92:18, 19

**goals** 21:1 104:6

**God** 30:1,21,22

**good** 5:14 33:4 110:9 111:3 112:14

**gosh** 21:2

**Gotcha** 38:24

**governing** 49:25

**government** 27:13

**grade** 11:19,20

**grain** 15:9 84:6, 16,17 88:5

**grandkids** 13:12

**ground** 85:2

**group** 18:3 64:1 86:23,24 98:17

**growing** 85:17

**grown** 81:20,25 82:4,11

**growth** 91:22 92:10,14,15

**guardian** 93:16

**guess** 7:23 16:3 19:13 28:20 30:14 31:1 32:1,25 34:3, 16 36:2,15 41:6 46:9,23 47:9 49:8 51:6 52:18 55:8 58:1,5 60:24 61:19 62:16 64:6 75:16 77:1,8,10, 24 84:25 86:1 88:24 94:15 96:18

99:9 100:9 110:9 112:14 113:11 119:2

**guidance** 20:22 39:14

**guided** 97:20

**guiding** 49:24

---

**H**

**Haas** 4:18

**half** 38:2,22 43:20

**halfway** 21:6 22:16

**hammer** 103:10

**hand** 50:4

**handbook** 50:4

**handle** 62:22 118:14

**handling** 31:6

**hands** 107:5

**happen** 94:5

**happened** 8:2 43:7 60:25 63:20 83:10 107:3 110:19

**harvest** 83:12 85:21,23 86:3,7, 11

**harvested** 82:4, 11,22 85:24 86:13,15

**harvesting** 85:14

**haul** 11:13 86:22

**head** 6:9 42:19 43:6 55:7 56:18 66:18 76:2 88:14 102:15

**header** 28:24 56:23

**heads** 77:22 98:22

**health** 31:10 51:20 109:22

**hearing** 27:20

**heat** 101:10

**held** 4:16 21:10 42:23 43:2 44:10 108:9 118:3

**helping** 18:23 24:17 76:16

**helps** 115:21

**high** 31:6 32:10

**hike** 100:13

**Hill** 4:17

**hire** 83:13

**hit** 103:10

**holding** 86:16

**holds** 41:21 114:6

**home** 10:12 12:9, 10 17:5,9 18:3,19, 24 19:1,23 20:7,8, 11,19 22:6,16 25:5 26:10 27:10, 18 28:25 31:16,18 36:3 37:4 39:11 66:1 80:1 81:21 92:18 100:9 110:10,11

**homes** 23:24 24:2 79:15

**honoring** 30:1

**Hoover** 34:25 35:5

**hours** 7:7 52:1,17 53:6 97:15 99:1,2 107:12,16,25

**house** 28:18,20 29:2,9 35:24 36:10,11,17,22 43:20 48:5 53:18 56:16 57:5 60:19 68:4 77:22 79:5, 12 95:11,19,22 96:6,8,11 98:5,24 100:8 106:19 115:12 117:17,19 118:11

**household** 65:19

**houses** 35:15 36:12 57:10

**Huber** 11:17

**hundred** 43:12

**hypothetical** 75:25 76:3,21 77:10

---

**I**

**idea** 16:3,8 23:10 64:15 73:12 116:4 117:15

**identified** 119:5

**identifies** 118:18

**identify** 30:5

**illustration** 77:12

**implemented** 18:24

**important** 8:10

**improve** 91:21

**inception** 36:15

**include** 30:15 114:7

**including** 119:20

**income** 51:2 115:13

**incoming** 116:24

**incorporating** 31:21

**incorrect** 73:6

**Indiana** 23:22

**indicating** 44:22

**individual** 29:18 30:3 34:25 51:4 72:12 75:21 89:13,23 115:12 119:23

**individual's** 78:25

**individually** 18:23 25:24

**individuals** 20:3 30:6 77:4 96:17

**individuals'** 95:3

**information** 23:2

72:10 98:20 113:13

**inmate** 111:8

**inmates** 24:7

**input** 83:14 113:13

**inputting** 114:16

**interact** 109:5

**interacted** 77:20

**interaction** 55:20,24 112:2 113:24

**interchangeably** 47:7

**interest** 15:19 22:9 49:20 93:23

**interested** 32:7

**interests** 13:18, 23 76:14

**internal** 68:8

**interstate** 11:15

**interview** 29:21 30:25

**interviewing** 30:9

**introduced** 5:16

**inventories** 80:9

**investigating** 20:19

**invoices** 116:6

**involved** 16:5,8, 11 17:4,8 21:21 23:2,4 25:14 26:13 27:12,16 28:19 29:1,14 31:2,23 33:3 37:10 45:8 51:4,8 52:19 57:5,9 63:23 68:18 69:8, 11 75:20 76:8 83:17,20,22,25 85:11,13 88:20 93:2 101:20 104:12,17,23 105:14 106:14 109:9,11,16,25 111:19

**involvement** 16:10,22 26:16,17 41:1,3 52:24 53:2, 3 67:25 69:7 82:23 83:1 85:12 87:17 88:3 111:1

**involving** 72:12

**issues** 6:2 112:11

**item** 25:6 26:10 27:10 28:24 31:16 118:16

**itemized** 115:15

**items** 11:12 81:2 115:12,13 118:10 119:16

**J**

**Jacob** 25:8,19 26:3 48:22 49:9

**James** 11:17

**Jane** 12:22

**Jason** 72:13 73:2 78:23 80:17

**Jersey** 11:14 13:10

**jig** 63:1

**job** 10:7 56:7 115:22,23

**jobs** 56:12 97:3,9

**Jocelyn** 5:1

**Jones** 72:12,13, 19 73:2,21 74:5, 11,21,22 78:23 80:17,25 81:15

**jump** 15:22 34:23 78:9

**jumping** 15:24

**June** 22:3,15

**Juniata** 27:4

**K**

**keeping** 114:15

**Ken** 4:18

**kind** 15:10 16:1 18:11 20:19,21 21:21 23:11 25:22,24 26:6 32:7 33:2 35:20 36:14 37:2,8 39:13 43:14 46:10 47:6,7,10 51:10 53:15,18 54:12 55:9 56:11,13,23 61:8,20 62:16 67:17 69:22 72:7, 9,10 73:5 75:11 77:24 79:22 83:20 86:2,23 88:16 91:19 97:19 99:10,11 100:14, 16 107:21,23 109:2,10 110:6, 17,25 111:11 112:17 116:10 117:15 119:22

**kinds** 30:24

**kitchen** 36:18

**knew** 90:10

**knowledge** 34:10 41:14,19 56:18 66:20 71:2 74:20 81:17,18 95:19 103:6 116:12

**Kyle** 34:25 35:5, 10

**L**

**labor** 31:22 51:24 52:6 86:11 118:24

**Lamar** 25:7,19

**Lancaster** 84:4

**land** 91:4 101:1

**Lane** 39:21

**laptop** 113:18 114:22

**large** 70:16

**larger** 81:24 82:3

**Lavina** 12:7

**law** 4:22

**lay** 63:1 85:8

**leadership** 46:10

**learn** 24:9

**learned** 19:18

**leave** 74:3 92:5 94:11 108:8

**leaves** 79:6,20

**leaving** 110:1

**Lebanon** 9:25 10:1,5

**ledger** 9:12 43:12 89:5 115:5,9,15 118:9

**ledgers** 43:9 112:19,25 113:3, 6,11 116:22 119:23

**left** 110:5,9

**legal** 37:7 109:3

**legs** 7:10

**length** 102:25

**level** 11:18

**levels** 107:21

**Liberty** 13:19,24 16:2,9 17:6,9 20:8 23:8,15 24:17 26:14 27:3,11 28:15 29:25 31:22 32:3 33:18 34:11, 15 35:6,12,20,22 36:2,7 37:2,5 39:6,22 41:2,14, 17,22 42:6,9,13, 24 43:25 44:15,21 45:5,9,14,19 46:10,21 47:21 48:8,10,13,18 49:1,7,13,21,23 50:10,23 51:6,7, 13,18,22 52:5,19, 24 53:24 55:12 56:4,13,17,24 57:9 58:2,10 59:14 60:3,15 61:4,5,12 64:3,5, 19,22 65:7,13,18 66:17,22,24 67:7, 9 68:1,11 69:4,5 70:1 71:2,11 72:4, 16,19 73:17,21 74:3,4,17 75:24

**lived** 10:5 38:10

**lives** 12:25 13:9, 10 23:23 24:5

**livestock** 65:17

**living** 31:11 97:12

**LLC** 31:19 41:18

**Lloyd** 4:19

**loan** 116:13

**loans** 116:25

**local** 14:2,4 57:18,19 66:8 68:20 70:14,15 73:8

76:3,18,21 77:2 78:21 79:25 80:11 81:20 82:18 83:9, 12,13,16 84:1,2,6, 12 86:10 87:17 88:22,23 89:9 90:2,13,16 91:5, 14,19 92:4,5,13 93:17,22 94:20 95:9 96:18 97:4,7, 9,11 98:14 104:3, 17,22 107:3 108:11,20,25 109:12,18 110:1 111:3,15,19,21 113:4 114:8,13,16 116:13,14,19 118:21

**life** 30:21 38:25 39:1 111:3

**lift** 89:24,25 90:1

**lifting** 89:17,18 90:8

**light** 7:1

**line-by-line** 118:16 119:15

**lines** 61:10

**list** 72:8 77:17 105:24 111:6

**listening** 105:24

**lists** 40:22 41:4,7

**live** 10:3 11:1 12:23 13:8 38:11 58:12,14,16,18 67:11

**locate** 59:12

**located** 11:25 73:7

**location** 38:13 73:22

**locations** 58:21 60:8

**logo** 88:7

**logs** 68:16 101:12,13,17

**long** 10:18 16:20 18:15 54:18 64:21 76:17 85:23 110:13

**looked** 19:2 26:18

**loosely** 21:21

**lot** 14:24 15:7 53:20 62:13 71:14 73:4 92:11 93:12 94:18 105:23

**low** 85:16 87:8

**lowest** 84:7

**LRF** 37:21

**LRF-36** 21:6

**lumber** 72:12,20 73:21 74:5,9,12, 21,22 80:25 81:1, 15

**lunch** 7:8

**M**

**M-A-R-T-I-N** 9:21

**machine** 62:1,2, 18,23

**machinery** 33:24 52:9

**made** 33:23 36:10 39:8 50:14 61:23 62:5 68:2 79:22 91:3 99:10,11

**main** 24:19 36:17 95:19 118:16

**maintain** 28:14 113:3 115:21

**maintained** 28:3, 5 83:5

**maintaining** 97:8 117:19

**maintenance** 85:16 100:6

**make** 6:13,18,23 7:18 9:2 32:10 36:17 37:22 45:5 68:16 75:8 76:10 79:7 81:6 83:19 88:23 100:13 114:6 117:10

**makes** 43:21

**making** 49:6 53:17 99:22

**man** 57:21

**management** 33:22

**manual** 103:7

**manufacture** 31:21

**manufacturing** 13:11 33:24

**Margolis** 4:16,24 5:1

**markers** 77:9

**market** 58:6 84:4, 7

**markup** 87:10,11

**married** 12:19 13:10

**Martin** 4:11,12 5:6,14 9:19 12:7, 22 21:14 25:7,8 37:14,24 38:6 39:19 40:24 43:22 44:4 45:3 118:8, 17 119:1,3,20 120:3

**Marvin** 95:6

**match** 76:10

**matched** 76:15

**material** 62:5

**materials** 61:19, 22 70:8

**matter** 4:12 5:20 113:18

**matters** 5:20,25

**maul** 103:1,8

**Mcalisterville** 39:21 70:12

**meaning** 109:3 118:20

**means** 91:25

**meant** 75:13 99:20

**mechanical** 76:13

**Mechanicsburg** 78:13

**Media** 71:23

**medication** 109:23

**meeting** 20:14 21:19 22:3,10,15, 17 31:15

**meetings** 16:14 20:12 49:7 55:17 98:17

**Meghan** 4:24

**Melvin** 95:6

**member** 53:4,5,6 92:7

**members** 15:18 19:12,14 22:11 25:6 31:1 48:17 52:14,23 53:14 79:13 106:22

**members'** 79:15

**men** 30:1

**Mendez** 5:1

**Mennonite** 16:6 19:11 23:25 24:5 39:14 51:15

**mental** 31:10 51:20 109:22

**mention** 80:9

**mentioned** 30:13 33:12 46:19 75:9

**mentions** 22:19 27:10 33:25

**mentor** 74:7 98:4 102:14 111:25

**mentors** 28:19, 20 29:2,9,21,24 30:4,10,12 31:2,4 46:18 48:5 49:10 53:18 63:2 77:23, 24 96:13,23 97:10 98:12,19 99:1 102:24 103:1,22 106:19

**mere** 109:3

**Messianic** 16:6

**metal** 62:13,14

**middle** 69:18

**migrating** 43:15

**mile** 38:22 43:20

**miles** 27:8 70:12

**milestone** 77:9

**milk** 54:10

**milked** 38:25

**Miller** 5:18 76:21 108:13 111:14

**mills** 84:11

**mind** 112:13

**minister** 71:14

**ministry** 29:20

**minutes** 8:19 21:19 22:3,15 31:15,18

**Mission** 16:6,7,8, 11,13,14,23 17:14,15,21 18:19 19:9,12 20:3,12, 18,21 21:19,22 23:3 26:23 33:18 39:5,13,25 47:22, 25 48:9,13,17,23 49:6,10 88:25 89:3,7 90:5,14,15, 17,20 91:3,15 106:23 107:2

**Mission's** 17:4 27:1

**missions** 16:12

**Missouri** 23:23 24:24 34:24

**Mm-hmm** 9:15 11:7 13:7

**MMM** 22:9 28:10

**moment** 55:11

**monetary** 26:15

**money** 60:14 68:10 84:12 94:16 116:14

**monitor** 120:8

**month** 94:2,6 96:9

**monthly** 95:11 96:14 116:18

**months** 46:7

**morning** 5:14

**mother** 32:15 34:20 35:9

**move** 8:20 25:4 43:7 61:9 63:10, 14 88:12,13

**moved** 13:6 37:3 43:5

**moving** 27:9 34:11 53:21 61:20

**Mow** 100:7

**mowing** 100:10

**Myerstown** 10:11 11:1 14:19 27:7 37:18 38:14 43:20

**N**

**named** 34:25 72:12

**names** 12:6 49:9 67:16 72:8 73:4 95:3 105:10,12

**national** 14:2,6 43:3,4,19

**nature** 29:12 118:25

**nebulous** 19:20

**necessarily** 47:24 48:9 53:9 78:2 118:20

**needed** 19:16 56:1 63:16 75:10 76:5 85:21 99:5, 12,18 110:23

**neighbor** 11:13

**neighbor's** 11:16

**neighboring** 84:4

**Nel-ray** 10:17 11:5 13:16 83:25 87:2 88:7 116:7, 13

**Nelson** 4:11,12 5:6 9:19 25:7 38:6 40:24

**nice** 36:18

**niche** 53:15

**nod** 6:9

**nodding** 43:6 55:7

**Nolan** 32:15 33:1, 8,10 34:20 61:22 63:21

**Nolt** 42:3

**non-verbal** 6:8

**normal** 100:16,18 107:16

**north** 57:17

**notated** 80:8

**notation** 43:10 78:11

**note** 31:18 75:8

**noticed** 65:12

**November** 45:17

**number** 4:14 7:21 8:25 22:4 39:10,20 42:15, 16,17 54:24 71:24

**numbered** 8:23

**Numbers** 115:2

**O**

**Objection** 29:3
57:1 58:3 74:25
104:19 109:13

**objections** 4:5

**observation**
49:17

**observe** 48:18
107:17

**observed** 107:24

**obtaining** 27:12

**occasion** 105:5

**occasionally**
11:15 56:9,10
85:20

**occupational**
98:14

**occurred** 8:4
18:23 117:12

**October** 4:10

**offer** 89:17,18,22

**offering** 89:15,25
90:1,9

**offerings** 89:4,6
90:12 91:13

**offhand** 95:5

**office** 28:15

**officers** 40:23

**official** 25:22

**older** 103:20

**onward** 82:5

**opened** 35:22
36:3 42:9 46:21,
24 56:17

**opening** 18:3
45:13

**operate** 102:17

**operated** 39:12
47:4 54:16

**operates** 47:12

**operating** 22:21
23:7 54:3,19

66:16 80:15 89:7
94:17,19 117:18

**operation** 11:6
24:22 34:16
57:22,23 70:16
91:6

**operations** 98:13

**opportunity**
119:2

**organizations**
23:25 24:5

**organized** 18:12,
19

**organizing** 51:5
53:20,22

**orientation**
29:22 30:13,14

**outline** 22:24

**overarching**
99:9

**oversees** 47:22

**oversight** 47:20

**owe** 94:2

**owned** 10:18
39:24 88:7

**owner** 40:24
41:4,5,7,8,9,12
44:22 70:24 73:2,
9

**ownership** 13:18
15:19 73:14

**P**

**p.m.** 120:11

**PA** 10:11 38:7
39:21

**pages** 21:19
40:18

**paid** 16:25 51:3
52:8 57:24 60:12
64:18 68:24 69:4
70:18 71:6 83:14
84:24 86:25 87:23
90:11 91:5 93:20
94:8,21 95:1
101:18,19

**paint** 61:25 62:23

**painted** 62:19

**painting** 62:2

**pallet** 69:6 70:1,6,
7,10 72:3 73:17

**pallets** 69:21
70:3 71:7 99:2,14

**paperwork** 27:23
33:17 37:5,9 44:3,
23 80:8

**Paraguay** 16:19
21:23

**parcels** 26:11

**pardon** 42:4

**parent** 94:5 95:19
98:5

**parents** 11:22
12:4,14 13:18
18:8 19:2 28:19,
20 29:2,9 30:23
36:11 48:5 53:18
54:3,7 77:22 79:5,
12 92:16,17,19
93:15 94:12,15
95:11,22 96:6,8,
11 98:24 104:2
106:19 116:25

**part** 13:9 16:14
33:1 34:16 54:2
102:3 115:14

**participate** 48:18

**participated**
93:6

**parties** 4:3

**parts** 53:21

**pass** 12:14

**passed** 12:17
54:7

**passive** 49:17

**past** 29:20 68:1

**patience** 93:12

**pause** 44:6 71:18
106:1

**paving** 118:22

**pay** 50:24 85:4

86:10 91:15
93:16,24 94:6,11
96:15 113:18
114:21 116:14

**payable** 115:6
116:7,23 117:6

**paying** 34:20
60:18 91:1 116:19

**payment** 60:16
74:18 91:3

**payments** 88:24
94:14

**peeps** 58:15

**pending** 7:15

**Pennsylvania**
4:14,18 10:1 19:6,
11 35:5 39:14
40:22 51:14

**penny** 90:19

**people** 32:17
46:18 62:14 71:15
86:20

**percent** 43:12

**perfectly** 7:11
8:5

**perform** 91:20
107:18

**performed** 74:21

**period** 55:9 56:4
80:5 88:18

**person** 25:11
49:3 51:11

**personal** 14:7,15
38:8,9,19 45:4
78:25 114:10

**personally** 28:2
45:6 83:7,9

**personnel** 28:18

**Philip** 95:8

**physical** 39:21
48:17 107:25

**physically** 55:11
107:8 110:3

**pick** 56:2 63:21
65:13 67:11
110:23

**picked** 110:24
111:7

**pickup** 67:2

**picnic** 79:18

**picture** 81:11

**piece** 59:9

**pigs** 65:21,24
66:10

**place** 35:11 36:21
50:10 53:10 58:17
69:22 86:14
110:16

**places** 12:2
24:14,21 66:7

**placing** 18:3

**Plaintiffs** 4:23
5:17

**plan** 26:7

**planing** 81:6

**planning** 18:6

**plant** 13:11 54:10
84:22,24

**plot** 35:13 81:21
82:2

**plots** 14:20,22,23

**PLS** 37:20

**PLS-56** 37:20

**PLS-62** 40:19

**point** 7:8 18:18
33:22 51:10 61:1
70:21 75:16 90:21
110:10 119:17,21

**policies** 50:14,17

**policy** 50:6,7,9,
10

**populate** 63:2

**portrays** 116:11

**position** 16:16,
25 42:5

**pound** 61:2

**precipitated**
105:20

preliminary 5:20,25 6:2

preparation 36:6,10 46:4 113:11

prepare 9:9 37:9 113:2

prepared 113:8

preparing 45:8

prescription 109:22

present 30:4 36:16 74:14

presented 22:25 31:19

presenting 23:2

president 47:15

pretty 44:4 59:5 75:18 85:16,23 87:8 97:15 98:4 112:13 115:25

prevent 8:13

price 84:7 87:5

primary 96:19

Prints 114:22

prior 16:8,23 17:5 32:18 33:10 51:18 111:15

prison 24:7 111:7

problem 67:12

Procedure 24:22

process 29:12 60:24 76:4 114:14

processed 102:23

processing 54:10 58:9 81:1,3, 4

product 61:21 63:14 74:9 75:4 79:23 87:24

productive 119:22

products 11:8 34:11 56:24 63:10

67:6 74:23

profit 32:10 64:10 68:6 74:24

profits 64:11,12 68:23

program 74:1 75:10 77:11 79:25 92:24 94:11 110:3,5,9 117:13

programing 51:22 75:16,21 76:5

progress 76:25 77:3

project 25:12

projected 23:9

projects 52:24

properties 14:16 15:2 78:21,25

property 10:12 11:24 12:2 14:11 26:11,14,18,19,22 27:4 35:21 36:6, 14,25 38:20 39:24 48:17 49:13,15 55:12 58:24 59:9, 14,18,21 60:5 61:13 63:5 64:3 65:18 72:20 80:10,19 82:8 88:12 89:3,8 90:24 91:2,8,15 100:3,6,21 102:1 105:9 106:23 107:7,11,16 117:20

proposal 31:19 33:12 79:10

provide 20:22 36:18 70:7

provided 50:9 112:19 113:7 118:21

providing 33:22

purchase 26:13 33:24 36:2

purchased 26:12,22 35:22 85:1,8

purely 65:25 66:12

purpose 55:16 65:7

pushed 62:1

put 5:24 37:4 39:5,6 41:12 43:19 57:11 62:18,22,24 85:1 115:24

Puts 114:22

## Q

quarters 36:18

question 4:6 6:17,21,22 7:2,3, 15,17 53:1 97:22 99:10 119:3

questioning 30:20 118:8

questions 5:19 6:7 8:17,21 9:4,6 22:20 23:5 37:23 61:8 106:13 113:1 119:15 120:1,3,5

quick 43:8 75:5

quota 63:15 71:10

quote 91:21 96:18

## R

R.M. 4:12

rack 62:24

rail 62:1,7

rails 62:22 63:1

raise 58:15

raised 58:18 60:22

ran 29:20

Ranch 23:22 24:4,24 34:24

re-acclimate 75:11

reached 21:16

reading 4:3

real 43:8

reason 6:20 7:11 43:18 84:5 104:23 106:23 107:9

recall 7:22 17:18 18:22 20:2 22:17 23:1 24:14 25:9 29:12 32:13,23 33:16 34:9,22,24 35:4 38:3 39:17 43:9 45:14 46:1 48:15 50:13 56:22 57:4 66:25 68:12 72:22 76:1 80:2 88:15 94:9 100:11 105:14 108:4,17 109:19,20 110:6, 8,19 112:5,11 116:9 119:20

receipts 114:16

receivable 115:6 116:17,22 117:5

receive 51:17 52:4 74:17

received 44:18

receiving 56:24

Recess 40:11 71:22 106:8

recognize 37:24

record 5:25 9:17 21:10 22:24 40:8 44:7,10 108:7,9 117:25 118:3,12 119:11,17

recorded 48:6

records 88:16 118:14,18 119:4

recruitment 28:20 29:1 104:18 109:9

redirecting 109:17

refer 8:24

referring 22:10 39:12 55:9 78:18

reflect 116:24

reflected 117:10

reflecting 27:24

registered 12:11 67:8

registration 37:5 40:17 44:19 66:21

regulations 51:24

reject 93:1

related 11:8 19:9 43:24

relates 45:4 51:25 61:6 87:24

relating 51:19 77:4

relationship 20:18 30:22 34:4 59:10

relatives 19:8

relocated 34:14

remain 26:25

remember 8:7 13:14 17:2,15 25:1 34:1,2 35:2 42:5 43:7 64:7,22 67:19 80:5 81:11 105:20 107:10 109:14 110:10 111:21 112:1

reminder 75:7

remodel 46:4 52:8 55:18

remodeling 36:11,12 56:1 87:20

removal 87:1

remove 59:22,25 60:23 83:11,12,15

removed 94:10 105:17

Renee 4:21 5:15

renovations 36:5

rent 60:16,18

85:4,5 91:4

**repeat** 6:1,22

**report** 20:23 21:1

**reported** 22:8

**reporter** 4:19 5:4

**reporting** 48:8
49:8

**reports** 47:24
49:6

**represent** 4:25
5:2,17

**representative**
59:13

**representatives**
28:10

**required** 71:11
102:6

**research** 23:14

**reserved** 4:6

**reside** 27:7 104:3

**residence** 35:16
79:5

**residences**
96:20

**resident** 45:15,
23 46:2,25 74:7
75:16,21,23 76:1,
3,17,24 77:10
105:16

**residential** 14:21

**residents** 27:11
31:22 36:7 46:18
55:21 56:5,20
72:19 73:22,25
74:5 75:9 76:7
77:21 78:1,4,14,
22,24 79:14,24
82:24 83:2,17,18
91:20 94:10 98:2,
20 103:1,13
104:3,25 105:10
106:15,18 107:17
109:10 117:13
118:24

**residents'** 104:2

**respect** 77:12

**respective** 4:3

**response** 6:9 7:2

**responses** 6:12,
14

**responsibilities**
19:25 30:20 50:22

**responsibility**
25:25 93:5 113:2

**responsible** 30:2
46:17 51:1 56:15
65:9 66:9 67:9,15
83:6 115:25

**rest** 13:5 26:18

**restrained** 107:8

**restriction** 7:14

**restroom** 7:10

**retain** 64:10
68:22

**retained** 64:12

**retire** 33:2,9

**retrieve** 113:14,
20

**return** 92:18

**returns** 45:5,6,9

**reviewed** 9:12,14

**Richland** 38:7

**rid** 69:20

**ride** 82:22

**rideable** 102:19

**Ridge** 13:19,24
16:2,9 17:6,9 20:8
23:8,15 24:17
26:14 27:4,11
28:15 29:25 32:3
33:18 34:11,15
35:6,12,20,22
36:3,7 37:2,5
39:7,22 41:2,14,
18,22 42:6,9,13,
24 43:25 44:15,21
45:5,10,14,19
46:10,21 47:21
48:8,10,13,18
49:1,7,13,21,23
50:10,23 51:6,7,
13,18,23 52:5,20,

24 53:24 55:12
56:4,13,17,24
57:9 58:2,10
59:14 60:3,15
61:4,5,12 64:3,5,
19,22 65:7,13,18
66:17,22,24 67:7,
9 68:1,11 69:4,5
70:2 71:3,12 72:4,
16,19 73:17,21
74:3,5,17 75:24
76:3,18,21 77:2
78:21 79:25 80:11
81:20 82:18 83:9,
12,13,14,16 84:1,
2,6,12 86:10
87:18 88:22,23
89:9 90:2,13,16
91:5,14,19 92:4,5,
13 93:17,22 94:20
95:9 96:18 97:4,7,
9,11 98:15 104:3,
17,22 107:4
108:12,20 109:1,
12,18 110:1
111:4,16,20,22
113:4 114:8,13,16
116:13,14,19
118:21

**risk** 31:6 51:19

**road** 38:6,23

**roaming** 97:23

**Robert** 5:18
76:21 108:13,24
111:14 112:4

**Robert's** 112:13

**Rohrer** 95:6

**role** 105:5,7 113:1

**roles** 53:13

**rotate** 15:12
82:15

**rotating** 95:25

**Ruby** 95:20

**rules** 5:21

**run** 23:16,24 24:5
60:11

**running** 53:25
108:1 110:2

**runs** 13:11 24:2

## S

**safe** 48:7 105:4
111:18

**safety** 98:18

**salaried** 95:10

**salary** 94:23 95:1

**sale** 63:23,24

**sales** 63:15 71:10

**sawmill** 36:24
37:1 80:9,10,13,
15

**saws** 103:13,24

**schedule** 91:21
95:25 99:11,16
100:17 104:6

**school** 93:3 95:7

**Scott** 25:7

**screening** 29:11,
17 30:9

**sealing** 4:4

**season** 84:21
85:24

**secondary** 99:6,
22

**seconds** 21:7

**secretary** 26:4
47:15,16

**secular** 24:6

**Security** 42:15

**seed** 84:25 85:7

**seek** 30:6 32:20,
21,24

**sell** 60:23 68:20
79:23

**selling** 71:7
101:21

**semblance**
106:24

**Senate** 4:17

**send** 65:12 93:16

**sense** 6:18 7:18
43:21

**Sensenig** 67:20,
24

**sentences**
107:22

**separately**
115:15

**serve** 17:11 20:4
29:10,18,19,25

**service** 118:21

**services** 60:16
118:25

**set** 31:20 37:21
50:13 117:15

**settlement**
26:20,21

**shake** 6:9

**share** 25:24

**She'll** 115:24

**shed** 13:11

**shop** 31:20 35:25
36:19,20 61:14,15
67:21,24 68:11,18
69:22

**shorter** 76:21

**show** 63:12

**showed** 67:17

**showers** 97:16

**siblings** 31:1

**side** 11:4 29:17
85:14

**sideline** 10:8
100:14

**sign** 117:23
118:22

**signatory** 41:25

**signature** 40:5

**signed** 41:10

**significantly**
87:6

**signing** 4:4

**signs** 117:22

**simply** 8:6 74:21

**sisters** 30:23
31:12

**sit-downs** 98:8,
12

**site** 74:22

**sitting** 93:10

**situation** 106:24

**skid** 70:4

**skill** 76:16

**skills** 32:6,8 33:5
36:21 56:16 71:17
76:9,10 91:23,25
92:5,22 98:17
99:6

**skip** 31:13

**skipping** 32:1

**slaughter** 66:3

**slaughtered**
58:11

**sleeping** 36:18

**slit** 62:1

**small** 35:25 36:19
59:8 61:14,15,16
81:21 82:2

**smallest** 115:1

**Snyder** 31:19,24
32:12,15,20
33:13,18,21
34:10,12,20 61:6,
12,22 63:4 64:6,8,
21

**Social** 42:15

**society** 74:2
75:12 92:6,7

**software** 113:16
114:19,21

**sold** 54:7 63:22
64:8 68:5 74:23
84:13

**solicited** 89:10

**soliciting** 89:15,
22

**son** 13:4,10 33:1

**sons** 13:2

**sort** 28:14 29:11
30:12 63:15 71:10
74:9 78:22 79:16
80:1 88:24

**sorts** 58:8 103:3

**sought** 32:22

**sound** 89:22

**sounds** 53:14

**sources** 113:13

**South** 16:12

**soybeans** 15:11
82:14 85:15

**space** 28:12

**speaking** 9:10
32:14 106:16

**specific** 8:1,21
31:5 51:17 69:15
93:19 96:5 113:1
119:15

**specifically** 7:22
8:3 17:16 31:16
32:13 51:14 88:16

**specifics** 76:1

**spell** 9:20

**spend** 24:8 52:23
99:1

**spent** 76:18

**spiritual** 91:21
92:9,13

**split** 64:10 68:16
101:14 103:1,11

**splitter** 103:2

**splitters** 103:5

**splitting** 102:21
103:8

**spoke** 6:19 13:24
42:4

**spoken** 8:18
13:17

**sporadically**
20:15

**stab** 7:23

**staff** 55:17 96:18
98:17

**stamped** 112:22

**standpoint** 18:25
26:15 52:6 83:25

**stands** 112:9

**Stars** 84:23 86:4,
5,7,14

**start** 5:19 10:20
16:1 23:22 24:4
25:14 37:23 62:16
108:22 114:25
117:14

**started** 5:24 9:6
10:19 23:11 26:3
43:3 69:18,21
72:4 95:10 107:21
118:7

**starting** 8:16
17:5 19:3,24
61:19 84:20 118:9

**starts** 42:20

**state** 4:20 41:12

**stated** 91:19

**States** 4:13

**stay** 104:5 110:13
116:19

**staying** 110:15

**stenographer**
6:11

**step** 22:22

**steps** 58:9

**stipulated** 4:2

**STIPULATIONS**
4:1

**storage** 84:2

**store** 68:21 84:3,
10

**story** 59:4

**straight** 43:17
90:15

**stretch** 7:10

**structure** 19:19
20:15,16 46:10,20
47:9,16 94:25
100:25

**structured** 46:24
47:1 91:21 95:14

**structures**
35:14,24 36:1
100:22

**studies** 93:3

**study** 93:3

**stuff** 55:18

**stump** 105:17
108:6

**subject** 15:24
119:20

**subjective** 77:5,
15

**submits** 45:10

**substantial** 59:5,
9

**suggested** 93:21
94:1

**Suite** 4:17

**summarize**
119:10

**supervise** 63:12

**supervising** 63:9

**supervision** 98:4

**supplying**
118:22

**support** 17:25
18:8

**supporting** 97:1

**supposed** 97:21

**swear** 5:4

**switch** 112:18

**T**

**table** 62:22

**takeaway** 118:16

**taking** 59:20
66:10 102:5

**talk** 21:4 91:24
101:2

**talked** 41:11
44:19 56:21 61:7

98:16 118:19
119:10

**talking** 15:6
32:12 38:14 46:7
56:5 61:11,16
72:2 76:25 78:9
81:15 97:25 98:9
100:4 101:5
106:13 107:21
110:1,2 114:12

**talks** 22:2 25:6
28:18 33:21

**targeted** 8:20
19:4

**task** 22:12 56:6

**tasks** 77:8 100:2,
10

**taught** 92:25

**tax** 42:16 45:5,6,9

**taxes** 43:24 44:1

**teach** 32:5 33:4
57:12 76:14 92:21

**teacher** 95:7

**team** 23:22 24:4,
24 34:24 57:13
61:25 107:6

**teens** 51:19

**temporary**
110:17,18

**ten** 16:21 53:6

**term** 39:16 47:6
89:14,16,21

**terms** 47:10 59:8
92:9

**testified** 5:7

**testify** 8:13

**testimony**
118:20

**therapeutic** 31:9

**therapy** 76:4

**thing** 6:5 8:10
18:11 33:4 34:2
41:10 53:19 79:18
82:21 100:15
112:14

**Witness Nelson Martin** 13

**things** 15:7 20:23 24:7,16 30:24 48:14 88:12,13, 20,21 92:11 99:13,24 104:6,9 106:15 107:4

**thinking** 110:12

**third-party** 32:2

**thirds** 25:5

**Thompsontown** 26:11

**thought** 33:3 78:8

**thousand** 116:8, 9,13

**throw** 67:16

**time** 4:6,10,20 7:22 8:25 9:1,17 21:8,11 22:15 24:8 25:9 26:9 30:21 36:13,20 40:9,12 42:11 44:8,11 46:2 48:12 49:8 52:9, 17,23 53:23 54:3 55:9,12,21 56:4 58:25 59:15 64:25 68:13 69:8,15 71:20,24 76:22 77:1 82:8 85:21 88:18 94:9 95:12 99:23 105:15 106:6,9 107:18 108:11 111:22,23 118:1,4,13 119:6 120:2,8

**times** 24:23 56:3 97:18 98:21 105:13,23

**Title** 40:24

**today** 4:9 5:15,22 6:14,24 7:7 8:11, 14,19 9:5,9 99:2,3

**today's** 59:8 71:24 120:8

**told** 21:20 104:4 109:6

**top** 28:24 42:19 46:11 56:18 66:17 76:2 88:14 116:6

**township** 27:10, 12,18,22,24

**track** 114:15

**tractors** 103:6

**Tracy** 4:19

**traditional** 47:8, 14

**trails** 100:13

**training** 30:13 31:5,8 33:22 51:18 98:10

**trainings** 98:9, 10,12

**traits** 29:24

**transaction** 115:9

**transactions** 116:10 117:12

**transcript** 4:4

**transfer** 84:1 87:3

**transition** 15:23 18:22

**transport** 84:11 88:5

**transportation** 66:21 67:6

**transported** 79:15

**travel** 16:16 23:18

**traveled** 24:20

**traveling** 24:9

**treasurer** 41:23 42:7,8 50:22 52:12,19,21 53:2 113:2

**tree** 81:6 102:4,22

**trees** 101:3,21 102:1,6

**trial** 4:7

**triaxials** 101:12

**troubled** 17:25

**truck** 10:9 88:6

**trucking** 11:3,8 78:12

**trucks** 65:13 86:19,20 88:4 117:23

**truth** 8:11,14

**turn** 8:25 18:19 21:5,15 26:8 37:19 40:2,18

**Turning** 28:17

**type** 6:12 15:5 30:8 47:16 49:24 52:1 74:4,10 78:12 79:18 102:13

**types** 48:3 82:10

**typing** 6:11

**U**

**uh-huh** 6:9

**umbrella** 56:14 83:8

**uncertain** 8:7

**understand** 6:18,21,23 97:14 117:12

**understanding** 19:15 50:8 81:20 83:20 91:18 96:22 103:21 106:17,21

**understood** 7:3 69:6

**United** 4:13

**unmarried** 96:23

**unquote** 96:18

**uploaded** 114:18

**user** 41:25

**V**

**vague** 92:10 112:13

**van** 67:2

**varied** 105:23

**Varner** 39:20

**vehicles** 66:23 67:1,7

**verbal** 6:8,12,14 7:2 33:14 34:1

**Vernon** 95:7

**versus** 100:21

**vice** 47:15

**visit** 49:12

**visitor** 111:6

**visits** 56:3

**vocation** 74:3

**vocational** 32:5, 8 33:4 36:21 56:16 71:16 76:9 92:22 99:6

**voice** 21:3,4

**voluntary** 29:19 52:7,16 53:12

**volunteer** 16:25 17:1 87:1,2,13,15

**volunteers** 97:5

**W**

**wait** 9:2

**waived** 4:5

**walk** 116:5

**walked** 110:6

**wanted** 17:22 18:2 32:6,10 64:1 71:15 74:1 105:17 110:15 118:17

**Wayne** 70:23

**ways** 47:11

**Weaver** 25:7,20 26:4 95:7,19 96:3

**website** 40:22

**week** 52:18 53:6 55:15 59:15,16

**weeks** 16:21

**welding** 62:14

**welfare** 99:18

**Wengerd** 69:6 70:10,23 72:3

**Wheat** 15:13

**wheelhouse** 65:15

**wife** 95:20 115:23

**wife's** 12:21

**wood** 62:9 102:22

**wooded** 100:13, 21,23

**wooden** 62:9

**woods** 101:4,6 102:10

**woodworking** 36:22

**word** 75:12

**worded** 6:19

**words** 6:12 32:10

**work** 11:4 18:10, 18 22:24 24:6 32:3,6 33:10 34:21 36:5,9 37:7, 8 46:6 51:18 52:1, 5,19 55:4 56:6,20, 25 57:2,6,13 58:2, 9 61:11 64:21 72:20 73:17,22 74:3,4,11,14,21, 23 75:17 78:14, 22,25 79:16 80:1, 16 82:17 87:15,23 91:20 92:12 98:11 105:17,18 107:5, 12,16 108:1 109:1 114:24 115:24

**worked** 11:21 23:12 52:1

**working** 19:1 22:9 25:12,21 34:4 52:23 72:4 94:7 99:14 108:11 114:20

**would've** 29:17 62:21

**write** 107:22

**writing** 33:14 107:22

**written** 34:1
59:11 94:1 119:17

**wrong** 27:3 67:23
71:6 73:16 89:21
91:13

**Wynkoop** 4:24
6:3 29:3 57:1 58:3
74:25 89:17
104:19 106:3
109:13 119:9,12,
24 120:4

———————
Y
———————

**yard** 100:7,10

**year** 45:24 48:2,4
49:8 54:22 65:23,
24 82:14 85:7
86:8

**yearly** 114:3

**years** 8:4 18:17
54:21,24 55:3,6
64:23 66:16
111:12 113:7

**yesterday**
112:20

**young** 30:1

**youngest** 13:2

**youth** 31:6 98:11

# EXHIBIT D

# Liberty Ridge Farm

### Resident Application - Parents

Name of youth _David Edward Cross_          Date _10-08-11_

Address _1561 E. Newport Rd._          Age _15_

_Lititz, PA 17543_          Parents _Bill & Joann Cross_

Congregation _Blue Rock_

Race _White_          Adopted – (Yes)- No    _Age @ Adoption_ _____

1. Describe the situation that has led you to contact Liberty Ridge Farm. _It doesn't work for him to be at home with his sibblings._

2. Describe his pattern of misbehavior _Hyper, instigator, rebellious, anger_

3. Describe any physical limitations he has. _None_

4. How does he express anger? _Unreasonable, threatening_

5. Has he ever been abused (physically,) verbally, (sexually?) (*Circle those that apply*)
   Describe that abuse _Happened before he was adopted! We do not know details._

6. Does he struggle with depression? _no_    If yes explain his struggle _____

7. How does he relate to his peers? _Enjoys stirring up trouble._

8. How does he relate to his siblings? _Same as #7_

9. Has there been a death of anyone close to him in recent years? _No_
If yes, how did he relate to that death? _____

10. Describe his school life. _Learning was difficult._
_Certain concepts he never could retain._
_(Peer m Meth )_

11. Explain the methods of discipline you used on this child (what worked, what didn't work)
_Spanking, taking away privileges, standing_
_in a corner, sitting with hands folded_
_Sometimes none worked._

12. What seems to be the most difficult thing for your child to do? _Stay focused._
_He has been on medication for ADHD, prescribed_
_by a doctor at Philhaven._

13. Describe a typical meal time in your home. _Most of the time_
_we ate as a family. Discussing the_
_day's happenings or what we plan to do_
_was a normal discussion._

14. Describe how you communicate with your family. _We talk_
_together._

15. What hobbies does your child have? _None_

16. Has your child ever had access to alcohol, drugs, tobacco? If so explain. _No_

17. Will you support and submit to the Liberty Ridge Farm guidelines? _Yes_

Signature
Father _Bill Gross_ Mother _Joann Gross_ Guardian _____

Mar 26 12 04:10p  James Sensenig  2178562367  p.5

03/26/2012  18:58  15058615993  RIO GRANDE ENT  PAGE 02

MAR 10 2012 12:58PM  LMANR GARMAN  7173368436  PAGE 1

505 861 5993

# Liberty Ridge Farm
### Resident Application - Parents

Name of youth __Robert Miller__  Date _____

Address __133 Sonnenberg Corp__  Age __17__

(Home) __Belen, NM 87002__

Parents __Allen + Virginia Miller__

Congregation __Belen Mennonite Church__

Race _____  Adopted — Yes No

1. Describe the situation that has led you to contact Liberty Ridge Farm. _We were unable to help Robert, partly because his word was taken above ours, and thus he wasn't held as accountable as he should have been. We took him to another home in hopes that things would go better, but his same problems showed up._

2. Describe his pattern of misbehavior. _He is disrespectful, feels he is an authority, demanding. If he wants to take part in some special activity (or communion time approaches) he does better for a time, up to several weeks. After the occasion is past he reverts to his misconduct. Was untruthful._

3. Describe any physical limitations he has. __none__

4. How does he express anger? __more a smoldering anger.__

5. Has he ever been abused physically, verbally, sexually? (Circle those that apply) Describe that abuse. _We know he had the "shaken baby syndrome" before he was placed with Virginia's parents as a foster child at 1 years old. He showed signs of fear the first months with them. He was with them about 5 years, but in (see below)_

6. Does he struggle with depression? __no__  If yes, explain his struggle.

7. How does he relate to his peers? __satisfactorily - Decent After church he spent more time with younger boys who looked up to him.__

8. How does he relate to his siblings? __generally satisfactory.__

5 cont. _that time he had overnight + weekend and visits and a 3 mo. plus return to his biological parents. We don't know what happened in those times. But one time he went to town with his foster father + they met up with his mother. She said, "Hi Robert," but he seemed very frightened at meeting up with her_

LRF0098

03/29/2012 23:37 717-229-2342 JACOB BRUBAKER PAGE 04/07
Mar 26 12 04:16p James Gehseniy 2178562367 p.4
Mar 10 2012 12:53PM LAMAR GARMAN 7173368436 Page 2

Case 5:21-cv-05070-PAC Document 44-1 Filed 01/20/23 Page 385 of 772

9. Has there been a death of anyone close to him in recent years? _one of his grandparents_
If yes, how did he relate to that death? _I do not Know._
_He would say she cared the best for him_

10. Describe his school life. _was not in school while with us_

11. Explain the methods of discipline you used on this child (what worked, what didn't work)
_Taking away a privilege or taking away_
_a personal possession that he very much liked._
_No discipline has seemed to work anymore._

12. What seems to be the most difficult thing for your child to do? _Respect_
_authority + give up his own agenda_

13. Describe a typical meal time in your home. _A time of general_
_sharing; generally a relaxed atmosphere._

14. Describe how you communicate with your family. _Verbally sharing in_
_family worship etc._

15. What hobbies does your child have? _raising a dog_

16. Has your child ever had access to alcohol, drugs, tobacco? If so explain. _No_

17. Will you support and submit to the Liberty Ridge Farm guidelines? _yes_

Signature
Father _____ Mother _____ Guardian _Stephen Worton_

# Liberty Ridge Farm

### Resident Application - Parents

Name of youth _Robert Harvey Miller_          Date _3-20-2012_

Address _2518 CR 1700E_                        Age _17 yrs_

_Arthur, IL 61911_          Parents _Allan Miller_

Race _Latin American_          Congregation _Berlin NM_

          Adopted (Yes) No

1. Describe the situation that has led you to contact Liberty Ridge Farm. _Robert lived with us for 9 months and it has become evident with his behavior that he needs more concentrated + rigid help to help him develop better attitudes + habits._

2. Describe his pattern of misbehavior. _He has had many wants + desires for things. We granted him some of them. (Especially attached to music) It seems like once he gets no for an answer he doesn't know how to accept that and has flown off the handle or gotten into a pouting mood._

3. Describe any physical limitations he has. _Perhaps not used to overly exerting himself_

4. How does he express anger? _with things although he has never gotten terribly out of hand. He has been to the point where talking didn't do much good anymore_

5. Has he ever been abused physically, verbally, sexually? (Circle those that apply) Describe that abuse _physically shaken as a small child till his one eye got messed up. According to him the way his dad (Allan) spanked him was abusive (with a piece of steel)_

6. Does he struggle with depression? _Yes_. If yes explain his struggle _Not knowing why he ever ended up in the home he was. He wondered if God really loves him_

7. How does he relate to his peers? _He makes friends very quickly + is considerate._

8. How does he relate to his siblings? _N/a     For the most part he has related well to our 3 year old boy although he has been a little over bearing in teasing him._

LRF0100

# Liberty Ridge Farm

## Resident Questionnaire

Name  *Robert Miller*

Address _____

_____

_____

Home Congregation  *Belen IVM*

Church Member- (Yes)- No

Date  *Mar 19  2012*

Home Phone _____

Age  *16*

Birthday  *Mar 20*

Parents  *Allen + Virginia Miller*

1.  Describe your relationship with God.  *He feels far    away*

2.  Describe your relationship with your father.  *tense Relationships   wed exchange siems.*

3.  Describe your relationship with your mother.  *She was overbearing.*

4.  Describe your devotional life.  *Its not that meaningful, saying the wrong things*

5.  List your areas of greatest struggle.  *respect for authority*

6.  List your fears.  *Going to Liberty Ridge Farm*

7.  Describe your church life.  *It goes pretty good*

8.  How would you describe yourself?  (circle those that apply)  (Kind) (Loving) (Truthful) Gentle-
    (Caring)  Submissive  (Content)  Morally Upright  Lustful  Immoral  Discontent
    Rebellious  (Bitter)  Angry  Dishonest  Harsh  Selfish  (Cheerful)  (Dependable)
    Other  *undependable*

9.  What happened when you did wrong as a child?  *Got whipped  got  eat a big  serman*

10. Who are your friends and how do you relate to them?  *Cole begene  many others  titus weaver  Merle struto*

11. Describe your school life.  *8th grades  good enough to pass  I did not enjoy it.*

LRF0101

| 12. | What kind of worker are you? | a hard worker I Hope |
| 13. | What do you enjoy doing most? | playing with my dog, Hunting |

14. What kind of books do you enjoy reading? Listening to music, singing History tound after story pioneer stories

15. What kind of music do you enjoy listening to? professional chorate

16. What is the most enjoyable time of the day to you? m in the evening when I can do what I enjoy me st

17. If you have some money to spend, how do you spend it? wisely & cd a book tools

18. Describe any personal problems you may have

19. Do you struggle with guilt? If so, what brings it on? no

20. Do you ever become angry? Yes     What do you do when you become angry? Say a few words

21. Describe your relationship to authority. most times alright unless im in a bad mood

22. Share a few goals you have for yourself. hope to run a good towing Buisness have a good Home

23. What makes you happy? Good social life

24. Name several things you find difficult to do. Have personal devotions every day

25. Will you submit and co-operate with the Liberty Ridge guidelines and program? yes

Comments you may have

Signature _palvin W. miller_     Date _Mar 24_

LRF0102

# EXHIBIT E

**In the Matter Of:**

D.C. AND R.M. vs.

NELSON MARTIN, et al.

Mark Torkelson

October 19, 2022

**HKW, LLC**
764 Corporate Circle, Suite 200
New Cumberland, PA  17070
717.214.1182
Schedule@hkwllc.com



**Witness Mark Torkelson**

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA


D.C. AND R.M.,                 :
          Plaintiffs           :
                               :
          vs.                  :
                               :
NELSON MARTIN D/B/A            :
LIBERTY RIDGE FARM,            :        CIVIL ACTION
LIBERTY RIDGE FARM,            :   NO: 5:21-CV-05070-JMG
EASTERN PENNSYLVANIA           :
MENNONITE CHURCH AND           :
RELATED AREAS, AND             :
MENNONITE MESSIANIC            :
MISSION OF THE EASTERN         :
PENNSYLVANIA MENNONITE         :
CHURCH,                        :
          Defendants           :




     DEPOSITION OF:    MARK TORKELSON

     TAKEN BY:         PLAINTIFFS

     REPORTER:         TRACY L. LLOYD, RPR
                       NOTARY PUBLIC

                       KYLAN BARRY, VIDEOGRAPHER

     DATE:             OCTOBER 19, 2022, 8:58 A.M.

     PLACE:            MARGOLIS EDELSTEIN
                       214 SENATE AVENUE, SUITE 402
                       CAMP HILL, PENNSYLVANIA
```

Witness Mark Torkelson

2

1   APPEARANCES:

2           ANDREOZZI & FOOTE
            BY:  RENEE E. FRANCHI, ESQUIRE
3                4503 NORTH FRONT STREET
                 HARRISBURG, PENNSYLVANIA  17110
4                (717) 686-9936
                 Renee@vca.law
5
                 -- For the Plaintiffs
6
            MARGOLIS EDELSTEIN
7           BY:  MEGHAN WYNKOOP, ESQUIRE
                 JOCELYN MENDEZ, ESQUIRE
8                THE CURTIS CENTER, SUITE 400E
                 170 SOUTH INDEPENDENCE MALL W.
9                PHILADELPHIA, PENNSYLVANIA  19106
                 (215) 922-1100
10               mwynkoop@margolisedelstein.com

11
                 -- For the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Mark Torkelson**

3

1                    INDEX OF WITNESSES

2     EXAMINATION                              PAGE

3     MARK TORKELSON

4          By Ms. Franchi                      5

5          By Ms. Wynkoop                      --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              STIPULATIONS

2          It is stipulated and agreed by and between

3     counsel for the respective parties that the reading,

4     signing, sealing, and filing of the transcript is

5     waived and that all objections, except as to the

6     form of the question, are reserved to the time of

7     trial.

8

9              THE VIDEOGRAPHER:  Here begins Media

10    Number 1 in the videotaped deposition of Mark

11    Torkelson in the matter of D.C. and R.M. v. Martin, et

12    al, in the United States District Court for the

13    Eastern District of Pennsylvania, Case Number

14    521-CV-05070-JMG.

15             Today's date is October 19th, 2022.  The

16    time on the video monitor is 8:58 a.m.  The

17    videographer today is Kylan Barry representing Planet

18    Depos.  This video deposition is taking place at 214

19    Senate Avenue, Suite 402, Camp Hill, PA, 17011.

20             Would counsel please voice identify

21    themselves and state whom they represent.

22             MS. FRANCHI:  I am Renee Franchi with the

23    law firm of Andreozzi and Foote, and I represent the

24    Plaintiffs in this matter.

25             MS. WYNKOOP:  Meghan Wynkoop, Margolis

**Witness Mark Torkelson**

5

1 | Edelstein, and I represent the Defendants.

2 |         MS. MENDEZ:  Jocelyn Mendez, Margolis

3 | Edelstein, and I represent the Defendants.

4 |         THE VIDEOGRAPHER:  The court reporter

5 | today is Tracy Lloyd.  Will the reporter please swear

6 | in the witness.

7 |

8 |         MARK TORKELSON, called as a witness,

9 | being affirmed, testified as follows:

10 |

11 |         MS. FRANCHI:  Okay.  We will just agree

12 | to the same preliminary issues that were put on the

13 | transcript first thing yesterday so I can spare

14 | counsel from repeating it again and for the next

15 | couple days.  Is there anything else you think?  We're

16 | good?

17 |         MS. WYNKOOP:  No.  We agree.

18 |

19 |                     EXAMINATION

20 |

21 | BY MS. FRANCHI:

22 |     Q.    Good morning, Mr. Torkelson.  My name is

23 | Renee Franchi.  I represent the Plaintiffs in this

24 | matter.  I apologize.  I'm already losing my voice

25 | from speaking all day yesterday.  I'm sure by Friday

6

1   it will be completely gone.  I appreciate you being

2   with us today.

3            Before we get to case-related questions,

4   I need to ask you some preliminary questions just to

5   make sure that you understand the expectations and the

6   rules for the deposition today.

7            The first thing is that when I or your

8   attorney asks you a question, you do have to give a

9   verbal answer.  This is not just a non-verbal response

10  like a head nod or uh-huh or something like that.

11  This is because of the stenographer being here.  She's

12  typing down all of the questions and the answers

13  today, and she can only type down verbal responses.

14  So will you be able to make sure that you do give me

15  verbal responses to your questions today?

16       A.    I will try.

17       Q.    Thank you.  Next, if you are asked a

18  question that you don't understand, that doesn't make

19  sense, whether it be because I worded it confusingly,

20  which has been known to happen, or for any other

21  reason, please feel to say you don't understand the

22  question or ask me to repeat the question, and I can

23  do that for you.  Can you do that?

24       A.    I will.

25       Q.    Okay.  In that same light, if you're

Witness Mark Torkelson

7

1    asked a question and you do answer with a verbal

2    response, I will assume that you understood the

3    question.  Is that fair?

4         A.    Yes.

5         Q.    Okay.  Now, I do expect that we'll be

6    here for a few hours this morning.  Attorneys are bad

7    at estimating time, but I don't think it will be too

8    long.  But if you do need to take a break at any time

9    to use the restroom, to get something to drink, to

10   stretch your legs, or for any other reason, please let

11   me know.  That's perfectly fine.

12              The only restriction is that if you're

13   asked a question, you may not take a break until the

14   question is answered, and then afterwards you may do

15   so.  Does that make sense?

16        A.    Yes.

17        Q.    Now, during this deposition, I may ask

18   you to either estimate or approximate something like

19   time or dates if you do not recall something

20   specifically.  Please do not just simply guess at the

21   answer.  If you think that you can give a fair

22   estimate or approximation, please let me know and

23   please do so.

24              For example, if I ask you a question

25   about when an event happened and if you don't know the

8

1    exact date, but you do know a time frame, say, between

2    the years of 2000 and 2004, it's fair to say that you

3    don't remember exactly when this event occurred, but

4    that it happened between those two years?

5            So if you are able to approximate, please

6    let me know.  But if you simply do not know or do not

7    remember an answer or an event, please say so.  Is

8    that fair?

9        A.    Yes.

10       Q.    The most important thing today is that we

11   just want you to tell the truth.  Is there anything

12   that would prevent you from being able to fully

13   testify to the truth today?

14       A.    No.

15       Q.    Okay.  So I think first we'll be

16   starting with some just general background questions.

17   I don't know you.  We've never spoken before, so I'd

18   like to get to know you a little bit, and then we'll

19   get into some more specific questions about the events

20   in this case or the issues that we brought you here

21   for today.

22           Do you have any questions for me or for

23   your attorney before we start today?

24       A.    I do not think so.

25       Q.    Okay.  So the first matter is what did

**Witness Mark Torkelson**

9

1    you do in preparation for your deposition today other

2    than speaking with your attorney, if anything?

3          A.      Nothing.

4          Q.      Okay.  Did you review any documents?

5          A.      No.

6          Q.      Okay.  And I know earlier you had said

7    your name.  But if you could, please for the record

8    today if you could state your full name?

9          A.      Mark Elton Torkelson.

10         Q.      And how do you spell your last name?

11         A.      T-o-r-k-e-l-s-o-n.

12         Q.      And what's your date of birth?

13         A.      1/3/54.

14         Q.      Where were you born?

15         A.      Cheverly, Maryland.

16         Q.      And have you lived in Maryland your

17   entire life?

18         A.      Except for one year that I lived in

19   Missouri.

20         Q.      Okay.  And where do you live now?

21         A.      At Keymar, Maryland.

22         Q.      Okay.  And what's your address?

23         A.      12029 Simpsons Mill Road.

24         Q.      And who do you live there with?

25         A.      My wife.

**Witness Mark Torkelson**

10

1    Q.    What's her name?

2    A.    Paula.

3    Q.    Do you have any children?

4    A.    Paula is my second wife, so we have no

5  children.

6    Q.    Okay.  Do you have children from your

7  first marriage?

8    A.    Yes.  I had seven.

9    Q.    Oh, wow.  Okay.  Are they all adults?

10    A.    Yes.

11    Q.    Do you have grandchildren?

12    A.    Yes.

13    Q.    A few?

14    A.    I think it's 24.

15    Q.    Wow.  That's great.  All right.  So what

16  do you do for a job?

17    A.    I'm a carpenter.

18    Q.    In Maryland?

19    A.    Yes.

20    Q.    Do you ever travel interstate or is it

21  generally in the same area that you live in?

22    A.    It's generally in the state of Maryland.

23    Q.    Do you own the business or do you work

24  for someone?

25    A.    I own the business.

11

1    Q.    What's it called?

2    A.    Weathertight Services.

3    Q.    And how long have you worked or owned

4  that company?

5    A.    It's a company that started in 1979.

6    Q.    Okay.  And when did you become involved?

7  At the time that it started or after?

8    A.    I started it.

9    Q.    You did, okay.  What's your education

10  level?

11    A.    Through grade 10.

12    Q.    Okay.  And then did you receive any sort

13  of graduation certificate, GED, anything like that or

14  was it just through grade 10 and you began working?

15    A.    That's correct.

16    Q.    Okay.  And are you -- would you consider

17  yourself to be a member of the Eastern Pennsylvania

18  Mennonite Church or Eastern Pennsylvania Mennonite

19  faith?

20    A.    Yes.

21    Q.    And what congregation do you belong to?

22    A.    Hopewell.

23    Q.    And is that down in Maryland?

24    A.    Yes.

25    Q.    How long have you been a member of that

12

1    specific congregation?

2         A.    It would be since 1968.

3         Q.    Oh, okay.  So would it be safe to say

4    then that you've been a part of the Mennonite faith

5    your entire life?

6         A.    That is correct.

7         Q.    Have you always been a member of the

8    Eastern Pennsylvania Church?

9         A.    No.  I was a member at Lancaster

10   Conference to begin with.

11        Q.    Okay.  And then when did you switch over?

12        A.    In 1968.

13        Q.    Okay.  So you had mentioned that you own

14   the one company.  You said it was Weathertight?

15        A.    That's correct.

16        Q.    And what kind of work do you do?

17        A.    We build pole barns.

18        Q.    Okay.  And is that the only work you do

19   or are there other types of construction or work that

20   you do with your company?

21        A.    We also work on the old bank barns.

22   Restore them.

23        Q.    Okay.  Do you -- so you do both

24   construction from basically the ground up, and then

25   you also do restoration work?

**Witness Mark Torkelson**

13

1      A.     That's correct.

2      Q.     **Do you ever do any demolition work?**

3      A.     Very little.

4      Q.     **Do you have any employees?**

5      A.     No.  We're set up as a limited

6  partnership.

7      Q.     **Okay.  How many people are involved?**

8      A.     It's approximately five.

9      Q.     **Okay.  And do you have any financial**

10  **interests in any other businesses?**

11      A.     Not really, no.

12      Q.     **What do you mean by that?**

13      A.     Well, I have loaned some money to another

14  young man who is starting a business.

15      Q.     **Oh, okay.**

16      A.     But I don't have any interest in the

17  business.

18      Q.     **Gotcha.  That makes sense.  And so in**

19  **that vein, I would assume then when you don't have any**

20  **other financial interests in other businesses, you**

21  **also don't have ownership interest in any other**

22  **businesses?**

23      A.     That is correct.

24      Q.     **Okay.  And where do you generally hold**

25  **your personal bank accounts and your work bank**

**Witness Mark Torkelson**

14

1    accounts?  Is it a local bank in the area that you

2    live in or is it somewhere else?

3         A.    It's a local bank.

4         Q.    Which one is it?

5         A.    WesBanco.

6         Q.    Okay.  And do you own any property?

7         A.    Yes.

8         Q.    Down in Maryland?

9         A.    Yes.

10        Q.    Is it just in Maryland?

11        A.    Yes.

12        Q.    Okay.  What would that be?  Just your

13   personal property?

14        A.    Our personal property.

15        Q.    Okay.  So I'm going to jump a little bit

16   more specifically into the matters involving this case

17   and specifically involving the Mennonite Messianic

18   Mission which I'm just going to refer to as the

19   Mission so you don't have to hear me stumbling over

20   that through the entire deposition.  So if you could,

21   just starting out in your own words what is the

22   Mission?

23        A.    It is the body that the church has

24   commissioned to oversee the outreach activities of the

25   church.

15

1    Q.    And are you aware of how long the Mission
2    has been in existence?
3        A.    I can give you an approximate date.
4        Q.    Sure.
5        A.    1966.
6        Q.    Okay.  So for some time now?
7        A.    Yes.
8        Q.    Okay.  And has the Mission always been
9    run by a board of directors?
10       A.    Yes.
11       Q.    And yesterday we spoke with a
12   representative of the Eastern Pennsylvania Church.
13   I'll just refer to it as the EPMC, again, so you don't
14   have to hear me keep stumbling over it throughout the
15   entire deposition.  And we learned a little bit
16   yesterday about the kind of governing body of the EPMC
17   and just the general guidance that it gives throughout
18   the community.
19            So as it relates to the Mission, does the
20   Mission receive any guidance from the EPMC at all?
21       A.    No.
22       Q.    Okay.  Are any of the EPMC leaders ever
23   involved in any of the board meetings at the Mission?
24       A.    Yes.
25       Q.    Okay.  And usually when does that occur?

16

1     A.    I'm not sure if I understand your

2  question.

3     Q.    So let me rephrase it.  Are there any

4  times when the Mission Board asks for guidance from

5  the EPMC leaders or seeks their involvement in any

6  matters during their board meetings?

7     A.    No.

8     Q.    Okay.  And are you currently on the board

9  of directors?

10    A.    Yes.

11    Q.    What's your position?

12    A.    I'm the secretary.

13    Q.    And what are your duties and

14 responsibilities?

15    A.    To record the proceedings of the board

16 and to sign any legal documents that need to be

17 signed.

18    Q.    And how long have you been the secretary?

19    A.    Since 2013.

20    Q.    And were you on the board before that?

21    A.    Yes.

22    Q.    What was your position?

23    A.    I was just an ordinary board member with

24 no position --

25    Q.    Okay.

**Witness Mark Torkelson**

17

1      A.      -- for a while, and then I was assistant
2  treasurer.
3      Q.      Okay.  And when were you the assistant
4  treasurer?
5      A.      I'm not really sure of that date.
6      Q.      Was it immediately preceding when you
7  became secretary?  Like did you go from assistant
8  treasurer to secretary?
9      A.      That is correct.
10      Q.      Okay.  So do you believe that you may
11  have been or approximately were the assistant
12  treasurer from the years of about 2010 to about 2013
13  or at least sometime during then?
14      A.      Sometime during then, yes.
15      Q.      Okay.  But maybe not the whole time?
16      A.      Probably the whole time.
17      Q.      Okay.  And what were your duties as the
18  assistant treasurer?
19      A.      Basically nothing.
20      Q.      I appreciate your honesty.  What did you
21  find yourself doing on the board when you were the
22  assistant treasurer?  If you didn't have any real
23  specific duties, what was your involvement?
24      A.      Just to give the treasurer's report.  And
25  in the very unlikely event that the treasurer was not

**Witness Mark Torkelson**

18

1    there, he would give me the report, and then I would

2    share it with the board.  And so really it was very

3    little that I did.

4         Q.    Then otherwise you just acted as a normal

5    board member?

6         A.    That's correct.

7         Q.    Okay.  And who was the treasurer at the

8    time?

9         A.    Mervin Martin.

10        Q.    And who is the treasurer now?

11        A.    Nelson Nolt.

12        Q.    And do you know who the treasurer was

13   from about 2010 to about 2014, if you can recall?

14        A.    I do not recall.

15        Q.    Okay.  Would it maybe have been one of

16   those two individuals?

17        A.    Probably would have been.

18        Q.    Okay.  Does your board have any governing

19   documents like bylaws or any rules that govern the

20   conduct of the board?

21        A.    Yes, we do.

22        Q.    And are you aware of whether those bylaws

23   have been updated or altered in any way since about

24   2010 onward?

25        A.    No, they would not have.

19

1    Q.    So I know you had said that the treasurer

2  generally handles the finances, and you are the

3  assistant treasurer and didn't do much in the form of

4  dealing with the treasurer's activities, but tell me a

5  little bit about the business structure of the Mission

6  and where it receives its funding from and financially

7  just how the Mission is structured, if you know.

8    A.    The funding that comes to the Mission

9  Board is strictly from congregational offerings and

10  from personal donations.

11    Q.    Does the Mission have any business

12  interests?

13    A.    No.

14    Q.    Okay.  Do you know if the Mission has any

15  bank accounts?

16    A.    Yes.

17    Q.    Where are they held at?

18    A.    I don't know.

19    Q.    So tell me a little bit more about the

20  duties of the Mission.  I know that it kind of

21  oversees a lot of different organizations and

22  different parts of the outreach for the Eastern

23  Pennsylvania Church.  But if you could tell me a

24  little bit more about what the Mission does.

25    A.    The Mission primarily clears individuals

**Witness Mark Torkelson**

20

1  for service in various fields, and in our foreign

2  fields would be responsible for making sure that the

3  fields have the necessary things that they need like

4  church houses, schools.

5       Q.    So the Mission oversees work in all sorts

6  of countries, not just here in the United States?

7       A.    That is correct.

8       Q.    Do you know approximately how many

9  countries it's doing work in now?

10      A.    Eight.

11      Q.    Oh, wow.  Okay.  Tell me about the

12 domestic entities or business that the Mission does.

13 I know obviously that we'll talk a little bit more

14 about Liberty Ridge in a bit.  But Liberty Ridge

15 aside, what domestic business is the Mission involved

16 in?

17      A.    The Mission is not really involved in any

18 business.

19      Q.    Okay.  Does it oversee or has it helped

20 set up any other domestic entities other than Liberty

21 Ridge?

22      A.    There would be a Publication Board.

23 There would also be two Bible schools.  There would be

24 a rest home committee.

25      Q.    And are there any other residential

21

1  type -- I don't want to say facilities or residential

2  type homes or programs other than Liberty Ridge that

3  the Mission has ever been involved in domestically?

4       A.     No.

5       Q.     Okay.  So I'm going to get a little bit

6  more into Liberty Ridge now.  And if there's anything

7  that I'm -- any road I'm going down or any questions I

8  ask that you don't know or you feel that somebody else

9  is better suited to answer those questions, please let

10  me know.  I don't want to go down a whole line of

11  questions where you're just going to keep telling me I

12  don't know.  I'll save you the time from that.

13            So were you on the board at the Mission

14  when the board first began discussing creating the

15  Liberty Ridge?

16       A.     Yes.

17       Q.     Do you remember about when that was?

18       A.     Not exactly.

19       Q.     When do you believe it may have been?

20       A.     I believe it may have been in 2009 to

21  2010.

22       Q.     How did that discussion first come up?

23       A.     It first came up because of the needs of

24  young men for more structure in their lives and young

25  men that needed help.

**Witness Mark Torkelson**

22

1    Q.    And within the discussion of the board,
2  when you talk about the needs of young men or young
3  men that need help, could you elaborate a little bit
4  more just about what needs these are or what kind of
5  help it was believed that these men needed?
6    A.    It would have been primarily in their
7  spiritual lives.
8    Q.    What do you mean by that?
9    A.    Some of these young men were rebellious
10  and not manageable at home and not getting along with
11  their peers and just simply very unstructured.
12    Q.    Were these concerns that were brought to
13  the board by any individual people or was it from the
14  congregations or was it just a general sense within
15  the community?  If you could just elaborate on that a
16  little bit.
17    A.    I think it would have been a general
18  sense within the committee, I mean within the
19  community.
20    Q.    Okay.  So once the discussion began in
21  the board, how quickly did the, I guess, creation of
22  Liberty Ridge come about?  Was it discussed at length
23  for quite some time and then began implementing some
24  more ideas or how did that discussion work, if you
25  remember?

Witness Mark Torkelson

23

1        A.     First of all, there was a committee
2   appointed to see if they could meet those needs by
3   just soliciting individual homes to care for these
4   boys.  And so they tried that for a while.  I'm not
5   sure exactly how long.
6        Q.     And when you say soliciting homes, do you
7   mean like actual homes of members of the church
8   community?
9        A.     That's correct.
10       Q.     Okay.  And when you say soliciting homes,
11   was the committee just simply asking other community
12   members if they'd be willing to house these young men
13   or what do you mean by that?
14       A.     That's correct.
15       Q.     Okay.  So you have that binder that's in
16   front of you.  I printed out all the documents in this
17   case.  They're all numbered.  Their pages are all
18   numbered.  I figured that would be easier than handing
19   documents back and forth.
20              So I'm going to have you turn to Page 86.
21   It's LRF-86, and it's probably about halfway through
22   the book.  I'll give you a second to get to it.  If
23   you could just let me know when you get there.  And
24   now that I'm looking back, I probably should have
25   tabbed the pages.  It would be Page 86.

**Witness Mark Torkelson**

24

1    A.    Yes.  Oh, 86.  I'm sorry.

2    **Q.    No.  That's okay.**

3    A.    I'm at 186.

4    **Q.    Now I'm thinking I should have put like**

5    **tabs, but it didn't even occur to me.**

6          MS. WYNKOOP:  This has been pretty great,

7    though.  No complaints here.

8    BY MS. FRANCHI:

9    **Q.    So I see you've turned to Page 86 in the**

10   **documents.  Do you recognize what this document is, if**

11   **not specifically, then generally?**

12   A.    Yes, I do.

13   **Q.    And what is this document?**

14   A.    This would have been minutes from the

15   Mission Board.

16   **Q.    Okay.  And is this generally how the**

17   **minutes of the Mission Board are kept during meetings?**

18   A.    That is correct.

19   **Q.    Okay.  Do you recall, and I believe the**

20   **date on this document is June 2nd, 2010.  I see at the**

21   **bottom that the names of the secretary and assistant**

22   **secretary.  Are those the individuals who likely would**

23   **have been the ones keeping the minutes at the time?**

24   A.    That is correct.

25   **Q.    Okay.  And I just want to make sure.  At**

25

1    the top of the page of this and the next pages until

2    Page 95 it says custom pole buildings, and there's a

3    date.  That isn't part of the minutes; correct?  That

4    looks like it would have been something that would

5    have been either printed or scanned on the documents?

6         A.    I don't understand your question.

7         Q.    At the very top of the page here where it

8    says custom pole buildings, I just want to make sure

9    that that's not a part of the actual minutes.  That

10   looks like it was just transposed onto the page?

11        A.    That is correct.

12        Q.    Okay.  Is that your business or were you

13   the one who compiled these documents or is that

14   somebody else?

15        A.    No.  That is my business.  I did not

16   compile these documents.

17        Q.    Okay.  Were you involved in printing -- I

18   just want to make sure I know what's on the page and

19   what isn't on the page that is part of what this is.

20   So that would have been then where it says here

21   12/19/21, you had somehow worked with either

22   transmitting or moving these documents from one place

23   to another, maybe your attorney?

24        A.    Apparently that was the case.

25        Q.    Okay.  So I want to go about two thirds

26

1   down the page where it says boys home, specifically it

2   says it was reported that the committee working on

3   this interest will be at the next MMM meeting.

4             Is that what you were saying earlier then

5   about how there was a committee that was kind of put

6   together to look into either creating the boys home or

7   housing these young men with spiritual needs in other

8   homes?

9        A.    That is correct.

10       Q.    Okay.  So I'm going to turn to the next

11  page.  It would be Page 87, and this looks like the

12  minutes from June 29th, 2010.  And I see now it says

13  boys home committee.

14            So, again, is this just going in the same

15  vein where you put a committee together to kind of

16  just look into the needs of the community with either

17  a boys home or placing these young men with other

18  families?

19       A.    My feeling at this point is that they

20  were moving from the mode of trying to do this with

21  individual homes to feeling that maybe should be an

22  institution.

23       Q.    Okay.  So when it says investigative

24  committee, is that what it would be referring to?

25       A.    That is correct.

Witness Mark Torkelson

27

1    Q.    Okay.  So at this point it doesn't seem
2  like they were sold on the idea of a boys home yet.
3  They were just kind of leaning in that direction?
4    A.    That is correct.
5    Q.    So I see the next page, Page 88, looks
6  like a meeting on August 3rd of 2010.  About two
7  thirds of the way down the page where it says boys
8  home, it says that there is a committee established,
9  and it lists some names.  Ethan Weaver, Lamar Garman,
10  Nelson Martin, Scott Martin, and Jacob Brubaker.
11        Does that seem correct as the committee
12  of individuals who were kind of investigating and
13  looking into starting a boys home?
14    A.    I think that is correct.
15    Q.    Okay.  Do you recall or do you have any
16  knowledge of how those individuals were selected?
17    A.    They were probably appointed by the
18  Mission Board to do that and would have been selected
19  on the basis that they had some personal interest in a
20  project like that.
21    Q.    Okay.  Do you recall -- and, again, if
22  you don't remember, please let me know.  Do you recall
23  whether there was any selection process like they
24  accepted resumes or did they just -- it was kind of
25  put out generally in the community that you were

28

1    looking for someone to engage in this?  Do you

2    remember the process at all?

3          A.    I do not remember any process like you

4    described.

5          Q.    Okay.  And all of the members of the

6    Mission Board -- and I apologize, I can't recall if I

7    asked this before -- are all members of the EPMC in

8    some congregation or another?

9          A.    That is correct.

10         Q.    Okay.  And then all of the men that are

11   in this investigative committee for the boys home,

12   would they also all be members of the EPMC in some

13   form or fashion, maybe not in the same congregation,

14   but somewhere?

15         A.    That is correct.

16         Q.    Okay.  Do you recall whether any of the

17   individuals from the investigative committee were sent

18   to any other homes or properties to, I guess, look

19   into other boys homes and how they were run to kind of

20   fashion Liberty Ridge after?

21         A.    That would have been at their own

22   choosing if they did such a thing.  We would not have

23   given any directive to that that I remember.

24         Q.    I guess you kind of anticipated my next

25   few questions then.  With the committee, did the

29

1    committee have any direction or oversight from the

2    Mission or was their job to go and work amongst

3    themselves and then come back and report their

4    findings to the Mission?

5         A.    They were to investigate and then come

6    back and report their findings, but we didn't

7    specifically tell them to go to other boys homes.

8         Q.    Okay.  So would it be safe to say then

9    you just gave them a task and a goal and said, you

10   know, go figure it out and then let us know what you

11   found?

12        A.    That is correct.

13        Q.    Okay.  I'm going to turn to the next

14   page, Page 89, where it talks about the purchase of a

15   property under the boys home notation.  Do you know if

16   that purchase of the property it's referring is the

17   current Liberty Ridge location?

18        A.    It is.

19        Q.    Okay.  Do you know who it was that

20   purchased the property?

21        A.    It would have been the Mission Board.

22        Q.    Okay.  So the Mission Board would have

23   purchased the property?

24        A.    That is correct.

25        Q.    Okay.  Does the Mission Board currently

Witness Mark Torkelson

30

1   own the property?

2          A.     I'm not sure about that.

3          Q.     Okay.  So you don't know if it changed

4   hands at all?

5          A.     I'm not sure about that.

6          Q.     Okay.  Moving on to the next page, Page

7   90, it talks about under the boys home notation on

8   December 28th, 2010, that it was noted that township

9   approval set the maximum age at 18 for residents in

10  the program.  Was the original discussion to also

11  include residents above the age of 18?

12         A.     I don't remember any discussion like

13  that.

14         Q.     Okay.  Do you know what types of

15  approvals were sought from the township?

16         A.     I cannot be sure of that.

17         Q.     Okay.  And, again, you may not know the

18  answers to these questions, but do you know if there

19  were any other governmental or agency approvals or

20  licensure that was sought out when creating Liberty

21  Ridge?

22         A.     I do not know that.

23         Q.     Okay.  Do you know or was there any

24  discussion amongst the Mission Board of any

25  consultations with psychological or medical

31

1   professionals as it relates to the treatment at this

2   boys home?

3        A.    I'm not sure that I understand that

4   question.

5        Q.    Were there any discussions amongst

6   yourselves when discussing the creation of the boys

7   home whether there would be any sort of medical

8   treatment or psychological treatment or at least a

9   consultation with a psychological professional in

10  developing the home?

11       A.    I do not remember any of that on the

12  board level.

13       Q.    Okay.  So I'm going to turn to the next

14  page, Page 91.  And this time I'll take you closer up

15  to the top of the page.  It looks like the minutes

16  from November 29th, 2010, and I see here personnel for

17  approval were shared as follows, and it has a list of

18  house parents and a list of mentors.

19             Were these individuals that were brought

20  to the Mission Board from the Liberty Ridge committee

21  or was the Mission Board involved in the selection of

22  these individuals?

23       A.    They were brought to the Mission Board

24  from the boys home committee.

25       Q.    Okay.  So the Mission Board didn't seek

32

1   these people out?

2        A.      No.

3        Q.      Okay.  Do you or did you have any prior

4   interaction with or knowledge of the individuals

5   listed for the house parents?

6        A.      In what way?

7        Q.      If you knew them personally, had any

8   business dealings with them before.  I see here that

9   at least one of them, Ethan Weaver, I believe was on

10  the committee, so you were likely familiar with him

11  before, but did you know any of the other individuals

12  listed?

13       A.      Some of them I would have known, not all

14  of them personally.

15       Q.      Okay.  And who are the individuals that

16  were known to you previously?

17       A.      Fred Miller, David Meck, Timothy

18  Newswanger, Raymond Martin.  Maybe Leroy Allgyer in a

19  very limited way.

20       Q.      And when you say that you knew of them,

21  were these people that you either did business with

22  and knew personally or just knew of them generally?

23       A.      Just knew of them generally.

24       Q.      Okay.  Do you know if there was any

25  selection process in indicating these individuals by

Witness Mark Torkelson

33

1   the committee or was that not something you were

2   involved in?

3        A.     It was not something I was involved in.

4        Q.     Okay.  And on the next page, Page 92,

5   where it says Liberty Ridge, where it says approval is

6   requested for the following for house parents Marlin

7   Mussers, Raymond Siegrists, Earl -- is it Gehmans?  I

8   cannot read that.  And Marlin Weavers.

9             Are these other individuals who acted as

10  house parents or were just deemed to be fit to be

11  house parents, if you know?

12       A.     They were just deemed to be fit for house

13  parents.

14       Q.     Okay.  And we'll move on to the next

15  page, Page 92, specifically under boys home where it's

16  Line Item E where it talks about the committee

17  presented a proposal from Snyder Gates, LLC, that

18  would allow them to set up the shop to manufacture

19  fiberglass farm gates incorporating the labor of the

20  Liberty Farm residents.

21            Were you involved in any discussions

22  about incorporating the labor of these boys for

23  third-party businesses?

24       A.     I do not recall that.

25       Q.     Okay.  Would this have been something

34

1    that the committee came up with a proposal and then

2    presented it to the Mission Board?

3           A.     That is correct.

4           Q.     Okay.  And it says a motion carried to

5    allow them to use this and enter into a one-year

6    agreement.  So would it be safe to say then the

7    committee brought this idea to the board, and the

8    board approved it?

9           A.     That is correct.

10          Q.     Okay.  Did the board when you were

11   involved have any other discussions involving the uses

12   of Liberty Ridge for any reason for any business

13   purpose or any other reason?

14          A.     Not that I remember.

15          Q.     Okay.  Do you know of the business Snyder

16   Gates, LLC?  Are you familiar with them at all?

17          A.     Not really.

18          Q.     Okay.  Do you know who owns it or who's

19   involved in the business?

20          A.     I do not.

21          Q.     Okay.  Are you aware in any way of how

22   Snyder Gates was contracted with or how its business

23   arrangements were set up with Liberty Ridge?

24          A.     No.  I do not know that.

25          Q.     Okay.  Are you familiar with -- and I'm

35

1    just going to list a few business names that have come

2    up generally in discovery with counsel so far in this

3    case.

4                    Are you familiar with any other business

5    that have done business with Liberty Ridge such as

6    Sensenig Chair Shop, Clark's Feed Mills, Wengerd

7    Pallet Company, or Dutch-Way Farm Market?

8         A.    I would be a little bit familiar with

9    Wengerd Feed Mills, and what was the other names that

10   you gave?

11        Q.    There's Clark's Feed Mills, Wengerd

12   Pallet Company, and Dutch-Way Farm Market.

13        A.    Yeah, the Wengerd Pallet Company.

14        Q.    And how were they known to you?

15        A.    Just by name.

16        Q.    Okay.  You don't have any business

17   dealings or any financial interests in that company?

18        A.    No.

19        Q.    Okay.  Do you know who owns it?

20        A.    No, I do not.

21        Q.    Are you aware personally of any other

22   businesses that from 2011 or about then when Liberty

23   Ridge began to the present that has done any business

24   at Liberty Ridge at all?

25        A.    Not other than the two that we talked

**Witness Mark Torkelson**

36

1   about.

2        Q.     Okay.  Are you aware of any training that

3   was given to any staff of Liberty Ridge?

4        A.     What kind of training are you talking

5   about?

6        Q.     Any.

7        A.     No.  I'm not really aware of that.

8        Q.     Okay.  Was that something that was

9   discussed at all during the Mission meetings?

10       A.     I don't recall that it was.

11       Q.     Are you aware of whether there was any

12  advertising or any publications put out to, I guess,

13  solicit residents for Liberty Ridge at any point?

14       A.     No.  There would not have been.

15       Q.     So that would, I guess, go into the next

16  few questions.  Are you aware of how people within the

17  community came to know of Liberty Ridge?  Was it just

18  word of mouth?  Was it preached at congregations?  How

19  would that have worked, if you know?

20       A.     I think it mostly would have been by word

21  of mouth.

22       Q.     Okay.  And do you know how Liberty Ridge

23  was being described or told to people what it would

24  have done for these boys?

25       A.     I don't recall of anything of that nature

37

1    other than to help young men.

2         Q.    Okay.  Was there any discussion with you

3    or with the Mission Board about the structure of the

4    programming at Liberty Ridge?

5         A.    Not in a specific way.

6         Q.    Okay.  Generally, how was it brought up,

7    if at all?

8         A.    They would have mostly formed their own

9    structure.

10         Q.    Okay.  And then just told the Mission

11    about it?

12         A.    That's correct.

13         Q.    Okay.  So is it safe to say then the

14    committee would bring the general ideas of the program

15    to the Mission Board, and as long as it didn't sound

16    outrageous in any way, say that sounds okay?

17         A.    That is correct.

18         Q.    Okay.  Do you know whether there is any

19    discussions about a number of work hours for the

20    residents or whether there was any consultation with

21    agencies like the Department of Labor or anything like

22    that?

23         A.    I'm not aware of that.

24         Q.    Okay.  Was there any discussion about the

25    price of the programing, whether parents would be

38

1   paying a certain amount of money in or anything like

2   that?

3        A.    No, not on the Mission Board level.

4        Q.    Okay.  So I guess at the end of the day,

5   now moving forward, Liberty Ridge is now open.  What

6   is the Mission's involvement once Liberty Ridge is now

7   its own entity?

8        A.    The only involvement that we would have

9   would be in approving personnel to serve there.

10       Q.    Okay.  And what do you mean by that?

11       A.    The committee would bring names for house

12  parents or mentors, and we would approve or

13  disapprove.

14       Q.    Okay.  And now that -- when I say now

15  that Liberty Ridge is open, I'm saying, you know, from

16  2011 and onward.  So once Liberty Ridge is opened, did

17  they report to the Mission Board in any way?  Like did

18  they give, you know, a report at board meetings or was

19  there any other type of oversight?

20       A.    They would have given a report at board

21  meetings if they had anything that they wanted to

22  request.

23       Q.    Okay.  And when you say anything they

24  want to request, what do you mean by that?

25       A.    Personnel.

Witness Mark Torkelson

39

1    Q.    Okay.  Was there any involvement with the

2    Mission Board with funding in any way of Liberty

3    Ridge?

4    A.    The Mission Board would have purchased

5    the farm to begin with to give them a place to

6    operate.

7    Q.    Okay.  Is the Mission Board or was the

8    Mission Board involved in any way with the actual

9    business entity generally of Liberty Ridge other than

10   the ownership of the property?

11   A.    No.

12   Q.    Okay.  Did the Mission Board give Liberty

13   Ridge any direction that was unsolicited by Liberty

14   Ridge?  Like say you told me earlier that Liberty

15   Ridge would report to the Mission Board and ask -- you

16   know, they would ask for certain things.  But was

17   there any point where the Mission Board would take the

18   first step to say you need to do X, Y, and Z?

19   A.    I do not recall anything like that.

20   Q.    Okay.  Have you personally been to the

21   Liberty Ridge property?

22   A.    Yes, I have.

23   Q.    Okay.  How many times?

24   A.    I do not know.

25   Q.    Would it be more than two?  More than

**Witness Mark Torkelson**

40

1    ten?  Less than ten?

2         A.    More than ten.

3         Q.    Okay.  And when would that have been

4    generally over a time frame?

5         A.    Sporadic.

6         Q.    Okay.  Do you know if other Mission Board

7    members have been to the Liberty Ridge property?

8         A.    I would think that most of them probably

9    have been.

10         Q.    Was there any direction from the Mission

11    Board to visit the Liberty Ridge property for any of

12    its members?

13         A.    No.

14         Q.    Okay.  So it would be safe to say then

15    that if any Mission Board members went to the

16    property, it was on their own, I guess on their own

17    volition?

18         A.    That's correct.

19         Q.    Okay.  When you went to the Liberty Ridge

20    property, did you give them any direction or make any

21    decisions for them or was it purely as an observer?

22         A.    It was purely as an observer for the most

23    part.

24         Q.    Okay.  And when you say for the most

25    part, were there any other times that you weren't just

41

1    observing that you were involved in any way?

2        A.    In the very beginning I was assigned to

3    help them to get started with the work.

4        Q.    Okay.  What do you mean by that?

5        A.    It was mostly administrative things.

6        Q.    Okay.

7        A.    Structuring the committee and structuring

8    the work.

9        Q.    Okay.  Did that involve any financial

10   reports or ledgers or anything like that?

11       A.    No.

12       Q.    Okay.  It was just general guidance?

13       A.    That's correct.

14       Q.    Okay.  Has your personal business ever

15   done any business with Liberty Ridge?

16       A.    No.

17       Q.    Okay.  Are you familiar with the

18   corporate filing of Liberty Ridge and specifically the

19   registration of the Liberty Ridge name and the

20   corporate documents?

21       A.    No.

22       Q.    Do you know if any of the other Mission

23   Board members, either past or present, were involved

24   in any way with a financial interest in Liberty Ridge,

25   any labor that was there, or any business interest?

**Witness Mark Torkelson**

42

1    A.    No.

2    Q.    Are you personally related to anyone

3    that's on the Liberty Ridge board currently?

4    A.    No.

5    Q.    Or past?

6    A.    No.

7    Q.    Okay.  Do you know -- this may be outside

8    of your knowledge -- what is the involvement of any

9    individual congregations within the EPMC with Liberty

10   Ridge?  Is there any?

11   A.    No.

12   Q.    Okay.  I know we heard yesterday in

13   testimony that within individual congregations that

14   sometimes -- I forget.  It wasn't the word solicit.

15   There was another word that was used for obtaining

16   donations from people that sometimes they would say

17   this week we're asking for donations for improvements

18   to the congregation or next week it will be for the

19   Mission Board.

20          Do you know was the Mission Board ever

21   directly asking any individual congregations for

22   money?

23   A.    No.

24   Q.    Okay.  So you wouldn't know if Liberty

25   Ridge had ever done that?

**Witness Mark Torkelson**

43

```
1        A.     Not that I'm aware of.
2        Q.     Okay.  Is Liberty Ridge making any
3   payments to the Mission Board, say, for use of the
4   property?  Anything like that?
5        A.     No.
6        Q.     Did they ever, if you know?
7        A.     The only thing that they would have done
8   would have been if congregations voluntarily lifted an
9   offering for --
10        Q.     Lifted an offering, okay.  That was the
11   term I was looking for.
12        A.     To help the expense.
13        Q.     Okay.
14        A.     To repay the loan.
15        Q.     Okay.
16        A.     Some of those offerings may have been
17   sent to Liberty Ridge.
18        Q.     Okay.
19        A.     They would have then taken it and sent
20   those offerings to the Mission Board because the
21   Mission Board was the one who supplied the funds to
22   buy the farm to begin with.
23        Q.     Okay.  So that would have been the only
24   financial, I guess, going back and forth between the
25   two entities?
```

44

1    A.    That is correct.

2    Q.    Okay.  Is that -- would it be considered

3  in the form of a loan or was it more casual in that

4  when you get money in, just pay it back to the Mission

5  Board when you have it from, say, these donations from

6  congregation members?

7    A.    I'm not sure if I understand your

8  question.

9    Q.    I guess when it comes to the property

10 being owned by the Mission Board that Liberty Ridge is

11 operating on, was it structured in a sense of like

12 this is a loan, you need to pay us this much money

13 every month, or was it more casual in that if

14 donations came in, then it would just go to the

15 Mission Board to help offset that payment?

16   A.    There was nothing structured as far as

17 repaying the loan.

18   Q.    Okay.

19   A.    It was only a general understanding that

20 if offerings would come that were to pay toward the

21 farm, that those would be sent back to the Mission

22 Board.

23   Q.    Okay.  Were you aware of any of the work

24 that was done on Liberty Ridge such as there was --

25 there were crops that were being harvested.  There

45

1    were pallets being built, things like that.  Were you

2    generally aware of the type of work that was being

3    done?

4         A.    Generally.

5         Q.    Okay.  Was it anything that was brought

6    to your attention in the capacity of being a board

7    member or was it more just you heard about it and were

8    aware?

9         A.    Just heard about it and was aware of it.

10        Q.    Okay.  Does Liberty Ridge in any way have

11   to report its finances or report its profits or

12   business or anything like that to the Mission Board?

13        A.    No, they do not.

14        Q.    Okay.  So I guess in a bird's eye view of

15   the Mission Board's current or from 2011 when it was

16   created to the present involvement with Liberty Ridge,

17   does Liberty Ridge have to report any certain things

18   to the Mission Board or is it just what they feel they

19   should report at the time?

20        A.    If they want to make any expenditure over

21   $5,000, then they would need to get approval from the

22   Mission Board for that.

23        Q.    Okay.  And why is that?

24        A.    Just a system of checks and balances.

25        Q.    Okay.  Do you know if Liberty Ridge makes

46

1   any income reports, files tax returns, anything like

2   that?

3        A.    I'm not aware of that.

4        Q.    Okay.  When you say Liberty Ridge has to

5   report any expenditures over $5,000, do they ever have

6   to report any certain profits or income coming into

7   the program?

8        A.    No.

9        Q.    Okay.  Are you personally familiar with

10  or have you met either of our clients either David

11  Cross or Robert Miller?

12       A.    I am not familiar with them.

13            MS. FRANCHI:  Okay.  All right.  I think

14  if we could maybe take like a ten-minute break.  I

15  think I'm probably going to be done soon.  I just want

16  to take a look at everything and then if you have any

17  questions after that.

18            MS. WYNKOOP:  Sure.

19            THE VIDEOGRAPHER:  We are going off the

20  record at 9:47 a.m.

21            (Recess)

22            THE VIDEOGRAPHER:  We are going back on

23  the record.  The time is 9:58 a.m.

24  BY MS. FRANCHI:

25       Q.    All right.  So I only have a few more

47

1   questions for you.  I was hoping that you could

2   explain to me a little bit better about why is it that

3   the Mission has any sort of oversight over Liberty

4   Ridge.

5              And what I mean by that is once Liberty

6   Ridge became its own entity, why is it that the

7   Mission has any oversight over it at all?

8        A.    I think it would be primarily because we

9   feel that it's good for any committee to have a checks

10  and balance arrangement where somebody would be

11  overseeing it even if it's just in a general way.

12       Q.    Okay.  And when you say checks and

13  balances, what is it that you're kind of making sure

14  that you keep an eye on?

15       A.    The personnel that they would use and the

16  funds that are being used.

17       Q.    And why is it that you or the Mission

18  Board feels that those types of things need to be --

19  there needs to be an eye kept on them, and I mean that

20  in that, you know, other business or non-profits kind

21  of report to their own individual governing structure.

22  So why is it that the Mission Board oversees these

23  other entities, Liberty Ridge or any of the other ones

24  within the community?

25       A.    I suppose it's just because that's the

Witness Mark Torkelson

48

1  way we got started and doing it.

2       Q.     Okay.  Does it have anything to do with

3  making sure it's also -- these organizations are kind

4  of working within the guidelines of the Eastern

5  Pennsylvania Church or are there other reasons?

6       A.     Could you be more specific?

7       Q.     Yeah.  I guess what I'm trying to get at

8  is, you know, what is it that makes Liberty Ridge or

9  any of the other organizations overseen by the

10  Mission, why is it that they need this oversight for

11  checks and balances?  Is it to adhere to certain

12  standards?  Is it just to make sure that it's

13  following certain guidelines?  I want to understand a

14  little bit better about how -- how that works.

15       A.     I wouldn't say that it's because we feel

16  that there's a need for it as far as being suspicious

17  of any particular thing.  It's just probably the way

18  that we do these type of things that somebody knows in

19  a general way what's going on.

20       Q.     Okay.

21       A.     What's happening.

22       Q.     And I know we learned or at least I

23  learned a little bit more yesterday just about the

24  EPMC in general, and that it's not really an

25  organization in that it doesn't have an office or a

49

1    bank account or anything like that.  It's kind of a

2    nebulous association of the congregations.

3              So because of that, does the Mission then

4    kind of take on that role because it is an

5    organization to make sure that these institutions

6    within the church are kind of, I guess, acting

7    appropriately?

8         A.    The mandate of the Mission Board is that

9    it's the official organization that is looked to for

10   help whenever help is needed.

11        Q.    Okay.

12        A.    And so if it's a church wide program,

13   then it would in a certain manner be under the Mission

14   Board.

15        Q.    Okay.

16        A.    But not in any other way that I can think

17   of.

18              MS. FRANCHI:  Okay.  Okay.  I think that

19   is probably everything that I have to ask today.  I

20   don't know if you have any follow-up questions or

21   anything?

22              MS. WYNKOOP:  No.

23              MS. FRANCHI:  All right.

24              THE VIDEOGRAPHER:  This marks the end of

25   the deposition of Mark Torkelson.  We are going off

**Witness Mark Torkelson**

50

1   the record at 10:02 a.m.

2                    (The deposition was concluded at 10:02

3   a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Mark Torkelson**

51

```
1    COMMONWEALTH OF PENNSYLVANIA    )
                                     )  SS.
2    COUNTY OF YORK                  )

3

4              I, Tracy L. Lloyd, a Registered
     Professional Reporter and Notary Public in and for
     the Commonwealth of Pennsylvania and County of
5    York, do hereby certify that the foregoing
     testimony was taken before me at the time and place
6    hereinbefore set forth, and that it is the
     testimony of:

7

8                    MARK TORKELSON

9

10             I further certify that said witness
     was by me duly sworn to testify the whole and
     complete truth in said cause; that the testimony
11   then given was reported by me stenographically, and
     subsequently transcribed under my direction and
12   supervision; and that the foregoing is a full, true
     and correct transcript of my original shorthand
13   notes.

14             I further certify that I am not
     counsel for nor related to any of the parties to
15   the foregoing cause, nor employed by them or their
     attorneys, and am not interested in the subject
16   matter or outcome thereof.

17             Dated at York, Pennsylvania, this 1st
     day of November, 2022.
18

19

20             _____
               Tracy L. Lloyd, Notary Public
21             Registered Professional Reporter

22

23   (The foregoing certification does not apply to any
     reproduction of the same by any means unless under
     the direct control and/or supervision of the
24   certifying reporter.)

25   My Commission expires:
     April 21, 2023
```

**$**

**$5,000** 45:21 46:5

**1**

**1** 4:10
**1/3/54** 9:13
**10** 11:11,14
**10:02** 50:1,2
**12/19/21** 25:21
**12029** 9:23
**17011** 4:19
**18** 30:9,11
**186** 24:3
**1966** 15:5
**1968** 12:2,12
**1979** 11:5
**19th** 4:15

**2**

**2000** 8:2
**2004** 8:2
**2009** 21:20
**2010** 17:12 18:13,
24 21:21 24:20
26:12 27:6 30:8
31:16
**2011** 35:22 38:16
45:15
**2013** 16:19 17:12
**2014** 18:13
**2022** 4:15
**214** 4:18
**24** 10:14
**28th** 30:8
**29th** 26:12 31:16
**2nd** 24:20

**3**

**3rd** 27:6

**4**

**402** 4:19

**5**

**521-CV-05070-
JMG** 4:14

**8**

**86** 23:20,25 24:1,9
**87** 26:11
**88** 27:5
**89** 29:14
**8:58** 4:16

**9**

**90** 30:7
**91** 31:14
**92** 33:4,15
**95** 25:2
**9:47** 46:20
**9:58** 46:23

**A**

**a.m.** 4:16 46:20,
23 50:1,3
**accepted** 27:24
**account** 49:1
**accounts** 13:25
14:1 19:15
**acted** 18:4 33:9
**acting** 49:6
**activities** 14:24
19:4
**actual** 23:7 25:9
39:8

**address** 9:22
**adhere** 48:11
**administrative**
41:5
**adults** 10:9
**advertising**
36:12
**affirmed** 5:9
**age** 30:9,11
**agencies** 37:21
**agency** 30:19
**agree** 5:11,17
**agreed** 4:2
**agreement** 34:6
**Allgyer** 32:18
**altered** 18:23
**amount** 38:1
**Andreozzi** 4:23
**answers** 6:12
30:18
**anticipated**
28:24
**apologize** 5:24
28:6
**Apparently**
25:24
**appointed** 23:2
27:17
**appropriately**
49:7
**approval** 30:9
31:17 33:5 45:21
**approvals** 30:15,
19
**approve** 38:12
**approved** 34:8
**approving** 38:9
**approximate**
7:18 8:5 15:3
**approximately**
13:8 17:11 20:8

**approximation**
7:22
**area** 10:21 14:1
**arrangement**
47:10
**arrangements**
34:23
**asks** 6:8 16:4
**assigned** 41:2
**assistant** 17:1,3,
7,11,18,22 19:3
24:21
**association** 49:2
**assume** 7:2
13:19
**attention** 45:6
**attorney** 6:8 8:23
9:2 25:23
**Attorneys** 7:6
**August** 27:6
**Avenue** 4:19
**aware** 15:1 18:22
34:21 35:21 36:2,
7,11,16 37:23
43:1 44:23 45:2,8,
9 46:3

**B**

**back** 23:19,24
29:3,6 43:24 44:4,
21 46:22
**background**
8:16
**bad** 7:6
**balance** 47:10
**balances** 45:24
47:13 48:11
**bank** 12:21 13:25
14:1,3 19:15 49:1
**barns** 12:17,21
**Barry** 4:17
**basically** 12:24
17:19

**basis** 27:19
**began** 11:14
21:14 22:20,23
35:23
**begin** 12:10 39:5
43:22
**beginning** 41:2
**begins** 4:9
**believed** 22:5
**belong** 11:21
**Bible** 20:23
**binder** 23:15
**bird's** 45:14
**birth** 9:12
**bit** 8:18 14:15
15:15 19:5,19,24
20:13,14 21:5
22:3,16 35:8 47:2
48:14,23
**board** 15:9,23
16:4,6,8,15,20,23
17:21 18:2,5,18,
20 19:9 20:22
21:13,14 22:1,13,
21 24:15,17 27:18
28:6 29:21,22,25
30:24 31:12,20,
21,23,25 34:2,7,8,
10 37:3,15 38:3,
17,18,20 39:2,4,7,
8,12,15,17 40:6,
11,15 41:23 42:3,
19,20 43:3,20,21
44:5,10,15,22
45:6,12,18,22
47:18,22 49:8,14
**Board's** 45:15
**body** 14:23 15:16
**book** 23:22
**born** 9:14
**bottom** 24:21
**boys** 23:4 26:1,6,
13,17 27:2,7,13
28:11,19 29:7,15
30:7 31:2,6,24
33:15,22 36:24
**break** 7:8,13
46:14

**bring** 37:14 38:11

**brought** 8:20
22:12 31:19,23
34:7 37:6 45:5

**Brubaker** 27:10

**build** 12:17

**buildings** 25:2,8

**built** 45:1

**business** 10:23,
25 13:14,17 19:5,
11 20:12,15,18
25:12,15 32:8,21
34:12,15,19,22
35:1,4,5,16,23
39:9 41:14,15,25
45:12 47:20

**businesses**
13:10,20,22 33:23
35:22

**buy** 43:22

**bylaws** 18:19,22

———————

**C**

**called** 5:8 11:1

**Camp** 4:19

**capacity** 45:6

**care** 23:3

**carpenter** 10:17

**carried** 34:4

**case** 4:13 8:20
14:16 23:17 25:24
35:3

**case-related** 6:3

**casual** 44:3,13

**certificate** 11:13

**Chair** 35:6

**changed** 30:3

**checks** 45:24
47:9,12 48:11

**Cheverly** 9:15

**children** 10:3,5,6

**choosing** 28:22

**church** 11:18
12:8 14:23,25
15:12 19:23 20:4
23:7 48:5 49:6,12

**Clark's** 35:6,11

**clears** 19:25

**clients** 46:10

**closer** 31:14

**commissioned**
14:24

**committee** 20:24
22:18 23:1,11
26:2,5,13,15,24
27:8,11 28:11,17,
25 29:1 31:20,24
32:10 33:1,16
34:1,7 37:14
38:11 41:7 47:9

**community**
15:18 22:15,19
23:8,11 26:16
27:25 36:17 47:24

**company** 11:4,5
12:14,20 35:7,12,
13,17

**compile** 25:16

**compiled** 25:13

**complaints** 24:7

**completely** 6:1

**concerns** 22:12

**concluded** 50:2

**conduct** 18:20

**Conference**
12:10

**confusingly** 6:19

**congregation**
11:21 12:1 28:8,
13 42:18 44:6

**congregational**
19:9

**congregations**
22:14 36:18 42:9,
13,21 43:8 49:2

**considered** 44:2

**construction**
12:19,24

**consultation**
31:9 37:20

**consultations**
30:25

**contracted** 34:22

**corporate** 41:18,
20

**correct** 11:15
12:6,15 13:1,23
17:9 18:6 20:7
23:9,14 24:18,24
25:3,11 26:9,25
27:4,11,14 28:9,
15 29:12,24 34:3,
9 37:12,17 40:18
41:13 44:1

**counsel** 4:3,20
5:14 35:2

**countries** 20:6,9

**couple** 5:15

**court** 4:12 5:4

**created** 45:16

**creating** 21:14
26:6 30:20

**creation** 22:21
31:6

**crops** 44:25

**Cross** 46:11

**current** 29:17
45:15

**custom** 25:2,8

———————

**D**

**D.C.** 4:11

**date** 4:15 8:1 9:12
15:3 17:5 24:20
25:3

**dates** 7:19

**David** 32:17
46:10

**day** 5:25 38:4

**days** 5:15

**dealing** 19:4

**dealings** 32:8

35:17

**December** 30:8

**decisions** 40:21

**deemed** 33:10,12

**Defendants** 5:1,
3

**demolition** 13:2

**Department**
37:21

**Depos** 4:18

**deposition** 4:10,
18 6:6 7:17 9:1
14:20 15:15 49:25
50:2

**developing**
31:10

**direction** 27:3
29:1 39:13 40:10,
20

**directive** 28:23

**directly** 42:21

**directors** 15:9
16:9

**disapprove**
38:13

**discovery** 35:2

**discussed** 22:22
36:9

**discussing**
21:14 31:6

**discussion**
21:22 22:1,20,24
30:10,12,24 37:2,
24

**discussions**
31:5 33:21 34:11
37:19

**District** 4:12,13

**document** 24:10,
13,20

**documents** 9:4
16:16 18:19
23:16,19 24:10
25:5,13,16,22
41:20

**domestic** 20:12,
15,20

**domestically**
21:3

**donations** 19:10
42:16,17 44:5,14

**drink** 7:9

**Dutch-way** 35:7,
12

**duties** 16:13
17:17,23 19:20

———————

**E**

**Earl** 33:7

**earlier** 9:6 26:4
39:14

**easier** 23:18

**Eastern** 4:13
11:17,18 12:8
15:12 19:22 48:4

**Edelstein** 5:1,3

**education** 11:9

**elaborate** 22:3,
15

**Elton** 9:9

**employees** 13:4

**end** 38:4 49:24

**engage** 28:1

**enter** 34:5

**entire** 9:17 12:5
14:20 15:15

**entities** 20:12,20
43:25 47:23

**entity** 38:7 39:9
47:6

**EPMC** 15:13,16,
20,22 16:5 28:7,
12 42:9 48:24

**established** 27:8

**estimate** 7:18,22

**estimating** 7:7

**Ethan** 27:9 32:9

event 7:25 8:3,7 17:25

events 8:19

exact 8:1

EXAMINATION 5:19

existence 15:2

expect 7:5

expectations 6:5

expenditure 45:20

expenditures 46:5

expense 43:12

explain 47:2

eye 45:14 47:14, 19

**F**

facilities 21:1

fair 7:3,21 8:2,8

faith 11:19 12:4

familiar 32:10 34:16,25 35:4,8 41:17 46:9,12

families 26:18

farm 33:19,20 35:7,12 39:5 43:22 44:21

fashion 28:13,20

Feed 35:6,9,11

feel 6:21 21:8 45:18 47:9 48:15

feeling 26:19,21

feels 47:18

fiberglass 33:19

fields 20:1,2,3

figure 29:10

figured 23:18

files 46:1

filing 4:4 41:18

finances 19:2 45:11

financial 13:9,20 35:17 41:9,24 43:24

financially 19:6

find 17:21

findings 29:4,6

fine 7:11

firm 4:23

fit 33:10,12

follow-up 49:20

Foote 4:23

foreign 20:1

forget 42:14

form 4:6 19:3 28:13 44:3

formed 37:8

forward 38:5

found 29:11

frame 8:1 40:4

Franchi 4:22 5:11,21,23 24:8 46:13,24 49:18,23

Fred 32:17

Friday 5:25

front 23:16

full 9:8

fully 8:12

funding 19:6,8 39:2

funds 43:21 47:16

**G**

Garman 27:9

gates 33:17,19 34:16,22

gave 29:9 35:10

GED 11:13

Gehmans 33:7

general 8:16 15:17 22:14,17 37:14 41:12 44:19 47:11 48:19,24

generally 10:21, 22 13:24 19:2 24:11,16 27:25 32:22,23 35:2 37:6 39:9 40:4 45:2,4

give 6:8,14 7:21 15:3 17:24 18:1 23:22 38:18 39:5, 12 40:20

goal 29:9

good 5:16,22 47:9

Gotcha 13:18

govern 18:19

governing 15:16 18:18 47:21

governmental 30:19

grade 11:11,14

graduation 11:13

grandchildren 10:11

great 10:15 24:6

ground 12:24

guess 7:20 22:21 28:18,24 36:12,15 38:4 40:16 43:24 44:9 45:14 48:7 49:6

guidance 15:17, 20 16:4 41:12

guidelines 48:4, 13

**H**

halfway 23:21

handing 23:18

handles 19:2

hands 30:4

happen 6:20

happened 7:25 8:4

happening 48:21

harvested 44:25

head 6:10

hear 14:19 15:14

heard 42:12 45:7, 9

held 19:17

helped 20:19

Hill 4:19

hold 13:24

home 20:24 22:10 26:1,6,13, 17 27:2,8,13 28:11 29:15 30:7 31:2,7,10,24 33:15

homes 21:2 23:3, 6,7,10 26:8,21 28:18,19 29:7

honesty 17:20

Hopewell 11:22

hoping 47:1

hours 7:6 37:19

house 23:12 31:18 32:5 33:6, 10,11,12 38:11

houses 20:4

housing 26:7

**I**

idea 27:2 34:7

ideas 22:24 37:14

identify 4:20

immediately 17:6

implementing 22:23

important 8:10

improvements 42:17

include 30:11

income 46:1,6

incorporating 33:19,22

indicating 32:25

individual 22:13 23:3 26:21 42:9, 13,21 47:21

individuals 18:16 19:25 24:22 27:12,16 28:17 31:19,22 32:4,11, 15,25 33:9

institution 26:22

institutions 49:5

interaction 32:4

interest 13:16,21 26:3 27:19 41:24, 25

interests 13:10, 20 19:12 35:17

interstate 10:20

investigate 29:5

investigating 27:12

investigative 26:23 28:11,17

involve 41:9

involved 11:6 13:7 15:23 20:15, 17 21:3 25:17 31:21 33:2,3,21 34:11,19 39:8 41:1,23

involvement 16:5 17:23 38:6,8 39:1 42:8 45:16

involving 14:16, 17 34:11

issues 5:12 8:20

Item 33:16

**J**

Jacob  27:10

job  10:16 29:2

Jocelyn  5:2

jump  14:15

June  24:20 26:12

**K**

keeping  24:23

Keymar  9:21

kind  12:16 15:16
  19:20 22:4 26:5,
  15 27:3,12,24
  28:19,24 36:4
  47:13,20 48:3
  49:1,4,6

knew  32:7,20,22,
  23

knowledge
  27:16 32:4 42:8

Kylan  4:17

**L**

labor  33:19,22
  37:21 41:25

Lamar  27:9

Lancaster  12:9

law  4:23

leaders  15:22
  16:5

leaning  27:3

learned  15:15
  48:22,23

ledgers  41:10

legal  16:16

legs  7:10

length  22:22

Leroy  32:18

level  11:10 31:12
  38:3

Liberty  20:14,20
  21:2,6,15 22:22
  28:20 29:17 30:20
  31:20 33:5,20
  34:12,23 35:5,22,
  24 36:3,13,17,22
  37:4 38:5,6,15,16
  39:2,9,12,13,14,
  21 40:7,11,19
  41:15,18,19,24
  42:3,9,24 43:2,17
  44:10,24 45:10,
  16,17,25 46:4
  47:3,5,23 48:8

licensure  30:20

life  9:17 12:5

lifted  43:8,10

light  6:25

limited  13:5
  32:19

list  31:17,18 35:1

listed  32:5,12

lists  27:9

live  9:20,24 10:21
  14:2

lived  9:16,18

lives  21:24 22:7

LLC  33:17 34:16

Lloyd  5:5

loan  43:14 44:3,
  12,17

loaned  13:13

local  14:1,3

location  29:17

long  7:8 11:3,25
  15:1 16:18 23:5
  37:15

looked  49:9

losing  5:24

lot  19:21

LRF-86  23:21

**M**

make  6:5,14,18

7:15 24:25 25:8,
  18 40:20 45:20
  48:12 49:5

makes  13:18
  45:25 48:8

making  20:2 43:2
  47:13 48:3

man  13:14

manageable
  22:10

mandate  49:8

manner  49:13

manufacture
  33:18

Margolis  4:25 5:2

Mark  4:10 5:8 9:9
  49:25

Market  35:7,12

marks  49:24

Marlin  33:6,8

marriage  10:7

Martin  4:11 18:9
  27:10 32:18

Maryland  9:15,
  16,21 10:18,22
  11:23 14:8,10

matter  4:11,24
  5:24 8:25

matters  14:16
  16:6

maximum  30:9

Meck  32:17

Media  4:9

medical  30:25
  31:7

meet  23:2

meeting  26:3
  27:6

meetings  15:23
  16:6 24:17 36:9
  38:18,21

Meghan  4:25

member  11:17,
  25 12:7,9 16:23

18:5 45:7

members  23:7,
  12 28:5,7,12 40:7,
  12,15 41:23 44:6

men  21:24,25
  22:2,3,5,9 23:12
  26:7,17 28:10
  37:1

Mendez  5:2

Mennonite  11:18
  12:4 14:17

mentioned  12:13

mentors  31:18
  38:12

Mervin  18:9

Messianic  14:17

met  46:10

Mill  9:23

Miller  32:17 46:11

Mills  35:6,9,11

minutes  24:14,
  17,23 25:3,9
  26:12 31:15

Mission  14:18,
  19,22 15:1,8,19,
  20,23 16:4 19:5,7,
  8,11,14,20,24,25
  20:5,12,15,17
  21:3,13 24:15,17
  27:18 28:6 29:2,4,
  21,22,25 30:24
  31:20,21,23,25
  34:2 36:9 37:3,10,
  15 38:3,17 39:2,4,
  7,8,12,15,17 40:6,
  10,15 41:22
  42:19,20 43:3,20,
  21 44:4,10,15,21
  45:12,15,18,22
  47:3,7,17,22
  48:10 49:3,8,13

Mission's  38:6

Missouri  9:19

MMM  12:8

mode  26:20

money  13:13
  38:1 42:22 44:4,
  12

monitor  4:16

month  44:13

morning  5:22 7:6

motion  34:4

mouth  36:18,21

move  33:14

moving  25:22
  26:20 30:6 38:5

Mussers  33:7

**N**

names  24:21
  27:9 35:1,9 38:11

nature  36:25

nebulous  49:2

needed  21:25
  22:5 49:10

Nelson  18:11
  27:10

Newswanger
  32:18

nod  6:10

Nolt  18:11

non-profits
  47:20

non-verbal  6:9

normal  18:4

notation  29:15
  30:7

noted  30:8

November  31:16

number  4:10,13
  37:19

numbered  23:17,
  18

**O**

objections  4:5

observer  40:21,
  22

observing  41:1

**obtaining** 42:15

**occur** 15:25 24:5

**occurred** 8:3

**October** 4:15

**offering** 43:9,10

**offerings** 19:9 43:16,20 44:20

**office** 48:25

**official** 49:9

**offset** 44:15

**one-year** 34:5

**onward** 18:24 38:16

**open** 38:5,15

**opened** 38:16

**operate** 39:6

**operating** 44:11

**ordinary** 16:23

**organization** 48:25 49:5,9

**organizations** 19:21 48:3,9

**original** 30:10

**outrageous** 37:16

**outreach** 14:24 19:22

**oversee** 14:24 20:19

**overseeing** 47:11

**overseen** 48:9

**oversees** 19:21 20:5 47:22

**oversight** 29:1 38:19 47:3,7 48:10

**owned** 11:3 44:10

**ownership** 13:21 39:10

**owns** 34:18 35:19

---

**P**

**PA** 4:19

**pages** 23:17,25 25:1

**Pallet** 35:7,12,13

**pallets** 45:1

**parents** 31:18 32:5 33:6,10,11, 13 37:25 38:12

**part** 12:4 25:3,9, 19 40:23,25

**parties** 4:3

**partnership** 13:6

**parts** 19:22

**past** 41:23 42:5

**Paula** 10:2,4

**pay** 44:4,12,20

**paying** 38:1

**payment** 44:15

**payments** 43:3

**peers** 22:11

**Pennsylvania** 4:13 11:17,18 12:8 15:12 19:23 48:5

**people** 13:7 22:13 32:1,21 36:16,23 42:16

**perfectly** 7:11

**personal** 13:25 14:13,14 19:10 27:19 41:14

**personally** 32:7, 14,22 35:21 39:20 42:2 46:9

**personnel** 31:16 38:9,25 47:15

**place** 4:18 25:22 39:5

**placing** 26:17

**Plaintiffs** 4:24 5:23

**Planet** 4:17

**point** 26:19 27:1 36:13 39:17

**pole** 12:17 25:2,8

**position** 16:11, 22,24

**preached** 36:18

**preceding** 17:6

**preliminary** 5:12 6:4

**preparation** 9:1

**present** 35:23 41:23 45:16

**presented** 33:17 34:2

**pretty** 24:6

**prevent** 8:12

**previously** 32:16

**price** 37:25

**primarily** 19:25 22:6 47:8

**printed** 23:16 25:5

**printing** 25:17

**prior** 32:3

**proceedings** 16:15

**process** 27:23 28:2,3 32:25

**professional** 31:9

**professionals** 31:1

**profits** 45:11 46:6

**program** 30:10 37:14 46:7 49:12

**programing** 37:25

**programming** 37:4

**programs** 21:2

**project** 27:20

**properties** 28:18

**property** 14:6,13, 14 29:15,16,20,23 30:1 39:10,21 40:7,11,16,20 43:4 44:9

**proposal** 33:17 34:1

**psychological** 30:25 31:8,9

**Publication** 20:22

**publications** 36:12

**purchase** 29:14, 16

**purchased** 29:20,23 39:4

**purely** 40:21,22

**purpose** 34:13

**put** 5:12 24:4 26:5,15 27:25 36:12

---

**Q**

**question** 4:6 6:8, 18,22 7:1,3,13,14, 24 16:2 25:6 31:4 44:8

**questions** 6:3,4, 12,15 8:16,19,22 21:7,9,11 28:25 30:18 36:16 46:17 47:1 49:20

**quickly** 22:21

---

**R**

**R.M.** 4:11

**Raymond** 32:18 33:7

**read** 33:8

**reading** 4:3

**real** 17:22

**reason** 6:21 7:10 34:12,13

**reasons** 48:5

**rebellious** 22:9

**recall** 7:19 18:13, 14 24:19 27:15, 21,22 28:6,16 33:24 36:10,25 39:19

**receive** 11:12 15:20

**receives** 19:6

**Recess** 46:21

**recognize** 24:10

**record** 9:7 16:15 46:20,23 50:1

**refer** 14:18 15:13

**referring** 26:24 29:16

**registration** 41:19

**related** 42:2

**relates** 15:19 31:1

**remember** 8:3,7 21:17 22:25 27:22 28:2,3,23 30:12 31:11 34:14

**Renee** 4:22 5:23

**repay** 43:14

**repaying** 44:17

**repeat** 6:22

**repeating** 5:14

**rephrase** 16:3

**report** 17:24 18:1 29:3,6 38:17,18, 20 39:15 45:11, 17,19 46:5,6 47:21

**reported** 26:2

**reporter** 5:4,5

**reports** 41:10 46:1

**represent** 4:21, 23 5:1,3,23

**representative**

**Witness Mark Torkelson** 6

15:12

**representing** 4:17

**request** 38:22,24

**requested** 33:6

**reserved** 4:6

**residential** 20:25 21:1

**residents** 30:9, 11 33:20 36:13 37:20

**respective** 4:3

**response** 6:9 7:2

**responses** 6:13, 15

**responsibilities** 16:14

**responsible** 20:2

**rest** 20:24

**restoration** 12:25

**Restore** 12:22

**restriction** 7:12

**restroom** 7:9

**resumes** 27:24

**returns** 46:1

**review** 9:4

**Ridge** 20:14,21 21:2,6,15 22:22 28:20 29:17 30:21 31:20 33:5 34:12, 23 35:5,23,24 36:3,13,17,22 37:4 38:5,6,15,16 39:3,9,13,14,15, 21 40:7,11,19 41:15,18,19,24 42:3,10,25 43:2, 17 44:10,24 45:10,16,17,25 46:4 47:4,6,23 48:8

**road** 9:23 21:7

**Robert** 46:11

**role** 49:4

**rules** 6:6 18:19

**run** 15:9 28:19

---

**S**

**safe** 12:3 29:8 34:6 37:13 40:14

**save** 21:12

**scanned** 25:5

**schools** 20:4,23

**Scott** 27:10

**sealing** 4:4

**secretary** 16:12, 18 17:7,8 24:21, 22

**seek** 31:25

**seeks** 16:5

**selected** 27:16, 18

**selection** 27:23 31:21 32:25

**Senate** 4:19

**sense** 6:19 7:15 13:18 22:14,18 44:11

**Sensenig** 35:6

**serve** 38:9

**service** 20:1

**Services** 11:2

**set** 13:5 20:20 30:9 33:18 34:23

**share** 18:2

**shared** 31:17

**shop** 33:18 35:6

**Siegrists** 33:7

**sign** 16:16

**signed** 16:17

**signing** 4:4

**simply** 7:20 8:6 22:11 23:11

**Simpsons** 9:23

**Snyder** 33:17 34:15,22

**sold** 27:2

**solicit** 36:13 42:14

**soliciting** 23:3,6, 10

**sort** 11:12 31:7 47:3

**sorts** 20:5

**sought** 30:15,20

**sound** 37:15

**sounds** 37:16

**spare** 5:13

**speaking** 5:25 9:2

**specific** 8:19 12:1 17:23 37:5 48:6

**specifically** 7:20 14:16,17 24:11 26:1 29:7 33:15 41:18

**spell** 9:10

**spiritual** 22:7 26:7

**spoke** 15:11

**spoken** 8:17

**Sporadic** 40:5

**staff** 36:3

**standards** 48:12

**start** 8:23

**started** 11:5,7,8 41:3 48:1

**starting** 8:16 13:14 14:21 27:13

**state** 4:21 9:8 10:22

**States** 4:12 20:6

**stenographer** 6:11

**step** 39:18

**stipulated** 4:2

**STIPULATIONS** 4:1

**stretch** 7:10

**strictly** 19:9

**structure** 19:5 21:24 37:3,9 47:21

**structured** 19:7 44:11,16

**structuring** 41:7

**stumbling** 14:19 15:14

**Suite** 4:19

**suited** 21:9

**supplied** 43:21

**suppose** 47:25

**suspicious** 48:16

**swear** 5:5

**switch** 12:11

**system** 45:24

---

**T**

**T-O-R-K-E-L-S-O-N** 9:11

**tabbed** 23:25

**tabs** 24:5

**taking** 4:18

**talk** 20:13 22:2

**talked** 35:25

**talking** 36:4

**talks** 29:14 30:7 33:16

**task** 29:9

**tax** 46:1

**telling** 21:11

**ten** 40:1,2

**ten-minute** 46:14

**term** 43:11

**testified** 5:9

**testify** 8:13

**testimony** 42:13

**thing** 5:13 6:7 8:10 28:22 43:7 48:17

**things** 20:3 39:16 41:5 45:1,17 47:18 48:18

**thinking** 24:4

**third-party** 33:23

**thirds** 25:25 27:7

**time** 4:6,16 7:7,8, 19 8:1 11:7 15:6 17:15,16 18:8 21:12 22:23 24:23 31:14 40:4 45:19 46:23

**times** 16:4 39:23 40:25

**Timothy** 32:17

**today** 4:17 5:5 6:2,6,13,15 8:10, 13,21,23 9:1,8 49:19

**Today's** 4:15

**told** 36:23 37:10 39:14

**top** 25:1,7 31:15

**Torkelson** 4:11 5:8,22 9:9 49:25

**township** 30:8,15

**Tracy** 5:5

**training** 36:2,4

**transcript** 4:4 5:13

**transmitting** 25:22

**transposed** 25:10

**travel** 10:20

**treasurer** 17:2,4, 8,12,18,22,25 18:7,10,12 19:1,3

**treasurer's** 17:24 19:4

**treatment** 31:1,8

**trial** 4:7

**truth** 8:11,13

**turn** 23:20 26:10 29:13 31:13

**turned** 24:9

**type** 6:13 21:1,2 38:19 45:2 48:18

**types** 12:19 30:14 47:18

**typing** 6:12

**U**

**uh-huh** 6:10

**understand** 6:5, 18,21 16:1 25:6 31:3 44:7 48:13

**understanding** 44:19

**understood** 7:2

**United** 4:12 20:6

**unsolicited** 39:13

**unstructured** 22:11

**updated** 18:23

**V**

**vein** 13:19 26:15

**verbal** 6:9,13,15 7:1

**video** 4:16,18

**view** 45:14

**visit** 40:11

**voice** 4:20 5:24

**volition** 40:17

**voluntarily** 43:8

**W**

**waived** 4:5

**wanted** 38:21

**Weathertight** 11:2 12:14

**Weaver** 27:9 32:9

**Weavers** 33:8

**week** 42:17,18

**Wengerd** 35:6,9, 11,13

**Wesbanco** 14:5

**wide** 49:12

**wife** 9:25 10:4

**word** 36:18,20 42:14,15

**worded** 6:19

**words** 14:21

**work** 10:23 12:16, 18,19,21,25 13:2, 25 20:5,9 22:24 29:2 37:19 41:3,8 44:23 45:2

**worked** 11:3 25:21 36:19

**working** 11:14 26:2 48:4

**works** 48:14

**wow** 10:9,15 20:11

**Wynkoop** 4:25 5:17 24:6 46:18 49:22

**Y**

**year** 9:18

**years** 8:2,4 17:12

**yesterday** 5:13, 25 15:11,16 42:12 48:23

**young** 13:14 21:24 22:2,9 23:12 26:7,17 37:1

# EXHIBIT F

**In the Matter Of:**

# D.C. AND R.M. vs.

# NELSON MARTIN, et al.

Gerald Nolt

# October 19, 2022

**HKW, LLC**
764 Corporate Circle, Suite 200
New Cumberland, PA  17070
717.214.1182
Schedule@hkwllc.com



**Witness Gerald Nolt**

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA


D.C. AND R.M.,                   :
          Plaintiffs             :
                                 :
          vs.                    :
                                 :
NELSON MARTIN D/B/A              :
LIBERTY RIDGE FARM,              :        CIVIL ACTION
LIBERTY RIDGE FARM,              :  NO: 5:21-CV-05070-JMG
EASTERN PENNSYLVANIA            :
MENNONITE CHURCH AND             :
RELATED AREAS, AND               :
MENNONITE MESSIANIC              :
MISSION OF THE EASTERN           :
PENNSYLVANIA MENNONITE           :
CHURCH,                          :
          Defendants             :
```

```
    DEPOSITION OF:    GERALD NOLT

   TAKEN BY:          PLAINTIFFS

   REPORTER:          TRACY L. LLOYD, RPR
                      NOTARY PUBLIC

                      KYLAN BARRY, VIDEOGRAPHER

   DATE:              OCTOBER 19, 2022, 11:12 A.M.

   PLACE:             MARGOLIS EDELSTEIN
                      214 SENATE AVENUE, SUITE 402
                      CAMP HILL, PENNSYLVANIA
```

**Witness Gerald Nolt**

2

1   APPEARANCES:

2         ANDREOZZI & FOOTE
          BY:  RENEE E. FRANCHI, ESQUIRE
3              4503 NORTH FRONT STREET
               HARRISBURG, PENNSYLVANIA  17110
4              (717) 686-9936
               Renee@vca.law
5
               -- For the Plaintiffs
6
          MARGOLIS EDELSTEIN
7         BY:  MEGHAN WYNKOOP, ESQUIRE
               JOCELYN MENDEZ, ESQUIRE
8              THE CURTIS CENTER, SUITE 400E
               170 SOUTH INDEPENDENCE MALL W.
9              PHILADELPHIA, PENNSYLVANIA  19106
               (215) 922-1100
10             mwynkoop@margolisedelstein.com

11
               -- For the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Gerald Nolt**

3

1                    INDEX OF WITNESSES

2    EXAMINATION                                PAGE

3    GERALD NOLT

4         By Ms. Franchi                          5

5         By Ms. Wynkoop                         --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                   STIPULATIONS

2          It is stipulated and agreed by and between

3    counsel for the respective parties that the reading,

4    signing, sealing, and filing of the transcript is

5    waived and that all objections, except as to the

6    form of the question, are reserved to the time of

7    trial.

8

9               THE VIDEOGRAPHER:  Here begins Media

10   Number 1 in the videotaped deposition of Gerald Nolt

11   in the matter of D.C. and R.M. v. Martin, et al, in

12   the United States District Court for the Eastern

13   District of Pennsylvania, Case Number

14   521-CV-05070-JMG.

15               Today's date is October 19th, 2022.  The

16   time on the video monitor is 11:12 a.m.  The

17   videographer today is Kylan Barry representing Planet

18   Depos.  This video deposition is taking place at 214

19   Senate Avenue, Suite 402, Camp Hill, PA, 17011.

20               Would counsel please voice identify

21   themselves and state whom they represent.

22               MS. FRANCHI:  I'm Renee Franchi with the

23   law firm of Andreozzi and Foote, and I represent the

24   Plaintiffs in this matter.

25               MS. WYNKOOP:  Meghan Wynkoop, Margolis

5

1   Edelstein, and I represent the Defendants.

2            MS. MENDEZ:  Jocelyn Mendez, Margolis

3   Edelstein, and I represent the Defendants.

4            THE VIDEOGRAPHER:  The court reporter

5   today is Tracy Lloyd.  Will the reporter please swear

6   in the witness.

7

8            GERALD NOLT, called as a witness, being

9   affirmed, testified as follows:

10

11           MS. FRANCHI:  May we begin?

12           THE VIDEOGRAPHER:  Yes.

13           MS. FRANCHI:  Okay.  Once again, same

14   preliminary matters as put on the first transcript

15   yesterday morning with Ethan Weaver will be the same

16   for now; correct?

17           MS. WYNKOOP:  Correct.

18           MS. FRANCHI:  Okay.

19

20                       EXAMINATION

21

22   BY MS. FRANCHI:

23       Q.    It's still morning.  Good morning,

24   Mr. Nolt.  Thank you for coming in today.  Again, my

25   name is Renee Franchi.  I represent the Plaintiffs in

Witness Gerald Nolt

6

1    this matter, David Cross and Robert Miller.  We

2    appreciate you coming in today.

3              I am slowly losing my voice as I've been

4    talking for a day and a half now, so I apologize if I

5    start coughing or I've been drinking water the whole

6    time.

7              Before I start with my questions relating

8    to the actual case, we have to go through just some

9    preliminary matters that unfortunately counsel has now

10   heard me say this for the fourth time just so that you

11   know the expectations and the rules for giving a

12   deposition.

13             So the first thing I'd like to go over is

14   that when I or your attorney, if she does, ask you any

15   question, you have to give verbal answers.  This means

16   not just nodding or shaking your head.  Even though

17   there is a video camera, we have a stenographer here

18   taking down the testimony.  So make sure that when you

19   do respond, it's an audible verbal answer and not like

20   mm-hmm or something like that.  So will you be able to

21   do that today?

22        A.    Yes.

23        Q.    Okay.  And you'd be surprised at how many

24   say uh-huh, but it's not a trick question.  I swear.

25   So next, if you're asked a question that you don't

Witness Gerald Nolt

7

1  understand or if it didn't make sense for any reason

2  whatsoever whether it be because I worded it

3  confusingly or I mumbled or for any other reason,

4  please feel free to tell me that you don't understand

5  or ask me to repeat it or ask me to rephrase a

6  question.  I can certainly do that for you.  Can you

7  do that today?

8      A.     Yes.

9      Q.     Okay.  So in that same light, if you are

10  asked a question and you do answer the question with a

11  verbal response, then I will assume that you

12  understood the question.  Is that fair?

13      A.     Yes.

14      Q.     Okay.  So I expect that we'll be here for

15  maybe a few hours.  I don't anticipate it taking more

16  than that, but I always say that attorneys are

17  notoriously bad at estimating time, so don't take me

18  at my word.

19          So if you do need a break at all, I know

20  we mentioned taking a lunch break for a little bit,

21  but if you do need to stand up, stretch your legs, get

22  something to drink, use the restroom at any point,

23  that's totally fine.  Just let me know, and we can

24  take a break.

25          The only restriction is that if I ask you

8

1  a question and the answer is pending and that you

2  haven't answered yet, we ask that you answer the

3  question and then say I need to take a break.

4       A.    Okay.

5       Q.    So is that fair?

6       A.    Understood.

7       Q.    Okay.  So at some point during the

8  deposition I may ask you to estimate or approximate

9  like a date or a time frame or something to that

10  effect.  Please don't simply guess or take a stab in

11  the dark.  That's not what I want.  But if there's

12  something that you think you can give a fair

13  estimation or approximation, please do so.

14           For example, if I ask you about a certain

15  event or a certain thing that happened and you say,

16  you know, I know that it happened between the years of

17  1990 and 1995, please just let me know that you are

18  estimating it's between this time, but you don't know

19  the exact date.  That's perfectly fair.  But if you

20  simply do not know or do not remember, please let me

21  know.  Can you do that today?

22       A.    Yes.

23       Q.    Okay.  And the last thing, the most

24  important thing is we just ask that you tell the truth

25  today.  That's all we want.  If you cannot answer

9

1  something truthfully or you don't know, just let us

2  know.  Is there anything that would prevent you from

3  being able to fully testify to the truth today?

4        A.    No.

5        Q.    Okay.  So I'm going to start with just

6  some general background questions.  I don't know you.

7  We've never spoken before, so I'll just get to know

8  you a little bit, and then we'll move into generally

9  more specific questions pertaining to this specific

10  case.  Your attorney may or may not have some

11  questions when I'm done.

12              But with that being said, do you have any

13  questions before we start?

14        A.    No.

15        Q.    Okay.  So first, what, if anything, did

16  you do to prepare for your deposition today other than

17  speaking with your attorney?  You don't need to tell

18  me about that.

19        A.    I prayed about it.

20        Q.    Okay.  Did you review any documents?

21        A.    No, I did not.

22        Q.    Okay.  So as your attorney pointed out,

23  there is a binder in front of you.  I may be referring

24  to it at some point to look at some documents.  They

25  are all numbered down on the bottom right-hand corner

10

1    of each page.

2              So when I do refer to a page, I'll let

3    you know the number.  I'll give you some time to flip

4    to it and look it over, and then you can just let me

5    know if you're done or if you found it.  If you ever

6    need more time, again, please let me know.  I want to

7    make sure that we get all the questions answered, and

8    that you're comfortable, and everything is going well,

9    so all right.

10             I know that we had mentioned your name at

11   the beginning.  But if you could, just for the record

12   what is your full name?

13        A.    Gerald H. Nolt.

14        Q.    And how do you spell your last name?

15        A.    N-o-l-t.

16        Q.    What's your date of birth?

17        A.    11/26/65.

18        Q.    Where were you born?

19        A.    Lancaster County.

20        Q.    In Pennsylvania?

21        A.    Yes.

22        Q.    There's actually a Lancaster, but they

23   call it Lancaster in Massachusetts.  They say it

24   differently.  Have you lived in Pennsylvania your

25   whole life?

**Witness Gerald Nolt**

11

1    A.    Yes.

2    **Q.    Okay.  Always in Lancaster County?**

3    A.    No.

4    **Q.    Where else have you lived?**

5    A.    I'm in Newport now which is Perry County,

6    Pennsylvania.

7    **Q.    Okay.  So that's pretty close by?**

8    A.    Yeah.

9    **Q.    What do you do for a job?**

10   A.    Truck driving and shop mechanic work.

11   **Q.    And do you do interstate trucking?**

12   A.    No.  It's all in PA.

13   **Q.    Okay.  Who do you work for?**

14   A.    Self-employed.

15   **Q.    Okay.  What's the name of your company?**

16   A.    Winding Hill Express.

17   **Q.    Is that the same company that you said**

18   **you do shop work or is that something different?**

19   A.    Yeah.  We do our own repair work.

20   **Q.    Oh, okay.  So how long have you owned**

21   **this company?**

22   A.    1995, so it's 27 years.

23   **Q.    And is that -- did you start the company**

24   **or did you buy it?**

25   A.    Yes.

12

1      Q.      Okay.  Do you have any employees?

2      A.      Yes.

3      Q.      How many?

4      A.      Presently there is three.

5      Q.      Okay.  So what kind of items do you

6   usually transport?  Do you have your own items or do

7   you contract it out?

8      A.      We're contracted out, and the items

9   are -- it is liquid manure from animal production

10  facilities.

11     Q.      Okay.  So you have specialized trucks?

12     A.      It's what you would not like to enjoy

13  when you have a picnic.

14     Q.      So are the trucks kind of specialized

15  then for transportation?

16     A.      Yes.  Yep.  Yep.  Exactly.

17     Q.      And you do all your own repairs,

18  everything like that?

19     A.      Yes.

20     Q.      Do you -- did you -- is this something

21  that -- a trade that you learned on your own or did

22  you go to school for that?

23     A.      I learned it from my dad.

24     Q.      Okay.  So your dad did this before you?

25     A.      Yeah.

**Witness Gerald Nolt**

13

1    Q.    Okay.  What's your education level?

2    A.    Grade 8 plus three-hour school.

3    Q.    Okay.  So after grade -- around what

4  age -- now I can't remember about how old you are in

5  8th grade.  Would that be like 13, 14 years old?

6    A.    Usually 14 and then three hours last

7  until you're 15 years old.

8    Q.    Okay.  Yeah.  Tell me about that a little

9  bit, so what does that mean?

10   A.    Three hours mean that you go to classroom

11 for three hours a day -- three hours a week.

12   Q.    Okay.

13   A.    And you keep a diary.  And during the

14 week, you are to keep a diary that you're doing

15 productive work at home.  You have a certain amount of

16 words you're supposed to put down, things that you did

17 during the day so that the teacher and the education

18 system understands that you were involved in

19 productive labor.

20   Q.    Okay.  So did you mainly just work with

21 your family then?

22   A.    Yes.

23   Q.    Okay.  Was it a paid job?

24   A.    No.

25   Q.    So who would you submit, I guess, your

14

1    papers and this -- your paragraphs and everything you

2    would write and your descriptions, who would you

3    submit that to?

4         A.    To the school teacher --

5         Q.    Okay.

6         A.    -- that would -- we would all congregate,

7    gather, all the three-hour students from several

8    schools would gather on Saturday morning for three

9    hours.  Have some curricular assignments and submit

10   our diaries and everything.

11        Q.    And I don't want to be presumptuous, but

12   I'm assuming this is a teacher within your Mennonite

13   community?

14        A.    Yes.

15        Q.    Okay.  And were you -- I guess you are

16   currently a member of the Eastern Pennsylvania

17   Mennonite Church?

18        A.    Yes.

19        Q.    What congregation do you go to?

20        A.    Millerstown.

21        Q.    And how long have you been attending

22   there?

23        A.    Since 1995.

24        Q.    Okay.  Have you always been a member --

25   I'm going to just refer to it as the EPMC.  It will be

15

1   easier than me stumbling over my words the whole time.
2   Have you always been a member of the EPMC?
3       A.     No.
4       Q.     Where were you a member prior to that?
5       A.     Weaverland Conference.
6       Q.     Okay.  And that was also in Pennsylvania?
7       A.     Yes.
8       Q.     Okay.  And when you said -- what year did
9   you become a member of the EPMC?
10      A.     1992.
11      Q.     Okay.  Was that -- did your whole family
12  decide to change or is that you personally?
13      A.     My wife and I.
14      Q.     Okay.
15      A.     Yes.
16      Q.     Okay.  What's your wife's name?
17      A.     Gloria.
18      Q.     How long have you been married for?
19      A.     Since 1985 which is --
20      Q.     Just the year is fine.  If you asked me
21  to do math on the spot, I would not be able to, so
22  that's good.  Do you have any children?
23      A.     Yes, we do.
24      Q.     How many?
25      A.     Nine.

**Witness Gerald Nolt**

16

1    Q.    Oh, wow.  Okay.  Are they all adults or
2    is there some minors?
3        A.    They are all adults.
4    Q.    Okay.
5        A.    As of last year.
6    Q.    Oh, wow.  So just you and your wife live
7    together or do you have any of your children living
8    with you?
9        A.    There's three at home yet.
10   Q.    Oh, there are.  Okay.  Any grandkids?
11       A.    Yes.
12   Q.    How many?
13       A.    19.
14   Q.    Wow.  I'm going to ask you all of their
15   birth dates.  No, I'm just kidding.  That would be
16   terribly mean unless you know them all, and you can
17   impress me.
18       A.    I know the first one.
19   Q.    I mean that's the most important one;
20   right?
21       A.    It was.
22   Q.    So do you have any position or title
23   within the congregation that you are a part of?
24       A.    No.
25   Q.    So you just consider yourself to just be

17

1  a member of that congregation?

2      A.    A member, yes.

3      Q.    Okay.  And what does it mean to you to

4  be, I guess, a member of the EPMC?  Meaning, and I

5  won't get specifically into what your beliefs are, but

6  is there just a general guidance or is there other

7  certain, I guess, general rules or just things that

8  you live by that's common to other people that are

9  within the EPMC?  Like what does it mean to you to be

10  a member of that church?

11      A.    I'm not sure that I totally understand

12  what you're asking.

13      Q.    Just more of just a general sense to you

14  what does it mean to be a member of the EPMC.  Like is

15  it a general set of beliefs that everybody shares?  Do

16  you try to live the same type of common practices?

17  What does it mean to you?

18      A.    In answer to your statements, yes.  We do

19  live -- we do have a general set of beliefs and live

20  by those, yes, and I'm happy to be there.  It's just a

21  good place to be.

22      Q.    So I'm going to transition a little bit

23  more specifically now into some businesses.  I know

24  that you said it was Winding Hills is the name?

25      A.    Winding Hill Express.

18

1    Q.    Winding Hill with no S?

2    A.    Yeah.

3    Q.    Okay.  Do you have ownership interest in

4  any other businesses?

5    A.    Yes, I do.

6    Q.    Which ones?

7    A.    Chestnut Ridge Mulch.

8    Q.    And what type of ownership interest do

9  you have in that business?

10    A.    Simply it's an LLC, and my son and I have

11  divided shares in that.  I have 80 percent.  He has 20

12  percent.

13    Q.    And is your son more active in the

14  company?

15    A.    Yes.

16    Q.    Okay.  So he is the one that kind of runs

17  it day-to-day?

18    A.    He does.

19    Q.    And do you have any financial interests

20  in any other businesses other than the ownership

21  interest in Chestnut Ridge and your trucking company?

22    A.    No.

23    Q.    Now, are both Chestnut Ridge and Winding

24  Hill with no S, are they both based in the same

25  general area in Pennsylvania?

**Witness Gerald Nolt**

19

1      A.      Chestnut Ridge Mulch is in Blairsville,
2  PA.
3      Q.      Okay.  What county is that?  I forget.
4      A.      Indiana.
5      Q.      Oh, okay.  So it's a little bit further
6  west, yeah.
7      A.      It's several hours west, yes.
8      Q.      Okay.  Do you and your businesses or I
9  guess specifically your primary business, do you hold
10  bank accounts in the same general area?  Like is it a
11  local bank or do you bank nationally?
12      A.      Winding Hill does the account -- does the
13  banking at Juniata Valley at Millerstown.
14      Q.      Okay.
15      A.      And Chestnut Ridge does the banking at
16  Indiana First Bank and also at Millerstown.  There's
17  accounts in either bank.
18      Q.      Okay.  What about you personally?  Same?
19      A.      It's Juniata.
20      Q.      Okay.  Do you own any property anywhere?
21      A.      My personal property and the adjoining
22  property.
23      Q.      And do you -- I guess is there like a
24  main shop or property that you run your business out
25  of or is it out of your house?

**Witness Gerald Nolt**

20

1       A.      Well, they're at the same address.

2       Q.      **Oh, they are.  Okay.**

3       A.      Yes.

4       Q.      **So I want to kind of skip ahead a little**

5    **bit to the -- kind of leading up to the creation and**

6    **beginning business of Liberty Ridge.**

7               **So it's my understanding that you were**

8    **involved in the committee work with kind of developing**

9    **Liberty Ridge, is that correct?**

10      A.      Yes.

11      Q.      **How did you first become involved in the,**

12   **I guess, inception of the concept of Liberty Ridge?**

13      A.      I was asked if I would serve on the

14   committee, and that's how I started.

15      Q.      **Who asked you?**

16      A.      The chairman at that time -- no, no.  He

17   was not the chairman.  I'm sorry.  Lamar Garman was

18   one of the committee members, and he asked me, and

19   that's how I responded.

20      Q.      **So you were asked specifically by**

21   **somebody who was already within the committee?**

22      A.      Yes.

23      Q.      **Okay.  And was his name again?**

24      A.      Lamar Garman.  He's no longer on the

25   committee.

21

1    Q.    Okay.  Were you approached at all by
2  anyone in the Mennonite Messianic Mission that I'm
3  just going to refer to as the Mission to do any of
4  this work or was it only from people who were --
5  Mr. Garman who was already on the Liberty Ridge
6  committee?
7    A.    All of my correspondence was with the
8  Liberty Ridge committee.
9    Q.    Okay.  And do you recall around when it
10 was that you first were approached by Mr. Garman to
11 help out?
12   A.    When I became part of the committee was
13 on April 2011.
14   Q.    So when you first became involved in the
15 committee, what were your duties or your
16 responsibilities?
17   A.    I had no specific assignments as I came
18 on.  That only developed later.
19   Q.    Okay.  So when you first came on, tell me
20 a little bit -- give me kind of a bird's eye view of
21 what you were asked to do and just what you
22 participated in when you first become involved in the
23 committee?
24   A.    Some of my first assignments were to help
25 recruit mentors.  I don't recall clearly how that was.

22

1    Q.    That's fine.  Did you or did your

2  committee, if you remember, receive any direction or

3  oversight from the Mission Board in creating Liberty

4  Ridge?

5    A.    Yes.

6    Q.    Okay.  Do you recall what involvement

7  there was with the Mission Board?

8    A.    Mission Board, yes, I do recall.  Mission

9  Board approved the members that were asked and

10 approved basically everything that we did.

11   Q.    Okay.  While you were on the committee --

12 I'll kind of separate it out from creating Liberty

13 Ridge and then after it kind of became an entity, so

14 we're still kind of working before it was an official

15 entity.

16         Did you attend any of the Mission Board

17 meetings or discuss any Liberty Ridge matters with the

18 Mission Board personally?

19   A.    No.

20   Q.    Okay.  What about as a committee?  Were

21 you involved in any communications with or discussions

22 with the Mission Board regarding Liberty Ridge?

23   A.    Yes, some.

24   Q.    Okay.  What kind of conversations?

25   A.    Just strategy for developing protocol,

23

1   moving forward.  We just had to develop it from the

2   ground up.

3       Q.    Okay.  So while developing Liberty Ridge

4   from the ground up, what did you and the committee use

5   as, I guess, your guidance in developing it, if any?

6   Was it kind of just an idea on its own or did you look

7   elsewhere?

8       A.    We compared -- we -- and this is where I

9   was not along at the very beginning when several

10  handful of the brethren went and visited other

11  institutions that were doing what we anticipated

12  doing.

13      Q.    Do you remember -- and I know you said

14  you didn't go personally, but do you recall what those

15  other institutions were?

16      A.    You mean by name?

17      Q.    Yeah, if you remember.  Again, if you

18  don't, that's fine.  I don't mean to have trick

19  questions.  I know it was a long time ago.

20      A.    It's not a trick question.  It's not a

21  problem, but I was not there personally, and we refer

22  to that institution often.  I cannot -- I cannot bring

23  it up right now.  I'm sorry.

24      Q.    That's fine.  Do you know who -- did

25  anybody physically go visit any of these other

**Witness Gerald Nolt**

24

1    institutions?

2         A.    Yes.

3         **Q.    Do you know who it was?**

4         A.    I think Ethan, Nelson, Martin.  I'm not

5    sure about all the others.

6         **Q.    Okay.  Now, in developing Liberty Ridge**

7    **do you know or were you involved in any discussions as**

8    **to why there was a need for Liberty Ridge within your**

9    **community?**

10        A.    Certainly.  Yes.  We had -- the need was

11   apparent because of parents that were saying could you

12   help with our boys.

13        **Q.    And what type of help was it that they**

14   **were asking for?**

15        A.    They were asking for help to train, guide

16   the boys.  Give them another scenery, something other

17   than their direction because -- yeah, they were

18   resisting the parents at home, and they couldn't get

19   anywhere with them.

20        **Q.    Okay.  Was this more behavioral**

21   **resistance?  Did they need discipline?  Was it**

22   **spiritual or was it a mix of kind of everything?**

23        A.    A mix.

24        **Q.    Okay.  Was there any targeted recruitment**

25   **or specific discussion about children who needed**

25

1    mental health treatment or had any specific mental

2    health diagnoses within Liberty Ridge?

3        A.    I'm not sure that I understand your

4    question.

5        Q.    Okay.  When creating Liberty Ridge, was

6    there discussion about -- any specific discussion

7    about providing treatment to young men who had mental

8    health diagnoses specifically?

9        A.    Yes.  We talked about that and the very,

10   very difficult cases we knew that we couldn't handle.

11       Q.    Tell me a little bit about those

12   discussions.

13       A.    We didn't -- we didn't feel like we could

14   handle very, very difficult mental cases because we

15   weren't set up for it, so we would not take those type

16   in.

17       Q.    Okay.  So it was discussed then having

18   obviously kind of an assessment process then before

19   having the boys come in?

20       A.    Yes.

21       Q.    Okay.  So tell me a little bit going back

22   about your involvement with selecting mentors for the

23   program.  How did you go about doing so?

24       A.    We would get suggestions from -- get

25   input from the local congregations where these boys

26

1    were.  Ask, you know, what kind of character and

2    personality and if they would actually be able to

3    relate well to this type of situation.

4         Q.    So you mentioned character, personality,

5    and then relating to the situation.  So let's -- I

6    guess let's start with one.  What type of character

7    traits were you looking for in selecting mentors?

8         A.    People that are -- boys that are able to

9    accept others for who they are.  Be a good example

10   themselves of good Christian ethics which includes

11   quite a bit.

12        Q.    And then you mentioned about, I guess,

13   character and personality I think kind of falls into

14   the same general discussion.  But when it comes to

15   being able to relate, what do you mean by that?

16        A.    Some people are obviously not able to

17   feel comfortable relating and not able to in a relaxed

18   way and help the residents to feel accepted and at

19   rest.

20        Q.    Okay.  When you say able to relate, are

21   these individuals who would also experience some

22   troubles in their youth or is that not somebody that

23   you were looking for in your selection?

24        A.    We weren't specifically targeting that,

25   no.

27

1      Q.      Okay.  When evaluating the mentors for

2   the program, did you ever observe them interacting

3   with any troubled -- I'm just going to use the word

4   troubled generally as we're discussing this -- any

5   other troubled youth?  Like was that part of your

6   selection process just observing them interacting with

7   your kind of target audience?

8      A.      Usually not that I would have personally

9   saw that.

10      Q.      Okay.

11      A.      But here again, I reflect back on the

12   recommendations of others, and a lot of times these

13   young men would have expressed an interest in helping

14   this type of person and would have had the history of

15   having done that.

16      Q.      Okay.

17      A.      Outside of Liberty Ridge.

18      Q.      Okay.  How old were the mentors that you

19   were selecting or helping go through the process of

20   selecting?

21      A.      During the time period of David Cross, it

22   was 21 years and older.

23      Q.      Okay.  Do you recall specifically, and

24   you may not, do you recall specifically how many

25   mentors were at Liberty Ridge when David and then

**Witness Gerald Nolt**

28

1   Robert were there?

2        A.    Usually one mentor per resident.

3        Q.    Okay.  Do you recall about the ages of

4   the mentors that were at Liberty Ridge during that

5   time?

6        A.    No.

7        Q.    Okay.  But generally speaking, probably

8   in like early twenties?

9        A.    Over 21.

10       Q.    Okay.  Were the mentors married or

11  single?

12       A.    Single.

13       Q.    Were they getting paid for their work

14  there?

15       A.    No.

16       Q.    But they lived on the property?

17       A.    During their time there, yes.

18       Q.    Okay.

19       A.    Yes.

20       Q.    Did the mentors ever get like vacation or

21  a break when they were working at Liberty Ridge?

22       MS. WYNKOOP:  Objection to form.  You can

23  answer.

24  BY MS. FRANCHI:

25       Q.    You can answer.

**Witness Gerald Nolt**

29

1    A.    I'm -- she told me about that.  I'm just

2  catching it.  Yes.  At that time it was one day a week

3  and one weekend per month that they got off.

4    **Q.    Okay.  And then I'm assuming other**

5  **mentors that were kind of in the pool would then fill**

6  **in during that time?**

7    A.    Correct.

8    **Q.    Okay.  When you were helping create**

9  **Liberty Ridge and select the mentors, was there any**

10  **discussion about oversight over the mentors while they**

11  **were working at Liberty Ridge?  Like did they have**

12  **somebody supervising them that they would report to?**

13    A.    Absolutely.

14    **Q.    Who would that be?**

15    A.    The department heads which is house

16  parent and a work coordinator.  At David Cross's era,

17  that was the same person.

18    **Q.    Okay.  And that would have been Ethan**

19  **Weaver?**

20    A.    Yes.

21    **Q.    Okay.  So I am going to -- we're going to**

22  **refer to the not so fancy book that I have in front of**

23  **you right now.  I specifically -- I just opened right**

24  **to the page that I was trying to go to.  So there are**

25  **some pages between LRF-86 and LRF-95.**

30

1          MS. WYNKOOP:   Sorry.  That was just the

2    coffee cup sliding.

3    BY MS. FRANCHI:

4          Q.      That I'll be referring to.  So if you

5    could first turn to LRF-86 which is about halfway

6    through the book.  Just let me know when you get

7    there.

8          A.      I'm here.

9          Q.      Okay.  Also turned right to the page.

10   That's great.  Maybe it's just -- I don't know.  So

11   you had said that you had not joined the committee

12   until after it had already been created.  So here were

13   the meeting minutes for June 2nd, 2010.  You weren't

14   involved at that time?

15         A.      That's correct.  I was not.

16         Q.      Okay.  And then going to Page 87 to Page

17   88 is June 29th, 2010, August 3rd, 2010, so you still

18   weren't involved at that time?

19         A.      That's right.

20         Q.      Okay.  And then continuing on Page 90 is

21   December of 2010.  Page 91 is November of 2010.  You

22   still weren't involved?

23         A.      That's right.

24         Q.      Okay.  So you said around April of 2011

25   is when you became involved.  Would that be -- if you

31

1    look at Page LRF-92, would that have been around the
2    time of these meeting minutes for the Mission?
3         A.    Yes.  That's right -- I don't recall
4    being at that meeting, but yes.
5         Q.    Okay.  Did the Liberty -- the full
6    Liberty Ridge committee attend all -- I guess did all
7    of the members of the committee attend all of the
8    Mission meetings or did it just depend who was
9    available?
10        A.    No.  After the formation, it's rare that
11   the Liberty Ridge committee will attend an MMM
12   meeting.
13        Q.    Okay.
14        A.    But there's a representative that -- from
15   our committee from Liberty Ridge that is at every --
16   usually every Mission Board meeting.
17        Q.    Okay.  So it's someone is there, but it's
18   not everybody?
19        A.    A representative, yes.
20        Q.    Okay.  So I'm going to turn you to Page
21   LRF-93.  This looks like it was from May 4th of 2011.
22   Specifically I'm going to draw your attention down
23   where it says boys home and then Item E.
24        A.    Okay.
25        Q.    Excuse me.  Sorry.  It talks about the

**Witness Gerald Nolt**

32

1   Liberty Ridge committee presenting a proposal from
2   Snyder Gates that would allow them to set up shop to
3   manufacture fiberglass farm gates incorporating the
4   labor of the Liberty Farm residents.  Were you
5   involved in those committee discussions?
6        A.    Yes.
7        Q.    Tell me a little bit about what was
8   discussed just generally, and then I'll ask you more
9   specific questions.
10       A.    Snyder Gates was looking for somebody to
11  assemble and paint, prep gates for sale, and we took
12  that on at Liberty Ridge.
13       Q.    Okay.  Did Snyder Gates approach the
14  committee or did the committee approach Snyder Gates?
15       A.    Snyder Gates approached the committee.
16       Q.    Okay.  And they were just looking for
17  just extra labor to help them assemble their
18  products?
19            MS. WYNKOOP:  Objection to form.
20  BY MS. FRANCHI:
21       Q.    If you know.
22       A.    Yes.  That's right.  They were just
23  looking for something -- somebody to do it, and we
24  were looking for something to employ.
25       Q.    Okay.  Do you remember who the

**Witness Gerald Nolt**

33

1    representative was from Snyder Gates that the

2    committee was speaking with?

3         A.    Nolan Snyder.

4         Q.    **Nolan Snyder, okay.  Was this somebody**

5    **that was familiar to you prior to these discussions?**

6         A.    Yes.

7         Q.    **Okay.  How did you know him?**

8         A.    Just a man in the area.  A man in the

9    community.

10        Q.    **Okay.  So you were just -- you knew of**

11   **him, but you weren't like friends or socialized or**

12   **close with?**

13        A.    That's correct.

14        Q.    **Okay.  Had you done business with him**

15   **before?**

16        A.    Not in the Snyder Gates.

17        Q.    **Okay.  So did Snyder Gates discuss with**

18   **the committee, if you recall, any talks about payment**

19   **for the work that was performed or anything like that?**

20             MS. WYNKOOP:  Objection to form.

21        A.    There we discussed the remuneration or

22   the payment that would come to Liberty Ridge Farm for

23   the service, yes.

24   BY MS. FRANCHI:

25        Q.    **Okay.  And what was that payment that was**

34

1    decided on, if you remember?

2         A.    I don't remember.

3         Q.    Okay.  Was there a written contract?

4         A.    I don't remember.

5         Q.    Okay.  So where it says where the

6    committee presented a proposal from Snyder Gates, was

7    it just a verbal proposal?

8         A.    I don't recall.

9         Q.    Okay.

10         A.    See, in the Mennonite community, they're

11    also Mennonites, there's a lot of verbal

12    understanding.

13         Q.    Okay.  And that was kind of what I

14    thought, but I'd be remiss in not asking.  But, again,

15    if you don't know or if there isn't such thing, please

16    let me know.

17              Do you know -- do you know if Snyder

18    Gates did remit any payments to Liberty Ridge for the

19    work that was done once Liberty Ridge was opened?

20              MS. WYNKOOP:  Objection to form.

21         A.    I would think they did.

22    BY MS. FRANCHI:

23         Q.    Okay.  But you don't know for sure?

24         A.    I was not the one that received them

25    personally, so maybe.

35

1    Q.    Who would that have been?

2    A.    Nelson Martin.

3    Q.    And he was the treasurer?

4    A.    Yes.

5    Q.    Okay.  Are you still on the Liberty Ridge

6  board now?

7    A.    Yes.

8    Q.    What's your position, if you have a

9  specific title?

10    A.    I don't.

11    Q.    Okay.  What are your general duties, if

12  there is anything specific, on the Liberty Ridge board

13  now?

14    A.    I recruit house parents, department

15  heads, and the department head -- the house parent is

16  answerable to me.  As far as if they have any

17  questions, they contact me as the contact person for

18  the committee, and then I'll get the committee

19  approval.

20    Q.    Okay.

21    A.    So they have somebody to go to.

22    Q.    Okay.  Were you involved in either the

23  recruitment of or the setting up of any other

24  businesses doing work with Liberty Ridge other than

25  Snyder Gates?

36

1      A.      No.

2      Q.      Do you know who would have been?

3              MS. WYNKOOP:  Objection to form.

4      A.      Explain.

5   BY MS. FRANCHI:

6      Q.      Who else on the Liberty Ridge board or

7   involved in Liberty Ridge do you know of that would

8   have been in contact with other businesses -- some of

9   the names I'll get to -- that would have had the

10  Liberty Ridge residents do work for them?  Who would

11  that person have been?

12     A.      I understand your question now.  I was

13  involved in communicating with Wengerd Pallet.

14     Q.      Okay.  So were -- when did you first

15  communicate with Wengerd Pallet about doing this kind

16  of work?

17     A.      December 2013.

18     Q.      And were those communications similar to

19  those that you had explained about the conversations

20  with Snyder Gates?

21     A.      Yes.  Very -- Wengerd is an Amish run

22  outfit and very verbal, yes.

23     Q.      Okay.  In either your setting up Snyder

24  Gates or Wengerd Pallet with Liberty Ridge, was there

25  any discussion about paying the boys for their work

37

1   specifically to the boys?

2                   MS. WYNKOOP:  Objection to form.

3        A.    No.

4   BY MS. FRANCHI:

5        Q.    Okay.  Was there any -- with setting up

6   either the work with these two companies, were there

7   any directives for, you know, there had to be this

8   many gates built or this many pallets built?

9                   MS. WYNKOOP:  Objection to form.

10       A.    No.

11  BY MS. FRANCHI:

12       Q.    Okay.  If there were any written

13  contracts between these two companies or any other

14  ones in Liberty Ridge, do you know who would have

15  copies of those contracts?

16       A.    No.

17       Q.    If there was any money transferred

18  between the two entities, do you know who would have

19  documentation of that?

20       A.    Nelson Martin.

21       Q.    Okay.  I know you had said that you

22  worked on your family farm while you were still in

23  three-hour schooling?

24       A.    Yes.

25       Q.    Is it a normal practice within the

38

1   Eastern Pennsylvania Mennonite community that children

2   would work on family farms or for family businesses?

3        A.     Yes.

4        Q.     Is it like learning by doing basically?

5        A.     That's right.  Yeah.

6        Q.     Okay.  Did children -- when I say

7   children, generally I mean anybody under the age of

8   18.  I'm not being specific about --

9        A.     Sure.

10        Q.     -- age.  But when children would begin,

11   you know, working and learning by doing, did they ever

12   work for other individuals that weren't their

13   families?

14        A.     Yes.

15        Q.     Okay.  While working for individuals

16   outside of their family, was it common for children to

17   work unpaid?

18        A.     Yes.

19        Q.     Okay.  Were there -- strike that.  Was it

20   uncommon for anyone under 18 working to be paid for

21   their labor or did it depend?

22        A.     I can't really answer.

23        Q.     Okay.

24        A.     I'm not sure.

25        Q.     So as Liberty Ridge was getting ready to

39

1    open, was there any specific training provided to the

2    mentors or the Liberty Ridge staff?

3          A.    No specific classes or training, no.

4          Q.    Okay.  Was there any direction given to

5    the mentors on how to handle situations with boys who

6    were troubled that would be attending Liberty Ridge?

7          A.    There were occasions that that was --

8    advice was given, yes.

9          Q.    What kind of advice?

10         A.    Just good advice.  Just how to relate,

11   and we had weekly meetings with the staff to field

12   questions, discuss strategy.

13         Q.    And when you say we, that would have

14   been --

15         A.    The committee.

16         Q.    The whole committee?

17         A.    Not the whole committee.

18         Q.    Just some individuals?

19         A.    A representative that would take a week.

20         Q.    Okay.  How were the mentors guided in

21   dealing with troubled boys who were having, I guess,

22   an increase in their mental distress or anger issues?

23   I guess, anything above the normal every day, how were

24   they guided in dealing with that?

25         A.    A lot of times the department head, the

**Witness Gerald Nolt**

40

1   house parent, or work coordinator, whoever was there,

2   would -- they would work together with it rather than

3   just one individual because when you have a troubled

4   youth, you can't just dive into it yourself.

5        Q.    Mm-hmm.  Do you know if there was any

6   consultation with any entities like Department of

7   Labor or the Department of Health or any of those

8   governmental agencies when establishing this youth

9   home or putting together any plans for having the

10   children work?

11        A.    I am not aware of any.

12        Q.    Okay.  There were no Department of Labor

13   rules or anything posted in the home, anything like

14   that?

15        A.    No.  That's right.

16        Q.    Okay.  So I know you had mentioned that

17   you were familiar with Wengerd Pallet, that you had

18   spoken with them.  You were also familiar with Snyder

19   Gates.

20             Were you also personally familiar with

21   any of the other businesses that work with Liberty

22   Ridge such as Sensenig Chair Shop, Clark's Feed Mills,

23   Dutch-Way Farm Market or any other businesses that did

24   work with Liberty Ridge?

25        A.    Sensenig Chair Shop I was -- I knew them.

**Witness Gerald Nolt**

41

1  But the others, I know who they are, but I didn't

2  really --

3      Q.     Okay.  Do you have any ownership interest

4  or financial interests or do your family members have

5  either in any of the businesses that did work with

6  Liberty Ridge?

7      A.     No.

8              MS. FRANCHI:  I'm going to take one quick

9  break.

10             THE VIDEOGRAPHER:  We are going off the

11 record at 11:55 a.m.

12             (Recess)

13             THE VIDEOGRAPHER:  We are going back on

14 the record.  The time is 12:12 p.m.

15 BY MS. FRANCHI:

16     Q.     So we'll get back at it.  I think we last

17 were going down the line of a couple questions about

18 the businesses that were associating with Liberty

19 Ridge, so I want to pivot a little bit to a different

20 direction now.

21             So I'm aware that there -- or let me go

22 back.  We had received a policy manual for Liberty

23 Ridge, but I believe it was a newer policy manual from

24 not the time period involving our clients, so we

25 couldn't have a copy of the old policy manual.

42

1               But do you recall being involved in the
2    drafting or preparation of the previous policy manual
3    that was in place when Liberty Ridge first opened, if
4    any?
5          A.    No.
6          Q.    Okay.  Do you know if there was
7    specifically like written down policies during that
8    time?
9          A.    I would assume so.
10         Q.    Okay.  If there was a policy manual or
11   some kind of handbook drafted, do you know who would
12   have been involved in that?
13         A.    No.
14         Q.    Okay.  So, again, in the new policy
15   manual it talks about the Liberty Ridge mission and
16   purpose.  But not having that to refer to now, from
17   your memory what was the mission and purpose of
18   Liberty Ridge once you got down to the point of
19   opening Liberty Ridge to residents?
20         A.    Pieces of the mission statement would be
21   to help parents with their troubled boys, to learn how
22   to relate well in -- and what Liberty Ridge is
23   providing is a family like setting.  Providing
24   education, spiritual nuture, and training on how to
25   relate, how to work, to help them relate to society

43

1   and church life.

2        Q.    So I guess was it described as being like

3   a therapeutic setting or was it more of a spiritual

4   setting or were any of those words used when, I guess,

5   describing to the public or to the community what

6   Liberty Ridge would be doing?

7        A.    It was -- I don't -- I don't have the

8   therapeutic definition exactly.  I'm not sure what

9   you're referring to on that.  But as far as spiritual

10  and relational, yes, that's what it was.

11       Q.    Okay.  And when you say spiritual, I'm

12  assuming that Liberty Ridge was operating under the

13  guidance of the Eastern Pennsylvania faith; correct?

14       A.    Yes.

15       Q.    Okay.  So tell me a little bit about the

16  assessment and, I guess, recruitment of boys to

17  participate in Liberty Ridge.  I guess first who

18  determines whether the child is, I guess, troubled or

19  is in a position to be taken into Liberty Ridge?

20            MS. WYNKOOP:  Objection to form.

21       A.    The parents.

22  BY MS. FRANCHI:

23       Q.    Okay.  So the parents would approach

24  Liberty Ridge?

25       A.    The parents and the ministry of the home

44

1   congregation of the parents.

2        Q.     Okay.  So that was going to be another

3   question then.  Oftentimes the parents would first

4   talk to the ministry?

5        A.     Yes.

6        Q.     Try to figure it out amongst

7   themselves?

8        A.     Yes.

9        Q.     And then come to Liberty Ridge?

10       A.     Yes.

11       Q.     Okay.  So it was kind of like not the

12   last resort, but one step after?

13       A.     Yes.

14       Q.     Okay.  When children were taken in, were

15   there ever -- was there a process of dealing with

16   specific mental health diagnoses or was that not

17   something that was considered or talked about?

18       A.     If there was mental health issues, it was

19   discussed.

20       Q.     Okay.  Was there any psychiatric, medical

21   or -- any psychologist or therapy-related services

22   provided to the residents while they were at Liberty

23   Ridge at any point?

24       A.     Yes.  I recall one time taking David to a

25   doctor.

**Witness Gerald Nolt**

45

1    Q.    Okay.  But as far as the staff at Liberty
2  Ridge, there wasn't like a therapist on staff;
3  correct?
4    A.    That's correct.
5    Q.    Okay.  I'm going to skip around a little
6  bit.  If you could just bear with me for just a
7  moment.  Are you or any of the board members paid for
8  your work with Liberty Ridge?
9    A.    No.
10    Q.    All volunteer?
11    A.    Yes.
12    Q.    Were you ever personally involved with
13  any of the day-to-day activities of Liberty Ridge?
14    A.    Yes.
15    Q.    Tell me about that.
16    A.    Just when I was there for -- okay.  I
17  give haircuts regular about every month, and sometimes
18  I'll stay and help with the work, you know, whatever
19  it is, but I've never spent weeks there, but I've been
20  there.
21    Q.    So is it safe to say you'd drop in and
22  help out as needed and then go about your business?
23    A.    Yes.
24    Q.    Okay.  Did you ever personally give
25  direction to the children to do any certain work?  I

46

1   guess did you oversee any of their work and say, you

2   know, you go do this or you go do this?

3        A.    Not that I recall.

4        Q.    Okay.  What is your understanding of

5   who directs the children to their specific

6   assignments?

7              MS. WYNKOOP:  Objection to form.

8        A.    That's the coordinators that are on

9   site.

10  BY MS. FRANCHI:

11       Q.    Okay.  When you say coordinators, you

12  mean the house parent or the mentors?

13       A.    Or the work coordinator.  Now, in that

14  case, the house parent and work coordinator were the

15  same.

16       Q.    Okay.  Back in 2011 to 2014?

17       A.    Yes, yes.

18       Q.    Okay.  Are you aware of whether -- we'll

19  just specifically talk about the time period of 2011

20  to 2014 because I understand that things have

21  changed, kind of developed since that time to some

22  extent.

23             Are you aware of whether during that time

24  the children were ever taken off the Liberty Ridge

25  property to do work elsewhere at other sites?

Witness Gerald Nolt

47

1      MS. WYNKOOP:  Objection to form.

2      A.     I can't recall.

3   BY MS. FRANCHI:

4      Q.     Okay.  What is your understanding of

5   Nelson Martin's involvement with Liberty Ridge other

6   than being the treasurer?

7      A.     He's the farm manager.

8      Q.     Okay.  And when you say the farm manager,

9   does he give direction, say, you know, where the

10  children are supposed to work and what duties are

11  supposed to be performed?

12     A.     He is not involved in the day-to-day work

13  or he's not involved in giving the residents

14  direction, but he is involved in -- with like Wengerd

15  Pallet or the chicken company and setting up the

16  arrangements.

17     Q.     Okay.  So --

18     A.     And coordinating some of those things.

19     Q.     So it's more of the overhead of

20  everything, not the specific telling the boys what to

21  do?

22     A.     That's right.

23     Q.     Okay.  But everybody kind of works under

24  his umbrella of these are the things that need to be

25  done, and then somebody else will implement it?

48

1      A.      Right.

2      Q.      Okay.  I'm sorry.  I talk with my hands.

3      A.      That's good.  I do, too.  You saw me.

4      Q.      So I can visualize it.  We were doing

5   that yesterday.  We were talking, and I was like this

6   is my imaginary whiteboard, so.

7      A.      Yep, yep.

8      Q.      Okay.  Are you aware of -- actually,

9   strike that.  What is your understanding of the

10  Mission Board's oversight of Liberty Ridge now that

11  it's -- I guess now that we're talking about it being

12  open and operating?

13     A.      And this is still the time period.  The

14  oversight was simply that they would give approval and

15  be aware of what's going on, the people that are

16  working there.

17     Q.      Okay.  So is it safe to say that the

18  Mission Board had an idea of the goings on at Liberty

19  Ridge.  Maybe not, you know, every day that they

20  worked from 8 a.m. to this time, but generally who was

21  there, the general duties that are being performed,

22  things like that?

23     A.      Yes.

24     Q.      Okay.  Was the Mission Board in a

25  position such that if they felt there was something

**Witness Gerald Nolt**

49

1   improper going on at Liberty Ridge or anything that

2   they deemed to not be appropriate, that they would

3   step in and say that you need to do something

4   different?

5          A.      If they were aware of it.

6          Q.      Okay.

7          A.      Which they may not have been aware of

8   everything.

9          Q.      Okay.  So were they basing their

10  perception off of what was being reported to them and

11  not as much -- it wasn't the Mission Board going and

12  watching what was happening every day?

13         A.      That's correct.

14         Q.      Okay.  Do you know at the time of the

15  beginning of Liberty Ridge to when David Cross left

16  Liberty Ridge, which is about 2014, are you aware of

17  which businesses were -- which businesses were

18  associated with Liberty Ridge, meaning was it the

19  pallet company?  Was it the gate company, if you

20  recall?

21              MS. WYNKOOP:  Objection to form.

22         A.      The chickens were there from the

23  beginning and the gate company.  And the first that we

24  had contact with the pallet company was in December of

25  2013.  Was it up and running while David was there?  I

**Witness Gerald Nolt**

50

1  can't answer.

2  BY MS. FRANCHI:

3      Q.      Okay.  What was the company Liberty Ridge

4  was dealing with for the chickens?

5      A.      I always forget that name.  That is

6  disgusting.

7      Q.      I don't know.  You're doing pretty good.

8      A.      You may have that.

9      Q.      I actually don't.

10      A.      I am sorry.

11      Q.      That's okay.  You don't need to apologize

12  to me.

13              MS. WYNKOOP:  You don't have to look.

14  BY MS. FRANCHI:

15      Q.      Do you think that Mr. Martin might know?

16      A.      Yes.

17      Q.      Okay.

18      A.      I saw the name so often.

19      Q.      It will come to you.  You're going to

20  leave and you're going to say --

21      A.      I know Bell and Evans, and I know all

22  those other popular ones.

23      Q.      Except for that one.  So I always

24  remember things like I'll leave and be doing something

25  else random and be like, wait a second, that is what I

**Witness Gerald Nolt**

51

1     was thinking of.

2                    MS. WYNKOOP:  Yep.

3     BY MS. FRANCHI:

4        Q.      Okay.  So now this is the point where I

5     said I was going to flip around a little bit because

6     we're kind of changing course about midway through.

7                    So while you were helping recruit the

8     mentors and kind of guide them into their role at

9     Liberty Ridge, did you have any discussions with them

10    or give them any directions about administering

11    consequences to the residents?

12       A.      As a committee, we would have done that.

13       Q.      Okay.  So it wouldn't have just been you.

14    It would have been the whole committee?

15       A.      That's right.

16       Q.      Okay.  Do you recall what was decided by

17    the committee as to how to handle situations of

18    consequences at Liberty Ridge?

19       A.      Yes.

20       Q.      Tell me about that.

21       A.      Are you asking what was administered or

22    what consequences we had or what's your question?

23       Q.      All of it.  Tell me about what was kind

24    of discussed and decided as a committee.  And then

25    if I need anything more specific, I'll ask.  I just

1  want to give you an opportunity to kind of explain it
2  in your own words.  And then if there's anything else
3  or you might just cover it all without me asking
4  again.
5          A.    Well, we would always start with a very
6  minimal assignment trying to -- you know, Ethan was
7  very good at drumming up essays.  Oh, you said you
8  don't want to.  Can you write an essay on I don't want
9  to, and they would do it.
10         Q.    So I've heard.
11         A.    You know, yes.  He was super at that.
12 And so you'd start at the bottom to encourage better
13 behavior.
14         Q.    And then did it kind of escalate from
15 there?  Like say talking to them didn't work.  You'd
16 move to a writing exercise, and then you'd move on to
17 something else.  What do you recall was kind of the
18 escalation of those consequences?
19         A.    You mean like the more maximum level?
20         Q.    Yeah.  I guess just walk me through it.
21 We talked, you know, Ethan talking to them, and then I
22 know he told us a little bit yesterday, and then you
23 mentioned today about the writing exercises that he
24 would come up with?
25         A.    Yeah, yeah.

53

1      Q.     What would happen after that?

2      A.     Well, that might be a run around the barn

3  or, you know, just, and finally if it was just not

4  received, we had options for digging post holes.  We

5  were putting a fence in for the cattle in the pastures

6  and dig a post hole that you can sit a five-gallon

7  bucket in and -- or a ditch or something like that.

8           It was just something to -- it's not that

9  we required them to have it done in a certain time,

10  but it was something for them to work at and think

11  about, you know.  And many a boy said while they were

12  doing that, that you know what, I'm going to comply.

13  I'm going to ask what they want of me, you know.  It

14  was a good result.

15      Q.     So was this at the discretion of the

16  mentors?

17      A.     No.

18      Q.     Would they -- who would then administer

19  the consequences -- generally called administer the

20  consequences if you know what I mean.  Like who would

21  decide that the boys would receive a consequence for

22  something?  Would it be the mentors?

23      A.     No.

24      Q.     Okay.  Tell me about that process.

25      A.     It was usually the department heads like

54

1   the house parent or the work coordinator and in

2   consultation with their committee contact or the

3   committee.  We had approved -- we had approved methods

4   and approved consequences --

5         Q.     Okay.

6         A.     -- that we would approve, and a lot of

7   times when there was an offense or a challenging

8   situation, the department head would even call and

9   say, you know, hey, I got this on hand, you know, what

10  do I do with it, which way do I go, and we would talk

11  about it.

12        Q.     Okay.  And what are some of, I guess, the

13  approved consequences?  Was it what you had already

14  mentioned?  Is there -- are there other things?

15        A.     In that era like your -- the running.

16  Just different things that were done.  I'm not sure

17  that I have more to say about that.

18        Q.     Okay.  Were you involved in any

19  discussions about any use of being hands-on with the

20  boys in the sense of like using any physical restraint

21  or anything like that?

22        A.     Yes.

23        Q.     Is that something that the committee

24  considered amongst itself?

25        A.     Yes.

55

1    Q.    Okay.  What did the committee determine

2  was an appropriate use of being, quote, unquote,

3  hands-on with the residents at Liberty Ridge?

4    A.    Only when a resident got violent were a

5  couple individuals allowed to put somebody like that

6  down and hold them carefully until they decide, and I

7  can still hear David saying I'm done.

8    Q.    Okay.

9    A.    Yeah.

10    Q.    When you say getting violent, and I just

11  want to make sure we're talking about the same

12  definition, do you mean like only when, say, somebody

13  goes to take a swing at someone or could it also be

14  like they're having a mental crisis, and they're just

15  mentally out of control?  Like what do you -- what is

16  your definition of being violent?

17    A.    Throwing tools at you.  Chasing you with

18  a shovel or things like that, yeah.  Wherever it would

19  be they would do physical injury.

20    Q.    Okay.  What about situations where the

21  residents were in some sort of mental crisis, maybe

22  not swinging on someone violently, but for a lack of

23  better words, just in crisis mode?  Was there ever a

24  time that you recall observing one of the children

25  being restrained in that sense?

**Witness Gerald Nolt**

56

1    A.    No.

2    Q.    Okay.  Were the mentors instructed on how

3  to handle a situation like that?

4    A.    Yes.

5    Q.    Okay.  Did you instruct them?

6    A.    No.

7    Q.    Okay.  Do you know who would have?

8    A.    No, I don't, but they were -- it may have

9  been the department heads or -- I just don't -- I

10  don't specifically remember in doing that instruction.

11    Q.    Okay.  That's fine.  Was it ever

12  discussed amongst the committee members the use of any

13  type of physical restraints not involving hands, but

14  using other objects?

15    A.    No.

16    Q.    Okay.  Was that something that the

17  committee permitted the mentors to do?

18    A.    No.

19    Q.    Okay.  Have you ever heard of an incident

20  of that occurring at Liberty Ridge during 2011 to

21  2014?

22    A.    No.

23    Q.    Okay.  If I were to tell you that one or

24  both of our clients would testify that they either

25  observed or had that physical restraint by the use of

57

1   objects performed on them or someone else, you would
2   say that that didn't happen?
3        A.    I don't know of any.
4        Q.    Okay.
5        A.    No.  I'm not aware of it.
6        Q.    Okay.  Sorry.  Bear with me for just a
7   moment.  I'm going to look through, and I might jump
8   forward a bit.  How -- what is your understanding of
9   how much time the residents would have only with their
10  mentors outside of the supervision of any like the
11  higher-ups of Liberty Ridge?
12       A.    Are you asking me for an estimation of
13  time?
14       Q.    Yes.  Just generally during the day, was,
15  you know, Mr. Weaver or yourself or someone else in
16  the committee always there with the mentors and the
17  boys or were the mentors kind of left to their own to
18  make sure that the boys were doing what they needed to
19  do?
20       A.    There are times that the mentors would be
21  with them on their own.
22       Q.    Okay.  So they're not under the constant
23  supervision, you know, just this close?
24       A.    Not constant.  That's right.
25       Q.    Okay.  Like left to their own devices, I

58

1   guess.  Okay.  Did you ever observe personally any of

2   the mentors acting in a way that you -- that gave you

3   pause or caused you to redirect them or say, you know,

4   that's not appropriate or anything to that extent?

5          A.     Yes.

6          Q.     Tell me about those times.

7          A.     Never physically.  There was never a

8   physical adjustment that I had to address because they

9   don't -- they're not supposed to be in physical

10  contact with the boys.

11         Q.     Right.

12         A.     With the residents.  But verbal and

13  relational I would have given direction just on how

14  to -- how to relate better.

15         Q.     And that usually ended up in a

16  discussion?

17         A.     Yes.

18         Q.     Okay.  Were there ever any mentors who

19  were removed from their work with Liberty Ridge or

20  asked to it leave or asked to not participate anymore?

21         A.     Yes.

22         Q.     When was that?

23         A.     I don't recall the date, but I think it

24  was after this era.

25         Q.     Okay.  So it wouldn't have been during

59

1    2011 to 2014?

2         A.    I don't think so.  I don't think.

3         Q.    Not that you can recall?

4         A.    That's right.

5         Q.    Okay.  Was it within the purview of

6    Liberty Ridge to have children perform consequences at

7    nighttime or after work hours at any point?

8         A.    That has happened, yes.

9         Q.    Okay.  Would those include consequences

10   of doing physical or manual labor like you said of

11   digging or anything else?

12        A.    Yes.

13        Q.    Okay.  And why was that?

14        A.    It was until the job was complete or

15   until the boy was ready to do what he needed to do.

16        Q.    Okay.  And a lot of times you've

17   mentioned, you know, the boys ready to do what he

18   needs to do or he's complied, who makes that

19   determination?

20        A.    When he's ready?

21        Q.    Mm-hmm.

22        A.    He does.

23        Q.    Okay.  Were the boys allowed to voice any

24   complaints about their mentors, say, if the boys

25   thought the mentors were mistreating them or doing

60

1   anything of that nature?

2        A.    Oh, yes.

3        Q.    Who would they report it to?

4        A.    Either a department head or a committee

5   contact, and I think they would have had access

6   through their parents, too.

7        Q.    Okay.  That's a great segue into my next

8   question.  It's like you anticipated it.  I was going

9   to talk a little bit about their communication with

10  their parents while they were at Liberty Ridge.

11            So the children, were they allowed to

12  call their parents on the phone?

13       A.    Yes.

14       Q.    Was there any restriction on how many

15  times they could call their parents?

16       A.    Yes.

17       Q.    Okay.  Tell me about that.

18       A.    I don't have everything in my mind

19  straight on that, but it was -- there was more

20  restriction during the first two months, and then it

21  was less restrictive after that.  And letters could be

22  written back and forth, but usually it settled in

23  that -- and then also visits.  They could come and

24  visit in person, too.

25       Q.    Were the residents' phone conversations

61

1    with their parents monitored by Liberty Ridge staff or

2    the mentors?

3          A.    Yes.

4          Q.    Why was that?

5          A.    For content.

6          Q.    Okay.  And these would be the same

7    mentors that were overseeing their work during the day

8    would also be with them for phone calls and letter

9    writing?

10         A.    Right or the house parent might do that

11   monitoring, too.

12         Q.    Okay.

13         A.    It could have been or it could have been

14   a fill-in mentor, too.  It's not always just one

15   person.

16         Q.    You mean they didn't work there seven

17   days a week and never take a break?

18         A.    Right.  That's right.  That's right.  And

19   what I'm saying is if a fill-in mentor would monitor

20   the phone call, it's not like the resident is stuck

21   with one mentor.

22         Q.    Okay.  How would those phone calls be

23   monitored?  Would they be on another line or just

24   sitting in the room?

25         A.    On another phone usually I believe.

62

1      Q.      So it would be like a hard line through

2  the --

3      A.      Yes, a landline phone.

4      Q.      Gotcha.  What about communications in and

5  out like letters, things like that?  Did the mentors

6  review the incoming and outgoing letters to and from

7  the children?

8      A.      Usually a department head would do that.

9      Q.      Okay.  So that would have been like Ethan

10  or one of those people?

11      A.      Yes, yes.

12      Q.      Okay.  And what would that -- what would

13  the purpose of that monitoring be for?

14      A.      For content.  Again, to make sure that

15  the letters coming in are good, and the ones going out

16  are, too.

17      Q.      Okay.  So when you talk about the content

18  of the letters and the phone calls, give me a little

19  bit more detail, if you will, about what type of

20  content they were monitoring for?

21      A.      Inappropriate discussions or

22  inappropriate content which would encourage the wrong

23  thing in the boys.

24      Q.      Okay.

25      A.      The reason that the parents brought them

63

1  and delegated them to our responsibility was to raise

2  them, help them to become more Godly, and so the

3  letters that are coming in had to be monitored as

4  well.

5       Q.      Okay.

6       A.      The parents wanted it that way.

7       Q.      So hypothetically speaking, if the boys

8  were on the phone with their parents and they wanted

9  to voice a concern about their mentor, it would be the

10 person sitting there listening to them that they would

11 have to talk to their parents about?

12      A.      Mm-hmm.

13      Q.      Okay.

14      A.      And they could, and they do.

15      Q.      Okay.

16      A.      They will.  If they have a desperate

17 issue, they will.

18      Q.      Okay.  What was the policy or the

19 instruction to the mentors about how to handle a

20 situation where the boys would physically try to leave

21 the farm?

22      A.      If the boys wanted to leave the farm, the

23 driveway was open.  They could walk.

24      Q.      Were they given any direction to try to

25 bring the boys back in a certain manner?

64

1          A.     The mentors were usually not involved

2      with that.

3          **Q.     Okay.  Is that something they would go to**

4      **like Ethan?  I just keep bringing his name up.**

5          A.     Absolutely.  Absolutely.

6          **Q.     Okay.**

7          A.     Yes, yes, yes.  I -- there's one -- one

8      walked off, and I was one of them that actually picked

9      him up and took him where he wanted to go.

10         **Q.     Okay.**

11         A.     We do not force anybody to stay.

12         **Q.     Was that -- would that have been one of**

13     **my clients or is that somebody else?**

14         A.     That was not one of yours, no.

15         **Q.     Okay.  And, again, I had mentioned this**

16     **yesterday during depositions.  If we're talking**

17     **specifically about my clients, we can -- we'll use**

18     **their names.  But if it involves any other minors that**

19     **were there, you don't need to use their names.  If one**

20     **of the names does come up unintentionally, we'll**

21     **redact that out of the actual physical transcript.**

22         A.     You know, I should -- I didn't recall

23     this before, but I actually believe that I did take

24     your client to where he wanted to go when he wanted to

25     leave.

65

1    Q.    Was it Robert or was it --

2    A.    I think it was David.

3    Q.    Was it David?  Okay.

4    A.    I think so.

5    Q.    Do you remember where it was?

6    A.    I think it was down to Nelson Martin.

7    Q.    Okay.

8    A.    I'm saying things that are just shadowy,

9    and I did not think about this before this moment.

10   Q.    I'm telling you, things pop up when you

11   start thinking about something else.

12   A.    That I'm pretty sure.

13   Q.    Do you remember when that may have been?

14   A.    No.

15   Q.    Okay.

16   A.    I don't have the date because I hardly

17   had the recollection.

18   Q.    That's fine.  We'll move on.

19   A.    But I think it's important for you to

20   understand when he wanted to leave, when he walked, we

21   took him.

22   Q.    Okay.  Are you aware of any time that the

23   mentors or any of the staff would have made any verbal

24   threats to any of the residents about what would

25   happen if they left?

66

1      A.      And what do you class as a verbal threat?

2      Q.      **Any use of force or legal process against**

3   **them.  For example, if you leave, the police are going**

4   **to bring you back or something to that extent?**

5      A.      We would notify the police.

6      Q.      **Okay.**

7      A.      Yes.  That's an understood fact because

8   we will not have a boy in the community.  Our

9   community was very concerned about that.  That we're

10  not going to have boy out on the loose that are going

11  to be a threat to their well-being, so the boys

12  understood that, yes.

13     Q.      **Okay.**

14     A.      Yes.

15     Q.      **Was this something that was discussed**

16  **with the local police department?**

17     A.      Yes, yes.

18     Q.      **Okay.  Did you personally have those**

19  **discussions?**

20     A.      I was personally there when the police

21  were there.

22     Q.      **Okay.  Tell me about that.**

23     A.      They would bring him back, and that

24  happened.  They brought him back and said that this is

25  the place you need, and this is -- they're doing it

1   for your good, and it was excellent.

2       Q.      Okay.

3       A.      Excellent.  The police did an excellent

4   job.

5       Q.      Was Liberty Ridge, and I have -- I've

6   only ever looked at over the Google map area of where

7   it is, but is it a pretty rural area?

8       A.      Very.

9       Q.      Are there neighborhoods or houses around

10  it at all?

11      A.      Yes.

12      Q.      About how close are the houses?

13      A.      Part of the farm was developed, and

14  there's approximately four or five houses at the end

15  of the long lane.

16      Q.      Oh, okay.

17      A.      The one lane.

18      Q.      So like walking distance, but not right

19  next door?

20      A.      Yes, yes.

21      Q.      Okay.  And are these just regular people

22  from outside the community that just bought houses in

23  a subdivision?

24      A.      Yes, yes.

25              MS. WYNKOOP:  Real quick.  Can I just run

68

1  to the restroom?

2           MS. FRANCHI:  Yes.  We can take a

3  five-minute break.

4           THE VIDEOGRAPHER:  We are going off the

5  record at 12:44 p.m.

6           (Recess)

7           THE VIDEOGRAPHER:  We are back on the

8  record at 12:48 p.m.

9  BY MS. FRANCHI:

10      Q.    Now, I apologize.  I'm going to jump

11  around a little bit.  While the boys were, I guess,

12  doing their consequences, whether it be the running or

13  any type of work or I guess anything, was there ever

14  any food restricted or water restricted to your

15  knowledge?

16      A.    Not water restrictions.

17      Q.    Okay.  Would food ever be restricted?

18      A.    I know that they were put on rice and

19  beans.

20      Q.    Okay.  And would that be like a last

21  resort or like when would it come to that decision

22  that okay, we're -- now you're on rice and beans?

23      A.    Well, it would come with the more

24  elevated consequences.

25      Q.    Okay.

69

1    A.    Certainly not at the beginning.

2    Q.    Okay.

3    A.    Yeah.

4    Q.    So it's not like you're doing your

5  consequences, and we're going to give you chocolate

6  chip cookies?

7    A.    That's right.

8    Q.    So let me think where I want to go with

9  this.  So you had talked -- this is kind of jumping

10  back to the beginning now.  You had mentioned we were

11  talking about mental health diagnoses and people who

12  were kind of to the point of not being able to be

13  helped by the program.

14         Was there ever concern with David Cross

15  that he was just -- that he just had too many mental

16  health issues to be helped at Liberty Ridge?  Was that

17  ever a discussion or a concern?

18    A.    I do not recall specific discussions, but

19  it's certainly in the back of our minds that is this

20  possible.

21    Q.    Okay.  About how long was David placed

22  there for?

23    A.    See, I do not have -- I do not have an

24  ending date for him.

25    Q.    Okay.  So if I were to say approximately

70

1   2011 to 2014, does that sound about right?

2        A.    Seems long.

3        Q.    Okay.

4        A.    But.

5        Q.    But it was longer than Robert Miller?

6        A.    Yes.

7        Q.    Okay.  Are you aware of whether David --

8   are you aware of whether David -- are you aware of

9   whether David was on any psychiatric medication when

10  he first came into Liberty Ridge?

11       A.    I was not.  I'm not personally aware of

12  what or how.

13       Q.    Okay.  That's not something in your

14  wheelhouse?

15       A.    No.  I was not in that.

16       Q.    Okay.  What were some of the behavior --

17  I know we -- let me go back.  We had talked about

18  obviously if a resident is in like mental distress or

19  getting violent or any type of behaviors like that.

20            But just generally speaking for the less

21  extreme behaviors, what were some of the behaviors

22  that were considered to be worthy of receiving a

23  consequence of any nature?  Like what were the typical

24  things that you would see or hear about?

25       A.    A very typical one is back talk to a --

**Witness Gerald Nolt**

71

1    and resisting authority.  Not playing fair in a game.

2    You know, wanting to kick and shove.  Just being

3    difficult.

4        Q.    What about speaking out against the

5    mentors and speaking out against the mentors'

6    behaviors?  Is that something that the mentors could

7    then give them a consequence for?

8        A.    The mentors would not give a consequence.

9        Q.    Okay.  So that wasn't something discussed

10   with mentors about doing that.  Like if they're

11   speaking out against you, you need to give them a

12   consequence wasn't --

13       A.    You mean that I would delegate a mentor?

14       Q.    Yeah.

15       A.    No.

16       Q.    Okay.

17       A.    No.

18       Q.    And you had said that the mentors were

19   generally watched over, but not all the time?

20       A.    That's right.

21       Q.    Okay.  So sometimes the mentors' actions

22   were at their own discretion when there wasn't

23   somebody, you know, standing over them directing them

24   like Ethan or you or I just keep using the names of

25   the people who I've talked to so far?

Witness Gerald Nolt

72

1      A.      Yeah.   Like if the mentor and his

2  resident would walk through the chicken house, the

3  department head wouldn't be with them at that point.

4      **Q.      Right.  Okay.  Were there any policies**

5  **that you were aware of or any direction given to the**

6  **Liberty Ridge staff on how to handle a situation if a**

7  **resident were to express any suicidal ideations or**

8  **suicidal gestures or anything to that effect?**

9      A.      In cases like that they would contact us,

10  and we would go into -- sit down with them.  Talk it

11  over.  Work through it.  That kind of thing.

12     **Q.      Okay.  Are you aware of any time that**

13  **either during 2011 to 2014 or any other time that any**

14  **child was in so much distress that they were brought**

15  **immediately to like a hospital or a crisis center or**

16  **anything like that?**

17     A.      When you say any other time, are you

18  referring to after 2014?

19     **Q.      Yeah, just generally.**

20     A.      I do not recall having that happen.

21     **Q.      Okay.  Did the committee ever consult**

22  **with a medical professional of any type or**

23  **psychological or psychiatric professional of any type**

24  **about the -- I guess whether or not the form of the**

25  **consequences or the type of work at Liberty Ridge or**

73

1    anything like that would cause any psychological harm?

2             MS. WYNKOOP:  Objection to form.

3        A.    Yes.  We would have had input.  Now,

4    specific to this era, I cannot recall that era.

5    BY MS. FRANCHI:

6        Q.    But it may have been sometime afterwards?

7        A.    Oh, we definitely do.

8        Q.    Okay.  So I guess to start to wrap this

9    up a little bit, I know we're talking this case about,

10   I guess, the early on years of Liberty Ridge?

11       A.    Yes.

12       Q.    Have things developed and changed since

13   that time?  I mean that was a long time ago now.  So

14   since about 2014, tell me about some of the changes

15   that have been made and some of the developments in

16   just how things are handled.

17       A.    They're handled very similarly to the way

18   they were in a lot of ways, but some things that have

19   changed perhaps are that we have more -- we had a

20   bigger program going recently, so we had reasons to

21   have more department heads.

22             We have -- which we talked about the

23   house parent, work coordinator, those are individual

24   people now rather than both in one like Ethan was.

25   And a guidance coordinator which gives -- which does

Witness Gerald Nolt

74

1  personal consulting.  Having personal interviews with

2  the boys once a week.  Teaching the Bible classes.

3  Coordinating all the phone calls and letters that come

4  in and visits with the parents and all that.  That's a

5  guidance coordinator.

6          So we have -- what changed is that we

7  have more adult -- I'll call them adult supervision on

8  hand.  More collaboration of working together.  That

9  brings more of a balance.

10          Q.    So it's not like Ethan being stretched

11  thin all the time?

12          A.    That's right.  That's right.

13          Q.    Okay.  And then you said that there may

14  have been talks after, I guess, the era of the case

15  with like therapists or, you know --

16          A.    Yes.

17          Q.    Okay.  And what brought about those

18  conversations?

19          A.    Well, when we -- when we have a boy that

20  has mental issues, is on medication or isn't on

21  medication, we've taken numerous boys to Dr. Walker,

22  and he has -- he has just endorsed our program to the

23  fullest.

24          Q.    And is that what came about with the

25  development of the new policy handbook was just the

75

1    kind of development of the program?

2         A.     Well, the new policy included more just

3    details as you sort of evolve and just brings more in,

4    and I'm not sure exactly like I can say what all went

5    into that, but a refinement of the policy, yes.

6         Q.     Okay.  And this would be just, you know,

7    learning from past residents?

8         A.     Yes.

9         Q.     Past mistakes or just ways of handling

10   things?

11        A.     Yes, and other institutions, and we're

12   always reaching out to learn more and from the

13   psychologists that help us, you know.

14              MS. FRANCHI:  Mm-hmm.  I think that might

15   be everything.  We don't need to go off the record,

16   but I'm just going to pause for just a second.  I want

17   to take a look through everything, and then it might

18   be about it.  So bear with me for just a second.

19              I think that is everything.  I always

20   scribble notes as I'm going through, and then I have

21   to go back and be like why did I write those notes.

22              MS. WYNKOOP:  Yeah.  Me, too.

23              MS. FRANCHI:  I think that takes care of

24   everything that we need today.  So do you have any

25   questions?

Witness Gerald Nolt

76

1          MS. WYNKOOP:  I do not have any

2    questions.

3          THE VIDEOGRAPHER:  This marks the end of

4    the deposition of Gerald Nolt.  We are going off the

5    record at 12:59 p.m.

6          (The deposition was concluded at 12:59

7    p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Gerald Nolt**

77

```
 1   COMMONWEALTH OF PENNSYLVANIA    )
                                     )  SS.
 2   COUNTY OF YORK                  )

 3
              I, Tracy L. Lloyd, a Registered
 4   Professional Reporter and Notary Public in and for
     the Commonwealth of Pennsylvania and County of
 5   York, do hereby certify that the foregoing
     testimony was taken before me at the time and place
 6   hereinbefore set forth, and that it is the
     testimony of:
 7

 8                    GERALD NOLT

 9
              I further certify that said witness
10   was by me duly sworn to testify the whole and
     complete truth in said cause; that the testimony
11   then given was reported by me stenographically, and
     subsequently transcribed under my direction and
12   supervision; and that the foregoing is a full, true
     and correct transcript of my original shorthand
13   notes.

14            I further certify that I am not
     counsel for nor related to any of the parties to
15   the foregoing cause, nor employed by them or their
     attorneys, and am not interested in the subject
16   matter or outcome thereof.

17            Dated at York, Pennsylvania, this 1st
     day of November, 2022.
18

19

20            _____
              Tracy L. Lloyd, Notary Public
21            Registered Professional Reporter

22
     (The foregoing certification does not apply to any
23   reproduction of the same by any means unless under
     the direct control and/or supervision of the
24   certifying reporter.)

25   My Commission expires:
     April 21, 2023
```

**1**

**1** 4:10
**11/26/65** 10:17
**11:12** 4:16
**11:55** 41:11
**12:12** 41:14
**12:44** 68:5
**12:48** 68:8
**12:59** 76:5,6
**13** 13:5
**14** 13:5,6
**15** 13:7
**17011** 4:19
**18** 38:8,20
**19** 16:13
**1985** 15:19
**1990** 8:17
**1992** 15:10
**1995** 8:17 11:22 14:23
**19th** 4:15

**2**

**20** 18:11
**2010** 30:13,17,21
**2011** 21:13 30:24 31:21 46:16,19 56:20 59:1 70:1 72:13
**2013** 36:17 49:25
**2014** 46:16,20 49:16 56:21 59:1 70:1 72:13,18 73:14
**2022** 4:15
**21** 27:22 28:9
**214** 4:18
**27** 11:22
**29th** 30:17

**2nd** 30:13

**3**

**3rd** 30:17

**4**

**402** 4:19
**4th** 31:21

**5**

**521-CV-05070-JMG** 4:14

**8**

**8** 13:2 48:20
**80** 18:11
**87** 30:16
**88** 30:17
**8th** 13:5

**9**

**90** 30:20
**91** 30:21

**A**

**a.m.** 4:16 41:11 48:20
**Absolutely** 29:13 64:5
**accept** 26:9
**accepted** 26:18
**access** 60:5
**account** 19:12
**accounts** 19:10,17
**acting** 58:2
**actions** 71:21
**active** 18:13
**activities** 45:13

**actual** 6:8 64:21
**address** 20:1 58:8
**adjoining** 19:21
**adjustment** 58:8
**administer** 53:18,19
**administered** 51:21
**administering** 51:10
**adult** 74:7
**adults** 16:1,3
**advice** 39:8,9,10
**affirmed** 5:9
**age** 13:4 38:7,10
**agencies** 40:8
**ages** 28:3
**agreed** 4:2
**ahead** 20:4
**allowed** 55:5 59:23 60:11
**Amish** 36:21
**amount** 13:15
**Andreozzi** 4:23
**anger** 39:22
**animal** 12:9
**answerable** 35:16
**answers** 6:15
**anticipate** 7:15
**anticipated** 23:11 60:8
**anymore** 58:20
**apologize** 6:4 50:11 68:10
**apparent** 24:11
**approach** 32:13, 14 43:23
**approached** 21:1,10 32:15

**approval** 35:19 48:14
**approve** 54:6
**approved** 22:9, 10 54:3,4,13
**approximate** 8:8
**approximately** 67:14 69:25
**approximation** 8:13
**April** 21:13 30:24
**area** 18:25 19:10 33:8 67:6,7
**arrangements** 47:16
**assemble** 32:11, 17
**assessment** 25:18 43:16
**assignment** 52:6
**assignments** 14:9 21:17,24 46:6
**associating** 41:18
**assume** 7:11 42:9
**assuming** 14:12 29:4 43:12
**attend** 22:16 31:6,7,11
**attending** 14:21 39:6
**attention** 31:22
**attorney** 6:14 9:10,17,22
**attorneys** 7:16
**audible** 6:19
**audience** 27:7
**August** 30:17
**authority** 71:1
**Avenue** 4:19
**aware** 40:11 41:21 46:18,23

48:8,15 49:5,7,16 57:5 65:22 70:7,8, 11 72:5,12

**B**

**back** 25:21 27:11 41:13,16,22 46:16 60:22 63:25 66:4, 23,24 68:7 69:10, 19 70:17,25 75:21
**background** 9:6
**bad** 7:17
**balance** 74:9
**bank** 19:10,11,16, 17
**banking** 19:13,15
**barn** 53:2
**Barry** 4:17
**based** 18:24
**basically** 22:10 38:4
**basing** 49:9
**beans** 68:19,22
**bear** 45:6 57:6 75:18
**begin** 5:11 38:10
**beginning** 10:11 20:6 23:9 49:15, 23 69:1,10
**begins** 4:9
**behavior** 52:13 70:16
**behavioral** 24:20
**behaviors** 70:19, 21 71:6
**beliefs** 17:5,15, 19
**Bell** 50:21
**Bible** 74:2
**bigger** 73:20
**binder** 9:23
**bird's** 21:20

**birth** 10:16 16:15

**bit** 7:20 9:8 13:9
17:22 19:5 20:5
21:20 25:11,21
26:11 32:7 41:19
43:15 45:6 51:5
52:22 57:8 60:9
62:19 68:11 73:9

**Blairsville** 19:1

**board** 22:3,7,8,9,
16,18,22 31:16
35:6,12 36:6 45:7
48:18,24 49:11

**Board's** 48:10

**book** 29:22 30:6

**born** 10:18

**bottom** 9:25
52:12

**bought** 67:22

**boy** 53:11 59:15
66:8,10 74:19

**boys** 24:12,16
25:19,25 26:8
31:23 36:25 37:1
39:5,21 42:21
43:16 47:20 53:21
54:20 57:17,18
58:10 59:17,23,24
62:23 63:7,20,22,
25 66:11 68:11
74:2,21

**break** 7:19,20,24
8:3 28:21 41:9
61:17 68:3

**brethren** 23:10

**bring** 23:22 63:25
66:4,23

**bringing** 64:4

**brings** 74:9 75:3

**brought** 62:25
66:24 72:14 74:17

**bucket** 53:7

**built** 37:8

**business** 18:9
19:9,24 20:6
33:14 45:22

**businesses**
17:23 18:4,20
19:8 35:24 36:8
38:2 40:21,23
41:5,18 49:17

**buy** 11:24

---

**C**

**call** 10:23 54:8
60:12,15 61:20
74:7

**called** 5:8 53:19

**calls** 61:8,22
62:18 74:3

**camera** 6:17

**Camp** 4:19

**care** 75:23

**carefully** 55:6

**case** 4:13 6:8
9:10 46:14 73:9
74:14

**cases** 25:10,14
72:9

**catching** 29:2

**cattle** 53:5

**caused** 58:3

**center** 72:15

**Chair** 40:22,25

**chairman** 20:16,
17

**challenging** 54:7

**change** 15:12

**changed** 46:21
73:12,19 74:6

**changing** 51:6

**character** 26:1,4,
6,13

**Chasing** 55:17

**Chestnut** 18:7,
21,23 19:1,15

**chicken** 47:15
72:2

**chickens** 49:22

**50:4**

**child** 43:18 72:14

**children** 15:22
16:7 24:25 38:1,6,
7,10,16 40:10
44:14 45:25 46:5,
24 47:10 55:24
59:6 60:11 62:7

**chip** 69:6

**chocolate** 69:5

**Christian** 26:10

**church** 14:17
17:10 43:1

**Clark's** 40:22

**class** 66:1

**classes** 39:3 74:2

**classroom** 13:10

**client** 64:24

**clients** 41:24
56:24 64:13,17

**close** 11:7 33:12
57:23 67:12

**coffee** 30:2

**collaboration**
74:8

**comfortable**
10:8 26:17

**committee** 20:8,
14,18,21,25 21:6,
8,12,15,23 22:2,
11,20 23:4 30:11
31:6,7,11,15 32:1,
5,14,15 33:2,18
34:6 35:18 39:15,
16,17 51:12,14,
17,24 54:2,3,23
55:1 56:12,17
57:16 60:4 72:21

**common** 17:8,16
38:16

**communicate**
36:15

**communicating**
36:13

**communication**
60:9

**communications** 22:21 36:18 62:4

**community**
14:13 24:9 33:9
34:10 38:1 43:5
66:8,9 67:22

**companies** 37:6,
13

**company** 11:15,
17,21,23 18:14,21
47:15 49:19,23,24
50:3

**compared** 23:8

**complaints**
59:24

**complete** 59:14

**complied** 59:18

**comply** 53:12

**concept** 20:12

**concern** 63:9
69:14,17

**concerned** 66:9

**concluded** 76:6

**Conference** 15:5

**confusingly** 7:3

**congregate** 14:6

**congregation**
14:19 16:23 17:1
44:1

**congregations**
25:25

**consequence**
53:21 70:23 71:7,
8,12

**consequences**
51:11,18,22 52:18
53:19,20 54:4,13
59:6,9 68:12,24
69:5 72:25

**considered**
44:17 54:24 70:22

**constant** 57:22,
24

**consult** 72:21

**consultation**

**40:6** 54:2

**consulting** 74:1

**contact** 35:17
36:8 49:24 54:2
58:10 60:5 72:9

**content** 61:5
62:14,17,20,22

**continuing** 30:20

**contract** 12:7
34:3

**contracted** 12:8

**contracts** 37:13,
15

**control** 55:15

**conversations**
22:24 36:19 60:25
74:18

**cookies** 69:6

**coordinating**
47:18 74:3

**coordinator**
29:16 40:1 46:13,
14 54:1 73:23,25
74:5

**coordinators**
46:8,11

**copies** 37:15

**copy** 41:25

**corner** 9:25

**correct** 5:16,17
20:9 29:7 30:15
33:13 43:13 45:3,
4 49:13

**correspondence**
21:7

**coughing** 6:5

**counsel** 4:3,20
6:9

**county** 10:19
11:2,5 19:3

**couple** 41:17
55:5

**court** 4:12 5:4

**cover** 52:3

create 29:8
created 30:12
creating 22:3,12 25:5
creation 20:5
crisis 55:14,21,23 72:15
Cross 6:1 27:21 49:15 69:14
Cross's 29:16
cup 30:2
curricular 14:9

**D**

D.C. 4:11
dad 12:23,24
dark 8:11
date 4:15 8:9,19 10:16 58:23 65:16 69:24
dates 16:15
David 6:1 27:21, 25 29:16 44:24 49:15,25 55:7 65:2,3 69:14,21 70:7,8,9
day 6:4 13:11,17 29:2 39:23 48:19 49:12 57:14 61:7
day-to-day 18:17 45:13 47:12
days 61:17
dealing 39:21,24 44:15 50:4
December 30:21 36:17 49:24
decide 15:12 53:21 55:6
decided 34:1 51:16,24
decision 68:21
deemed 49:2
Defendants 5:1, 3

definition 43:8 55:12,16
delegate 71:13
delegated 63:1
department 29:15 35:14,15 39:25 40:6,7,12 53:25 54:8 56:9 60:4 62:8 66:16 72:3 73:21
depend 31:8 38:21
Depos 4:18
deposition 4:10, 18 6:12 8:8 9:16 76:4,6
depositions 64:16
describing 43:5
descriptions 14:2
desperate 63:16
detail 62:19
details 75:3
determination 59:19
determine 55:1
determines 43:18
develop 23:1
developed 21:18 46:21 67:13 73:12
developing 20:8 22:25 23:3,5 24:6
development 74:25 75:1
developments 73:15
devices 57:25
diagnoses 25:2, 8 44:16 69:11
diaries 14:10
diary 13:13,14
differently 10:24

difficult 25:10,14 71:3
dig 53:6
digging 53:4 59:11
directing 71:23
direction 22:2 24:17 39:4 41:20 45:25 47:9,14 58:13 63:24 72:5
directions 51:10
directives 37:7
directs 46:5
discipline 24:21
discretion 53:15 71:22
discuss 22:17 33:17 39:12
discussed 25:17 32:8 33:21 44:19 51:24 56:12 66:15 71:9
discussing 27:4
discussion 24:25 25:6 26:14 29:10 36:25 58:16 69:17
discussions 22:21 24:7 25:12 32:5 33:5 51:9 54:19 62:21 66:19 69:18
disgusting 50:6
distance 67:18
distress 39:22 70:18 72:14
District 4:12,13
ditch 53:7
dive 40:4
divided 18:11
doctor 44:25
documentation 37:19
documents 9:20, 24

door 67:19
drafted 42:11
drafting 42:2
draw 31:22
drink 7:22
drinking 6:5
driveway 63:23
driving 11:10
drop 45:21
drumming 52:7
Dutch-way 40:23
duties 21:15 35:11 47:10 48:21

**E**

early 28:8 73:10
easier 15:1
Eastern 4:12 14:16 38:1 43:13
Edelstein 5:1,3
education 13:1, 17 42:24
effect 8:10 72:8
elevated 68:24
employ 32:24
employees 12:1
encourage 52:12 62:22
end 67:14 76:3
ended 58:15
ending 69:24
endorsed 74:22
enjoy 12:12
entities 37:18 40:6
entity 22:13,15
EPMC 14:25 15:2,9 17:4,9,14
era 29:16 54:15 58:24 73:4 74:14

escalate 52:14
escalation 52:18
essay 52:8
essays 52:7
establishing 40:8
estimate 8:8
estimating 7:17 8:18
estimation 8:13 57:12
et al 4:11
Ethan 5:15 24:4 29:18 52:6,21 62:9 64:4 71:24 73:24 74:10
ethics 26:10
evaluating 27:1
Evans 50:21
event 8:15
evolve 75:3
exact 8:19
EXAMINATION 5:20
excellent 67:1,3
Excuse 31:25
exercise 52:16
exercises 52:23
expect 7:14
expectations 6:11
experience 26:21
explain 36:4 52:1
explained 36:19
express 11:16 17:25 72:7
expressed 27:13
extent 46:22 58:4 66:4
extra 32:17

extreme 70:21

eye 21:20

**F**

facilities 12:10

fact 66:7

fair 7:12 8:5,12,19
71:1

faith 43:13

falls 26:13

familiar 33:5
40:17,18,20

families 38:13

family 13:21
15:11 37:22 38:2,
16 41:4 42:23

fancy 29:22

farm 32:3,4 33:22
37:22 40:23 47:7,
8 63:21,22 67:13

farms 38:2

Feed 40:22

feel 7:4 25:13
26:17,18

felt 48:25

fence 53:5

fiberglass 32:3

field 39:11

figure 44:6

filing 4:4

fill 29:5

fill-in 61:14,19

finally 53:3

financial 18:19
41:4

fine 7:23 15:20
22:1 23:18,24
56:11 65:18

firm 4:23

five-gallon 53:6

five-minute 68:3

flip 10:3 51:5

food 68:14,17

Foote 4:23

force 64:11 66:2

forget 19:3 50:5

form 4:6 28:22
32:19 33:20 34:20
36:3 37:2,9 43:20
46:7 47:1 49:21
72:24 73:2

formation 31:10

forward 23:1
57:8

found 10:5

fourth 6:10

frame 8:9

Franchi 4:22
5:11,13,18,22,25
28:24 30:3 32:20
33:24 34:22 36:5
37:4,11 41:8,15
43:22 46:10 47:3
50:2,14 51:3 68:2,
9 73:5 75:14,23

free 7:4

friends 33:11

front 9:23 29:22

full 10:12 31:5

fullest 74:23

fully 9:3

**G**

game 71:1

Garman 20:17,24
21:5,10

gate 49:19,23

gates 32:2,3,10,
11,13,14,15 33:1,
16,17 34:6,18
35:25 36:20,24
37:8 40:19

gather 14:7,8

gave 58:2

general 9:6 17:6,
7,13,15,19 18:25
19:10 26:14 35:11
48:21

generally 9:8
27:4 28:7 32:8
38:7 48:20 53:19
57:14 70:20 71:19
72:19

Gerald 4:10 5:8
10:13 76:4

gestures 72:8

get all 10:7

give 6:15 8:12
10:3 21:20 24:16
45:17,24 47:9
48:14 51:10 52:1
62:18 69:5 71:7,8,
11

giving 6:11 47:13

Gloria 15:17

Godly 63:2

goings 48:18

good 5:23 15:22
17:21 26:9,10
39:10 48:3 50:7
52:7 53:14 62:15
67:1

Google 67:6

Gotcha 62:4

governmental
40:8

grade 13:2,3,5

grandkids 16:10

great 30:10 60:7

ground 23:2,4

guess 8:10 13:25
14:15 17:4,7 19:9,
23 20:12 23:5
26:6,12 31:6
39:21,23 43:2,4,
16,17,18 46:1
48:11 52:20 54:12
58:1 68:11,13
72:24 73:8,10
74:14

guidance 17:6
23:5 43:13 73:25

74:5

guide 24:15 51:8

guided 39:20,24

**H**

haircuts 45:17

half 6:4

halfway 30:5

hand 54:9 74:8

handbook 42:11
74:25

handful 23:10

handle 25:10,14
39:5 51:17 56:3
63:19 72:6

handled 73:16,17

handling 75:9

hands 48:2 56:13

hands-on 54:19
55:3

happen 53:1 57:2
65:25 72:20

happened 8:15,
16 59:8 66:24

happening 49:12

happy 17:20

hard 62:1

harm 73:1

head 6:16 35:15
39:25 54:8 60:4
62:8 72:3

heads 29:15
35:15 53:25 56:9
73:21

health 25:1,2,8
40:7 44:16,18
69:11,16

hear 55:7 70:24

heard 6:10 52:10
56:19

helped 69:13,16

helping 27:13,19
29:8 51:7

hey 54:9

higher-ups
57:11

Hill 4:19 11:16
17:25 18:1,24
19:12

Hills 17:24

history 27:14

hold 19:9 55:6

hole 53:6

holes 53:4

home 13:15 16:9
24:18 31:23 40:9,
13 43:25

hospital 72:15

hours 7:15 13:6,
10,11 14:9 19:7
59:7

house 19:25
29:15 35:14,15
40:1 46:12,14
54:1 61:10 72:2
73:23

houses 67:9,12,
14,22

hypothetically
63:7

**I**

idea 23:6 48:18

ideations 72:7

identify 4:20

imaginary 48:6

immediately
72:15

implement 47:25

important 8:24
16:19 65:19

impress 16:17

improper 49:1

inappropriate
62:21,22

inception 20:12

incident 56:19

include 59:9

included 75:2

includes 26:10

incoming 62:6

incorporating 32:3

increase 39:22

Indiana 19:4,16

individual 40:3 73:23

individuals 26:21 38:12,15 39:18 55:5

injury 55:19

input 25:25 73:3

institution 23:22

institutions 23:11,15 24:1 75:11

instruct 56:5

instructed 56:2

instruction 56:10 63:19

interacting 27:2, 6

interest 18:3,8,21 27:13 41:3

interests 18:19 41:4

interstate 11:11

interviews 74:1

involved 13:18 20:8,11 21:14,22 22:21 24:7 30:14, 18,22,25 32:5 35:22 36:7,13 42:1,12 45:12 47:12,13,14 54:18 64:1

involvement 22:6 25:22 47:5

involves 64:18

involving 41:24

56:13

issue 63:17

issues 39:22 44:18 69:16 74:20

Item 31:23

items 12:5,6,8

———

**J**

job 11:9 13:23 59:14 67:4

Jocelyn 5:2

joined 30:11

jump 57:7 68:10

jumping 69:9

June 30:13,17

Juniata 19:13,19

———

**K**

kick 71:2

kidding 16:15

kind 12:5,14 18:16 20:4,5,8 21:20 22:12,13, 14,24 23:6 24:22 25:18 26:1,13 27:7 29:5 34:13 36:15 39:9 42:11 44:11 46:21 47:23 51:6,8,23 52:1,14, 17 57:17 69:9,12 72:11 75:1

knew 25:10 33:10 40:25

knowledge 68:15

Kylan 4:17

———

**L**

labor 13:19 32:4, 17 38:21 40:7,12 59:10

lack 55:22

Lamar 20:17,24

Lancaster 10:19, 22,23 11:2

landline 62:3

lane 67:15,17

law 4:23

leading 20:5

learn 42:21 75:12

learned 12:21,23

learning 38:4,11 75:7

leave 50:20,24 58:20 63:20,22 64:25 65:20 66:3

left 49:15 57:17, 25 65:25

legal 66:2

legs 7:21

letter 61:8

letters 60:21 62:5,6,15,18 63:3 74:3

level 13:1 52:19

Liberty 20:6,9,12 21:5,8 22:3,12,17, 22 23:3 24:6,8 25:2,5 27:17,25 28:4,21 29:9,11 31:5,6,11,15 32:1, 4,12 33:22 34:18, 19 35:5,12,24 36:6,7,10,24 37:14 38:25 39:2, 6 40:21,24 41:6, 18,22 42:3,15,18, 19,22 43:6,12,17, 19,24 44:9,22 45:1,8,13 46:24 47:5 48:10,18 49:1,15,16,18 50:3 51:9,18 55:3 56:20 57:11 58:19 59:6 60:10 61:1 67:5 69:16 70:10 72:6,25 73:10

life 10:25 43:1

light 7:9

liquid 12:9

listening 63:10

live 16:6 17:8,16, 19

lived 10:24 11:4 28:16

living 16:7

LLC 18:10

Lloyd 5:5

local 19:11 25:25 66:16

long 11:20 14:21 15:18 23:19 67:15 69:21 70:2 73:13

longer 20:24 70:5

looked 67:6

loose 66:10

losing 6:3

lot 27:12 34:11 39:25 54:6 59:16 73:18

LRF-86 29:25 30:5

LRF-92 31:1

LRF-93 31:21

LRF-95 29:25

lunch 7:20

———

**M**

made 65:23 73:15

main 19:24

make 6:18 7:1 10:7 55:11 57:18 62:14

makes 59:18

man 33:8

manager 47:7,8

manner 63:25

manual 41:22,23, 25 42:2,10,15 59:10

manufacture 32:3

manure 12:9

map 67:6

Margolis 4:25 5:2

Market 40:23

marks 76:3

married 15:18 28:10

Martin 4:11 24:4 35:2 37:20 50:15 65:6

Martin's 47:5

Massachusetts 10:23

math 15:21

matter 4:11,24 6:1

matters 5:14 6:9 22:17

maximum 52:19

meaning 17:4 49:18

means 6:15

mechanic 11:10

Media 4:9

medical 44:20 72:22

medication 70:9 74:20,21

meeting 30:13 31:2,4,12,16

meetings 22:17 31:8 39:11

Meghan 4:25

member 14:16, 24 15:2,4,9 17:1, 2,4,10,14

members 20:18 22:9 31:7 41:4 45:7 56:12

memory 42:17

men 25:7 27:13

Mendez 5:2

**Witness Gerald Nolt**                                                                 6

**Mennonite** 14:12,17 21:2 34:10 38:1

**Mennonites** 34:11

**mental** 25:1,7,14 39:22 44:16,18 55:14,21 69:11,15 70:18 74:20

**mentally** 55:15

**mentioned** 7:20 10:10 26:4,12 40:16 52:23 54:14 59:17 64:15 69:10

**mentor** 28:2 61:14,19,21 63:9 71:13 72:1

**mentors** 21:25 25:22 26:7 27:1, 18,25 28:4,10,20 29:5,9,10 39:2,5, 20 46:12 51:8 53:16,22 56:2,17 57:10,16,17,20 58:2,18 59:24,25 61:2,7 62:5 63:19 64:1 65:23 71:5,6, 8,10,18

**mentors'** 71:5,21

**Messianic** 21:2

**methods** 54:3

**midway** 51:6

**Miller** 6:1 70:5

**Millerstown** 14:20 19:13,16

**Mills** 40:22

**mind** 60:18

**minds** 69:19

**minimal** 52:6

**ministry** 43:25 44:4

**minors** 16:2 64:18

**minutes** 30:13 31:2

**mission** 21:2,3 22:3,7,8,16,18,22

31:2,8,16 42:15, 17,20 48:10,18,24 49:11

**mistakes** 75:9

**mistreating** 59:25

**mix** 24:22,23

**mm-hmm** 6:20 40:5 59:21 63:12 75:14

**MMM** 31:11

**mode** 55:23

**moment** 45:7 57:7 65:9

**money** 37:17

**monitor** 4:16 61:19

**monitored** 61:1, 23 63:3

**monitoring** 61:11 62:13,20

**month** 29:3 45:17

**months** 60:20

**morning** 5:15,23 14:8

**move** 9:8 52:16 65:18

**moving** 23:1

**Mulch** 18:7 19:1

**mumbled** 7:3

**N**

**N-O-L-T** 10:15

**names** 36:9 64:18,19,20 71:24

**nationally** 19:11

**nature** 60:1 70:23

**needed** 24:25 45:22 57:18 59:15

**neighborhoods** 67:9

**Nelson** 24:4 35:2 37:20 47:5 65:6

**newer** 41:23

**Newport** 11:5

**nighttime** 59:7

**nodding** 6:16

**Nolan** 33:3,4

**Nolt** 4:10 5:8,24 10:13 76:4

**normal** 37:25 39:23

**notes** 75:20,21

**notify** 66:5

**notoriously** 7:17

**November** 30:21

**number** 4:10,13 10:3

**numbered** 9:25

**numerous** 74:21

**nuture** 42:24

**O**

**Objection** 28:22 32:19 33:20 34:20 36:3 37:2,9 43:20 46:7 47:1 49:21 73:2

**objections** 4:5

**objects** 56:14 57:1

**observe** 27:2 58:1

**observed** 56:25

**observing** 27:6 55:24

**occasions** 39:7

**occurring** 56:20

**October** 4:15

**offense** 54:7

**official** 22:14

**Oftentimes** 44:3

**older** 27:22

**open** 39:1 48:12

63:23

**opened** 29:23 34:19 42:3

**opening** 42:19

**operating** 43:12 48:12

**opportunity** 52:1

**options** 53:4

**outfit** 36:22

**outgoing** 62:6

**overhead** 47:19

**oversee** 46:1

**overseeing** 61:7

**oversight** 22:3 29:10 48:10,14

**owned** 11:20

**ownership** 18:3, 8,20 41:3

**P**

**p.m.** 41:14 68:5,8 76:5,7

**PA** 4:19 11:12 19:2

**pages** 29:25

**paid** 13:23 28:13 38:20 45:7

**paint** 32:11

**pallet** 36:13,15,24 40:17 47:15 49:19,24

**pallets** 37:8

**papers** 14:1

**paragraphs** 14:1

**parent** 29:16 35:15 40:1 46:12, 14 54:1 61:10 73:23

**parents** 24:11,18 35:14 42:21 43:21,23,25 44:1, 3 60:6,10,12,15 61:1 62:25 63:6,8, 11 74:4

**part** 16:23 21:12 27:5 67:13

**participate** 43:17 58:20

**participated** 21:22

**parties** 4:3

**past** 75:7,9

**pastures** 53:5

**pause** 58:3 75:16

**paying** 36:25

**payment** 33:18, 22,25

**payments** 34:18

**pending** 8:1

**Pennsylvania** 4:13 10:20,24 11:6 14:16 15:6 18:25 38:1 43:13

**people** 17:8 21:4 26:8,16 48:15 62:10 67:21 69:11 71:25 73:24

**percent** 18:11,12

**perception** 49:10

**perfectly** 8:19

**perform** 59:6

**performed** 33:19 47:11 48:21 57:1

**period** 27:21 41:24 46:19 48:13

**permitted** 56:17

**Perry** 11:5

**person** 27:14 29:17 35:17 36:11 60:24 61:15 63:10

**personal** 19:21 74:1

**personality** 26:2, 4,13

**personally** 15:12 19:18 22:18 23:14,21 27:8 34:25 40:20 45:12,24 58:1

66:18,20 70:11

**pertaining** 9:9

**phone** 60:12,25 61:8,20,22,25 62:3,18 63:8 74:3

**physical** 54:20 55:19 56:13,25 58:8,9 59:10 64:21

**physically** 23:25 58:7 63:20

**picked** 64:8

**picnic** 12:13

**Pieces** 42:20

**pivot** 41:19

**place** 4:18 17:21 42:3 66:25

**Plaintiffs** 4:24 5:25

**Planet** 4:17

**plans** 40:9

**playing** 71:1

**point** 7:22 8:7 9:24 42:18 44:23 51:4 59:7 69:12 72:3

**pointed** 9:22

**police** 66:3,5,16, 20 67:3

**policies** 42:7 72:4

**policy** 41:22,23, 25 42:2,10,14 63:18 74:25 75:2, 5

**pool** 29:5

**pop** 65:10

**popular** 50:22

**position** 16:22 35:8 43:19 48:25

**post** 53:4,6

**posted** 40:13

**practice** 37:25

**practices** 17:16

**prayed** 9:19

**preliminary** 5:14 6:9

**prep** 32:11

**preparation** 42:2

**prepare** 9:16

**presented** 34:6

**presenting** 32:1

**Presently** 12:4

**presumptuous** 14:11

**pretty** 11:7 50:7 65:12 67:7

**prevent** 9:2

**previous** 42:2

**primary** 19:9

**prior** 15:4 33:5

**problem** 23:21

**process** 25:18 27:6,19 44:15 53:24 66:2

**production** 12:9

**productive** 13:15,19

**products** 32:18

**professional** 72:22,23

**program** 25:23 27:2 69:13 73:20 74:22 75:1

**property** 19:20, 21,22,24 28:16 46:25

**proposal** 32:1 34:6,7

**protocol** 22:25

**provided** 39:1 44:22

**providing** 25:7 42:23

**psychiatric** 44:20 70:9 72:23

**psychological** 72:23 73:1

**psychologist** 44:21

**psychologists** 75:13

**public** 43:5

**purpose** 42:16, 17 62:13

**purview** 59:5

**put** 5:14 13:16 55:5 68:18

**putting** 40:9 53:5

———————

**Q**

**question** 4:6 6:15,24,25 7:6,10, 12 8:1,3 23:20 25:4 36:12 44:3 51:22 60:8

**questions** 6:7 9:6,9,11,13 10:7 23:19 32:9 35:17 39:12 41:17 75:25 76:2

**quick** 41:8 67:25

**quote** 55:2

———————

**R**

**R.M.** 4:11

**raise** 63:1

**random** 50:25

**rare** 31:10

**reaching** 75:12

**reading** 4:3

**ready** 38:25 59:15,17,20

**Real** 67:25

**reason** 7:1,3 62:25

**reasons** 73:20

**recall** 21:9,25 22:6,8 23:14 27:23,24 28:3

31:3 33:18 34:8 42:1 44:24 46:3 47:2 49:20 51:16 52:17 55:24 58:23 59:3 64:22 69:18 72:20 73:4

**receive** 22:2 53:21

**received** 34:24 41:22 53:4

**receiving** 70:22

**recently** 73:20

**Recess** 41:12 68:6

**recollection** 65:17

**recommendatio ns** 27:12

**record** 10:11 41:11,14 68:5,8 75:15 76:5

**recruit** 21:25 35:14 51:7

**recruitment** 24:24 35:23 43:16

**redact** 64:21

**redirect** 58:3

**refer** 10:2 14:25 21:3 23:21 29:22 42:16

**referring** 9:23 30:4 43:9 72:18

**refinement** 75:5

**reflect** 27:11

**regular** 45:17 67:21

**relate** 26:3,15,20 39:10 42:22,25 58:14

**relating** 6:7 26:5, 17

**relational** 43:10 58:13

**relaxed** 26:17

**remember** 8:20 13:4 22:2 23:13,

17 32:25 34:1,2,4 50:24 56:10 65:5, 13

**remiss** 34:14

**remit** 34:18

**removed** 58:19

**remuneration** 33:21

**Renee** 4:22 5:25

**repair** 11:19

**repairs** 12:17

**repeat** 7:5

**rephrase** 7:5

**report** 29:12 60:3

**reported** 49:10

**reporter** 5:4,5

**represent** 4:21, 23 5:1,3,25

**representative** 31:14,19 33:1 39:19

**representing** 4:17

**required** 53:9

**reserved** 4:6

**resident** 28:2 55:4 61:20 70:18 72:2,7

**residents** 26:18 32:4 36:10 42:19 44:22 47:13 51:11 55:3,21 57:9 58:12 65:24 75:7

**residents'** 60:25

**resistance** 24:21

**resisting** 24:18 71:1

**resort** 44:12 68:21

**respective** 4:3

**respond** 6:19

**responded** 20:19

**Witness Gerald Nolt**                                                    **8**

response 7:11

responsibilities 21:16

responsibility 63:1

rest 26:19

restrained 55:25

restraint 54:20 56:25

restraints 56:13

restricted 68:14, 17

restriction 7:25 60:14,20

restrictions 68:16

restrictive 60:21

restroom 7:22 68:1

result 53:14

review 9:20 62:6

rice 68:18,22

Ridge 18:7,21,23 19:1,15 20:6,9,12 21:5,8 22:4,13,17, 22 23:3 24:6,8 25:2,5 27:17,25 28:4,21 29:9,11 31:6,11,15 32:1, 12 33:22 34:18,19 35:5,12,24 36:6,7, 10,24 37:14 38:25 39:2,6 40:22,24 41:6,19,23 42:3, 15,18,19,22 43:6, 12,17,19,24 44:9, 23 45:2,8,13 46:24 47:5 48:10, 19 49:1,15,16,18 50:3 51:9,18 55:3 56:20 57:11 58:19 59:6 60:10 61:1 67:5 69:16 70:10 72:6,25 73:10

right-hand 9:25

Robert 6:1 28:1 65:1 70:5

role 51:8

room 61:24

rules 6:11 17:7 40:13

run 19:24 36:21 53:2 67:25

running 49:25 54:15 68:12

runs 18:16

rural 67:7

---
**S**
---

safe 45:21 48:17

sale 32:11

Saturday 14:8

scenery 24:16

school 12:22 13:2 14:4

schooling 37:23

schools 14:8

scribble 75:20

sealing 4:4

segue 60:7

select 29:9

selecting 55:22 26:7 27:19,20

selection 26:23 27:6

Self-employed 11:14

Senate 4:19

sense 7:1 17:13 54:20 55:25

Sensenig 40:22, 25

separate 22:12

serve 20:13

service 33:23

services 44:21

set 17:15,19 25:15 32:2

setting 35:23

36:23 37:5 42:23 43:3,4 47:15

settled 60:22

shadowy 65:8

shaking 6:16

shares 17:15 18:11

shop 11:10,18 19:24 32:2 40:22, 25

shove 71:2

shovel 55:18

signing 4:4

similar 36:18

similarly 73:17

simply 8:10,20 18:10 48:14

single 28:11,12

sit 53:6 72:10

site 46:9

sites 46:25

sitting 61:24 63:10

situation 26:3,5 54:8 56:3 63:20 72:6

situations 39:5 51:17 55:20

skip 20:4 45:5

sliding 30:2

slowly 6:3

Snyder 32:2,10, 13,14,15 33:1,3,4, 16,17 34:6,17 35:25 36:20,23 40:18

socialized 33:11

society 42:25

son 18:10,13

sort 55:21 75:3

sound 70:1

speaking 9:17

28:7 33:2 63:7 70:20 71:4,5,11

specialized 12:11,14

specific 9:9 21:17 24:25 25:1, 6 32:9 35:9,12 38:8 39:1,3 44:16 46:5 47:20 51:25 69:18 73:4

specifically 17:5,23 19:9 20:20 25:8 26:24 27:23,24 29:23 31:22 37:1 42:7 46:19 56:10 64:17

spell 10:14

spent 45:19

spiritual 24:22 42:24 43:3,9,11

spoken 9:7 40:18

spot 15:21

stab 8:10

staff 39:2,11 45:1, 2 61:1 65:23 72:6

stand 7:21

standing 71:23

start 6:5,7 9:5,13 11:23 26:6 52:5, 12 65:11 73:8

started 20:14

state 4:21

statement 42:20

statements 17:18

States 4:12

stay 45:18 64:11

stenographer 6:17

step 44:12 49:3

stipulated 4:2

STIPULATIONS 4:1

straight 60:19

strategy 22:25 39:12

stretch 7:21

stretched 74:10

strike 38:19 48:9

stuck 61:20

students 14:7

stumbling 15:1

subdivision 67:23

submit 13:25 14:3,9

suggestions 25:24

suicidal 72:7,8

Suite 4:19

super 52:11

supervising 29:12

supervision 57:10,23 74:7

supposed 13:16 47:10,11 58:9

surprised 6:23

swear 5:5 6:24

swing 55:13

swinging 55:22

system 13:18

---
**T**
---

takes 75:23

taking 4:18 6:18 7:15,20 44:24

talk 44:4 46:19 48:2 54:10 60:9 62:17 63:11 70:25 72:10

talked 25:9 44:17 52:21 69:9 70:17 71:25 73:22

talking 6:4 48:5, 11 52:15,21 55:11 64:16 69:11 73:9

**Witness Gerald Nolt** 9

talks 31:25 33:18 42:15 74:14

target 27:7

targeted 24:24

targeting 26:24

teacher 13:17 14:4,12

Teaching 74:2

telling 47:20 65:10

terribly 16:16

testified 5:9

testify 9:3 56:24

testimony 6:18

therapeutic 43:3, 8

therapist 45:2

therapists 74:15

therapy-related 44:21

thin 74:11

thing 6:13 8:15, 23,24 34:15 62:23 72:11

things 13:16 17:7 46:20 47:18,24 48:22 50:24 54:14,16 55:18 62:5 65:8,10 70:24 73:12,16,18 75:10

thinking 51:1 65:11

thought 34:14 59:25

threat 66:1,11

threats 65:24

three-hour 13:2 14:7 37:23

Throwing 55:17

time 4:6,16 6:6,10 7:17 8:9,18 10:3,6 15:1 20:16 23:19 27:21 28:5,17 29:2,6 30:14,18

31:2 41:14,24 42:8 44:24 46:19, 21,23 48:13,20 49:14 53:9 55:24 57:9,13 65:22 71:19 72:12,13,17 73:13 74:11

times 27:12 39:25 54:7 57:20 58:6 59:16 60:15

title 16:22 35:9

today 4:17 5:5,24 6:2,21 7:7 8:21,25 9:3,16 52:23 75:24

Today's 4:15

told 29:1 52:22

tools 55:17

totally 7:23 17:11

Tracy 5:5

trade 12:21

train 24:15

training 39:1,3 42:24

traits 26:7

transcript 4:4 5:14 64:21

transferred 37:17

transition 17:22

transport 12:6

transportation 12:15

treasurer 35:3 47:6

treatment 25:1,7

trial 4:7

trick 6:24 23:18, 20

troubled 27:3,4,5 39:6,21 40:3 42:21 43:18

troubles 26:22

Truck 11:10

trucking 11:11 18:21

trucks 12:11,14

truth 8:24 9:3

truthfully 9:1

turn 30:5 31:20

turned 30:9

twenties 28:8

type 17:16 18:8 24:13 25:15 26:3, 6 27:14 56:13 62:19 68:13 70:19 72:22,23,25

typical 70:23,25

———

**U**

uh-huh 6:24

umbrella 47:24

uncommon 38:20

understand 7:1, 4 17:11 25:3 36:12 46:20 65:20

understanding 20:7 34:12 46:4 47:4 48:9 57:8

understands 13:18

understood 7:12 8:6 66:7,12

unintentionally 64:20

United 4:12

unpaid 38:17

unquote 55:2

———

**V**

vacation 28:20

Valley 19:13

verbal 6:15,19 7:11 34:7,11 36:22 58:12 65:23 66:1

video 4:16,18 6:17

view 21:20

violent 55:4,10, 16 70:19

violently 55:22

visit 23:25 60:24

visited 23:10

visits 60:23 74:4

visualize 48:4

voice 4:20 6:3 59:23 63:9

volunteer 45:10

———

**W**

wait 50:25

waived 4:5

walk 52:20 63:23 72:2

walked 64:8 65:20

Walker 74:21

walking 67:18

wanted 63:6,8,22 64:9,24 65:20

wanting 71:2

watched 71:19

watching 49:12

water 6:5 68:14, 16

ways 73:18 75:9

Weaver 5:15 29:19 57:15

Weaverland 15:5

week 13:11,14 29:2 39:19 61:17 74:2

weekend 29:3

weekly 39:11

weeks 45:19

well-being 66:11

Wengerd 36:13, 15,21,24 40:17 47:14

west 19:6,7

whatsoever 7:2

wheelhouse 70:14

whiteboard 48:6

wife 15:13 16:6

wife's 15:16

Winding 11:16 17:24,25 18:1,23 19:12

word 7:18 27:3

worded 7:2

words 13:16 15:1 43:4 52:2 55:23

work 11:10,13,18, 19 13:15,20 20:8 21:4 28:13 29:16 33:19 34:19 35:24 36:10,16,25 37:6 38:2,12,17 40:1,2, 10,21,24 41:5 42:25 45:8,18,25 46:1,13,14,25 47:10,12 52:15 53:10 54:1 58:19 59:7 61:7,16 68:13 72:11,25 73:23

worked 37:22 48:20

working 22:14 28:21 29:11 38:11,15,20 48:16 74:8

works 47:23

worthy 70:22

wow 16:1,6,14

wrap 73:8

write 14:2 52:8 75:21

writing 52:16,23 61:9

written 34:3 37:12 42:7 60:22

**wrong** 62:22

**Wynkoop** 4:25
  5:17 28:22 30:1
  32:19 33:20 34:20
  36:3 37:2,9 43:20
  46:7 47:1 49:21
  50:13 51:2 67:25
  73:2 75:22 76:1

---

**Y**

---

**year** 15:8,20 16:5

**years** 8:16 11:22
  13:5,7 27:22
  73:10

**yesterday** 5:15
  48:5 52:22 64:16

**young** 25:7 27:13

**youth** 26:22 27:5
  40:4,8

# EXHIBIT G

**MARGOLIS EDELSTEIN**
BY: Michael R. Miller, Esquire
Identification No.: 306904
Email: mmiller@margolisedelstein.com
BY: Meghan Wynkoop, Esquire
Identification No.: 324242
Email: mwynkoop@margolisedelstein.com
The Curtis Center                                    *Attorneys for Defendants*
170 S. Independence Mall W.                           *Nelson Martin d/b/a Liberty*
Suite 400 E                                          *Ridge Farm, Eastern Pennsylvania*
Philadelphia, PA 19106-3337                          *Mennonite Messianic Mission of the*
Tel: (215) 931-1100                                  *Eastern Pennsylvania Mennonite Church*
Fax: (215) 922-1772

| | | |
|---|---|---|
| D.C. and R.M., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No.: 5:21-CV-05070-JMG |
| | : | |
| NELSON MARTIN d/b/a LIBERTY | : | |
| RIDGE FARM, LIBERTY RIDGE | : | |
| FARM, EASTERN PENNSYLVANIA | : | |
| MENNONITE CHURCH AND | : | |
| RELATED AREAS, and MENNONITE | : | |
| MESSIANIC MISSION OF THE | : | |
| EASTERN PENNSYLVANIA | : | |
| MENNONITE CHURCH, | : | |
| | : | |
| Defendants. | : | |

## AFFIDAVIT OF BILL CROSS

I, Bill Cross, affirm according to law and subject to the penalties of 18 Pa.C.S.A. Section

4904, relating to falsifications to authorities, depose and state the following:

1.      I am the father of David Cross, former resident at Liberty Ridge Farm and

Plaintiff in this lawsuit.

2.      In 2011, I voluntarily enrolled my son into Liberty Ridge Farm because I was struggling to care for him.

3.      I believed that Liberty Ridge Farm would be a good place for my son to improve on his discipline and social skills, as well as prepare him to enter society.

4.      I voluntarily completed an Application, Power of Attorney, and Medical Authorization forms for David Cross, allowing the Liberty Ridge Farm administration to care for David.

5.      I was aware that the programming at Liberty Ridge Farm consisted of schooling, bible study, and various vocational skill-building projects, such as tending chickens and painting fences.

6.      As part of his enrollment at the Farm, I sent tuition payments on a monthly basis, as long as I was financially able.

7.      I was neither solicited nor coerced to enroll my son into Liberty Ridge Farm.

8.      My son was neither solicited nor recruited to join Liberty Ridge Farm.

9.      I was able to visit David during his time at Liberty Ridge Farm.

10.     At any point during David's time at Liberty Ridge Farm, David could return to our residence if we no longer wished for him to remain at Liberty Ridge Farm.

11.     I do not agree with David filing this lawsuit.


*Bill Cross*

BILL CROSS
Father of Plaintiff, David Cross

Date: 12/9/22

# EXHIBIT H

Dear Liberty Ridge Boys

8-14-15

I realy hope that this letter reaches you all safe + sound! How is everybody doing up there by now? I'm not doing to bad at all for considering that I've been in Jail for Almost six months now!

It is my prayer for you young men that you are reading your bibles + putting the scripture to practice for the persecution you could face in the end times.

When I was in LRF I thought that I had it ruff + that Ethan + the Mentors were unfair, but you guys don't know what the word's cruel + unfair are until you have done jail time + let me tell you right now, LRF is a place to keep you from coming to jail.

Take the lessons + values that you are learning and keep them, practice them till the day you die, I don't know all your names anymore but in here I am eating my Breakfast Lunch + dinner beside Murders, rapist, thieves, liars, drug users, drug dealers I see it all + its horrifying.

The beds you boys are not what you need they are a priviledge, how >out sleeping on A 3" mattress stuffed with cellulose on a Metal bunk no pillow no real blankets? You boys want to do that for the rest of jour lives? Try doing + living like the prodigal Son + you will, I did two months in a place right like Loysville detention Center for 12-18 yr olds my friends its worse than here! you only get to call your Legal guardian once a week for 5 minutes! Big boy Jails you pay for your call + its 5 minutes long.

When I came to jail the first time I saw 3 people commit suicide, My own cellmate was one, in here its totall negativity, caous + straight Hell on earth.

My Friends if you think living the life by being able to go out to a bar, Stripping Clubs, Watching porn is what you want to be able

LRF0032

to do go ahead; but remember when you come to Lancaster County Maximum Security Prison & you see me in here don't say I didn't warn you. I Know grown men who are in Jail here for watching pornography which led them to other evil things, men who are in here for drinking, I even deal with a grown man Who is black has Kids & he is here for rape of a mother + daughter he posted Bail + went back stabbed the Mother + 2 daughters + raped them post Mortem, he Went to court with a smile on his face + told the Judge "no Love of mine was lost", this man Will now do life in Jail. I have been into a two fights and sat in the hole for 30 days, the next time I go to the hole it will be for 6 months to a year. how about living in here, no phone calls, no Watching T.v, no visits from your family that's hard cuffs.

I will be out of Jail on 11/31/16 I came in on 3/18/15 so how bout living a life you have just been described? If you readily willing to stop living /Christianism life? If so I will see you here. If I ever come back to Jail I will be going to Camp Hill + then another State Pen for 3-6 years! I've done it, I'll Had sex with ungodly woman + may possibly be the father if a ting black girl, I've drank, done Heroine, Pot, Crack, Cocaine, let me tell you, of the life, you want to die in Jail + be buried in a State Prison grave yard because your family does not want to give you their respects; go Ahead, live in the Casualty do drugs go ahead go do it, I get drunk + driving + Kill someone in the road for your pathetic stupid perverted passion to please yourself, in't don't say I never warned you. y'all is real.

Sincerely, David Cross

Cell 31D9

Pod J.1-2   Inmate # 15-1035

LRF0033

My Prison Song

If I had the wings of an angel
over these Prison Walls I would Fly.
I'd fly to the arms of my loved ones
and there I'd be willing to die.
Please meet me alone in the moonlight
or meet me alone in this cell.
For I have a Sad Story to tell you
a story thats never been told.
Tommorow I'll be taken to Prison, For
away from my Loved ones I'll be.
Oh I cant wait to go on to heaven
and there with my Lord I shall be.

Sincerely





# EXHIBIT I

*To the Parent:*

Please sign your name to show that you have read this report and return the report to school promptly.

First Report _____ Merlin Owen _____

Second Report _____ E. David Welk _____

Third Report _____

**Final Recommendation**

In view of the performance shown on this report.

is assigned to the _____ grade

for the _____ — _____ school term.

Comments _____

_____

_____

Teacher's Signature _____ Date _____

**Eastern Mennonite Publications**
40 Wood Corner Road
Ephrata, Pennsylvania 17522

---

# Report Card

of

David Cross

Grade _____ School Year 20 **13** – 20 ____

Liberty Ridge Mennonite School

*"The fear of the Lord is the beginning of wisdom." Psalm 111:10*

*To the Parents:*

This report is to inform you of your child's performance in his studies and conduct at school. Please read it carefully and discuss it with your child.

The school requests your support so that your child does his best at school. We invite you to visit school and observe your child at work. We also encourage you to discuss your child's progress with his teacher.

*The School Board and Teachers*

## REPORT PERIODS

**BIBLE**
Senses meaning of Bible lessons
Remembers Bible stories

**BIBLE MEMORY**

**READING**
Reads with expression
Reads with understanding
Reading workbook
Phonics

**ENGLISH**
Writes good compositions
Uses correct grammar

**ARITHMETIC**
Knows number facts
Figures accurately
Grasps new concepts
Understands reading problems

**SPELLING**
Prepares for weekly tests
Spells correctly in all subjects

**SOCIAL STUDIES**
Remembers important facts
Understands important ideas
Understands maps

**SCIENCE/HEALTH**
Understands science concepts

**PENMANSHIP**
Forms letters correctly
Does all written work neatly

**MUSIC**
Participates in singing
Learns the rudiments

**ART**

**TYPING**

| | 1 | 2 | 3 | 4 | Avg. |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | – | – | | | |
| | F | E | E | E | E |
| | C | C | D+ | | D+ |
| | D | B | B | | B |
| | – | – | | | |
| | C+ | + | + | | |
| | | | | | |
| | C | D+ | C | C | |
| | | | | | |

### Key to Subject Grades
A    (94-100)    Excellent Work
B    (86-93)     Good Work
C    (76-85)     Fair Work
D    (70-75)     Poor Work
E    (63-69)     Failing Work—Needs Improvement to Pass
F    (62 and below)    Failing Work—Needs Great Improvement to Pass

## REPORT PERIODS

**CONDUCT GRADE**

**SPIRITUAL AND MORAL TRAITS**
Is reverent during worship
Takes spiritual matters seriously
Exercises self-control
Is honest and trustworthy
Uses wholesome speech
Obeys school regulations
Respects authority
Responds promptly and submissively

**INTERPERSONAL RELATIONSHIPS**
Is well mannered
Is kind and courteous
Plays fairly and unselfishly
Respects feelings of others
Respects property of others
Accepts counsel and criticism
Participates in group activities
Speaks in an appropriate manner

**CLASSROOM BEHAVIOR**
Pays close attention
Participates in discussion
Speaks clearly
Avoids disturbing others
Maintains good posture

**STEWARDSHIP**
Avoids waste
Cares for school property
Maintains tidy desk and textbooks

**WORK HABITS**
Is diligent
Uses time well
Follows directions
Completes work on time
Prepares assignments thoroughly
Shows good attitude toward learning

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | | | | |
| | | + | + | |
| | | – | + | |
| | | – | + | |
| | | | | |

### Key to Conduct Grades
(and First Grade Subjects)
S    Satisfactory
N    Needs Improvement
U    Unsatisfactory

### Key to Subheading Marks
(+)    Commendable
(no mark)    Satisfactory
(–)    Needs Improvement

**ATTENDANCE**

| | 1 | 2 | 3 | 4 | Total |
|---|---|---|---|---|---|
| Days Absent | 0 | 0 | 0 | 0 | 0 |
| Days Tardy | 0 | 0 | 0 | 1 | 1 |
| TOTAL DAYS PRESENT | 19 | 15 | 8 | | 41 |



# EXHIBIT J

**In the Matter Of:**

# D.C. AND R.M. vs.
# NELSON MARTIN, et al.

Dana Ressler

# October 18, 2022



**HKW, LLC**
764 Corporate Circle, Suite 200
New Cumberland, PA  17070
717.214.1182
Schedule@hkwllc.com

**Witness Dana Ressler**

```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA


D.C. AND R.M.,                 :
          Plaintiffs           :
                               :
          vs.                  :
                               :
NELSON MARTIN D/B/A            :
LIBERTY RIDGE FARM,            :        CIVIL ACTION
LIBERTY RIDGE FARM,            :  NO: 5:21-CV-05070-JMG
EASTERN PENNSYLVANIA           :
MENNONITE CHURCH AND           :
RELATED AREAS, AND             :
MENNONITE MESSIANIC            :
MISSION OF THE EASTERN         :
PENNSYLVANIA MENNONITE         :
CHURCH,                        :
          Defendants           :




     DEPOSITION OF:    DANA RESSLER

    TAKEN BY:          PLAINTIFFS

    REPORTER:          TRACY L. LLOYD, RPR
                       NOTARY PUBLIC

                       KYLAN BARRY, VIDEOGRAPHER

    DATE:              OCTOBER 18, 2022, 12:37 P.M.

    PLACE:             MARGOLIS EDELSTEIN
                       214 SENATE AVENUE, SUITE 402
                       CAMP HILL, PENNSYLVANIA
```

**Witness Dana Ressler**

2

1   APPEARANCES:

2           ANDREOZZI & FOOTE
            BY:  RENEE E. FRANCHI, ESQUIRE
3                4503 NORTH FRONT STREET
                 HARRISBURG, PENNSYLVANIA  17110
4                (717) 686-9936
                 Renee@vca.law
5
                 -- For the Plaintiffs
6
            MARGOLIS EDELSTEIN
7           BY:  MEGHAN WYNKOOP, ESQUIRE
                 JOCELYN MENDEZ, ESQUIRE
8                THE CURTIS CENTER, SUITE 400E
                 170 SOUTH INDEPENDENCE MALL W.
9                PHILADELPHIA, PENNSYLVANIA  19106
                 (215) 922-1100
10               mwynkoop@margolisedelstein.com

11
                 -- For the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Witness Dana Ressler

                                                                3

1                    INDEX OF WITNESSES

2   EXAMINATION                                    PAGE

3   DANA RESSLER

4        By Ms. Franchi                            5

5        By Ms. Wynkoop                            --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Witness Dana Ressler

4

1              STIPULATIONS

2          It is stipulated and agreed by and between

3     counsel for the respective parties that the reading,

4     signing, sealing, and filing of the transcript is

5     waived and that all objections, except as to the

6     form of the question, are reserved to the time of

7     trial.

8

9              THE VIDEOGRAPHER:  Here begins Media

10    Number 1 in the videotaped deposition of Dana Ressler

11    in the matter of D.C. and R.M. v. Martin, et al., in

12    the United States District Court for the Eastern

13    District of Pennsylvania, Case Number

14    521-CV-05070-JMG.

15              Today's date is October 18th, 2022.  The

16    time on the video monitor is 12:37 p.m.  The

17    videographer today is Kylan Barry representing Planet

18    Depos.  This video deposition is taking place at 214

19    Senate Avenue, Suite 402, Camp Hill, PA, 17011.

20              Would counsel please voice identify

21    themselves and state whom they represent.

22              MS. FRANCHI:  My name is Renee Franchi.

23    I am an attorney with the law firm of Andreozzi and

24    Foote, and I represent the Plaintiffs in this matter.

25              MS. WYNKOOP:  Meghan Wynkoop, Margolis

**Witness Dana Ressler**

5

1   Edelstein, and I represent the Defendants.

2            MS. MENDEZ:  Jocelyn Mendez, Margolis

3   Edelstein, and I represent the Defendants.

4            THE VIDEOGRAPHER:  The court reporter

5   today is Tracy Lloyd.  Will the reporter please swear

6   in the witness.

7

8            DANA RESSLER, called as a witness, being

9   affirmed, testified as follows:

10

11           MS. FRANCHI:  May we begin?

12           THE VIDEOGRAPHER:  Yes.

13

14                    EXAMINATION

15

16  BY MS. FRANCHI:

17       Q.    And we'll just keep the same preliminary

18  issues that we put on the first transcript instead of

19  repeating them for the next three and half a days.

20           All right.  Good afternoon, Mr. Ressler.

21  As I stated, my name is Renee Franchi.  I represent

22  the Plaintiffs David Cross and Robert Miller in this

23  matter.  Thank you, first of all, for being here with

24  us today and driving in from Delaware.  Hopefully

25  we'll get this done as quick as possible.

6

1          So we have some preliminary matters to
2   kind of go over just so you know the expectations and
3   the rules for the deposition today.  The preliminary
4   matters will probably take about as long as the actual
5   questions in this case.
6          So the first thing that I'd like to go
7   over with you is that when I or your attorney ask you
8   any questions, that you must give a verbal answer.
9   That means not to use a non-verbal response such as
10  uh-huh or a head shake or a head nod.  This is because
11  we do have the stenographer here who is typing down
12  all the questions and answers and can only type down
13  verbal responses.  So will you be able to only give
14  verbal responses to the questions today?
15      A.    Yes.
16      Q.    You'd be surprised at how many people
17  answer that with saying uh-huh, and I'm like oh.
18  Next, if you're asked a question that you don't
19  understand or that doesn't make sense, whether it be
20  because it's worded confusingly or for any other
21  reason, please feel free to say that you do not
22  understand the question or please just ask me to
23  repeat the question.  Is that something you can do?
24      A.    Yes.
25      Q.    Okay.  In that same light, if you're

Witness Dana Ressler

7

1   asked a question and you do answer with a verbal

2   response, then I will assume that you understood the

3   question.  Is that fair?

4        A.    Yes.

5        Q.    So if you do need to take a break at any

6   point during your deposition, to get something to

7   drink, to stretch your legs, or for any other reason,

8   that's perfectly fine.  Just let me know.  The only

9   restriction is that if you are asked a question, that

10  you may not take a break until the question is

11  answered.  Does that make sense?

12       A.    Yes.

13       Q.    Okay.  So during this deposition I may or

14  may not ask you to estimate or approximate something

15  if you do not recall it specifically like a date or a

16  time.  Please don't simply like guess or take a stab

17  in the dark.  If you do think you can give a fair

18  estimation or approximation, please do so and please

19  let me know.

20            For example, if I ask you if you know

21  when an event happened, and that it was within a time

22  frame, say, between 2000 and 2004, for example,

23  between two specific years, it's fair to say that you

24  don't remember exactly when the event occurred, but

25  that it happened between maybe these two years.

8

1   That's completely fine.

2            If you simply do not know or do not

3   remember or you're uncertain, please say so.  Is that

4   fair?

5        A.    Yes.

6        Q.    The last and most important thing is that

7   you tell the truth today.  So is there anything that

8   would prevent you from being able to fully testify to

9   the truth today?

10       A.    No.

11       Q.    Okay.  All right.  So I'm just going to

12  ask you some general background questions first.

13  Obviously, I've never met you or spoken with you

14  before other than preliminarily today, so just to get

15  to know you a little bit.

16            Before we do that, do you have any

17  questions for any of us before we start or are you

18  ready to just keep going?

19       A.    I'm ready to go.

20       Q.    All right.  So first is there anything

21  that you did to prepare for the deposition today other

22  than speaking with counsel?

23       A.    Basically would have been with counsel

24  and with the group that's working on this.

25       Q.    Okay.  Did you review any documents in

**Witness Dana Ressler**

9

1    preparation?

2          A.     I reviewed part of the discovery.

3          Q.     Okay.

4          A.     Yeah, discovery.

5          Q.     Okay.  So just to start off, if you

6    could, just state your full name again.

7          A.     My name is Dana Ressler.

8          Q.     And could you spell your last name,

9    please?

10         A.     R-e-s-s-l-e-r.

11         Q.     And what's your date of birth?

12         A.     December 20th, 1950.

13         Q.     Where were you born?

14         A.     Wadsworth, Ohio.

15         Q.     And where do you live now?

16         A.     I live in Newark, Delaware, 497 Gender

17   Road.

18         Q.     How long have you lived in Delaware?

19         A.     Since I was 19, so I would say about 50

20   some years.

21         Q.     Okay.  And what do you do for a job,

22   Mr. Ressler?

23         A.     I have a landscape contractor business.

24         Q.     Okay.  What's it called?

25         A.     Keener Sensenig.  K-e-e-n-e-r.  Sensenig

**Witness Dana Ressler**

10

1   is S-e-n-s-e-n-i-g.  That is not as unfamiliar to

2   Pennsylvania, but it is in Delaware.

3          Q.      And is that a --

4          A.      It's an LLC.

5          Q.      Okay.  And you operate that out of

6   Delaware?

7          A.      Yes.

8          Q.      Do you ever do any work in Pennsylvania

9   or is it just generally --

10         A.      Small amount in Pennsylvania up 476 some.

11         Q.      Okay.

12         A.      And we do a little bit in Maryland and a

13  little bit in New Jersey.

14         Q.      What type of landscaping?

15         A.      We do everything from installation to

16  maintenance, and then we do a lot of hardscaping.  We

17  have a hardscaping division.

18         Q.      Okay.  How long have you had this company

19  for?

20         A.      I bought it in 1972.

21         Q.      Okay.

22         A.      So 50 years.

23         Q.      So you've been running it since then?

24         A.      I started running it two months after I

25  came.

**Witness Dana Ressler**

11

1    Q.    Okay.  What's your education level?

2    A.    12th grade.

3    Q.    Okay.  And where did you graduate high

4  school from?

5    A.    Wadsworth High School in Ohio.

6    Q.    Okay.  So when you moved to Delaware, it

7  was when you were an adult after you graduated?

8    A.    Yeah.  Right.

9    Q.    What brought you to Delaware?

10    A.    I was a conscientious objector, and I

11  served in the Wilmington Hospital for two years in

12  lieu of military service.

13    Q.    And that was during the Vietnam conflict?

14    A.    The Vietnam war.

15    Q.    Okay.  And I can probably assume the

16  answer, but you can read, write, and understand

17  English?

18    A.    Yes.

19    Q.    Okay.  Have you ever been charged with or

20  convicted of a crime?

21    A.    No.

22    Q.    And are you married, sir?

23    A.    Yes.

24    Q.    What's your wife's name?

25    A.    Mary Jane.

**Witness Dana Ressler**

12

1  Q.   Do you have any kids?

2  A.   Yep.

3  Q.   How many?

4  A.   Three girls and three boys.

5  Q.   Oh, boy.

6  A.   That's six.

7  Q.   Are they all adults?

8  A.   Yes.

9  Q.   Okay.

10  A.   Youngest one is 33.

11  Q.   Okay.  So you just live with your wife?

12  A.   Basically, except when the girls come

13  home.

14  Q.   Sometimes by choice, sometimes

15  involuntarily?

16  A.   Yeah.

17  Q.   And do you -- you know what, I'm going to

18  just strike through some of these questions, and we're

19  just going to keep going.  So all right.  I'm going to

20  ask you some general questions just beginning with the

21  Eastern Pennsylvania Mennonite Church.

22       I want to apologize ahead of time if some

23  of the questions are worded strangely or I'm using the

24  wrong term to refer to something, please correct me.

25  A.   Okay.

**Witness Dana Ressler**

13

1    Q.    I am learning as I go and am often
2    incorrect.
3    A.    We understand that.
4    Q.    Okay.  I always want to make sure that I
5    put that out there first.  So if I say anything that
6    is not right, I don't mean to be offensive.
7    A.    You won't.
8    Q.    Okay.  I guess just kind of starting from
9    the basics, can you just explain to me what the
10   Eastern Pennsylvania Mennonite Church is?
11   A.    The Eastern Pennsylvania Mennonite Church
12   is a name which was chosen for a group of believers
13   that practiced the same things.
14   Q.    Okay.  Is it an organization in the sense
15   of, you know, it's like a registered corporation with
16   an address and a board of directors or is it more
17   nebulous?
18   A.    More nebulous.
19   Q.    Can you explain a little bit more about
20   how that is and just the kind of structure or lack
21   thereof?
22   A.    As I said, it was formed because there
23   was a group of people who were not satisfied with the
24   church they were going to and wanted to practice more
25   traditional Mennonite ways.

Witness Dana Ressler

14

1        As they began their group in the
2   Lancaster area, they became called the Eastern
3   Pennsylvania Mennonite Church.  There is no structure,
4   but each congregation has a structure in their
5   congregation.  But voluntarily these congregations can
6   join -- can ask to be a part of the Eastern
7   Pennsylvania Mennonite Church.
8        It is what we call a conferring
9   fellowship where we have meetings a couple times a
10  year where the ministry go, and they discuss issues,
11  how we want to respond to them, but there is no
12  treasury.  There is no -- has a little section of
13  bylaws, but there is no set up of LLC, 501, or
14  anything like that.
15       Q.    Okay.  So when the ministry, I guess,
16  kind of officials meet however many times a year it
17  is, is it, and please correct me if I'm wrong just so
18  I'm understanding correctly, is it more just so that
19  all the different congregations are kind of following
20  the same sets of rules and guidelines and things like
21  that?
22       A.    Right.  And we may be having some
23  particular problem that we want to discuss how could
24  we handle this problem.  Part of the meeting is open
25  to the public, and part of the meeting is open to

15

1  ministry only.

2          Q.     Okay.  So then when people talk generally

3  about the Eastern Pennsylvania Mennonite Church, and

4  they say the church, they're generally then speaking

5  about this, again, kind of nebulous collection of

6  thoughts and not necessarily a physical like this is

7  the church?

8          A.     That is correct.

9          Q.     Okay.  So even though there really

10  isn't -- I don't want to say there isn't an

11  organization.  That's not the word that I mean, but

12  even though it's not a business in the traditional

13  sense, what is considered to be the like home base?

14  Is there like a place that you meet or does it change?

15          A.     It changes.  Geographically there are

16  districts of congregations, and so each one has an

17  opportunity to share the meetings.  So we will travel

18  to those areas for the meeting.

19          Q.     Okay.  The districts of congregations,

20  about how big are they geographically or does it

21  depend?

22          A.     Because of growth, sometimes a district

23  is formed because there is a bishop who maybe is in

24  that direction or -- and so our district that I'm a

25  part of reaches from Florida to -- well, it's in

16

1    Lancaster area.

2         Q.      Okay.  So it really does depend?

3         A.      Yeah, it depends.

4         Q.      Okay.  About how many congregations are a

5    part of the --

6         A.      There's 92 I think.

7         Q.      Okay.  About how many members does that

8    encompass?

9         A.      About 7,000.

10        Q.      Oh, wow.  Okay.  And this is all over the

11   United States and other countries?

12        A.      And Canada as well -- well, most of our

13   Canadian ones are in Manitoba and in northwest like in

14   B.C.  It does have foreign churches as well where

15   we've started missions.

16        Q.      Okay.  So I'm guessing then this kind of

17   goes without saying, so the Eastern Pennsylvania

18   Mennonite Church doesn't have like a bank account or

19   an office or maybe contracts?

20        A.      Absolutely no bank account.

21        Q.      Okay.

22        A.      If you would look in our directory, you

23   would see that it has an address, 40 Wood Corner Road,

24   Ephrata, Pennsylvania.  That address is for mail, I

25   guess if somebody wanted to write to us who knew about

17

1   us.  That is actually our publication office.

2        Q.     Okay.

3        A.     And they would take the mail and say, you

4   know, they'd open it and say this belongs to this

5   person or whatever.

6        Q.     Just forward it along accordingly?

7        A.     Right.  So there is no -- we have no EPMC

8   meetings at that place.

9        Q.     Okay.  Okay.  So the individual

10  congregations, who then decides, I guess, the

11  leadership officials at each of the congregations,

12  and, again, I apologize if I -- I was raised Catholic,

13  so I understand, you know, there are priests, and I

14  understand that.  So, again, if I'm getting this

15  wrong, please let me know.

16             Within each individual congregation, who

17  is like the leader of the congregation?

18       A.     Okay.  Well, probably you can get me

19  started, and we'll be here all afternoon because I

20  love the Mennonite church.  So your question is on the

21  leadership.  We have -- all of our leaders are

22  ordained from within the congregations.

23       Q.     Okay.

24       A.     So we have no formal -- we have training,

25  but no formal training in divinity.

**Witness Dana Ressler**

18

1      Q.      Okay.

2      A.      I am a deacon.  There are ministers and

3   bishops.  The bishops normally are over six or seven

4   or eight churches.

5      Q.      Okay.

6      A.      The ministers are local, and the deacons

7   are local.

8      Q.      Okay.  So then that would go into my next

9   set of questions.  Explain your role to me.

10      A.      My role in my congregation or my role in

11   Eastern Pennsylvania Mennonite Church?

12      Q.      Both.

13      A.      In the congregation I was ordained a

14   deacon in 1983, and in 19 -- and we are ordained for

15   life unless we ask for, you know, resign, our health

16   prohibits.

17              Normally along the way a younger man --

18   as we get older, fifties and sixties, a younger man is

19   ordained that we are somewhat supposed to train, and

20   our roles are to keep the records of the church, the

21   financial records, to help the people in need, to

22   preach occasionally, help with the ordinances like

23   communion, etcetera.  Somewhat like your deacons do.

24   The second -- and so I was ordained for that, and we

25   have a younger deacon that takes care of a lot of the

**Witness Dana Ressler**

19

1   nitty-gritty anymore.

2            So some of the older deacons, and we also

3   take some of the younger ones along as well, are

4   called by the Eastern Pennsylvania Mennonite Church to

5   work on particular cases to help.  So somebody, I

6   don't remember who, asked me if I would help with the

7   case of Liberty Ridge.

8            All I knew about Liberty Ridge was that

9   it was a place for boys.  Never had been there.  I

10  knew some people that had worked there.  I knew

11  people, but I never been there.  And so I took that as

12  something I could accept, and I did.  That's how I'm

13  here.

14       **Q.    Okay.  Your role within your congregation**

15  **currently and then generally with the Eastern**

16  **Pennsylvania Mennonite Church, then I can assume that**

17  **you're not paid through the Eastern Pennsylvania**

18  **Mennonite Church that does not have a bank account?**

19       A.    Everything we do is voluntary.

20       **Q.    Okay.  That was going to be my next**

21  **question then.  For your congregation then, is it also**

22  **a voluntary position?**

23       A.    That's correct.

24       **Q.    Okay.**

25       A.    All bishops, ministers, and deacons serve

20

1  voluntarily.  Now, there is a gift at times given to

2  them for serving.

3       Q.    Okay.

4       A.    But it's a voluntary thing.

5       Q.    Okay.  So individually within

6  congregations, are members of the -- I'm going to call

7  it the EPMC so I don't have to keep --

8       A.    Please.

9       Q.    Yeah.  So if people are donating to the

10  church or tithing, I think, I don't know if you use

11  that term or not, is that going to individual

12  congregations then or, again, does it depend?  It's a

13  very lawyerly answer, it depends, but I'm used to

14  that.

15       A.    Okay.  I think I gathered what you're

16  asking.  We take an offering on Sunday morning which

17  is a voluntary offering.

18       Q.    Okay.

19       A.    We suggest tithe and that type of thing,

20  but it's a voluntary offering.

21       Q.    Okay.

22       A.    It is announced usually either by

23  schedules printed or on the Sunday prior that we will

24  be lifting an offering for a particular thing.

25       Q.    Okay.

**Witness Dana Ressler**

21

1    A.    So let's say we decided to lift an

2  offering for Liberty Ridge as a congregation.  You'd

3  have the opportunity to give if you wanted to, and it

4  would be forwarded to the Liberty Ridge treasury.

5    **Q.    Okay.**

6    A.    The Mennonite Messianic Mission, a lot of

7  churches lift an offering once a month for the

8  Mennonite Messianic Mission because we have a lot of

9  foreign missions.

10    **Q.    Okay.**

11    A.    So that's how it's done.  One Sunday

12  we'll lift it for the expenses of the congregation.

13    **Q.    Okay.**

14    A.    One Sunday we'll lift it for maybe

15  someone who has a hospital need.  We do not carry

16  insurances, so that's one of the deacon's big jobs is

17  to settle insurance claims and take care of making

18  sure the person is paid, etcetera.

19    **Q.    Okay.  So you had mentioned the Mission**

20  **or generally Liberty Ridge and asking for offerings,**

21  **is that at the direction of the Mission or would that**

22  **be at the discretion of the congregation?**

23    A.    Discretion of the congregation.

24    **Q.    Okay.**

25    A.    No one asks for money.

22

1    Q.    Okay.  So when the congregation decides

2  at their discretion that, say, they are going to --

3  again, not specifically Liberty Ridge or the Mission,

4  but just because they're involved, I'll just keep

5  using them.

6            If the congregation decides that one

7  Sunday they are going to ask for -- oh, my gosh.  I

8  cannot speak today.  That they are going to ask for

9  donations for the Mission, then does the Mission, you

10  know, put out a directive or ask anybody and say hey,

11  we're in need of any money, and then at their

12  discretion they ask for it at the congregation or how

13  does that come about?

14    A.    Very rarely would anyone ask for it.

15    Q.    Okay.  So are there, you know, a set of

16  rules written down or a book or something like that

17  for members of the EPMC to say, you know, this, other

18  than the Bible, I mean another like set of hard rules

19  or anything that's written down to say, you know, this

20  is what you need to live by, this is what you need to

21  do to be a member?

22    A.    Yes.  We have a statement of practice for

23  Eastern Pennsylvania Mennonite Church.

24    Q.    Okay.

25    A.    I think it's called statement of

**Witness Dana Ressler**

23

1  instruction and discipline for Eastern Pennsylvania.

2      **Q.     And is that -- is it guidelines or is it**

3  **like these are rules that you have to --**

4      A.     There are some rules.  There is also the

5  guidelines in there for the MMM.

6      **Q.     Okay.**

7      A.     There's guidelines in there for Eastern

8  Pennsylvania Mennonite Church.

9      **Q.     Okay.**

10      A.     And its formation.

11      **Q.     You had said that individuals in**

12  **congregations can -- obviously, they can leave if they**

13  **would like to.  Is there ever a time where members are**

14  **asked to leave by church leadership or they must leave**

15  **or is that beyond the scope of what the religious**

16  **leaders within the EPMC can do?**

17      A.     We would never ask anyone to stop coming

18  to church.

19      **Q.     Okay.**

20      A.     But if you decide you do not want to

21  abide by the rules of the church, you would eventually

22  have your membership removed.

23      **Q.     Okay.**

24      A.     But you can still come.

25      **Q.     Okay.  So are there any rules or**

Witness Dana Ressler

24

1   guidelines set forth by the EPMC generally about

2   employment or labor or anything about when, you know,

3   children are supposed to begin working or is it up to

4   their families and their congregations?

5              I guess what I'm getting at is everybody

6   has this idea when they, you know, think of the

7   community of saying, you know, there's always children

8   that start working on farms at the age of four.  What

9   I'm getting at is is that a family decision or is that

10  everybody is different or is there like a rule that

11  says when a child is 12, they can start doing this

12  kind of work?

13       A.    There are no rules that way.

14       Q.    Okay.  And, again, it was a very

15  long-winded way of asking the question, but I just

16  wanted to make sure I was communicating it --

17       A.    Yes.

18       Q.    -- appropriately.  So are there any rules

19  or restrictions to people within the EPMC community

20  seeking medical care from psychiatrists or certain

21  doctors or are people free to seek whatever type of

22  medical treatment or care that they desire?

23       A.    Yes.

24       Q.    Okay.  Yes meaning they can do whatever

25  they need to or --

**Witness Dana Ressler**

25

1       A.      Yes.

2       **Q.      Okay.**

3       A.      They may do whatever they feel they need

4    to.

5       **Q.      Okay.  So is there such a thing as**

6    **excommunication from the EPMC, and is that a common**

7    **practice?**

8       A.      There is no excommunication from EPMC.

9    There could be excommunication from a congregation.

10      **Q.      Okay.  And is that -- I guess just in**

11   **your general experience, what does that encompass and**

12   **how would that come about?**

13      A.      As I said, if a person did not abide by

14   the rules that we have set up, they would probably

15   choose to leave.  But occasionally in our

16   congregation -- I'll give one example.  In our

17   congregation, one of the most recent excommunications

18   was a man left his wife and went to another woman.  He

19   withdrew his membership, but he was actually announced

20   to have terminated his -- we terminated his membership

21   as well.

22      **Q.      Okay.  And, again, I appreciate you**

23   **bearing with me as I'm asking some of these questions.**

24      A.      Oh, please.

25      **Q.      I just want to make sure that I'm getting**

**Witness Dana Ressler**

26

1    it correct.  So is there a requirement that people

2    participate monetarily within their congregations or

3    to the Mission or any of the other organizations?

4         A.    No requirement whatsoever.

5         Q.    Okay.  So you had mentioned about the

6    kind of mailbox address of the, quote, unquote, the

7    church?

8         A.    Right.

9         Q.    And that being the publication office.

10   So tell me a little bit about this publication board

11   or committee or who it is that is in charge of the

12   publications.  Like what is this entity?

13        A.    I don't want to take the steam out of

14   Mark's talk tomorrow on MMM.  MMM is the outreach of

15   the church.

16        Q.    Okay.

17        A.    Of EPMC.  The publication facility falls

18   under the Mennonite Messianic Mission.

19        Q.    Okay.

20        A.    They were started as a publication board

21   to help -- we have our own schools, so we make some of

22   our own school books.  We buy them from other

23   publishers as well.  Sunday school material, all kinds

24   of textbooks, religious books, that type of thing.  So

25   we have a store that also sells them to the public and

**Witness Dana Ressler**

27

1    to our own people.

2          Q.      Okay.

3          A.      That is the publication office.

4          Q.      Okay.  So the books or anything that's

5    either published within or sold within the store, I

6    guess anything that's kind of overseen by the

7    publication board, do they also then answer to or

8    within -- underneath the umbrella of the leadership of

9    the EPMC kind of oversees it, and it has to be within

10   the guidelines of what the EPMC is for?

11         A.      The Mennonite Messianic Mission oversees

12   them.

13         Q.      Okay.

14         A.      They oversee all the branches.

15         Q.      Okay.

16         A.      But on the Mennonite Mission, the bishops

17   are also like ex officio members.

18         Q.      Okay.

19         A.      So they can sit there and say --

20         Q.      And offer guidance?

21         A.      And offer guidance.

22         Q.      Okay.  So the Mission itself then is its

23   own actual corporate body then unlike the EPMC which

24   is, again, a nebulas, for lack of a better term?

25         A.      They are a corporate body.

Witness Dana Ressler

28

1        Q.      So they are a corporate entity, okay.

2   But they just get guidance from the bishops and the

3   religious leaders?

4        A.      And the whole ministry.

5                MS. FRANCHI:  Okay.  That makes sense.

6   If we can take maybe five minutes.  I just want to

7   look through everything, and we'll probably get you

8   out of here sooner rather than later.  So let's take

9   five.  I just want to stand up quick.  Pour myself

10  more water.  Take a look at everything.  We might come

11  back, and I might have almost no questions, so.

12               THE VIDEOGRAPHER:  We are going off the

13  record at 1:04 p.m.

14               (Recess)

15               THE VIDEOGRAPHER:  We are back on the

16  record.  The time is 1:07 p.m.

17               MS. FRANCHI:  All right.

18

19  BY MS. FRANCHI:

20       Q.      All right.  So before we took our brief

21  break, you were explaining just a little bit generally

22  about the Mission Board and its responsibilities

23  generally.  Again, I know that there are other people

24  that I will be asking those specific questions of, so

25  I don't want to draw you into that too much because

29

1   it's not your role.

2              But so are all of the board members of

3   the Mission all members of the EPMC in some sort?

4       A.    That's correct.

5       Q.    So did the overarching EPMC leaders have

6   any involvement in the creation and implementation of

7   Liberty Ridge to your knowledge?

8       A.    Not to my knowledge.

9       Q.    Okay.  Do you -- you had mentioned

10  hearing about Liberty Ridge briefly.  But just to be

11  clear, did you, yourself, have any participation in or

12  really have any understanding of Liberty Ridge when it

13  was created or moving forward?

14      A.    I would have had a minor understanding of

15  what they were trying to do.  You ask about an overall

16  EPMC involvement.  Many of us felt there was a need,

17  but that final need will be decided by the Mission

18  Board who then called for a vote of the EPMC members.

19      Q.    Okay.  So, okay.  Did the EPMC members

20  offer any guidance or input to the board as they were

21  kind of creating this entity of Liberty Ridge?

22      A.    Nothing official.

23      Q.    Okay.  Do you know -- and, again, it's

24  perfectly fine if you don't.  I just need to ask the

25  question.  Do you know if any of the EPMC -- I keep

Witness Dana Ressler

30

1   referring to them as leaders.  I don't want to say

2   board because that kind of implies --

3        A.     There is no real board.

4        Q.     Yeah, because it implies a corporation or

5   a real board, so I'm just going to say leaders.  To

6   your knowledge, did any of the leaders of the EPMC go

7   to the Liberty Ridge property or have any involvement

8   with Liberty Ridge itself once it was -- once it

9   began -- began operating?

10        A.     Anyone could visit Liberty Ridge.

11             MS. FRANCHI:  Okay.  All right.  I think

12   those are all of the questions that I have unless you

13   have any questions.

14             MS. WYNKOOP:  I do not.

15             MS. FRANCHI:  Okay.  I appreciate your

16   time.  Thank you very much.

17             THE VIDEOGRAPHER:  This marks the end of

18   the deposition of Dana Ressler.  We are going off the

19   record at 1:09 p.m.

20             (The deposition was concluded at 1:09

21   p.m.)

22

23

24

25

**Witness Dana Ressler**

31

```
1   COMMONWEALTH OF PENNSYLVANIA    )
                                    )  SS.
2   COUNTY OF YORK                  )

3

4           I, Tracy L. Lloyd, a Registered
    Professional Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania and County of
5   York, do hereby certify that the foregoing
    testimony was taken before me at the time and place
6   hereinbefore set forth, and that it is the
    testimony of:

7

8                   DANA RESSLER

9

10          I further certify that said witness
    was by me duly sworn to testify the whole and
    complete truth in said cause; that the testimony
11  then given was reported by me stenographically, and
    subsequently transcribed under my direction and
12  supervision; and that the foregoing is a full, true
    and correct transcript of my original shorthand
13  notes.

14          I further certify that I am not
    counsel for nor related to any of the parties to
15  the foregoing cause, nor employed by them or their
    attorneys, and am not interested in the subject
16  matter or outcome thereof.

17          Dated at York, Pennsylvania, this 31st
    day of October, 2022.
18

19

20  _____
                Tracy L. Lloyd, Notary Public
21              Registered Professional Reporter

22

    (The foregoing certification does not apply to any
23  reproduction of the same by any means unless under
    the direct control and/or supervision of the
24  certifying reporter.)

25  My Commission expires:
    April 21, 2023
```

**1**

**1** 4:10
**12** 24:11
**12:37** 4:16
**12th** 11:2
**17011** 4:19
**18th** 4:15
**19** 9:19 18:14
**1950** 9:12
**1972** 10:20
**1983** 18:14
**1:04** 28:13
**1:07** 28:16
**1:09** 30:19,20

**2**

**2000** 7:22
**2004** 7:22
**2022** 4:15
**20th** 9:12
**214** 4:18

**3**

**33** 12:10

**4**

**40** 16:23
**402** 4:19
**476** 10:10
**497** 9:16

**5**

**50** 9:19 10:22
**501** 14:13
**521-CV-05070-JMG** 4:14

**7**

**7,000** 16:9

**9**

**92** 16:6

**A**

**abide** 23:21 25:13
**Absolutely** 16:20
**accept** 19:12
**account** 16:18,20 19:18
**actual** 6:4 27:23
**address** 13:16 16:23,24 26:6
**adult** 11:7
**adults** 12:7
**affirmed** 5:9
**afternoon** 5:20 17:19
**age** 24:8
**agreed** 4:2
**ahead** 12:22
**amount** 10:10
**Andreozzi** 4:23
**announced** 20:22 25:19
**answers** 6:12
**anymore** 19:1
**apologize** 12:22 17:12
**appropriately** 24:18
**approximate** 7:14
**approximation** 7:18
**area** 14:2 16:1
**areas** 15:18

**asks** 21:25
**assume** 7:2 11:15 19:16
**attorney** 4:23 6:7
**Avenue** 4:19

**B**

**B.C.** 16:14
**back** 28:11,15
**background** 8:12
**bank** 16:18,20 19:18
**Barry** 4:17
**base** 15:13
**Basically** 8:23 12:12
**basics** 13:9
**bearing** 25:23
**began** 14:1 30:9
**begin** 5:11 24:3
**beginning** 12:20
**begins** 4:9
**believers** 13:12
**belongs** 17:4
**Bible** 22:18
**big** 15:20 21:16
**birth** 9:11
**bishop** 15:23
**bishops** 18:3 19:25 27:16 28:2
**bit** 8:15 10:12,13 13:19 26:10 28:21
**board** 13:16 26:10,20 27:7 28:22 29:2,18,20 30:2,3,5
**body** 27:23,25
**book** 22:16
**books** 26:22,24 27:4

**born** 9:13
**bought** 10:20
**boy** 12:5
**boys** 12:4 19:9
**branches** 27:14
**break** 7:5,10 28:21
**briefly** 29:10
**brought** 11:9
**business** 9:23 15:12
**buy** 26:22
**bylaws** 14:13

**C**

**call** 14:8 20:6
**called** 5:8 9:24 14:2 19:4 22:25 29:18
**Camp** 4:19
**Canada** 16:12
**Canadian** 16:13
**care** 18:25 21:17 24:20,22
**carry** 21:15
**case** 4:13 6:5 9:7
**cases** 19:5
**Catholic** 17:12
**change** 15:14
**charge** 26:11
**charged** 11:19
**child** 24:11
**children** 24:3,7
**choice** 12:14
**choose** 25:15
**chosen** 13:12
**church** 12:21 13:10,11,24 14:3,7 15:3,4,7 16:18 17:20 18:11,20

19:4,16,18 20:10 22:23 23:8,14,18, 21 26:7,15
**churches** 16:14 18:4 21:7
**claims** 21:17
**clear** 29:11
**collection** 15:5
**committee** 26:11
**common** 25:6
**communicating** 24:16
**communion** 18:23
**community** 24:7, 19
**company** 10:18
**completely** 8:1
**concluded** 30:20
**conferring** 14:8
**conflict** 11:13
**confusingly** 6:20
**congregation** 14:4,5 17:16,17 18:10,13 19:14,21 21:2,12,22,23 22:1,6,12 25:9,16, 17
**congregations** 14:5,19 15:16,19 16:4 17:10,11,22 20:6,12 23:12 24:4 26:2
**conscientious** 11:10
**considered** 15:13
**contractor** 9:23
**contracts** 16:19
**convicted** 11:20
**Corner** 16:23
**corporate** 27:23, 25 28:1
**corporation**

13:15 30:4

**correct** 12:24 14:17 15:8 19:23 26:1 29:4

**correctly** 14:18

**counsel** 4:3,20 8:22,23

**countries** 16:11

**couple** 14:9

**court** 4:12 5:4

**created** 29:13

**creating** 29:21

**creation** 29:6

**crime** 11:20

**Cross** 5:22

---

**D**

**D.C.** 4:11

**Dana** 4:10 5:8 9:7 30:18

**dark** 7:17

**date** 4:15 7:15 9:11

**David** 5:22

**days** 5:19

**deacon** 18:2,14, 25

**deacon's** 21:16

**deacons** 18:6,23 19:2,25

**December** 9:12

**decide** 23:20

**decided** 21:1 29:17

**decides** 17:10 22:1,6

**decision** 24:9

**Defendants** 5:1, 3

**Delaware** 5:24 9:16,18 10:2,6 11:6,9

**depend** 15:21 16:2 20:12

**depends** 16:3 20:13

**Depos** 4:18

**deposition** 4:10, 18 6:3 7:6,13 8:21 30:18,20

**desire** 24:22

**direction** 15:24 21:21

**directive** 22:10

**directors** 13:16

**directory** 16:22

**discipline** 23:1

**discovery** 9:2,4

**discretion** 21:22, 23 22:2,12

**discuss** 14:10,23

**district** 4:12,13 15:22,24

**districts** 15:16, 19

**divinity** 17:25

**division** 10:17

**doctors** 24:21

**documents** 8:25

**donating** 20:9

**donations** 22:9

**draw** 28:25

**drink** 7:7

**driving** 5:24

---

**E**

**Eastern** 4:12 12:21 13:10,11 14:2,6 15:3 16:17 18:11 19:4,15,17 22:23 23:1,7

**Edelstein** 5:1,3

**education** 11:1

**employment**

24:2

**encompass** 16:8 25:11

**end** 30:17

**English** 11:17

**entity** 26:12 28:1 29:21

**Ephrata** 16:24

**EPMC** 17:7 20:7 22:17 23:16 24:1, 19 25:6,8 26:17 27:9,10,23 29:3,5, 16,18,19,25 30:6

**estimate** 7:14

**estimation** 7:18

**et al** 4:11

**etcetera** 18:23 21:18

**event** 7:21,24

**eventually** 23:21

**EXAMINATION** 5:14

**excommunicatio n** 25:6,8,9

**excommunicatio ns** 25:17

**expectations** 6:2

**expenses** 21:12

**experience** 25:11

**explain** 13:9,19 18:9

**explaining** 28:21

---

**F**

**facility** 26:17

**fair** 7:3,17,23 8:4

**falls** 26:17

**families** 24:4

**family** 24:9

**farms** 24:8

**feel** 6:21 25:3

**fellowship** 14:9

**felt** 29:16

**fifties** 18:18

**filing** 4:4

**final** 29:17

**financial** 18:21

**fine** 7:8 8:1 29:24

**firm** 4:23

**Florida** 15:25

**Foote** 4:24

**foreign** 16:14 21:9

**form** 4:6

**formal** 17:24,25

**formation** 23:10

**formed** 13:22 15:23

**forward** 17:6 29:13

**forwarded** 21:4

**frame** 7:22

**Franchi** 4:22 5:11,16,21 28:5, 17,19 30:11,15

**free** 6:21 24:21

**full** 9:6

**fully** 8:8

---

**G**

**gathered** 20:15

**Gender** 9:16

**general** 8:12 12:20 25:11

**generally** 10:9 15:2,4 19:15 21:20 24:1 28:21, 23

**geographically** 15:15,20

**gift** 20:1

**girls** 12:4,12

**give** 6:8,13 7:17 21:3 25:16

**Good** 5:20

**gosh** 22:7

**grade** 11:2

**graduate** 11:3

**graduated** 11:7

**group** 8:24 13:12, 23 14:1

**growth** 15:22

**guess** 7:16 13:8 14:15 16:25 17:10 24:5 25:10 27:6

**guessing** 16:16

**guidance** 27:20, 21 28:2 29:20

**guidelines** 14:20 23:2,5,7 24:1 27:10

---

**H**

**half** 5:19

**handle** 14:24

**happened** 7:21, 25

**hard** 22:18

**hardscaping** 10:16,17

**head** 6:10

**health** 18:15

**hearing** 29:10

**hey** 22:10

**high** 11:3,5

**Hill** 4:19

**home** 12:13 15:13

**hospital** 11:11 21:15

**Witness Dana Ressler** 3

---

**I**

idea 24:6

identify 4:20

implementation 29:6

implies 30:2,4

important 8:6

incorrect 13:2

individual 17:9, 16 20:11

individually 20:5

individuals 23:11

input 29:20

installation 10:15

instruction 23:1

insurance 21:17

insurances 21:16

involuntarily 12:15

involved 22:4

involvement 29:6,16 30:7

issues 5:18 14:10

---

**J**

Jane 11:25

Jersey 10:13

job 9:21

jobs 21:16

Jocelyn 5:2

join 14:6

---

**K**

K-E-E-N-E-R 9:25

Keener 9:25

---

kids 12:1

kind 6:2 13:8,20 14:16,19 15:5 16:16 24:12 26:6 27:6,9 29:21 30:2

kinds 26:23

knew 16:25 19:8, 10

knowledge 29:7, 8 30:6

Kylan 4:17

---

**L**

labor 24:2

lack 13:20 27:24

Lancaster 14:2 16:1

landscape 9:23

landscaping 10:14

law 4:23

lawyerly 20:13

leader 17:17

leaders 17:21 23:16 28:3 29:5 30:1,5,6

leadership 17:11,21 23:14 27:8

learning 13:1

leave 23:12,14 25:15

left 25:18

legs 7:7

level 11:1

Liberty 19:7,8 21:2,4,20 22:3 29:7,10,12,21 30:7,8,10

lieu 11:12

life 18:15

lift 21:1,7,12,14

lifting 20:24

---

light 6:25

live 9:15,16 12:11 22:20

lived 9:18

LLC 10:4 14:13

Lloyd 5:5

local 18:6,7

long 6:4 9:18 10:18

long-winded 24:15

lot 10:16 18:25 21:6,8

love 17:20

---

**M**

mail 16:24 17:3

mailbox 26:6

maintenance 10:16

make 6:19 7:11 13:4 24:16 25:25 26:21

makes 28:5

making 21:17

man 18:17,18 25:18

Manitoba 16:13

Margolis 4:25 5:2

Mark's 26:14

marks 30:17

married 11:22

Martin 4:11

Mary 11:25

Maryland 10:12

material 26:23

matter 4:11,24 5:23

matters 6:1,4

meaning 24:24

---

means 6:9

Media 4:9

medical 24:20,22

meet 14:16 15:14

meeting 14:24,25 15:18

meetings 14:9 15:17 17:8

Meghan 4:25

member 22:21

members 16:7 20:6 22:17 23:13 27:17 29:2,3,18, 19

membership 23:22 25:19,20

Mendez 5:2

Mennonite 12:21 13:10,11,25 14:3, 7 15:3 16:18 17:20 18:11 19:4, 16,18 21:6,8 22:23 23:8 26:18 27:11,16

mentioned 21:19 26:5 29:9

Messianic 21:6,8 26:18 27:11

met 8:13

military 11:12

Miller 5:22

ministers 18:2,6 19:25

ministry 14:10, 15 15:1 28:4

minor 29:14

minutes 28:6

Mission 21:6,8, 19,21 22:3,9 26:3, 18 27:11,16,22 28:22 29:3,17

missions 16:15 21:9

MMM 23:5 26:14

---

monetarily 26:2

money 21:25 22:11

monitor 4:16

month 21:7

months 10:24

morning 20:16

moved 11:6

moving 29:13

---

**N**

nebulas 27:24

nebulous 13:17, 18 15:5

necessarily 15:6

Newark 9:16

nitty-gritty 19:1

nod 6:10

non-verbal 6:9

northwest 16:13

Number 4:10,13

---

**O**

objections 4:5

objector 11:10

occasionally 18:22 25:15

occurred 7:24

October 4:15

offensive 13:6

offer 27:20,21 29:20

offering 20:16, 17,20,24 21:2,7

offerings 21:20

office 16:19 17:1 26:9 27:3

official 29:22

officials 14:16 17:11

---

**officio** 27:17

**Ohio** 9:14 11:5

**older** 18:18 19:2

**open** 14:24,25 17:4

**operate** 10:5

**operating** 30:9

**opportunity** 15:17 21:3

**ordained** 17:22 18:13,14,19,24

**ordinances** 18:22

**organization** 13:14 15:11

**organizations** 26:3

**outreach** 26:14

**overarching** 29:5

**oversee** 27:14

**overseen** 27:6

**oversees** 27:9,11

**P**

**p.m.** 4:16 28:13, 16 30:19,21

**PA** 4:19

**paid** 19:17 21:18

**part** 9:2 14:6,24, 25 15:25 16:5

**participate** 26:2

**participation** 29:11

**parties** 4:3

**Pennsylvania** 4:13 10:2,8,10 12:21 13:10,11 14:3,7 15:3 16:17, 24 18:11 19:4,16, 17 22:23 23:1,8

**people** 6:16 13:23 15:2 18:21 19:10,11 20:9

24:19,21 26:1 27:1 28:23

**perfectly** 7:8 29:24

**person** 17:5 21:18 25:13

**physical** 15:6

**place** 4:18 15:14 17:8 19:9

**Plaintiffs** 4:24 5:22

**Planet** 4:17

**point** 7:6

**position** 19:22

**Pour** 28:9

**practice** 13:24 22:22 25:7

**practiced** 13:13

**preach** 18:22

**preliminarily** 8:14

**preliminary** 5:17 6:1,3

**preparation** 9:1

**prepare** 8:21

**prevent** 8:8

**priests** 17:13

**printed** 20:23

**prior** 20:23

**problem** 14:23, 24

**prohibits** 18:16

**property** 30:7

**psychiatrists** 24:20

**public** 14:25 26:25

**publication** 17:1 26:9,10,17,20 27:3,7

**publications** 26:12

**published** 27:5

**publishers** 26:23

**put** 5:18 13:5 22:10

**Q**

**question** 4:6 6:18,22,23 7:1,3, 9,10 17:20 19:21 24:15 29:25

**questions** 6:5,8, 12,14 8:12,17 12:18,20,23 18:9 25:23 28:11,24 30:12,13

**quick** 5:25 28:9

**quote** 26:6

**R**

**R-E-S-S-L-E-R** 9:10

**R.M.** 4:11

**raised** 17:12

**rarely** 22:14

**reaches** 15:25

**read** 11:16

**reading** 4:3

**ready** 8:18,19

**real** 30:3,5

**reason** 6:21 7:7

**recall** 7:15

**recent** 25:17

**Recess** 28:14

**record** 28:13,16 30:19

**records** 18:20,21

**refer** 12:24

**referring** 30:1

**registered** 13:15

**religious** 23:15 26:24 28:3

**remember** 7:24 8:3 19:6

**removed** 23:22

**Renee** 4:22 5:21

**repeat** 6:23

**repeating** 5:19

**reporter** 5:4,5

**represent** 4:21, 24 5:1,3,21

**representing** 4:17

**requirement** 26:1,4

**reserved** 4:6

**resign** 18:15

**respective** 4:3

**respond** 14:11

**response** 6:9 7:2

**responses** 6:13, 14

**responsibilities** 28:22

**Ressler** 4:10 5:8, 20 9:7,22 30:18

**restriction** 7:9

**restrictions** 24:19

**review** 8:25

**reviewed** 9:2

**Ridge** 19:7,8 21:2,4,20 22:3 29:7,10,12,21 30:7,8,10

**Road** 9:17 16:23

**Robert** 5:22

**role** 18:9,10 19:14 29:1

**roles** 18:20

**rule** 24:10

**rules** 6:3 14:20 22:16,18 23:3,4, 21,25 24:13,18 25:14

**running** 10:23,24

**S**

**S-E-N-S-E-N-I-G** 10:1

**satisfied** 13:23

**schedules** 20:23

**school** 11:4,5 26:22,23

**schools** 26:21

**scope** 23:15

**sealing** 4:4

**section** 14:12

**seek** 24:21

**seeking** 24:20

**sells** 26:25

**Senate** 4:19

**sense** 6:19 7:11 13:14 15:13 28:5

**Sensenig** 9:25

**serve** 19:25

**served** 11:11

**service** 11:12

**serving** 20:2

**set** 14:13 18:9 22:15,18 24:1 25:14

**sets** 14:20

**settle** 21:17

**shake** 6:10

**share** 15:17

**signing** 4:4

**simply** 7:16 8:2

**sir** 11:22

**sit** 27:19

**sixties** 18:18

**Small** 10:10

**sold** 27:5

**sooner** 28:8

sort 29:3

speak 22:8

speaking 8:22
15:4

specific 7:23
28:24

specifically 7:15
22:3

spell 9:8

spoken 8:13

stab 7:16

stand 28:9

start 8:17 9:5
24:8,11

started 10:24
16:15 17:19 26:20

starting 13:8

state 4:21 9:6

stated 5:21

statement 22:22,
25

States 4:12 16:11

steam 26:13

stenographer
6:11

stipulated 4:2

STIPULATIONS
4:1

stop 23:17

store 26:25 27:5

strangely 12:23

stretch 7:7

strike 12:18

structure 13:20
14:3,4

suggest 20:19

Suite 4:19

Sunday 20:16,23
21:11,14 22:7
26:23

supposed 18:19
24:3

surprised 6:16

swear 5:5

---
**T**
---

takes 18:25

taking 4:18

talk 15:2 26:14

term 12:24 20:11
27:24

terminated 25:20

testified 5:9

testify 8:8

textbooks 26:24

thereof 13:21

thing 6:6 8:6
20:4,19,24 25:5
26:24

things 13:13
14:20

thoughts 15:6

time 4:6,16 7:16,
21 12:22 23:13
28:16 30:16

times 14:9,16
20:1

tithe 20:19

tithing 20:10

today 4:17 5:5,24
6:3,14 8:7,9,14,21
22:8

Today's 4:15

tomorrow 26:14

Tracy 5:5

traditional 13:25
15:12

train 18:19

training 17:24,25

transcript 4:4
5:18

travel 15:17

treasury 14:12
21:4

treatment 24:22

trial 4:7

truth 8:7,9

type 6:12 10:14
20:19 24:21 26:24

typing 6:11

---
**U**
---

uh-huh 6:10,17

umbrella 27:8

uncertain 8:3

underneath 27:8

understand
6:19,22 11:16
13:3 17:13,14

understanding
14:18 29:12,14

understood 7:2

unfamiliar 10:1

United 4:12 16:11

unlike 27:23

unquote 26:6

---
**V**
---

verbal 6:8,13,14
7:1

video 4:16,18

Vietnam 11:13,
14

visit 30:10

voice 4:20

voluntarily 14:5
20:1

voluntary 19:19,
22 20:4,17,20

vote 29:18

---
**W**
---

Wadsworth 9:14
11:5

waived 4:5

wanted 13:24
16:25 21:3 24:16

war 11:14

water 28:10

ways 13:25

whatsoever 26:4

wife 12:11 25:18

wife's 11:24

Wilmington
11:11

withdrew 25:19

woman 25:18

Wood 16:23

word 15:11

worded 6:20
12:23

work 10:8 19:5
24:12

worked 19:10

working 8:24
24:3,8

wow 16:10

write 11:16 16:25

written 22:16,19

wrong 12:24
14:17 17:15

Wynkoop 4:25
30:14

---
**Y**
---

year 14:10,16

years 7:23,25
9:20 10:22 11:11

younger 18:17,
18,25 19:3

Youngest 12:10

# EXHIBIT K

### *18 USCS § 1589*

Current through Public Law 117-262, approved December 21, 2022.

*United States Code Service  >  TITLE 18. CRIMES AND CRIMINAL PROCEDURE (§§ 1 — 6005)  >  Part I. Crimes (Chs. 1 — 123)  >  CHAPTER 77. Peonage, slavery, and trafficking in persons (§§ 1581 — 1597)*

## § 1589. Forced labor

**(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

**(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

**(2)** by means of serious harm or threats of serious harm to that person or another person;

**(3)** by means of the abuse or threatened abuse of law or legal process; or

**(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

**(b)** Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

**(c)** In this section:

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

**(d)** Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

## History

**HISTORY:**

Added Oct. 28, 2000, *P. L. 106-386*, Div A, § 112(a)(2), *114 Stat. 1486*; Dec. 23, 2008, *P. L. 110-457*, Title II, Subtitle C, § 222(b)(3), *122 Stat. 5068*.

Annotations

# EXHIBIT L

⚠️ Caution
As of: January 18, 2023 1:49 PM Z

## *United States v. Calimlim*

United States Court of Appeals for the Seventh Circuit

January 9, 2008, Argued; August 15, 2008, Decided

Nos. 07-1112, 07-1113 & 07-1281

**Reporter**
538 F.3d 706 *; 2008 U.S. App. LEXIS 20058 **

UNITED STATES OF AMERICA, Plaintiff-Appellee/Cross-Appellant, v. ELNORA M. CALIMLIM and JEFFERSON N. CALIMLIM, Defendants-Appellants/Cross-Appellees.

**Subsequent History:** US Supreme Court certiorari denied by *Calimlim v. United States, 129 S. Ct. 935, 2009 U.S. LEXIS 552 (U.S., Jan. 12, 2009)*

**Prior History: [**1]** Appeals from the United States District Court for the Eastern District of Wisconsin. No. 04 CR 0248--Rudolph T. Randa, Chief Judge.

## Core Terms

enhancement, vulnerable, forced labor, harboring, vague, convictions, alien, district court, financial gain, Sentencing, overbreadth, Guideline, innocent, serious harm, criminalized, warnings, threats, felony, deportation, immigration, coercion, bargain, counts, notice, involuntary servitude, scienter requirement, vulnerable-victim, instructions, housekeeper, procuring

## Case Summary

### Procedural Posture

Defendants appealed a judgment of the United States District Court for the Eastern District of Wisconsin convicting them of obtaining and conspiring to obtain forced labor, a violation of *18 U.S.C.S. §§ 371*, *1589*, and *1594*, and harboring and conspiring to harbor an alien for private financial gain, a violation of *8 U.S.C.S. § 1324(a)(1)*, arising out of their treatment of their Philippine housekeeper. The Government appealed defendants' sentences.

### Overview

On appeal, the court held that the forced labor statute, *18 U.S.C.S. § 1589*, provided sufficient notice of what it criminalized and, thus, was not vague under the *Fifth Amendment Due Process Clause*. Even if defendants did not know for certain that they would be convicted, the language of the statute alerted them to what was prohibited. They knew that they were telling the housekeeper that if she did not do everything they asked, they would not send money back home for her. Defendants also knew that not sending money back home was, for the housekeeper, a "serious harm." They also warned the housekeeper about her precarious position under the immigration laws, conveniently omitting anything about their own vulnerability. The jury was instructed on scienter and found conduct that met the definition. Further, contrary to defendants' argument, the statute did not state that only direct threats were forbidden. Finally, the language of *§ 1589* covered nonviolent coercion, and that was what the indictment accused defendant of doing; there was nothing arbitrary in applying the statute that way. The court also rejected defendants' overbreadth challenge to *§ 1589* under the *First Amendment*.

### Outcome
The court affirmed defendants' convictions but vacated their sentences and remanded for resentencing.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Governments > Legislation > Vagueness

*HN1*[] **Judicial & Legislative Restraints,**

538 F.3d 706, *706; 2008 U.S. App. LEXIS 20058, **1

## Overbreadth & Vagueness of Legislation

A vagueness challenge is best described by the evils it seeks to prevent: Unconstitutionally vague statutes pose two primary difficulties: (1) they fail to provide due notice so that ordinary people can understand what conduct is prohibited, and (2) they encourage arbitrary and discriminatory enforcement.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

Governments > Legislation > Vagueness

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > General Overview

**HN2[⬇]   Constitutional Law, Involuntary Servitude**

The forced labor statute provides sufficient notice of what it criminalizes.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > Elements

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

**HN3[⬇]   Constitutional Law, Involuntary Servitude**

Under *18 U.S.C.S. § 1589*, it is illegal knowingly to provide or obtain the labor or services of a person (1) by threats of serious harm to, or physical restraint against, that person or another person; (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) by means of the abuse or threatened abuse of law or the legal process.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > Elements

Governments > Legislation > Vagueness

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

**HN4[⬇]   Constitutional Law, Involuntary Servitude**

A vagueness challenge not premised on the *First Amendment* is evaluated as-applied, rather than facially. The action criminalized by *18 U.S.C.S. § 1589*, knowingly providing or obtaining the labor or services of a person, is sufficiently removed from anything protected by the *First Amendment* that a court must evaluate it as-applied.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > General Intent

Governments > Legislation > Vagueness

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

**HN5[⬇]   Constitutional Law, Involuntary Servitude**

The presence of a scienter element to the offense makes the defendants' burden on a vagueness challenge to a statute very difficult to carry. When the government must prove intent and knowledge, these requirements do much to destroy any force in the argument that application of the statute would be so

538 F.3d 706, *706; 2008 U.S. App. LEXIS 20058, **1

unfair that it must be held invalid. *18 U.S.C.S. § 1589* contains an express scienter requirement. In addition, one of the three ways in which labor can be obtained criminally contains a second scienter requirement: by means of any scheme intended to cause the person to believe. *§ 1589(2)*. Obtaining the services of another person is not itself illegal; it is illegal only when accompanied by one of the three given circumstances, and the jury must find that the defendant knew that the circumstance existed.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > General Intent

Governments > Legislation > Vagueness

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

**HN6[↓] Constitutional Law, Involuntary Servitude**

*18 U.S.C.S. § 1589* does not specify that the "serious harm" be at the defendant's hand. It requires that the plan be intended to cause the victim to believe that such harm will befall her. *§ 1589(2)*. This subsection describes a more indirect form of threat than that covered by *§ 1589(1)*, which criminalizes direct threats of serious harm to the victim or another person. Taken as a whole, the statute provides ample notice that it prohibits intentionally creating the belief that serious harm is possible, either at the defendant's hands or those of others.

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Governments > Legislation > Vagueness

**HN7[↓] Judicial & Legislative Restraints, Overbreadth & Vagueness of Legislation**

Speculation about possible vagueness in hypothetical situations not before the court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Governments > Legislation > Vagueness

**HN8[↓] Judicial & Legislative Restraints, Overbreadth & Vagueness of Legislation**

A statute may be unconstitutionally vague when an ambiguity allows for arbitrary enforcement of the law beyond what Congress intended. A statute is vague in this sense when there is a lack of clarity that would give law enforcement officials discretion to pull within the statute activities not within Congress' intent.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > Elements

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

**HN9[↓] Constitutional Law, Involuntary Servitude**

After the United States Supreme Court ruled that a similar statute involving involuntary servitude, *18 U.S.C.S. § 1584*, prohibited only servitude procured by threats of physical harm, Congress enacted *18 U.S.C.S. § 1589*. The language of *§ 1589* covers nonviolent coercion.

Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation

Governments > Legislation > Overbreadth

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

538 F.3d 706, *706; 2008 U.S. App. LEXIS 20058, **1

*HN10*[⤓]  **Judicial & Legislative Restraints, Overbreadth & Vagueness of Legislation**

Overbreadth is a doctrine designed to protect free speech.

> Constitutional Law > ... > Fundamental Freedoms > Judicial & Legislative Restraints > Overbreadth & Vagueness of Legislation
>
> Governments > Legislation > Overbreadth
>
> Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN11*[⤓]  **Judicial & Legislative Restraints, Overbreadth & Vagueness of Legislation**

The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of *First Amendment* rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep.

> Constitutional Law > Involuntary Servitude
>
> Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > Elements
>
> Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope
>
> Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview
>
> Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > General Intent

*HN12*[⤓]  **Constitutional Law, Involuntary Servitude**

*18 U.S.C.S. § 1589* does not criminalize any speech; it bans behavior that may involve speech. This blunts any overbreadth attack. Because of the scienter requirement, any speech involved must be a threat or else intended to achieve an end prohibited by law.

> Constitutional Law > Involuntary Servitude

> Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > Elements
>
> Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope
>
> Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview
>
> Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > General Intent

*HN13*[⤓]  **Constitutional Law, Involuntary Servitude**

To the extent that *18 U.S.C.S. § 1589* raises *First Amendment* concerns, the scienter requirement limits the prohibited speech to unprotected speech.

> Criminal Law & Procedure > ... > Miscellaneous Offenses > Harboring & Transporting Illegal Aliens > Elements
>
> Immigration Law > ... > Criminal Offenses > Illegal Entry > Concealing, Harboring & Shielding

*HN14*[⤓]  **Harboring & Transporting Illegal Aliens, Elements**

See *8 U.S.C.S. § 1324(a)(1)*.

> Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > General Overview
>
> Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > General Overview

*HN15*[⤓]  **Crimes Against Persons, Coercion & Harassment**

A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out.

> Constitutional Law > Involuntary Servitude
>
> Criminal Law & Procedure > Criminal

538 F.3d 706, *706; 2008 U.S. App. LEXIS 20058, **1

Offenses > Miscellaneous Offenses > General Overview

Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > General Overview

**HN16**[⬇]  **Constitutional Law, Involuntary Servitude**

The immigration laws do not aim to help employers retain secret employees by threats of deportation, and so their "warnings" about the consequences are directed to an end different from those envisioned by the law and are thus an abuse of the legal process. The warnings therefore fit within the scope of *18 U.S.C.S. § 1589(3)*.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Crimes Against Persons > False Imprisonment > Elements

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

**HN17**[⬇]  **Constitutional Law, Involuntary Servitude**

*18 U.S.C.S. § 1589* is not written in terms limited to overt physical coercion, and when Congress amended the statute, it expanded the definition of involuntary servitude to include nonphysical forms of coercion.

Criminal Law & Procedure > Trials > Jury Instructions > General Overview

**HN18**[⬇]  **Trials, Jury Instructions**

The court of appeals will not quibble with a district court's wording in a jury instruction as long as it fairly summarized the law for the jury.

Criminal Law & Procedure > ... > Miscellaneous Offenses > Harboring & Transporting Illegal Aliens > Elements

Immigration Law > ... > Criminal Offenses > Illegal Entry > Concealing, Harboring & Shielding

Criminal Law & Procedure > ... > Miscellaneous

Offenses > Harboring & Transporting Illegal Aliens > Penalties

**HN19**[⬇]  **Harboring & Transporting Illegal Aliens, Elements**

*8 U.S.C.S. § 1324(a)(1)* provides for stricter punishments if the harboring occurs for the purpose of commercial advantage or private financial gain. *§ 1324(a)(1)(B)(i)*.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

**HN20**[⬇]  **Substantial Evidence, Sufficiency of Evidence**

A challenge to the sufficiency of the evidence for conviction is reviewed in the light most favorable to the government; the court of appeals will uphold a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN21**[⬇]  **Sentencing Guidelines, Adjustments & Enhancements**

*U.S. Sentencing Guidelines Manual § 2H4.1* covers peonage, involuntary servitude, and slave trade. It establishes a base offense level of 22, and identifies several special offense characteristics, including one for another felony: If any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of two plus the offense level as determined above.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Immigration Law > ... > Criminal Offenses > Illegal Entry > Concealing, Harboring & Shielding

Criminal Law & Procedure > ... > Miscellaneous Offenses > Harboring & Transporting Illegal Aliens > Penalties

**_HN22_[⬇]** Sentencing Guidelines, Adjustments & Enhancements

_8 U.S.C.S. § 1324(a)(1)_, harboring an alien for private financial gain, has its own sentencing Guideline, _U.S. Sentencing Guidelines Manual § 2L1.1_. It is therefore an other felony offense other than an offense that is itself covered by _U.S. Sentencing Guidelines Manual § 2H4.1_. _U.S. Sentencing Guidelines Manual § 2H4.1(b)(4)_, cmt., application n. 2. A harboring conviction falls within the terms of _§ 2H4.1(b)(4)_ and should trig its application.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**_HN23_[⬇]** Sentencing Guidelines, Adjustments & Enhancements

The bar on double counting comes into play only if the offense itself necessarily includes the same conduct as the sentencing enhancement.

Criminal Law & Procedure > ... > Miscellaneous Offenses > Harboring & Transporting Illegal Aliens > Penalties

Immigration Law > ... > Criminal Offenses > Illegal Entry > Concealing, Harboring & Shielding

**_HN24_[⬇]** Harboring & Transporting Illegal Aliens, Penalties

There is nothing artificial about treating forced labor and harboring as two separate offenses. They are based on different conduct, and neither necessarily encompasses the other.

Constitutional Law > Involuntary Servitude

Criminal Law & Procedure > ... > Miscellaneous Offenses > Harboring & Transporting Illegal Aliens > Elements

Immigration Law > ... > Criminal Offenses > Illegal Entry > Concealing, Harboring & Shielding

**_HN25_[⬇]** Constitutional Law, Involuntary Servitude

Even today, long after the passage of the _Thirteenth Amendment_, it is possible to violate the law by forcing an American into servitude just as one can force an alien into servitude. In no sense does forced labor necessarily imply that the victim is an alien. Similarly, it is possible to harbor an alien for private financial gain without forcing that person to work; the gain might come from the use of valuable property that the alien has, or even from a ransom.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Vulnerable Victims

**_HN26_[⬇]** Adjustments & Enhancements, Vulnerable Victims

_U.S. Sentencing Guidelines Manual § 3A1.1(b)(1)_ requires a two-level increase if the defendant knew or should have known that a victim of the offense was a vulnerable victim. The commentary accompanying this section defines a "vulnerable victim" as one who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. _U.S. Sentencing Guidelines Manual § 3A1.1_, cmt., application n. 2.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Vulnerable Victims

**_HN27_[⬇]** Adjustments & Enhancements, Vulnerable Victims

_U.S. Sentencing Guidelines Manual § 2H4.1_, which is the Guideline for the forced labor offense, does not say anything about the vulnerability of the victim. The only adjustments it requires are for death or serious bodily injury, use of a dangerous weapon, a period greater than a year, and commission of another felony. The United States Court of Appeals for the Ninth Circuit has held that the vulnerable victim adjustment is not part-and-parcel of the offense Guideline. The Seventh Circuit agrees.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Vulnerable Victims

**HN28[↓] Adjustments & Enhancements, Vulnerable Victims**

The key concern behind the vulnerable victim enhancement as the desire to deter criminals from targeting certain groups by increasing the penalties for doing so.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Vulnerable Victims

**HN29[↓] Adjustments & Enhancements, Vulnerable Victims**

where vulnerability is not already accounted for in the United States Sentencing Guidelines, the court will apply the vulnerable victim enhancement when the victim is a member of a group typically vulnerable to the particular manifestation of the general offense committed by the defendant, whether or not the victim is otherwise unusually vulnerable.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Use of Minor

**HN30[↓] Adjustments & Enhancements, Use of Minor**

*U.S. Sentencing Guidelines Manual § 3B1.4* requires a two-level enhancement for using a minor to commit a crime. "Use" includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting. *U.S. Sentencing Guidelines Manual § 3B1.4*, cmt., application n. 1.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > Use of Minor

**HN31[↓] Adjustments & Enhancements, Use of Minor**

Whether the minor understands what is going on is

irrelevant: The enhancement in *U.S. Sentencing Guidelines Manual § 3B1.4* focuses on whether the defendant used a minor in the commission of a crime, not whether the minor knew that he was being used to commit a crime.

Criminal Law & Procedure > Sentencing > Sentencing Guidelines > General Overview

Criminal Law & Procedure > Sentencing > Appeals > Proportionality & Reasonableness Review

**HN32[↓] Sentencing, Sentencing Guidelines**

When a judge does not properly calculate a guidelines sentence, the court of appeals' review for reasonableness is forestalled.

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Factors

Criminal Law & Procedure > Sentencing > Sentencing Guidelines > General Overview

Criminal Law & Procedure > Sentencing > Ranges

**HN33[↓] Imposition of Sentence, Factors**

Once the proper sentencing range has been determined, rather than thinking in terms of "departures" and "enhancements," a district court should simply decide whether to impose a sentence within the range or outside it, by reference to the factors set forth in *18 U.S.C.S. § 3553(a)*.

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee (07-1112, 07-1113, 07-1281): Sarah E. Harrington, DEPARTMENT OF JUSTICE, Civil Rights Division, Appellate Section, Washington, DC, USA.

For ELNORA M. CALIMLIM, JEFFERSON N. CALIMLIM, Defendant - Appellants (07-1112, 07-1113): Dean A. Strang, Marcus J. Berghahn, HURLEY, BURISH & STANTON, Madison, WI, USA.

For ELNORA M. CALIMLIM, Defendant - Appellee (07-1281): Michael J. Fitzgerald, GLYNN, FITZGERALD &

538 F.3d 706, *706; 2008 U.S. App. LEXIS 20058, **1

ALBEE, Milwaukee, WI, USA.

For JEFFERSON N. CALIMLIM, Defendant - Appellee (07-1281): Dean A. Strang, HURLEY, BURISH & STANTON, Madison, WI, USA.

**Judges:** Before WOOD, SYKES, and TINDER, Circuit Judges.

Opinion by: WOOD

# Opinion

[*708]  WOOD, *Circuit Judge.* At age 16, Irma Martinez began working for the Mendoza family in the Philippines, where it is common for wealthier families to have a live-in housekeeper to attend to the house and children. Her family was poor and depended on the salary she earned. At the urging of Dr. Jovito Mendoza (the father of defendant Elnora Calimlim), Martinez traveled to the United States when she was about 19 years old. [**2] She told consular officials that she needed a visa in order to accompany Dr. Mendoza, who was going to the United States for medical treatment, but she really intended to stay in the United States to work. Her visa permitted a two-year stay as long as she departed and re-entered the United States at least once every six months.

When Martinez arrived, Jefferson and Elnora Calimlim confiscated her passport and told her that she would have to reimburse the Mendozas for the cost of her plane ticket. The Calimlims told her she was in the United States illegally from the day after she arrived. Martinez was unable to communicate in English for the first five or six years of her stay.

Martinez worked for the Calimlims, both of whom are physicians, as a live-in housekeeper. Her daily routine usually began at 6:00 a.m. and ended around 10:00 p.m., seven days a week as well as during most vacations. Her duties initially included caring for the Calimlim household and children; eventually they expanded to include the family cars, investment properties, and medical offices. After ten years, the family moved to a more luxurious house, 8,600 [*709] square feet in area and equipped with a private tennis court. [**3] Martinez provided their only household help.

While she worked for the Calimlims, Martinez was greatly restricted in what she could do. She never walked out the front door of the first house, and only answered the door in the second house once--on Halloween, wearing a mask. She was told not to play outside with the children or leave her room in the basement during social functions, even to go to the bathroom. She was permitted to walk to church (one selected by Elnora), but only via a back path that was well away from possible observation. Elnora did not allow her to go to the same church too many times in a row. When she was driven someplace she had to ride in the back seat with her head down so that nobody could see her. The "house rules" included a phone code that enabled Martinez to answer the phone when the children called, but not when outsiders did. The children were told not to discuss Martinez with anyone outside the family. Martinez was not permitted to seek medical care outside of the house, even for special needs such as dentistry.

The Calimlims allowed Martinez to speak with her family four or five times over the 19 years she was with them, and even then she was surrounded [**4] by the Calimlim family while speaking on the phone. Martinez initially had a savings account into which her earnings were deposited, but Elnora closed it one day after Martinez's visa expired. Martinez authorized Elnora to send money to Martinez's family in the Philippines through Elnora's parents' account, but over the entire 19-year period, the total that the Calimlims sent was only 654,412 pesos, or about $ 19,000. Martinez's "earnings" were nothing but a book entry in the Calimlims' accounts. Martinez was allowed to shop for personal items, but she had to leave the cart in the store (so that Elnora Calimlim could pay) and go wait in the car; she would later "reimburse" the Calimlims for the cost through withheld "wages." Martinez was told repeatedly by the adult Calimlims and their children that if anyone discovered her she could be arrested, imprisoned, and deported, and she would not be able to send any more money back to her family. Fear of that consequence kept her from breaking any of the rules or appearing outside the house.

On September 29, 2004, federal agents, acting on an anonymous tip, executed a search warrant and found a trembling Martinez huddled in the closet of her [**5] bedroom. A federal grand jury returned a third superseding indictment on December 6, 2005, charging the Calimlims with obtaining and conspiring to obtain forced labor (Counts 1 and 2), in violation of *18 U.S.C. §§ 371, 1589,* and *1594,* and harboring and conspiring to harbor an alien for private financial gain (Counts 3 and 4), in violation of *8 U.S.C. § 1324(a)(1).* A jury

convicted them of all four counts on May 26, 2006. On November 16, 2006, the district court sentenced the Calimlims to 48 months' imprisonment on each count, to run concurrently. Bond was denied pending appeal.

The Calimlims appeal their convictions, and the Government has cross-appealed from the district court's refusal to apply several enhancements in its calculation of the advisory Sentencing Guideline range. We find no error in the convictions, but we agree with the Government that resentencing is required, and so we reverse and remand for that purpose.

I

The Calimlims challenge their convictions on several grounds: that the forced labor statute is vague and overbroad, that **[*710]** the jury instructions on the forced labor counts failed to exclude the possibility of a conviction for innocent actions, and that there was insufficient **[**6]** evidence of financial gain on the harboring counts.

A. Vagueness and Overbreadth

The Calimlims raise two constitutional challenges to the forced labor statute, *18 U.S.C. § 1589*. First, they argue that the statute is so vague that it fails to provide notice of what is criminalized, and second, that it is overbroad enough to punish innocent activity. They do not specify which provision of the Constitution supports their position, but the first argument apparently alludes to the *Due Process Clause of the Fifth Amendment*, and the overbreadth argument sounds like a *First Amendment* free speech challenge.

*HN1*[↑] A vagueness challenge is best described by the evils it seeks to prevent: "Unconstitutionally vague statutes pose two primary difficulties: (1) they fail to provide due notice so that 'ordinary people can understand what conduct is prohibited,' and (2) they 'encourage arbitrary and discriminatory enforcement.'" *United States v. Cherry, 938 F.2d 748, 753 (7th Cir. 1991)* (quoting *Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)*). The Calimlims argue that the statute failed to put them on notice that warning Martinez that she was violating the law by being in the country illegally could be construed **[**7]** as violating the forced labor statute. This point overlaps to some degree with their overbreadth argument. They also assert that this prosecution took the statute beyond the boundaries Congress intended. Neither argument has merit.

We find that *HN2*[↑] the forced labor statute provides sufficient notice of what it criminalizes. *HN3*[↑] Under *18 U.S.C. § 1589*, it is illegal

> knowingly [to] provide [] or obtain [] the labor or services of a person--
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
> (3) by means of the abuse or threatened abuse of law or the legal process . . . .

The Government did not allege that the Calimlims made direct threats against Martinez within the scope of *§ 1589(1)*; the charges rest on *subparts (2)* and *(3)*. They kept Martinez under physical restraint and caused her to believe that she might be deported and her family seriously harmed because she would no longer be able to send money. They also implicitly threatened **[**8]** her with deportation proceedings. Looking at those charges, the Calimlims argue that the phrases "serious harm" and "threatened abuse of the law or the legal process" are too vague to support criminal liability. They argue that while they did notify Martinez that a threat existed from other quarters, they did not threaten Martinez that they would take action themselves.

*HN4*[↑] A vagueness challenge not premised on the *First Amendment* is evaluated as-applied, rather than facially. *Chapman v. United States, 500 U.S. 453, 467, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991)*. Here, the action criminalized by *§ 1589*--"knowingly provid[ing] or obtain[ing] the labor or services of a person"--is sufficiently removed from anything protected by the *First Amendment* that we must evaluate it as-applied. The question is thus whether **[*711]** the Calimlims were on notice that their conduct was illegal.

*HN5*[↑] The presence of a *scienter* element to the offense makes the Calimlims' burden very difficult to carry. *See Screws v. United States, 325 U.S. 91, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945)* (rejecting vagueness challenge to what is now *18 U.S.C. § 242* because it had a *scienter* requirement). "When the government must prove intent and knowledge, 'these requirements . . . do [] much to destroy any **[**9]** force in the argument that application of the [statute] would be so unfair that it must be held invalid[.]'" *Cherry, 938 F.2d at 754* (quoting *Jackson, 935 F.2d 832 at 839*) (other internal quotations omitted). *Section 1589* contains an express *scienter*

requirement. In addition, one of the three ways in which labor can be obtained criminally contains a second *scienter* requirement: "by means of any scheme . . . intended to cause the person to believe. . . ." *18 U.S.C. § 1589(2)*. Obtaining the services of another person is not itself illegal; it is illegal only when accompanied by one of the three given circumstances, and the jury must find that the defendant knew that the circumstance existed.

Even if the Calimlims did not know for certain that they would be convicted, the language of the statute alerted them to what was prohibited. They knew that they were telling Martinez that if she did not do everything they asked, they would not send money back home for her. The Calimlims also knew that not sending money back home was, for Martinez, a "serious harm." The Calimlims also warned Martinez about her precarious position under the immigration laws, conveniently omitting anything about their **[**10]** own vulnerability. The jury was instructed on *scienter* and found conduct that met the definition.

The Calimlims further assert that a reader of the statute would think that only direct threats are forbidden. That is not, however, what it says. **HN6**[⬆] The statute does not specify that the "serious harm" be at the defendant's hand. It requires that the plan be "intended to cause the [victim] to believe that" that harm will befall her. *18 U.S.C. § 1589(2)*. This subsection describes a more indirect form of threat than that covered by *§ 1589(1)*, which criminalizes direct "threats of serious harm to . . . [the victim] or another person." Taken as a whole, the statute provides ample notice that it prohibits intentionally creating the belief that serious harm is possible, either at the defendant's hands or those of others.

We have found only one unpublished decision from a district court that has directly addressed this issue, and that court took the same approach that we have. *See United States v. Garcia, 2003 U.S. Dist. Lexis 22088 (W.D.N.Y., Dec. 2, 2003)* (unpublished). Our conclusion is, more importantly, consistent with the approach that the Supreme Court reached in *Screws, supra*, and *Hill v. Colorado, 530 U.S. 703, 732-33, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000)*, **[**11]** which rejected vagueness challenges to statutes requiring *scienter*. The *Hill* Court reasoned that **HN7**[⬆] "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications[.]" *530 U.S. at 733* (quotation omitted).

**HN8**[⬆] A statute may also be unconstitutionally vague when an ambiguity allows for arbitrary enforcement of the law beyond what Congress intended. A statute is vague in this sense when "[t]here is [a] lack of clarity . . . that would give law enforcement officials discretion to pull within the statute activities not within Congress' intent." *United States v. Collins, 272 F.3d 984, 989 (7th Cir. 2001)*. **[*712]** With reference to *§ 1589*, **HN9**[⬆] after the Supreme Court ruled that a similar statute involving involuntary servitude, *18 U.S.C. § 1584*, prohibited only servitude procured by threats of physical harm, see *United States v. Kozminski, 487 U.S. 931, 952, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988)*, Congress enacted *§ 1589*, *see United States v. Bradley, 390 F.3d 145, 156-57 (1st Cir. 2004)*; *see also 22 U.S.C. § 7101(b)(13)* (rejecting the definition of coercion applied by *Kozminski*). The language of *§ 1589* **[**12]** covers nonviolent coercion, and that is what the indictment accused the Calimlims of doing; there was nothing arbitrary in applying the statute that way.

We turn, then, to the Calimlims' overbreadth argument. It is tempting to reject this for the simple reason that *§ 1589* penalizes conduct, whereas **HN10**[⬆] overbreadth is a doctrine designed to protect free speech. *See Virginia v. Hicks, 539 U.S. 113, 118, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003)*. The Calimlims argue that they are focusing, however, on speech associated with the forbidden conduct. They speculate that, in the wake of their convictions, innocent employers who merely warn their workers about the consequences of illegal immigration or a potential loss of health insurance coverage could get caught up by this law. **HN11**[⬆] "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of *First Amendment* rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales, 527 U.S. 41, 52, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999)* (quoting *Broadrick v. Oklahoma, 413 U.S. 601, 612-15, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)*).

There are many problems with this argument. As we said, **HN12**[⬆] *§ 1589* does not criminalize any speech; **[**13]** it bans behavior that may involve speech. This blunts any overbreadth attack. *See id. at 52-53* (noting that an unconstitutionally vague statute criminalizing "loitering," which may or may not involve speech and association, was not subject to an overbreadth attack). Because of the *scienter* requirement, any speech involved must be a threat or else intended to achieve an end prohibited by law.

HN13[⬆] To the extent that § 1589 raises *First Amendment* concerns, the *scienter* requirement limits the prohibited speech to unprotected speech. The Calimlims imagine many hypothetical innocent parties who might get swept up by the law. For example, they pose the case of a small employer who tells her employees that they must start paying a portion of their health insurance premiums or face the loss of their health insurance benefits (surely a common situation in these times). This example does not advance their case for overbreadth, however, because this employer would not run afoul of the statute. This plan could not be a "scheme . . . intended to cause the [employee] to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm . . . ," 18 U.S.C. § 1589(2), [**14] because the employee could quit and change jobs. The employer is not procuring labor by means of this statement, only lower wages or a renegotiation of the employment contract. There is no reliance on fear consistent with an intended scheme. Irma Martinez did not have an exit option: because the threats in her case involved her immigration status, she could not freely work for another employer in order to escape the threatened harm. Indeed, had Martinez escaped, she could have informed the authorities about the Calimlims' own violation of the law forbidding employment of an undocumented worker. See HN14[⬆] 8 U.S.C. § 1324a(1) ("It is unlawful for a person . . . (A) to hire . . . for [*713] employment in the United States an alien knowing the alien is an unauthorized alien . . . with respect to such employment. . . ."). The Calimlims' problem is the lack of connection between their case and that of the innocent employer they posit.

Taking their vagueness and overbreadth challenges together, the Calimlims are arguing that nothing they said or did to Martinez amounted to a threat. To the contrary, they urge, they meant her no harm and were only telling her these things in her best interest. Perhaps another [**15] jury might have accepted this story, but the one that heard their case did not. The key to distinguishing this innocent explanation from the facts of conviction, and the reason why the record contains evidence supporting the jury's verdict, lies in part in what they did not tell her: that they knew how to set in motion the process that might have resulted in a legitimate green card (specifically through an I-140 form and a Department of Labor certification program). HN15[⬆] A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out. See, e.g., United States v.

Fuller, 387 F.3d 643, 646 (7th Cir. 2004) (threat to life of President); United States v. Hart, 226 F.3d 602, 607 (7th Cir. 2000) (threat of death with unknown object purported to be bomb during bank robbery).

The evidence showed that the Calimlims intentionally manipulated the situation so that Martinez would feel compelled to remain. They kept her passport, never admitted that they too were violating the law, and never offered to try to regularize her presence in the United States. Their vague warnings that someone [**16] might report Martinez and their false statements that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave. That is all the jury needed to convict. (Notably, the Calimlims did not challenge the sufficiency of evidence supporting the jury's findings of intent.)

Almost as an aside, the Calimlims also argue that the "abuse of law" here is not an "abuse" at all: Martinez was throughout the relevant time in the United States illegally and was thus subject to deportation. (The Calimlims once again conveniently overlook the fact that they themselves were also breaking the law by employing Martinez. See 8 U.S.C. § 1324a(1).) But HN16[⬆] the immigration laws do not aim to help employers retain secret employees by threats of deportation, and so their "warnings" about the consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process. See Restatement (Second) of Torts § 682. The warnings therefore fit within the scope of § 1589(3). In summary, as applied to the Calimlims' case § 1589 is neither vague nor overbroad.

**B. Jury Instructions [**17]**

The Calimlims also challenge the instructions given to the jury on the forced labor count. They argue that the district court's instructions permitted them to be convicted for innocent warnings. This challenge depends, however, on the overbreadth argument that we have rejected. The Calimlims do not argue that the district court misstated the law--indeed, they concede that the court "fairly and accurately" summarized the statute. At best, they seem to be challenging the district court's use of its discretion in giving the instruction at all. The only reason they give why this might be an abuse, however, is that the statute permits conviction for [*714] innocent warnings--in short, it is overbroad.

In fact, the district court advised the jury that "[w]arnings of legitimate but adverse consequences or credible

threats of deportation, standing alone, are not sufficient to violate the forced labor statute." The Calimlims complain that the court failed to define "legitimate but adverse consequences," but, in the context of the whole discussion, the meaning of that phrase is plain. This instruction effectively alerted the jury to the *scienter* that the Government had to prove beyond a **[**18]** reasonable doubt.

To the extent the Calimlims raise a challenge to the sufficiency of the evidence supporting the court's instruction to the jury, they argue that no reasonable jury would have convicted the Calimlims on the charges because there was no evidence of threats of violence or physical coercion. No objection was raised on this point at trial, so we review for plain error only.

We have already reviewed why this argument has no merit. *HN17*[↑] *Section 1589* is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion. *See Bradley, 390 F.3d at 156* (stating that Congress believed *Kozminski* "mistakenly narrowed the definition of involuntary servitude by limiting it to physical coercion"). There was no error, plain or otherwise, in a jury instruction based on this understanding of the law. The jury instructions properly recited the law, alerted the jury to the potential complications involving *scienter,* and were based on sufficient evidence. *HN18*[↑] We will not quibble with a district court's wording as long as it fairly summarized the law for the jury. *See* **[**19]** *United States v. Bailey, 227 F.3d 792, 799 (7th Cir. 2000)*.

C. Insufficient Evidence for Harboring Conviction

We next turn to the Calimlims' challenge to the evidence supporting their conviction for harboring an alien for private financial gain under *HN19*[↑] *8 U.S.C. § 1324(a)(1)*. The statute provides for stricter punishments if the harboring occurs "for the purpose of commercial advantage or private financial gain." *8 U.S.C. § 1324(a)(1)(B)(i)*. *HN20*[↑] A challenge to the sufficiency of the evidence for conviction is reviewed "in the light most favorable to the government," *United States v. Albarran, 233 F.3d 972, 975 (7th Cir. 2000)*; we uphold a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*.

The Calimlims argue that Congress intended to punish smugglers and coyotes when it doubled the maximum

penalty for harboring aliens for private financial gain. They portray themselves as innocent employers who simply bargained for mutual advantage. They struck a fair deal with Martinez for the value of her labor, they claim; they even go so far as to say that she enjoyed a fine lifestyle while **[**20]** she lived with them. Perhaps, they concede, they did take some advantage of the fact that she was present in the country illegally, but they blame the immigration system, not themselves, for that inequity. This was a fair deal, they conclude, from which they reaped no net financial gain.

This argument makes no sense. The Calimlims must have enjoyed some profit, at least on the margin, or else they would not have gone to the trouble of having a live-in housekeeper whom they kept hidden, often through extraordinary measures, from all outsiders. They argue that the value of her labor was offset by 1) the price of her wages, room, and board, and **[*715]** 2) the risk of harboring her, and that the values all balance out. Even accepting this implausible argument and granting that the Calimlims might not have any reason to spend one *more* dollar on Martinez, they would still have a motive to spend *some* dollars on her: her labor came at a significantly lower price than a comparable American housekeeper. This is enough of a pecuniary motive by itself to prove financial gain, as we observed in *United States v. Fujii, 301 F.3d 535, 539-40 (7th Cir. 2002)*.

In effect, by adding the risk of harboring Martinez **[**21]** into the equation the Calimlims are trying to pay in an illegal currency. The whole point of criminalizing the act of harboring for financial gain and punishing it more strictly is to remove the financial incentive for doing so. If the risk of harboring Martinez is removed from the equation, the transaction becomes very imbalanced: the value of Martinez's labor, priced at a fair market value, greatly outweighs the wages, room, and board the Calimlims furnished for her. The law cannot take cognizance of a portion of a transaction that it forbids.

Finally, the Calimlims' argument ignores the circumstances surrounding the so-called bargain. They assert that the bargain was fair and any advantage they enjoyed was attributable to Martinez's illegal status and the legal hobbles it placed on her. What they ignore is that they procured her illegal presence by manipulating her travel with Jovito Mendoza, confiscating her passport, and never attempting to rectify her status. The Government even showed that the Calimlims possessed the very forms that would have permitted her to apply for legal status, but they never filed the forms or even

told Martinez about them. The circumstances surrounding **[\*\*22]** the imbalance in bargaining power were not inevitable; they were constructs of the Calimlims' own making that brought about a slanted and inequitable bargain.

This court cannot stand back and dignify this as a fair deal that resulted in no financial gain for the Calimlims. An above-board arrangement with a housekeeper whose immigration status was not in question would have cost the Calimlims a great deal more money. (Indeed, they could not have required one such person to work all of the hours that Martinez did, and so a fair comparison to the market would probably require looking at two or more substitutes.) By procuring Martinez's vulnerable status, driving a hard bargain, and paying with an illegal currency, they received a manifest benefit at a drastically reduced price. There was overwhelming evidence of financial gain, and an attempt to characterize it as something different seems cynical at best and outrageous at worst--and illegal in either case.

**II**

Although that disposes of the Calimlims' appeal, there is more to this case. At the sentencing phase, the Government argued that the Calimlims' offense level for purposes of the Sentencing Guidelines should be increased under three **[\*\*23]** separate sections: commitment of another felony during the course of committing the crime of forced labor, *U.S.S.G. § 2H4.1(b)(4)*; vulnerable victim, *U.S.S.G. § 3A1.1(b)(1)*; and use of a minor to commit a crime, *U.S.S.G. § 3B1.4*. The district court rejected all three, and the Government has cross-appealed on the ground that this was error and that the overall sentences of 48 months each were unreasonable.

A. "Any Other Felony" Enhancement

The Guideline that applies to forced labor convictions is **HN21**[⬆] *U.S.S.G. § 2H4.1*, which covers "peonage, involuntary servitude, and slave trade." It establishes a base **[\*716]** offense level of 22, and identifies several "special offense characteristics," including one for another felony:

> (b)(4) If any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of:
>
> (A) 2 plus the offense level as determined above, . . . .

*See also U.S.S.G. § 2H4.1(b)(4), appl. n. 2*. The Calimlims and the district court both took the position that all of their convictions were covered by *§ 2H4.1* and thus that there was no "other" felony offense that would support the enhancement.

This argument **[\*\*24]** overlooks entirely the actual offenses for which the Calimlims were convicted: violations of *§ 1589* (forced labor) *and* **HN22**[⬆] *§ 1324(a)(1)* (harboring an alien for private financial gain). The latter offense has its own Sentencing Guideline, *U.S.S.G. § 2L1.1*. It is therefore "an [] other felony offense . . . other than an offense that is itself covered by [*§ 2H4.1*]." *U.S.S.G. § 2H4.1(b)(4), appl. n. 2*. The harboring conviction falls within the terms of *§ 2H4.1(b)(4)* and should have triggered its application. **HN23**[⬆] "The bar on double counting comes into play only if the offense itself *necessarily* includes the same conduct as the enhancement." *United States v. Senn, 129 F.3d 886, 897 (7th Cir. 1997)* (emphasis in original).

**HN24**[⬆] There is nothing artificial about treating forced labor and harboring as two separate offenses. They are based on different conduct, and neither necessarily encompasses the other. *See, e.g., Bradley, 390 F.3d at 148-50* (listing charges of forced labor but not harboring of Jamaican nationals). To state the obvious, **HN25**[⬆] even today, long after the passage of the *Thirteenth Amendment*, it is possible to violate the law by forcing an American into servitude just as one can force an alien into **[\*\*25]** servitude. In no sense does forced labor necessarily imply that the victim is an alien. Similarly, it is possible to harbor an alien for private financial gain without forcing that person to work; the gain might come from the use of valuable property that the alien has, or even from a ransom. The enhancement called for by *§ 2H4.1(b)(4)* should have been applied here.

B. "Vulnerable Victim" Enhancement

**HN26**[⬆] *U.S.S.G. § 3A1.1(b)(1)* requires a two-level increase if the defendant "knew or should have known that a victim of the offense was a vulnerable victim." The commentary accompanying this section defines a "vulnerable victim" as one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *U.S.S.G. § 3A1.1, appl. n. 2*. The question here is whether the vulnerability of the victim is to be measured against the general population or against the group comprised of the likely victims of this crime. If the former, Martinez is vulnerable, but if the latter (as the

538 F.3d 706, *716; 2008 U.S. App. LEXIS 20058, **25

district court thought), then she is no worse off than any other victim of these crimes. In the latter case, the vulnerability of the victim would already [**26] have been built into the offense Guideline, and it would be double-counting to apply the enhancement.

HN27[↑] Section 2H4.1, which as we have just noted is the Guideline for the forced labor offense, does not say anything about the vulnerability of the victim. The only adjustments it requires are for death or serious bodily injury, use of a dangerous weapon, a period greater than a year, and commission of another felony. The Ninth Circuit has held that the vulnerable victim adjustment is not part-and-parcel of the offense Guideline. United States v. Veeracol, 312 F.3d 1128, 1132-33 (9th Cir. 2002). [*717] We agree with our colleagues and find the Calimlims' argument to the contrary unpersuasive. The Calimlims assert, in essence, that any victim of forced labor is by definition vulnerable, and so a vulnerable-victim enhancement would be redundant. This is not the case: with enough muscle, it would be possible to coerce a perfectly able-bodied, English-speaking, independent American citizen into forced labor. The district court erred by failing to recognize that there are more ways to commit the forced labor crime than the one the Calimlims chose.

The Calimlims also appeal to the Ninth Circuit's decision [**27] in United States v. Castaneda, 239 F.3d 978 (9th Cir. 2001), which held that only certain victims of a Mann Act violation would qualify as unusually vulnerable before the enhancement provided by U.S.S.G. § 3A1.1(b)(1) would be justified. The Calimlims argue that the same logic should apply to the forced labor statute: because all victims of that crime are vulnerable to a certain degree (or else no one could force them into servitude) only the subset who are worse off than most would warrant the vulnerable-victim enhancement.

In our view, this misinterprets Castaneda. Castaneda differentiated between victims of the particular scheme (for example, an offer of a bogus cure for cancer) and victims of the general offense (for example, health-care fraud); it permitted application of the enhancement when the victim was vulnerable in a way typical of the special scheme. See id. at 981 n.4. For example, somebody who uses mail fraud to victimize the aged should be punished more than a person who victimizes younger (and presumably more capable) people: the law recognizes that preying on the elderly is more culpable than many other instances of mail fraud. Even though Martinez may not have been [**28] especially vulnerable among the population of illegal aliens, she

was among the most vulnerable of the broader group who are forced into labor. The Calimlims victimized her by targeting her special vulnerability.

In Veeracol, on facts very similar to those before us, the Ninth Circuit upheld the use of the vulnerable-victim enhancement. See 312 F.3d at 1133. The approach to the enhancement taken by other circuits is consistent with that in the Ninth. See generally, e.g., United States v. Zats, 298 F.3d 182 (3d Cir. 2002) (fraudulent debt collection scheme); United States v. McCall, 174 F.3d 47 (2d Cir. 1998) (embezzlement). We have described HN28[↑] the key concern behind the vulnerable-victim enhancement as the desire to deter criminals from targeting certain groups by increasing the penalties for doing so. See, e.g., United States v. Newsom, 402 F.3d 780, 785 (7th Cir. 2005); United States v. Grimes, 173 F.3d 634, 637 (7th Cir. 1999); United States v. Lallemand, 989 F.2d 936, 940 (7th Cir. 1993). Lest there be any doubt about our position on the question raised by the Calimlims, we clarify today that HN29[↑] where vulnerability is not already accounted for in the Guidelines, we will apply the vulnerable-victim [**29] enhancement when the victim is a member of a group typically vulnerable to the particular manifestation of the general offense committed by the defendant, whether or not the victim is otherwise unusually vulnerable. In this case, Martinez was a member of a group typically targeted by those desiring forced labor, but her group (illegal aliens) is only part of the broader set of possible victims. She was therefore a vulnerable victim for the purposes of U.S.S.G. § 3A1.1(b)(1). The district court erred when it denied this enhancement.

C. "Use of Minor Children" Enhancement

Finally, HN30[↑] U.S.S.G. § 3B1.4 requires a two-level enhancement for using a minor [*718] to commit a crime. "Use" includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." U.S.S.G. § 3B1.4, appl. n. 1. The district court thought that the Calimlims' minor children were not active and knowing cooperators in the scheme, but were rather innocent dupes of their parents.

A legal error lies behind this finding. HN31[↑] Whether the minor understands what is going on is irrelevant: "The enhancement in section 3B1.4 focuses on whether the defendant used a minor in the commission of a crime, [**30] not whether the minor knew that he was being used to commit a crime." United States v. Ramsey, 237 F.3d 853, 861 (7th Cir. 2001). The district

court erred when it relied on the children's (lack of) knowledge as the reason not to apply this enhancement.

The Calimlims' discussion of *United States v. Acosta, 474 F.3d 999 (7th Cir. 2007)*, is wide of the mark. In *Acosta*, this court vacated the application of the enhancement because the defendant did not personally use a minor in committing the crime, even though he was aware of the minor's participation. *Id. at 1003*. The emphasis there was on the fact that the defendant did not *personally* solicit, encourage, or otherwise facilitate the crime; someone else in the conspiracy did. The *Acosta* court affirmed the defendant's conspiracy conviction, but it refused to enhance the sentence based on use of the minor. *Id.* The Calimlims frame this as a holding that the defendant must affirmatively use the child in order to warrant the enhancement. They then leap to an equation of the term "affirmatively use" with a requirement that the *child* know what is going on. The one does not follow from the other. The district court erred in not applying the enhancement, **[**31]** based on the ample evidence in the record that the Calimlims used their children to help conceal Martinez and to keep her in bondage all those years.

D. Reasonableness of Sentences

At this point, we do not need to explore the reasonableness of the Calimlims' sentences because a remand for a proper Guidelines calculation is necessary in any event. *See United States v. Robinson, 435 F.3d 699, 701 (7th Cir. 2006)* (**HN32**[⬆]) "When a judge does not properly calculate a guidelines sentence, our review for reasonableness is forestalled."). **HN33**[⬆] Once the proper range has been determined, rather than thinking in terms of "departures" and "enhancements," the court should simply "decide whether to impose a sentence within the range or outside it, by reference to the factors set forth in *18 U.S.C. § 3553(a)*." *Id.*

**III**

We AFFIRM the Calimlims' convictions, but VACATE their sentences and REMAND for resentencing in accordance with this opinion.

# EXHIBIT M

⚠ Caution
As of: January 18, 2023 2:12 PM Z

# *United States v. Dann*

United States Court of Appeals for the Ninth Circuit

May 9, 2011, Argued and Submitted, San Francisco, California; July 22, 2011, Filed

No. 10-10191

**Reporter**

652 F.3d 1160 *; 2011 U.S. App. LEXIS 15012 **

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. MABELLE DE LA ROSA DANN, Defendant-Appellant.

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of California. D.C. No. 08-390-CW. Claudia Wilken, District Judge, Presiding.

*United States v. Dann, 2010 U.S. Dist. LEXIS 83294 (N.D. Cal., July 22, 2010)*

**Disposition:** AFFIRMED IN PART, REVERSED IN PART.

## Core Terms

forced labor, district court, enhancement, child support, accrued, visa, immigration, serious harm, Guidelines, sentencing, passport, argues, restitution order, harboring, servitude, felony, alien, financial gain, facilitated, documents, talk, custodial parent, belong, Trafficking, challenges, convicted, juror, slave, child support payment, minimum wage

## Case Summary

### Procedural Posture

Defendant was convicted of conspiracy to commit visa fraud and visa fraud (*18 U.S.C.S. §§ 371* and *1546(a)*), forced labor and attempted forced labor (*18 U.S.C.S. §§ 1589* and *1594*), document servitude (*18 U.S.C.S. § 1592*), and harboring an illegal alien for private financial gain (*8 U.S.C.S. §§ 1324(a)(1)(A)(iii)* and *(B)(i)*) in the United States District Court for the Northern District of California Defendant appealed.

### Overview

Defendant arranged to bring an immigrant nanny into the country to take care of her children. However, she treated the nanny like a slave, taking her visa from her and taking steps to ensure that the nanny would not leave. Defendant appealed her conviction and sentence as well as a restitution order requiring that accrued child support payments made while she was in prison be paid to the nanny. The appellate court affirmed the convictions on all counts as supported by sufficient evidence. With respect to sentencing, the court declined to reach the merits of the first sentencing enhancement for visa fraud because it did not affect the guidelines offense level, affirmed the second enhancement for holding the nanny in forced labor for over one year, and affirmed the third enhancement for committing a felony in connection with forced labor. However, the court reversed the restitution order because any money that defendant received for child support did not belong to her but rather to her minor children and it could not be assigned to the nanny.

### Outcome

The conviction and sentence were affirmed except for the restitution order, which was reversed.

## LexisNexis® Headnotes

Immigration Law > Admission of Immigrants & Nonimmigrants > Visa Eligibility & Issuance > Issuance of Visas

**HN1[⬇]** Visa Eligibility & Issuance, Issuance of Visas

For a T-Visa to be issued pursuant to *8 U.S.C.S. § 1101(a)(15)(T)(i)(I)*, agents or prosecutors have to submit a letter to Immigration Services certifying that the visa applicant has been the victim of a severe form of

652 F.3d 1160, *1160; 2011 U.S. App. LEXIS 15012, **1

trafficking in persons, and the visa applicant must also cooperate in the prosecution of the trafficker.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

Criminal Law & Procedure > Trials > Motions for Acquittal

*HN2*[⤓]  **Standards of Review, De Novo Review**

An appellate court reviews the district court's denial of a motion for acquittal de novo. The appellate court asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Criminal Law & Procedure > Trials > Motions for Acquittal

*HN3*[⤓]  **Trials, Motions for Acquittal**

The analysis of a motion for judgment of acquittal requires two steps: First, the court reviews the evidence presented at trial in the light most favorable to the prosecution; then, the court determines whether the evidence, so construed, would allow any rational trier of fact to find the defendant guilty of the crime beyond a reasonable doubt. This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. Rather, when faced with a record of historical facts that supports conflicting inferences a reviewing court must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Nevertheless, a defendant will prevail if, once all of the evidence has been construed in favor of the government, the evidence is still so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General

Overview

*HN4*[⤓]  **Coercion & Harassment, Elements**

See *18 U.S.C.S. § 1589(a)*.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

*HN5*[⤓]  **Coercion & Harassment, Elements**

Legislative history suggests that Congress passed the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, to correct what they viewed as the U.S. Supreme Court's mistaken holding in United States v. Kozminski. In *18 U.S.C.S. § 1589*, Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. Victims of Trafficking and Violence Protection Act of 2000 § 102(b)(13). Congress concluded that the means used by modern day traffickers are increasingly subtle. And therefore *§ 1589* defines harm broadly as any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm. *§ 1589(c)(2)*. In other words, someone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm — physical or nonphysical, including psychological, financial, reputation harm — that would compel someone in her circumstances to continue working to avoid that harm.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

*HN6*[⤓]  **Coercion & Harassment, Elements**

To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor. First, the threat of harm must be serious. Congress intended to address serious

trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence. According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be sufficiently serious to compel that person to remain. *18 U.S.C.S. § 1589(c)(2)*.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

*HN7*[ ] Coercion & Harassment, Elements

The scope of *18 U.S.C.S. § 1589* is narrowed by the requirement of scienter. The jury must find that the employer intended to cause the victim to believe that she would suffer serious harm — from the vantage point of the victim — if she did not continue to work. While the serious harm need not be effectuated at the defendant's hand, the statute requires that the plan be intended to cause the victim to believe that that harm will befall her. The linchpin of the serious harm analysis under *§ 1589* is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her.

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

*HN8*[ ] Appeals, Standards of Review

The United States Court of Appeals for the Ninth Circuit has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Sufficiency of Evidence

*HN9*[ ] De Novo Review, Sufficiency of Evidence

At the appellate stage in the litigation, the appellate court is to ask whether the evidence produced at trial

was sufficient for any reasonable juror to convict according to the instructions that he was given.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

*HN10*[ ] Coercion & Harassment, Elements

On a charge of a *18 U.S.C.S. § 1589* violation, while the court considers each harm separately below, the appellate court is to ask whether, from the vantage point of an immigrant in the victim's position, these harms — taken together — were sufficiently serious so as to compel her to remain in the defendant's employ.

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

*HN11*[ ] Appeals, Standards of Review

On appeal of a guilty verdict, the appellate court is to draw every inference in favor of the verdict.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

*HN12*[ ] Coercion & Harassment, Elements

On a charge of a *18 U.S.C.S. § 1589* violation, a victim has fewer means of escape where the threats in her case involve immigration. An immigrant victim does not have an exit option where the defendant's threats in her case involved her immigration status, she could not freely work for another employer in order to escape the threatened harm.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

*HN13*[ ] Coercion & Harassment, Elements

Congress, which enacted *18 U.S.C.S. § 1589* to address traffickers who use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave, as when a nanny is led to believe that the children in her care will be harmed if she leaves the home.

652 F.3d 1160, *1160; 2011 U.S. App. LEXIS 15012, **1

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > General Overview

### HN14[↓] Coercion & Harassment, Elements

Document servitude occurs where a defendant knowingly conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document of another person in the course of trafficking, peonage, slavery, involuntary servitude or forced labor. *18 U.S.C.S. § 1592(a)(1)*.

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > General Overview

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

### HN15[↓] Criminal Offenses, Crimes Against Persons

*18 U.S.C.S. § 1592(a)* requires merely that the defendant possess the document, not that the defendant lock it up.

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

### HN16[↓] Appeals, Standards of Review

An appellate court cannot affirm a criminal conviction on the basis of a theory not presented to the jury.

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Findings of Fact

Criminal Law & Procedure > Sentencing > Restitution

Criminal Law & Procedure > ... > Standards of

Review > Abuse of Discretion > General Overview

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

### HN17[↓] Clearly Erroneous Review, Findings of Fact

An appellate court reviews the district court's interpretation of the U.S. Sentencing Guidelines Manual de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error. A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error. The legality of an order of restitution is reviewed de novo.

Criminal Law & Procedure > ... > Fraud > Fraud Against the Government > General Overview

Immigration Law > Admission of Immigrants & Nonimmigrants > Visa Eligibility & Issuance > General Overview

### HN18[↓] Fraud, Fraud Against the Government

Visa fraud falls under *U.S. Sentencing Guidelines Manual § 2L2.1*, which governs Trafficking in a Document Relating to Naturalization, Citizenship, or Legal Resident Status, or a United States Passport; False Statement in Respect to the Citizenship or Immigration Status of Another. The base offense level under this Guideline is eleven and includes an enhancement of four levels if the defendant knew, believed, or had reason to believe that a passport or visa was to be used to facilitate the commission of a felony offense, other than an offense involving violation of the immigration laws. *U.S. Sentencing Guidelines Manual § 2L2.1(b)(3)*.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

### HN19[↓] Coercion & Harassment, Elements

652 F.3d 1160, *1160; 2011 U.S. App. LEXIS 15012, **1

Sentencing for forced labor is governed by *U.S. Sentencing Guidelines Manual § 2H4.1*, for Peonage, Involuntary Servitude, Slave Trade, and Child Soldiers. The base level is 22. The offense may be subject to a three-level enhancement if any victim was held in a condition of peonage or involuntary servitude for more than one year, *U.S. Sentencing Guidelines Manual § 2H4.1(b)(3)*, and an additional two-level enhancement if any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, *§ 2H4.1(b)(4)*.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Penalties

**HN20**[ 🔽 ]   **Sentencing Guidelines, Adjustments & Enhancements**

*U.S. Sentencing Guidelines Manual § 2H4.1 cmt. n.1*. defines "peonage or involuntary servitude" as including forced labor.

Criminal Law & Procedure > ... > Appeals > Standards of Review > Clear Error Review

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN21**[ 🔽 ]   **Standards of Review, Clear Error Review**

An appellate court reviews a district court's factual findings in support of a sentencing enhancement for clear error. Reversal for clear error requires a definite and firm conviction that the district court made a mistake.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN22**[ 🔽 ]   **Coercion & Harassment, Elements**

See *U.S. Sentencing Guidelines Manual § 2H4.1(b)(4)*.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN23**[ 🔽 ]   **Coercion & Harassment, Elements**

The first step in an analysis under *U.S. Sentencing Guidelines Manual § 2H4.1(b)(4)* is to determine what it means to commit a crime in connection with forced labor under *§ 2H4.1(b)(4)*. There is an analogous provision in the offense guideline for unlawful possession of a firearm, *U.S. Sentencing Guidelines Manual § 2K2.1(b)(6)*. If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels. The commentary of *§ 2K2.1(b)(6)* states that possession of a firearm in connection with another felony applies if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively. *U.S. Sentencing Guidelines Manual § 2K2.1* cmt. 14. Clearly, the drafters must be held to define terms consistently throughout the Guidelines. Thus "in connection with" must mean facilitation. In the forced labor context, a felony is committed in connection with forced labor where that crime facilitates or has the potential of facilitating forced labor — or conversely where forced labor facilitates or has the potential of facilitating another felony offense.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN24**[ 🔽 ]   **Sentencing Guidelines, Adjustments & Enhancements**

The United States Court of Appeals for the Ninth Circuit has interpreted the second half of *U.S. Sentencing Guidelines Manual § 2K2.1(b)(6)*— the enhancement that applies where a defendant possessed or

transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense. *U.S. Sentencing Guidelines Manual § 2K2.1(b)(6)*. To prove the application of this enhancement, the government must provide sufficient evidence that when the defendant came into possession of the firearm, he had a firm intent to use it to commit a felony. The intent requirement was drawn directly from the language of the enhancement (requiring knowledge, intent, or reason to believe). There is no comparable intent language in the forced labor Guideline under *U.S. Sentencing Guidelines Manual § 2K2.1*, and the court cannot read intent into the provision.

Criminal Law & Procedure > ... > Appeals > Standards of Review > De Novo Review

Criminal Law & Procedure > Sentencing > Restitution

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

**HN25**[🔖]  **Standards of Review, De Novo Review**

An appellate court reviews legal issues regarding a restitution order de novo.

Criminal Law & Procedure > Sentencing > Restitution

**HN26**[🔖]  **Sentencing, Restitution**

The Mandatory Victims Restitution Act requires that a district court consider three factors before ordering restitution: (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents. *18 U.S.C.S. § 3664(f)(2)(A)-(C)*. Any restitution order under this section may be enforced only as against property that is the defendant's own according to the relevant state law.

Family Law > ... > Support Obligations > Enforcement > Arrearage Judgments

**HN27**[🔖]  **Enforcement, Arrearage Judgments**

As a general rule, a parent's obligation to pay child support runs to the child, rather than to the other parent, and the parent, to whom such support is paid, is but a mere conduit for the disbursement of that support. Indeed, the equities between the parents do not alter the child support obligation. The United States Court of Appeals for the Ninth Circuit acknowledges California authority recognizing that when a custodial parent has expended her own resources, she may recover the accrued child support for her own benefit, and that the right of reimbursement may be assigned in certain circumstances. *Cal. Welf. & Inst. Code § 11477(a)* requires the assignment of child support arrearages to the state where the state has dispersed cash assistance to the child.

Family Law > ... > Support Obligations > Enforcement > Arrearage Judgments

**HN28**[🔖]  **Enforcement, Arrearage Judgments**

The California Supreme Court has suggested that even the assignable right of reimbursement to the custodial parent is superceded if reimbursement is sought when the children are minors. For example, a custodial parent is estopped from bringing a claim for accrued child support if she concealed the children from the non-custodial parent when the children were minors. However, this is limited to cases where the custodial parent brings suit after the children have reached majority. A custodial parent may sue for accrued child support even if she previously concealed the child, so long as the child is not yet an adult. This seems to suggest that accrued payments belong to the child until adulthood. This distinction regarding the child's age is significant, because, in contrast to most adults, children (particularly those in their early years) in fairness cannot be expected to raise themselves and pursue an education without the financial support of responsible adults The child's need for sustenance must be the paramount consideration. If child support has not been paid for a period of time, it is likely that the child's needs were met at only a minimal level. Thus, a child may have accrued needs, including educational expenses or cultural opportunities, that may be met by an accrued child support payment, and these needs trump the custodial parent's entitlement to reimbursement.

652 F.3d 1160, *1160; 2011 U.S. App. LEXIS 15012, **1

Family Law > ... > Support
Obligations > Enforcement > Arrearage Judgments

**HN29**[⬇] **Enforcement, Arrearage Judgments**

Read together, Damico and Comer suggest that so long as the children have not reached majority, a custodial parent remains the conduit for child support — even accrued child support. Therefore the United States Court of Appeals for the Ninth Circuit concludes that under California law, a creditor (or a crime victim with a restitution order) is not entitled to accrued child support payments owed to a custodial parent of children who have not yet reached the age of majority.

Family Law > ... > Support
Obligations > Enforcement > Arrearage Judgments

**HN30**[⬇] **Enforcement, Arrearage Judgments**

Under California law, the custodial parent, not the child, has the beneficial interest in collecting arrearages in child support. Spirtos, Shasta and Lackey cite Utigard for the proposition that a child is not the real party of interest in accrued child support. Utigard, however, involves adult children's interest in collecting child support arrearages.

Family Law > ... > Support
Obligations > Enforcement > Arrearage Judgments

**HN31**[⬇] **Enforcement, Arrearage Judgments**

Now adult children have no interest in accrued child support.

Family Law > ... > Support
Obligations > Modification > Best Interests of Child

Family Law > ... > Custody
Awards > Standards > Best Interests of Child

Family Law > ... > Visitation
Awards > Standards > Best Interests of Child

Family Law > Child Support > Support
Obligations > General Overview

**HN32**[⬇] **Modification, Best Interests of Child**

Throughout the case law, California courts are guided by a fundamental principle: In any proceedings involving custody and support it is axiomatic that the court should always adopt the course that is for the best interests of the child.

Family Law > ... > Support
Obligations > Enforcement > Arrearage Judgments

**HN33**[⬇] **Enforcement, Arrearage Judgments**

Under California law, the custodial parent is a conduit for accrued child support to meet the needs of her minor children.

Family Law > ... > Support
Obligations > Enforcement > Arrearage Judgments

**HN34**[⬇] **Enforcement, Arrearage Judgments**

The United States Court of Appeals for the Ninth Circuit reads California law as stating that, until a child reaches the age of majority, the child is the real party of interest in child support arrearages. To the extent that accrued child support payments are made to a parent while she is in prison, she remains a conduit for her child's support and free to disperse those funds for the care of her child. Accrued child support is simply not the property of the parent (of a child who has not yet reached majority) to be redistributed to a victim as restitution.

Family Law > ... > Support
Obligations > Modification > Best Interests of Child

**HN35**[⬇] **Modification, Best Interests of Child**

The single most important question in an action that involves child support in any form is the need and interest of the minor child. State family courts or probate courts are best equipped to balance the equities and determine the best interest of children, and federal courts should not interfere by exercising authority over child support payments in a criminal proceeding.

**Counsel:** Barry J. Portman, Federal Public Defender, and Jerome E. Matthews, Assistant Federal Public Defender, Oakland, California, for the defendant-appellant.

Thomas E. Perez, Assistant Attorney General, Civil Rights Division Melinda Haag, United States Attorney, Barbara J. Valliere, Chief, Appellate Section, and Assistant United States Attorney, Merry Jean Chan, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

**Judges:** Before: Betty B. Fletcher and Sidney R. Thomas, Circuit Judges, and Nancy Gertner, District Judge.[*] Opinion by Judge Gertner.

**Opinion by:** Nancy Gertner

# Opinion

[*1162]  GERTNER, District Judge:

Mabelle de la Rosa Dann ("Dann") was charged with conspiracy to commit visa fraud (count one), visa fraud (count two), forced labor (count three), unlawful conduct regarding documents in furtherance of servitude (count four),[1] and harboring an illegal alien for the purpose of private financial [**2] gain (count five). All charges arose out of conduct involving her live-in nanny and housekeeper, Zoraida Peña Canal ("Peña Canal").

Dann, an American citizen of Peruvian descent, arranged for Peña Canal to travel from her native Peru to the United States in 2006 and enter under a fraudulently-obtained visa to serve as a nanny and housekeeper. Dann was going through a divorce at the time, was unemployed, and was not receiving child support. Once Peña Canal arrived, Dann kept her passport, forbade her from speaking with anyone outside the home, and failed to pay her for two years, although she often promised that she would. She repeatedly threatened to send Peña Canal back to Peru; and yet when Peña Canal agreed to go home, Dann told her that she would owe her $8,000 because she had only worked off $7,000 of the $15,000 worth of "expenses" that Dann had paid on her behalf. Dann eventually asked Peña Canal to sign a false statement that she had been paid minimum wage. This statement, along with Peña Canal's passport and Peruvian identification, were later found by U.S. Immigration and Customs Enforcement ("ICE") agents underneath [**3] clothes in a drawer in Dann's room.

Dann was convicted after a jury trial on all five counts and sentenced to 60 months' imprisonment. The district court ordered that she pay restitution to Peña Canal of $123,740.34. And because the court found that Peña Canal (who was living in a shelter) needed money immediately, the court ordered Dann to turn over any accrued child support payments that she received from her ex-husband while incarcerated directly to Peña Canal. Dann's children were eligible for child support. Her eldest son is now sixteen, and her twins are ten years old.

Dann appeals her convictions for forced labor as well as for the related offenses of document servitude and harboring an alien for financial gain. She also appeals three sentencing enhancements under the United States Sentencing Guidelines ("U.S.S.G.") and the district court's restitution order.

As we explain below, we affirm the convictions on all counts as supported by sufficient evidence. With respect to sentencing, we decline to reach the merits of the first enhancement for visa fraud because it does not affect the guidelines offense level; we affirm the second enhancement for holding Dann in forced labor for [**4] over one year; and we affirm the third enhancement for committing a felony "in connection with" forced labor.

[*1163]  Finally, we reverse the district court's restitution order. This case raises a question of first impression: whether child support arrearages belong to a criminal defendant such that they may be assigned to a victim by a restitution order while the defendant's children are still minors. Upon review of California case law, we conclude that the minor child is the real party in interest to accrued child support. Until the child reaches the age of majority, the parent remains a conduit of the support and may distribute it for his benefit. Thus, any money that Dann receives for child support does not belong to her but rather to her children; it cannot be assigned to Peña Canal.

## BACKGROUND

### I. Factual Background

The parties at trial and on appeal present two competing narratives. Dann contends that this case is a not unusual story of the relationship between two women, with all its ups and downs. As a divorced, single mother with three small children, Dann was desperate. She gave Peña Canal the opportunity to come to the United

---

[*] The Honorable Nancy Gertner, United States District Judge for the District of Massachusetts, sitting by designation.

[1] The parties refer to this charge as "document servitude."

States, and she treated her as a family member. Dann took [**5] care of, housed, and fed Peña Canal, and wanted to pay her as soon as she had the chance. Dann hoped to give Peña Canal a room of her own but was unable to do so. The two women had their fights, as all family members do. After Peña Canal left Dann, she discovered that she could obtain a T-Visa and stay in the United States, as long as she testified against Dann.[2] Peña Canal's testimony is tainted by her incentive to lie.

The government in turn portrays a woman who went to great lengths to violate immigration laws so that Peña Canal could work for her. She needed cheap — or free — labor, and this was her means of procuring it. Her behavior towards Peña Canal became worse and worse over time, culminating in Peña Canal's working without pay in slave-like conditions, fearful of what would happen if she were to leave.

Since Dann was convicted, however, the two narratives [**6] are not on equal footing. The Court is to construe all facts in favor of the verdict. The facts below are therefore presented in the light most favorable to the prosecution. *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*.

### 1. Dann Brings Peña Canal to the United States

Dann is a naturalized American citizen of Peruvian descent who graduated from U.C. Berkeley's Business School. She first met Peña Canal during a brief visit to Peru in March of 2002, when Peña Canal was working as a nanny for Dann's sister. Dann suggested that Peña Canal come to the United States to nanny for her family instead.

Dann returned to Peru a few months later and hired Peña Canal to take care of her twin baby boys during the trip. Again she spoke of taking Peña Canal to the United States. She promised Peña Canal the opportunity to study English and a salary that would increase from $300 to $600 per month. At trial, Peña Canal testified that even at that time, Dann spoke about deductions, calculations, and costs, such as the cost of a visa and the cost of housing in the United States.

Dann and Peña Canal went about the process of applying for a visa. Dann filled out the papers for Peña Canal and told her [**7] to pretend [**7] that she was a tourist going to the United States for vacation. Dann told her that it would be more believable if Peña Canal said that she had a daughter in Peru or a mother who was sick, and so on her first application, Peña Canal stated that she had a four-year-old daughter and presented a false birth certificate as proof. That application was denied.

Dann filled out a second application, this time stating that she and Peña Canal, along with the twins, would go to the United States for Thanksgiving and then return. This time Peña Canal was granted an interview at the U.S. Consulate, but this application was also denied. Dann returned to the United States in November of 2002 but vowed to send for Peña Canal, even if it meant smuggling her with "coyotes" through Mexico.

During the following two years, Dann tried to help Peña Canal come to the United States on three occasions. Dann was going through a divorce, and in 2004 she wrote to Peña Canal:

Dear Zoraida,

> I hope you are well. Here, I'm trying to do everything possible to get ahead all alone and with the responsibility of three children. As you probably know, my divorce will be finalized very soon. Now, the judge has ordered that I [**8] must go out and work. And I need more help than ever . . . I'm going to try and see how to bring you over here. As you probably know, a man that my brother is acquainted with is going to get in touch with you very soon and will try to bring you. Don't tell anyone from your family . . . .

Finally, in December 2004, Dann arranged for Peña Canal to contact Dann's friend, Silvana de la Rosa ("Silvana"). Dann and Silvana entered into a contract to bring Peña Canal to the United States. Silvana would pretend that she was so frail from cancer that she needed an assistant, Peña Canal, to travel with her. Dann hired a consultant to teach Peña Canal how to lie to immigration officials, with whom Peña Canal met regularly over a period of several months before her interview at the consulate. Peña Canal was granted a tourist visa and entered the United States on July 27, 2006.

---

[2] *HN1* [↑] For a T-Visa to be issued pursuant to *8 U.S.C. § 1101(a)(15)(T)(i)(I)*, agents or prosecutors have to submit a letter to Immigration Services certifying that the visa applicant has been the victim of a "severe form of trafficking in persons," and the visa applicant must also cooperate in the prosecution of the trafficker.

652 F.3d 1160, *1164; 2011 U.S. App. LEXIS 15012, **8

At this point, Dann was unemployed and receiving no child support. She and her three children were living with her mother.

## 2. Work Conditions with Dann

When Peña Canal arrived in the United States, she moved in with Dann and Dann's three boys at Dann's mother's house. The house was cramped, and Peña Canal slept on the floor. **[*9]** Dann promised that they would be there for only a few days, and then they would move to a bigger apartment where they would have more privacy. Around this time, Dann took Peña Canal's passport for safe-keeping, since Peña Canal did not have any private or secure space of her own. When Silvana left the country, Dann tore up Peña Canal's return ticket to Peru along with the contract to bring Peña Canal to the United States.

Eventually, in late September of 2006, Dann, her three children, and Peña Canal moved out of Dann's mother's house and into a two-bedroom apartment. Here again, Peña Canal did not have a room of her own. She slept on the floor in the corner of the living room. Dann began working as a real estate agent but funds were tight. She promised Peña Canal that she would pay her as soon as she got on her feet. Dann, however, never paid Peña Canal.

Peña Canal's workday began at 6:00 a.m. when she made breakfast for Dann and the boys. Once the boys were off to school, she had until noon to clean the **[*1165]** apartment, do laundry and ironing, and prepare lunch. At about 12:30 p.m., she walked thirty minutes to the twins' school to pick them up. She would feed them lunch and then supervise **[**10]** their homework until the elder son came home. She would take the children out to play, feed them dinner at 6:00 p.m., and then get them ready for bed at 8:00 p.m. After the children were asleep, she would tidy the house before retiring at about 10:00 p.m.

The conditions — and the relationship — worsened over time. In January of 2007, Dann forbade Peña Canal from leaving the apartment without permission. When Dann's friends came over, she made Peña Canal hide in the gym of the apartment complex. She told Peña Canal not to talk to anyone because she did not want Peña Canal to tell "anybody about the things here at home." At trial, the property manager of Dann's apartment complex testified that Dann told him to order Spanish-speaking personnel not to speak with Peña Canal.

Sometime in the winter of 2007, Dann began restricting Peña Canal's food intake. Dann forbade Peña Canal from eating fruit or drinking tea without permission. Eventually, Dann began weighing the meat and counting eggs and bread to make sure Peña Canal was not eating more than her ration.

By February 2007 — seven months after Peña Canal's arrival in the United States — Dann still had not paid Peña Canal. At that time, Dann **[**11]** told Peña Canal:

> You shouldn't — you shouldn't think that I'm treating you like a slave, you shouldn't think that I'm treating you like a slave. I'm going to pay you. I don't want for you to leave me because I don't know what would happen to my children. Where would I keep them? The government would take them from me.

Dann continued to promise to pay Peña Canal. In March of 2007, she opened a bank account for Peña Canal (falsely informing the bank that Peña Canal worked for Whole Foods). Dann kept the bank documents; the personal checks issued to the account were later found in her possession.

In January 2008, the two women had a heated argument because Dann thought that Peña Canal had spoken to her son's trombone teacher without permission. Dann said, "I told you not to talk to anybody. Why did you go and talk to the teacher? Did you want to practice your English?" She threatened to send Peña Canal back to Peru. She said, "I'm giving you a chance to be here in this country. I'm going to buy your ticket right now. But first, I'm going to figure out our accounts." Dann concluded that Peña Canal owed a total of $15,000, of which she had worked off only $7,000.

Dann falsely accused Peña Canal **[**12]** of stealing from her on at least four occasions. The last of these, on March 1, 2008, resulted in another argument. This time, Peña Canal stood up to Dann and said,

> You know what? If I'm here in the United States, [it] is so that I can make as much as a dollar even honestly. Even if it's cleaning bathrooms, but honest money. I've never taken anybody's money in Peru and even less here. . . . If you think that I'm stealing from you, call the police. Call the police.

Peña Canal went into the bathroom to wash her face, and Dann followed her in and turned off the light. Dann then grabbed Peña Canal by the neck, called her names, and said she was going to send her back to Peru. When Peña Canal answered that she actually wanted to go home, Dann reminded her of all the clothes that Dann had purchased for her.

Dann continued to insult Peña Canal often, calling her "little girl" and "shit." On March 27, 2008, Dann told Dann **[*1166]** to replace a radio she had broken, and Dann said, "You're talking to me about rights. What rights do you have in the United States? . . . You're a peasant. I'm giving you an opportunity here in this country." Peña Canal replied, "You're treating me like a slave. You're **[**13]** not paying me. You're not paying me. And besides that, you broke my radio." Dann countered, "This is my house. In my house, I can do whatever I want."

A few days later, Dann told her mother — in front of Peña Canal — that Peña Canal had no rights "since here in the United States, the illegal people don't even have as much as Medi-Cal. They die here." Then Dann ordered Peña Canal to sign a letter that stated that Dann had paid her minimum wage in California. The agreement stated in full:

> I, Zoraida Peña, have received from Ms. Mabelle Dann the minimum wage in the State of California starting on July 27th, 2007, for the care of her children [names omitted] home from school at 2:30 to 6:00 p.m.. In addition, I receive lodging. I occupy the entire living room for a value of $500 in rent. And food, breakfast, lunch, food [sic] and dinner every day.
>
> In addition to this, I have received some clothes items and gifts from members of Mabelle's family. Perfumes, clothes items, shoes, jackets, pants, et cetera. I have received a yearly total of $10,200.

Peña Canal testified that she signed the letter, knowing that its contents were false.

At trial, the prosecutor asked Peña Canal why she had stayed **[**14]** with Dann; Peña Canal answered: (i) she didn't trust anybody and had nowhere to go; (ii) Dann had her passport; (iii) Dann was making false accusations against her that she was taking her money; and (iv) the children were her responsibility.

### 3. Peña Canal's Departure

Peña Canal had made friends at the twins' school when she went to pick them up. Although she did not speak English, there were a few Spanish-speakers at the school, including the school custodian, Anselma Soto ("Soto"). Peña Canal told him about her working conditions, that she had not been paid, and that she was not allowed to talk to anyone. Eventually Peña Canal began keeping some of her belongings with Soto in an envelope at the school. She also became friends with a gardener, Miguel Lopez ("Lopez"). She told him that she was afraid to leave work because Dann "was accusing her, saying that she was going to report her to immigration, that she was illegal and that she couldn't be in this country." Another mother at the school, Amy Oz ("Oz") began giving Peña Canal rides to and from school. She spoke a little Spanish, and Peña Canal told her that she would get in trouble if she was found talking with her. In March of 2008, **[**15]** Oz contacted La Raza Centro Legal, an organization that assists domestic workers, on Peña Canal's behalf.

Soto, Lopez, and Oz helped Peña Canal leave on April 16, 2008. Peña Canal dropped the children off at the school. She then went through the school kitchen and hid in a car that was driven to a safe house. Oz was responsible for calling Dann to tell her that she would need to pick up her children herself and that she should pick up a letter from Peña Canal at the school. The letter contained keys to Dann's apartment and asked Dann to return Peña Canal's passport and Peruvian identification.

When Dann got to the school and read the letter, she became hysterical. She said that Peña Canal had taken everything — she had emptied Dann's house, taken the keys, all her jewelry and all her money. Dann later told Oz that Peña **[*1167]** Canal had been a terrible nanny who had stolen her jewelry. On April 21, 2008, Dann e-mailed her sister and said, "Zoraida escaped, got away, left. But at least she was here for two years. But I realized from the day she got here that she wanted to look for another job."

Meanwhile, Peña Canal met with a lawyer from La Raza Centro Legal, the immigration advocacy group with **[**16]** whom Oz had spoken on her behalf. She had told Oz that she wanted to stay in the United States. La Raza contacted ICE and reported Peña Canal's situation. Upon ICE's recommendation, Peña Canal was granted a T-Visa pursuant to *8 U.S.C. § 1101(a)(15)(T)(i)(I)* (requiring that the victim cooperate in the prosecution of the trafficker).

Peña Canal also filed a civil suit against Dann and her mother, Vittett, seeking civil, punitive and other damages. Peña Canal was granted a default judgment and $612,812.82 in compensatory and punitive damages. *Canal v. Dann, No. 09-03366CW, 2010 U.S. Dist. LEXIS 97856, 2010 WL 3491136, at *4 (N.D. Cal. Sept. 2, 2010)*.

**4. Passport and Identification Papers**

Dann never returned Peña Canal's passport or Peruvian identification. A police officer testified that he went to the apartment on Peña Canal's behalf to ask for these papers. Dann was not present but called him back later. She denied having any documents, denied knowing what he was talking about, and denied having any property that belonged to Peña Canal.

In June of 2008, ICE agents searched Dann's apartment. They found Peña Canal's passport, her Peruvian identification card, and checks for a bank account in her name, along with the **[**17]** agreement that Dann had forced her to sign about minimum wage, all buried under clothing in a drawer in Dann's room.

*II. Procedural Background*

On June 5, 2008, Dann was charged in a one-count indictment with harboring an illegal alien for purpose of private financial gain, in violation of *8 U.S.C. § 1324(a)(1)(A)(iii)* and *(B)(i)*. On February 4, 2009, the government filed a superceding indictment, charging Dann with five counts: (i) conspiracy to commit visa fraud in violation of *18 U.S.C. §§ 371* and *1546(a)*; (ii) visa fraud in violation of *18 U.S.C. § 1546(a)*; (iii) forced labor and attempted forced labor in violation of *18 U.S.C. §§ 1589* and *1594*; (iv) document servitude in violation of *18 U.S.C. § 1592*; and (v) harboring an illegal alien for private financial gain in violation of *8 U.S.C. §§ 1324(a)(1)(A)(iii)* and *(B)(i)*.

After a jury trial, Dann was convicted on all five counts. During deliberations, the jury asked four questions. One question was about visa fraud. The other questions were about the forced labor charge.

The district court instructed the jury that forced labor has three elements: (1) that Dann obtained or attempted to obtain the labor or services of Peña Canal; (2) by **[**18]** means of a scheme, plan or pattern intended to cause Peña Canal to believe that, if she did not perform such labor or services, she or another person would suffer serious harm; and (3) that Dann acted knowingly. The jury asked, "Must the charge of forced labor apply to the entire duration of Ms. Peña Canal's service, or can it be applied only to a portion of the time?" The district court answered, "It need not apply to the entire duration of Peña Canal's service. It could be applied to only a portion of the time."

The jury also asked, "Is the duration of time relevant to

determining serious harm?" The district court answered, "Yes, the duration of time is relevant. A harm that might be serious if it happened for only a short — that might not be serious **[*1168]** if it happened for a short time might be serious if it went on for a very long time." Shortly after this instruction, the jury returned with a unanimous verdict of guilty on all five counts.

On October 15, 2009, Dann filed a motion for judgment of acquittal and/or motion for new trial. Dann had also made an oral motion for a judgment of acquittal after the government rested and at the close of all the evidence. The district court denied **[**19]** these motions in a written order on December 23, 2009. *United States v. Dann, No. 08-00390, 2009 U.S. Dist. LEXIS 122774, 2009 WL 5062345 (N.D. Cal. Dec. 23, 2009)*.

On April 14, 2010, the district court sentenced Dann to 60 months on each count, to run concurrently. The court also ordered restitution in the amount of $123,740.34, payable to Peña Canal. As part of this restitution, the district court ordered that any accrued child support payable to Dann while she is incarcerated be paid directly to Peña Canal.

Dann filed a notice of appeal on April 22, 2010. On April 28, 2010, she filed a motion under *Federal Rule of Criminal Procedure 35(a)* to correct the sentence on the grounds that the district court erred when it ordered accrued child support to be paid to the victim. The district court denied this motion on July 22, 2010. *United States v. Dann, No. 08-00390, 2010 U.S. Dist. LEXIS 83294, 2010 WL 2891585 (N.D. Cal. July 22, 2010)*.

Dann appeals her conviction and sentence. We address each in turn below.

**CONVICTION**

*I. Standard of Review*

Dann argues on appeal that there was insufficient evidence to support her conviction for forced labor, document servitude, and harboring an illegal alien for financial gain. *HN2*[↑] The Court reviews the district court's **[**20]** denial of a motion for acquittal *de novo*. *See, e.g., United States v. Carranza, 289 F.3d 634, 641 (9th Cir. 2002)*.

*HN3*[↑] The Court asks whether, "[a]fter viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Jackson, 443 U.S. at 319*. The analysis requires two steps: First, the court reviews the evidence presented at trial in the light most favorable to the prosecution; then, the court determines whether the evidence, so construed, would allow any rational trier of fact to find the defendant guilty of the crime beyond a reasonable doubt. *See, e.g., United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010)* (en banc). The *Nevils* court cautioned:

> This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. Rather, when faced with a record of historical facts that supports conflicting inferences a reviewing court must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor **[**21]** of the prosecution, and must defer to that resolution.

*Id.* (quotation marks and citations omitted).

Nevertheless, Dann will prevail if, once all of the evidence has been construed in favor of the government, the evidence is still "so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt." *Id. at 1167*.

## II. Discussion

Dann argues that the evidence was insufficient to support a conviction for three of the five crimes for which she was convicted: **[*1169]** forced labor, document servitude, and alien harboring for financial gain. We consider each in turn.

## A. Forced Labor

First, Dann argues that she should be acquitted of forced labor because there was insufficient evidence that she intended to threaten serious harm.

The federal forced labor statute, *18 U.S.C. § 1589(a)*, provides:

> *HN4*[⬆] (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
> (1) by means of force, threats of force, physical

restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means **[**22]** of the abuse or threatened abuse of law or legal process;
> or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
> shall be punished as provided under subsection(d).

The government limited this case to the fourth means of violating the forced labor statute, and the court instructed:

> If you find that Dann obtained the labor or services of Peña Canal, then you must determine whether she did so by means of a scheme, plan, or pattern intended to cause Peña Canal to believe that, if she did not perform such labor or services, she or another person would suffer serious harm.

The court then defined serious harm exactly as described in the statute, which includes "physical or nonphysical" harm, "including psychological, financial or reputational harm." *18 U.S.C. § 1589(c)(2)*. The jury convicted on this count.

Dann does not challenge the instruction. Rather she argues that her relationship with Peña Canal does not fit within the forced labor statute and that the evidence presented was insufficient to support the conviction as a matter **[**23]** of law.

## 1. Serious Harm Under *§ 1589*

The acts proved by the government in this case are well within the scope of the Victims of Trafficking and Violence Protection Act of 2000. *Pub. L. No. 106-386, 114 Stat. 1464. HN5*[⬆] Legislative history suggests that Congress passed this act to correct what they viewed as the Supreme Court's mistaken holding in *United States v. Kozminski, 487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988)*. *Kozminski* limited the definition of involuntary servitude to "physical" or "legal" coercion. *Id. at 952*. In *§ 1589*, Congress intended to "reach cases in which persons are held in a condition of servitude through nonviolent coercion." Victims of Trafficking and Violence Protection Act of 2000 §

652 F.3d 1160, *1169; 2011 U.S. App. LEXIS 15012, **23

102(b)(13).

Congress concluded that the means used by modernday traffickers are "increasingly subtle." H.R. Rep. No. 106- 939, at 101 (2000) (Conf. Rep.), 2000 WL 1479163, at *91. And therefore _§ 1589_ defines harm broadly as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing **[\*\*24]** labor or services in order to avoid incurring that harm.

_18 U.S.C. § 1589(c)(2)_. In other words, someone is guilty of forced labor if he **[\*1170]** intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm — physical or nonphysical, including psychological, financial, reputation harm — that would compel someone in her circumstances to continue working to avoid that harm. _See, e.g., United States v. Calimlim, 538 F.3d 706, 712, 714 (7th Cir. 2008)_ (finding threat to stop paying victim's poor family members constitutes serious harm).

**HN6**[⬆] To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor. First, the threat of harm must be serious. Congress intended to address serious trafficking, or cases "where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Rep. No. 106-939, at 101 (Conf. Rep.). According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently **[\*\*25]** serious" to compel that person to remain. _See 18 U.S.C. § 1589(c)(2)._

Second, **HN7**[⬆] the scope of the statute is narrowed by the requirement of _scienter. Calimlim, 538 F.3d at 711-12._ The jury must find that the employer intended to cause the victim to believe that she would suffer serious harm — from the vantage point of the victim — if she did not continue to work. While the serious harm need not be effectuated at the defendant's hand, the statute "requires that the plan be intended to cause the victim to believe that that harm will befall her." _Id._ (internal quotation marks and punctuation omitted). The linchpin

of the serious harm analysis under _§ 1589_ is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her.

**2. Evidence of Intent**

Here, Dann argues that there was insufficient evidence that she _intended_ to make Peña Canal believe that she would suffer serious harm if she were to stop working for Dann. The government counters that the evidence supports Dann's intent to have Peña Canal believe: (i) that she would not be paid back wages for close to two years of work and in fact would owe Dann $8,000 for expenses already **[\*\*26]** paid; (ii) that Dann would falsely accuse her of wrongdoing and cause reputational harm; (iii) that Peña Canal would suffer immigration consequences because she would either not be able to leave the country at all (since Dann held her passport and papers) _or_ she would be sent back to Peru and would not have the opportunity to study in the United States; and (iv) that the children for whom she cared would be taken from their mother.[3]

**[\*1171]    HN10**[⬆] While we consider each of these

_____

[3] Dann suggests on appeal that the government has waived its right to argue as to these last two harms because the government focused primarily on financial and reputational harm at trial and in response to the defendant's post-trial Rule 25(a) motion. _See McCormick v. United States, 500 U.S. 257, 270 n.8, 111 S. Ct. 1807, 114 L. Ed. 2d 307 (1991)_ (**HN8**[⬆]) "This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

In this case, however, the jury was instructed clearly on the broad **[\*\*27]** definition of "serious harm." **HN9**[⬆] At this stage in the litigation, we are to ask whether the evidence produced at trial was sufficient for any reasonable juror to convict according to the instructions that he was given. While the government focused on reputational and financial harm, there was surely evidence of other harms presented to the jury. And in fact, the jury may have concluded that the combination of these various harms was sufficiently serious as to compel a reasonable person in the victim's position to continue to work. This is not a case where the government suddenly suggests on appeal an entirely different theory that would have required different instructions. _Cf. id._

harms separately below, we are to ask whether, from the vantage point of an immigrant in Peña Canal's position, these harms — taken together — were sufficiently serious so as to compel her to remain in Dann's employ.

### a. Financial Harm

First, Dann argues that there was insufficient evidence that Dann intended Peña Canal to believe that she would suffer serious financial harm if she were to leave. Dann points out that Peña Canal never testified that Dann *told* her that she would not **[**28]** be paid back wages. That may well be true, but the inference was clear. Dann told Peña Canal that she would *owe* money if she left. After one argument, Dann said, "I'm giving you a chance to be here in this country. I'm going to buy you your ticket right now. But first, I'm going to figure out our accounts." And then she concluded that Peña Canal owed her a total of $15,000, of which only $7,000 had been worked off. On another occasion, when Peña Canal told Dann to send her home, Dann began to calculate the cost of clothes that she had purchased for Peña Canal.

Moreover, as the district court pointed out, Dann made Peña Canal sign a note stating that she had been paid minimum wage. The district court found this fact persuasive:

> The jury could make three reasonable inferences from this note when considered in conjunction with Defendant's false promises to pay Ms. Peña Canal and the debt Defendant imposed on Ms. Peña Canal: (1) Defendant had no intention of paying Ms. Peña Canal, (2) Defendant had a consciousness of guilt for not paying Ms. Peña Canal so she wanted to preserve the note to guard against any possible future charges and (3) Defendant wanted Ms. Peña Canal to be aware that Defendant **[**29]** would keep this note to deter her from trying to enforce her rights.

*Dann, 2009 U.S. Dist. LEXIS 122774, 2009 WL 5062345, at *2*. We agree.

We conclude that there was sufficient evidence for a reasonable juror to find that Dann intended Peña Canal to believe that Peña Canal would suffer financial harm and that that financial harm was "sufficiently serious" within the meaning of the statute. For an immigrant without access to a bank account and not a dollar to her name, a juror could conclude that the failure to pay her

— and thus the lack of money to leave or live — was sufficiently serious to compel Peña Canal to continue working.[4]

### b. Reputational Harm

Second, Dann argues that there was insufficient evidence that Dann intended **[**30]** that Peña Canal believe that Peña Canal would suffer reputational harm if she were to leave. Again, Dann points out that Peña Canal never testified that Dann *told* her that she would call Peña Canal a thief if she left or that Dann would tell people back in Peru that she was untrustworthy. But here again, *HN11*[⬆] we are to draw every inference in favor of the guilty verdict.

 **[*1172]** The jury heard evidence that Dann falsely accused Peña Canal of theft on four occasions. The jury could reasonably conclude that Dann intended Peña Canal to believe that she would in fact falsely accuse her when she left. And in fact that fear was realized: When Dann read Peña Canal's letter, she told everyone within earshot at the school that Peña Canal was a thief who had robbed her and taken everything she had.

### c. Immigration Harm

There was also evidence that Dann intended Peña Canal to fear immigration harm. As the Seventh Circuit articulated in *Calimlim*, *HN12*[⬆] a victim has fewer means of escape where the threats in her case involve immigration. *538 F.3d at 712* (noting that the immigrant victim "did not have an exit option: because the threats in her case involved her immigration status, she could not freely work for another **[**31]** employer in order to escape the threatened harm.").

While Dann never explicitly threatened deportation, she did repeatedly threaten to send Peña Canal back to Peru. That threat alone — to be forced to leave the country — could constitute serious harm to an

---

4 Dann argues that the government's case fails because Peña Canal told officials that "it wasn't about the money," that she didn't stay for the money. As we have said, however, the linchpin of this analysis is the intent of the employer, or in this case what Dann *intended* Peña Canal to believe in order to induce her to stay in her employ. And here it is clear that a reasonable juror could conclude that Dann intended Peña Canal to believe that she would suffer financial harm if she were to leave.

immigrant who came to the United States in part to study English and who dreamed of starting a business. *See United States v. Djoumessi, 538 F.3d 547, 552 (6th Cir. 2008)* (noting that the defendant's threats to send victim back to Cameroon were coercive in light of the victim's special vulnerability as illegal immigrant). Dann also had custody of Peña Canal's passport and Peruvian identification; Peña Canal testified that she stayed in part because Dann held her papers. And in fact, when she did leave, the only request she made of Dann in her closing letter was the return of her Peruvian passport and identification.

Thus the evidence, taken in the light most favorable to the prosecution, suggests that Dann intended to inspire two related immigration fears in Peña Canal: that she would be forced to leave the country *or* that she would not be able to leave the country because she had no documents. Both threats are serious, and this exercise **[**32]** of control is further evidence of scienter. And in fact Dann used the word "escape" to describe Peña Canal's eventual departure.[5] A juror could reasonably have concluded that Dann intended to keep Peña Canal in fear of serious immigration consequences.

### d. Harm to the Children

Finally, there was evidence to suggest that Dann intended Peña Canal to fear what would happen to the children if she were to leave. Such a fear is squarely within the intent of *HN13*[⬆]] Congress, which enacted *§ 1589* to address "traffickers [who] use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave, *as when a nanny is led to believe that the children in her care will be harmed if she leaves the home.*" H.R. Rep. No. 106-939, at 101 (Conf. Rep.) (emphasis added).

Peña Canal testified that she did not leave because she worried about what would happen to the children. In February of 2007, Dann told her,

> You shouldn't — you shouldn't **[**33]** think that I'm treating you like a slave, you shouldn't think that I'm treating you like a slave. I'm going to pay you. I don't want for you to leave me because I don't know

what would happen to my children. **[*1173]** Where would I keep them? The government would take them from me.

There are two reasonable interpretations: Dann may have been apologizing for not paying Peña Canal and pleading with her to stay so that she would not lose her children. Alternatively, Dann may have been threatening that the children would suffer if Peña Canal were to leave — exactly the type of coercion that Congress envisioned. Again, drawing all inferences in favor of the verdict, we must assume that the jury came to the latter conclusion. A juror could conclude that a reasonable person in Peña Canal's position — that is, a nanny who had cared for three boys from infancy — would feel compelled to stay on account of such a threat.

In sum, a reasonable juror could have concluded that Dann intended to cause Peña Canal to believe that she would suffer financial, reputational, and immigration harms, as well as cause harm to Dann's children. Such a juror could further conclude that the *sum* of these threatened harms would **[**34]** have compelled a reasonable person in Peña Canal's position to continue to work for Dann. Having determined that there was sufficient evidence to support Dann's conviction for forced labor, we AFFIRM the district court's denial of Dann's *Rule 35(a)* motion on this ground.

### B. Document Servitude

Dann also challenges her conviction for document servitude, which arises out of her forced labor conviction. *HN14*[⬆]] Document servitude occurs where a defendant "knowingly . . . conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document . . . of another person . . . in the course of" trafficking, peonage, slavery, involuntary servitude or forced labor. *18 U.S.C. § 1592(a)(1)*. The district court instructed the jury on the three elements of this crime as follows:

> First, Ms. Dann concealed, removed, confiscated, or possessed Ms. Peña Canal's passport or other immigration document or government identification document. Second, such acts were undertaken in the course of committing or with the intent to commit the crime of forced labor. Third, that Ms. Dann acted knowingly in doing such an act or acts.

Dann challenges the second element.

Dann first argues that there **[**35]** was insufficient evidence that she had any intent to commit forced labor, an argument we have already rejected. Second, Dann

---

[5] Specifically, on April 21, 2008, Dann e-mailed her sister and said, "Zoraida escaped, got away, left. But at least she was here for two years. But I realized from the day she got here that she wanted to look for another job."

argues that even if she had the intent to commit forced labor, she did not keep Peña Canal's documents in order to commit that offense. She notes that Peña Canal testified that she gave her documents to Dann because she did not have any safe place to put them; she did not testify that she looked for the documents or that she asked Dann to give them back to her. Indeed, this case stands in contrast to other document servitude cases where the passports were kept in a locked drawer, or where an employer confiscated documents upon arrival. *See, e.g., United States v. Sabhnani, 599 F.3d 215, 245 (2d Cir. 2010); United States v. Farrell, 563 F.3d 364, 376-77 (8th Cir. 2009).*

*HN15*[↑] The statute, however, requires merely that the defendant "possess[ ]" the document, not that the defendant lock it up. *18 U.S.C. § 1592(a)*. Here, the jury heard evidence that when the police asked Dann for the papers on Peña Canal's behalf, she claimed that she did not have them. They heard evidence that the documents were ultimately found alongside the note about minimum wage, buried under clothes **[**36]** in a drawer.

Again, there are two stories. Dann may have kept the passport for safe keeping and may have genuinely believed that she **[*1174]** did not have it when the police asked. Alternatively, she may have hid the passport in a place where Peña Canal likely would not have found it, along with the false minimum wage note, in order to prevent Peña Canal from leaving. Construing all inferences in favor of the verdict, we must assume the latter. A rational juror could have concluded that Dann possessed and concealed Peña Canal's passport as part of her plan to cause Peña Canal to believe that she could not leave, or that she would suffer serious harm if she did.

We conclude that there was sufficient evidence to support Dann's conviction for document servitude and AFFIRM the district court's denial of Dann's 35(a) motion on this ground as well.

## C. Alien Harboring for Financial Gain

Finally, Dann challenges her conviction for alien harboring for financial gain. The district court instructed the jury that to convict Dann on this count, it had to find:

> First, that Ms. Peña Canal was an alien. Second, Ms. Peña Canal had come to, entered, or remained unlawfully in the United States. Third, Ms. Dann knew **[**37]** or was in reckless disregard of the fact

that Ms. Peña Canal had come to, entered, or remained unlawfully in the United States. Fourth, Ms. Dann concealed, harbored, or shielded Ms. Peña Canal for the purpose of avoiding Ms. Peña Canal's detection by the immigration authorities. And fifth, Ms. Dann concealed, harbored, or shielded Ms. Peña Canal for the purpose of private financial gain.

Dann challenges the sufficiency of the evidence on the fourth element.

As a preliminary matter, the parties disagree as to whether the government had to prove that Dann harbored Peña Canal to prevent detection by immigration authorities. The government argues that according to *United States v. Acosta de Evans*, harboring does not require that the defendant actively take steps to hide the alien from immigration authorities; it is sufficient that the defendant provided the alien with shelter for financial gain. *531 F.2d 428, 430 (9th Cir. 1976).*

Although the government is correct, the jury was instructed on a different standard: specifically, it was asked whether "Ms. Dann concealed, harbored, or shielded Ms. Peña Canal *for the purpose of avoiding Ms. Peña Canal's detection by the immigration authorities.*" **[**38]** To convict Dann, according to this instruction, the jury had to find that she expressly shielded her from immigration authorities, not just that she gave her shelter. Dann argues, and we agree, that this Court is bound by that instruction. *See Chiarella v. United States, 445 U.S. 222, 236, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980)* (*HN16*[↑]) "We cannot affirm a criminal conviction on the basis of a theory not presented to the jury."); *McCormick, 500 U.S. at 270 n.8.*

The district court found, based on this standard, that there was sufficient evidence for a reasonable juror to conclude that Dann shielded Peña Canal for the purpose of avoiding detection by immigration authorities. Dann restricted Peña Canal's movement and forbade her from speaking to anyone outside the home. Dann even asked the manager of the apartment complex to tell the Spanish-speaking staff not to talk to Peña Canal. Dann repeatedly reminded Peña Canal of her illegal status and asked if Peña Canal was "scared" when she talked to a police officer. Whenever Peña Canal came into the house, Dann or her mother would ask if she had spoken to anyone.

Dann contends that this story is more consistent with

652 F.3d 1160, *1174; 2011 U.S. App. LEXIS 15012, **38

someone who did not want **[\*1175]** her good employee to be poached. That interpretation **[\*\*39]** is plausible, but it is not the only one. The same evidence suggests that Dann was harboring Peña Canal from immigration authorities. And that inference is more plausible given the fact that Dann, herself, was implicated in the visa fraud.

We conclude therefore that there was sufficient evidence to support Dann's conviction for alien harboring for financial gain, and AFFIRM the district court's denial of Dann's *Rule 35(a)* motion on this final claim.

## SENTENCING

In addition to challenging her conviction, Dann challenges the district court's sentencing guideline calculation and the restitution order that required her to sign over to the victim any payments made by her ex-husband toward accrued child support.

I. *Standard of Review*

**HN17**[⬆] This Court reviews "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Grissom, 525 F.3d 691, 696 (9th Cir. 2008)* (internal quotation marks and citation omitted). "A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds **[\*\*40]** of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error. The legality of an order of restitution is reviewed de novo." *United States v. Foreman, 329 F.3d 1037, 1039 (9th Cir. 2003)* (internal quotation marks and citations omitted).

II. *Discussion*

## A. Guidelines Enhancements

The district court accepted the Guidelines calculation in Dann's Pre-Sentence Report ("PSR"), which calculated Dann's offense at a base level of 27, her criminal history as Category I, with the resulting Guidelines prison range of 70 to 87 months. The probation officer recommended, and the court agreed, to a prison term of 60 months under *18 U.S.C. § 3553*, based on her behavioral and

mental health issues.[6] The district court did not comment on the three contested enhancements to which the defendant objected at sentencing.

Dann argues on appeal that the district court erred in applying the following Guidelines enhancements to her sentence: for visa fraud, a four-level enhancement for committing visa fraud with reason to believe **[\*\*41]** that the visa would be used to facilitate a felony; and for forced labor, a three-level enhancement for holding a victim in document servitude for over a year and a two-level enhancement for committing a felony (visa fraud) in connection with forced labor. We consider each in turn.

## 1. Visa Fraud Enhancement

**HN18**[⬆] Visa fraud falls under *§ 2L2.1 of the U.S. Sentencing Guidelines Manual*, which governs "Trafficking in a Document Relating to Naturalization, Citizenship, or Legal Resident Status, or a United States Passport; False Statement in Respect to the Citizenship or Immigration Status of Another[.]" The base offense level under this Guideline is eleven and includes an enhancement of four levels "[i]f the defendant knew, believed, or had reason to believe that a passport or visa was to be used **[\*1176]** to facilitate the commission of a felony offense, other than an offense involving violation of the immigration laws." *U.S.S.G. § 2L2.1(b)(3)*. In the PSR, the probation officer reasoned that "the defendant had reason to believe that the visa would facilitate her conduct that rose to a felony, unlawful conduct regarding documents in furtherance of servitude." Dann argues that the trial court erred in imposing **[\*\*42]** this enhancement because the crime of document servitude — identified by the probation officer — is "an offense involving violation of the immigration laws" and is thus excepted by the clear language of the Guidelines.

We need not reach this argument. Dann's base offense level of 27 was driven by the forced labor offense and not visa fraud. An enhancement on visa fraud would not affect the Guideline range, and therefore any error would be harmless.[7] *Cf. United States v. Munoz-*

---

[6] Notably, on appeal Dann does not challenge the reasonableness of this sentence of 60 months. She challenges only the Guidelines calculation.

[7] Indeed, it is not clear that the trial court even applied this enhancement. During the sentencing hearing, the trial judge said, "Your objection had to do with the visa count and

652 F.3d 1160, *1176; 2011 U.S. App. LEXIS 15012, **42

*Camarena,* 631 F.3d 1028 (9th Cir. 2011).

## 2. Forced Labor Enhancements

Next, Dann challenges the Guideline enhancements to her base offense level on the forced labor conviction. **HN19**[⬆] Sentencing for forced labor is governed by *§ 2H4.1 of the U.S. Sentencing Guidelines Manual*, for "Peonage, Involuntary Servitude, Slave Trade, and Child Soldiers." The **[**43]** base level is 22. The offense may be subject to a three-level enhancement "[i]f any victim was held in a condition of peonage or involuntary servitude for [ ] more than one year," *U.S.S.G. § 2H4.1(b)(3),*[8] and an additional two-level enhancement "[i]f any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense," *id. § 2H4.1(b)(4).* Here, the district court applied both of these enhancements over Dann's objections.

**HN21**[⬆] This Court reviews a district court's factual findings in support of a sentencing enhancement for clear error. *United States v. Rivera-Alonzo, 584 F.3d 829, 836 (9th Cir. 2009)* (citation omitted). "Reversal for clear error requires a definite and firm conviction that the district court made a mistake." *Rodriguez v. United States, 542 F.3d 704, 711 (9th Cir. 2008)* (internal quotation marks and citation omitted).

### a. More than one year

Dann argues that the evidence before the district court failed to show that she had held Peña Canal in forced labor for more than one year, or from at least April **[**44]** 15, 2007 until her escape on April 16, 2008. She contends that the evidence supported forced labor for a much shorter period. The government's closing argument focused on the beginning of 2008 when Dann's conduct was at its worst. And in fact, the jury asked whether the charge of forced labor had to apply to the entire duration of Peña Canal's service. The question may suggest that the jury believed that Peña

---

whether the visa offense was in furtherance of another immigration offense, and that would appear to be a moot point because the visa offense isn't the one that's driving the guideline calculation."

[8] **HN20**[⬆] Application Note 1 defines "peonage or involuntary servitude" as including forced labor. *U.S.S.G. § 2H4.1 cmt. n.1.*

Canal was not subject to forced labor for the entire time that she resided with Dann.

To be sure, the government's evidence indicated that the worst of Dann's bad behavior occurred in or after January 2008. It was at that time that Dann told Peña Canal that she owed $15,000. Thereafter, Dann became increasingly controlling and abusive, ultimately physically accosting **[*1177]** Peña Canal. Dann then forced Peña Canal to sign the "agreement" stating that she had been paid minimum wage.

Nevertheless, there was sufficient evidence for the trial judge to find by a preponderance of the evidence that Peña Canal was subject to forced labor prior to April 2007. She testified that Dann began to restrict her movement by January of 2007 and forbade her from leaving the apartment without her permission. **[**45]** She told Peña Canal not to "talk to anybody, not to reveal anything about us, don't tell anybody anything." Dann even told the property manager of the apartment complex to order Spanish-speaking personnel not to talk with Peña Canal.

Sometime in the winter of 2007, Dann also began restricting Peña Canal's food intake, forbidding her from eating fruit and drinking tea without permission and eventually weighing the meat and counting the eggs and bread. It was in February of 2007 that Dann told Peña Canal:

> You shouldn't — you shouldn't think that I'm treating you like a slave, you shouldn't think that I'm treating you like a slave. I'm going to pay you. I don't want for you to leave me because I don't know what would happen to my children. Where would I keep them? The government would take them from me.

The district court could have reasonably concluded that Dann already knew the implications of her conduct with Peña Canal ? that she was in fact treating her like a slave. By April of 2007, Peña Canal had already foregone eight months in unpaid wages that she risked losing if she were to leave.

We conclude that the district court did not clearly err when it found that Peña Canal had been held **[**46]** in forced labor for over one year and therefore AFFIRM the district court's Guideline enhancement.

### b. Felony in connection with forced labor

Finally, Dann challenges the sentencing enhancement for committing another felony "during the commission of, or in connection with" forced labor under *§ 2H4.1(b)(4)*

*of the U.S. Sentencing Guidelines Manual*. The district court adopted the PSR, which suggested that Dann committed the felony of visa fraud in connection with the forced labor. Dann argues that at the time that she committed visa fraud, she had no intention of committing forced labor. These crimes, she argues, are entirely unrelated.

**HN22**[⬆] *Section 2H4.1(b)(4) of the U.S. Sentencing Guidelines Manual* provides in full:

> If any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of:
> (A) 2 plus the offense level as determined above, or
> (B) 2 plus the offense guideline applicable to that other offense, but in no event greater than level 43.

**HN23**[⬆] The first step in our analysis is to determine what it means to commit a crime "in connection with" forced labor under *§ 2H4.1(b)(4)*. This is a matter of first impression, **[**47]** as the commentary in this section does not define the term and no court has interpreted the language of this enhancement.

There is, however, an analogous provision in the offense guideline for unlawful possession of a firearm, *U.S.S.G. § 2K2.1(b)(6)*:

> If the defendant used or possessed any firearm or ammunition *in connection with another felony offense*; or possessed or transferred any firearm or ammunition with knowledge, intent, or **[*1178]** reason to believe that it would be used or possessed in *connection with another felony offense*, increase by 4 levels.

(emphasis added). The commentary of *§ 2K2.1(b)(6)* states that possession of a firearm "in connection with" another felony applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively." *U.S.S.G. § 2K2.1 cmt. 14*.

Clearly, the drafters must be held to define terms consistently throughout the Guidelines. Thus "in connection with" must mean *facilitation*. In the forced labor context, a felony is committed "in connection with" forced labor where that crime facilitates or has the potential of facilitating forced labor — or conversely where forced labor facilitates or **[**48]** has the potential of facilitating another felony offense. In this case, it is clear that the visa fraud facilitated the forced labor.

Indeed, as we have explained, Dann used Peña Canal's illegal immigration status to intimidate her, to cause her to fear deportation or to fear the risk of leaving without documentation. This evidence is sufficient to show that Dann committed forced labor in connection with visa fraud.

Dann, however, suggests that according to our holding in *United States v. Jimison*, "in connection with" requires an additional element of intent. *493 F.3d 1148, 1149 (9th Cir. 2007)*. She argues that the enhancement applies only where the defendant commits the first felony (either forced labor or the other crime) with the intent to commit the other. This argument is unavailing. In *Jimison*, **HN24**[⬆] we interpreted the second half of *§ 2K2.1(b)(6)*— the enhancement that applies where a defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." *U.S.S.G. § 2K2.1(b)(6)*. We held that, to prove the application of this enhancement, the government must provide sufficient **[**49]** evidence that when the defendant came into possession of the firearm, he had a "firm intent" to use it to commit a felony. *Jimison, 493 F.3d at 1149*. The intent requirement was drawn directly from the language of the enhancement (requiring "knowledge, intent, or reason to believe"). There is no comparable intent language in the forced labor Guideline under *U.S.S.G. § 2K2.1*, and we cannot read intent into the provision.

We conclude therefore that a felony is committed "in connection with" forced labor where it facilitates or is facilitated by the offense of forced labor. And because in this case visa fraud facilitated Dann's commission of forced labor, the district court's Guideline enhancement is AFFIRMED.

**B. Restitution Order**

Finally, we turn to the district court's restitution order. At sentencing, the Court ordered Dann to pay $123,740.34 in restitution and required that "any payments made by [Dann's exhusband] toward back child support that he owes shall be signed over to the victim as payment towards restitution." Dann filed a motion under *Federal Rule of Criminal Procedure 35(a)* to correct the sentence on the grounds that the district court erred when it ordered accrued child support **[**50]** to be paid to Peña Canal. The district court denied the *Rule 35(a)*

motion.[9]

 [*1179]  On appeal, Dann argues that the district court erred by assigning a debt that did not belong to Dann but rather to her minor children, who are now sixteen, ten, and ten years old respectively. *HN25*[⬆] This Court reviews legal issues regarding a restitution order *de novo. Foreman, 329 F.3d at 1039*.

*HN26*[⬆] The Mandatory Victims Restitution Act requires that a district court consider three factors before ordering restitution: "(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents." *18 U.S.C. § 3664(f)(2)(A)-(C)*. Any restitution order under this section may be enforced only as against **[**52]** property that is the defendant's own according to the relevant state law. *See, e.g., United States v. Berger, 574 F.3d 1202, 1205*

---

[9] The district court held in relevant part:

Although no authority directly addresses the issue presented in this motion, case law appears to support the view that child support in the form of arrearages is a debt owed to the children if the children stand to benefit from the payments. The debt is owed to the custodial parent when the children will not benefit from the payment of the arrearages.

Here, Defendant will be incarcerated for a period of years. Child support arrearages paid to her will not benefit her children during her period of incarceration. Accordingly, the Court will not modify its restitution order at this time. If child support arrearages are received by Defendant at a time when she has custody of the children and needs the arrearages to support them, she may move for modification of the restitution order, setting out her financial circumstances and how the money will be used for the benefit of her children. Similarly, if Defendant receives arrearages at a time when someone other than herself or [defendant's ex-husband] has custody of the children, and the money is needed to support the children, **[**51]** she can move to modify the restitution order so that she is allowed to sign over the arrearages to the guardian rather than to the victim. During the time these child support arrearages were accruing, Defendant and her children were receiving the benefit of unpaid childcare services from the victim. It is equitable that these arrearages be paid over, although belatedly, to the victim.

*Dann, 2010 U.S. Dist. LEXIS 83294, 2010 WL 2891585, at *2.*

*(9th Cir. 2009)*; *In re Ramirez, 795 F.2d 1494, 1497 (9th Cir. 1986)* ("The determination of child support rights is a matter of state statutory and common law."), *superseded by statute as recognized in In re Leibowitz, 217 F.3d 799, 800 (9th Cir. 2000)*.

The question before the Court is whether child support arrearages belong to Dann such that they may be assigned to the victim by a restitution order, or whether the arrearage actually belongs to her children. This is a matter of first impression.

*HN27*[⬆] As a general rule, a parent's obligation to pay child support runs to *the child*, rather than to the other parent, and "the parent, to whom such support is paid, is but a mere conduit for the disbursement of that support." *Williams v. Williams, 8 Cal. App. 3d 636, 640, 87 Cal. Rptr. 754 (1970)*. Indeed, the equities between the parents do not alter the child support obligation. *Comer, 14 Cal. 4th 504, 516, 59 Cal. Rptr. 2d 155, 927 P.2d 265 (1996)*.

We acknowledge California authority recognizing that when a custodial parent has expended her own resources, she may recover the accrued child support *for her own benefit*, and that **[**53]** that right of reimbursement may be assigned in certain circumstances. *See, e.g., In re Marriage of Utigard, 126 Cal. App. 3d 133, 141-42, 178 Cal. Rptr. 546 (1981)*; *Cal. Welf. & Inst. Code § 11477(a)* (requiring the assignment of child support arrearages to the state where the state has dispersed cash assistance to the child).

*HN28*[⬆] The California Supreme Court holdings in *In re Marriage of Damico* and *Comer*, however, suggest that even the assignable right of reimbursement to the custodial parent is superceded if reimbursement is sought when the children are minors. *In re Marriage of Damico, 7 Cal. 4th 673, 29 Cal. Rptr. 2d 787, 872 P.2d 126 (1994)*; *Comer, 14 Cal. 4th at 516* [*1180]  . For example, the Damico court held that a custodial parent is estopped from bringing a claim for accrued child support if she concealed the children from the non-custodial parent when the children were minors. *Damico, 7 Cal. 4th at 684-85*. In *Comer*, however, this holding was limited to cases where the custodial parent brings a suit *after the children have reached majority. 14 Cal. 4th at 516*. A custodial parent may sue for accrued child support even if she previously concealed the child, so long as the child is not yet an adult. *Id. Comer* thus seems to suggest that accrued **[**54]** payments belong to the child until adulthood.

652 F.3d 1160, *1180; 2011 U.S. App. LEXIS 15012, **54

The *Comer* court explained that

> [t]his distinction [regarding the child's age] is a significant one, because, in contrast to most adults, children (particularly those in their early years) in fairness cannot be expected to raise themselves and pursue an education without the financial support of responsible adults . . . The child's need for sustenance must be the paramount consideration.

*Id. at 516* (quotation marks and citation omitted). If child support has not been paid for a period of time, it is likely that the child's needs were met at only a minimal level. *Id. at 517-18*. Thus, a child may have accrued needs, including educational expenses or cultural opportunities, that may be met by an accrued child support payment, and these needs trump the custodial parent's entitlement to reimbursement.

*HN29*[⬆] Read together, *Damico* and *Comer* suggest that so long as the children have not reached majority, a custodial parent remains the "conduit" for child support — even accrued child support. We therefore conclude that under California law, a creditor (in this case a crime victim with a restitution order) is not entitled to accrued child support payments owed **[**55]** to a custodial parent of children who have not yet reached the age of majority.

*In re Estate of Spiritos, 443 F.3d 1172, 1177 n.4 (9th Cir. 2006)*, is not to the contrary. In a footnote, this Court noted that *HN30*[⬆] "[u]nder California law, 'the custodial parent, not the child, has the beneficial interest in collecting arrearages in child support.'" *Id.* (quoting *Cnty. of Shasta v. Smith, 38 Cal. App. 4th 329, 335, 45 Cal. Rptr. 2d 52 (1995)* and citing *In re Marriage of Lackey, 143 Cal. App. 3d 698, 706, 191 Cal. Rptr. 309 (1983)* and *Utigard, 126 Cal. App. 3d at 143*). *Spiritos, Shasta* and *Lackey* cite *Utigard* for the proposition that a child is not the real party of interest in accrued child support. *Spiritos, 443 F.3d at 1177 n.4*; *Shasta, 38 Cal. App. 4th at 335*; *Lackey, 143 Cal. App. 3d at 706*.

*Utigard*, however, involved *adult* children's interest in collecting child support arrearages. *126 Cal. App. 3d at 137* ("Mary Lou . . . and four of her *adult* children appeal from the judgment.") (emphasis added). In *Utigard*, the court addressed a property dispute after a divorce. The plaintiff's ex-husband conveyed their marital home to his new wife in an attempt to avoid a writ of execution for then accrued child support. When the plaintiff eventually **[**56]** filed an action under the Uniform Fraudulent Conveyance Act five years later, the trial court found

that the statute of limitations had run. Because her children — who were minors at the time of conveyance — were not barred by the statute of limitations, she attempted to have the writ of execution issued in their names. In a very narrow ruling, the *Utigard* court found that the *HN31*[⬆] now adult children had no interest in the **[*1181]** accrued child support. *Id. at 143*.

The *Utigard* court noted that in this case "no issue [was] tendered concerning the present or future needs of the children, nor any issue concerning the relation of the unpaid support to the children's needs." *126 Cal. App. 3d at 139*. They declined to reach the "question under what conditions the children might be deemed the beneficiaries of arrearages in child support. . . . Similarly, [they did] not decide how to resolve a dispute between parent and child as to entitlement to arrearages." *Id. at 144*.

Indeed, the holding in *Utigard* seems to hinge precisely on the fact that the case did not involve minor children who needed funds. *HN32*[⬆] Throughout the case law, California courts are guided by a fundamental principle: "In any proceedings involving **[**57]** custody and support it is axiomatic that the court should always adopt the course that is for the best interests of the child." *Comer, 14 Cal. 4th at 517* (internal quotation marks omitted) (quoting *Evans v. Evans, 185 Cal. App. 2d 566, 572, 8 Cal. Rptr. 412 (1960)*).

We have therefore concluded that *HN33*[⬆] under California law, the custodial parent is a conduit for accrued child support to meet the needs of her minor children. In the case at hand, however, the district court pointed out that Dann is not currently the custodial parent. Because Dann is incarcerated, the district court assumed that payments made to her would not benefit her children. Like a parent of a child who has reached the age of majority, the district court reasoned, Dann is entitled to accrued child support as reimbursement to her personally for the funds that she expended to care for her children while she was not receiving support. Accordingly the funds belong to Dann and not to her children; and any sums received should be paid to Peña Canal, who provided child support services during this time period.

While at first glance the district court's order seems equitable in this particular case, its implications are troubling. The district **[**58]** court assumed that accrued child support payments paid to Dann would not benefit Dann's children simply because Dann is

incarcerated. By this logic, young children of incarcerated parents could lose the benefit of accrued child support payments which — as the district court recognized — the children may very well need.[10] Indeed, the children of incarcerated women are especially vulnerable. They have likely accrued needs that may be met by *any* payments of support, even late ones.

The district court erred when it assumed that these funds belonged to Dann in the first instance. As applied to these facts, *HN34*[↑] we read California law as stating that, until a child reaches the age of majority, the *child* is the real party of interest in child support arrearages. To the extent that accrued child support payments are made to a parent while she is in prison, she remains a conduit for her child's support and free to  **[**59]** disperse those funds for the care of her child. See *Comer, 14 Cal. 4th at 516*; *Williams, 8 Cal. App. 3d at 640*. Accrued child support is simply not the property of the parent (of a child who has not yet reached majority) to be redistributed to a victim as restitution.

We should note that the district court's order in this case also raises practical challenges.  **[*1182]** *HN35*[↑] The single most important question in an action that involves child support in any form is the need and interest of the minor child. *See* *In re Marriage of Lippel, 51 Cal. 3d 1160, 1172 n.4, 276 Cal. Rptr. 290, 801 P.2d 1041 (1990)*. State family courts or probate courts are best equipped to balance the equities and determine the best interest of children, and federal courts should not interfere by exercising authority over child support payments in a criminal proceeding. In the case at hand, for instance, the children were not represented. No guardian ad litem weighed in at the sentencing hearing in federal court when the restitution order was rendered. Although perhaps equitable in the instant case, a restitution order simply cannot redistribute child support — or accrued child support — where minor children are involved.

The district court's order directing that  **[**60]** accrued child support payments be made directly to Peña Canal is REVERSED.

---

[10] The court suggested that the defendant may move to modify the order when she regains custody of the children, or she could move to modify the order "so that she is allowed to sign over the arrearages" to a guardian of her children while she is incarcerated. *Dann, 2010 U.S. Dist. LEXIS 83294, 2010 WL 2891585, at *2*.

**AFFIRMED IN PART, REVERSED IN PART**.

---

End of Document

# EXHIBIT N

⚠ Caution
As of: January 18, 2023 2:38 PM Z

## *United States v. Marcus*

United States Court of Appeals for the Second Circuit

October 13, 2010, Argued; December 7, 2010, Decided

Docket No. 07-4005-cr

**Reporter**
628 F.3d 36 *; 2010 U.S. App. LEXIS 24895 **

UNITED STATES OF AMERICA, Appellee, -v.- GLENN MARCUS, Defendant-Appellant.

**Subsequent History:** As Amended January 10, 2011.

Appeal after remand at, Decision reached on appeal by *United States v. Marcus, 2013 U.S. App. LEXIS 4137 (2d Cir. N.Y., Feb. 28, 2013)*

**Prior History: [**1]** Appeal from a judgment of the United States District Court for the Eastern District of New York (Ross, J.), entered on September 18, 2007, convicting defendant of violating the sex trafficking and forced labor provisions of the Trafficking Victims Protection Act.

*United States v. Marcus, 130 S. Ct. 2159, 176 L. Ed. 2d 1012, 2010 U.S. LEXIS 4163 (U.S., 2010)*
*United States v. Marcus, 487 F. Supp. 2d 289, 2007 U.S. Dist. LEXIS 35969 (E.D.N.Y., 2007)*

**Disposition:** AFFIRMED in part, VACATED in part, and REMANDED.

## Core Terms

website, forced labor, trafficking, proceedings, convicted, sex, district court, plain error, post-enactment, public reputation, diary entry, pre-enactment, vacate, reasonable probability, inflicted, pictures, sexual

## Case Summary

### Procedural Posture

Defendant was convicted following a jury trial of violating the forced labor and sex trafficking provisions of the Trafficking Victims Protection Act (TVPA), *18 U.S.C.S. §§ 1589, 1591*. The court vacated the judgment and remanded the case on the ground that, under plain error review, the convictions violated the Ex Post Facto Clause, but the U.S. Supreme Court reversed and remanded for reconsideration under the appropriate plain error standard.

### Overview

There was no reasonable probability that the jury would have acquitted defendant absent an erroneous jury instruction. First, the Government presented post-enactment evidence sufficient to satisfy the elements of the forced labor statute. Specifically, defendant forced the complaining witness, through the persistent threat of serious physical harm and actual physical harm, to create and maintain a commercial website from which only defendant derived pecuniary gain. The witness testified that she worked on the website for eight to nine hours a day including while she had a full time job. She was motivated to work on the website out of fear of future physical and sexual abuse from defendant. One of the most severe punishments occurred post-enactment. Second, there was no reasoned basis to differentiate between defendant's pre- and post-enactment conduct. Unlike with the forced labor charge, the conduct supporting the sex trafficking charge differed materially before and after TVPA's enactment, such that there was a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings.

### Outcome

Defendant's conviction with respect to the forced labor charge was affirmed, his conviction with respect to the sex trafficking charge was vacated, and the case was remanded to the district court for further proceedings consistent with the opinion. If the Government determined that it would not retry defendant on the sex trafficking charge, the district court was directed to reconsider defendant's sentence.

628 F.3d 36, *36; 2010 U.S. App. LEXIS 24895, **1

# LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Burdens of Proof

## *HN1*[⬇] **Plain Error, Burdens of Proof**

*Fed. R. Crim. P. 52(b)* permits an appellate court to recognize a plain error that affects substantial rights, even if the claim of error was not brought to the district court's attention. An appellate court will exercise its discretion to correct an error not raised at trial only where an appellant demonstrates that: (1) there is an error; (2) the error is plain, that is, the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Burdens of Proof

## *HN2*[⬇] **Plain Error, Burdens of Proof**

To satisfy the third requirement for a plain error under *Fed. R. Crim. P. 52*, an appellant must demonstrate that the error was prejudicial. In the ordinary case, an error is prejudicial where there is a reasonable probability that the error affected the outcome of the trial. Regarding the fourth requirement, in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the fairness, integrity, or public reputation of the judicial process.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > Elements

## *HN3*[⬇] **Coercion & Harassment, Elements**

See *18 U.S.C.S. § 1589*.

Constitutional Law > ... > Bills of Attainder & Ex Post

Facto Clause > Ex Post Facto Clause > Application & Interpretation

## *HN4*[⬇] **Ex Post Facto Clause, Application & Interpretation**

A conviction for a continuing offense straddling enactment of a statute will not run afoul of the Ex Post Facto Clause unless it was possible for the jury to convict exclusively on pre-enactment conduct.

Criminal Law & Procedure > ... > Sex Crimes > Pandering & Pimping > Elements

## *HN5*[⬇] **Pandering & Pimping, Elements**

See *18 U.S.C.S. § 1591(a)(1)*.

Criminal Law & Procedure > ... > Crimes Against Persons > Coercion & Harassment > General Overview

Governments > Legislation > Interpretation

## *HN6*[⬇] **Crimes Against Persons, Coercion & Harassment**

The forced labor statute punishes anyone who knowingly provides or obtains the labor or services of a person by threats of serious harm to, or physical restraint against, that person or another person. *18 U.S.C.S. § 1589*. The term "labor or services," which is not defined by the statute, is viewed in accord with its ordinary meaning. Absent ambiguity in the statutory text, only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from the statutory language. Court will only look to legislative history to interpret unambiguous statutes in rare and exceptional circumstances. Moreover, they will not apply the rule of lenity to narrowly construe a statute where the applicable text is unambiguous.

Governments > Legislation > Interpretation

## *HN7*[⬇] **Legislation, Interpretation**

"Labor" is defined as the expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory. "Service" is defined as the performance of

work commanded or paid for by another.

Governments > Legislation > Vagueness

*HN8*[ ] **Legislation, Vagueness**

One whose conduct is clearly proscribed by a statute cannot successfully challenge it for vagueness.

**Counsel:** HERALD PRICE FAHRINGER (Erica T. Dubno, on the brief), Fahringer & Dubno, New York, NY, for Defendant-Appellant.

PAMELA CHEN, Assistant United States Attorney, for Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee. (Peter A. Norling, Assistant United States Attorney, Benton J. Campbell, United States Attorney, Eastern District of New York, Brooklyn, NY; Grace Chung Becker, Acting Assistant Attorney General, Jessica Dunsay Silver, Tovah R. Calderon, Attorneys, Department of Justice, Civil Rights Division, Appellate Section, on the brief in the original appeal).

**Judges:** Before: CALABRESI, STRAUB, WESLEY, Circuit Judges.

**Opinion by:** WESLEY

# Opinion

**[\*38]** WESLEY, *Circuit Judge*:

Defendant-Appellant was convicted following a jury trial on charges of violating the forced labor and sex trafficking provisions of the Trafficking Victims Protection Act ("TVPA"), *18 U.S.C. §§ 1589,* **[\*\*2]** *1591.* In an opinion dated August 14, 2008, this Court vacated the judgment and remanded the case on the ground that, under plain error review, Marcus's convictions violated the Ex Post Facto Clause. *United States v. Marcus, 538 F.3d 97 (2d Cir. 2008)* (per curiam).

The Supreme Court reversed and remanded. Noting that Marcus's contention implicated the *Due Process Clause,* [1] the **[\*39]** Supreme Court held that this

Court's standard for plain error review, as applied to Marcus's claim, was inconsistent with the Supreme Court's extant precedent. *United States v. Marcus, 130 S. Ct. 2159, 2163, 176 L. Ed. 2d 1012 (2010).* On remand, we must address Marcus's due process challenge to his sex trafficking and forced labor convictions under the appropriate plain error standard. For the reasons set forth below, we affirm Marcus's forced labor conviction and vacate his sex trafficking conviction. The case is remanded to the district court for proceedings consistent with this opinion.

## I.  [\*\*3] BACKGROUND

The facts of this case are set forth in the district court's opinion, *United States v. Marcus, 487 F. Supp. 2d 289, 292-97 (E.D.N.Y. 2007),* and summarized in this Court's prior opinion, *Marcus, 538 F.3d at 98-100.* Because familiarity with those opinions is presumed, we recite only the facts and procedural history relevant to the issues on remand.

From October 1998 through approximately June 1999, Marcus and the complaining witness, Jodi, [2] engaged in a consensual relationship that involved bondage, dominance/discipline, submission/sadism, and masochism ("BDSM"). After they met on the internet, Marcus convinced Jodi to move from her home in the Midwest to Maryland, where she lived in the apartment of a woman named Joanna. Jodi, Joanna, and other women participated in various BDSM activities with Marcus. This included being considered Marcus's "slaves" and being subjected to various physical and sexual "punishments." At Marcus's direction, Joanna maintained a membership BDSM website called "Subspace," which contained pictures of Jodi and other women participating in BDSM activities and fantasy diary entries written about these activities.

By October 1999, the nature of this arrangement changed. Because Jodi refused to recruit her younger sister to become one of Marcus's "slaves," Marcus inflicted upon Jodi a "punishment" that was the most physically severe that she had experienced to date. Jodi testified that she cried throughout the incident and that

---

[1] Marcus's claim is properly labeled a due process claim because the potential retroactive application of the TVPA to Marcus's conduct was the result of an erroneous jury

instruction rather than an act of Congress. *See United States v. Marcus, 130 S. Ct. 2159, 2165, 176 L. Ed. 2d 1012 (2010).*

[2] At trial, the district court granted **[\*\*4]** the Government's motion to allow certain witnesses to testify using their first names only. *Marcus, 487 F. Supp. 2d at 292 n.2.*

thereafter her relationship with Marcus became nonconsensual. According to Jodi, she began to feel "trapped" and "full of terror."

In January 2000, Marcus instructed Jodi to move to New York, where she lived with Rona, another one of Marcus's "slaves." Jodi testified that upon her move to New York, Marcus directed her to create and maintain a new commercial BDSM website called "Slavespace." Jodi indicated that she worked on the site for approximately eight to nine hours per day, updating photographs and diary entries and clicking on banner advertisements to increase revenue and enhance the site's visibility on the internet. She testified that she continued to work on the website in this manner after she obtained a full-time job in November 2000. **[**5]** Marcus received all revenues from the website, consisting primarily of membership fees and advertising.

Although Jodi did not want to work on the website as Marcus instructed, she did so because she feared the consequences of her refusal. Marcus created and fueled Jodi's fear by physically and sexually **[*40]** "punishing" her when he was unhappy with her work on the website. Punishment would occur when Jodi did not post pictures or diary entries quickly enough or when the website was not making as much money as Marcus expected. These punishments were photographed, and the pictures were posted on Slavespace. Additionally, Marcus required Jodi to write diary entries about these punishments, which, at his direction, indicated her satisfaction in receiving them.

One of the most severe punishments Marcus imposed on Jodi occurred in Rona's apartment in April 2001. Marcus tied Jodi's hands together with rope, made Jodi lie down on a coffee table, and told Jodi he was going to put a safety pin through her labia. Because she began to scream and cry, Marcus put a washcloth in Jodi's mouth and whipped her with a kitchen knife in an unsuccessful attempt to force her to stop crying. Marcus proceeded to put **[**6]** the safety pin through Jodi's labia and attached a padlock to it, closing her vagina. Marcus photographed this incident, and the pictures were posted on the Slavespace website. He also directed Jodi to write a diary entry about this incident for the website.

Although Jodi's relationship with Marcus had become nonconsensual, she remained with Marcus out of fear of his reaction if she left. Specifically, at one point, when Jodi told Marcus that she was unhappy and could not continue with the arrangement, Marcus threatened to send pictures of Jodi to her family and the media.

In March 2001, Jodi told Marcus that she wanted to leave. In response, Marcus told Jodi that she had to endure one final punishment. In the basement of a Long Island residence, Marcus inflicted a severe punishment on Jodi, including banging her head against a basement ceiling beam, tying her hands and ankles to the beam, beating her and whipping her while she was hanging from the beam, drugging her with Valium, and inserting a large surgical needle through her tongue. After inflicting this beating, Marcus let Jodi off the beam, took her to a bedroom, and had sexual intercourse with her. Marcus photographed Jodi throughout **[**7]** the punishment and instructed her to write and post on the website a diary entry about the incident.

Jodi testified that, after this incident, she felt broken, surrounded by fear and terror, and trapped in this relationship with Marcus. She continued to live in Rona's apartment until August 2001, at which point Rona told Marcus that she no longer wanted Jodi to live with her. Jodi then moved into her own apartment, and her interactions with Marcus became less frequent and less extreme, although she remained in contact with him until 2003.

On February 9, 2007, the Government obtained a superseding indictment charging Marcus with violating the sex trafficking statute, _18 U.S.C. § 1591(a)(1)_, and the forced labor statute, _18 U.S.C. § 1589_, of the TVPA "[i]n or about and between January 1999 and October 2001." After a jury trial, Marcus was convicted on both counts. [3]

Although the TVPA was not enacted until October 28, 2000, the Government presented evidence with respect to the entire period charged in the superseding indictment, and the district court did not instruct **[**8]** the jury with respect to the TVPA's enactment date. At trial, Marcus did not object to the jury instructions on **[*41]** this ground, nor did he raise the argument in his motion for a judgment of acquittal under _Rule 29 of the Federal Rules of Criminal Procedure_. Marcus's post-conviction motions for judgment of acquittal, _Fed. R. Crim. P. 29_, and for a new trial, _Fed. R. Crim. P. 33_, were denied by the district court. _See Marcus, 487 F. Supp. 2d at 313_.

_____

[3] The indictment also charged Marcus with obscenity in violation of _18 U.S.C. § 1462_, but the jury acquitted him of that count.

628 F.3d 36, *41; 2010 U.S. App. LEXIS 24895, **8

Marcus brought a timely appeal in which he argued, in relevant part, that the TVPA was applied retroactively in his case in violation of the Ex Post Facto Clause of the United States Constitution. Because Marcus failed to raise this argument before the district court, we reviewed for plain error only.

We vacated Marcus's convictions, holding that under *United States v. Torres, 901 F.2d 205 (2d Cir. 1990)*, on plain error review, an error implicating the Ex Post Facto Clause requires a new trial if, as was the case here, "there is any possibility, no matter how unlikely" that an uninstructed jury could have convicted the defendant based exclusively on pre-enactment conduct. *Marcus, 538 F.3d at 102*.

Though joining in the judgment because our then **[**9]** precedent compelled the result, two members of the panel noted that the standard in *Torres* was inconsistent with Supreme Court precedent. *Id. at 102-03* (Sotomayor, J., concurring). Looking to *United States v. Cotton, 535 U.S. 625, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002)*, and *Johnson v. United States, 520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997)*, the concurrence concluded that "where there is no reasonable possibility that an error not objected to at trial had an effect on the judgment, the Supreme Court counsels us against exercising our discretion to notice that error." *Marcus, 538 F.3d at 104*. Applying this principle to the context of an *ex post facto* violation under a plain error standard of review, the concurrence reasoned:

> [W]here the evidence is "overwhelming" or "essentially uncontroverted" that the defendant's relevant pre- and post-enactment conduct is materially indistinguishable, such that a reasonable jury would not have convicted the defendant based solely on pre-enactment conduct, a retrial is unwarranted. In other words, the defendant must meet the low threshold of offering a plausible explanation as to how relevant pre- and post-enactment conduct differed, thereby demonstrating a reasonable possibility that the jury might have **[**10]** convicted him or her based exclusively on pre-enactment conduct. When this requirement is not met, the error does not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

*Id.*

The concurrence concluded that Marcus's sex trafficking

conviction should be vacated, but his forced labor conviction affirmed, because with respect to the forced labor charge, Marcus offered "no plausible argument as to why the jury would have differentiated between his conduct before and after the enactment of the statute." *Id. at 106*.

The Supreme Court reversed and remanded, holding that the "any possibility, however remote" standard was inconsistent with its plain error review precedents. *Marcus, 130 S. Ct. at 2164*. On remand, we must decide whether the error in this case affected Marcus's substantial rights and the fairness, integrity or public reputation of his judicial proceeding.

## II. DISCUSSION

*HN1*[⬆] *Federal Rule of Criminal Procedure 52(b)* permits an appellate court to recognize a "plain error that affects substantial rights," even if the claim of error **[*42]** was not brought to the district court's attention. *Marcus, 130 S. Ct. at 2164*. We will exercise our discretion to correct **[**11]** an error not raised at trial only where an appellant demonstrates that: (1) there is an error; (2) the error is plain, that is, the error is "clear or obvious, rather than subject to reasonable dispute;" (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings;" and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (brackets in original). Here, only the third and fourth requirements are in dispute.

*HN2*[⬆] To satisfy the third requirement, an appellant must demonstrate that the error was prejudicial. In the ordinary case, an error is prejudicial where there is a "reasonable probability that the error affected the outcome of the trial." *Id.* Regarding the fourth requirement, "in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the fairness, integrity, or public reputation of the judicial process." *Id. at 2166* (internal quotation marks omitted). Therefore, to have impacted Marcus's substantial rights and the fairness, integrity or public reputation of the judicial proceedings, the overall effect **[**12]** of the due process error must have been sufficiently great such that there is a reasonable probability that the jury would not have convicted him absent the error.

Here, there is no reasonable probability that the jury would have acquitted Marcus absent the error. First, the

Government presented post-enactment evidence sufficient to satisfy the elements of the forced labor statute. [4] From January 2000 until at least the spring of 2001, Marcus forced Jodi, through the persistent threat of serious physical harm and actual physical harm, to create and maintain a commercial BDSM website from which only Marcus derived pecuniary gain. Jodi testified that she worked on Marcus's website for eight to nine hours a day including while she had a full time job. [5] During this time period, Jodi was motivated to work on the website out of fear of future physical and sexual abuse from Marcus. One of the most severe punishments, the April 2001 coffee table incident, occurred post-enactment. Jodi testified that this punishment was due to her unsatisfactory work on the website. Based on this evidence, a **[*43]** jury could find that Marcus obtained Jodi's labor through threat of serious physical harm and actual **[**13]** physical harm after October 2000. [6]

Second, we find no reasoned basis to differentiate between Marcus's pre- and post-enactment conduct,

and we find no reason to presume that the jury did so. Although the Government presented evidence that Jodi wrote diary entries about her BDSM activities for Marcus's old BDSM website dating back to 1999, the substantial evidence of forced labor begins in January 2000, when Marcus directed Jodi to move from Maryland to New York and instructed her to create and manage his new commercial BDSM website. From January 2000, continuing through the effective date of the TVPA in October 2000, and into April 2001, Marcus's conduct supporting the forced labor conviction is essentially the same. **[**15]** If anything, Marcus's use of force against Jodi *increased* post-enactment, with two of the most severely violent incidents occurring in March and April of 2001. Marcus offers no explanation for how his pre-enactment conduct differed from his post-enactment conduct in a manner that would lead us to conclude that there is a reasonable probability that the jury would not have convicted him absent the due process error. [7]

For substantially similar reasons, we reject Marcus's additional argument that he was prejudiced, not because of the potential retroactive application of the TVPA to his pre-enactment conduct, but because the proceedings were "swamped by highly prejudicial evidence — spanning 22 months - that, although charged as criminal, violated no law at the time." The Government presented substantial evidence of Marcus's post-enactment conduct, and nothing about the nature or quantity of the evidence of Marcus's pre-enactment conduct leads us to conclude that it is reasonably

---

4 *18 U.S.C. § 1589* provided, in relevant part: **HN3[↑]** "Whoever knowingly provides or obtains the labor or services of a person . . . by threats of serious harm to, or physical restraint against, that person or another person; . . . by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or . . . by means of the abuse or threatened abuse of law or the legal process, shall be [punished]." *18 U.S.C. § 1589 (2000)*. We note that the language of *18 U.S.C. § 1589* was amended in 08. We apply the version of the statute in effect at the time of Marcus's conduct.

5 Marcus argues that the fact that Jodi acquired a full time job in November 2000 undermines the credibility of her testimony that she worked on the website eight to nine hours a day post-enactment. He also points out that Rona testified that Jodi did not work on the website after she acquired the full time job. These arguments, however, do not compel the conclusion that the jury believed that Jodi provided website related services to Marcus pre-enactment **[**14]** rather than post-enactment. First, it is not impossible for Jodi to have worked an eight-hour day, commuted from Queens, NY, and still worked eight hours on the website. Second, it is undisputed that Jodi was required, under threat of punishment, to write diary entries for Slavespace expressing her enjoyment of the March and April 2001 punishments.

6 This conclusion likewise disposes of Marcus's argument that the evidence of his post-enactment conduct is insufficient to sustain the forced labor conviction.

---

7 On appeal, the parties originally disputed whether forced labor and sex trafficking constituted continuing offenses. **HN4[↑]** "A conviction for a continuing offense straddling enactment of a statute will not run afoul of the Ex Post Facto clause unless it was possible for the jury . . . to convict exclusively on pre-enactment conduct." *United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999)* (internal quotation marks omitted). Prior to the Supreme Court's opinion in this case, under *Torres*, the same analysis applied under plain error review. See *Torres, 901 F.2d at 229*. In our prior opinion, we did not decide whether violations of the forced labor and sex trafficking statutes constitute continuing offenses because, in any event, it was possible that Marcus had been convicted solely **[**16]** on the basis of pre-enactment conduct and thus a new trial was necessary. *Marcus, 538 F.3d at 101*. Although we now affirm Marcus's forced labor conviction, we again have no need to decide whether forced labor constitutes a continuing offense. Even assuming it does not, a new trial is not warranted because neither the third nor fourth requirements of the plain error standard are satisfied.

probable that the jury would have acquitted Marcus but for the evidence of Marcus's pre-enactment conduct.

Therefore, because the erroneous jury instruction neither prejudiced Marcus nor called into question the "fairness, integrity or public [**17] reputation of the judicial system," we will not set aside Marcus's forced labor conviction. See Marcus, 130 S. Ct. at 2164.

By contrast, with regard to Marcus's sex trafficking conviction, the Government concedes that the erroneous jury instruction constituted plain error. [8] The [*44] Government produced evidence that Marcus knowingly recruited and enticed Jodi in 1998; transported Jodi from Maryland to New York in early 2000; and harbored her from 1999 until 2001. Unlike with the forced labor charge, the conduct supporting the sex trafficking charge differed materially before and after October 2000, such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings. Consequently, we again vacate Marcus's sex trafficking conviction and remand the case for retrial on this charge. [9] What remains are Marcus's other challenges to his forced labor conviction.

Marcus argues that 18 U.S.C. § 1589 does not apply to his conduct. He contends that Jodi and he engaged in an "intimate domestic relationship" based upon a shared BDSM lifestyle. Further, he contends that the forced labor statute's phrase "labor and services" [**19] is

ambiguous as applied to his conduct, and that the district court erred in refusing to apply the rule of lenity to narrowly construe the statute in his favor. We agree with the district court's well-reasoned opinion that these arguments are without merit.

In relevant part, HN6[↑] the forced labor statute punishes anyone who "knowingly provides or obtains the labor or services of a person . . . by threats of serious harm to, or physical restraint against, that person or another person." 18 U.S.C. § 1589 (2000). The term "labor or services," which is not defined by the statute, is viewed in accord with its ordinary meaning. See Smith v. United States, 508 U.S. 223, 228, 113 S. Ct. 2050, 124 L. Ed. 2d 138 (1993); Harris v. Sullivan, 968 F.2d 263, 265 (2d Cir. 1992). Absent ambiguity in the statutory text, "[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [the statutory] language." United States v. Albertini, 472 U.S. 675, 680, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985) (internal quotation marks omitted). We will only look to legislative history to interpret unambiguous statutes in "rare and exceptional circumstances." Garcia v. United States, 469 U.S. 70, 75, 105 S. Ct. 479, 83 L. Ed. 2d 472 (1984). Moreover, we will not apply [**20] the rule of lenity to narrowly construe a statute where the applicable text is unambiguous. See United States v. Giordano, 442 F.3d 30, 40 (2d Cir. 2006) (citing Salinas v. United States, 522 U.S. 52, 66, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)).

The parties do not dispute that the ordinary meaning of the phrase "labor or services" [10] encompasses Jodi's various [*45] contributions to the Slavespace website from which only Marcus derived pecuniary gain. Marcus, however, contends that Jodi's work on the Slavespace website was volunteered to Marcus in a manner similar to unpaid domestic chores performed by any co-habiting couple, and the "punishments" Marcus inflicted upon Jodi are inseparable from the BDSM activities that were a long standing part of their intimate relationship. Marcus argues that by applying the statute's plain meaning to this relationship, the forced

---

[8] 18 U.S.C. § 1591(a)(1) provides, in relevant part: HN5[↑] "Whoever knowingly . . . in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, [**18] harbors, transports, provides, or obtains by any means a person . . . knowing that force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act . . . shall be punished . . . ." 18 U.S.C. § 1591(a)(1).

[9] In our prior opinion we held that "for substantially the same reasons set forth in the District Court's opinion, . . . the totality of the evidence presented at trial was sufficient to support the convictions." Marcus, 538 F.3d at 102 n.6. With respect to Marcus's sex trafficking conviction, we reaffirm that holding today. We need not decide whether only the post-enactment evidence was sufficient to sustain the sex trafficking conviction because, even assuming it was not, double jeopardy would not bar retrial. Id. (citing United States v. Mandel, 591 F.2d 1347, 1371-74, rev'd en banc on other grounds, 602 F.2d 653 (4th Cir. 1979); United States v. Harmon, 632 F.2d 812, 814 (9th Cir. 1980) (per curiam)).

[10] Webster's Dictionary HN7[↑] defines "labor" as the "expenditure [**21] of physical or mental effort especially when fatiguing, difficult, or compulsory." Merriam-Webster's Third New International Dictionary Unabridged (2002) available at http://www.mwu.eb.com/mwu. "Service" is defined as "the performance of work commanded or paid for by another." Id.

labor statute is susceptible to application in the context of "purely domestic chores" performed, for example, at the behest of an abusive spouse. Marcus presses that this is an incorrect application of a statute that was intended to proscribe international trafficking in slave labor and prostitution.

Marcus's argument is unpersuasive. The jury was properly instructed that consensual BDSM activities alone could not constitute the basis for a conviction under the sex trafficking charge, [11] and there is no reason to believe that the jury did not understand this instruction to be equally true with respect to the forced labor charge. The jury rejected Marcus's view of the affair, namely, that Jodi's work on the website and punishments relating thereto were all part of her long-time intimate relationship with Marcus and their broad participation in BDSM. Moreover, the evidence fully supports the Government's theory that, over time, the violence Marcus inflicted upon Jodi became nonconsensual, the punishments became more severe, and that Jodi would not have performed services for Marcus's website had she not feared that noncompliance would result in future physical and sexual abuse. The fact that Jodi's enslavement **[**22]** arose from her initial participation in consensual BDSM activities does not require a contrary conclusion.

Therefore, we conclude that the plain meaning of the forced labor statute unambiguously applies to Marcus's conduct. Thus, we do not address the statute's legislative history. See *Giordano, 442 F.3d at 40*. [12]

_____

[11] With respect to the sex trafficking charge, the court instructed:

> Throughout the trial, you have heard evidence about sexual practices called Bondage, Discipline/Domination, Submission/Sadism, Masochism, or "BDSM," that may involve actual physical restraint, such as being tied up or placed in a cage. The mere fact that a person was physically restrained during the course of such acts does not necessarily mean that the statute was violated. For example, if the physical restraint was consensual, then it would not constitute a violation of the statute.

> It is for you to decide, based on a careful consideration of all the facts and surrounding circumstances, whether the acts of physical restraint violated the statute.

Trial Tr. 1261: 3-18.

[12] Because we conclude that the forced labor statute unambiguously applies to Marcus's conduct, we reject his as-applied vagueness argument. *HN8*[↑] "[O]ne **[**23]** whose

For the reasons discussed above, we affirm Marcus's conviction with respect to **[*46]** *18 U.S.C. § 1589*, vacate his conviction with respect to *18 U.S.C. § 1591*, and remand the case to the district court for further proceedings consistent with this opinion. Should the Government determine that it will not retry Marcus on the sex trafficking charge, we direct the district court to reconsider Marcus's **[**24]** sentence. At this time, review of the reasonableness of his sentence is premature.

## III. CONCLUSION

The district court's September 18, 2007 judgment of conviction is hereby AFFIRMED in part and VACATED in part. The case is REMANDED to the district court for proceedings consistent with this opinion.

_____

**End of Document**

_____

conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)*. In any event, this argument was raised for the first time on appeal, and Marcus does not contend that the district court committed plain error by not addressing it. Consequently it is deemed waived. *See United States v. Feliciano, 223 F.3d 102, 125 (2d Cir. 2000)*.

Marcus also argues (1) that the district court's decision permitting two of the Government's witnesses to testify using only their first names and not to disclose their addresses or employment violated his due process rights; and (2) that the district court improperly denied Marcus's motion to suppress certain evidence. We have considered both arguments and find them to be without merit.

# EXHIBIT O

**In the Matter Of:**

D.C. AND R.M. vs.

NELSON MARTIN, et al.

Ethan Weaver

October 18, 2022

**HKW, LLC**
764 Corporate Circle, Suite 200
New Cumberland, PA  17070
717.214.1182
Schedule@hkwllc.com



**Witness Ethan Weaver**

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


D.C. AND R.M.,                  :
          Plaintiffs            :
                                :
          vs.                   :
                                :
NELSON MARTIN D/B/A             :
LIBERTY RIDGE FARM,             :          CIVIL ACTION
LIBERTY RIDGE FARM,             :  NO: 5:21-CV-05070-JMG
EASTERN PENNSYLVANIA            :
MENNONITE CHURCH AND            :
RELATED AREAS, AND              :
MENNONITE MESSIANIC             :
MISSION OF THE EASTERN          :
PENNSYLVANIA MENNONITE          :
CHURCH,                         :
          Defendants            :




      DEPOSITION OF:    ETHAN WEAVER

     TAKEN BY:          PLAINTIFFS

     REPORTER:          TRACY L. LLOYD, RPR
                        NOTARY PUBLIC

                        KYLAN BARRY, VIDEOGRAPHER

     DATE:              OCTOBER 18, 2022, 9:03 A.M.

     PLACE:             MARGOLIS EDELSTEIN
                        214 SENATE AVENUE, SUITE 402
                        CAMP HILL, PENNSYLVANIA
```

Witness Ethan Weaver

2

1    APPEARANCES:

2           ANDREOZZI & FOOTE
            BY:  RENEE E. FRANCHI, ESQUIRE
3                4503 NORTH FRONT STREET
                 HARRISBURG, PENNSYLVANIA  17110
4                (717) 686-9936
                 Renee@vca.law
5
                 -- For the Plaintiffs
6
            MARGOLIS EDELSTEIN
7           BY:  MEGHAN WYNKOOP, ESQUIRE
                 JOCELYN MENDEZ, ESQUIRE
8                THE CURTIS CENTER, SUITE 400E
                 170 SOUTH INDEPENDENCE MALL W.
9                PHILADELPHIA, PENNSYLVANIA  19106
                 (215) 922-1100
10               mwynkoop@margolisedelstein.com

11
                 -- For the Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Ethan Weaver**

3

1                    INDEX OF WITNESSES

2    EXAMINATION                                      PAGE

3    ETHAN WEAVER

4         By Ms. Franchi                              5

5         By Ms. Wynkoop                              --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Witness Ethan Weaver**

4

1            STIPULATIONS

2            It is stipulated and agreed by and between

3    counsel for the respective parties that the reading,

4    signing, sealing, and filing of the transcript is

5    waived and that all objections, except as to the

6    form of the question, are reserved to the time of

7    trial.

8

9            THE VIDEOGRAPHER:  Here begins Media

10   Number 1 in the videotaped deposition of Ethan Weaver

11   in matter of D.C. and R.M. v. Martin, et al. in the

12   United States District Court for the Eastern District

13   of Pennsylvania, case number 521-CV-05070-JMG.

14            Today's date is October 18th, 2022, and

15   the time on the video monitor is 9:03 a.m.  The

16   videographer today is Kylan Barry representing Planet

17   Depos.  This video deposition is taking place at 214

18   Senate Avenue, Suite 402, Camp Hill, Pennsylvania,

19   17011.

20            Would counsel please voice identify

21   themselves and state whom they represent.

22            MS. FRANCHI:  My name is Renee Franchi.

23   I'm with the law firm of the Andreozzi and Foote, and

24   I represent the Plaintiffs in this case.

25            MS. WYNKOOP:  Meghan Wynkoop, Margolis

**Witness Ethan Weaver**

5

1    Edelstein, and I represent the Defendants.

2                    MS. MENDEZ:   Jocelyn Mendez, Margolis

3    Edelstein, and I represent the Defendants.

4                    THE VIDEOGRAPHER:   The court reporter

5    today is Tracy Lloyd.  Will the reporter please swear

6    in the witness.

7

8                    ETHAN WEAVER, called as a witness, being

9    affirmed, testified as follows:

10

11                              EXAMINATION

12

13   BY MS. FRANCHI:

14        Q.    All right.  Good morning, Mr. Weaver.

15        A.    Good morning.

16        Q.    Again, my name is Renee Franchi.  I'm one

17   of the attorneys for the Plaintiffs in this case.  I

18   know as we talked about before, you had indicated that

19   you have a hearing problem or if there's any point at

20   any time that I -- you can't hear me, you don't

21   understand me or I'm talking too fast which I tend to

22   do, please don't hesitate to interrupt or tell me to

23   speak up.  Sometimes I get going on a roll and don't

24   realize what I'm doing.

25                    So before we get going with any

**Witness Ethan Weaver**

6

1   questions, I feel like we can put a few things on the

2   record that counsel and I had spoken about previously,

3   and I think that we can probably just have these carry

4   over into all of the depositions this week instead of

5   rehashing.

6            Agreeing to usual stipulations, reserving

7   the right to recall witnesses because discovery is

8   ongoing, and we do have a binder full of the printed

9   discovery that has been exchanged in this matter.  So

10  instead of admitting any exhibits, I'll just be

11  referring to pages of the discovery and the Bates

12  stamp numbers as long as counsel is okay with all of

13  that.  I think that's probably everything.

14            MS. WYNKOOP:  Yeah, we agree.

15  BY MS. FRANCHI:

16       Q.    Okay.  So all right.  Thank you for being

17  here with us today.  Before we go through with the

18  questions in this case in the litigation involving

19  Liberty Ridge Farm, we have some preliminary matters

20  that we always have to go through in these depositions

21  just to make sure you know the expectations and the

22  rules for taking a deposition.

23            The first thing is that if I or your

24  attorney or if anybody asks you a question during the

25  deposition, you'll have to give a verbal answer, not a

Witness Ethan Weaver

7

1    non-verbal response like uh-huh or a head nod or a
2    head shake.  This is because obviously the
3    stenographer is here.  They're typing down all of the
4    questions, all of the answers.  They can only type
5    down verbal responses, so will you be able to give
6    verbal responses to questions today?
7         A.    Yes.
8         Q.    All right.  Thank you.  Next, as I
9    mentioned earlier, if I ask a question that you don't
10   understand, you can't hear it properly, or if it just
11   doesn't make sense whether it be because I worded it
12   confusingly or any other reason, please feel free to
13   tell me that you don't understand the question or ask
14   me to repeat it.  Can you do that?
15        A.    Yes.
16        Q.    In that same light, if you're asked a
17   question and you answer with a verbal response, I will
18   assume that you understood the question.  Is that
19   fair?
20        A.    Yes.
21        Q.    Okay.  I expect we will be here for a few
22   hours this morning.  I know attorneys are inherently
23   bad at estimating time.  I hope we're not here longer
24   than that.
25              If at any point you need to take a break

**Witness Ethan Weaver**

8

1    to use the restroom, get something to drink, stretch

2    your legs, anything like that, that's fine.  Just let

3    me know or let your attorney know.  The only

4    restriction is that if you are asked a question, you

5    may not take a break until the question is answered.

6    Does that make sense?

7           A.    Yes.

8           Q.    Okay.  Now, during this deposition at

9    some point I may or may not ask you to estimate or

10   approximate something if you do not recall something

11   specifically like a date or a time.  Please do not

12   simply guess or take a stab in the dark.

13               If you think you can give a fair estimate

14   or a fair approximation, please do so.  For example,

15   if I ask you a question where you know the event

16   happened in a certain time frame, for example, between

17   two specific years like 2005 and 2008, just for

18   example, it's fair to say that you don't remember

19   exactly when the event occurred, but remember that it

20   happened between those two years, and that's

21   completely fine.  But if you simply don't know or do

22   not remember something at all or you're uncertain,

23   please say so.  Is that fair?

24          A.    Yes.

25          Q.    Okay.  Now, the last and most important

**Witness Ethan Weaver**

9

1    thing today is that all we ask is that you tell the

2    truth.  Is there anything that would prevent you from

3    being able to fully testify to the truth today?

4         A.    No.

5         Q.    So first I will be starting with just

6    some general background questions so I can get to know

7    you.  Obviously I've never spoken with you before, and

8    then I will get into some more specifics about the

9    case.  I'm sure that your attorney will likely have

10   some questions when I'm finished.  Maybe not.  Maybe

11   she will.  Do you have any questions for me before we

12   start?

13        A.    No.

14        Q.    Okay.  So to begin, what, if anything,

15   did you do in preparation for your deposition today

16   other than speaking with your lawyer?

17        A.    Nothing except pray.

18        Q.    Okay.  Did you review any documents in

19   preparation?

20        A.    No.

21        Q.    Okay.  So here are the background

22   questions, and then, again, we'll get into some more

23   specifics.  Sir, what is your full name?

24        A.    Ethan Weaver.

25        Q.    And can you spell your last name?

**Witness Ethan Weaver**

10

1       A.      W-e-a-v-e-r.

2       Q.      And how old are you?

3       A.      40 -- 68.

4       Q.      And what is your date of birth?

5       A.      8/5/54.

6       Q.      And where were you born?

7       A.      Harrisburg.

8       Q.      Oh, local.  Where do you live now?

9       A.      Newville.

10      Q.      And that's in Pennsylvania?

11      A.      Yes.

12      Q.      Have you lived in Pennsylvania your whole

13  life?

14      A.      Whole life.

15      Q.      Okay.  What do you do for a job?

16      A.      I'm a truck driver.

17      Q.      Interstate?

18      A.      No.

19      Q.      Okay.  Who do you work for?

20      A.      A.B. Martin.

21      Q.      How long have you worked there?

22      A.      Nine or ten years.

23      Q.      Where did you work before that?

24      A.      Farm, on the farm.

25      Q.      Okay.

**Witness Ethan Weaver**

11

1        A.      I had a farm.

**2        Q.      Where at?**

3        A.      Newville.

**4        Q.      Okay.  What was the name of the farm?**

5        A.      Wildwood Acres.

**6        Q.      Okay.  Was it a family farm?**

7        A.      Yes.

**8        Q.      Okay.  Did you own it or family members**
**9   own it?**

10       A.      My daughter and her husband own it
11   presently.

**12       Q.      Okay.  Now, sir, what's your education**
**13   level?**

14       A.      High school.

**15       Q.      And did you attend, I guess, a**
**16   traditional high school or did you attend a high**
**17   school within your community?**

18       A.      The community, Big Spring High School,
19   Newville, Pennsylvania.

**20       Q.      And can you read, write, and understand**
**21   English?**

22       A.      Absolutely.

**23       Q.      And have you ever been charged with a**
**24   crime?**

25       A.      No.

**Witness Ethan Weaver**

12

1    Q.    And I saw that you had come in with your

2    wife today, so you're married?

3    A.    Yes.

4    Q.    And what's your wife's name?

5    A.    Ruby.

6    Q.    Same last name?

7    A.    Yes.

8    Q.    And you live together?

9    A.    Yes.

10   Q.    Do you have any children?

11   A.    Two.

12   Q.    What are their names?

13   A.    Sharon and Joy.

14   Q.    And how old are they?

15   A.    Sharon was born January 8, '78, and Joy

16   was born June 2, '81.

17   Q.    And they don't live with you?

18   A.    No.

19   Q.    Okay.  So I guess this probably goes

20   without saying, but you were raised within the

21   Mennonite faith?

22   A.    Yes.

23   Q.    Were you always a member of the Eastern

24   Pennsylvania Mennonite Church?

25   A.    Yes.  No.  I was baptized in Lancaster

**Witness Ethan Weaver**

13

1   Conference and then transferred to the Eastern Church

2   when I was 16 I think.

3        **Q.     Okay.  Was that your family's choice?**

4   **Was that your personal choice?**

5        A.     My personal choice.

6        **Q.     Okay.  Now, just generally, again, I'm**

7   **not -- I'm only as familiar with the Eastern**

8   **Pennsylvania Church as I have been within this case,**

9   **but tell me a little bit about just what the Eastern**

10  **Pennsylvania Mennonite faith means to you.  Like, for**

11  **example, kind of what are the pillars of the faith?**

12  **Just what does it mean to you?**

13       A.     Everything.  It's a biblical based church

14  that we try to specifically and deliberately follow

15  the Bible.

16       **Q.     Okay.  What are some of the more**

17  **important factors or rules to live by within your**

18  **faith?**

19       A.     Honesty, integrity, uprightness,

20  Godliness, discipleship.

21       **Q.     What about volunteerism?  Is that**

22  **important?**

23       A.     Oh, yes.

24       **Q.     And what does that mean to you?**

25       A.     That I give my time to help others.

**Witness Ethan Weaver**

14

1    Q.    And within your faith and within your

2  community, and I apologize.  If there's another way

3  you would like for me to reference it other than your

4  faith or your community, please let me.  I don't mean

5  to be offensive, and, again, I'm just ignorant to it.

6  I'm learning as I go.

7              So if I'm misstating anything, please

8  correct me.  But what are some examples of what that

9  would mean?  Would it mean going and helping someone

10 in aid?  Going and cleaning the church on the

11 weekends?

12   A.    That's correct.

13   Q.    Okay.  Is working important within your

14 faith and within your community?

15   A.    Yes, it is.

16   Q.    Now, how much oversight does -- and when

17 I say the church, I'm generally just referring to, I

18 guess, the Eastern Pennsylvania Mennonite Church as a

19 whole and also individual parishes, but how much

20 oversight does the church have over just the

21 day-to-day lives of members?

22   A.    Very little.

23   Q.    Are there rules to live by within the

24 community?

25   A.    No.

Witness Ethan Weaver

15

1    Q.     Okay.

2    A.     Honesty and integrity.

3    Q.     Okay.  Within your community if there is

4  any guidance that comes down from the church for its

5  members, how does that get communicated?  Is it

6  through the bishops in each parish or how does that

7  work?

8    A.     It's through the leadership of the

9  church.

10   Q.     And who is the leadership of the church?

11   A.     Okay.  We have a bishop, and then we have

12 ministry, and then we have a deacon.

13   Q.     Okay.  And pardon my ignorance.  So if

14 you can, to the extent that you're able to, explain to

15 me who belongs where.  Is it individual parishes?  Is

16 it kind of the greater church?  How does that

17 structure work to the extent that you know?

18   A.     We have a church in general which is

19 called the Eastern Pennsylvania Mennonite Church.

20 Then we have districts which composes about five or

21 six congregations, and then we have a bishop over each

22 of those five or six congregations that give general

23 oversight.

24          Then we have ministry that is under that

25 that do the preaching basically, and the deacon of the

**Witness Ethan Weaver**

1  church takes care of the details of the church.  If

2  someone has a need in the congregation, he sees --

3  helps to see that need.  If there's a death, there's a

4  sickness, there's need, he will come out or call and

5  say can I help you.

6      **Q.    Okay.  Now, I know that obviously being a**

7  **member of your church is voluntary.  People can leave**

8  **if they would like to.  Is there ever a time when**

9  **people are asked to leave by the church or asked to**

10 **leave the community or for any reason non-voluntarily**

11 **have to leave?**

12     A.    No.  No.  If a person would be involved

13 in immorality, for example, they would be

14 excommunicated, but they would not be told to leave.

15     **Q.    Okay.  What --**

16     A.    We encourage them to stay.

17     **Q.    Sorry.  I didn't mean to interrupt you.**

18 **What does it mean to be excommunicated?**

19     A.    It means you're just removed from church

20 membership, so then you're not entitled to communion.

21 That's all basically.

22     **Q.    Okay.  If someone is excommunicated, are**

23 **there any rules that prohibit them from communicating**

24 **with other members of their family who are still**

25 **within the community?**

Witness Ethan Weaver

17

1       A.      No, no.

2       Q.      Okay.  So kind of moving on from that and

3   just asking you a little bit more about your business

4   and personal life, do you have currently any ownership

5   interests in any businesses?

6       A.      No.

7       Q.      Do you have any financial interests in

8   any businesses other than the job you were --

9       A.      Well, I have a business called Blue

10  Mountain Supply.

11      Q.      Okay.

12      A.      Which is I'm dissolving that presently.

13  It's a fencing business.  The farm I sold to my

14  daughter and her husband.  That is all.

15      Q.      Okay.  So this case generally encompasses

16  the years of about 2010 to 2014.  So if at any point I

17  mention the time frame of this case or those years, I

18  may be asking you some specific questions encompassing

19  that time.  I know that was a while ago now.

20              So if there's anything you don't

21  remember, please let me know.  But if I do reference

22  the time frame of this case, that's generally what I

23  will be referring to.  If you need any clarification,

24  again, please ask.

25              So during the time frame of this case

18

1    that we're here for, did you have any ownership

2    interests in any businesses other than the farm that

3    you had sold to your daughter or Blue Mountain Supply?

4          A.    No.

5          Q.    Any financial interests in any other

6    businesses?

7          A.    No.

8          Q.    How long have you been involved in Blue

9    Mountain Supply?

10         A.    I don't remember.  It's many years.

11         Q.    Was it before 2011?

12         A.    Yes.

13         Q.    And you said it was a fencing business?

14         A.    Yes.

15         Q.    Did it build fences?

16         A.    Yes.

17         Q.    Did you have your own sawmill or

18   anything?  Was it wooden fences?

19         A.    It was vinyl fencing.

20         Q.    Okay.  So like what you would see in

21   someone's backyard?

22         A.    Yeah.

23         Q.    Okay.  So currently you live in Newville?

24         A.    That's correct.

25         Q.    Where did you hold your personal bank

19

1   accounts?  Is it a local bank?  Is it a state bank?

2        A.     Newville.

3        Q.     Okay.  They have their own bank?

4        A.     Yes.

5        Q.     Okay.  What about Blue Mountain Supply?

6   Where do they hold their or where does it hold its

7   bank account at?

8        A.     Same bank.

9        Q.     Do you have any employees?

10       A.     No.

11       Q.     Just you?

12       A.     Just me.  I subbed out the work that

13  needed to be installed.

14       Q.     Okay.  Do you -- generally when you sub

15  out work or you hire any contractors, do you usually

16  keep it within people within your community or do you

17  hire or subcontract out to people that are not within

18  your community?

19       A.     I only ever had one.  He was sort of an

20  independent.

21       Q.     Okay.

22       A.     That's --

23       Q.     Now, of the businesses that we've talked

24  about, whether it be the farm or the supply company,

25  were any of them associated in any way or receive any

**Witness Ethan Weaver**

20

1   benefit from any work performed at Liberty Ridge?

2        A.    No.

3        Q.    So I want to get a little bit more now

4   into Liberty Ridge and just how it was formed.  How

5   did you first become involved with Liberty Ridge?

6        A.    The church asked me to be involved.

7        Q.    And when you say the church asked you,

8   who was it that communicated to you?  I know I keep

9   referring to the church kind of as this nebulous

10  entity, but I know there are individuals involved.

11       A.    It was the Mission Board that asked me.

12       Q.    Okay.  And when was that?

13       A.    I don't remember.

14       Q.    If I said around 2010 give or take, does

15  that sound about right?

16       A.    I don't remember.

17       Q.    Okay.  Do you remember who it was

18  specifically from the Mission Board who asked you?

19       A.    Yes.  I think it was Jacob Brubaker.

20       Q.    Okay.  Do you remember who he was or what

21  his position was on the board?

22       A.    No.

23       Q.    Okay.  Do you have or did you have any

24  involvement in the Mission Board at that time?

25       A.    No.

Witness Ethan Weaver

21

1    Q.    Did you know Jacob -- I'm sorry.  I can't
2  speak today.  Did you know Jacob Brubaker or any other
3  members of the Mission Board just personally or
4  through the church before they asked you?
5    A.    Just through the church.
6    Q.    Okay.  And within your district when you
7  mentioned the church, is it a small community?
8    A.    Yeah.  It's five congregations, something
9  like that.
10   Q.    So you know or at least are aware of --
11   A.    Oh, yeah.
12   Q.    -- most people that are within it?
13   A.    Mm-hmm.
14   Q.    Okay.  After they or the Mission Board
15 asked you to become involved with Liberty Ridge, did
16 you attend any of the Mission Board meetings or were
17 you involved in any discussions with them?
18   A.    No.
19   Q.    Okay.  And what exactly, if you can
20 recall, did Mr. Brubaker ask you or tell you when he
21 first communicated with you about the creation of
22 Liberty Ridge?
23   A.    He just asked me if I would be interested
24 in serving.
25   Q.    Okay.  Did he say anything else?  What it

22

1    would be for or what it would involve?

2           A.     We knew it was with youth, working with

3    youth.  That's all.

4           Q.     Okay.  When you're chosen or asked to

5    volunteer by the Mission Board, I'm assuming this was

6    not a paid position?

7           A.     No.

8           Q.     Okay.  Was there some sort of a committee

9    formed or anything to that nature?

10          A.     Yes.

11          Q.     Were you part of that committee?

12          A.     Yes.

13          Q.     Do you remember who else was on the

14   committee?

15          A.     Yes.  Jacob Brubaker, Lamar Garman,

16   Nelson Martin, myself.  I think that's all.

17          Q.     Okay.  Did your committee meet

18   independently to discuss the creation of Liberty

19   Ridge?

20          A.     Yes.

21          Q.     And what all did you talk about in your

22   meetings?

23          A.     I don't remember everything.

24          Q.     If you can remember any specifics just to

25   kind of give me an idea of what it was.  I mean, for

**Witness Ethan Weaver**

23

1    example, were you tasked with creating the entity from

2    the ground up or did the board give you any guidance?

3    How did that work?

4          A.     We worked trying to establish what we

5    wanted to accomplish and where we wanted to have a

6    facility, under what guidelines we were going to

7    operate, I guess.

8          Q.     Okay.  Now, do you remember at any point

9    when you were discussing with your committee

10   establishing Liberty Ridge that there was a proposal

11   from a company called Snyder Gates or another company

12   that wanted to do work with Liberty Ridge?

13         A.     Yes.  I remember it being discussed.

14         Q.     Okay.  Do you remember anything else

15   about it?

16         A.     No.

17         Q.     Do you remember anything specific from

18   the discussion that you had amongst the committee?

19         A.     No.

20         Q.     Did you personally talk with anybody from

21   Snyder Gates about this?

22         A.     I talked to the owner at the time which

23   was Nolan Snyder.

24         Q.     Okay.  Do you recall any of that

25   conversation?

24

1      A.    No.  That's been so long ago.

2      Q.    I apologize.  I know that it has been

3  quite some time, so I don't mean to presume that you

4  remember things from 23 years ago now.

5      A.    Something like that, yeah.

6      Q.    If you can't, that's fine.  I want to

7  point you to -- we'll go to Page 93.  It's LRF-93

8  which is almost halfway through the stack.  Just let

9  me know when you get there.

10     A.    93.  Here?

11     Q.    Yes.  So towards the bottom of the page

12 it says Number 13, specifically it says the committee

13 presented a proposal from Snyder Gates LLC that would

14 allow them --

15     A.    I'm sorry.  Okay.  Number E?  Okay.  Yes.

16 I'm with you now.

17     Q.    Okay.  That would allow them to set up

18 the shop to manufacture fiberglass farm gates

19 incorporating the labor of the Liberty Farm residents.

20 Snyder Gates would provide training and management for

21 a one-year period.

22           At that point a decision would need to be

23 made whether the farm would purchase the manufacturing

24 machinery or discontinue the contract.  Snyder Gates

25 would continue to handle the inventory and sales.  A

**Witness Ethan Weaver**

25

1  motion carried to allow them to use and enter a

2  one-year agreement.

3           Now, do you remember drafting or creating

4  or being involved in any way with a contract with

5  Snyder Gates?

6       A.    No.  I don't remember.

7       Q.    Okay.  And do you recall anything about

8  the conversations with any representative from Snyder

9  Gates about incorporating the labor of the Liberty

10 Ridge Farm residents?

11      A.    No.  I don't remember.

12      Q.    Okay.  You don't remember any of the

13 other specifics about the proposal or the arrangement?

14      A.    That was not my role.

15      Q.    Okay.  Whose was it?

16      A.    Nelson Martin.

17      Q.    Okay.  Do you recall what his role was on

18 the committee?  Actually, let me take that back.  Did

19 you all have specific roles or did you work kind of as

20 a group?

21      A.    No.  We had specific roles.

22      Q.    What was your specific role?

23      A.    Secretary.

24      Q.    Okay.  And what was Mr. Martin's?

25      A.    Treasurer.

**Witness Ethan Weaver**

26

1    Q.    Okay.  And did you know Mr. Martin prior
2  to being on the committee together?

3    A.    No.

4    Q.    Okay.  So they just threw you all
5  together?

6    A.    Yeah.

7    Q.    Okay.  So if I were to ask questions
8  about any of the financial benefit from this
9  arrangement, how the sales worked, anything like that,
10  you wouldn't have any knowledge?

11    A.    I have no idea.

12    Q.    Okay.  You think Mr. Martin would?

13    A.    I would guess so, but I do not know.

14    Q.    Okay.  Excuse me.  I apologize.  I'm
15  losing my voice.  Are you familiar with any other
16  businesses that have done any sort of business or had
17  an arrangement with Liberty Ridge just over the years?
18  Specifically, some of the names that have come up are
19  Sensenig Chair Shop, Clark's Feed Mill, Wengerd Pallet
20  Company, or Dutch-Way Farm Market.

21    A.    I was not involved in that.  That was not
22  my role.

23    Q.    Okay.  Were you familiar with them or at
24  least knew of them?

25    A.    Well, I heard the names.  That's all.

**Witness Ethan Weaver**

27

1     Q.    But you weren't involved in their

2  business in any way?

3     A.    No, no.

4     Q.    Okay.  And you weren't involved with any

5  arrangement between them and the farm?

6     A.    No.

7     Q.    Okay.  Sorry.  Just give me one moment.

8  When I start talking too much, I just need to start

9  drinking a whole bunch of water.  Are you good --

10  you're good to keep going?

11     A.    Mm-hmm.

12     Q.    Okay.  At the inception of Liberty Ridge

13  in about 2011, how was the -- how was the farm run?

14  What was the organization structure, if you recall?

15  Was there a board of directors?

16     A.    Yes.

17     Q.    Okay.  And do you recall who was on the

18  board?

19     A.    The original -- it was Jacob Brubaker,

20  Lamar Garman, Nelson Martin, myself.  Might be one

21  more.

22     Q.    So the original committee?

23     A.    Huh?

24     Q.    The original committee?

25     A.    The original committee.

28

1    Q.    Okay.

2    A.    Yeah.

3    Q.    And were you at that point when it became

4  an official board were you still the assistant

5  secretary?

6    A.    I was secretary originally.

7    Q.    You were secretary, okay.  And when did

8  that change?

9    A.    I don't recall.

10    Q.    Do you recall if it was before or after

11  2014?  Again, if you don't remember, please tell me.

12    A.    I don't remember.  I don't remember.

13    Q.    So the Liberty Ridge Farm Board, who do

14  they answer to or do they have to give any updates or

15  answer to any other entity or person in particular?

16    A.    The Mission Board.

17    Q.    Okay.  And do you know or at least from

18  your knowledge generally what is the Mission Board or

19  what is their role?  What do they do within the

20  church?

21    A.    They would direct these kind of affairs.

22    Q.    Okay.  Do you know who the Mission Board

23  would answer to?

24    A.    The Bishop Board.

25    Q.    Okay.  So the church does have a Bishop

**Witness Ethan Weaver**

29

1    Board?

2         A.    Yes.

3         Q.    Okay.  How often would you or anybody

4    from the Liberty Ridge Board have to report to the

5    Mission Board?

6         A.    Jacob Brubaker reported.  I have no idea

7    how often he reported.

8         Q.    Okay.

9         A.    He was the Mission Board representative

10   on our -- on Liberty Ridge Board.

11        Q.    Oh, he was.  Okay.  Were all of the

12   members of the Liberty Ridge Board members of the

13   Eastern Pennsylvania Church?

14        A.    Yes.

15        Q.    Okay.  What about the Mission Board?

16        A.    Yes.

17        Q.    Okay.  Do you have to be in any sort of

18   standing or good standing or anything with the church

19   or can it just be anybody who wants to volunteer?

20        A.    They wanted those in good standing with

21   the church.

22        Q.    What does that mean within your community

23   to be in good standing with the church?

24        A.    That you're in harmony with the church

25   structure.

**Witness Ethan Weaver**

30

1    Q.    Okay.  And who makes that decision or is
2  it just common knowledge?
3    A.    Common knowledge, I guess.
4    Q.    Okay.  They wouldn't have somebody come
5  and tell you like you're in good standing?
6    A.    No, no.
7    Q.    Okay.  Are you familiar with the
8  publication that Eastern Mennonite Testimony?
9    A.    Yes.
10   Q.    What is that?
11   A.    It's just basically the organ of the
12  church that reports on the function of the church and
13  also keep us doctrinally connected, cohesion.
14   Q.    Okay.  Is that the main, I guess,
15  publication of the church?
16   A.    That is the main publication, yes.
17   Q.    Okay.  Do you know who puts it out?
18   A.    The Publication Board.
19   Q.    Okay.  So that's its own board?
20   A.    Yeah, that its own board.
21   Q.    And who reads it?  Is it just members of
22  the church?
23   A.    Anyone can read it.
24   Q.    Okay.
25   A.    If you want a copy, we can get you a

**Witness Ethan Weaver**

31

```
1   copy.
2        Q.     And who writes for it?  Is it just
3   members of the community?  Do they tell people to
4   write articles?  Do people volunteer?
5        A.     They would ask those to write on it.  The
6   Publication Board has their board, and I think they
7   ask other persons.  They could ask me to write if they
8   want.
9        Q.     Okay.  And this may be silly, and I
10  apologize if I don't know.  Is this put out in a
11  written publication?  Is it --
12       A.     Yes.
13       Q.     Is it emailed out to people?  I don't
14  know too much about your faith.  I know you're very
15  conservative.  I don't know what your internet access
16  is.  So I, again, apologize if I'm being ignorant if I
17  don't know.
18       A.     We get it on a written form.
19       Q.     Okay.
20       A.     Otherwise, I'm not aware if it's any
21  other media form.
22       Q.     Okay.
23            MS. WYNKOOP:  Real quick.  Just make sure
24  she finishes because she can't type down everything.
25       A.     Okay.  Sorry.  Sorry.
```

Witness Ethan Weaver

32

1    BY MS. FRANCHI:

2         Q.    I have often been yelled at by

3    stenographers before also for speaking over people

4    unintentionally.  So if I get yelled at, I usually

5    just say I'm sorry and then move on.

6              Okay.  So I want to go to the very first

7    page of the book, so you don't have to flip around too

8    much.  PLS Page 1.  Do you recognize this document at

9    all?  You can flip through it.  It goes until Page 15.

10        A.    Yes.

11        Q.    And what is it?

12        A.    It's the organ of the church.

13        Q.    And specifically going to Page 12 and 13,

14   do you recognize this article?

15        A.    Oh, yes.

16        Q.    Do you know who wrote it?

17        A.    I wrote it.

18        Q.    So when it says Brother Ethan for the

19   Liberty Ridge Farm Committee, that's you?

20        A.    Yeah.

21        Q.    And were you asked to write this?

22        A.    Yes.

23        Q.    Who asked you?

24        A.    I don't remember.

25        Q.    Do you remember who they represented?

Witness Ethan Weaver

33

1        A.     No, I don't.  No.

2        Q.     Was it somebody from the Publication

3   Board?  Somebody from the church?  Somebody from the

4   Mission Board?  If you remember at all.

5        A.     No.  I do not remember.

6        Q.     Now, obviously we can read through the

7   article.  We know what it says.  I'll spare the

8   stenographer from having to type the whole thing or

9   listening to me read it.

10              Just generally in your words what was the

11   purpose of putting this article out?

12       A.     To inform the church of the Liberty Ridge

13   and to create a burden for the work.

14       Q.     Okay.  And this went out to members of

15   the church community?

16       A.     Yeah.

17       Q.     Okay.  And was Liberty Ridge Farm

18   something that was talked about within the church

19   community?  Was it -- I guess was it seen as being a

20   church organization?

21       A.     Yes.

22       Q.     Okay.  Were you aware of anything kind of

23   behind the scenes in the business structure of Liberty

24   Ridge?  Like how it was registered?  Who owns it?

25   Anything like that?

**Witness Ethan Weaver**

34

1      A.      No, no.

2      Q.      Does the Board have any governing

3   documents like bylaws or rules or anything like that?

4      A.      Yes.

5      Q.      You do, okay.  And do you recall what

6   they are?  Is it just the bylaws?  Are there other

7   articles?

8      A.      Bylaws.

9      Q.      Okay.  And they were put into place at

10  the beginning --

11     A.      Yes.

12     Q.      -- when it was created?

13     A.      Yes.

14     Q.      Do you remember if they've been amended

15  at all since then or have they stayed pretty

16  consistent?

17     A.      Pretty much the same.  Very few

18  amendments.

19     Q.      Now, in opening Liberty Ridge I know that

20  you had said that you and the committee had talked

21  about the purpose and just what you wanted to

22  accomplish.  Just in your words what was the purpose

23  of creating Liberty Ridge?

24     A.      To help troubled youth.

25     Q.      Okay.  And when you say troubled youth,

**Witness Ethan Weaver**

35

1    what does that mean to you or within the Eastern

2    Pennsylvania community?

3         A.    Youth that are struggling with the issues

4    of life.

5         Q.    Okay.  And what do you consider to be the

6    issues of life?

7         A.    Respect, trust, honesty.

8         Q.    Okay.  And was it supposed to be a

9    therapeutic setting for these boys?

10        A.    Yes.

11        Q.    Okay.  Were there any therapists or

12   medical doctors or any of those types of professional

13   staff working at Liberty Ridge or that contracted with

14   Liberty Ridge?

15        A.    No.

16        Q.    Okay.  Who determined whether a child was

17   considered to be, I guess, troubled in evaluating them

18   to go to Liberty Ridge?  I guess what does that --

19   what does that include and who kind of makes that

20   assessment?

21        A.    Parents.

22        Q.    Okay.  Now, would parents -- who would

23   they come to?  Would they come to anybody on the board

24   or was there a specific individual?

25        A.    No.  They would come to the chairman.

**Witness Ethan Weaver**

36

1     Q.     And who was that?

2     A.     Jacob Brubaker.

3     Q.     Oh, it was.  Okay.  Were there any

4  professional assessments required or was it just them

5  saying that they --

6     A.     It was just them.

7     Q.     Okay.

8            MS. WYNKOOP:  Make sure she finishes her

9  question.

10    A.     Sorry.

11           MS. WYNKOOP:  That's okay.

12  BY MS. FRANCHI:

13    Q.     So when a parent would come to

14  Mr. Brubaker indicating that they have -- their

15  child -- I'll just use the word troubled because

16  that's what you used, what would happen after that?

17  Like how would the process of them placing their child

18  in Liberty Ridge come about?  If you know or recall.

19    A.     Well, the first thing was a questionnaire

20  was given to the parents and the resident.  Then it

21  was completed and returned.  And then the boy was -- a

22  resident was -- the boy was put there on his own will.

23  He signed his document.  He's ready to come.

24    Q.     Okay.  So you would have the child sign a

25  document as well?

**Witness Ethan Weaver**

37

1       A.      Yes.

2       **Q.      Okay.**

3       A.      Yes.

4       **Q.      Did you -- when I say you, I mean the**

5  **committee or the board or the general leadership of**

6  **Liberty Ridge, not to put it on you personally, did**

7  **you or the board have any sort of advertising or was**

8  **it just word of mouth within the community?**

9       A.      Only word of mouth.

10      **Q.      So you didn't have a pamphlet saying, you**

11 **know, here's Liberty Ridge?**

12      A.      No.

13      **Q.      Okay.  And was it something that was**

14 **spoken about during sermons or during church time or**

15 **was it just within the community just talked about?**

16      A.      Within the community.

17      **Q.      Okay.  Now, when a child is placed or was**

18 **placed at Liberty Ridge, are there individual**

19 **treatment plans or therapies or, I guess, is it**

20 **individualized for all the children?**

21      A.      Yes.

22      **Q.      Okay.  In what way?  If you know.**

23      A.      We would make an evaluation based on our

24 best knowledge and tailor the program accordingly.

25      **Q.      What kind of an evaluation would that be?**

**Witness Ethan Weaver**

38

1    A.    Based on the questionnaire that the child
2   prepared.
3    **Q.    What are some of the items that were**
4   **evaluated?  Would it be their behaviors?  Struggles?**
5   **Things like that?**
6    A.    Behavior and struggles, fears.
7    **Q.    Okay.  Were there any sort of therapeutic**
8   **evaluations?  Psychological?  Medical evaluations?**
9    A.    Yes, occasionally whenever there was a
10  need evident.
11   **Q.    Okay.  So who then -- after the**
12  **questionnaire was, I guess, submitted, who would**
13  **perform, I guess perform or undertake or go about the**
14  **evaluation of the child and kind of tailoring the**
15  **program to them?**
16   A.    That was the board.
17   **Q.    The whole board?**
18   A.    Whole board.
19   **Q.    Okay.  So moving on a little bit, how**
20  **were the mentors chosen that were involved in Liberty**
21  **Ridge?**
22   A.    The church leadership would consider the
23  various possibilities and then ask them if they would
24  serve.
25   **Q.    Okay.  And how -- if you know, how did**

**Witness Ethan Weaver**

39

1   the church consider the mentors?  Did they come to the

2   church and say I want to volunteer?  Would the church

3   seek them out?

4        A.    Most the church sought them out.

5        Q.    Okay.  And do you know what that involved

6   or why they would seek out certain individuals?

7        A.    No.

8        Q.    Okay.  Do you know who would know?

9        A.    Pardon?

10       Q.    Do you know who would know?  I'm sorry

11  I'm speaking quietly.

12       A.    The chairman I suppose.

13       Q.    Mr. Brubaker?

14       A.    Yeah.

15       Q.    Okay.  Did the mentors have any sort of

16  training to work at Liberty Ridge?

17       A.    We had a brief orientation program.

18       Q.    Do you know what the orientation program

19  involved?

20       A.    It was basically outlining the purposes,

21  the objectives of Liberty Ridge.

22       Q.    Okay.  And these mentors, were they

23  within a certain age group?  A certain demographic?

24  Is there anything specific about them that would make

25  them common or is it just anybody the church found to

**Witness Ethan Weaver**

40

1    be appropriate?

2         A.    It's what the church found appropriate.

3    Mature, steady with no record of problems.

4         Q.    Were they generally married or single?

5         A.    Single.

6         Q.    Okay.  So they were young men?

7         A.    Yes.

8         Q.    They were adults?

9         A.    Yes.

10        Q.    Okay.  Do you know if they had any

11   training specifically for working with high needs

12   children such as children with mental health issues or

13   diagnoses or emotional issues?

14        A.    No.

15        Q.    Do you know while you were on the board

16   or on the committee creating Liberty Ridge and also

17   while you were on the board, did Liberty Ridge obtain

18   any state or governmental licensing or anything like

19   that prior to opening?

20        A.    Not that I'm aware of.

21        Q.    Okay.  Do you recall when Liberty Ridge

22   opened, did it have just one resident or were there

23   multiple that came in at once?

24        A.    One to begin.

25        Q.    Do you remember who that was?

**Witness Ethan Weaver**

41

1      A.     David Cross.

2      Q.     And do you recall, if you do remember,

3   how long he was there alone before another resident

4   came in?

5      A.     I do not know.

6      Q.     Generally speaking, about how many

7   residents at a time are there at Liberty Ridge?

8      A.     It varied quite a bit.

9      Q.     Okay.  Generally, from one to how many?

10     A.     One to four at the most.

11     Q.     Okay.  So there weren't dozens of

12   children?

13     A.     No, no.

14     Q.     So you said that you are now the

15   assistant secretary?

16     A.     Yes.

17     Q.     But you were the secretary?

18     A.     Yes.

19     Q.     Okay.  What were your duties as secretary

20   for Liberty Ridge?

21     A.     Take the minutes from the board meetings.

22   I sat there and listened.

23     Q.     I'm familiar with that.  I have also been

24   the secretary on a board before, and you do sit there,

25   and you act like a stenographer.  Did you have any

42

1   other specific roles to you as the secretary?

2        A.    No, other than putting things in a file

3   cabinet.  That's about all.

4        Q.    What about now as the assistant

5   secretary?

6        A.    Less yet.

7        Q.    Did -- the other I guess general duties

8   of the board, were they kind of shared amongst

9   everybody other than the specific you take notes, you

10  know, you --

11       A.    Yeah.

12       Q.    Okay.

13       A.    Yes.

14       Q.    During the years of 2011 to 2014, did you

15  have an active position on Liberty Ridge's property at

16  all?

17       A.    Yes.  I was house parent.

18       Q.    Oh, were you?  Okay.

19       A.    Yes.

20       Q.    Were you a house parent that whole time?

21       A.    I was house parent until '16.

22       Q.    Okay.  So from 2011 to 2016?

23       A.    That's right.

24       Q.    Okay.  The current Mission Board and also

25  the Mission Board when Liberty Ridge was created, were

Witness Ethan Weaver

43

1   you personally related to anybody on the board like

2   family members?

3        A.    No.

4        Q.    Okay.  What about anybody else involved

5   in the Liberty Ridge?

6        A.    No.

7        Q.    So talking a little bit about being a

8   house parent, just in your words, what were your

9   responsibilities as a house parent?

10       A.    Just like a normal household.  Give

11  direct -- feed and clothe them and see they follow

12  schedule.

13       Q.    Did your wife live there with you?

14       A.    Yes.

15       Q.    Did your -- I cannot remember when you

16  said your children's birthdays were.  Did they live

17  there with you or were they already out of the house?

18       A.    No.  They were both married.

19       Q.    Okay.  So as a house parent, if you could

20  describe to me, you were literally living in a house

21  with the residents?

22       A.    Yes.

23       Q.    Okay.  Were the mentors living there,

24  too?

25       A.    Yes.

**Witness Ethan Weaver**

44

1    Q.    Was it just one house at that time?

2    A.    Yes.

3    Q.    In the best way that you can, could you

4    just describe the house a little bit?  Was it one

5    story, and everybody was sleeping in one room?  Were

6    there multiple bedrooms?  If you could, just explain.

7    I mean I don't know what it looks like, so if you

8    could explain it to me.

9    A.    Of course.  We as house parents had our

10   separate bedroom, and the residents' bedroom is

11   upstairs.

12   Q.    And all the residents shared a bedroom?

13   A.    Well, there was only one boy to start, so

14   yeah.

15   Q.    Well, after that?

16   A.    We put boys in rooms as there was space.

17   Q.    Okay.  What about the mentors?  Where do

18   they sleep?

19   A.    They slept with the resident in a

20   separate bed.

21   Q.    Okay.  Excuse me.  Were you paid to be a

22   house parent?

23   A.    Yes.

24   Q.    How much were you paid?

25   A.    $2,000 a month.

Witness Ethan Weaver

45

1    Q.    Okay.  Was your wife paid or was it
2  just --
3    A.    No.
4    Q.    Okay.  And did your wife have any duties?
5    A.    She fried the eggs and did the cooking,
6  baking, just like a mother would.
7    Q.    That was going to be my next question.
8  She was kind of like the mother to everybody?
9    A.    She was a mother.  She did a very good
10  job.
11    Q.    Was she or did you both kind of act as
12  parents to the mentors and the residents or mainly
13  just the residents, and the mentors were other just
14  adults in the household?
15    A.    We were mentors to all.
16    Q.    Okay.  Did you ever get a break?
17    A.    Yes.
18    Q.    How often?
19    A.    Every weekend we were off.
20    Q.    Okay.
21    A.    And we had breaks as we asked for them.
22    Q.    Okay.  What about the supervision of the
23  mentors?  Were you -- actually, let's go back.  Were
24  you the only house parent from 2011 to 2014?
25    A.    Permanent house parent?

**Witness Ethan Weaver**

46

1    Q.    I don't know.  Were there more than one?

2    A.    Well, weekends.  Others would come in on

3  weekends, so somebody else was there.  We were there

4  during the week.

5    Q.    Okay.

6    A.    That's all.

7    Q.    Okay.  So who did the mentors kind of

8  answer to?  Did you communicate direction to the

9  mentors or did they receive their, I guess, direction

10  from someone else?

11    A.    Both.

12    Q.    Okay.

13    A.    During the day, they would ask me.  And

14  if there's other questions, they would respond to

15  other board members.

16    Q.    Okay.  Not anyone in particular?

17    A.    No.

18    Q.    Okay.  Do you know who gave the mentors

19  the day-to-day directions as to, you know, you're

20  going to have this child do this, you're going to have

21  this child do that, or did the mentors make their own

22  individual determinations?

23    A.    The mentors were assigned to a boy, a

24  resident.

25    Q.    Okay.

**Witness Ethan Weaver**

47

1    A.    And they were responsible to see that the
2    schedule was met, that they were comfortable.
3    Q.    The different -- I guess I don't want to
4    say business entities, but the different kind of types
5    of work to do at the farm, I know that there was a
6    proposal from the gates, so I'm assuming they were
7    making some type of gates at one point.
8        There was other farm work like the
9    chicken house, things like that, so I guess individual
10   jobs on the farm for the boys.  Who determined, you
11   know, you're going to work in the chicken house today,
12   you're going to build gates today?  Do you know who
13   made that determination?
14   A.    That was a corporate decision among the
15   staff.
16   Q.    Okay.  And when you say the staff, you
17   mean the board?
18   A.    I meant the mentors, the mentors.
19   Q.    Okay.
20   A.    In other words, I'd say who wants to do
21   or we'd have it by -- I forget how we had it
22   scheduled.  This man -- this mentor was responsible
23   for the chickens, and this one was responsible for,
24   let's say, the firewood.
25   Q.    Okay.  So did you or the board get any --

**Witness Ethan Weaver**

48

1    get any direction from the Mission or anybody else to
2    say I need, for example, someone to work 12 hours
3    building gates this week or anything like that?
4         A.    No, no.
5         Q.    Okay.  Were the mentors paid?
6         A.    A small stipend.
7         Q.    Okay.  Do you know how much that was?
8         A.    I don't recall.  I don't remember what
9    that was.
10        Q.    And if a mentor didn't want to be a
11   mentor anymore, could they go leave and seek
12   employment somewhere else?
13        A.    Yes.
14        Q.    Okay.  And then the board would just
15   select someone else or the church would say you're
16   going to take someone else or how would that role be
17   filled?
18        A.    Mentors were free to go whenever they
19   wished, although they were asked how long they're
20   going to be there, and then the Mission Board would
21   fill in the gap.
22        Q.    Okay.  Did you personally go through any
23   training before working at Liberty Ridge?
24        A.    None, other than observing other
25   institutions, how they operated.

**Witness Ethan Weaver**

49

1     Q.     Okay.  Do you remember any of them?

2     A.     LUC in Missouri.  Fresh Start in Indiana.

3  Team Boys Ranch in Missouri.

4     Q.     What does LUC stand for?

5     A.     Lives Under Construction.

6     Q.     Okay.  So these are all similar

7  facilities?

8     A.     Yeah.

9     Q.     Were they all run by the Eastern

10  Pennsylvania Mennonite Church or were there other, I

11  guess, divisions of the church that ran them?

12          MS. WYNKOOP:  Objection to form.  You can

13  answer.

14  BY MS. FRANCHI:

15     Q.     Do you need me to repeat?

16     A.     Yeah.

17     Q.     Okay.  So these other facilities that you

18  went to see, do you know which church entity oversaw

19  each of them?

20     A.     No.

21     Q.     Was it the Eastern Pennsylvania Church?

22     A.     No.

23     Q.     So they were all different?

24     A.     That's correct.

25     Q.     This is more of a clarification question.

**Witness Ethan Weaver**

50

1    When I talk about the Eastern Pennsylvania Church or

2    other Mennonite churches, should I refer to them as

3    other Mennonite churches or other Mennonite

4    organizations or divisions?  What's the proper way to

5    refer to each individual, I guess, overseeing body of

6    the different types of Mennonite faiths, I guess?

7         A.    I don't understand your question.

8         Q.    So if I were to say there's like the

9    fellowship or Eastern Pennsylvania, what do you call

10   those individual bodies of church?

11        A.    They would be their own conference.

12        Q.    Conference, okay.  That's the word I was

13   looking for.  I just want to make sure I'm not

14   misspeaking or referring to something that's

15   incorrect.

16             So day-to-day at Liberty Ridge, kind of

17   walk me through from when the boys would get up and

18   what they would do through the rest of the day, I

19   guess approximate times of when each thing would

20   occur.

21        A.    They got up at I think 6:30.  It's

22   getting fuzzy.  Came downstairs.  Of course, you got

23   ready for the day.  Came downstairs.  Had their

24   personal devotions.  They made breakfast.  They went

25   for a walk first when they wake up to wake them up.

**Witness Ethan Weaver**

51

1    Then they had devotions.  They had breakfast, and we

2    have family worship.  Then we had the activities of

3    the morning.  Some boys went to school.  Some did

4    laundry, dishes, domestic duties.

5         **Q.    How long would that go on for?**

6         A.    You mean?

7         **Q.    The devotions and then the activities**

8    **before they kind of left the house for the day?**

9         A.    I think at 8:00, if I recall correctly,

10   that's when the day's activities began.

11        **Q.    Okay.  And how long did the, I guess,**

12   **day's activities go on for until there was some kind**

13   **of break or lunch or anything like that?**

14        A.    They were free to take a break anytime

15   really.  If somebody needed to drink, they were always

16   free to go get a drink.

17        **Q.    Okay.**

18        A.    Depends on if we were in the chicken

19   house which is dusty, we got drinks more often, of

20   course.

21        **Q.    Chickens are really dirty.**

22        A.    Yeah.

23        **Q.    And around what time was, I guess, like**

24   **the lunch break or like the midday break?**

25        A.    They had an hour at lunch time.

**Witness Ethan Weaver**

52

1    Q.    Okay.  Would they come back up to the
2    house to eat?

3    A.    Yes.

4    Q.    So your wife would cook them lunch
5    usually?

6    A.    Yes.

7    Q.    What time did they, I guess, go back out
8    or did they have -- after lunch were there other
9    activities before going back out to work?

10    A.    After lunch at 1:00 we had a class.

11    Q.    Okay.

12    A.    In the basement in the classroom.

13    Q.    What kind of class?

14    A.    It was more of a structuring Bible class,
15    morals.

16    Q.    Did you run the class?

17    A.    Yes.  Do you want me to --

18    Q.    And did you run that class the whole time
19    that you were at Liberty Ridge?

20    A.    Yes.

21    Q.    Okay.  So after that, around what time
22    would they go back out?

23    A.    2:00.  2 to -- sometimes we'd get on some
24    discussions.  The boys would ask questions.  And when
25    boys are asking questions, that was number one.

53

1    Q.    So it wasn't -- you didn't hold them to a

2    strict time schedule.  You just wanted to make sure

3    their questions were answered?

4    A.    Yes.

5    Q.    How long would they then go back out to

6    work?

7    A.    They went out until supper time which was

8    5, I think.

9    Q.    Okay.

10   A.    Then we'd come in and clean up and have

11   supper.  And then it was activities times, kind of

12   their free time.  We did many things in the evening.

13   Q.    Like what?

14   A.    Take a hike.  Sometimes they wanted to

15   split firewood.  They just loved to split firewood.  I

16   thought that's a little strange, but anyway they loved

17   it.

18   Q.    Around what time did everyone go to bed?

19   A.    It was 9:00.  9:00 I think was -- was it

20   9:30?  9 to 10, I'll just have to give it to be

21   accurate there.

22   Q.    That's fine.  I appreciate it.  So you

23   said that you kind of did the devotional studies after

24   lunch, and the boys would ask a lot of questions.  In

25   the morning who would do their, I guess, Bible studies

**Witness Ethan Weaver**

54

1    with them?  Would it also be you?

2         A.    That was the mentors took charge of that.

3         Q.    Oh, they did.  Okay.  How many days a

4    week did the children adhere to this kind of general

5    schedule?

6         A.    Five days a week.

7         Q.    What about Saturday and Sunday?

8         A.    Saturday we had a little bit of an

9    interrupted schedule.  In other words, we did not have

10   school on Saturday.  The exception would be there

11   sometimes if we had other activities that took place

12   of the school during the week, occasionally we had

13   school on Saturday.

14        Q.    Okay.  What about Sundays?

15        A.    Sunday there was no school time at all.

16   No work time on Sunday.

17        Q.    I'm assuming it was church and worship

18   time?

19        A.    Church and worship time.  They wrote

20   letters.  Often took hikes.  Many hikes.

21        Q.    Did the children leave the property to

22   attend church or did somebody come in?

23        A.    No.  We left the property to attend

24   church.

25        Q.    You did, okay.  And where did you take

**Witness Ethan Weaver**

55

1   them?

2       A.    Various churches.

3       Q.    Oh, okay.  Was that based on anything in

4   particular or just to give them kind of a wide

5   variety?

6       A.    Just to give them a wide margin.

7       Q.    Okay.  Do you know what happened to the

8   products that were kind of -- that were built by the

9   children when they were working like the gates or

10  anything else, any other type of work that was done?

11      A.    That was beyond my role.

12      Q.    Okay.  Whose role would that be?

13      A.    Nelson.

14      Q.    Okay.  So that was just not within your

15  assigned duties.  Okay.

16      A.    We were to make the gates and all the

17  other things.

18      Q.    Okay.  While you were a house parent at

19  Liberty Ridge at least from 2011 to 2014, do you

20  recall any of the other products that were built or

21  any of the other work or jobs that the boys performed?

22      A.    We made little stools.  This was a

23  project for them to make.  Stools.  We made a few

24  apple crates just for the fun of it.  We did some --

25  made some trails in the woods.  We built switchbacks

**Witness Ethan Weaver**

56

1    where they dug furiously until they had -- they were

2    not forced, but they dug until they had blisters on

3    their hand.  I marveled how they -- they were so

4    excited about it.

5         Q.    And this was like trails through the

6    woods?

7         A.    Yeah, yeah.

8         Q.    Okay.  How many acres were there?

9         A.    I don't know.

10        Q.    Were there any other products built that

11   were -- I guess that were sold?  Were the stools sold

12   or were they for the boys?

13        A.    No, no.

14        Q.    Okay.  The gates, though, I'm assuming

15   were sold?

16        A.    Yeah.

17        Q.    Okay.  Was there -- I know there was a

18   small garden that some of the food was grown?

19        A.    Yes.

20        Q.    What about there was a lot of fields

21   there where other crops were grown; correct?

22        A.    Yes.

23        Q.    Okay.  What happened to those crops?

24        A.    Nelson sold them.

25        Q.    Okay.

**Witness Ethan Weaver**

57

```
 1        A.     He was the -- took care of the products
 2   that were finished.
 3        Q.     Okay.  So any of those questions would be
 4   something he would know?
 5        A.     Yeah.
 6        Q.     Okay.  Do you know were the children ever
 7   transported to other properties to do work anywhere?
 8        A.     Yes.  We took the boys up to Ashland
 9   Bible School to rake leaves in the fall.
10        Q.     Okay.
11        A.     There was an older man at the one church
12   that we help to put a roof on.  Probably some others,
13   but I can't recall what they might have been.
14        Q.     Okay.  Were they transported off the
15   property to build any products that were then sold or
16   was it more volunteer work when they were --
17        A.     It was all volunteer work.
18        Q.     Okay.  Did they ever leave the property
19   to do something like, you know, like deconstruct barns
20   or help put up barns or take anything to the Liberty
21   Ridge property to be used?  Anything like that?
22        A.     Yes.  Neighbor had a barn foundation.  It
23   was all stone.
24        Q.     Okay.
25        A.     I wanted the stone for a project.  Never
```

**Witness Ethan Weaver**

58

1  used it, but we brought those stones back to Liberty

2  Ridge.

3      Q.      Okay.

4      A.      Beautiful limestones.

5      Q.      And then you never used them?

6      A.      No.  I was going to make a wall.  I just

7  thought that would be an excellent skill for the boys

8  to learn.

9      Q.      Okay.  Now, as it relates to the

10  schooling that the boys received, was it

11  individualized per child?

12      A.      Yes, yes.

13      Q.      Okay.  Who determined what type of

14  schooling they would receive?

15      A.      The board.

16      Q.      Okay.  Who -- was there a teacher brought

17  in?

18      A.      Yes.

19      Q.      Who was it?  Do you remember?

20      A.      One of them was Leonard Sensenig.

21      Q.      Okay.  And was he a traditional like

22  school teacher within the community?

23      A.      Yes.

24      Q.      Okay.  And do you know, and, again,

25  pardon my ignorance, the teachers that are within your

59

1    community, do they have any sort of like state

2    licensing or does your church have its own internal

3    determination of teachers and who can teach?

4         A.    We have our own internal qualifications.

5         Q.    Okay.  When the children were in school,

6    did Liberty Ridge and the board regularly keep records

7    of the schooling?

8         A.    Yes.

9         Q.    Okay.  Did each individual child, I

10   guess, have their own file with their own paperwork or

11   anything that occurred?

12        A.    Yes.

13        Q.    Okay.  After the children left, did --

14   were those files maintained or were any of them

15   purged?

16        A.    I have no idea.

17        Q.    Okay.  Who would take care of that, if

18   you know?  I'm assuming not you.

19        A.    No.  Mostly the mentors would have taken

20   care of that.

21        Q.    Okay.  Are you familiar with the daily

22   moral inventories?

23        A.    Yes.

24        Q.    What are they?

25        A.    It's to record their thoughts, their

**Witness Ethan Weaver**

60

1   goals, aspirations, recorded their failures, and how

2   they could do better.

3       Q.      Who writes them?

4       A.      The boys did.

5       Q.      Was this like a supervised project with

6   their mentors or were they just left alone to do it?

7       A.      The mentors saw that it got done.

8       Q.      Okay.

9       A.      But the boys were free to write their own

10  thoughts.

11      Q.      Okay.  Did the mentors have any say over

12  what was put in these inventories?

13      A.      No.

14      Q.      Okay.  Do you know within Liberty Ridge

15  anywhere were there any like Department of Labor

16  notices posted or like the children's rights or the

17  rules or anything like that posted anywhere on the

18  property for the children to see?

19      A.      No.

20      Q.      Okay.  Typically, how long did children

21  reside at Liberty Ridge or did it depend?

22      A.      It varied greatly.

23      Q.      Who would determine how long they were

24  staying?

25      A.      The board.

**Witness Ethan Weaver**

61

1      Q.      Okay.  So generally the board would make

2   the individual decisions together on all the children?

3      A.      That's correct.

4      Q.      Okay.  How often were their board

5   meetings?

6      A.      Once a month.

7      Q.      Okay.  So once a month they would go over

8   everybody, their progress, things like that?

9      A.      Yes.

10      Q.      And the mentors would provide that

11   information to the board?

12      A.      Yes.

13      Q.      Okay.  What if one of the children wanted

14   to leave, but it was determined that they needed more,

15   I guess, treatment or needed more time there, could

16   the children or the individual child choose to leave?

17      A.      They were free to leave, although they

18   were not encouraged to do so.

19      Q.      Okay.  What would happen if a child tried

20   to leave?  Were the mentors given any direction on how

21   to handle that?

22      A.      Yes.

23      Q.      What was that?

24      A.      When a boy -- when David Cross walked

25   off, we walked with him to the edge of the property.

62

1      Q.     Okay.  Do you remember how many times
2   Mr. Cross tried to leave?
3      A.     I think once or twice.
4      Q.     And, again, I know I'm making you go back
5   a whole bunch of years.
6      A.     Yeah.  I'm not all together sure.
7      Q.     Okay.  How were the children dissuaded
8   from trying to leave?
9      A.     Basically say if you would leave, you're
10   on your own.
11      Q.     Okay.  Now, who had the most, I guess,
12   day-to-day interaction with the residents?  Would that
13   be the mentors?
14      A.     The mentors, yes.
15      Q.     So you weren't standing there with the
16   mentors all day like looking at them and making sure
17   they were doing what they needed to do?
18      A.     No.
19      Q.     Okay.  So they were kind of given their
20   own -- I want to say they weren't like super closely
21   supervised.  They were given their own kind of lead to
22   deal with the boys as they felt fit; correct?
23      A.     Yes.
24      Q.     Okay.  So there were times obviously
25   during the day that you didn't see them.  You weren't

**Witness Ethan Weaver**

63

1   standing there watching all of them all day?

2        A.    That's correct.

3        Q.    Okay.  I know in some of the discovery,

4   some of the answers and just speaking to people that

5   the phrase like spiritually strong enough comes up a

6   lot.  The boys needed to be, I guess, spiritually

7   strong enough to leave.  What does that mean to you or

8   within Liberty Ridge?

9        A.    To be spiritually strong is to be able to

10  face life intelligently.

11       Q.    Okay.  And would this be based on the

12  general Eastern Pennsylvania standards, I guess, or

13  just how you were taught to live within the community?

14       A.    It would be society's standards.

15       Q.    Okay.  So there wasn't like a rule, like

16  a list of rules?

17       A.    No.

18       Q.    Okay.

19             MS. WYNKOOP:  Do you mind if we just take

20  a quick comfort break?

21             MS. FRANCHI:  Yes.  Sure.  I don't even

22  know how long I've been yapping for.

23             MS. WYNKOOP:  No.  It's only been an

24  hour.  I just drank a lot of coffee.

25             THE VIDEOGRAPHER:  Going off the record

**Witness Ethan Weaver**

64

1  at 10:03 a.m.

2           (Recess)

3           THE VIDEOGRAPHER:  We are going back on

4  the record.  The time is 10:15 a.m.

5  BY MS. FRANCHI:

6      Q.     Mr. Weaver, are you good to go?

7      A.     Mm-hmm.

8      Q.     Okay.

9      A.     Yes.

10     Q.     So I think we had ended with talking a

11 little bit about children being free to leave.  You

12 had mentioned Mr. Cross tried to leave maybe two times

13 that you remember.

14     A.     Yes.

15     Q.     And that, I guess, and correct me if I'm

16 wrong.  I'm just trying to gather my train of thought

17 from where we left off in that the mentors were kind

18 of the ones who were directly responsible for each of

19 the residents day-to-day.  That you weren't standing

20 over them all day telling them what to do; correct?

21     A.     That's correct.

22     Q.     Okay.  If I ever misstate anything,

23 please correct me.  So moving on a little bit to

24 discipline, you know, discipline or consequences or

25 whenever the boys were not, I guess, adhering to the

Witness Ethan Weaver

65

1    standards of Liberty Ridge or behavior, who was in

2    charge of individual discipline or consequences for

3    each of the individual residents?

4          A.    The mentor --

5          Q.    Or did it depend?

6          A.    -- made sure that it got carried out.

7          Q.    Okay.

8          A.    If there was an infraction, they would

9    sit down with the boy and discuss what's going wrong.

10   If it got involved, then I would come on.  They would

11   ask for me to come around to help resolve the issue.

12         Q.    Okay.  So they were the first level of

13   dealing with it?

14         A.    Yes.

15         Q.    And then they would come to you?

16         A.    Yes.

17         Q.    Okay.  Was there ever a talk with the

18   mentors, either you personally or that you're aware of

19   from any of the members of the board, telling the

20   mentors how to handle discipline with the boys?

21         A.    Yes.

22         Q.    Okay.  What were some of those

23   discussions, if you remember?

24         A.    What to do when the boy became angry or

25   didn't want to do what was asked of him.

Witness Ethan Weaver

66

1    Q.    Okay.  What were they or what were the

2  mentors told or how were they supposed to handle these

3  situations?

4    A.    Well, if there was an infraction, the

5  first thing that they were asked to do was sit down

6  and talk to the boy, and most of the time that's all

7  they did.

8    Q.    And what if that didn't work?

9    A.    Then you would have him write some

10  sentences.

11    Q.    And what were these -- what kind of

12  sentences were these?  Were they like -- were they

13  based on their Bible studies?  Was it something else?

14    A.    Other things like I am a happy boy when

15  and what it takes to enjoy life.  What do you feel it

16  takes to enjoy life.

17    Q.    And if -- how long would that go on for?

18    A.    However long it took.

19    Q.    Okay.  Until -- I guess what was the

20  deciding factor when -- when you say how long it took,

21  when would the mentors be able to decide, okay, enough

22  is enough or you've learned whatever you need to

23  learn?  What was that kind of determination?

24    A.    Whenever they corrected their attitudes

25  or their -- say okay, we're ready to go back to work.

67

1      Q.      Okay.  So they would try to talk to them
2   first.  They would work on writing sentences --
3      A.      Mm-hmm.
4      Q.      -- to kind of correct their behavior,
5   their attitude.
6      A.      Mm-hmm.
7      Q.      What if that didn't work?
8      A.      Then they would write an essay of some
9   sort.  All kinds of topics.  I am happy when.  If I
10  was a rock in the middle of a stream.  Something to
11  help them structurally.
12     Q.      Okay.
13     A.      When I see clouds, I think of.  I don't
14  know if there's any -- I don't know if I have any
15  copies of that, but that came in.
16     Q.      Okay.
17     A.      I had a whole list of essay suggestions
18  that we worked from.
19     Q.      So they were kind of like self-directed
20  essays?
21     A.      Mm-hmm.
22     Q.      Okay.  So I guess if the essay writing
23  didn't work, then what would happen?  So I guess what
24  I'm kind of getting at is it seems like there's a bit
25  of structure of how to handle it?

**Witness Ethan Weaver**

68

1    A.     Oh, yeah.   The next would be maybe wash

2  dishes or some other extra domestic chore.

3    **Q.     Okay.  And then what would happen after**

4  **that if that didn't work?**

5    A.     Then it would be probably running, and we

6  run with them most of the time.

7    **Q.     Okay.  You personally?**

8    A.     Oh, yeah.

9    **Q.     Really?**

10    A.     I remember the one time the boy didn't

11  want to run.  He didn't want to run.  I said well,

12  I'll run with you.  We run.  After a bit he looked

13  over at me, and he says this is kind of fun.  His

14  attitude changed.

15    **Q.     Okay.**

16    A.     I said then we're done.  I could give you

17  a lot of stories like that.

18    **Q.     So after -- how long, I guess, would you**

19  **decide that they would run for or, again, would it**

20  **depend?**

21    A.     It depended.

22    **Q.     Okay.  If it got to the point where the**

23  **boy was running and he was exhausted, but his attitude**

24  **hadn't changed, would he keep running?  How would that**

25  **work?**

69

1      A.      No.  We'd stop for a break.

2      **Q.      Okay.**

3      A.      Get a drink, wash your hands and face.

4   My wife often had chocolate milk, cookies, refreshment

5   there.  If it was cold, it was hot chocolate.  Always

6   had refreshment.

7      **Q.      What happened if the running didn't work?**

8      A.      Then we went to some other thing.  We dug

9   some holes for fence posts because we needed a fence

10  for the cattle, and I would help or the mentor would

11  help.

12     **Q.      So then that's when it would escalate to**

13  **kind of more going back to doing physical labor?**

14     A.      Yeah.

15     **Q.      Okay.  Did you oversee all consequences**

16  **that were, I guess, administered or were there times**

17  **that you weren't involved?**

18     A.      If I wasn't there, I didn't do it.  But

19  yes, if I was there, I knew what was going on although

20  I was not always directly involved.

21     **Q.      Okay.  Do you recall the names of the**

22  **individuals who kind of took over your role as house**

23  **parents on the weekend so you had a break?**

24     A.      When I left, I left for the weekend.

25  When I was done, I was done.

**Witness Ethan Weaver**

70

1      Q.     Good man.

2      A.     That's up to them.

3      Q.     More people should have that attitude.

4 Were they always the same people?  Do you know?

5      A.     No.

6      Q.     Or was it just anybody that could fill

7 in?

8      A.     Anybody could fill in.

9      Q.     Okay.  Do you know, and you may not have

10 this knowledge, but the people who would fill in on

11 the weekends, were they also trained or were they just

12 there to just be a warm body in the home?

13      A.     They were lightly trained.

14      Q.     Okay.  What does that mean?

15      A.     They knew what the schedule was supposed

16 to be like and who was supposed to do what.  Like

17 who's in charge of the dishes, who was in charge of

18 laundry.  They knew all that.

19      Q.     Okay.  So they weren't -- they didn't go

20 through the full kind of training that you were

21 talking about before?

22      A.     No, no.

23      Q.     Okay.  So on the weekends let's say if

24 there was discipline or some type of a consequence,

25 you weren't necessarily there then to oversee it

**Witness Ethan Weaver**

71

1    because you were taking your time off?

2         A.    That's correct.

3         Q.    Okay.  So the house parents that were

4    there on the weekends may not have handled it the same

5    way that you did?

6         A.    That's correct.

7         Q.    Okay.  Do you know -- excuse me -- what

8    the Liberty Ridge policy or just the understanding of

9    when physical restraint can be used?

10        A.    Do I what?  Say that again.

11        Q.    When could physical restraint be used on

12   the children when they were on the Liberty Ridge

13   property, if at all?

14        A.    When they became violent.

15        Q.    Okay.  Do you know or was there any sort

16   of training on how to handle physical restraint with

17   children?

18        A.    I had some training.

19        Q.    Okay.  What kind of training?

20        A.    What to do with an angry boy.

21        Q.    Okay.

22        A.    Basically, you know, you take him, but

23   you don't hold his body.  Only hold his arms.

24        Q.    Okay.

25        A.    Do not restrict his breathing, his --

Witness Ethan Weaver

72

1   just keep him from hurting himself to protect the
2   others around him.
3       Q.    Was there ever a time when there was a
4   determination like you said that a boy became violent
5   or became agitated enough to be physically restrained
6   that the police were called or mental health services
7   were called?
8       A.    The only time is whenever he run off that
9   then we needed to report it.
10      Q.    Okay.  Did that ever happen when you were
11  there?
12      A.    Yes.  There was one time.  I don't
13  recall.
14      Q.    And by the time -- and just so you know,
15  if we're ever talking and it doesn't involve my
16  clients, I'm not going to ask specific names of any of
17  the other children that were there.  So if it's not
18  Robert Miller or David Cross, if it was anything that
19  we're talking involves another child, you don't have
20  to refer to them by their full names.
21          I know that's something that would be
22  objectionable anyway.  I'm not going to push that
23  button, so you can choose a way to refer to them like
24  initials or just the boy so just to kind of clear that
25  up.

**Witness Ethan Weaver**

73

1          So anyway, do you recall, like I was

2     asking, a time when you were at Liberty Ridge that a

3     boy either became violent or ran off, and you had to

4     call the police or call the authorities?

5          A.    I don't recall who called the police, but

6     the police came out and talked to David.

7          Q.    Oh, it was David?

8          A.    Yes.  It was David.

9          Q.    Okay.

10          A.    They came out and talked to him.  He was

11     very angry.  Yeah, he talked to him pretty straight.

12          Q.    Do you recall how long David was off the

13     property?

14          A.    No.  I do not know.

15          Q.    Okay.  If you are able to approximate,

16     was it a matter of minutes?  Was it hours?  Was it

17     days?

18          A.    Oh, just a matter of minutes or hours.

19          Q.    Okay.  So it wasn't several days he was

20     missing?

21          A.    No, no.

22          Q.    Okay.  Was there any other time that you

23     remember a child, well, at least while you were at

24     Liberty Ridge, where he became so distressed that he

25     needed to be either seek medical attention or police

**Witness Ethan Weaver**

74

1  intervention?

2       A.    No.

3       Q.    Okay.  Were the mentors the ones who

4  would need to physically restrain the boys when they

5  would become angry or would it be you or would it be,

6  I guess, anybody in charge who was there when it

7  happened?

8       A.    Yes.

9       Q.    Okay.  And were the mentors trained in

10 how to handle this?

11      A.    Yes.

12      Q.    Okay.  And, again, as we were talking

13 about, there could have been times that the mentors

14 administered this type of restraints on the children

15 when you weren't there, say, on the weekends or if you

16 were off the property?

17      A.    I told them the first when the boy

18 becomes angry and becomes -- starts to become agitated

19 and violent, just have the boy sit for a while.

20      Q.    Okay.

21      A.    And that often worked.

22      Q.    Okay.

23      A.    Just sit until they're ready.  Raise

24 their hand when they're ready to talk.

25      Q.    Okay.  That was your rule?

Witness Ethan Weaver

75

1      A.      Mm-hmm or let us know in some way.

2      Q.      Okay.  Do you know if the other house

3  parents that would fill in would handle things

4  differently from you or did you have no idea?

5      A.      I have no idea.

6      Q.      When the children were at Liberty Ridge,

7  did they have access to phones or any sort of outside

8  communication?

9      A.      They could use a phone with permission.

10      Q.      Okay.  How often could they use the phone

11  with permission?

12      A.      They could call their parents.  I think

13  it was once a month.  I hardly recall anymore.

14      Q.      Okay.  And when the children would call

15  their parents, was there some type of supervision?

16  Was somebody, you know, listening on the other phone?

17  Were they sitting with them?  How did that work?

18      A.      We were listening on another phone.

19      Q.      Okay.  And when you say we, it could have

20  been you or any other mentor?

21      A.      That's correct.

22      Q.      Okay.  What were -- I'll just say

23  generally you or the mentors, what were you listening

24  for when the children were on the phone?

25      A.      Just to have an accurate -- to hear what

Witness Ethan Weaver

76

1  they were saying so that we knew what was going on.
2       Q.    Okay.  Did you or did the board
3  communicate to the mentors what to listen for?
4       A.    Just listen.
5       Q.    Okay.  At any point did you or the
6  mentors that you're aware of ever intervene in a call
7  and say you can't talk about this or something?
8       A.    No, no.
9       Q.    Okay.  In your recollection, did you or
10 the mentors ever tell the children these are certain
11 things that you have to talk about on the phone?
12      A.    No.
13      Q.    Okay.  But you weren't there for all the
14 phones calls?
15      A.    No.
16      Q.    Okay.  So I'm sure there were plenty
17 where just the mentors were listening?
18      A.    That's correct.
19      Q.    Okay.  And just to be clear, so your wife
20 wasn't involved in any of like the direct supervision
21 of the labor or the phone calls or the consequences,
22 anything like that?
23      A.    No.
24      Q.    Okay.  What about visitation?  Did the
25 children have time for visitors like family members or

77

1   parents or anything?

2        A.    Yes.

3        Q.    Okay.  Do you recall generally how often?

4        A.    There was a period at the beginning they

5   did not have contact at home, but I think it was six

6   weeks -- I'm not sure on that -- when the first visit

7   was allowed.

8        Q.    Okay.  So they had kind of a breaking-in

9   period then?

10       A.    Yes.  They had a breaking-in period.

11       Q.    Okay.  You said it was about six weeks?

12       A.    I think that.  I'm not all together sure

13   on that.

14       Q.    Okay.  But approximately?

15       A.    Approximately.

16       Q.    So during that, I guess we'll call it

17   kind of settling in six weeks, the boys weren't

18   allowed to have family members come visit?

19       A.    No.

20       Q.    Could they have phone access?

21       A.    Yes.

22       Q.    Okay.

23       A.    Wait.  I'm not sure on that.

24       Q.    Okay.  When the boys did have visitors,

25   was it limited to just direct family members?

78

1    A.    Yes.

2    Q.    So they couldn't just have their friends
3 come?

4    A.    No.

5    Q.    When family members would come and visit,
6 was there a protocol or structure to where they would
7 visit, you know, what would go on, how long they would
8 be there, or could they come and go as they pleased?

9    A.    Come and go as they pleased as long as
10 they stayed on the property.

11    Q.    Okay.  And were the mentors with the boys
12 for all of these visits?

13    A.    Somebody was around somewhere, not always
14 right up against them, but they were within earshot.

15    Q.    So somewhere?

16    A.    Yeah.  The mentors might be over in the
17 corner doing a puzzle, and they're over here visiting,
18 something of that nature.

19    Q.    Okay.  So they were just generally in the
20 area to keep an eye on them at all times?

21    A.    Generally, yeah.

22    Q.    Okay.  Was there any time when the boys
23 were completely without any adult supervision or
24 mentors or anybody?

25    A.    No, not that I'm aware of.

79

1      Q.    Okay.   Except for, I'm assuming, when

2   they used the restroom or showered?

3      A.    Yeah.   That's correct.   Yeah.

4      Q.    Okay.   Were the children allowed to write

5   or receive written communication?

6      A.    Yes.

7      Q.    Okay.   Was there any limitation to

8   that?

9      A.    I don't think so.

10      Q.    Okay.   Any written communication that

11   went out or was received, was that all reviewed by the

12   mentors?

13      A.    Yes.

14      Q.    Okay.   And what was the purpose of

15   reviewing the outgoing and incoming communications?

16      A.    Just to get the feel for the whole

17   situation.

18      Q.    Okay.   Did you give or did anybody give

19   the mentors any direction on what to look for in the

20   written communication to say either, you know, that

21   can't be said or you can't receive this?

22      A.    No, no.   They look for negativism, that

23   kind of thing.

24      Q.    Okay.   Do you recall any time that you

25   monitored the incoming or outgoing communications?

**Witness Ethan Weaver**

80

1    A.    Yes.

2    Q.    Okay.  So sometimes you did?

3    A.    Yes.  Sometimes I did.

4    Q.    But not all the time?

5    A.    No, not all the time.

6    Q.    That would have been a lot?

7    A.    Yeah.

8    Q.    So that would have been left up to the

9    mentor's discretion?

10    A.    Yes.

11    Q.    What would happen if the children were

12    writing to, say, their parents or I guess anybody

13    outside the program and were voicing displeasure about

14    the program?  Was that allowed or was that something

15    that they weren't allowed to do?

16    A.    They were allowed.  I don't think any of

17    them ever did.

18    Q.    Okay.  Do you know if the mentors

19    communicated with them about what they could or could

20    not write or were you not there for those?

21    A.    No, no.  They did not dictate what they

22    should write at all.

23    Q.    Okay.  But you weren't with them all the

24    time when they were doing this?

25    A.    No.

Witness Ethan Weaver

81

1    Q.    Okay.  So a lot of times when you and I

2    are talking about what the mentors did or didn't know

3    are just generally what you've observed but not

4    everything because you didn't --

5    A.    That's correct.

6    Q.    You didn't see them all the time?

7    A.    That's correct.

8    Q.    Okay.  So I'm going to have you turn to

9    Page 72.  It's about maybe a third of the way in a

10   little bit more.  Just let me know when you get there.

11   That would be LRF-72.

12   A.    72?

13   Q.    Mm-hmm.

14   A.    Okay.

15   Q.    Do you recognize this document?

16   A.    Yes.

17   Q.    And what is it?

18   A.    It's the handbook of operating.

19   Q.    And do you know who it was that created

20   this policy manual?

21   A.    I do not know.

22   Q.    Was this something that in your knowledge

23   was in place when Liberty Ridge began?

24   A.    No.  This came on the scene down the road

25   a piece.  I was not involved in this.

82

1    Q.    Okay.  Do you have any idea when you say

2  down the road, was it two years ago?  Was it ten years

3  ago?

4    A.    I have no recollection.

5    Q.    Okay.  Are you aware of when Liberty

6  Ridge began in about 2011, was there any sort of

7  written policy manual or anything like that?

8    A.    Yes.

9    Q.    Okay.  But it wasn't this one?

10   A.    It wasn't this one.

11   Q.    Okay.  Do you know if there is still a

12  copy of that anywhere or where that would be

13  maintained?

14   A.    It should be there yet, yeah.  It's still

15  in place.

16   Q.    Okay.  So the one that's in front of you

17  specifically goes from Page 72 to I believe 81.  If

18  you just take a look through that and just confirm

19  that this was not the policy manual that was in place

20  in 2011.

21   A.    Say that again.

22   Q.    In 2011 to 2014.

23   A.    I don't remember.

24         MS. WYNKOOP:  I will just note on the

25  record that I will search for something if there is a

**Witness Ethan Weaver**

83

1   different one in existence.

2                    MS. FRANCHI:  Okay.  Thank you.  Can I

3   take like a ten-minute break or maybe five minutes if

4   that's okay?

5                    MS. WYNKOOP:  Sure.

6                    MS. FRANCHI:  Can we go off the record?

7                    THE VIDEOGRAPHER:  We are going off the

8   record.  Time is 10:35 a.m.

9                    (Recess)

10                   THE VIDEOGRAPHER:  We are back on the

11  record.  Time is 10:43 a.m.

12  BY MS. FRANCHI:

13        Q.    Okay.  So I believe where we left off is

14  I showed you a copy of the handbook of standard

15  operating policy that's Bates stamped LRF-72 to

16  LRF-81.  And correct me if I'm wrong, Mr. Weaver, you

17  said that this was not the policy manual that was in

18  place from 2011 to 2014?

19        A.    That is correct.

20        Q.    Okay.  And you had said to me before that

21  when we were taking the break that although you don't

22  have the old policy manual in front of you, you

23  generally remember some of the concepts?

24        A.    Oh, yes, yes.

25        Q.    Okay.  So the old policy manual that we

84

1   don't have a copy of right now -- just to be clear,

2   I'm not referring to the one that's sitting in front

3   of me -- who created that policy, the old policy

4   manual?

5        A.    The board.

6        Q.    Okay.  So it would have been the Liberty

7   Ridge committee that then became the board?

8        A.    Yes.

9        Q.    So you helped create it?

10        A.    Yes.

11        Q.    Did all of the board members participate

12   in some way?

13        A.    Yes.

14        Q.    Okay.  Do you know was this policy manual

15   something that was disseminated to the parents or was

16   this something that was kind of kept in-house as

17   reference for the staff?

18        A.    If I recall correctly, the parents had a

19   copy of it.

20        Q.    Okay.

21        A.    But I am not a hundred percent sure.  I

22   am almost a hundred percent sure.

23        Q.    Okay.  Do you remember at least again

24   from 2011 to 2014 when a child was placed at Liberty

25   Ridge, what documents, if any, did the parents

**Witness Ethan Weaver**

85

1  receive?

2       A.    They had the questionnaires.  They would

3  have the guidelines.  Parents had a questionnaire to

4  fill out.  So they would have had the guidelines.

5  They would have had the questionnaires from the boy

6  and the parents, and also they would have had the

7  power of attorney papers were given to the parents.

8  They signed them.  Medical consent forms so we could

9  take care of any medical needs.

10          And we also had a paper that said if the

11  parents had a restriction on anything, if they did

12  want their boy to be involved in any area of the

13  project there.

14       Q.    Okay.

15       A.    In other words, if they had allergies,

16  they would say the boy has allergies.  We don't want

17  him inhaling chicken dust, so they had that power as

18  well.

19       Q.    Okay.  When discussing with the guardians

20  or the parents of the boys before putting them in

21  Liberty Ridge, were you involved in those

22  conversations or was that somebody else?

23       A.    Mostly someone else.

24       Q.    Okay.  Do you know who it would have

25  been?

**Witness Ethan Weaver**

86

1    A.    No.  I don't know.

2    Q.    Okay.  So you don't know what was told to

3 the parents when they were interviewing them about

4 bringing the boy?

5    A.    No.  I might have heard a few.  I think

6 it was mostly the chairman.

7    Q.    Mr. Brubaker?

8    A.    Yes, and maybe a sprinkling of somebody

9 else that was available.

10    Q.    Okay.  Do you recall being involved in

11 that conversation with David Cross before he came to

12 Liberty Ridge?

13    A.    I don't recall.

14    Q.    Okay.  Did you -- if you recall, do you

15 recall having any contact with Mr. Cross before he

16 came to Liberty Ridge?

17    A.    No.  I had no contact with him.

18    Q.    Okay.  Were you familiar with or I

19 believe -- Mr. Cross was also Mr. Bates when he was

20 within the community.  Did you know his parents or his

21 guardians before he came to Liberty Ridge?

22    A.    Not very well at all.

23    Q.    Okay.

24    A.    I might have met them a time or so at

25 church.  But other than their name, I wouldn't have

**Witness Ethan Weaver**

87

1  even known where they lived.

2      Q.    Okay.  So you don't remember -- you said
3  you don't remember if you were involved in his, I
4  guess, recruiting process?

5      A.    No.

6           MS. WYNKOOP:  Objection to form.  You can
7  answer.

8      A.    Did I do something wrong?

9           MS. WYNKOOP:  No, no, no.

10          MS. FRANCHI:  No, no.

11 BY MS. FRANCHI:

12     Q.    So I just want to be clear.  Earlier you
13 had said that you don't recall if you were involved in
14 Mr. Cross or Mr. Bate's recruitment process; correct?

15     A.    Yes.

16     Q.    Okay.  So generally within the new policy
17 manual it mentions that Liberty Ridge is a, quote, a
18 farm approach and a, quote, intense spiritual
19 atmosphere.  Is that something that was consistent
20 prior to this policy manual when Liberty Ridge was
21 created?

22     A.    Yes.

23     Q.    What does it mean to you when they say a
24 farm approach?

25     A.    A farm environment.

88

1      Q.     And that would be just the chores, the

2   work, things like that?

3      A.     Garden, lawn, cleaning, eating.

4      Q.     Eating a lot?

5      A.     Yeah.

6      Q.     And does that also include the side

7   projects or the side labor?  Was that -- that was all

8   considered to be in the farm approach like building

9   gates, things like that?

10     A.     Yes.

11     Q.     Okay.  And when they say intense

12  spiritual atmosphere, does that encompass the Bible

13  studies, things like that?

14     A.     Yes.

15     Q.     Okay.  So bear with me, some of my pauses

16  again.  I'm trying to make sure I can go through some

17  things that were in the policy manual specifically.

18            Within the new policy manual it discusses

19  boys having emotional or behavioral difficulties that

20  have not been resolved in a normal home setting.  Is

21  that a theme that also was true when Liberty Ridge

22  opened until 2014?

23     A.     Yes.

24     Q.     Okay.  And then we talked about it a

25  little bit before, but what do emotional and

Witness Ethan Weaver

89

1    behavioral difficulties kind of mean within the

2    context of Liberty Ridge and its admissions?

3         A.    Relationship to others, relating to

4    others, working together with others.

5         Q.    Okay.  Does this also encompass mental

6    health diagnoses and things like that?

7         A.    Yes.

8         Q.    Okay.  Are you aware of when boys would

9    enter the program if any of them had a mental health

10   diagnosis like bipolar disorder or something like

11   that?

12        A.    No.

13        Q.    Okay.  That wasn't something that was

14   asked?

15        A.    No.

16        Q.    Okay.  And, again, pardon my ignorance.

17   I'm just not familiar.  Within your community are

18   there, say, if a boy does have bipolar disorder or

19   some other -- I just keep saying bipolar just because

20   it's the first thing that pops in my head, but we'll

21   just run with that.

22             If a boy does have a mental health

23   diagnosis, are they taken to, I guess, sort of like

24   what we consider like the traditional doctor,

25   psychiatrist, other doctors within your community or

**Witness Ethan Weaver**

90

1    does it just depend?

2         A.    It depends.  But if it was shown, mostly

3    we took them to a psychiatrist.

4         Q.    Okay.  So to be clear then, if a boy came

5    into Liberty Ridge with mental health diagnoses, the

6    staff wouldn't necessarily ask or it wouldn't be told

7    to them or how does that work?

8         A.    We did not have anybody come in with a

9    known psychological problem.

10        Q.    Okay.

11        A.    It was obvious, but it was not stated as

12   such.

13        Q.    Okay.  So within the programing of

14   Liberty Ridge, when it says a therapeutic setting, it

15   doesn't mean therapy in the sense of there is a

16   licensed therapist on the property?

17        A.    That's correct.

18        Q.    Okay.  Are you aware of any boys coming

19   into the program who were on any sort of mental health

20   medications?

21        A.    I was not aware of it.

22        Q.    Okay.  Were the mentors or the staff

23   trained in how to deal with boys who were on any sort

24   of prescription medication, if you know?

25        A.    I don't know.

Witness Ethan Weaver

91

1    Q.    Okay.  So, again, this goes in the same
2    vein.  If you don't know, please let me know.  If a
3    boy was on some sort of prescription medication, would
4    that be up to the mentors to make sure they received
5    it appropriately?
6    A.    Yes.
7    Q.    Okay.  Were there any specific guidelines
8    or rules that the mentors had to follow that were
9    written down in the policy manual from 2011 to 2014?
10    A.    That the mentors followed?
11    Q.    Mm-hmm.
12    A.    What was in the handbook, that's what was
13    there.
14    Q.    There were rules written down?
15    A.    Yes.
16    Q.    Okay.  Was there any -- that you can
17    remember, was there any level of either discipline or
18    correction for mentors who overstepped their bounds or
19    acted improperly?
20    A.    No.  I marveled at that.
21    Q.    Okay.
22    A.    They responded very well.
23    Q.    Okay.  So you did have a way of
24    correcting them?
25    A.    Oh, yeah, yeah.

**Witness Ethan Weaver**

92

1    Q.    Who was that, if you can remember?  I
2    guess to rephrase, how would you deal with it if you
3    heard that a mentor was acting improperly?
4         A.    I don't know if I had any examples of it.
5         Q.    Okay.  If I guess hypothetically then, if
6    there was a mentor acting improperly or that needed
7    correction, what were you supposed to have done or
8    what was, I guess, the structure of how to deal with
9    that?
10        A.    If there was a mentor acting wrong, I
11   would pull the mentor aside and give him correction.
12        Q.    Okay.  And this would have been from your
13   own observations if they were acting wrong?
14        A.    Yes, yes.
15        Q.    Okay.  So you never yourself saw what you
16   seen to be the mentors acting improperly?
17        A.    No.
18        Q.    Okay.  And it wasn't reported to you that
19   they were acting improperly?
20        A.    No.
21        Q.    Okay.  But, again, you didn't supervise
22   them 24 hours a day?
23        A.    That's correct.
24        Q.    Okay.  So hypothetically speaking, things
25   could have happened that you just weren't aware of?

**Witness Ethan Weaver**

93

1    A.    Yes, but I know it didn't happen.

2    Q.    Do you remember -- you may not.  Do you

3 remember any of the names of any of the mentors from

4 2011 to 2014?

5    A.    Linden Graham.  Chris Ebersole.

6    Q.    Okay.  Is there anything that you

7 remember?  Anybody else that you remember or are those

8 the only names that pop in your head?

9    A.    That's the first ones that popped into my

10 head.  It's too long ago.

11    Q.    Now, within the new policy manual that

12 was provided to me, it talks about there being

13 spiritual and religious indoctrination within Liberty

14 Ridge.

15         Was that a term that was used in the old

16 book that you remember or is that something you don't

17 recall?

18    A.    I don't recall.

19    Q.    Okay.  So I guess generally going in that

20 same line, do the boys have a choice of what religion

21 they practice within Liberty Ridge or are they just

22 taught the Eastern Pennsylvania, I guess, standards of

23 worship?

24    A.    We would have taught them that, but the

25 choice was totally theirs.

94

1      Q.      Okay.  The individuals who would teach

2   the morning Bible studies that you had mentioned

3   earlier, and, again, I apologize.  I don't recall.

4   You said there was somebody who came in to teach that

5   or did you handle that or the mentors?

6      A.      The mentors taught that in the morning.

7      Q.      Okay.  Were they under the direction of

8   anybody?

9      A.      My direction.

10      Q.      Okay.  Was there ever a time that any

11   religious leaders were brought into Liberty Ridge for

12   the boys for any sort of worship or anything?

13      A.      Yes.  How that was, I'm not all together

14   sure, but I know there was some there.

15      Q.      Okay.  Would they just come from local

16   parishes?

17      A.      Local -- yeah, local.  Aaron Martin came

18   from Hartleton once a week.

19      Q.      Okay.  And is that an Eastern

20   Pennsylvania parish or is that something else?

21      A.      Yes, it is.

22      Q.      Okay.  Do you recall if in the old policy

23   manual there was any direction about how to utilize

24   consequences with the boys?

25      A.      No.  I don't think.

Witness Ethan Weaver

95

1    Q.    Okay.  In your recollection when were

2  consequences, I guess, performed?  Could it be any

3  time or was it only during like normal work hours?

4    A.    Any time, but mostly during work hours.

5    Q.    Okay.  Was there ever a time that you

6  recall while you were at Liberty Ridge that

7  consequences were performed, you know, after dinner or

8  overnight or for any extended period of time?

9    A.    Yes.

10    Q.    When -- how many times did that happen?

11    A.    Very few.

12    Q.    Okay.  And what were those circumstances

13  that you can recall?  Like what were the circumstances

14  of the consequences being performed, I guess, either

15  overnight or after work hours?

16    A.    Anger.

17    Q.    Okay.  If you can elaborate a little bit.

18  If you could give me one example of -- again, if it's

19  not one of my clients, you don't need to give me a

20  name -- of when a boy's behavior caused him to suffer

21  or to have to perform consequences overnight or for an

22  extended period of time?

23    A.    Well, if in the evening he was ready for

24  bed or time for bed and he would say I'm not doing it,

25  well, then we'll just go run a little bit until you're

Witness Ethan Weaver

96

1   ready to do it.

2        Q.    Okay.  In your time at Liberty Ridge, do

3   you remember there being a time where the boy's

4   behavior or for whatever reason it escalated to the

5   point where they were then put to the physical labor

6   part of consequences overnight or after work hours?

7        A.    There was a few times of that, yes.

8        Q.    Okay.  If you could, the ones that you

9   remember, if you can just tell me a little bit about

10  them.

11       A.    That's whenever they would have dug.  You

12  know, we'd set up a light, dig a hole.

13       Q.    Okay.

14       A.    A fence post hole --

15       Q.    Okay.

16       A.    -- for fence posts.

17       Q.    And who determined how long this would go

18  on for?

19       A.    That was the staff.

20       Q.    Okay.  The mentors generally?

21       A.    The mentors were all involved there.

22       Q.    Okay.  Would you be involved in that?

23       A.    Yes.

24       Q.    Okay.  So you would have an idea that it

25  was going on?

**Witness Ethan Weaver**

97

1        A.      I knew it was going on.

2        Q.      Okay.  During the nighttime consequences,

3   things like that, was it generally the type of labor

4   of, you know, digging a hole or things like that or

5   were they ever at the pallet shop or at the sawmill or

6   something like that?

7        A.      No.  It was always digging a hole, not

8   related to the work chores at all.

9        Q.      Okay.  But it was -- so it was like

10  digging a hole for fence posts or a drain or something

11  like that?

12       A.      That's correct.  Yes.

13       Q.      Okay.  During that time, do you recall

14  the longest that somebody had worked kind of overnight

15  or do you not remember?

16       A.      I do not remember that.

17       Q.      Okay.  Would there always be a mentor out

18  watching them or would you just kind of generally know

19  that they were --

20       A.      No.  They were supervised.

21       Q.      Okay.

22       A.      And often helped.

23       Q.      Okay.  Are you aware of whether the

24  mentors restricted any food or water to the boy while

25  he was performing these consequences?

**Witness Ethan Weaver**

98

1      A.      No.  We were very careful that they had

2   food and water.

3      **Q.      Okay.**

4      A.      If it was hot, they had water and juice.

5   If it was cold, they had hot drinks.

6      **Q.      Okay.  What about food?**

7      A.      Food, they would have some food during

8   the night, too.  I remember my wife bringing a

9   sandwich out, cookies out, doughnuts out.

10     **Q.      Okay.  Are you aware of whether any of**

11  **these overnight consequences occurred when you were**

12  **gone for the weekend or not on the property?  Like**

13  **would it have been reported to you or you just don't**

14  **know?**

15     A.      It would have been reported to me.

16     **Q.      Okay.**

17     A.      But I'm not aware of any.

18     **Q.      Okay.  So you don't know for sure?**

19     A.      I don't know for sure.

20     **Q.      Okay.  What were some of the other, I**

21  **would say, physical consequences?  You had mentioned**

22  **digging post holes, digging a drain.  What were some**

23  **of the other, I guess, physical consequences that the**

24  **boys would have to do?**

25     A.      We would have -- the tree stump that was

Witness Ethan Weaver

99

1   in our driveway or off to the side of the driveway, we

2   would've dug at that.  It was light.  Place to work

3   close to the house.  We could go for refreshment.  We

4   dug at it for a while in the evening, you know.

5           Q.     What about were there ever consequences

6   of like breaking rocks or sawing wood, things like

7   that?

8           A.     Yes.

9           Q.     Okay.  Explain them to me a little bit

10  about breaking the rocks.

11          A.     We had a five gallon bucket that had inch

12  size holes on it.  And we gave them a face shield

13  protection for their face, a hammer, and they had to

14  fill a bucket with crushed rocks.

15          Q.     And what was the purpose of that?

16          A.     It was to help them to break a bad habit.

17          Q.     Okay.

18          A.     It was typical.  Give an illustration of

19  this needs -- and I remember the boys saying I'm going

20  to break this habit, and, you know, they were

21  determined, and mostly that was very positive.

22          Q.     Okay.  What about like sawing wood or

23  anything like that?  I know the sawmill is different

24  from cutting and sawing wood and firewood.

25          A.     I think there was one time where a boy --

**Witness Ethan Weaver**

100

1   I don't think it was David or Robert -- that sawed a

2   chunk of wood in the evening.

3        **Q.    Okay.  And were there any other types of**

4   **consequences that weren't necessarily labor, but were**

5   **also physically intensive?  You said there was**

6   **running.  Was there anything else like dragging items**

7   **or anything like that?**

8        A.    There was, not when I was up there,

9   dragging some chains.

10       **Q.    Okay.**

11       A.    Very little.

12       **Q.    Okay.**

13       A.    Almost -- that was almost never used when

14  I was there anyway.

15       **Q.    Okay.  So it may have been afterwards?**

16       A.    That's right.

17       **Q.    But you don't remember it happening when**

18  **you were there?**

19       A.    I don't recall.  Maybe once or so.

20       **Q.    Okay.  And it wasn't David or Robert, if**

21  **you remember?**

22       A.    I don't recall, but I don't think so.

23       **Q.    Okay.  What would happen if a child had**

24  **stayed up during the night to perform any**

25  **consequences?  Say it was in the morning hours, how**

**Witness Ethan Weaver**

101

1  would their sleep schedule then change?  Would they

2  still have to get up at 6 a.m. or would they sleep

3  later?  How would that work?

4          A.      Mostly they slept later.

5          Q.      Okay.

6          A.      To get some rest.

7          Q.      Okay.  Do you recall any time where

8  either David or Robert was kept up at night for a

9  consequence?

10         A.      Yes.  David did.  I remember working with

11 him digging a hole one night.

12         Q.      Okay.

13         A.      And as he dug, his attitude changed.  And

14 I remember it was cold, and we sat -- I was digging

15 with him.  We sat on the edge of the hole and just

16 talked.  It was beautiful.

17         Q.      Okay.

18         A.      Beautiful.

19         Q.      And you think this happened maybe one

20 time?

21         A.      At night?

22         Q.      Yeah.  That you can remember.

23         A.      That I recall that's -- that's all I

24 recall at presently.

25         Q.      Okay.  And this is just another general

Witness Ethan Weaver

102

1   question.  I know David was there for several years.

2   Robert wasn't there as long.

3        A.    No.

4        Q.    But there were obviously times when they

5   were with their mentors or at Liberty Ridge when you

6   weren't there; correct?

7        A.    That's correct.  Yeah.

8        Q.    You went away every weekend just to get

9   some time to yourself?

10       A.    Yeah.  We needed time alone.

11       Q.    Where did you usually go?

12       A.    Home.

13       Q.    Oh, okay.  So you maintained another

14   home?

15       A.    Yes.

16       Q.    Okay.  Okay.  So are you aware of how

17   often David had to perform any physical consequences?

18       A.    How often?

19       Q.    Mm-hmm.

20       A.    It varied quite a bit.

21       Q.    Okay.

22       A.    Yeah.  I would say most of the time he

23   did very well.  He did well, but it would show up once

24   in a while just like any normal child.

25       Q.    Were you aware of whether David had any

**Witness Ethan Weaver**

103

1  mental health diagnoses?

2       A.    No, not when he came.

3       Q.    Okay.  Were you aware of whether David

4  was on any prescription medication when he came to

5  Liberty Ridge?

6       A.    I don't recall.

7       Q.    Okay.  Now, we talked a little bit

8  earlier about using physical restraint on the boys for

9  various reasons.  Was this something that, if you

10  remember, that would have been in the old policy

11  manual?

12       A.    I don't think so.

13       Q.    Okay.  So it wouldn't have been written

14  out?

15       A.    I don't think so.

16       Q.    Okay.  In your experience at Liberty

17  Ridge, do you ever recall any of the boys being

18  restrained in any way other than just by using their

19  hands?

20       A.    No, no.  We never restrained our boys

21  with anything but our hands.

22       Q.    Okay.  Were there ever any times that you

23  were aware that either Mr. Cross or Robert or any of

24  the boys were restrained in any way when you weren't

25  at Liberty Ridge or --

**Witness Ethan Weaver**

104

```
1        A.     No.
2        Q.     -- again, you don't know?
3        A.     We were very stern on that.  They do not
4   restrain them with anything but your hands.
5        Q.     Okay.  If Mr. Cross or Mr. Miller or any
6   witness were to say that they or any other boy was
7   restrained by any other means than using hands, then
8   you would disagree with that?
9        A.     I certainly would.
10       Q.     Okay.  So like rope or zip ties, anything
11  like that?
12       A.     No.  We did not use those.
13       Q.     Okay.
14       A.     I remember asking the question to the
15  board is there ever an occasion where you would
16  restrain a boy with a rope or a zip tie, and the board
17  said no, don't do it, and so we didn't.
18       Q.     Was this ever communicated to the
19  mentors?
20       A.     Yes.  Oh, yes.
21       Q.     Are you aware of any times that the
22  mentors would have or may have had to either chastise
23  or take David or Robert through any of the steps of
24  consequences when you weren't there?
25       A.     I don't recall.
```

**Witness Ethan Weaver**

105

1   Q.   Okay.  Was there ever a time that you

2   remember multiple individuals or multiple mentors

3   having to either hold down or restrain David, Robert,

4   or anyone else?

5   A.   One time we had two mentors holding

6   David.

7   Q.   Okay.  Now, at any time when David was at

8   Liberty Ridge, do you ever remember taking him or

9   anybody taking him for any crisis treatment or mental

10  health treatment, anything like that?

11  A.   Yes.  He went to Dr. Walker at Annville.

12  Q.   Okay.

13  A.   Several times.

14  Q.   Who's Dr. Walker?

15  A.   I don't know.  Dr. Walker.

16  Q.   And what was the reason for taking him

17  there?

18  A.   We had suspicion there was -- we knew

19  there was some issues that needed professional help.

20  Q.   Okay.  So you think that he may have been

21  to a psychiatric or psychological professional?

22  A.   Oh, yeah, he is.  Mm-hmm.  Yeah.

23  Q.   Are you aware of whether he prescribed

24  David any medication?

25  A.   Yes, he did.

Witness Ethan Weaver

106

1    Q.    Okay.  Do you remember when this was?

2    A.    No.  I do not remember.

3    Q.    Okay.  Were the boys ever paid for any of

4    the work they did while at Liberty Ridge whether it be

5    the farm chores or the work like building gates or in

6    the sawmill or pallets or anything like that?

7    A.    We paid them indirectly.

8    Q.    Okay.

9    A.    In other words, they could earn points.

10    Q.    Okay.

11    A.    And I had in the basement a little store,

12    let's call it, where there was anything.  They had

13    tools.  They had books.  They had puzzles.  They had

14    models.  So with good behavior, they could earn and

15    then turn those point into -- so I guess that's called

16    pay I guess.

17    Q.    Okay.  So if -- again, I keep referring

18    to the gates because that was the one company that was

19    talked about when Liberty Ridge was first created.

20    Any knowledge about the business dealings with the

21    gate company or any of the other companies that were

22    kind of doing business at Liberty Ridge?  You said

23    Mr. Nelson would probably know that?

24    A.    Yeah.  I wasn't involved in that.

25    Q.    Okay.  Do you recall the boys ever using

**Witness Ethan Weaver**

107

1   any sort of power tools whether it be, you know, a

2   drill or a chain saw or --

3        A.      Yeah.  They would use the drill.

4        Q.      Okay.

5        A.      Yeah.

6        Q.      Can you explain the sawmill a little bit

7   to me?  I guess when the documents say sawmill, is it

8   like just a saw or is it like a milling like

9   machinery?

10       A.      That came after I left.

11       Q.      Okay.

12       A.      We had no sawmill on the farm when I was

13  there.

14       Q.      Okay.  So if David's daily moral

15  inventories mentioned working at the sawmill, like the

16  word sawmill, that wouldn't mean the sawmill structure

17  that's there now or could it have been?

18       A.      No.  If I recall correctly, the boys were

19  allowed to work at a local sawmill just to stack

20  lumber.

21       Q.      Okay.  What local sawmill was it?

22       A.      I don't even remember what it was.

23       Q.      Okay.

24       A.      It was just very short.  Very -- just a

25  couple occasions.

**Witness Ethan Weaver**

108

1    Q.    Okay.  So it was off the property?

2    A.    Off the property.

3    Q.    Who would take them there?

4    A.    One of the mentors.

5    Q.    Okay.  Not you?

6    A.    No, not me.

7    Q.    And you said you don't remember the name

8  of it?

9    A.    No, I do not.

10    Q.    Mr. Martin, would he know maybe?

11    A.    Possibly.

12    Q.    Okay.  When you were there, did the boys

13  ever use chain saws for any woodwork?

14    A.    Not for woodwork.  They did -- yes, they

15  did.  They cut some firewood with some chain saws.

16    Q.    Were there specific children that were or

17  were not allowed to use the chain saws?

18    A.    Yes.

19    Q.    Okay.  What were the rules or

20  limitations?

21    A.    For one thing if they had -- we went

22  through a demonstration of the correct use of chain

23  saws.

24    Q.    Okay.

25    A.    They had to wear chaps.  That's leg

Witness Ethan Weaver

109

1   protections.  And they were to use it in a way the

2   chain saw is to be used.  And I think there was a time

3   or so that I took the chain saw from the boy because

4   he was starting to use it wrongly.

5          Q.     Okay.  Was it limited by age?  Were

6   there, I guess, certain ages that weren't allowed to

7   use it or was it just making sure they had the

8   knowledge and proper use?

9          A.     Knowledge and proper use.

10         Q.     Okay.  Do you recall if the parents or

11  guardians of the boys would pay a rate to Liberty

12  Ridge for their children to be there?

13         A.     I think they did.  I don't have any idea

14  what it was.

15         Q.     Okay.  Again, that would probably be

16  within the purview of the treasurer?

17         A.     Yes.

18         Q.     Okay.  Do you recall at any time when you

19  were at Liberty Ridge that there was ever an incident

20  or a behavior or any occurrence that required any sort

21  of government reporting like to Children and Youth or

22  I know you said one time that the police talked to

23  David when he left, but that aside, any other

24  incidents that occurred?

25         A.     No.

**Witness Ethan Weaver**

110

1       Q.      Okay.  Are you aware of any children ever

2   being placed at Liberty Ridge for any, I would say,

3   like homosexual tendencies or sexual-related offenses?

4       A.      No, no.

5       Q.      Okay.  Would children receive

6   consequences if they did not want to participate in

7   any sort of Bible studies or any of the worship

8   portions of Liberty Ridge?

9       A.      Were they restricted you say?

10      Q.      Would they receive any consequences at

11  any level?

12      A.      They might have to write some

13  sentences --

14      Q.      Okay.

15      A.      -- on why they didn't want to.

16      Q.      Are you aware of any of the boys

17  receiving consequences for trying to leave Liberty

18  Ridge?

19      A.      Not that I recall.

20      Q.      Okay.  Are you aware of the boys ever

21  being physically restrained in any way, whether it be

22  the passive restraint that you talked about, holding

23  their arms, or anything else for trying to leave?

24      A.      No.

25      Q.      Okay.  Do you ever recall either telling

**Witness Ethan Weaver**

111

1   the children or overhearing any staff telling the

2   children that if they left, that there would be any

3   sort of negative repercussions like the police would

4   bring them back or there would be any sort of threat

5   to keep them there?

6        A.    Not that I'm aware of.

7        Q.    Okay.  But, again, you weren't there for

8   every conversation?

9        A.    That's correct.  Yeah.

10       Q.    I know I keep saying that, but I just

11   want to be clear.

12       A.    Yeah.

13       Q.    Throughout the Liberty Ridge mission and

14   documents, again, we keep talking about the word

15   therapeutic, and just to be clear, when determining

16   that the certain exercises, and by exercises I mean

17   occupational exercises, work, anything that was done

18   there was considered to be therapeutic that was not

19   because you went and talked to a therapist to say it

20   is therapeutic to do X?

21       A.    No.

22       Q.    Okay.  Do you recall if you or the board

23   ever consulted with a medical or a psychological

24   professional to determine whether the work performed

25   at Liberty Ridge or the forms of consequences may

**Witness Ethan Weaver**

112

1   cause psychological or physical harm or anything?

2        A.     No.

3        Q.     Okay.

4               MS. WYNKOOP:  Off the record for a

5   second.  Do you want a break?

6        A.     I have a cramp in my leg.

7               MS. FRANCHI:  I honestly only have like a

8   few more minutes.  If you want to stand up, we can

9   take five, and then we can --

10       A.     Suddenly I got a cramp in my leg.

11              THE VIDEOGRAPHER:  We are going off the

12   record at 11:17 a.m.

13              (Recess)

14              THE VIDEOGRAPHER:  We are back on the

15   record at 11:20 a.m.

16   BY MS. FRANCHI:

17       Q.     All right.  Mr. Weaver, I'm going to

18   pivot a little bit.  We only have, I think, a few more

19   minutes, and then your attorney can ask you any

20   questions if she has any.

21              So I just want to touch base briefly

22   about my clients specifically.  I know we talked a

23   little bit about David Cross, and a lot of these may

24   have been generally asked before, but you are familiar

25   with Mr. Cross?

**Witness Ethan Weaver**

113

1      A.      Yes.

2      Q.      And was he Mr. Bates when he was at

3  Liberty Ridge?

4      A.      Mr.?

5      Q.      Bates?  David Bates?  I know he went by

6  two different names at one point.

7      A.      No.

8      Q.      Okay.  Was it always David Cross?

9      A.      Yes.

10     Q.      Okay.  And were you working at Liberty

11  Ridge the entire time that David was at Liberty Ridge?

12     A.      Yes.

13     Q.      Okay.  And would that have been as house

14  parent the entire time?

15     A.      Yes.

16     Q.      And you had said to me that you don't

17  recall being involved in David's recruitment?

18     A.      No.

19          MS. WYNKOOP:  Objection to form.  Go

20  ahead.

21  BY MS. FRANCHI:

22     Q.      You said no?

23     A.      Yeah.

24          MS. WYNKOOP:  You can answer when I do

25  that.  I'll tell you if you can't.

**Witness Ethan Weaver**

114

1      A.      I'm sorry.

2              MS. WYNKOOP:  Yeah.  That's okay.

3      A.      Did I do something wrong?

4              MS. WYNKOOP:  No.

5      A.      Okay.

6   BY MS. FRANCHI:

7      Q.      And, again, you had mentioned earlier

8   that you weren't generally familiar with the finances

9   of Liberty Ridge, so you do not know how much David's

10  parents were paying for him to go to Liberty Ridge?

11     A.      No.

12     Q.      Okay.  And that would be the same thing

13  for Robert, you don't know?

14     A.      I do not know.

15     Q.      Okay.  Were you ever involved in the

16  day-to-day direction of telling David what to do or

17  was that always communicated to the mentors to tell

18  David what to do?

19     A.      Occasionally I would add some dimension

20  to it.

21     Q.      Okay.  But generally it was the mentors?

22     A.      Generally it was the mentors.

23     Q.      Okay.  Were you ever involved in directly

24  administering consequences to David or was that the

25  mentors would do that, and then you would secondarily

115

1   become involved?

2          A.     Some of both.

3          Q.     Okay.  What was that generally for?

4          A.     Just so that one man didn't have all the

5   burden of it.

6          Q.     Okay.  Were you ever involved -- at least

7   you said two times that David tried to leave the

8   property?

9          A.     Were I ever involved?

10         Q.     Were you involved in bringing him back or

11  did you just hear about it?

12         A.     I escorted him once to the edge of the

13  property.

14         Q.     Oh, you did.  Okay.

15         A.     Yeah.

16         Q.     Do you recall whether David ever

17  expressed any suicidal ideations or intent when he was

18  at Liberty Ridge?

19         A.     No, no.

20         Q.     Okay.  And this, again, that was just you

21  never heard of that or observed it?

22         A.     No.

23         Q.     Okay.

24         A.     No.

25         Q.     Moving on to Robert Miller.  So you were

**Witness Ethan Weaver**

116

1    familiar with Mr. Miller?

2         A.    Mm-hmm.

3         Q.    And were you the house parent at Liberty

4    Ridge the entire time Robert was there?

5         A.    Yes.

6         Q.    Okay.  And do you recall about how long

7    Robert was at Liberty Ridge for?

8         A.    Not exactly, but six to eight months.

9         Q.    So significantly shorter than David?

10        A.    Yeah, much shorter.

11        Q.    Okay.  Were you involved in any way with

12   Robert's recruitment or bringing him to Liberty Ridge?

13        A.    No.

14             MS. WYNKOOP:  Objection to form.

15   BY MS. FRANCHI:

16        Q.    Okay.  Were you familiar with Robert

17   prior to him coming to Liberty Ridge?

18        A.    No.

19        Q.    Okay.  Are you aware of -- were you

20   familiar with his family at all before he came to

21   Liberty Ridge?

22        A.    No.

23        Q.    Okay.  Were you -- strike that.  Are you

24   familiar with where Robert came from before coming to

25   Liberty Ridge or do you not have that knowledge

117

1    usually?

2         A.    Did not have that knowledge.

3         Q.    Okay.  Do you recall Robert ever

4    receiving any consequences?

5         A.    Very little.  Maybe some sentence

6    writing.  Very little.

7         Q.    Okay.

8         A.    Robert did very well.

9         Q.    Okay.  Do you ever recall David or any of

10   the boys receiving consequences for, I guess, either

11   intervening or sticking up for other children that

12   were at Liberty Ridge?

13        A.    I don't recall.

14        Q.    Okay.  Do you ever recall any of the

15   children being made to run and like following them in

16   a vehicle or golf cart or anything like that to keep

17   them running?

18        A.    We followed occasionally beside them, but

19   we didn't -- it was not being pushed.

20        Q.    Okay.

21        A.    It was just to be with them.  That's all.

22        Q.    Okay.  And that would occur in -- it

23   could be in a vehicle or something to that?

24        A.    Yes.

25        Q.    Okay.

**Witness Ethan Weaver**

118

1        A.      But we did not push them in any way.

2        Q.      Okay.  Do you ever recall any of the

3   children speaking out about any of the mentors either

4   amongst themselves or to you?

5        A.      No.

6        Q.      Okay.

7        A.      No.

8        Q.      And within the new policy manual it

9   speaks a little bit to there being rules against the

10  boys, I guess, complaining about the mentors.

11              Was that something that was in the policy

12  manual when you were the house parent at Liberty

13  Ridge?

14       A.      I don't think so.

15       Q.      Okay.  Do you recall whether there were

16  any rules prohibiting the children from either

17  complaining or speaking out against their mentors?

18       A.      No.  There was no rules on that.

19       Q.      Okay.  I think this might be all of the

20  questions -- actually, I have three more brief ones.

21  Are you aware while you were a house parent or at

22  least between the years of 2011 to 2014 were there any

23  law enforcement investigations or governmental

24  investigations of Liberty Ridge when you were there?

25       A.      One time.

Witness Ethan Weaver

119

1    Q.    Okay.  What was that?

2    A.    That's whenever I.M. was there.

3    Q.    Okay.

4    A.    His brother turned us in because he said

5  we do not have the legal right to have him there.

6    Q.    Okay.

7    A.    So Children and Youth Services showed up

8  and asked for documentation.  I gave them the power of

9  attorney papers, the medical consent forms, activity

10  restriction the parents -- I gave them all the papers

11  that we had, and we were cleared.

12    Q.    Okay.  Did any -- do you remember if CYS

13  spoke with any of the mentors or any of the other

14  staff?

15    A.    No.

16    Q.    Okay.  Do you remember if they talked to

17  any of the children?

18    A.    They talked to I.M.

19    Q.    Okay.

20    A.    I remember the lady said to I.M., she

21  said do you enjoy it here, and he said yes.  We did

22  not tell him to say that.  He offered it on his own.

23        MS. FRANCHI:  Okay.  And, again, what we

24  can do is just for you and if you agree, we can strike

25  his name from the actual transcript.

**Witness Ethan Weaver**

120

1          MS. WYNKOOP:  Yes.

2          MS. FRANCHI:  So instead of saying the

3  name I.M., we can just put like the boy.

4          MS. WYNKOOP:  Or initials, whatever.

5  BY MS. FRANCHI:

6      **Q.    Do you recall when I.M. was interviewed,**

7  **was his mentor or were other staff members present?**

8      A.    I do not know.

9          MS. FRANCHI:  Okay.  I don't think I have

10  any more questions.  Thank you.

11          MS. WYNKOOP:  I don't have any questions.

12          MS. FRANCHI:  All right.  I think we're

13  good.

14          MS. WYNKOOP:  You're done.

15          THE VIDEOGRAPHER:  This marks the end of

16  the deposition of Ethan Weaver.  We are going off the

17  record at 11:28 a.m.

18          (The deposition was concluded at 11:28

19  a.m.)

20

21

22

23

24

25

Witness Ethan Weaver

121

```
1   COMMONWEALTH OF PENNSYLVANIA    )
                                    )  SS.
2   COUNTY OF YORK                  )

3

4           I, Tracy L. Lloyd, a Registered
    Professional Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania and County of
5   York, do hereby certify that the foregoing
    testimony was taken before me at the time and place
6   hereinbefore set forth, and that it is the
    testimony of:

7

8                   ETHAN WEAVER

9

10          I further certify that said witness
    was by me duly sworn to testify the whole and
    complete truth in said cause; that the testimony
11  then given was reported by me stenographically, and
    subsequently transcribed under my direction and
12  supervision; and that the foregoing is a full, true
    and correct transcript of my original shorthand
13  notes.

14          I further certify that I am not
    counsel for nor related to any of the parties to
15  the foregoing cause, nor employed by them or their
    attorneys, and am not interested in the subject
16  matter or outcome thereof.

17          Dated at York, Pennsylvania, this 31st
    day of October, 2022.
18

19

20  _____
                Tracy L. Lloyd, Notary Public
21              Registered Professional Reporter

22

23  (The foregoing certification does not apply to any
    reproduction of the same by any means unless under
    the direct control and/or supervision of the
24  certifying reporter.)

25  My Commission expires:
    April 21, 2023
```

**$**

**$2,000** 44:25

**1**

**1** 4:10 32:8
**10** 53:20
**10:03** 64:1
**10:15** 64:4
**10:35** 83:8
**10:43** 83:11
**11:17** 112:12
**11:20** 112:15
**11:28** 120:17,18
**12** 32:13 48:2
**13** 24:12 32:13
**15** 32:9
**16** 13:2 42:21
**17011** 4:19
**18th** 4:14
**1:00** 52:10

**2**

**2** 12:16 52:23
**2005** 8:17
**2008** 8:17
**2010** 17:16 20:14
**2011** 18:11 27:13
42:14,22 45:24
55:19 82:6,20,22
83:18 84:24 91:9
93:4 118:22
**2014** 17:16 28:11
42:14 45:24 55:19
82:22 83:18 84:24
88:22 91:9 93:4
118:22
**2016** 42:22
**2022** 4:14
**214** 4:17

**23** 24:4
**24** 92:22
**2:00** 52:23

**4**

**40** 10:3
**402** 4:18

**5**

**5** 53:8
**521-CV-05070-
JMG** 4:13

**6**

**6** 101:2
**68** 10:3
**6:30** 50:21

**7**

**72** 81:9,12 82:17
**78** 12:15

**8**

**8** 12:15
**8/5/54** 10:5
**81** 12:16 82:17
**8:00** 51:9

**9**

**9** 53:20
**93** 24:7,10
**9:00** 53:19
**9:03** 4:15
**9:30** 53:20

**A**

**A.B.** 10:20
**a.m.** 4:15 64:1,4
83:8,11 101:2

112:12,15 120:17,
19
**Aaron** 94:17
**Absolutely** 11:22
**access** 31:15
75:7 77:20
**accomplish** 23:5
34:22
**account** 19:7
**accounts** 19:1
**accurate** 53:21
75:25
**acres** 11:5 56:8
**act** 41:25 45:11
**acted** 91:19
**acting** 92:3,6,10,
13,16,19
**active** 42:15
**activities** 51:2,7,
10,12 52:9 53:11
54:11
**activity** 119:9
**actual** 119:25
**add** 114:19
**adhere** 54:4
**adhering** 64:25
**administered**
69:16 74:14
**administering**
114:24
**admissions** 89:2
**admitting** 6:10
**adult** 78:23
**adults** 40:8 45:14
**advertising** 37:7
**affairs** 28:21
**affirmed** 5:9
**age** 39:23 109:5
**ages** 109:6
**agitated** 72:5
74:18

**agree** 6:14
119:24
**agreed** 4:2
**Agreeing** 6:6
**agreement** 25:2
**ahead** 113:20
**aid** 14:10
**allergies** 85:15,
16
**allowed** 77:7,18
79:4 80:14,15,16
107:19 108:17
109:6
**amended** 34:14
**amendments**
34:18
**Andreozzi** 4:23
**Anger** 95:16
**angry** 65:24
71:20 73:11 74:5,
18
**Annville** 105:11
**answers** 7:4 63:4
**anymore** 48:11
75:13
**anytime** 51:14
**apologize** 14:2
24:2 26:14 31:10,
16 94:3
**apple** 55:24
**approach** 87:18,
24 88:8
**appropriately**
91:5
**approximate**
8:10 50:19 73:15
**approximately**
77:14,15
**approximation**
8:14
**area** 78:20 85:12
**arms** 71:23
110:23

**arrangement**
25:13 26:9,17
27:5
**article** 32:14
33:7,11
**articles** 31:4 34:7
**Ashland** 57:8
**asks** 6:24
**aspirations** 60:1
**assessment**
35:20
**assessments**
36:4
**assigned** 46:23
55:15
**assistant** 28:4
41:15 42:4
**assume** 7:18
**assuming** 22:5
47:6 54:17 56:14
59:18 79:1
**atmosphere**
87:19 88:12
**attend** 11:15,16
21:16 54:22,23
**attention** 73:25
**attitude** 67:5
68:14,23 70:3
101:13
**attitudes** 66:24
**attorney** 6:24 8:3
9:9 85:7 112:19
119:9
**attorneys** 5:17
7:22
**authorities** 73:4
**Avenue** 4:18
**aware** 21:10
31:20 33:22 40:20
65:18 76:6 78:25
82:5 89:8 90:18,
21 92:25 97:23
98:10,17 102:16,
25 103:3,23
104:21 105:23
110:1,16,20 111:6

116:19 118:21

---

**B**

**back** 25:18 45:23 52:1,7,9,22 53:5 58:1 62:4 64:3 66:25 69:13 83:10 111:4 112:14 115:10

**background** 9:6, 21

**backyard** 18:21

**bad** 7:23 99:16

**baking** 45:6

**bank** 18:25 19:1, 3,7,8

**baptized** 12:25

**barn** 57:22

**barns** 57:19,20

**Barry** 4:16

**base** 112:21

**based** 13:13 37:23 38:1 55:3 63:11 66:13

**basement** 52:12 106:11

**basically** 15:25 16:21 30:11 39:20 62:9 71:22

**Bate's** 87:14

**Bates** 6:11 83:15 86:19 113:2,5

**bear** 88:15

**beautiful** 58:4 101:16,18

**bed** 44:20 53:18 95:24

**bedroom** 44:10, 12

**bedrooms** 44:6

**began** 51:10 81:23 82:6

**begin** 9:14 40:24

**beginning** 34:10 77:4

**begins** 4:9

**behavior** 38:6 65:1 67:4 95:20 96:4 106:14 109:20

**behavioral** 88:19 89:1

**behaviors** 38:4

**belongs** 15:15

**benefit** 20:1 26:8

**Bible** 13:15 52:14 53:25 57:9 66:13 88:12 94:2 110:7

**biblical** 13:13

**Big** 11:18

**binder** 6:8

**bipolar** 89:10,18, 19

**birth** 10:4

**birthdays** 43:16

**bishop** 15:11,21 28:24,25

**bishops** 15:6

**bit** 13:9 17:3 20:3 38:19 41:8 43:7 44:4 54:8 64:11, 23 67:24 68:12 81:10 88:25 95:17,25 96:9 99:9 102:20 103:7 107:6 112:18,23 118:9

**blisters** 56:2

**Blue** 17:9 18:3,8 19:5

**board** 20:11,18, 21,24 21:3,14,16 22:5 23:2 27:15, 18 28:4,13,16,18, 22,24 29:1,4,5,9, 10,12,15 30:18, 19,20 31:6 33:3,4 34:2 35:23 37:5,7 38:16,17,18 40:15,17 41:21,24 42:8,24,25 43:1

46:15 47:17,25 48:14,20 58:15 59:6 60:25 61:1,4, 11 65:19 76:2 84:5,7,11 104:15, 16 111:22

**bodies** 50:10

**body** 50:5 70:12 71:23

**book** 32:7 93:16

**books** 106:13

**born** 10:6 12:15, 16

**bottom** 24:11

**bounds** 91:18

**boy** 36:21,22 44:13 46:23 61:24 65:9,24 66:6,14 68:10,23 71:20 72:4,24 73:3 74:17,19 85:5,12, 16 86:4 89:18,22 90:4 91:3 97:24 99:25 104:6,16 109:3 120:3

**boy's** 95:20 96:3

**boys** 35:9 44:16 47:10 49:3 50:17 51:3 52:24,25 53:24 55:21 56:12 57:8 58:7,10 60:4, 9 62:22 63:6 64:25 65:20 74:4 77:17,24 78:11,22 85:20 88:19 89:8 90:18,23 93:20 94:12,24 98:24 99:19 103:8,17, 20,24 106:3,25 107:18 108:12 109:11 110:16,20 117:10 118:10

**break** 7:25 8:5 45:16 51:13,14,24 63:20 69:1,23 83:3,21 99:16,20 112:5

**breakfast** 50:24 51:1

**breaking** 99:6,10

**breaking-in** 77:8, 10

**breaks** 45:21

**breathing** 71:25

**briefly** 112:21

**bring** 111:4

**bringing** 86:4 98:8 115:10 116:12

**brother** 32:18 119:4

**brought** 58:1,16 94:11

**Brubaker** 20:19 21:2,20 22:15 27:19 29:6 36:2, 14 39:13 86:7

**bucket** 99:11,14

**build** 18:15 47:12 57:15

**building** 48:3 88:8 106:5

**built** 55:8,20,25 56:10

**bunch** 27:9 62:5

**burden** 33:13 115:5

**business** 17:3,9, 13 18:13 26:16 27:2 33:23 47:4 106:20,22

**businesses** 17:5,8 18:2,6 19:23 26:16

**button** 72:23

**bylaws** 34:3,6,8

---

**C**

**cabinet** 42:3

**call** 16:4 50:9 73:4 75:12,14 76:6 77:16 106:12

**called** 5:8 15:19 17:9 23:11 72:6,7 73:5 106:15

**calls** 76:14,21

**Camp** 4:18

**care** 16:1 57:1 59:17,20 85:9

**careful** 98:1

**carried** 25:1 65:6

**carry** 6:3

**cart** 117:16

**case** 4:13,24 5:17 6:18 9:9 13:8 17:15,17,22,25

**cattle** 69:10

**caused** 95:20

**chain** 107:2 108:13,15,17,22 109:2,3

**chains** 100:9

**Chair** 26:19

**chairman** 35:25 39:12 86:6

**change** 28:8 101:1

**changed** 68:14, 24 101:13

**chaps** 108:25

**charge** 54:2 65:2 70:17 74:6

**charged** 11:23

**chastise** 104:22

**chicken** 47:9,11 51:18 85:17

**chickens** 47:23 51:21

**child** 35:16 36:15, 17,24 37:17 38:1, 14 46:20,21 58:11 59:9 61:16,19 72:19 73:23 84:24 100:23 102:24

**children** 12:10 37:20 40:12 41:12 54:4,21 55:9 57:6 59:5,13 60:18,20 61:2,13,16 62:7 64:11 71:12,17

72:17 74:14 75:6, 14,24 76:10,25 79:4 80:11 108:16 109:12,21 110:1,5 111:1,2 117:11,15 118:3,16 119:7,17

**children's** 43:16 60:16

**chocolate** 69:4,5

**choice** 13:3,4,5 93:20,25

**choose** 61:16 72:23

**chore** 68:2

**chores** 88:1 97:8 106:5

**chosen** 22:4 38:20

**Chris** 93:5

**chunk** 100:2

**church** 12:24 13:1,8,13 14:10, 17,18,20 15:4,9, 10,16,18,19 16:1, 7,9,19 20:6,7,9 21:4,5,7 28:20,25 29:13,18,21,23,24 30:12,15,22 32:12 33:3,12,15,18,20 37:14 38:22 39:1, 2,4,25 40:2 48:15 49:10,11,18,21 50:1,10 54:17,19, 22,24 57:11 59:2 86:25

**churches** 50:2,3 55:2

**circumstances** 95:12,13

**clarification** 17:23 49:25

**Clark's** 26:19

**class** 52:10,13, 14,16,18

**classroom** 52:12

**clean** 53:10

**cleaning** 14:10 88:3

**clear** 72:24 76:19 84:1 87:12 90:4 111:11,15

**cleared** 119:11

**clients** 72:16 95:19 112:22

**close** 99:3

**closely** 62:20

**clothe** 43:11

**clouds** 67:13

**coffee** 63:24

**cohesion** 30:13

**cold** 69:5 98:5 101:14

**comfort** 63:20

**comfortable** 47:2

**committee** 22:8, 11,14,17 23:9,18 24:12 25:18 26:2 27:22,24,25 32:19 34:20 37:5 40:16 84:7

**common** 30:2,3 39:25

**communicate** 46:8 76:3

**communicated** 15:5 20:8 21:21 80:19 104:18 114:17

**communicating** 16:23

**communication** 75:8 79:5,10,20

**communications** 79:15,25

**communion** 16:20

**community** 11:17,18 14:2,4, 14,24 15:3 16:10, 25 19:16,18 21:7 29:22 31:3 33:15, 19 35:2 37:8,15, 16 58:22 59:1 63:13 86:20

89:17,25

**companies** 106:21

**company** 19:24 23:11 26:20 106:18,21

**complaining** 118:10,17

**completed** 36:21

**completely** 8:21 78:23

**composes** 15:20

**concepts** 83:23

**concluded** 120:18

**conference** 13:1 50:11,12

**confirm** 82:18

**confusingly** 7:12

**congregation** 16:2

**congregations** 15:21,22 21:8

**connected** 30:13

**consent** 85:8 119:9

**consequence** 70:24 101:9

**consequences** 64:24 65:2 69:15 76:21 94:24 95:2, 7,14,21 96:6 97:2, 25 98:11,21,23 99:5 100:4,25 102:17 104:24 110:6,10,17 111:25 114:24 117:4,10

**conservative** 31:15

**considered** 35:17 88:8 111:18

**consistent** 34:16 87:19

**Construction** 49:5

**consulted** 111:23

**contact** 77:5 86:15,17

**context** 89:2

**continue** 24:25

**contract** 24:24 25:4

**contracted** 35:13

**contractors** 19:15

**conversation** 23:25 86:11 111:8

**conversations** 25:8 85:22

**cook** 52:4

**cookies** 69:4 98:9

**cooking** 45:5

**copies** 67:15

**copy** 30:25 31:1 82:12 83:14 84:1, 19

**corner** 78:17

**corporate** 47:14

**correct** 14:8,12 18:24 49:24 56:21 61:3 62:22 63:2 64:15,20,21,23 67:4 71:2,6 75:21 76:18 79:3 81:5,7 83:16,19 87:14 90:17 92:23 97:12 102:6,7 108:22 111:9

**corrected** 66:24

**correcting** 91:24

**correction** 91:18 92:7,11

**correctly** 51:9 84:18 107:18

**counsel** 4:3,20 6:2,12

**couple** 107:25

**court** 4:12 5:4

**cramp** 112:6,10

**crates** 55:24

**create** 33:13 84:9

**created** 34:12 42:25 81:19 84:3 87:21 106:19

**creating** 23:1 25:3 34:23 40:16

**creation** 21:21 22:18

**crime** 11:24

**crisis** 105:9

**crops** 56:21,23

**Cross** 41:1 61:24 62:2 64:12 72:18 86:11,15,19 87:14 103:23 104:5 112:23,25 113:8

**crushed** 99:14

**current** 42:24

**cut** 108:15

**cutting** 99:24

**CYS** 119:12

**D**

**D.C.** 4:11

**daily** 59:21 107:14

**dark** 8:12

**date** 4:14 8:11 10:4

**daughter** 11:10 17:14 18:3

**David** 41:1 61:24 72:18 73:6,7,8,12 86:11 100:1,20 101:8,10 102:1, 17,25 103:3 104:23 105:3,6,7, 24 109:23 112:23 113:5,8,11 114:16,18,24 115:7,16 116:9 117:9

**David's** 107:14

113:17 114:9

**day** 46:13 50:18, 23 51:8 62:16,25 63:1 64:20 92:22

**day's** 51:10,12

**day-to-day** 14:21 46:19 50:16 62:12 64:19 114:16

**days** 54:3,6 73:17,19

**deacon** 15:12,25

**deal** 62:22 90:23 92:2,8

**dealing** 65:13

**dealings** 106:20

**death** 16:3

**decide** 66:21 68:19

**deciding** 66:20

**decision** 24:22 30:1 47:14

**decisions** 61:2

**deconstruct** 57:19

**Defendants** 5:1, 3

**deliberately** 13:14

**demographic** 39:23

**demonstration** 108:22

**Department** 60:15

**depend** 60:21 65:5 68:20 90:1

**depended** 68:21

**depends** 51:18 90:2

**Depos** 4:17

**deposition** 4:10, 17 6:22,25 8:8 9:15 120:16,18

**depositions** 6:4,

20

**describe** 43:20 44:4

**details** 16:1

**determination** 47:13 59:3 66:23 72:4

**determinations** 46:22

**determine** 60:23 111:24

**determined** 35:16 47:10 58:13 61:14 96:17 99:21

**determining** 111:15

**devotional** 53:23

**devotions** 50:24 51:1,7

**diagnoses** 40:13 89:6 90:5 103:1

**diagnosis** 89:10, 23

**dictate** 80:21

**differently** 75:4

**difficulties** 88:19 89:1

**dig** 96:12

**digging** 97:4,7,10 98:22 101:11,14

**dimension** 114:19

**dinner** 95:7

**direct** 28:21 43:11 76:20 77:25

**direction** 46:8,9 48:1 61:20 79:19 94:7,9,23 114:16

**directions** 46:19

**directly** 64:18 69:20 114:23

**directors** 27:15

**dirty** 51:21

**disagree** 104:8

**discipleship** 13:20

**discipline** 64:24 65:2,20 70:24 91:17

**discontinue** 24:24

**discovery** 6:7,9, 11 63:3

**discretion** 80:9

**discuss** 22:18 65:9

**discussed** 23:13

**discusses** 88:18

**discussing** 23:9 85:19

**discussion** 23:18

**discussions** 21:17 52:24 65:23

**dishes** 51:4 68:2 70:17

**disorder** 89:10, 18

**displeasure** 80:13

**disseminated** 84:15

**dissolving** 17:12

**dissuaded** 62:7

**distressed** 73:24

**district** 4:12 21:6

**districts** 15:20

**divisions** 49:11 50:4

**doctor** 89:24

**doctors** 35:12 89:25

**doctrinally** 30:13

**document** 32:8 36:23,25 81:15

**documentation** 119:8

**documents** 9:18 34:3 84:25 107:7 111:14

**domestic** 51:4 68:2

**doughnuts** 98:9

**downstairs** 50:22,23

**dozens** 41:11

**drafting** 25:3

**dragging** 100:6,9

**drain** 97:10 98:22

**drank** 63:24

**drill** 107:2,3

**drink** 8:1 51:15, 16 69:3

**drinking** 27:9

**drinks** 51:19 98:5

**driver** 10:16

**driveway** 99:1

**dug** 56:1,2 69:8 96:11 99:2,4 101:13

**dust** 85:17

**dusty** 51:19

**Dutch-way** 26:20

**duties** 41:19 42:7 45:4 51:4 55:15

**E**

**earlier** 7:9 87:12 94:3 103:8 114:7

**earn** 106:9,14

**earshot** 78:14

**Eastern** 4:12 12:23 13:1,7,9 14:18 15:19 29:13 30:8 35:1 49:9,21 50:1,9 63:12 93:22 94:19

**eat** 52:2

**eating** 88:3,4

**Ebersole** 93:5

**Edelstein** 5:1,3

**edge** 61:25 101:15 115:12

**education** 11:12

**eggs** 45:5

**elaborate** 95:17

**emailed** 31:13

**emotional** 40:13 88:19,25

**employees** 19:9

**employment** 48:12

**encompass** 88:12 89:5

**encompasses** 17:15

**encompassing** 17:18

**encourage** 16:16

**encouraged** 61:18

**end** 120:15

**ended** 64:10

**enforcement** 118:23

**English** 11:21

**enjoy** 66:15,16 119:21

**enter** 25:1 89:9

**entire** 113:11,14 116:4

**entities** 47:4

**entitled** 16:20

**entity** 20:10 23:1 28:15 49:18

**environment** 87:25

**escalate** 69:12

**escalated** 96:4

**escorted** 115:12

**essay** 67:8,17,22

**essays** 67:20

**establish** 23:4

**establishing** 23:10

**estimate** 8:9,13

**estimating** 7:23

**et al** 4:11

**Ethan** 4:10 5:8 9:24 32:18 120:16

**evaluated** 38:4

**evaluating** 35:17

**evaluation** 37:23,25 38:14

**evaluations** 38:8

**evening** 53:12 95:23 99:4 100:2

**event** 8:15,19

**evident** 38:10

**EXAMINATION** 5:11

**examples** 14:8 92:4

**excellent** 58:7

**exception** 54:10

**exchanged** 6:9

**excited** 56:4

**excommunicated** 16:14,18,22

**excuse** 26:14 44:21 71:7

**exercises** 111:16,17

**exhausted** 68:23

**exhibits** 6:10

**existence** 83:1

**expect** 7:21

**expectations** 6:21

**experience** 103:16

**explain** 15:14 44:6,8 99:9 107:6

**expressed** 115:17

**extended** 95:8, 22

**extent** 15:14,17

**extra** 68:2

**eye** 78:20

---
**F**
---

**face** 63:10 69:3 99:12,13

**facilities** 49:7,17

**facility** 23:6

**factor** 66:20

**factors** 13:17

**failures** 60:1

**fair** 7:19 8:13,14, 18,23

**faith** 12:21 13:10, 11,18 14:1,4,14 31:14

**faiths** 50:6

**fall** 57:9

**familiar** 13:7 26:15,23 30:7 41:23 59:21 86:18 89:17 112:24 114:8 116:1,16, 20,24

**family** 11:6,8 16:24 43:2 51:2 76:25 77:18,25 78:5 116:20

**family's** 13:3

**farm** 6:19 10:24 11:1,4,6 17:13 18:2 19:24 24:18, 19,23 25:10 26:20 27:5,13 28:13 32:19 33:17 47:5, 8,10 87:18,24,25 88:8 106:5 107:12

**fast** 5:21

**fears** 38:6

**feed** 26:19 43:11

**feel** 6:1 7:12 66:15 79:16

**fellowship** 50:9

**felt** 62:22

**fence** 69:9 96:14, 16 97:10

**fences** 18:15,18

**fencing** 17:13 18:13,19

**fiberglass** 24:18

**fields** 56:20

**file** 42:2 59:10

**files** 59:14

**filing** 4:4

**fill** 48:21 70:6,8, 10 75:3 85:4 99:14

**filled** 48:17

**finances** 114:8

**financial** 17:7 18:5 26:8

**fine** 8:2,21 24:6 53:22

**finished** 9:10 57:2

**finishes** 31:24 36:8

**firewood** 47:24 53:15 99:24 108:15

**firm** 4:23

**fit** 62:22

**flip** 32:7,9

**follow** 13:14 43:11 91:8

**food** 56:18 97:24 98:2,6,7

**Foote** 4:23

**forced** 56:2

**forget** 47:21

**form** 4:6 31:18,21 49:12 87:6 113:19 116:14

**formed** 20:4 22:9

**forms** 85:8 111:25 119:9

**found** 39:25 40:2

**foundation** 57:22

**frame** 8:16 17:17, 22,25

**Franchi** 4:22 5:13,16 6:15 32:1 36:12 49:14 63:21 64:5 83:2,6,12 87:10,11 112:7,16 113:21 114:6 116:15 119:23 120:2,5,9,12

**free** 7:12 48:18 51:14,16 53:12 60:9 61:17 64:11

**Fresh** 49:2

**fried** 45:5

**friends** 78:2

**front** 82:16 83:22 84:2

**full** 6:8 9:23 70:20 72:20

**fully** 9:3

**fun** 55:24 68:13

**function** 30:12

**furiously** 56:1

**fuzzy** 50:22

---
**G**
---

**gallon** 99:11

**gap** 48:21

**garden** 56:18 88:3

**Garman** 22:15 27:20

**gate** 106:21

**gates** 23:11,21

24:13,18,20,24 25:5,9 47:6,7,12 48:3 55:9,16 56:14 88:9 106:5, 18

**gather** 64:16

**gave** 46:18 99:12 119:8,10

**general** 9:6 15:18,22 37:5 42:7 54:4 63:12 101:25

**generally** 13:6 14:17 17:15,22 19:14 28:18 33:10 40:4 41:6,9 61:1 75:23 77:3 78:19, 21 81:3 83:23 87:16 93:19 96:20 97:3,18 112:24 114:8,21,22 115:3

**give** 6:25 7:5 8:13 13:25 15:22 20:14 22:25 23:2 27:7 28:14 43:10 53:20 55:4,6 68:16 79:18 92:11 95:18,19 99:18

**goals** 60:1

**Godliness** 13:20

**golf** 117:16

**good** 5:14,15 27:9,10 29:18,20, 23 30:5 45:9 64:6 70:1 106:14 120:13

**governing** 34:2

**government** 109:21

**governmental** 40:18 118:23

**Graham** 93:5

**greater** 15:16

**greatly** 60:22

**ground** 23:2

**group** 25:20 39:23

**grown** 56:18,21

**guardians** 85:19 86:21 109:11

**guess** 8:12 11:15 12:19 14:18 23:7 26:13 30:3,14 33:19 35:17,18 37:19 38:12,13 42:7 46:9 47:3,9 49:11 50:5,6,19 51:11,23 52:7 53:25 56:11 59:10 61:15 62:11 63:6, 12 64:15,25 66:19 67:22,23 68:18 69:16 74:6 77:16 80:12 87:4 89:23 92:2,5,8 93:19,22 95:2,14 98:23 106:15,16 107:7 109:6 117:10 118:10

**guidance** 15:4 23:2

**guidelines** 23:6 85:3,4 91:7

—————————

**H**

—————————

**habit** 99:16,20

**halfway** 24:8

**hammer** 99:13

**hand** 56:3 74:24

**handbook** 81:18 83:14 91:12

**handle** 24:25 61:21 65:20 66:2 67:25 71:16 74:10 75:3 94:5

**handled** 71:4

**hands** 69:3 103:19,21 104:4,7

**happen** 36:16 61:19 67:23 68:3 72:10 80:11 93:1 95:10 100:23

**happened** 8:16, 20 55:7 56:23 69:7 74:7 92:25 101:19

**happening**

100:17

**happy** 66:14 67:9

**harm** 112:1

**harmony** 29:24

**Harrisburg** 10:7

**Hartleton** 94:18

**head** 7:1,2 89:20 93:8,10

**health** 40:12 72:6 89:6,9,22 90:5,19 103:1 105:10

**hear** 5:20 7:10 75:25 115:11

**heard** 26:25 86:5 92:3 115:21

**hearing** 5:19

**helped** 84:9 97:22

**helping** 14:9

**helps** 16:3

**hesitate** 5:22

**high** 11:14,16,18 40:11

**hike** 53:14

**hikes** 54:20

**Hill** 4:18

**hire** 19:15,17

**hold** 18:25 19:6 53:1 71:23 105:3

**holding** 105:5 110:22

**hole** 96:12,14 97:4,7,10 101:11, 15

**holes** 69:9 98:22 99:12

**home** 70:12 77:5 88:20 102:12,14

**homosexual** 110:3

**honestly** 112:7

**honesty** 13:19 15:2 35:7

**hope** 7:23

**hot** 69:5 98:4,5

**hour** 51:25 63:24

**hours** 7:22 48:2 73:16,18 92:22 95:3,4,15 96:6 100:25

**house** 42:17,20, 21 43:8,9,17,19, 20 44:1,4,9,22 45:24,25 47:9,11 51:8,19 52:2 55:18 69:22 71:3 75:2 99:3 113:13 116:3 118:12,21

**household** 43:10 45:14

**hundred** 84:21, 22

**hurting** 72:1

**husband** 11:10 17:14

**hypothetically** 92:5,24

—————————

**I**

—————————

**I.M.** 119:2,18,20 120:3,6

**idea** 22:25 26:11 29:6 59:16 75:4,5 82:1 96:24 109:13

**ideations** 115:17

**identify** 4:20

**ignorance** 15:13 58:25 89:16

**ignorant** 14:5 31:16

**illustration** 99:18

**immorality** 16:13

**important** 8:25 13:17,22 14:13

**improperly** 91:19 92:3,6,16, 19

**in-house** 84:16

**inception** 27:12

**inch** 99:11

**incident** 109:19

**incidents** 109:24

**include** 35:19 88:6

**incoming** 79:15, 25

**incorporating** 24:19 25:9

**incorrect** 50:15

**independent** 19:20

**independently** 22:18

**Indiana** 49:2

**indicating** 36:14

**indirectly** 106:7

**individual** 14:19 15:15 35:24 37:18 46:22 47:9 50:5, 10 59:9 61:2,16 65:2,3

**individualized** 37:20 58:11

**individuals** 20:10 39:6 69:22 94:1 105:2

**indoctrination** 93:13

**inform** 33:12

**information** 61:11

**infraction** 65:8 66:4

**inhaling** 85:17

**inherently** 7:22

**initials** 72:24 120:4

**installed** 19:13

**institutions** 48:25

**integrity** 13:19 15:2

**intelligently** 63:10

**intense** 87:18 88:11

**intensive** 100:5

**intent** 115:17

**interaction** 62:12

**interested** 21:23

**interests** 17:5,7 18:2,5

**internal** 59:2,4

**internet** 31:15

**interrupt** 5:22 16:17

**interrupted** 54:9

**Interstate** 10:17

**intervene** 76:6

**intervening** 117:11

**intervention** 74:1

**interviewed** 120:6

**interviewing** 86:3

**inventories** 59:22 60:12 107:15

**inventory** 24:25

**investigations** 118:23,24

**involve** 22:1 72:15

**involved** 16:12 18:8 20:5,6,10 21:15,17 25:4 26:21 27:1,4 38:20 39:5,19 43:4 65:10 69:17, 20 76:20 81:25 85:12,21 86:10 87:3,13 96:21,22 106:24 113:17 114:15,23 115:1, 6,9,10 116:11

**Witness Ethan Weaver** 7

**involvement** 20:24

**involves** 72:19

**involving** 6:18

**issue** 65:11

**issues** 35:3,6 40:12,13 105:19

**items** 38:3 100:6

**J**

**Jacob** 20:19 21:1,2 22:15 27:19 29:6 36:2

**January** 12:15

**job** 10:15 17:8 45:10

**jobs** 47:10 55:21

**Jocelyn** 5:2

**Joy** 12:13,15

**juice** 98:4

**June** 12:16

**K**

**kind** 13:11 15:16 17:2 20:9 22:25 25:19 28:21 33:22 35:19 37:25 38:14 42:8 45:8,11 46:7 47:4 50:16 51:8, 12 52:13 53:11,23 54:4 55:4,8 62:19, 21 64:17 66:11,23 67:4,19,24 68:13 69:13,22 70:20 71:19 72:24 77:8, 17 79:23 84:16 89:1 97:14,18 106:22

**kinds** 67:9

**knew** 22:2 26:24 69:19 70:15,18 76:1 97:1 105:18

**knowledge** 26:10 28:18 30:2, 3 37:24 70:10 81:22 106:20 109:8,9 116:25

117:2

**Kylan** 4:16

**L**

**labor** 24:19 25:9 60:15 69:13 76:21 88:7 96:5 97:3 100:4

**lady** 119:20

**Lamar** 22:15 27:20

**Lancaster** 12:25

**laundry** 51:4 70:18

**law** 4:23 118:23

**lawn** 88:3

**lawyer** 9:16

**lead** 62:21

**leaders** 94:11

**leadership** 15:8, 10 37:5 38:22

**learn** 58:8 66:23

**learned** 66:22

**learning** 14:6

**leave** 16:7,9,10, 11,14 48:11 54:21 57:18 61:14,16, 17,20 62:2,8,9 63:7 64:11,12 110:17,23 115:7

**leaves** 57:9

**left** 51:8 54:23 59:13 60:6 64:17 69:24 80:8 83:13 107:10 109:23 111:2

**leg** 108:25 112:6, 10

**legal** 119:5

**legs** 8:2

**Leonard** 58:20

**letters** 54:20

**level** 11:13 65:12 91:17 110:11

**Liberty** 6:19 20:1, 4,5 21:15,22 22:18 23:10,12 24:19 25:9 26:17 27:12 28:13 29:4, 10,12 32:19 33:12,17,23 34:19,23 35:13, 14,18 36:18 37:6, 11,18 38:20 39:16,21 40:16, 17,21 41:7,20 42:15,25 43:5 48:23 50:16 52:19 55:19 57:20 58:1 59:6 60:14,21 63:8 65:1 71:8,12 73:2,24 75:6 81:23 82:5 84:6, 24 85:21 86:12, 16,21 87:17,20 88:21 89:2 90:5, 14 93:13,21 94:11 95:6 96:2 102:5 103:5,16,25 105:8 106:4,19,22 109:11,19 110:2, 8,17 111:13,25 113:3,10,11 114:9,10 115:18 116:3,7,12,17,21, 25 117:12 118:12, 24

**licensed** 90:16

**licensing** 40:18 59:2

**life** 10:13,14 17:4 35:4,6 63:10 66:15,16

**light** 7:16 96:12 99:2

**lightly** 70:13

**limestones** 58:4

**limitation** 79:7

**limitations** 108:20

**limited** 77:25 109:5

**Linden** 93:5

**list** 63:16 67:17

**listen** 76:3,4

**listened** 41:22

**listening** 33:9 75:16,18,23 76:17

**literally** 43:20

**litigation** 6:18

**live** 10:8 12:8,17 13:17 14:23 18:23 43:13,16 63:13

**lived** 10:12 87:1

**lives** 14:21 49:5

**living** 43:20,23

**LLC** 24:13

**Lloyd** 5:5

**local** 10:8 19:1 94:15,17 107:19, 21

**long** 6:12 10:21 18:8 24:1 41:3 48:19 51:5,11 53:5 60:20,23 63:22 66:17,18,20 68:18 73:12 78:7, 9 93:10 96:17 102:2 116:6

**longer** 7:23

**longest** 97:14

**looked** 68:12

**losing** 26:15

**lot** 53:24 56:20 63:6,24 68:17 80:6 81:1 88:4 112:23

**loved** 53:15,16

**LRF-72** 81:11 83:15

**LRF-81** 83:16

**LRF-93** 24:7

**LUC** 49:2,4

**lumber** 107:20

**lunch** 51:13,24, 25 52:4,8,10 53:24

**M**

**machinery** 24:24 107:9

**made** 24:23 47:13 50:24 55:22,23,25 65:6 117:15

**main** 30:14,16

**maintained** 59:14 82:13 102:13

**make** 6:21 7:11 8:6 31:23 36:8 37:23 39:24 46:21 50:13 53:2 55:16, 23 58:6 61:1 88:16 91:4

**makes** 30:1 35:19

**making** 47:7 62:4,16 109:7

**man** 47:22 57:11 70:1 115:4

**management** 24:20

**manual** 81:20 82:7,19 83:17,22, 25 84:4,14 87:17, 20 88:17,18 91:9 93:11 94:23 103:11 118:8,12

**manufacture** 24:18

**manufacturing** 24:23

**margin** 55:6

**Margolis** 4:25 5:2

**Market** 26:20

**marks** 120:15

**married** 12:2 40:4 43:18

**Martin** 4:11 10:20 22:16 25:16 26:1, 12 27:20 94:17 108:10

**Martin's** 25:24

**marveled** 56:3 91:20

**matter** 4:11 6:9 73:16,18

**matters** 6:19

**Mature** 40:3

**means** 13:10 16:19 104:7

**meant** 47:18

**media** 4:9 31:21

**medical** 35:12 38:8 73:25 85:8,9 111:23 119:9

**medication** 90:24 91:3 103:4 105:24

**medications** 90:20

**meet** 22:17

**meetings** 21:16 22:22 41:21 61:5

**Meghan** 4:25

**member** 12:23 16:7

**members** 11:8 14:21 15:5 16:24 21:3 29:12 30:21 31:3 33:14 43:2 46:15 65:19 76:25 77:18,25 78:5 84:11 120:7

**membership** 16:20

**men** 40:6

**Mendez** 5:2

**Mennonite** 12:21,24 13:10 14:18 15:19 30:8 49:10 50:2,3,6

**mental** 40:12 72:6 89:5,9,22 90:5,19 103:1 105:9

**mention** 17:17

**mentioned** 7:9 21:7 64:12 94:2 98:21 107:15 114:7

**mentions** 87:17

**mentor** 47:22 48:10,11 65:4 69:10 75:20 92:3, 6,10,11 97:17 120:7

**mentor's** 80:9

**mentors** 38:20 39:1,15,22 43:23 44:17 45:12,13, 15,23 46:7,9,18, 21,23 47:18 48:5, 18 54:2 59:19 60:6,7,11 61:10, 20 62:13,14,16 64:17 65:18,20 66:2,21 74:3,9,13 75:23 76:3,6,10, 17 78:11,16,24 79:12,19 80:18 81:2 90:22 91:4,8, 10,18 92:16 93:3 94:5,6 96:20,21 97:24 102:5 104:19,22 105:2,5 108:4 114:17,21, 22,25 118:3,10,17 119:13

**met** 47:2 86:24

**midday** 51:24

**middle** 67:10

**milk** 69:4

**Mill** 26:19

**Miller** 72:18 104:5 115:25 116:1

**milling** 107:8

**mind** 63:19

**ministry** 15:12, 24

**minutes** 41:21 73:16,18 83:3 112:8,19

**missing** 73:20

**mission** 20:11, 18,24 21:3,14,16 22:5 28:16,18,22 29:5,9,15 33:4 42:24,25 48:1,20 111:13

**Missouri** 49:2,3

**misspeaking** 50:14

**misstate** 64:22

**misstating** 14:7

**Mm-hmm** 21:13 27:11 64:7 67:3,6, 21 75:1 81:13 91:11 102:19 105:22 116:2

**models** 106:14

**moment** 27:7

**monitor** 4:15

**monitored** 79:25

**month** 44:25 61:6,7 75:13

**months** 116:8

**moral** 59:22 107:14

**morals** 52:15

**morning** 5:14,15 7:22 51:3 53:25 94:2,6 100:25

**mother** 45:6,8,9

**motion** 25:1

**Mountain** 17:10 18:3,9 19:5

**mouth** 37:8,9

**move** 32:5

**moving** 17:2 38:19 64:23 115:25

**multiple** 40:23 44:6 105:2

**N**

**names** 12:12 26:18,25 69:21 72:16,20 93:3,8 113:6

**nature** 22:9 78:18

**nebulous** 20:9

**necessarily** 70:25 90:6 100:4

**needed** 19:13 51:15 61:14,15 62:17 63:6 69:9 72:9 73:25 92:6 102:10 105:19

**negative** 111:3

**negativism** 79:22

**Neighbor** 57:22

**Nelson** 22:16 25:16 27:20 55:13 56:24 106:23

**Newville** 10:9 11:3,19 18:23 19:2

**night** 98:8 100:24 101:8,11,21

**nighttime** 97:2

**nod** 7:1

**Nolan** 23:23

**non-verbal** 7:1

**non-voluntarily** 16:10

**normal** 43:10 88:20 95:3 102:24

**note** 82:24

**notes** 42:9

**notices** 60:16

**number** 4:10,13 24:12,15 52:25

**numbers** 6:12

**O**

**Objection** 49:12 87:6 113:19 116:14

**objectionable** 72:22

**objections** 4:5

**objectives** 39:21

**observations** 92:13

**observed** 81:3 115:21

**observing** 48:24

**obtain** 40:17

**obvious** 90:11

**occasion** 104:15

**occasionally** 38:9 54:12 114:19 117:18

**occasions** 107:25

**occupational** 111:17

**occur** 50:20 117:22

**occurred** 8:19 59:11 98:11 109:24

**occurrence** 109:20

**October** 4:14

**offenses** 110:3

**offensive** 14:5

**offered** 119:22

**official** 28:4

**older** 57:11

**one-year** 24:21 25:2

**ongoing** 6:8

**opened** 40:22 88:22

**opening** 34:19 40:19

**operate** 23:7

**operated** 48:25

**operating** 81:18 83:15

**organ** 30:11 32:12

**organization** 27:14 33:20

**organizations** 50:4

**orientation** 39:17,18

**original** 27:19,22, 24,25

**originally** 28:6

**outgoing** 79:15, 25

**outlining** 39:20

**overhearing** 111:1

**overnight** 95:8, 15,21 96:6 97:14 98:11

**oversaw** 49:18

**oversee** 69:15 70:25

**overseeing** 50:5

**oversight** 14:16, 20 15:23

**overstepped** 91:18

**owner** 23:22

**ownership** 17:4 18:1

**owns** 33:24

**P**

**pages** 6:11

**paid** 22:6 44:21, 24 45:1 48:5 106:3,7

**pallet** 26:19 97:5

**pallets** 106:6

**pamphlet** 37:10

**paper** 85:10

**papers** 85:7 119:9,10

**paperwork** 59:10

**pardon** 15:13 39:9 58:25 89:16

**parent** 36:13 42:17,20,21 43:8, 9,19 44:22 45:24, 25 55:18 113:14 116:3 118:12,21

**parents** 35:21,22 36:20 44:9 45:12 69:23 71:3 75:3, 12,15 77:1 80:12 84:15,18,25 85:3, 6,7,11,20 86:3,20 109:10 114:10 119:10

**parish** 15:6 94:20

**parishes** 14:19 15:15 94:16

**part** 22:11 96:6

**participate** 84:11 110:6

**parties** 4:3

**passive** 110:22

**pauses** 88:15

**pay** 106:16 109:11

**paying** 114:10

**Pennsylvania** 4:13,18 10:10,12 11:19 12:24 13:8, 10 14:18 15:19 29:13 35:2 49:10, 21 50:1,9 63:12 93:22 94:20

**people** 16:7,9 19:16,17 21:12 31:3,4,13 32:3 63:4 70:3,4,10

**percent** 84:21,22

**perform** 38:13 95:21 100:24 102:17

**performed** 20:1 55:21 95:2,7,14 111:24

**performing** 97:25

**period** 24:21 77:4,9,10 95:8,22

**Permanent** 45:25

**permission** 75:9, 11

**person** 16:12 28:15

**personal** 13:4,5 17:4 18:25 50:24

**personally** 21:3 23:20 37:6 43:1 48:22 65:18 68:7

**persons** 31:7

**phone** 75:9,10, 16,18,24 76:11,21 77:20

**phones** 75:7 76:14

**phrase** 63:5

**physical** 69:13 71:9,11,16 96:5 98:21,23 102:17 103:8 112:1

**physically** 72:5 74:4 100:5 110:21

**piece** 81:25

**pillars** 13:11

**pivot** 112:18

**place** 4:17 34:9 54:11 81:23 82:15,19 83:18 99:2

**placing** 36:17

**Plaintiffs** 4:24 5:17

**Planet** 4:16

**plans** 37:19

**pleased** 78:8,9

**plenty** 76:16

**PLS** 32:8

**point** 5:19 7:25 8:9 17:16 23:8 24:7,22 28:3 47:7 68:22 76:5 96:5 106:15 113:6

**points** 106:9

**police** 72:6 73:4, 5,6,25 109:22 111:3

**policy** 71:8 81:20 82:7,19 83:15,17, 22,25 84:3,14 87:16,20 88:17,18

**pop** 93:8

**popped** 93:9

**pops** 89:20

**portions** 110:8

**position** 20:21 22:6 42:15

**positive** 99:21

**possibilities** 38:23

**Possibly** 108:11

**post** 96:14 98:22

**posted** 60:16,17

**posts** 69:9 96:16 97:10

**power** 85:7,17 107:1 119:8

**practice** 93:21

**pray** 9:17

**preaching** 15:25

**preliminary** 6:19

**preparation** 9:15,19

**prepared** 38:2

**prescribed** 105:23

**prescription** 90:24 91:3 103:4

**present** 120:7

**presented** 24:13

**presently** 11:11 17:12 101:24

**presume** 24:3

**pretty** 34:15,17 73:11

**prevent** 9:2

**previously** 6:2

**printed** 6:8

**prior** 26:1 40:19 87:20 116:17

91:9 93:11 94:22 103:10 118:8,11

**problem** 5:19 90:9

**problems** 40:3

**process** 36:17 87:4,14

**products** 55:8,20 56:10 57:1,15

**professional** 35:12 36:4 105:19,21 111:24

**program** 37:24 38:15 39:17,18 80:13,14 89:9 90:19

**programing** 90:13

**progress** 61:8

**prohibit** 16:23

**prohibiting** 118:16

**project** 55:23 57:25 60:5 85:13

**projects** 88:7

**proper** 50:4 109:8,9

**properly** 7:10

**properties** 57:7

**property** 42:15 54:21,23 57:15, 18,21 60:18 61:25 71:13 73:13 74:16 78:10 90:16 98:12 108:1,2 115:8,13

**proposal** 23:10 24:13 25:13 47:6

**protect** 72:1

**protection** 99:13

**protections** 109:1

**protocol** 78:6

**provide** 24:20 61:10

**provided** 93:12

**psychiatric** 105:21

**psychiatrist**
89:25 90:3

**psychological**
38:8 90:9 105:21
111:23 112:1

**publication** 30:8,
15,16,18 31:6,11
33:2

**pull** 92:11

**purchase** 24:23

**purged** 59:15

**purpose** 33:11
34:21,22 79:14
99:15

**purposes** 39:20

**purview** 109:16

**push** 72:22 118:1

**pushed** 117:19

**put** 6:1 31:10 34:9
36:22 37:6 44:16
57:12,20 60:12
96:5 120:3

**puts** 30:17

**putting** 33:11
42:2 85:20

**puzzle** 78:17

**puzzles** 106:13

**Q**

**qualifications**
59:4

**question** 4:6
6:24 7:9,13,17,18
8:4,5,15 36:9 45:7
49:25 50:7 102:1
104:14

**questionnaire**
36:19 38:1,12
85:3

**questionnaires**
85:2,5

**questions** 6:1,18
7:4,6 9:6,10,11,22
17:18 26:7 46:14
52:24,25 53:3,24
57:3 112:20

118:20 120:10,11

**quick** 31:23 63:20

**quietly** 39:11

**quote** 87:17,18

**R**

**R.M.** 4:11

**Raise** 74:23

**raised** 12:20

**rake** 57:9

**ran** 49:11 73:3

**Ranch** 49:3

**rate** 109:11

**read** 11:20 30:23
33:6,9

**reading** 4:3

**reads** 30:21

**ready** 36:23
50:23 66:25
74:23,24 95:23
96:1

**Real** 31:23

**realize** 5:24

**reason** 7:12
16:10 96:4 105:16

**reasons** 103:9

**recall** 6:7 8:10
21:20 23:24 25:7,
17 27:14,17 28:9,
10 34:5 36:18
40:21 41:2 48:8
51:9 55:20 57:13
69:21 72:13 73:1,
5,12 75:13 77:3
79:24 84:18
86:10,13,14,15
87:13 93:17,18
94:3,22 95:6,13
97:13 100:19,22
101:7,23,24
103:6,17 104:25
106:25 107:18
109:10,18 110:19,
25 111:22 113:17
115:16 116:6
117:3,9,13,14
118:2,15 120:6

**receive** 19:25
46:9 58:14 79:5,
21 85:1 110:5,10

**received** 58:10
79:11 91:4

**receiving** 110:17
117:4,10

**Recess** 64:2 83:9
112:13

**recognize** 32:8,
14 81:15

**recollection** 76:9
82:4 95:1

**record** 6:2 40:3
59:25 63:25 64:4
82:25 83:6,8,11
112:4,12,15
120:17

**recorded** 60:1

**records** 59:6

**recruiting** 87:4

**recruitment**
87:14 113:17
116:12

**refer** 50:2,5
72:20,23

**reference** 14:3
17:21 84:17

**referring** 6:11
14:17 17:23 20:9
50:14 84:2 106:17

**refreshment**
69:4,6 99:3

**registered** 33:24

**regularly** 59:6

**rehashing** 6:5

**related** 43:1 97:8

**relates** 58:9

**relating** 89:3

**Relationship**
89:3

**religion** 93:20

**religious** 93:13
94:11

**remember** 8:18,
19,22 17:21 18:10
20:13,16,17,20
22:13,23,24 23:8,
13,14,17 24:4
25:3,6,11,12
28:11,12 32:24,25
33:4,5 34:14
40:25 41:2 43:15
48:8 49:1 58:19
62:1 64:13 65:23
68:10 73:23 82:23
83:23 84:23 87:2,
3 91:17 92:1 93:2,
3,7,16 96:3,9
97:15,16 98:8
99:19 100:17,21
101:10,14,22
103:10 104:14
105:2,8 106:1,2
107:22 108:7
119:12,16,20

**removed** 16:19

**Renee** 4:22 5:16

**repeat** 7:14 49:15

**repercussions**
111:3

**rephrase** 92:2

**report** 29:4 72:9

**reported** 29:6,7
92:18 98:13,15

**reporter** 5:4,5

**reporting** 109:21

**reports** 30:12

**represent** 4:21,
24 5:1,3

**representative**
25:8 29:9

**represented**
32:25

**representing**
4:16

**required** 36:4
109:20

**reserved** 4:6

**reserving** 6:6

**reside** 60:21

**resident** 36:20,
22 40:22 41:3
44:19 46:24

**residents** 24:19
25:10 41:7 43:21
44:12 45:12,13
62:12 64:19 65:3

**residents'** 44:10

**resolve** 65:11

**resolved** 88:20

**Respect** 35:7

**respective** 4:3

**respond** 46:14

**responded** 91:22

**response** 7:1,17

**responses** 7:5,6

**responsibilities**
43:9

**responsible**
47:1,22,23 64:18

**rest** 50:18 101:6

**restrain** 74:4
104:4,16 105:3

**restrained** 72:5
103:18,20,24
104:7 110:21

**restraint** 71:9,11,
16 103:8 110:22

**restraints** 74:14

**restrict** 71:25

**restricted** 97:24
110:9

**restriction** 8:4
85:11 119:10

**restroom** 8:1
79:2

**returned** 36:21

**review** 9:18

**reviewed** 79:11

**reviewing** 79:15

**Ridge** 6:19 20:1,
4,5 21:15,22
22:19 23:10,12
25:10 26:17 27:12

28:13 29:4,10,12
32:19 33:12,17,24
34:19,23 35:13,
14,18 36:18 37:6,
11,18 38:21
39:16,21 40:16,
17,21 41:7,20
42:25 43:5 48:23
50:16 52:19 55:19
57:21 58:2 59:6
60:14,21 63:8
65:1 71:8,12 73:2,
24 75:6 81:23
82:6 84:7,25
85:21 86:12,16,21
87:17,20 88:21
89:2 90:5,14
93:14,21 94:11
95:6 96:2 102:5
103:5,17,25 105:8
106:4,19,22
109:12,19 110:2,
8,18 111:13,25
113:3,11 114:9,10
115:18 116:4,7,
12,17,21,25
117:12 118:13,24

**Ridge's** 42:15

**rights** 60:16

**road** 81:24 82:2

**Robert** 72:18
100:1,20 101:8
102:2 103:23
104:23 105:3
114:13 115:25
116:4,7,16,24
117:3,8

**Robert's** 116:12

**rock** 67:10

**rocks** 99:6,10,14

**role** 25:14,17,22
26:22 28:19 48:16
55:11,12 69:22

**roles** 25:19,21
42:1

**roll** 5:23

**roof** 57:12

**room** 44:5

**rooms** 44:16

**rope** 104:10,16

**Ruby** 12:5

**rule** 63:15 74:25

**rules** 6:22 13:17
14:23 16:23 34:3
60:17 63:16 91:8,
14 108:19 118:9,
16,18

**run** 27:13 49:9
52:16,18 68:6,11,
12,19 72:8 89:21
95:25 117:15

**running** 68:5,23,
24 69:7 100:6
117:17

**S**

**sales** 24:25 26:9

**sandwich** 98:9

**sat** 41:22 101:14,
15

**Saturday** 54:7,8,
10,13

**sawed** 100:1

**sawing** 99:6,22,
24

**sawmill** 18:17
97:5 99:23 106:6
107:6,7,12,15,16,
19,21

**saws** 108:13,15,
17,23

**scene** 81:24

**scenes** 33:23

**schedule** 43:12
47:2 53:2 54:5,9
70:15 101:1

**scheduled** 47:22

**school** 11:14,16,
17,18 51:3 54:10,
12,13,15 57:9
58:22 59:5

**schooling** 58:10,
14 59:7

**sealing** 4:4

**search** 82:25

**secondarily**
114:25

**secretary** 25:23
28:5,6,7 41:15,17,
19,24 42:1,5

**seek** 39:3,6 48:11
73:25

**sees** 16:2

**select** 48:15

**self-directed**
67:19

**Senate** 4:18

**sense** 7:11 8:6
90:15

**Sensenig** 26:19
58:20

**sentence** 117:5

**sentences**
66:10,12 67:2
110:13

**separate** 44:10,
20

**sermons** 37:14

**serve** 38:24

**services** 72:6
119:7

**serving** 21:24

**set** 24:17 96:12

**setting** 35:9
88:20 90:14

**settling** 77:17

**sexual-related**
110:3

**shake** 7:2

**shared** 42:8
44:12

**Sharon** 12:13,15

**shield** 99:12

**shop** 24:18 26:19
97:5

**short** 107:24

**shorter** 116:9,10

**show** 102:23

**showed** 83:14
119:7

**showered** 79:2

**shown** 90:2

**sickness** 16:4

**side** 88:6,7 99:1

**sign** 36:24

**signed** 36:23
85:8

**significantly**
116:9

**signing** 4:4

**silly** 31:9

**similar** 49:6

**simply** 8:12,21

**single** 40:4,5

**sir** 9:23 11:12

**sit** 41:24 65:9
66:5 74:19,23

**sitting** 75:17 84:2

**situation** 79:17

**situations** 66:3

**size** 99:12

**skill** 58:7

**sleep** 44:18
101:1,2

**sleeping** 44:5

**slept** 44:19 101:4

**small** 21:7 48:6
56:18

**Snyder** 23:11,21,
23 24:13,20,24
25:5,8

**society's** 63:14

**sold** 17:13 18:3
56:11,15,24 57:15

**someone's**
18:21

**sort** 19:19 22:8
26:16 29:17 37:7
38:7 39:15 59:1

67:9 71:15 75:7
82:6 89:23 90:19,
23 91:3 94:12
107:1 109:20
110:7 111:3,4

**sought** 39:4

**sound** 20:15

**space** 44:16

**spare** 33:7

**speak** 5:23 21:2

**speaking** 9:16
32:3 39:11 41:6
63:4 92:24 118:3,
17

**speaks** 118:9

**specific** 8:17
17:18 23:17
25:19,21,22 35:24
39:24 42:1,9
72:16 91:7 108:16

**specifically** 8:11
13:14 20:18 24:12
26:18 32:13 40:11
82:17 88:17
112:22

**specifics** 9:8,23
22:24 25:13

**spell** 9:25

**spiritual** 87:18
88:12 93:13

**spiritually** 63:5,
6,9

**split** 53:15

**spoke** 119:13

**spoken** 6:2 9:7
37:14

**Spring** 11:18

**sprinkling** 86:8

**stab** 8:12

**stack** 24:8 107:19

**staff** 35:13 47:15,
16 84:17 90:6,22
96:19 111:1
119:14 120:7

**stamp** 6:12

stamped 83:15

stand 49:4 112:8

standard 83:14

standards 63:12, 14 65:1 93:22

standing 29:18, 20,23 30:5 62:15 63:1 64:19

start 9:12 27:8 44:13 49:2

starting 9:5 109:4

starts 74:18

state 4:21 19:1 40:18 59:1

stated 90:11

States 4:12

stay 16:16

stayed 34:15 78:10 100:24

staying 60:24

steady 40:3

stenographer 7:3 33:8 41:25

stenographers 32:3

steps 104:23

stern 104:3

sticking 117:11

stipend 48:6

stipulated 4:2

stipulations 4:1 6:6

stone 57:23,25

stones 58:1

stools 55:22,23 56:11

stop 69:1

store 106:11

stories 68:17

story 44:5

straight 73:11

strange 53:16

stream 67:10

stretch 8:1

strict 53:2

strike 116:23 119:24

strong 63:5,7,9

structurally 67:11

structure 15:17 27:14 29:25 33:23 67:25 78:6 92:8 107:16

structuring 52:14

struggles 38:4,6

struggling 35:3

studies 53:23,25 66:13 88:13 94:2 110:7

stump 98:25

subbed 19:12

subcontract 19:17

submitted 38:12

Suddenly 112:10

suffer 95:20

suggestions 67:17

suicidal 115:17

Suite 4:18

Sunday 54:7,15, 16

Sundays 54:14

super 62:20

supervise 92:21

supervised 60:5 62:21 97:20

supervision 45:22 75:15 76:20 78:23

supper 53:7,11

supply 17:10 18:3,9 19:5,24

suppose 39:12

supposed 35:8 66:2 70:15,16 92:7

suspicion 105:18

swear 5:5

switchbacks 55:25

_____

**T**

tailor 37:24

tailoring 38:14

takes 16:1 66:15, 16

taking 4:17 6:22 71:1 83:21 105:8, 9,16

talk 22:21 23:20 50:1 65:17 66:6 67:1 74:24 76:7, 11

talked 5:18 19:23 23:22 33:18 34:20 37:15 73:6,10,11 88:24 101:16 103:7 106:19 109:22 110:22 111:19 112:22 119:16,18

talking 5:21 27:8 43:7 64:10 70:21 72:15,19 74:12 81:2 111:14

talks 93:12

tasked 23:1

taught 63:13 93:22,24 94:6

teach 59:3 94:1,4

teacher 58:16,22

teachers 58:25 59:3

Team 49:3

telling 64:20 65:19 110:25 111:1 114:16

ten 10:22 82:2

ten-minute 83:3

tend 5:21

tendencies 110:3

term 93:15

testified 5:9

testify 9:3

Testimony 30:8

theme 88:21

therapeutic 35:9 38:7 90:14 111:15,18,20

therapies 37:19

therapist 90:16 111:19

therapists 35:11

therapy 90:15

thing 6:23 9:1 33:8 36:19 50:19 66:5 69:8 79:23 89:20 108:21 114:12

things 6:1 24:4 38:5 42:2 47:9 53:12 55:17 61:8 66:14 75:3 76:11 88:2,9,13,17 89:6 92:24 97:3,4 99:6

thought 53:16 58:7 64:16

thoughts 59:25 60:10

threat 111:4

threw 26:4

tie 104:16

ties 104:10

time 4:6,15 5:20 7:23 8:11,16 13:25 16:8 17:17, 19,22,25 20:24 23:22 24:3 37:14

41:7 42:20 44:1 51:23,25 52:7,18, 21 53:2,7,12,18 54:15,16,18,19 61:15 64:4 66:6 68:6,10 71:1 72:3, 8,12,14 73:2,22 76:25 78:22 79:24 80:4,5,24 81:6 83:8,11 86:24 94:10 95:3,4,5,8, 22,24 96:2,3 97:13 99:25 101:7,20 102:9, 10,22 105:1,5,7 109:2,18,22 113:11,14 116:4 118:25

times 50:19 53:11 62:1,24 64:12 69:16 74:13 78:20 81:1 95:10 96:7 102:4 103:22 104:21 105:13 115:7

today 4:16 5:5 6:17 7:6 9:1,3,15 12:2 21:2 47:11, 12

Today's 4:14

told 16:14 66:2 74:17 86:2 90:6

tools 106:13 107:1

topics 67:9

totally 93:25

touch 112:21

Tracy 5:5

traditional 11:16 58:21 89:24

trails 55:25 56:5

train 64:16

trained 70:11,13 74:9 90:23

training 24:20 39:16 40:11 48:23 70:20 71:16,18,19

transcript 4:4 119:25

**transferred** 13:1

**transported** 57:7,14

**treasurer** 25:25 109:16

**treatment** 37:19 61:15 105:9,10

**tree** 98:25

**trial** 4:7

**troubled** 34:24, 25 35:17 36:15

**truck** 10:16

**true** 88:21

**trust** 35:7

**truth** 9:2,3

**turn** 81:8 106:15

**turned** 119:4

**type** 7:4 31:24 33:8 47:7 55:10 58:13 70:24 74:14 75:15 97:3

**types** 35:12 47:4 50:6 100:3

**typical** 99:18

**Typically** 60:20

**typing** 7:3

---

**U**

**uh-huh** 7:1

**uncertain** 8:22

**understand** 5:21 7:10,13 11:20 50:7

**understanding** 71:8

**understood** 7:18

**undertake** 38:13

**unintentionally** 32:4

**United** 4:12

**updates** 28:14

**uprightness**

---

13:19

**upstairs** 44:11

**usual** 6:6

**utilize** 94:23

---

**V**

**varied** 41:8 60:22 102:20

**variety** 55:5

**vehicle** 117:16, 23

**vein** 91:2

**verbal** 6:25 7:5,6, 17

**video** 4:15,17

**vinyl** 18:19

**violent** 71:14 72:4 73:3 74:19

**visit** 77:6,18 78:5, 7

**visitation** 76:24

**visiting** 78:17

**visitors** 76:25 77:24

**visits** 78:12

**voice** 4:20 26:15

**voicing** 80:13

**voluntary** 16:7

**volunteer** 22:5 29:19 31:4 39:2 57:16,17

**volunteerism** 13:21

---

**W**

**W-E-A-V-E-R** 10:1

**Wait** 77:23

**waived** 4:5

**wake** 50:25

**walk** 50:17,25

---

**walked** 61:24,25

**Walker** 105:11, 14,15

**wall** 58:6

**wanted** 23:5,12 29:20 34:21 53:2, 14 57:25 61:13

**warm** 70:12

**wash** 68:1 69:3

**watching** 63:1 97:18

**water** 27:9 97:24 98:2,4

**wear** 108:25

**Weaver** 4:10 5:8, 14 9:24 64:6 83:16 112:17 120:16

**week** 6:4 46:4 48:3 54:4,6,12 94:18

**weekend** 45:19 69:23,24 98:12 102:8

**weekends** 14:11 46:2,3 70:11,23 71:4 74:15

**weeks** 77:6,11,17

**Wengerd** 26:19

**wide** 55:4,6

**wife** 12:2 43:13 45:1,4 52:4 69:4 76:19 98:8

**wife's** 12:4

**Wildwood** 11:5

**wished** 48:19

**witnesses** 6:7

**wood** 99:6,22,24 100:2

**wooden** 18:18

**woods** 55:25 56:6

**woodwork** 108:13,14

---

**word** 36:15 37:8, 9 50:12 107:16 111:14

**worded** 7:11

**words** 33:10 34:22 43:8 47:20 54:9 85:15 106:9

**work** 10:19,23 15:7,17 19:12,15 20:1 23:3,12 25:19 33:13 39:16 47:5,8,11 48:2 52:9 53:6 54:16 55:10,21 57:7,16, 17 66:8,25 67:2,7, 23 68:4,25 69:7 75:17 88:2 90:7 95:3,4,15 96:6 97:8 99:2 101:3 106:4,5 107:19 111:17,24

**worked** 10:21 23:4 26:9 67:18 74:21 97:14

**working** 14:13 22:2 35:13 40:11 48:23 55:9 89:4 101:10 107:15 113:10

**worship** 51:2 54:17,19 93:23 94:12 110:7

**would've** 99:2

**write** 11:20 31:4, 5,7 32:21 60:9 66:9 67:8 79:4 80:20,22 110:12

**writes** 31:2 60:3

**writing** 67:2,22 80:12 117:6

**written** 31:11,18 79:5,10,20 82:7 91:9,14 103:13

**wrong** 64:16 65:9 83:16 87:8 92:10, 13 114:3

**wrongly** 109:4

**wrote** 32:16,17 54:19

---

**Wynkoop** 4:25 6:14 31:23 36:8, 11 49:12 63:19,23 82:24 83:5 87:6,9 112:4 113:19,24 114:2,4 116:14 120:1,4,11,14

---

**Y**

**yapping** 63:22

**years** 8:17,20 10:22 17:16,17 18:10 24:4 26:17 42:14 62:5 82:2 102:1 118:22

**yelled** 32:2,4

**young** 40:6

**youth** 22:2,3 34:24,25 35:3 109:21 119:7

---

**Z**

**zip** 104:10,16