**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | Civil No. 5:21-cv-05070-JMG |
| D.C., *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LIBERTY RIDGE FARM, *et al.*, | : | |
| Defendants. | : | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | |

<u>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**</u>

AND NOW, come the Plaintiffs, D.C. and R.M., by counsel, who file the within Brief in

Opposition to Defendants' Motion for Summary Judgment, and state as follows:

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS…………………………………………………………….   x

TABLE OF AUTHORITIES……………………………………………………   xi

I.   INTRODUCTION………………………………………………………………   2

II.   PROCEDURAL HISTORY…………………………………….......................   3

III.   STATEMENT OF FACTS…………………………………...........................   4

IV.   STANDARD OF REVIEW……………………………………………………..   32

V.   ARGUMENT…………………………………………………………………   33

VI.   CONCLUSION………………………………………………………………   45

## TABLE OF AUTHORITIES

### CASES

*Big Apple BMW Inc. v. BMW of North America, Inc*. 974 F. 2d 1358 (3d Cir. 1992)

*Bistline v. Parker*, 918 F.3d 849, 870 (10th Cir. 2019)

*US v. Garcia*, No. 02-CR-110S-01, 2003 WL 22956917, at *4-5 (W.D.N.Y. Dec. 2, 2003

*U.S. v. Kaufmann*, 546 F.3d 1242, 1261 (10th Cir. 2008)

*United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)

*United States v. Salimlim*, 538 F.3d 706 (7th Cir. 2008)

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011)

*Sherman v. Trinity Teen Sols., Inc.*, 2021 U.S. Dist. Lexis 254754 (Dist. of WY, 2021)

*United States v. Lewis*, 644 F.Supp. 1391 (W.D.MI 1986)

*United States v. Mussry*, at 726 F.2d 1448, 1452 (9th Cir.1984)

*Ricchio v. Bijal, Inc*., 424 F. Supp. 3d 182, 193-194, 2019 U.S. Dist. LEXIS 203132, *24-25 (Nov. 22, 2019)

*M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-CV-849, 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019)

*AB v. Marriott International*.  455 F. Supp. 3d 171 (E.D.Pa. 2020)

*Fed. Mar. Comm'n v. Pac. Mar. Ass'n*, 435 U.S. 40, 71 (1978)

*Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011)

*Francisvo v. Susano*, 525 F. App'x 828, 835 (10th Cir. 2013)

*Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26 (D.D.C. 2013)

*Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *4 (E.D. Va. Sept. 24, 2012)

*David v. Signal Int'l, LLC,* No. 2:08-CV-01220 (E.D. La. Jan. 28, 2015)

*SHV Coal, Inc. v. Cont'l  Grain Co*., 587 A.2d 702, 705 (Pa.  1991)

*Chambers v. Montgomery*, 192 A.2d 355 (Pa. 1963)

*Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766 (Pa. 2005)

### STATUTES

18 U.S. Code § 1589 Trafficking Victims Protection Act ("TVPA")

18 Pa.C.S. § 3001 Pennsylvania Law Against Human Trafficking

18 U.S.C. § 1595

18 U.S.C. § 1590

## I.      Introduction

For many years, the Eastern Pennsylvania Mennonite Church ("EPMC") operated a labor camp for children called "Liberty Ridge."   The EPMC's Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite Church (the "Mission") established and oversaw Liberty Ridge (referred to collectively as "the Mennonites").  The Mennonites advertised Liberty Ridge to their community as a wholesome place for "troubled" children "who have special spiritual, emotion, and social needs" giving them "the advantage of therapy."

Or so they said.  As the Mennonites' official publication touted to their community:

> **Church Committee Report: Liberty Ridge Farm**
>
> The Liberty Ridge Farm near McAlisterville, Pennsylvania, is an institution that has been established by the Mennonite Messianic Mission to assist our homes with boys who have special spiritual, emotional, and social needs. At our orientation meeting in November of 2011, Brother Lynn stated our purpose—"It is an intense spiritual atmosphere for the purpose of effecting social and behavioral changes in the lives of the troubled boys in a structured, closely supervised homelike setting."
>
> Liberty Ridge Farm is an eighty-acre farm nestled in the Juniata Valley of central Pennsylvania. The Board chose to have a farm emphasis to give the boys the advantage of the therapy and structure that comes from a working farm. The farm came with two operating chicken houses, buildings for cattle and hogs, and garden space to raise the necessary food. Firewood for heating is harvested from the woodland.
>
> In 2013 a fifty- by eighty-foot shop was added to give the boys space to build fiberglass farm gates, to build and repair pallets, and to develop other occupational skills. The boys work side by side with their mentors, which provides opportunity to encourage structure and answer questions about life. Farm life is an excellent place to learn work ethics, time management, and ways to prioritize projects. To see the smile of accomplishment at a finished project or a goal achieved is very rewarding for the staff.[1]

In reality, Liberty Ridge was a brutal work camp for children.  Although held out as a therapeutic setting, Liberty Ridge deprived boys of medical and mental health care.  Liberty Ridge had no therapists, doctors, or professional staff.  *See* Exhibit A, p. 35.

Instead of therapy, boys were tortured into giving the Mennonites profitable free labor.  To do so, Liberty Ridge broke their wills.  The boys were deprived of food and water.  They

---

[1] This article was written by Ethan Weaver, an original Liberty Ridge Committee member who became a Board Member when Liberty Ridge was formally created, and also served as a house parent at Liberty Ridge when Plaintiffs were residents.  *See* Exhibit A, p. 20, 28, 42.

were denied sleep.  On occasion, boys were hog-tied.  Liberty Ridge threatened residents with legal action if they tried to leave.  All the while, the Mennonites used the boys to make money. The Mennonites' conduct was a violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S. Code § 1589(a).[2]

Under the TVPA, § 1589(a), a defendant violates the TVPA if they "knowingly provid[e] or obtai[n] the labor or services of a person" through (1) "threats of force, physical restraint, or threats of physical restraint," (2) "serious harm or threats of serious harm," (3) " abuse or threatened abuse of law or legal process," or (4) by "causing [a] person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

Under 18 U.S.C. § 1595, the Mennonites need not have intended a violation of the TVPA, so long as they "should have known" of a TVPA violation.  Here, the Court will conclude the Defendants violated § 1589(a) and § 1595 at Liberty Ridge in multiple ways.

## II.    Procedural History

Plaintiffs D.C. and R.M. filed this action November 17, 2021, against the Defendants: (1) Nelson Martin d/b/a Liberty Ridge Farm; (2) Liberty Ridge Farm; (3) Eastern Pennsylvania Mennonite Church; and (4) the Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite Church (collectively the "Mennonites").  On March 3, 2022, Plaintiffs filed their First Amended Complaint,[3] which the Mennonites answered.

Soon thereafter, on August 31, 2022, the United States Department of Labor ("DOL") filed a complaint in the US District Court for the Middle District of Pennsylvania against the

---

[2] Plaintiffs also filed suit under the Pennsylvania Law Against Human Trafficking, 18 Pa.C.S. § 3001, Pennsylvania's version of the TVPA.  Courts' analysis of the two statutes is the same.
[3] Plaintiffs' Amended Complaint removed one plaintiff, leaving only R.M. and D.C.

Defendants alleging violations of the Fair Labor Standards Act ("FLSA").  A copy of the DOL Complaint, filed August 31, 2022 is attached hereto as Exhibit B.

On December 6, 2022, the Court entered its First Amended Scheduling Order, which set a January 20, 2023 deadline for the Mennonites' Motion for Summary Judgement.  On that date, the Mennonites filed their Motion.  Plaintiffs now respond in opposition.

### III.   Facts[4]

#### a.  The Mission and its relationship with the EPMC

The EPMC was formed by a group of people who wanted to practice more traditional Mennonite ways.  *See* Exhibit C, p. 13.  The EPMC is a group of Mennonite "believers" who practice the religion similarly.  The EPMC is made up of individual Mennonite congregations. *See* Exhibit M, p. 13, 14.  The EMPC is made up of regional districts of congregations throughout the United States, Canada, and other countries.  *See* Exhibit C, p. 15.

The EMPC is comprised of about 92 total congregations, with about 7,000 members.  *See* Exhibit C, p. 16.  Each congregation is run by local ministers.  *See* Exhibit C, p. 18.  Mennonite bishops oversee six to eight congregations.  *See* Exhibit C, p. 18.  Mennonite deacons oversee geographic regions of congregations that meet several times a year.  *See* Exhibit C, p. 14.  At these meetings, the deacons and other church leaders discuss issues within the EPMC, how to collectively respond, and the direction they want the ministry to go.  *See* Exhibit C, p. 14.

During Sunday morning worship, individual Mennonite congregations "lift offerings" from their members.  *See* Exhibit C, p. 20.  Mennonite churches inform worshipers before a particular Sunday that they will be lifting an offering for a particular thing, like Liberty Ridge,

---

[4] Plaintiffs simultaneously filed a Counterstatement of Material Facts, which contains cites to the record.  For brevity, the key facts are recited here.  The Plaintiffs of course encourage the Court review Plaintiffs' Counterstatement for a more comprehensive recitation of the material facts.

the Mission, or something else. *See* Exhibit C, p. 20, 21. Lifting offerings for particular EPMC projects, like Liberty Ridge, is at the discretion of the individual congregations. *See* Exhibit C, p. 21.

The Mennonite Messianic Mission of the Eastern Pennsylvania Mennonite Church (the "Mission") is the EPMC body that "oversee[s] the outreach activities of the church." *See* Exhibit D, p. 14. The Mission is a corporate body guided by EPMC's Bishops and ministry. *See* Exhibit C, p. 28. The EMPC has a "statement of instruction and discipline" that contains the Mission's guidelines. *See* Exhibit D, p. 22-23.

**b. The Mennonites established Liberty Ridge as a work camp for children the Mennonites believe have "special spiritual, emotion, and social needs."**

The idea for Liberty Ridge first came up "because of the needs of young men for more structure in their lives and young men that needed help" within the Mennonite community. *See* Exhibit D, p. 21. The Mennonites thought the "needs" of these young men were "primarily in their spiritual lives." *See* Exhibit D, p. 22. The Mission identified a "general sense within the community" that "some [Mennonite] young men were rebellious and not manageable at home and not getting along with their peers and were just simply very unstructured." *See* Exhibit D, p. 22.

The Mission first considered soliciting individual homes within the Mennonite community to host troubled boys. *See* Exhibit D, p. 23. Eventually, the Mission felt that it should be an "institution" instead. *See* Exhibit D, p. 26. To explore this option, the Mission created an investigative committee for Liberty Ridge, selecting members that "had some personal interest in a project like that." *See* Exhibit D, p. 27.

In designing Liberty Ridge, members of the Mission traveled to other troubled teen labor programs throughout the United States as research, spending a few days at each.  *See* Exhibit E, p. 23, 24.

Nelson Martin, one of the Mission members most involved in Liberty Ridge, traveled to two (2) Mennonite run labor programs: Fresh Start in Indiana and Team Boys Ranch in Missouri. *See* Exhibit E, p. 23-24.  Martin studied the secular Lives Under Construction organization in Missouri that housed *inmates* coming out of *prison*. *See* Exhibit E, p. 24 (*emphasis added*). Martin drew from each visit a "procedure of operation."  *See* Exhibit E, p. 24.  Kyle Hoover, a former Mennonite teen resident of Team Boys Ranch, was also conscripted to help construct Nelson Martin construct Liberty Ridge.  *See* Exhibit F, p. 49.

After finishing its "research," the Mission's Liberty Ridge committee solicited men from EMPC congregations to be "mentors."  *See* Exhibit E, p. 30.  The individual congregations also presented mentor candidates to the Liberty Ridge committee. *See* Exhibit E, p. 30.  The goal was for mentors to be "God honoring, God fearing young men that were responsible."  *See* Exhibit E, p. 29-30.

There was no screening process for Liberty Ridge's mentors.  The mentor candidates were simply to self-report why the candidate believed they were appropriate for the position. Prospective mentors were questioned about their life, relationship with God, and relationship to their siblings and parents.  *See* Exhibit E, p. 30.  The Liberty Ridge committee did not interview any family members, siblings, or anyone else.  Mentors had no training in dealing with at-risk youth.  Mentors had no training dealing with children with mental health disorders.  *See* Exhibit E, p. 30, 31.  The Liberty Ridge committee did not observe the Mentors interacting with troubled children.  *See* Exhibit G, p. 27.

To set up Liberty Ridge, the Mission purchased property in Juniata County, Pennsylvania.  To pay for it, individual congregations within the EPMC donated money to the Mission for payment.  EMPC churches throughout the Mennonite community "lifted offerings" to Liberty Ridge at Sunday congregations.  *See* Exhibit E, p. 90.  Some Liberty Ridge donations went to the Mission first, and the Mission would then decide how the money was spent.  *See* Exhibit E, p. 90.  If parishioners' offerings went directly to Liberty Ridge, Liberty Ridge would forward the funds directly to the Mission to pay for the property.  *See* Exhibit E, p. 90.  Liberty Ridge paid the Mission for the property out of parishioners' offerings and nothing else.  *See* Exhibit E, p. 91.

Right away, the Mission sought to monetize the labor of Liberty Ridge residents.  Gerald Nolt was one of the founding Liberty Ridge Committee members.  *See* Exhibit G, p. 20.  Nolt explained the Liberty Ridge Committee was approached by Snyder Gates LLC with a proposal to establish a workshop at Liberty Ridge.  *See* Exhibit G, p. 32, 33.  The Committee was familiar with Snyder from the Mennonite community.  *See* Exhibit G, p. 33.  As reflected in the Mission's Meeting Minutes on May 4, 2011:

> The committee presented a proposal from Snyder Gates LLC that would allow them to set up the shop to manufacture fiberglass farm gates **incorporating the labor of the Liberty Ridge Farm residents**. Snyder Gates would be providing training and management for a one-year period.  At that point a decision would need to be made whether the farm would purchase the manufacturing machinery or discontinue the contract

*See* Exhibit A, p. 24-25; *see also* Exhibit H (*emphasis added*).

Snyder Gates saw Liberty Ridge as free labor for its operation.  "Snyder Gates was looking for somebody to assemble and paint, prep gates for sale, and we took that on at Liberty Ridge."  *See* Exhibit G, p. 32.  "They were just looking for something - - somebody to do it, and we were looking for something to employ."  *See* Exhibit G, p. 32.

Paying the Liberty Ridge residents never came up.  There was never a discussion with Snyder to pay the boys for their work.  *See* Exhibit G, p. 36-37.  The arrangement was not formal.  Like many business arrangements within the Mennonite community, there was no formal contract between Liberty Ridge, the Mission, or Snyder Gates.  *See* Exhibit E, p. 33.  And Snyder Gates was not the only business to exploit the Liberty Ridge residents, as described below.

To help defray Liberty Ridge's cost, Liberty Ridge residents' parents made payments to Liberty Ridge for operating expenses, to "help to cover for - - it just cost a lot for the food, for the - - yeah, operating expense."  *See* Exhibit E, p. 94.  For example, D.C.'s parents paid anywhere from $1,700 to $3,400 monthly, while R.M.'s parents paid $1,000 monthly.  *See* General Ledger Account Activity, 1/1/2011 to 12/31/2011, p. 7; 1/1/2012 to 12/31/2012, pp. 13-14; 1/1/2013 to 12/31/2013, p. 17.  *See* Exhibits I, J, and K, respectively.

Once Liberty Ridge was up and running, despite tuition and money-making businesses, there was no real "programming."  The Liberty Ridge Committee determined how long each resident spent at Liberty Ridge.  *See* Exhibit E, p. 76.  This was determined by the boys' "progress and also how they were relating to individuals."  *See* Exhibit E, p. 77.  The standards were "subjective;" there was not a progress list of items to check off.  *See* Exhibit E, p. 77.  One "benchmark" was "their respect for those in authority" at Liberty Ridge.  *See* Exhibit E, p. 77.

Residents had a variety of requirements at Liberty Ridge once they arrived.  The residents performed household chores, household farming work, "vocational" work, and "consequences."  Household chores were "property maintenance" like when the boys would "mow the yard" and "of course, they all had their house chores to do."  *See* Exhibit E, p. 100.  Household farming

work included tending to the small garden on the property, and to the hogs and several beef cattle all which were used to feed the boys.  *See* Exhibit L, p. 33, 37.

However, as described more in more detail below, "vocational" work and "consequences" were not run-of-the-mill "chores."

> **c.  Liberty Ridge was advertised to parents and the Mennonite community as being a "treatment" center for high-risk youth.  In reality, Liberty Ridge offered no treatment whatsoever; only harsh punishments and forced unpaid labor for profit.**

Liberty Ridge, the Mission, and the EPMC told the Mennonite community that Liberty Ridge's purpose was to "help troubled youth."  *See* Exhibit A, p. 34.  Ethan Weaver, another Mission member involved with Liberty Ridge, explained that meant "youth that are struggling with … issues of life" in the Mennonite community.  *See* Exhibit A, p. 34.  Mennonite parents believed their children would have their "emotional or behavioral difficulty" treated at Liberty Ridge.  *See* Exhibit A, p. 88.

Before Liberty Ridge opened, the Mission spread the word about Liberty Ridge throughout the Mennonite community.  Individual congregations would "take an offering" on Sunday mornings from their parishioners for Liberty Ridge.  *See* Exhibit C, p. 20.  Mission leadership announced or printed the week prior to Sunday services asking for offerings to Liberty Ridge.  *See* Exhibit C, p. 20.  Ethan Weaver described such "advertising" as "word of mouth" in their community.  *See* Exhibit A, p. 37.

Once word was out, parents approached Mennonite church leaders about needing help with a child.  *See* Exhibit G, p. 44.  Then, the ministry would make the decision with the parents about whether to send the child to Liberty Ridge.  *See* Exhibit G, p. 43-44.  Individual churches and parents believed Liberty Ridge was providing "a family like setting" that was "[p]roviding

education, spiritual nature, and training on how to relate, how to work, to help them relate to society and church life." *See* Exhibit G, p. 42-43.

Again, while the Mission said Liberty Ridge was therapeutic, there were no therapists, medical doctors, or trained staff of any kind. *See* Exhibit A, p. 35. Ethan Weaver did not even know if the staff or mentors were trained in how to deal with boys who were prescribed medication. *See* Exhibit A, p. 90.

Liberty Ridge purported to create "individual treatment plans or therapies" for each child. But these were based only on the "best knowledge" of Liberty Ridge's untrained staff based on the child's "behavior and struggles." *See* Exhibit A, p. 37-38.

In fact, neither Plaintiff (R.M. nor D.C.) received *any* therapy while at Liberty Ridge. *See* Exhibit L, p. 65.

Again, there were no professional assessments of the child residents performed. *See* Exhibit A, p. 36. Liberty Ridge's staff had no training on high needs children, such as children with mental health issues, diagnoses, or emotional issues. *See* Exhibit A, p. 40. Liberty Ridge did seek nor obtain state or governmental licensing. Liberty Ridge did not consult with the US DOL regarding child labor prior to opening. *See* Exhibit A, p. 40.

Even though Liberty Ridge claimed to be a "structured" and "therapeutic" program, the children's files were only haphazardly maintained by untrained mentors. According to Ethan Weaver, the mentors maintained the files on the kids, but he had no idea what happened to the files. *See* Exhibit A, p. 59.

This is evident in the documents missing from R.M. and D.C.'s files, despite both being there so long. For example, D.C. knew that the mentors would keep journals about him and his behaviors. *See* Exhibit E, p. 106. In discovery, however, no such documents were turned over.

Additionally, despite D.C. being at Liberty Ridge for several years, only a handful of daily inventories written by D.C. were turned over.

Contact with the outside world monitored and screened.  The residents, including Plaintiffs, could not express to their parents what was happening to them, and parents thought they were just living in a godly home.  D.C. testified all external communication was monitored by the Liberty Ridge staff.  *See* Exhibit M, p. 105.  "There was always somebody on the other end of the phone listening."  *See* Exhibit M, p. 105.

D.C. further explained that when parents would visit, there was always a mentor with them to observe.  *See* Exhibit M, p. 105.

All written communications were screened as well.  D.C. testified he did not try to write anything against Liberty Ridge in his communications "because I was afraid that something would happen."  *See* Exhibit M, p. 105.  "I was afraid that there would be consequences because of it."  *See* Exhibit M, p. 105.

### d.  The Residents' typical day at Liberty Ridge

During a usual day at Liberty Ridge, the boys would wake up and perform household chores and have bible study before eating breakfast.  *See* Exhibit L, p. 32.  Sometimes the boys would go to the chicken house first, then come back inside for devotionals before breakfast.  *See* Exhibit M, p. 32.

After breakfast, the boys would work until lunch.  *See* Exhibit L, p. 32.  Over lunch, the boys would eat and attend bible study for about an hour.  *See* Exhibit L, p. 41.  Then, the boys would go back out and work again.

The boys performed manual labor, such as milling logs and working on gates.  *See* Exhibit L, p. 41.  To mill logs, the boys would fell trees, drag them out of the woods, and split

them to be milled.  *See* Exhibit L, p. 33.  R.M. used a chainsaw to split the trees and manually handled the logs, while his mentor ran the sawmill machinery to mill the processed logs.  *See* Exhibit L, p. 35.  The children would use other dangerous tools like a rivet gun, drills, and saws. *See* Exhibit M, p. 34-35.

The boys worked daily in the chicken house to raise chickens for a live market in New York.  *See* Exhibit L, p. 33, 37.  Residents would remove dead chickens, put out feed and water, and clean up the barn after the chickens were loaded up for market.  *See* Exhibit M, p. 32, 36.

Labor was performed "pretty much from sunup to sundown."  *See* Exhibit M, p. 85.

The boys would only get recreation time on Sundays.  *See* Exhibit L, p. 38.  D.C. recalls the only real recreation as walking through the woods and driving up to the mountains a few times.  *See* Exhibit M, p. 37.

Residents received no schooling to speak of.  Schooling was unstructured, at best.  A schoolteacher was only available on site for a few hours during the day, every once in a while. *See* Exhibit M, p. 103.  Eventually, the schooling just stopped completely.  *See* Exhibit M, p. 104.

Manual labor was different from run-of-the-mill daily household chores and tasks, such as tending to the "hobby animals" such as hogs, or the small garden to grow some crops, like peppers, to eat within the home.  *See* Exhibit L, p. 33, 37; s*ee also* Exhibit M, p. 36, 40.  R.M. explained this general farming knowledge was already something that was known within the Mennonite culture.  *See* Exhibit L, p. 38.

    **e. Liberty Ridge tortured children to force compliance with the Defendants' demands for free labor.**

As stated above, Liberty Ridge residents performed chores, but were also forced into "vocational" labor, and were subject to severe "consequences" for non-compliance. And "consequences" at Liberty Ridge were extreme.

What caused "consequences" varied, but often revolved around a boy's non-cooperation with staff demands, including for the boys' labor.

Consequences "varied, but a lot of times it was, you know, disrespect or not listening or the list can go on." *See* Exhibit E, p. 105. When a boy "became angry" or exhibited "anger," "didn't want to do what was asked of him," or even "if a boy did not want to go to bed yet" then Liberty Ridge mentors enforced consequences. *See* Exhibit A, p. 57, 95. Other times, the boys would receive labor consequences for simply talking about sports cars, which was deemed "rebellious." *See* Exhibit L, p. 43.

Boys could stop the consequences "whenever they corrected their attitudes or their - - say okay, **we're ready to go back to work**." *See* Exhibit A, p. 66.

Consequences would escalate from mundane to extreme. It would start with talking to the offending child (*See* Exhibit A, p. 65), writing sentences for "however long it took" (*See* Exhibit A, p. 66), to running (*See* Exhibit A, p. 69). If the boy ran until exhausted but his "attitude didn't change" then consequences would become worse. *See* Exhibit A, p. 69.

If a boy suffering mental distress acted out or "become violent," consequences would escalate to physical restraint and forced labor immediately. Physical restraint of the children was allowed and even *encouraged* at Liberty Ridge. *See* Exhibit A, p. 71. Liberty Ridge never called police, emergency services, or a mental health crisis line when a child became "violent." *See* Exhibit A, p. 71. Instead, Liberty Ridge used boys' misbehavior to work them until exhaustion.

Liberty Ridge also fostered an environment of division between the boys.  *See* Exhibit L, p. 62. R.M. explained that they would achieve the "moral high ground" over each other so that the other boys would get in trouble first.  *See* Exhibit L, p. 62.

It is undisputed that boys performed laborious consequences outside of normal work hours, after dinner, overnight, and for extended periods of time.  *See* Exhibit A, p. 95.  Some examples of laborious physical consequences were digging holes, digging drains, digging tree stumps, sawing wood, and breaking rocks into small pieces that fit in a five-gallon bucket to "help them break a bad habit."  *See* Exhibit A, p. 99-100.  Physical consequences were "something for them to work at and think about" and after doing it the boys would think: "I'm going to comply."  *See* Exhibit G, p. 53.  The Mission's Liberty Ridge Committee approved the methods and consequences used at Liberty Ridge.  *See* Exhibit G, p. 53-54.

Boy's physical labor punishments were to be performed "until the job was complete or until the boy was ready to do what he needed to do." *See* Exhibit G, p. 59.  R.M. explained that Ethan Weaver was the "main guy that - - he was the instigator.  He was the one that decided what type of punishment I was going to get."  *See* Exhibit L, p. 44.

Liberty Ridge also imposed food and water restriction while the boys were performing consequences, like limiting them to "rice and beans."  *See* Exhibit G, p. 68.  For example, D.C. was made to work for several days without rest and was only given two sandwiches and two glasses of water.  *See* Exhibit M, p. 90, 96.  Food and water restriction would come with more "elevated consequences."  *See* Exhibit G, p. 68.

The Plaintiffs were subject to extreme consequences for failing to comply with Liberty Ridge's demands.  For example:

- D.C. was subject to sleep deprivation.  D.C. was up all night digging a hole "until his attitude changed."  *See* Exhibit A, p. 101.

- Two mentors used physical restraint upon D.C. at one time.  *See* Exhibit A, p. 105.

- One night, several mentors tied up D.C. and left him on the ground, outside, for hours.  *See* Exhibit L, p. 68.

- R.M. was subject to sleep, food, and water deprivation.  R.M. was up all-night digging holes in rocky soil, only receiving one glass of water several hours into the night of labor.  *See* Exhibit L, p. 65.  In the morning, instead of finally allowing R.M. to sleep, he then had to write "a hundred-some sentences."  *See* Exhibit L, p. 44.

Neither Liberty Ridge nor the Mission ever consulted with any medical or psychological professionals to determine whether the work performed at Liberty Ridge or the consequences would cause psychological or physical harm to the boys.  *See* Exhibit A, p. 111-12.  There was no consultation whatsoever to determine whether these "occupational exercises" or work was "therapeutic" for the children.  *See* Exhibit A, p. 111.

### f.   Liberty Ridge threatened legal process against the children if they left.

Defendants claim they "do not force anybody to stay" at Liberty Ridge, and that if the boys wanted to leave the farm, "the driveway was open."  *See* Exhibit G, p. 63, 64.  This is not true.

Gerald Nolt said that if boys left, Liberty Ridge would "notify the police" because "we will not have a boy in the community…so the boys understood that, yes."  *See* Exhibit G, p. 66. Nolt explained the police would bring the boys back to Liberty Ridge and, according to Nolt, if a child ran away, the Police would say to the boys, "this is the place you need" and "it was excellent." *See* Exhibit G, p. 66-67.

R.M. testified Weaver told the boys if they ever ran away, law enforcement would bring them back.  *See* Exhibit L, p. 67.  This was reinforced within the EPMC churches, "they will preach that law enforcement looks up to them."  *See* Exhibit L, p. 67.  R.M.'s biggest fears were leaving and having the police bring him back, the Liberty Ridge punishments, and that if he did

end up leaving, he would not be accepted back in the Mennonite community.  As a child, "I'd be pretty much homeless at that point."  *See* Exhibit L, p. 67.

> **g.  Liberty Ridge and other associated Mennonites made money off the coerced free labor of the boys at Liberty Ridge.**

Liberty Ridge claims it provided "vocational training" and "therapy" for boys.  *See* Exhibit E, p. 92; *see also* Exhibit A, p. 37-38.   In reality the children only performed rudimentary, unskilled, manual labor that offered no real job training skills.  Nor did the children receive any therapy or treatment.

Instead, the boys' free labor was used in two ways.  First, Liberty Ridge residents' labor was used as a substitute for local businesses' paid labor, which, in turn kicked back money to Liberty Ridge.  *See infra.*   Second, Liberty Ridge Residents' physical labor was a tool to break their will and force compliance with Liberty Ridge's demands.  *See infra.*

First, there Liberty Ridge made money several ways off the boys' labor:

- Clark's Feed Mill was involved with Liberty Ridge's chicken house.  *See* Exhibit E, p. 57.  Clark's had paid employees, but also benefitted from Liberty Ridge residents' free labor.  *See* Exhibit E, p. 57-58.  From about 2011 to 2014, there were about 30,000 birds at Liberty Ridge in the 300 by 600-foot chicken barn. *See* Exhibit E, p. 58-59.  Liberty Ridge's residents tended to chickens from when they were "little peeps" until Clark's would remove the birds for sale.  *See* Exhibit E, p. 58, 59-60.   Clark's "would just give [Liberty Ridge] so much a pound" for chickens.  *See* Exhibit E, p. 60-61.

  For example, in 2011, 2012, and 2013, Liberty Ridge received $38,328.73, $41,831.76, and $43,828.70 per year, respectively, from "Chicken income":

**Chicken income**

| | | | | |
|---|---|---|---|---:|
| 3/31/2011 | 000004 | Cash Receipt | Clark's Feed Mills Inc. | 6,147.86 |
| 6/13/2011 | 000006 | Cash Receipt | Clark's Feed Mills Inc. | 7,911.06 |
| 7/29/2011 | 000008 | Cash Receipt | Clark's Feed Mills Inc. | 6,743.43 |
| 9/29/2011 | 000009 | Cash Receipt | Clark's Feed Mills Inc. | 6,970.04 |
| 9/30/2011 | 000010 | Cash Receipt | Hart Brothers | 300.00 |
| 10/31/2011 | 000012 | Cash Receipt | Ruth Shertzler | 260.00 |
| 11/17/2011 | 000015 | Cash Receipt | Clark's Feed Mills Inc. | 9,996.34 |
| | | | **Chicken income Totals** | **$38,328.73** |

**Chicken income**

| | | | | |
|---|---|---|---|---|
| 1/24/2012 | 000017 | Cash Receipt | Clark's Feed Mills Inc. | 8,234.72 |
| 1/26/2012 | 000020 | Cash Receipt | Ruth Shertzler | 500.00 |
| 3/23/2012 | 000021 | Cash Receipt | Clark's Feed Mills Inc. | 6,024.14 |
| 6/1/2012 | 000027 | Cash Receipt | Clark's Feed Mills Inc. | 9,598.94 |
| 7/24/2012 | 000033 | Cash Receipt | Clark's Feed Mills Inc. | 3,854.92 |
| 9/18/2012 | 000042 | Cash Receipt | Clark's Feed Mills Inc. | 7,354.53 |
| 9/18/2012 | 000044 | Cash Receipt | Nathan Shertzler | 450.00 |
| 11/23/2012 | 000062 | Cash Receipt | Nathan Shertzler | 250.00 |
| 11/23/2012 | 000066 | Cash Receipt | Clark's Feed Mills Inc. | 5,564.51 |
| | | | **Chicken income Totals** | **$41,831.76** |

**Chicken income**

| | | | | |
|---|---|---|---|---|
| 1/17/2013 | 000091 | Cash Receipt | Clark's Feed Mills Inc. | 7,366.56 |
| 2/4/2013 | 000096 | Cash Receipt | Nathan Shertzler | 300.00 |
| 3/20/2013 | 000110 | Cash Receipt | Clark's Feed Mills Inc. | 6,744.83 |
| 5/29/2013 | 000120 | Cash Receipt | Ruth Shertzler | 250.00 |
| 5/29/2013 | 000121 | Cash Receipt | Clark's Feed Mills Inc. | 7,548.66 |
| 8/13/2013 | 000134 | Cash Receipt | Clark's Feed Mills Inc. | 6,202.85 |
| 8/13/2013 | 000136 | Cash Receipt | Nathan Shertzler | 250.00 |
| 9/24/2013 | 000145 | Cash Receipt | Clark's Feed Mills Inc. | 6,634.74 |
| 11/11/2013 | 000152 | Cash Receipt | Nathan Shertzler | 250.00 |
| 11/12/2013 | 000159 | Cash Receipt | Benjamin H Shertzer | 250.00 |
| 11/20/2013 | 000162 | Cash Receipt | Clark's Feed Mills Inc. | 8,031.06 |
| | | | **Chicken income Totals** | **$43,828.70** |

*See* Exhibits I, J, and K.

- As discussed above, there was Snyder Gates. By having Liberty Ridge residents perform its work, Snyder Gates did not have to hire employees. *See* Exhibit E, p. 33. After the gates were finished, Snyder would pick up its gates from Liberty Ridge and sell them. *See* Exhibit E, p. 63. Liberty Ridge was paid a fee by Snyder Gates for the boys' labor in assembling the gates. *See* Exhibit E, p. 63-64.

  For example, in 2012 Liberty Ridge received $8,124.70 for "Gate assembly" and $3,597.75 for "Gates Sold LRF," and in 2013 Liberty Ridge received $4,679.50 for "Gate assembly" and $388.00 for "Gates Sold LRF" (see below).

**Gate assembly**

| | | | | |
|---|---|---|---|---|
| 1/24/2012 | 000018 | Cash Receipt | Snyder Gates llc | 440.70 |
| 3/23/2012 | 000022 | Cash Receipt | Snyder Gates llc | 764.00 |
| 5/7/2012 | 000024 | Cash Receipt | Snyder Gates llc | 2,337.00 |
| 6/1/2012 | 000026 | Cash Receipt | Snyder Gates llc | 1,585.00 |
| 7/24/2012 | 000032 | Cash Receipt | Snyder Gates llc | 312.00 |
| 9/30/2012 | 000047 | Cash Receipt | Snyder Gates llc | 762.00 |
| 11/23/2012 | 000064 | Cash Receipt | Snyder Gates llc | 1,513.00 |
| 12/31/2012 | 000082 | Cash Receipt | Snyder Gates llc | 411.00 |
| | | | **Gate assembly Totals** | **$8,124.70** |

**Gates Sold LRF**

| | | | | |
|---|---|---|---|---|
| 5/7/2012 | 000025 | Cash Receipt | LRF Gate Sales | 290.00 |
| 6/1/2012 | 000028 | Cash Receipt | LRF Gate Sales | 117.75 |
| 7/24/2012 | 000030 | Cash Receipt | Nel-Ray Farms | 1,885.00 |
| 7/31/2012 | 000035 | Cash Receipt | LRF Gate Sales | 750.00 |
| 12/14/2012 | 000071 | Cash Receipt | Winding Hill Express | 555.00 |
| | | | **Gates Sold LRF Totals** | **$3,597.75** |

**Gate assembly**

| | | | | |
|---|---|---|---|---|
| 1/17/2013 | 000089 | Cash Receipt | Snyder Gates llc | 915.00 |
| 2/18/2013 | 000100 | Cash Receipt | Snyder Gates llc | 360.00 |
| 4/9/2013 | 000116 | Cash Receipt | Snyder Gates llc | 956.00 |
| 7/1/2013 | 000127 | Cash Receipt | Snyder Gates llc | 1,367.50 |
| 11/11/2013 | 000157 | Cash Receipt | Snyder Gates llc | 1,081.00 |
| | | | **Gate assembly Totals** | **$4,679.50** |

**Gates Sold LRF**

| | | | | |
|---|---|---|---|---|
| 4/25/2013 | 000118 | Cash Receipt | Snyder Gates llc | 30.00 |
| 8/13/2013 | 000135 | Cash Receipt | Chris Ebersole | 358.00 |
| | | | **Gates Sold LRF Totals** | **$388.00** |

*See* Exhibits J and K.

- Sensenig Chair Shop was another business that operated out of Liberty Ridge. Boys helped fell and drag trees from Liberty Ridge's woodland. Boys cut trees to length, and then split the trees for firewood. *See* Exhibit E, p. 102-03. Some firewood was used to heat the Liberty Ridge home. But Sensenig Chair Shop also sold firewood cut by the children that was not used on the Liberty Ridge property. *See* Exhibit E, p. 68. Sensenig Chair Shop paid Liberty Ridge for the timber processed by the boys. *See* Exhibit E, p. 68.

For example, in 2012 and 2013, Liberty Ridge received $2,065.00 and $5,590.00, respectively, in "Fire wood income":

**Fire wood income**

| | | | | |
|---|---|---|---|---|
| 11/13/2012 | 000059 | Cash Receipt | Sensenig Chair Shop | 360.00 |
| 11/13/2012 | 000060 | Cash Receipt | Sensenig Chair Shop | 60.00 |
| 11/23/2012 | 000061 | Cash Receipt | Nel-Ray Farms | 140.00 |
| 12/14/2012 | 000067 | Cash Receipt | Sensenig Chair Shop | 240.00 |
| 12/14/2012 | 000068 | Cash Receipt | Sensenig Chair Shop | 120.00 |
| 12/14/2012 | 000069 | Cash Receipt | Sensenig Chair Shop | 240.00 |
| 12/14/2012 | 000070 | Cash Receipt | Nel-Ray Farms | 65.00 |
| 12/14/2012 | 000072 | Cash Receipt | Sensenig Chair Shop | 60.00 |
| 12/14/2012 | 000077 | Cash Receipt | Sensenig Chair Shop | 120.00 |
| 12/31/2012 | 000080 | Cash Receipt | Sensenig Chair Shop | 300.00 |
| 12/31/2012 | 000081 | Cash Receipt | Oak Ridge Farm & Garden | 360.00 |
| | | | **Fire wood income Totals** | **$2,065.00** |

**Fire wood income**

| | | | | |
|---|---|---|---|---|
| 1/3/2013 | 000084 | Cash Receipt | Sensenig Chair Shop | 120.00 |
| 1/17/2013 | 000093 | Cash Receipt | Sensenig Chair Shop | 120.00 |
| 1/17/2013 | 000094 | Cash Receipt | Nel-Ray Farms | 70.00 |
| 2/18/2013 | 000099 | Cash Receipt | Oak Ridge Farm & Garden | 780.00 |
| 2/18/2013 | 000102 | Cash Receipt | Sensenig Chair Shop | 290.00 |
| 3/11/2013 | 000106 | Cash Receipt | Sensenig Chair Shop | 120.00 |
| 3/20/2013 | 000107 | Cash Receipt | Sensenig Chair Shop | 60.00 |
| 4/5/2013 | 000111 | Cash Receipt | Sensenig Chair Shop | 300.00 |
| 4/15/2013 | 000117 | Cash Receipt | Marvin L Graham | 425.00 |

| | | | | |
|---|---|---|---|---:|
| 4/25/2013 | 000119 | Cash Receipt | Sensenig Chair Shop | 60.00 |
| 7/1/2013 | 000125 | Cash Receipt | Oak Ridge Farm & Garden | 180.00 |
| 8/13/2013 | 000137 | Cash Receipt | Sensenig Chair Shop | 65.00 |
| 9/24/2013 | 000146 | Cash Receipt | Sensenig Chair Shop | 130.00 |
| 9/24/2013 | 000147 | Cash Receipt | Glen Gehman | 350.00 |
| 11/11/2013 | 000150 | Cash Receipt | Sensenig Chair Shop | 65.00 |
| 11/11/2013 | 000151 | Cash Receipt | Sensenig Chair Shop | 130.00 |
| 11/11/2013 | 000153 | Cash Receipt | Galen High | 560.00 |
| 11/11/2013 | 000154 | Cash Receipt | Nel-Ray Farms | 400.00 |
| 11/12/2013 | 000160 | Cash Receipt | Sensenig Chair Shop | 390.00 |
| 12/2/2013 | 000169 | Cash Receipt | Sensenig Chair Shop | 520.00 |
| 12/5/2013 | 000173 | Cash Receipt | Sensenig Chair Shop | 130.00 |
| 12/20/2013 | 000177 | Cash Receipt | Sensenig Chair Shop | 130.00 |
| 12/20/2013 | 000179 | Cash Receipt | Sensenig Chair Shop | 130.00 |
| 12/30/2013 | 000184 | Cash Receipt | Sensenig Chair Shop | 65.00 |
| | | | **Fire wood income Totals** | **$5,590.00** |

*See* Exhibits J and K.

- Jones Lumber was another lumber processing business within the Mennonite community that benefited from Liberty Ridge residents' free labor. *See* Exhibit E, p. 81. Unlike the other businesses, Liberty Ridge staff transported residents to Jones Lumber's property to work. *See* Exhibit E, p. 73. The boys would handle and sort the lumber. *See* Exhibit E, p. 74. Jones Lumber then paid Liberty Ridge for the work performed by the boys. *See* Exhibit E, p. 74. Another time, the boys disassembled a 50 by 80-foot pole barn located at Jones Lumber, including smashing concrete. *See* Exhibit M, p. 86-87. The disassembled barn was transported to Liberty Ridge where the children had to put it back together. *See* Exhibit M, p. 87. The boys were not paid for the work at Jones Lumber. *See* Exhibit M, p. 86.

- Throughout the years, Liberty Ridge accounted for "Other Income" in 2011, 2012, and 2013 in the amounts of $200.00, $278.59, and $2,311.18, respectively.

**Other Income**

| | | | | |
|---|---|---|---|---:|
| 11/10/2011 | 000014 | Cash Receipt | Tim Varner | 200.00 |
| | | | **Other Income Totals** | **$200.00** |

**Other Income**

| | | | | |
|---|---|---|---|---:|
| 7/24/2012 | 000031 | Cash Receipt | CCD Scrap Yard | 78.59 |
| 9/30/2012 | 000048 | Cash Receipt | Snyder Gates llc | 200.00 |
| | | | **Other Income Totals** | **$278.59** |

**Other Income**

| | | | | |
|---|---|---|---|---:|
| 3/20/2013 | 000109 | Cash Receipt | Frederick Wadel | 145.00 |
| 7/1/2013 | 000124 | Cash Receipt | Cash Sales | 80.00 |
| 7/1/2013 | 000126 | Cash Receipt | Greble Scrap | 299.30 |
| 7/1/2013 | 000128 | Cash Receipt | Goods Livestock | 658.36 |
| 7/1/2013 | 000132 | Cash Receipt | CCD Scrap Yard | 116.27 |
| 8/13/2013 | 000138 | Cash Receipt | Cash Sales | 12.25 |
| 12/4/2013 | 000171 | Cash Receipt | LRF New checking acc. ENB | 1,000.00 |
| | | | **Other Income Totals** | **$2,311.18** |

*See* Exhibits I, J, and K.

As stated above, funds paid to Liberty Ridge for the boys' labor did not go towards the cost of the land, as that was paid for by the Mennonite community.  As reflected in the records, by way of example, in 2011 Liberty Ridge received $25,473.50 in donations from "MM Mission":

**MM Mission**

| | | | | |
|---|---|---|---|---|
| 1/25/2011 | 000001 | Cash Receipt | Mennonite Messianic Mission | 2,500.00 |
| 2/26/2011 | 000002 | Cash Receipt | Mennonite Messianic Mission | 3,500.00 |
| 5/12/2011 | 000005 | Cash Receipt | Mennonite Messianic Mission | 2,855.50 |
| 7/19/2011 | 000007 | Cash Receipt | Mennonite Messianic Mission | 5,618.00 |
| 10/31/2011 | 000011 | Cash Receipt | Mennonite Messianic Mission | 5,000.00 |
| 11/10/2011 | 000013 | Cash Receipt | Mennonite Messianic Mission | 6,000.00 |
| | | | **MM Mission Totals** | **$25,473.50** |

*See* Exhibit I.   In 2012, Liberty Ridge received $1,000.00 in "Donations for farm" and $15,494.45 in "EPMC Offerings" from the Mennonite community:

**Donations for farm**

| | | | | |
|---|---|---|---|---|
| 12/14/2012 | 000076 | Cash Receipt | Leon W Hurst | 1,000.00 |
| | | | **Donations for farm Totals** | **$1,000.00** |

**EPMC Offerings**

| | | | | |
|---|---|---|---|---|
| 7/24/2012 | 000029 | Cash Receipt | Honey Brook Church | 4,101.12 |
| 8/8/2012 | 000038 | Cash Receipt | Waterloo Church | 2,158.50 |
| 9/30/2012 | 000050 | Cash Receipt | Little Falls School | 261.01 |
| 10/15/2012 | 000054 | Cash Receipt | Mechanicsville Mennonite Church | 2,494.05 |
| 11/13/2012 | 000055 | Cash Receipt | New England Valley Church | 979.92 |
| 11/13/2012 | 000056 | Cash Receipt | Centerville Menonite Church | 5,499.85 |
| | | | **EPMC Offerings Totals** | **$15,494.45** |

*See* Exhibit J.   In 2013, Liberty Ridge received $23,447.65 in "Donations for farm" and $19,709.39 in "EPMC Offerings" from the Mennonite community:

**Donations for farm**

| | | | | |
|---|---|---|---|---|
| 1/3/2013 | 000085 | Cash Receipt | Tim Varner | 200.00 |
| 1/3/2013 | 000086 | Cash Receipt | Chris Ebersole | 100.00 |
| 1/3/2013 | 000087 | Cash Receipt | Kenton R Kreider | 178.50 |
| 2/4/2013 | 000097 | Cash Receipt | Mennonite Messianic Mission | 15,000.00 |
| 3/11/2013 | 000105 | Cash Receipt | Debra Martise | 200.00 |
| 11/11/2013 | 000149 | Cash Receipt | Paul M Freed | 169.15 |
| 11/12/2013 | 000158 | Cash Receipt | Robert E Eshleman | 2,000.00 |
| 11/12/2013 | 000161 | Cash Receipt | Donation | 200.00 |
| 12/5/2013 | 000174 | Cash Receipt | Myerstown Sheds & Fencing | 5,000.00 |
| 12/20/2013 | 000178 | Cash Receipt | Elva K Martin | 400.00 |
| | | | **Donations for farm Totals** | **$23,447.65** |

**EPMC Offerings**

| Date | Number | Type | Description | Amount |
|------|--------|------|-------------|--------|
| 1/3/2013 | 000088 | Cash Receipt | Wolcott Mennonite Church | 1,256.56 |
| 3/11/2013 | 000104 | Cash Receipt | Mountain View Church | 2,545.68 |
| 4/5/2013 | 000112 | Cash Receipt | Richland Mennonite Church | 4,539.69 |
| 4/5/2013 | 000113 | Cash Receipt | Conococheague Mennonite Church | 2,621.24 |
| 4/9/2013 | 000114 | Cash Receipt | Maple River Church | 914.76 |
| 4/9/2013 | 000115 | Cash Receipt | Richland Mennonite Church | 500.00 |
| 5/29/2013 | 000123 | Cash Receipt | Denver Mennonite Church | 3,453.06 |
| 9/24/2013 | 000143 | Cash Receipt | Honey Brook Church | 2,850.42 |
| 9/24/2013 | 000148 | Cash Receipt | Little Falls School | 1,027.98 |
| | | | **EPMC Offerings Totals** | **$19,709.39** |

*See* Exhibit K.

Also, operating costs were covered by the boys' parents.  And it certainly did not go to the boys to pay them for their work.  For example, 2011, 2013, and 2013, Liberty Ridge received $1,700.00, $25,800.00, and $42,871.90, respectively, in "Resident Contributions":

**Resident Contributions**

| Date | Number | Type | Description | Amount |
|------|--------|------|-------------|--------|
| 12/6/2011 | 000001 | AR Invoice | Bill Cross | 1,700.00 |
| | | | **Resident Contributions Totals** | **$1,700.00** |

**Resident Contributions**

| Date | Number | Type | Description | Amount |
|------|--------|------|-------------|--------|
| 2/2/2012 | 000019 | Cash Receipt | Bill Cross | 1,700.00 |
| 5/7/2012 | 000023 | Cash Receipt | Bill Cross | 3,400.00 |
| 7/27/2012 | 000034 | Cash Receipt | Bill Cross | 3,400.00 |
| 8/8/2012 | 000037 | Cash Receipt | ███████████ | 1,700.00 |
| 9/4/2012 | 000040 | Cash Receipt | Bill Cross | 1,700.00 |
| 9/4/2012 | 000041 | Cash Receipt | Allen Miller | 1,000.00 |
| 9/18/2012 | 000043 | Cash Receipt | ███████████ | 1,700.00 |
| 9/24/2012 | 000045 | Cash Receipt | Allen Miller | 1,000.00 |
| 10/15/2012 | 000051 | Cash Receipt | ███████████ | 700.00 |
| 10/15/2012 | 000052 | Cash Receipt | Allen Miller | 1,000.00 |
| 10/15/2012 | 000053 | Cash Receipt | Clearview Mennonite Church | 1,700.00 |
| 11/13/2012 | 000058 | Cash Receipt | Bill Cross | 1,700.00 |
| 11/23/2012 | 000063 | Cash Receipt | Allen Miller | 1,000.00 |
| 12/14/2012 | 000073 | Cash Receipt | ███████████ | 675.00 |
| 12/14/2012 | 000074 | Cash Receipt | | 25.00 |
| 12/14/2012 | 000078 | Cash Receipt | Allen Miller | 1,000.00 |
| 12/31/2012 | 000083 | Cash Receipt | ███████████ | 700.00 |
| | | | **Resident Contributions Totals** | **$24,100.00** |
| 2/2/2012 | 000019 | Cash Receipt | Bill Cross | 1,700.00 |
| | | | **Residents contributions Totals** | **$1,700.00** |

**Resident Contributions**

| | | | | |
|---|---|---|---|---:|
| 1/17/2013 | 000090 | Cash Receipt | Bill Cross | 3,400.00 |
| 2/4/2013 | 000095 | Cash Receipt | Allen Miller | 1,000.00 |
| 2/18/2013 | 000098 | Cash Receipt | Bill Cross | 3,400.00 |
| 2/18/2013 | 000101 | Cash Receipt | Allen Miller | 1,000.00 |
| 2/18/2013 | 000103 | Cash Receipt | ███████████ | 1,235.06 |
| 3/20/2013 | 000108 | Cash Receipt | Allen Miller | 1,000.00 |
| 5/29/2013 | 000122 | Cash Receipt | | 986.94 |
| 7/1/2013 | 000131 | Cash Receipt | ███████████ | 3,400.00 |
| 7/1/2013 | 000133 | Cash Receipt | | 1,549.90 |
| 8/13/2013 | 000139 | Cash Receipt | | 1,700.00 |
| 8/29/2013 | 000140 | Cash Receipt | | 1,700.00 |
| 8/29/2013 | 000141 | Cash Receipt | Bill Cross | 1,700.00 |
| 9/24/2013 | 000142 | Cash Receipt | Blue Rock Mennonite Church | 1,700.00 |
| 9/24/2013 | 000144 | Cash Receipt | ███████████ | 1,700.00 |
| 11/11/2013 | 000155 | Cash Receipt | Blue Rock Mennonite Church | 1,700.00 |
| 11/11/2013 | 000156 | Cash Receipt | ███████████ | 1,700.00 |
| 11/21/2013 | 000165 | Cash Receipt | | 1,700.00 |
| 12/2/2013 | 000170 | Cash Receipt | Gospel Light Chapel | 5,500.00 |
| 12/20/2013 | 000176 | Cash Receipt | Blue Rock Mennonite Church | 1,700.00 |
| 12/30/2013 | 000182 | Cash Receipt | ███████████ | 3,400.00 |
| 12/30/2013 | 000183 | Cash Receipt | Blue Rock Mennonite Church | 1,700.00 |
| | | | **Resident Contributions Totals** | **$42,871.90** |

*See* Exhibits I, J, and K.

Liberty Ridge residents, including Plaintiffs, never got a dime for their labor.  *See* Exhibit M, p. 37.

The boys were even taken off site to perform work for members of Liberty Ridge and the Mission.  This included deconstructing a barn so that Ethan Weaver could recover stone he wanted for a Liberty Ridge project.  *See* Exhibit A, p. 57.  Another time, they were taken to Nelson Martin's property in Myerstown to blow insulation into a building.  *See* Exhibit M, p. 88. D.C. was not paid for this work either.  *See* Exhibit M, p. 88.

**h.  Plaintiff D.C.'s experience at Liberty Ridge.**

At age 5, due to his birth parents' ongoing drug use and physical abuse, D.C. and four of his siblings were adopted by a Mennonite family.  *See* Exhibit M, p. 15; s*ee also* Exhibit N, p. 1. D.C.'s adoptive family already had five biological children.  *See* Exhibit N, p. 1.  Throughout his childhood, D.C. was sexually abused several times by adults within the Mennonite community, including a babysitter and a teacher.  *See* Exhibit N, p. 6.  When he reported the abuse by his

babysitter to his parents, he was told "we'll pray to got about it.  That God will forgive [his abuser]."  *See* Exhibit N, p. 6.  When D.C. reported the abuse by his teacher to the church leaders, they "told me to pray to God to forgive [his abuser]."  *See* Exhibit N, p. 6.

D.C. had a history of mental health issues prior to Liberty Ridge.  This included childhood sexual trauma, developmental disabilities, anxiety, depression, post-traumatic stress disorder, mood disorder, personality disorder, suspected bipolar disorder, and reactive attachment disorder.  *See* Exhibit N, p. 10; s*ee also* Exhibit O, p. 2, 3, 4; *see also* Exhibit P, p. 1; s*ee also* Exhibit Q, p. 1.

About 6 months before D.C.'s time at Liberty Ridge, D.C. was sent to live with his adoptive aunt and uncle.  *See* Exhibit M, p. 23-24, 26.  D.C. remembers one Sunday his aunt and uncle kept him home after church.  *See* Exhibit M, p. 27.  They brought Ethan Weaver over for dinner.  *See* Exhibit M, p. 23-24.  Weaver told D.C. about the Liberty Ridge "program" and said, "wouldn't it be fun to go to this place?"  *See* Exhibit M, p. 24.  "I was young, obviously, so I agreed" said D.C.  *See* Exhibit M, p. 24.  About a month later, D.C. was living at Liberty Ridge. *See* Exhibit M, p. 24.

D.C. was the first resident at Liberty Ridge.  *See* Exhibit A, p. 40-41.  D.C. arrived in 2011, when he was 14, and left in 2014, when he was 17.

That D.C. was the first resident was tragic.  The Liberty Ridge committee knew they "didn't feel like we could handle very, very difficult mental cases because we weren't set up or it."  *See* Exhibit G, p. 25.  Unfortunately, D.C. suffered from his mental health issues that were only exacerbated at Liberty Ridge.

Before going to Liberty Ridge, D.C. saw a psychiatrist and was on medication for his mental health.  *See* Exhibit M, p. 47, 81.  While at Liberty Ridge, after Nelson Martin noticed

D.C. would fall asleep due to his medication, Ethan Weaver discontinued his prescription.  *See* Exhibit M, p. 85.

Liberty Ridge handled D.C. poorly, at best.  Even though D.C. had ongoing mental health crises, they never took D.C. to a hospital, a crisis center, or called the police.  *See* Exhibit M, p. 102.  Despite D.C.'s obvious medical struggles, D.C. was only taken to a doctor "one time" in the years that he was at Liberty Ridge.  *See* Exhibit G, p. 44.

D.C. was isolated from his family and support system.  Over the years that D.C. was at Liberty Ridge, D.C.'s adoptive parents visited no more than four times.  *See* Exhibit M, p. 33.  D.C. was only allowed to call his parents on the phone twice.  *See* Exhibit M, p. 34.  D.C. tried to write letters to his parents while he was at Liberty Ridge.  *See* Exhibit M, p. 34.  Through discovery in this case, D.C. found out Liberty Ridge never sent a Mother's Day letter to D.C. wrote his mom.  *See* Exhibit M, p. 34, 104, 121.  "[O]bviously they monitored the letters if they kept my mail from going out."  *See* Exhibit M, p. 105.

In 2013, D.C. attempted suicide by hanging at Liberty Ridge.  *See* Exhibit N, p. 3, 4; *see also* Exhibit O, p. 3, 4; *see also* Exhibit P, p. 1, 3.  Liberty Ridge never called law enforcement, nor took D.C. to a hospital, called any other crisis center, or sought additional immediate mental health treatment.  *See* Exhibit M, p. 102.  Even after attempting suicide, D.C. remained at Liberty Ridge.

D.C. also attempted to run away from Liberty Ridge on two separate occasions.  *See* Exhibit N, p. 7.  The first time, D.C. "walked off the property, and I told them that I was going to go out to the neighbors and tell them was they were doing to us there, 'cause it was a - - like, nobody else around the town really knew what the place was and what was going on behind closed doors."  *See* Exhibit M, p. 92.  Liberty Ridge staff brought him back and told him that if

he tried to run away again, the police would bring him back.  *See* Exhibit M, p. 92.  Then, the

mentors sat down and discussed D.C.'s punishment for trying to leave.  *See* Exhibit M, p. 92.

After that, "they showed me where I had to dig."  *See* Exhibit M, p. 92.

D.C. spent two days digging a French drain due to trying to leave Liberty Ridge.  *See*

Exhibit M, p. 41, 91-92, 95. "Digging the French drain was probably the most traumatic to me

because they made me stay out all night and dig for hours on end."  *See* Exhibit M, p. 90.  D.C.

explained:

> [O]n the backside of a house where they housed the house parents, where Ethan
> [Weaver] and Ruby lived.  There was a pipe that came out the back for the
> washing machine and where the water would drain off. So instead of having the
> water drain around the house, there was a hole - - I can't recall exactly how deep
> it was, but at the beginning of the hole, it was fairly deep, and then there was a
> narrow - - and they took stones and then there was a narrow trench that went
> around the side of the property where they had a hole that was very, very deep
> that I had to dig.  And that's where the water would drain off into.

*See* Exhibit M, p. 93 (*paragraph breaks omitted*).  Where the trench began, it was at least up to

D.C.'s waist.  *See* Exhibit M, p. 94.  By the end of the trench, it was a couple feet deep, "more

than I could crawl up out of by myself."  *See* Exhibit M, p. 95.

After the first day of digging, D.C. told them, "I'm not going to dig.  Look.  I'm not

going to do this.  So you cannot make me do this."  *See* Exhibit M, p. 91.  Because D.C. refused

to work, they started "adding the consequences on to the point where that I had to go to sleep,

you know, and then when I woke up, they would make me go back and dig some more."  *See*

Exhibit M, p. 91. If D.C. fell asleep while digging, "[t]hey would just wake me up and tell me I

had to keep digging or add time on."  *See* Exhibit M, p. 95.  "And I remember, while I was

digging, I ended up falling asleep while I was standing in the hole trying to dig."  *See* Exhibit M,

p. 92.

D.C. was only brought a sandwich and one cup of water two times while digging the French drain over two days.  *See* Exhibit M, p. 90, 96.

Another time, D.C. "stuck up for" another child who was forced to run in front of a truck as a consequence.  *See* Exhibit M, p. 89, 111.  D.C. "thought it wasn't right how they were treating him," so they gave D.C. and the other child a consequence.  *See* Exhibit M, p. 90.  D.C. and the child were made to use a 2-handed saw to cut chunks of wood off a log *See* Exhibit M, p. 90.  During the consequence, D.C. talked to the boy about leaving Liberty Ridge.  *See* Exhibit M, p. 90.  For talking about leaving Liberty Ridge, D.C. was issued another consequence.  *See* Exhibit M, p. 90.  "They made me dig a tree stump out.  And then I had to write - - write a bunch of sentences."  *See* Exhibit M, p. 90.  D.C. had to write about 600 lines of Bible verses, and things like "I will behave at all the times and listen to my mentors."  *See* Exhibit M, p. 90.

The second time D.C. tried to leave, D.C. was moved out to Nelson Martin's house.  *See* Exhibit M, p. 55.  D.C. was sent to work on Nelson Martin's farm for about a month or two.  *See* Exhibit M, p. 56, 59.  D.C. does not think his parents knew that he had been removed from Liberty Ridge.  *See* Exhibit M, p. 60.  D.C. could not contact his parents during this time because he did not have access to a phone.  *See* Exhibit M, p. 60.

Other consequences D.C. suffered including the overnight digging of post holes, a stump, and digging into the side of a hill.  *See* Exhibit M, p. 97.  Another consequence was crushing larger stones into smaller stones by hand "if we disobeyed."  *See* Exhibit M, p. 40-41.  The crushed stones were then filled into a five-gallon bucket through a quarter sized hole in the top.  *See* Exhibit M, p. 40-41.  "And refusal of any of that just added more time onto that.  Like, let's say, if I refused and just kept misbehaving during crushing stones for the bucket, they would add buckets on."  *See* Exhibit M, p. 41.

Liberty Ridge knew D.C. was too much to handle: "it's certainly in the back of our minds that this is possible."  *See* Exhibit G, p. 69.  Liberty Ridge never brought a child, D.C. or otherwise, to a hospital or a crisis center for their mental health or suicidal ideations.  *See* Exhibit G, p. 72.  Instead, Liberty Ridge staff would just contact the board, "and we would go into - - sit down with them.  Talk it over.  Work through it."  *See* Exhibit G, p. 72.

R.M. witnessed the Liberty Ridge staff provoking D.C. into having a mental health crisis.  R.M. testified de-escalation was "definitely not used" with D.C. To the contrary, it was "an escalation through words" and "they knew obviously he was weak-minded."  *See* Exhibit L, p. 76.  "You could kind of tell when [D.C.] had his good days."  *See* Exhibit L, p. 63.  The "whole idea" at Liberty Ridge was "to work out rebellion, you gotta bring it to the surface."  *See* Exhibit L, p.  64.  The Liberty Ridge staff would "push [D.C.'s] buttons" to "get him to react."  *See* Exhibit L, p. 63.  Once D.C. would react, "then it was hands - - you know, let's go hands-on with the guy."  *See* Exhibit L, p. 63.

For example, "[T]hey would sit there and start talking to [D.C], you know, like as far as their beliefs, for example."  *See* Exhibit L, p. 64.  "If they had a belief, a conversation on, you know, beliefs or something like that, they would push their side of thinking; and that would just irritate him to the point where he was - - he would get violent, you know, because he wasn't thinking rationally, and then it would go from there, you know."  *See* Exhibit L, p. 64.  When asked if Liberty Ridge ever took D.C. to the hospital or to a crisis center when he was in mental health distress, R.M. answered definitely, "No, absolutely not.  They didn't even get emergency services there for any of that."  *See* Exhibit L, p. 71.

D.C. remembers being physically restrained at least two times while at Liberty Ridge. *See* Exhibit M, p. 98.  "[O] time they had zip tied my feet and held my hands behind my back or they

had zip tied my hands and held - - and they - - and bent my feet forward and sat on top of them so I couldn't move and just kept me out there like that for a couple hours." *See* Exhibit M, p. 98. This was for refusing to do the work consequence that he was told to do. *See* Exhibit M, p. 99. He was outside digging a stump. *See* Exhibit M, p. 100. D.C. tried to stop performing the consequence by walking away. *See* Exhibit M, p. 99. They told D.C. that he was not allowed to get out of doing his consequence. *See* Exhibit M, p. 99. Then, he remembers they "gripped me up and then I tried to, like - - was struggling, and then they put me on the ground face down and restrained me." *See* Exhibit M, p. 99.

His wrists were tied, and he remained tied up, face down on the stones on the ground, for a couple hours. *See* Exhibit M, p. 100. He remained that way so long that his hands went numb. *See* Exhibit M, p. 101. He was finally released in the middle of the night. *See* Exhibit M, p. 101.

"And then another time, they just put my hands behind my back and made me lay face down on the ground." *See* Exhibit M, p. 98. This happened when D.C. was digging the French drain. *See* Exhibit M, p. 101. While he was digging, D.C. remembers Ethan Weaver coming towards him and he was afraid. *See* Exhibit M, p. 45. D.C. swung the digging iron at Ethan; he was put on the ground and held there for over an hour. *See* Exhibit M, p. 45, 101-02. When they finally released him, he had to continue digging. *See* Exhibit M, p. 102.

Soon after leaving Liberty Ridge at age 18, D.C. began consuming alcohol, crack, and marijuana because "it helps with his mental health issues." *See* Exhibit N, p., 2, 4, 5. Soon thereafter, D.C. began using methamphetamines and K2 as well. *See* Exhibit N, p. 2, 5. D.C. has only been able to hold several odd jobs here for a few months at a time since becoming an adult. The majority of his adult life, however, has been spent in and out of prison and homelessness. *See* Exhibit M, p. 3-4, 8, 10.

D.C. explains that the only thing that Liberty Ridge prepared him for was being institutionalized. Since turning 18 in 2014, soon after leaving Liberty Ridge, D.C. has been arrested on 6 parole violations and another 8 times for other reasons. *See* Exhibit M, p. 8.

A psychiatrist has written D.C. "has difficulty with authority figures, who repeat the cycle of punishment and resentment stemming from his childhood." *See* Exhibit N, p. 9. The psychiatrist explained that "[D.C] has a significant mood disorder which results in anger, and chronic substance problems. Each of these problems worsens the other. While the effects of trauma and poor attachment have impacted [D.C.'s] mental health problems, it cannot be ruled out that at least some of his deficits are secondary to the neurodevelopmental effects of substances in utero, given that his biological mother is a chronic drug and alcohol user." *See* Exhibit M, p. 9.

D.C. now only has a sixth or seventh grade education. *See* Exhibit M, p. 21-22. D.C. has never been able to hold a job for any extended period. *See* Exhibit M, p. 112. The only jobs D.C. was able to perform after Liberty Ridge were those with "basic" unskilled labor. *See* Exhibit M, p. 58-59, 112. For example, D.C. temporarily held some jobs where he cut sheet metal, washed mats that came off bakery lines, stood on a factory line to look out for defects, packaging steaks, and packaging and palletizing glass. *See* Exhibit M, p. 75-76, 78. It "didn't take a genius to figure it out." *See* Exhibit M, p. 75.

"[U]nfortunately, Liberty Ridge destroyed me as an adult." *See* Exhibit M, p. 112.

### i.   Plaintiff R.M.'s experience at Liberty Ridge

R.M. was also adopted by a Mennonite family when he was about 5 years old. *See* Exhibit L, p. 9. R.M. had developmental disabilities. *See* Exhibit L, p. 56. R.M.'s birth mother drank alcohol during her pregnancy. *See* Exhibit L, p. 56. He was malnourished due to his birth

parents failing to feed him.  R.M. was labeled as "failure to thrive."  *See* Exhibit L, p. 56.  R.M. also believes he was shaken as a baby.  *See* Exhibit L, p. 56.

Soon after R.M. was adopted, when he was about 5 or 6 years old, R.M. was sexually abused by the older biological son of his adoptive parents, who was about 17 or 18 years old. *See* Exhibit L, p. 56.  R.M. told his adoptive parents, but instead of helping him, they punished R.M. for it.  *See* Exhibit L, p. 56.

Several years later, R.M.'s adoptive parents sent him away because he "wasn't building a good relationship with [his] parents, and [his] parents were at their wits' end."  *See* Exhibit L, p. 11.  This was the last time he lived with his parents.  *See* Exhibit L, p. 13.  R.M. was not quite sure why he was ultimately sent away, "I wasn't bonding with families or something.  *See* Exhibit L, p. 21.  According to R.M., he only recalls that his parents believed him to be "rebellious" and that "in their eyes [I] had an attachment disorder."  *See* Exhibit L, p. 21.

Throughout the rest of his childhood, due to his developmental disabilities and trauma, R.M. continued to struggle with fitting into the Mennonite culture.  *See* Exhibit L, p. 58.  Being bounced around from home-to-home did not help.  *See* Exhibit L, p. 58-59.  "After a while, you just kind of get the instinct or the thing - - the fight to survive instinct.  That kicks in."  *See* Exhibit L, p. 59.

First, R.M. was sent to live with his adoptive grandparents in Arizona for about a year. *See* Exhibit L, p. 11.  At about age 11, R.M. was sent to another Mennonite family in Illinois. *See* Exhibit L, p. 10-11.  R.M. finally began feeling like he had "a shot at maybe a normal life" in Illinois.  However, he was soon made to relocate within the Mennonite community again.  *See* Exhibit L, p. 59.  "I got told I was going to have to move and that just - - yeah.  That definitely

was kind of quite heartbreaking.  After that, I just kind of shelled up into my own shell and, yeah, pretty much survived after that."  *See* Exhibit L, p. 59.

After living with Illinois for some time, a Mennonite bishop decided that "it wasn't working out" and relocated R.M. several more times before ultimately, sending R.M. to Liberty Ridge.  *See* Exhibit L, p. 10, 12.  Before being placed at Liberty Ridge, R.M. was told he was not confirming or fitting in with the Mennonite community.  *See* Exhibit L, p. 22.

The decision to send R.M. to Liberty Ridge was made by church leadership, not his parents.  *See* Exhibit L, p. 23.  Once again, R.M. was not sure why he was sent to Liberty Ridge, other than vagaries such as "to help me," to "grow with my spiritual walk," to "build better relationships, something like that.  I'm not sure exactly, but yeah."  *See* Exhibit L, p. 21.  R.M. was about 15 or 16 years old when he was sent away to Liberty Ridge and remained there for about a year.  *See* Exhibit L, p. 30.  When R.M. arrived at Liberty Ridge, D.C. was the only other resident.  *See* Exhibit L, p. 31.

"I was quite terrified at first," said R.M.  *See* Exhibit L, p. 61.  "I was in a fight to survive instinct mode then."  *See* Exhibit L, p. 62.  Due to being shuffled between so many different homes throughout his childhood, R.M. tried to figure out what would cause punishments in Liberty Ridge.  *See* Exhibit L, p. 62.  "When I realized that, that it was a super sensitive place, that's kind of where I hunkered down and survived, and I knew I was going to be there for a year.  So you play happy or play - - you know, you kind of learn to, like, mentally be okay with your surroundings while you're in there.  Another instinct mode, yes."  *See* Exhibit L, p. 62.

While at Liberty Ridge, R.M. explained that there was a difference between household chores and labor.  *See* Exhibit L, p. 66.  Upon waking up in the morning, the boys would help with cleaning dishes, "stuff like that."  *See* Exhibit L, p. 66.  The labor included the profitable

work such as "raising chickens for the live market" and working with lumber *See* Exhibit L, p. 66.

R.M. also talked about the time when he was forced to work overnight, digging postholes and stump holes, as a consequence.  *See* Exhibit L, p. 43-44.  He received a consequence for talking about "sports cars."  *See* Exhibit L, p. 43.  Liberty Ridge staff felt that expressing an opinion about sports cars was R.M. "being rebellious because obviously I did not have those convictions that they had."  *See* Exhibit L, p. 43.  He worked all night.  *See* Exhibit L, p. 65.  He only received one glass of water "probably three or four hours into it."  *See* Exhibit L, p. 65.  "And it wasn't digging either.  It was super rocky."  *See* Exhibit L, p. 65.  In the morning, instead of allowing R.M. to sleep, they made him write "a hundred-some sentences."  *See* Exhibit L, p. 44.

R.M. never received treatment or therapy while at Liberty Ridge.  *See* Exhibit L, p. 65.  Nor did anyone at Liberty Ridge talk to R.M. about treatment for his traumatic history. *See* Exhibit L, p. 65.

By the time that R.M. left, D.C. remained.  *See* Exhibit L, p. 48.  R.M. was not allowed to have much communication with D.C. after he left because "he was under pretty strict communication there" because "they monitored everything really closely."  *See* Exhibit L, p. 52.

### IV.    Standard of Review

When a defendant moves for summary judgment, the plaintiff must show there is a genuine issue for trial.  F.R.C.P. 56.  When considering the Mennonites' Motion, the Court must draw all inferences in the light most favorable to [D.C. and R.M.], and where [D.C. and R.M.'s] evidence contradicts the movant's, then [D.C. and R.M.'s] must be taken as true." *Big Apple*

*BMW Inc. v. BMW of North America, Inc.* 974 F. 2d 1358 (3d Cir. 1992).  "[I]t is inappropriate for a court to resolve factual disputes and to make credibility determinations."  *Id.*

**V.      Argument[5]**

The Mennonites make four primary arguments in the Mennonites' Motion, all of which are meritless.

- The Mennonites contend the TVPA was not designed to combat the Mennonites' conduct here.  The Mennonites cast their behavior as benign compared to other defendants courts found violated the TVPA.

  ***Suggested Answer:*** *The TVPA was designed to punish the Mennonites' conduct at Liberty Ridge.*

- The Mennonites argue they did not violate the TVPA as "the fundamental purpose of Liberty Ridge Farm was to assist young men on their spiritual journey," so the Mennonites cannot have "knowingly engaged in an enterprise by which they solicited children to provide forced labor."

  ***Suggested Answer:*** *The TVPA does not require a defendant to have "knowingly engaged" in a scheme to solicit children to provide forced labor.  This Court has held (as have others) that a defendant can violate the TVPA if it "should have known" of a civil TVPA violation.*

- The Mennonites say they did not solicit or recruit the Plaintiffs.  According to the Mennonites, absent the Mennonites affirmative solicitation, they cannot be liable under the TVPA.

  ***Suggested Answer:***  *The TVPA does not require the Mennonites' "affirmatively solicit" the Plaintiffs.  As stated, this Court has held (as have others) that a defendant can violate the TVPA if it "should have known" of a TVPA violation.  Also, the Mennonites absolutely solicited families by promoting Liberty Ridge.*

- The Mennonites argue Plaintiffs are not entitled to punitive damages as the Mennonites did not have an "evil motive" or "reckless indifference" to Plaintiffs.

  ***Suggested Answer:***  *The Plaintiffs have shown they are entitled to punitive damages as the Mennonites' conduct was sufficiently reckless to justify such a punitive damages award.  Punitive damages are explicitly available under the TVPA.*

---

[5] Plaintiffs' discussion herein is related to the TVPA, but the analysis applies equally to Plaintiffs' claims under Pennsylvania's human trafficking law.

Plaintiffs will address each of Mennonites' points in turn.  The Court should reject each of the Mennonites' arguments.

> a. **The TVPA was designed to combat the kind of conduct the Mennonites engaged in at Liberty Ridge.  The Mennonites' treatment of the Plaintiffs was not the benign program the Mennonites describe.  Regardless of their goals, the Mennonites in practice tortured children to extort their profitable free labor.**

The Mennonites argue Liberty Ridge "falls outside of the scope of the severe conduct contemplated by the TVPA, because Plaintiffs were not subjected to involuntary servitude."  The Mennonites call Liberty Ridge a place of "caring and nurturing these young men so that they could be contributing members of society."  The Mennonites say Liberty Ridge can be "distinguished from other cases under the TVPA."

The Court should reject this argument.  First, it asks the Court to test the facts, which the Court cannot do.  Second, the TVPA was designed to combat the Mennonites' conduct at Liberty Ridge.

First, this Court should reject the Mennonites depiction of the facts.  As this Court knows, "it is inappropriate for a court to resolve factual disputes and to make credibility determinations" here.  *Big Apple BMW Inc. v. BMW of North America, Inc.* 974 F. 2d 1358 (3d Cir. 1992).  The Court must credit Plaintiffs' version of the story, in which Liberty Ridge was hellish and they worked to avoid the Mennonites' terrible "consequences."

For example, D.C. had to perform hard labor for days at a time with limited rest and restricted food and water.  *See* Exhibit M, p. 41, 91-92, 95.  When D.C. feel asleep while digging in the hole, he was woken up and told to keep digging or would add more time on.  *See* Exhibit M, p. 95.  He was only given limited food and water throughout these days.  *See* Exhibit M, p. 90, 96.  If he tried to stop or walk away, they would make him to back and dig more.  *See* Exhibit

M, p. 91.  The reason for this consequence?  Because D.C. tried to leave Liberty Ridge.  *See* Exhibit M, p. 92.

Other times, consequences for refusal to complete labor was physical restraint by use of zip ties.  *See* Exhibit M, p. 90.  D.C.'s wrists were tied, and he remained tied up, face down on the rocky ground, at night, for hours.  *See* Exhibit M, p. 100.  He remained there until his extremities went numb.  *See* Exhibit M, p. 101.

Second, the Mennonites' conduct violated the TVPA, regardless of how benevolent the Mennonites claim their intentions were.

Civil liability for forced labor under the TVPA requires the Mennonites "provide[d] or obtained] the labor or services of a person" by any of *one* the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;[6]
> (3) by means of the abuse or threatened abuse of law or legal process;[7] or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, ..." 18 U.S.C. § 1589.

The Mennonites need not have **known** their conduct was a violation of the TVPA, if the Mennonites "in reckless disregard" knowingly benefited from a TVPA violation. 18 U.S.C. § 1589(b).  Also, and more importantly, a **civil** violation of the TVPA is subject to an even lower

---

[6] "Serious harm" includes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to [render labor]…to avoid incurring that harm." *Bistline v. Parker*, 918 F.3d 849, 870 (10th Cir. 2019), quoting 18 U.S.C. § 1589(c)(2).  The TVPA was enacted to encompass all forms of coercion, even to what outsiders may seem to be "more subtle forms of abuse and nonviolent coercion than those previously required to hold perpetrators accountable." *Id.* at 871.

[7] "Abuse of the law or legal process" is the "use of threats of legal action, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed in order to coerce someone into working against that person's will." *US v. Garcia*, No. 02-CR-110S-01, 2003 WL 22956917, at *4-5 (W.D.N.Y. Dec. 2, 2003));

standard under 18 U.S. Code § 1595 (which codifies the TVPA's civil remedy).  Under § 1595, the Mennonites violated the TVPA even if they only "**should have known**" of a TVPA violation under 18 U.S.C. § 1589.[8]

In the alternative, a trafficking-into-servitude claim under 18 U.S.C. § 1590 "prohibits human trafficking to further forced labor."  18 U.S.C. § 1590.  Like 18 U.S.C. § 1589, § 1590's civil remedy is codified under § 1595, which requires only that the Mennonites "should have known" of trafficking for forced labor.

The Mennonites, at the very least, "should have known," their conduct at Liberty Ridge fits within that prohibited under 18 U.S.C. §§ 1589, 1590, and 1595.  Indeed, the Mennonites' conduct violated the TVPA in multiple, obvious ways.

The Mennonites coerced Plaintiffs' labor through (1) "force, threats of force, physical restraint, or threats of physical restraint," (18 U.S. Code § 1589(a)(1)) (2) "serious harm or threats of serious harm," (18 U.S. Code § 1589(a)(2)) and (3) "abuse or threatened abuse of law or legal process."  (18 U.S. Code § 1589(a)(3).

The list of ways in which the Mennonites coerced Plaintiffs into providing free labor in these ways is long:

- Plaintiffs performed grueling physical and even dangerous menial labor as a "consequence" of disobedience;
- Plaintiffs worked five (5) and sometimes (6) days a week, from sun-up to sun-down, and sometimes overnight without rest;
- Defendants withheld proper schooling from Plaintiffs;
- Defendants withheld food from Plaintiffs;
- Defendants withheld water from Plaintiffs;
- Defendants subjected Plaintiffs to sleep deprivation;
- Defendants forced Plaintiffs to run until exhaustion;
- Defendants threatened harm to Plaintiffs

---

[8] To be guilty of a criminal TVPA violation, Plaintiffs acknowledge the Mennonites *mens rea* must be at least recklessness.  But here, in a civil case, as is discussed in detail below, the Mennonites need only have **negligently** violated the TVPA at Liberty Ridge.

- Defendants physically restrained Plaintiffs, including by utilizing zip-ties;
- Defendants threatened to call the police if Plaintiffs' left or tried to leave Liberty Ridge;
- Defendants threatened to excommunicate Plaintiffs from the church if they left or tried to leave Liberty Ridge

Still, the Mennonites argue this conduct is not prohibited by the TVPA.  Defendants say the work done by the boys were just "chores."  Sure, some acts at Liberty Ridge were traditional chores.  Household chores ("property maintenance") like when the boys would "mow the yard" and were "chores" in the ordinary sense of the word.

But the Mennonites themselves testified to the differences between vocational work, household chores, and "consequences."  "Vocational" labor and "consequences" were drastically different from chores.  The Mennonites themselves never referred to these acts as "chores" during depositions.

Liberty Ridge residents, Plaintiffs included, needed medical and psychiatric treatment; not ditch digging and rock breaking, sleep and food deprivation. They needed therapy, not threats of jail or excommunication from their families and churches.  They needed support, not hogtieing when they complained, or suffered symptoms of untreated mental illness.

Actions speak louder than words.  Liberty Ridge's true purpose was to work children into compliance, not to teach them any meaningful skills, and for Liberty Ridge and other related businesses within the Mennonite community to profit from unpaid child labor.

The Court must look at the Plaintiffs' experience through their worldview.  Plaintiffs grew up in small Mennonite communities for all their lives.  Plaintiffs had little-to-no outside interaction, internet access, telephones, or other "worldly" experiences we take for granted.  The Mennonite community was all they knew.  Losing that would have been catastrophic.  To Plaintiffs, excommunication from the Mennonite community was akin to forced deportation.

Plaintiffs would be left homeless, with no money, skills, or essential support mechanisms necessary for daily existence.

Defendants' own cited authority supports Plaintiffs' allegations, starting with the "stated purpose of the TVPA is to 'combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and *children*, to ensure just and effective punishment of traffickers, and to protect their victims.'" *U.S. v. Kaufmann*, 546 F.3d 1242, 1261 (10th Cir. 2008); Doc. 12, p. 11-12.  Defendants concede that in a successful trafficking case, as in the case at hand, a plaintiff "is forced to labor for long hours for minimal or no pay."  *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015); Doc. 12, p. 13.

Moreover, the cases relied upon by Defendants attempt create an improper distinction that trafficking may only be applied to immigrant labor.  *See United States v. Salimlim*, 538 F.3d 706 (7th Cir. 2008) and *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011). Asking this Court to read a requirement into the TVPA that simply does not exist is improper.  As seen below, the TVPA has been applied in similar religious and "troubled teen camp" circumstances for non-immigrant plaintiffs, including in a case where the parents similarly "consented" to sending their children to the camp under the guise of providing "therapy" to their children on a "ranch."

Courts around the United States have found TVPA violations under circumstances like Liberty Ridge.  For example:

- Plaintiffs' claims are like another isolated religious community: the Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS").  *See Bistline v. Parker*, 918 F.3d 849, 870 (10th Cir. 2019).  In *Bistline*, *supra*, the plaintiffs alleged they were forced to perform labor for Warren Jeffs, the leader of the FLDS, and for the FLDS church in violation of the TVPA.  *Id*. at 872.  The Court agreed.  The FLDS, like the Mennonites, is secluded; its members are cut-off from the outside world.  *Id*.  As here, FLDS parents and guardians "consented" to the orders of the FLDS church for their minor children to engage in free labor. The court determined that when FLDS members were "ordered" to do something, they had no choice but to comply.  *Id*. at 871.  This was due to the

church leader's control over every aspect of their lives, which "create[d] the ability to punish malcontents or recalcitrant followers with swift and horrendous punishments, including the loss of all shelter, food, medical care, cash, livelihood, and other essential support mechanisms necessary to an endurable daily existence." *Id*. Plaintiffs were threatened with force, kidnapped, physically restrained, and threatened with other harms if they failed to cooperate. *Id*. Other punishments included "intense and prolonged forced labor for underage workers and adults alike, which labor was typically performed in dangerous construction or excavation activities in which safety precautions were regularly ignored. *Id*.

- Plaintiffs' claims are also like those in *Sherman v. Trinity Teen Sols., Inc.*, 2021 U.S. Dist. Lexis 254754 (Dist. of WY, 2021), 20-CV-215-SWS. In this case, a similar organization purported to provide education and therapy to troubled teenagers. Instead, they exploited the teenagers as a source of labor. The Court held that the plaintiffs sufficiently pled causes of action for forced labor and human trafficking under 18 U.S.C. § 1589 and § 1590 because the complaint plausible asserted that the organizations and their owners knowingly obtained the teenagers' labor by means of force or threats and benefited from the labor. The parents of the "troubled teen minors" paid to send their children to working ranches in Wyoming where they were supposed to receive various forms of therapy. The ranches, however, were "light on the education, even lighter on the therapy, and largely forced the teenagers to labor for many hours per day under horrible conditions." *Id*. at *4.

In *United States v. Lewis*, 644 F.Supp. 1391 (W.D.MI 1986), the court examined the criminal side of involuntary servitude. In *Lewis*, the defendants were members of an insular religious sect that organized a remote, rural camp. *Id*. at 1396.

The *Lewis* court explained that "[n]o longer is the slave always black and the master white. And, while subtler forms of coercion have replaced the blatant methods of subjugation practiced n the ante-bellum South, these new practices are no less effective than their older counterparts." *Id*. at 1400. "The essence of a holding to involuntary servitude is an exercise of control by one person over another so that the latter is coerced into laboring for the former. *Id*. at 1401; *citing United States v. Mussry*, at 726 F.2d 1448, 1452 (9th Cir.1984).

The use or threatened use of law or physical force is the most common method of forcing someone to enter into or remain in a state of involuntary servitude.  *Id.*    The Court went on to explain that:

> A holding in involuntary servitude occurs when an individual coerces another into his service by improper or wrongful conduct that is intended to cause and does cause the other person to believe that he or she has no alternative but to perform the labor. In determining the question of involuntariness, the court should consider whether the challenged conduct would have had the claimed effect upon a reasonable person of the same general background and experience. Thus, the particular individual's background is relevant in deciding whether he or she was coerced into laboring for the defendant.

*Id*.  Thus, it is important in the case at hand to not only look at the conduct of Liberty Ridge in coercing Plaintiffs into their service by improper or wrongful conduct, but to also take a reasonable look at the Plaintiffs' background.  In considering whether the conduct at hand would have coerced other boys of similar background and experience to perform labor, the only answer is a resounding "yes."

> **b.  The TVPA does not require a defendant to have "knowingly engaged" in a scheme to violate the TVPA.  The TVPA's civil remedy only requires a defendant "should have known" it was violating the TVPA.**

The Mennonites argue they did not violate the TVPA as "the fundamental purpose of Liberty Ridge Farm was to assist young men on their spiritual journey."  As such, the Mennonites say they cannot have "***knowingly*** engaged in an enterprise by which they solicited children to provide forced labor." (emphasis added).

However, the TVPA does not require a defendant to "knowingly" violate the TVPA. Rather, the law is clear the Mennonites may ***negligently*** civilly violate the TVPA if the Mennonites "should have known" of a TVPA violation under 18 U.S. Code § 1595 (the "civil remedy" provision of the TVPA).

The civil provision of the TVPA requires only that a defendant "knowingly benefit[], . . . from participation in a venture which that person **. . . should have known** has engaged in an act in violation of [the TVPA]" to be liable. *Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182, 193-194, 2019 U.S. Dist. LEXIS 203132, *24-25 (Nov. 22, 2019) (citing 18 U.S.C. § 1595) (emphasis added). The "phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence." *Ricchio v. Bijal, Inc. (citing See M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-CV-849, 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019) (allowing TVPA claims under against two hotels and finding the statute "invokes a negligence standard"); *see also, e.g.*, Dan B. Dobbs et al., Dobb's Law of Torts § 159 (2019) (using phrase "knew . . . or should have known it" to describe negligence standard).

In short, "it is possible for a defendant to be civilly liable [in negligence] without having violated any of the criminal portions of the TVPA, because the statute permits recovery under a civil standard **even in the absence of proof of intentional conduct**." *Ricchio v. Bijal, Inc.* (emphasis added).

This Court has held the same. In 2020, this Court addressed the issue of a defendant's necessary *mens rea* under the TVPA in *AB v. Marriott International*. 455 F. Supp. 3d 171 (E.D.Pa. 2020). In that case, the plaintiff alleged Marriott violated the TVPA by benefitting from her sex trafficking. The Court explained "the heart of [Marriott's] argument is it did not knowingly participate in a sex trafficking venture." The Court, however, disagree with Marriott, and held Marriott could be liable under the TVPA if Marriot "should have known" of a TVPA violation.[9]

---

[9] Marriott was alleged to have facilitated sex trafficking, not labor trafficking as here, but the analysis under the TVPA is the same regardless of the kind of trafficking.

Moreover, the Mennonites' self-serving argument about Liberty Ridge residents purported "spiritual journey" should be ignored. The evidence shows Liberty Ridge's "spiritual journey" was nothing more than free labor under threat of grueling and demeaning labor, deprivation of food, water, and sleep, to the benefit of Liberty Ridge and other Church-related entities. What is important is the actions of Defendants, not their excuses.

As discussed at length, the boys worked from "sunup to sundown" and, sometimes, all night long, at the behest of Defendants. For example, multiple related Mennonite businesses utilized the Plaintiff's labor: Snyder Gates; Clark's Feed Mill; Sensenig Chair Shop; and Jones Lumber. As reflected above, the boys built gates, labored in the chicken house, and milled firewood for these businesses. These businesses, in turn, paid Liberty Ridge for the labor, purchased the items, and removed them from the Liberty Ridge property for sale. The boys were also forced to perform degrading, humiliating, exhausting, and sometimes dangerous consequences in the form of labor with limited sleep, food, and water for attempting to leave, or even simply talking about leaving Liberty Ridge. The only purpose of these consequences was to break the will of the boys so that they would remain at Liberty Ridge to continue working.

### c. TVPA does not require the Mennonites' "affirmatively solicit" the Plaintiffs. As stated, This Court has held (as have others) that a defendant can violate the TVPA if it "should have known" of a TVPA violation.

The Mennonites say they did not solicit or recruit the Plaintiffs. According to the Mennonites, absent the Mennonites affirmative solicitation, they cannot be liable under the TVPA.

This is wrong for two reasons. First, as explained above, intentional conduct is not required under the TVPA. Second, the Mennonites misstate the facts, as the Mennonites absolutely advertised and promoted Liberty Ridge to families within their closed community (i.e.

to solicit residents).  The families believed that their children would be living in a loving, farm-like home setting, where they would receive schooling and therapy for their behavioral and mental health issues.  In reality, the children received sporadic schooling, no therapy, and worked for the profit of Liberty Ridge and other associated Mennonite entities and individuals. Defendants even conned the general parishioners into supporting them monetarily.  Liberty Ridge, the Mission, and the EPMC religious leadership held out Liberty Ridge as a therapeutic home where boys would become godly young men.  In doing so, they solicited donations from community members to fund the Mission and Liberty Ridge.

Once on the farm, the boys were coerced into working for profit under threat of grueling and dehumanizing labor and physical restraint.  One time, D.C. received days' worth of hard labor for trying to escape and threatening to tell the outside world what was truly happening at Liberty Ridge.

Defendants also try to argue that Defendants cannot be liable under the TVPA because Plaintiffs' guardians may or may not have consented to the illegal and abusive treatment of their children.  Put simply, this argument is shocking and appalling.  One cannot reasonably argue that the abuse of children is within the bounds of the law because their parents or guardians' consent to the abuse.  Defendants cannot claim that they are not subject to the TVPA because the minor victims' parents consented to Defendants' violation of the law.  *See Fed. Mar. Comm'n v. Pac. Mar. Ass'n*, 435 U.S. 40, 71 (1978) (the parties to a contract "cannot agree to terms that violate the law").

> **d. The Plaintiffs have shown they are entitled to punitive damages as the Mennonites' conduct was sufficiently reckless to justify such an award.**

The Mennonites argue Plaintiffs are not entitled to punitive damages as the Mennonites did not have an "evil motive" or "reckless indifference" to Plaintiffs. Here, the Court should allow Plaintiffs' punitive damages claim to move forward, as the Mennonites are wrong.

First, the TVPA explicitly allows for punitive damages. *Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011) ("We . . . hold that punitive damages are available under 18 U.S.C. § 1595."); *Francisvo v. Susano*, 525 F. App'x 828, 835 (10th Cir. 2013) ("We . . . agree with the only other circuit to address the matter and hold punitive damages to be available under § 1595."); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26 (D.D.C. 2013) ("Punitive damages are . . . available under the TVPA."); *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *4 (E.D. Va. Sept. 24, 2012) ("Punitive damages are available under the TVPA . . . ."); *David v. Signal Int'l, LLC,* No. 2:08-CV-01220 (E.D. La. Jan. 28, 2015) (Same).

Second, punitive damages are a jury question. *SHV Coal, Inc. v. Cont'l  Grain Co*., 587 A.2d 702, 705 (Pa.  1991) ("The determination of whether a person's actions arise to  outrageous conduct lies within the sound discretion of the fact-finder.").  "The rule of punitive damages set forth in the Restatement (Second) of Torts § 908 has been adopted in Pennsylvania." *Chambers v. Montgomery*, 192 A.2d 355 (Pa. 1963). Section 908 states that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's . . . reckless indifference to the rights of others."  *See also Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766 (Pa. 2005) ("Punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate . . . reckless conduct."). "[A] punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and, that (2) he acted or failed to act . . . in conscious disregard of that risk." *Id.*

In this case, the facts show the Mennonites had a "subjective appreciation of the risk of harm to which [D.C. and R.M] [were] exposed," and then "acted or failed to act . . . in conscious disregard of that risk."   Liberty Ridge coerced Plaintiffs into attending its "program" by soliciting it as a place where they would receive "therapy."   These were children who already came from a background of trauma, mental illness, and instability.   Defendants took these high-risk, high-need children and subjected them to mental and physical abuse and labor.   Defendants did so without any medical guidance or consultation.   Defendants consciously disregarded the risks of further harm to D.C. and R.M. throughout their program.

## VI.   Conclusion

For the reasons discussed herein, this Court should deny the Defendants' Motion for Summary Judgement.

**Respectfully submitted,**

Dated: February 17, 2023

*/s/ Renee E. Franchi, Esq.*
Renee E. Franchi, Esq. (PA #313950)
renee@vca.law
Nathaniel L. Foote, Esq. (PA #318998)
nate@vca.law
Andreozzi + Foote
4503 North Front Street
Harrisburg, PA 17110
Ph: 717.525.9124 | Fax: 717.525.9143
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served upon all

Counsel of record through the Court's ECF system on this date.


Dated: February 17, 2023

*<u>/s/ Renee E. Franchi, Esq.</u>*
Renee E. Franchi, Esq. (PA #313950)
renee@vca.law
Nathaniel L. Foote, Esq. (PA #318998)
nate@vca.law
Andreozzi + Foote
4503 North Front Street
Harrisburg, PA 17110
Ph: 717.525.9124 | Fax: 717.525.9143
*Attorneys for Plaintiffs*