# EXHIBIT D

**Deposition of Mark Torkelson (M.T.)**

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA


  D.C. AND R.M.,               :
         Plaintiffs             :
                                :
         vs.                    :
                                :
  NELSON MARTIN D/B/A           :
  LIBERTY RIDGE FARM,           :        CIVIL ACTION
  LIBERTY RIDGE FARM,           :   NO: 5:21-CV-05070-JMG
  EASTERN PENNSYLVANIA          :
  MENNONITE CHURCH AND          :
  RELATED AREAS, AND            :
  MENNONITE MESSIANIC           :
  MISSION OF THE EASTERN        :
  PENNSYLVANIA MENNONITE        :
  CHURCH,                       :
         Defendants              :



   DEPOSITION OF:      MARK TORKELSON

   TAKEN BY:           PLAINTIFFS

   REPORTER:           TRACY L. LLOYD, RPR
                       NOTARY PUBLIC

                       KYLAN BARRY, VIDEOGRAPHER

   DATE:               OCTOBER 19, 2022, 8:58 A.M.

   PLACE:              MARGOLIS EDELSTEIN
                       214 SENATE AVENUE, SUITE 402
                       CAMP HILL, PENNSYLVANIA
```

### Page 2

```
 1  APPEARANCES:
 2          ANDREOZZI & FOOTE
            BY: RENEE E. FRANCHI, ESQUIRE
 3              4503 NORTH FRONT STREET
                HARRISBURG, PENNSYLVANIA  17110
 4              (717) 686-9936
                Renee@vca.law
 5
                -- For the Plaintiffs
 6
            MARGOLIS EDELSTEIN
 7          BY: MEGHAN WYNKOOP, ESQUIRE
                JOCELYN MENDEZ, ESQUIRE
 8              THE CURTIS CENTER, SUITE 400E
                170 SOUTH INDEPENDENCE MALL W.
 9              PHILADELPHIA, PENNSYLVANIA  19106
                (215) 922-1100
10              mwynkoop@margolisedelstein.com
11
                -- For the Defendants
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1              INDEX OF WITNESSES
 2  EXAMINATION                              PAGE
 3  MARK TORKELSON
 4      By Ms. Franchi                          5
 5      By Ms. Wynkoop                         --
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 4

1  STIPULATIONS
2       It is stipulated and agreed by and between
3  counsel for the respective parties that the reading,
4  signing, sealing, and filing of the transcript is
5  waived and that all objections, except as to the
6  form of the question, are reserved to the time of
7  trial.
8
9       THE VIDEOGRAPHER:  Here begins Media
10 Number 1 in the videotaped deposition of Mark
11 Torkelson in the matter of D.C. and R.M. v. Martin, et
12 al, in the United States District Court for the
13 Eastern District of Pennsylvania, Case Number
14 521-CV-05070-JMG.
15      Today's date is October 19th, 2022.  The
16 time on the video monitor is 8:58 a.m.  The
17 videographer today is Kylan Barry representing Planet
18 Depos.  This video deposition is taking place at 214
19 Senate Avenue, Suite 402, Camp Hill, PA, 17011.
20      Would counsel please voice identify
21 themselves and state whom they represent.
22      MS. FRANCHI:  I am Renee Franchi with the
23 law firm of Andreozzi and Foote, and I represent the
24 Plaintiffs in this matter.
25      MS. WYNKOOP:  Meghan Wynkoop, Margolis

### Page 5

1  Edelstein, and I represent the Defendants.
2       MS. MENDEZ:  Jocelyn Mendez, Margolis
3  Edelstein, and I represent the Defendants.
4       THE VIDEOGRAPHER:  The court reporter
5  today is Tracy Lloyd.  Will the reporter please swear
6  in the witness.
7
8       MARK TORKELSON, called as a witness,
9  being affirmed, testified as follows:
10
11      MS. FRANCHI:  Okay.  We will just agree
12 to the same preliminary issues that were put on the
13 transcript first thing yesterday so I can spare
14 counsel from repeating it again and for the next
15 couple days.  Is there anything else you think?  We're
16 good?
17      MS. WYNKOOP:  No.  We agree.
18
19           EXAMINATION
20
21 BY MS. FRANCHI:
22      Q.   Good morning, Mr. Torkelson.  My name is
23 Renee Franchi.  I represent the Plaintiffs in this
24 matter.  I apologize.  I'm already losing my voice
25 from speaking all day yesterday.  I'm sure by Friday

Page 6

1  it will be completely gone. I appreciate you being
2  with us today.
3       Before we get to case-related questions,
4  I need to ask you some preliminary questions just to
5  make sure that you understand the expectations and the
6  rules for the deposition today.
7       The first thing is that when I or your
8  attorney asks you a question, you do have to give a
9  verbal answer. This is not just a non-verbal response
10 like a head nod or uh-huh or something like that.
11 This is because of the stenographer being here. She's
12 typing down all of the questions and the answers
13 today, and she can only type down verbal responses.
14 So will you be able to make sure that you do give me
15 verbal responses to your questions today?
16   A.   I will try.
17   Q.   Thank you. Next, if you are asked a
18 question that you don't understand, that doesn't make
19 sense, whether it be because I worded it confusingly,
20 which has been known to happen, or for any other
21 reason, please feel to say you don't understand the
22 question or ask me to repeat the question, and I can
23 do that for you. Can you do that?
24   A.   I will.
25   Q.   Okay. In that same light, if you're

Page 7

1  asked a question and you do answer with a verbal
2  response, I will assume that you understood the
3  question. Is that fair?
4    A.   Yes.
5    Q.   Okay. Now, I do expect that we'll be
6  here for a few hours this morning. Attorneys are bad
7  at estimating time, but I don't think it will be too
8  long. But if you do need to take a break at any time
9  to use the restroom, to get something to drink, to
10 stretch your legs, or for any other reason, please let
11 me know. That's perfectly fine.
12      The only restriction is that if you're
13 asked a question, you may not take a break until the
14 question is answered, and then afterwards you may do
15 so. Does that make sense?
16   A.   Yes.
17   Q.   Now, during this deposition, I may ask
18 you to either estimate or approximate something like
19 time or dates if you do not recall something
20 specifically. Please do not just simply guess at the
21 answer. If you think that you can give a fair
22 estimate or approximation, please let me know and
23 please do so.
24      For example, if I ask you a question
25 about when an event happened and if you don't know the

Page 8

1  exact date, but you do know a time frame, say, between
2  the years of 2000 and 2004, it's fair to say that you
3  don't remember exactly when this event occurred, but
4  that it happened between those two years?
5       So if you are able to approximate, please
6  let me know. But if you simply do not know or do not
7  remember an answer or an event, please say so. Is
8  that fair?
9    A.   Yes.
10   Q.   The most important thing today is that we
11 just want you to tell the truth. Is there anything
12 that would prevent you from being able to fully
13 testify to the truth today?
14   A.   No.
15   Q.   Okay. So I think first we'll be
16 starting with some just general background questions.
17 I don't know you. We've never spoken before, so I'd
18 like to get to know you a little bit, and then we'll
19 get into some more specific questions about the events
20 in this case or the issues that we brought you here
21 for today.
22      Do you have any questions for me or for
23 your attorney before we start today?
24   A.   I do not think so.
25   Q.   Okay. So the first matter is what did

Page 9

1  you do in preparation for your deposition today other
2  than speaking with your attorney, if anything?
3    A.   Nothing.
4    Q.   Okay. Did you review any documents?
5    A.   No.
6    Q.   Okay. And I know earlier you had said
7  your name. But if you could, please for the record
8  today if you could state your full name?
9    A.   Mark Elton Torkelson.
10   Q.   And how do you spell your last name?
11   A.   T-o-r-k-e-l-s-o-n.
12   Q.   And what's your date of birth?
13   A.   1/3/54.
14   Q.   Where were you born?
15   A.   Cheverly, Maryland.
16   Q.   And have you lived in Maryland your
17 entire life?
18   A.   Except for one year that I lived in
19 Missouri.
20   Q.   Okay. And where do you live now?
21   A.   At Keymar, Maryland.
22   Q.   Okay. And what's your address?
23   A.   12029 Simpsons Mill Road.
24   Q.   And who do you live there with?
25   A.   My wife.

Page 10

1   Q.   What's her name?
2   A.   Paula.
3   Q.   Do you have any children?
4   A.   Paula is my second wife, so we have no
5   children.
6   Q.   Okay. Do you have children from your
7   first marriage?
8   A.   Yes. I had seven.
9   Q.   Oh, wow. Okay. Are they all adults?
10  A.   Yes.
11  Q.   Do you have grandchildren?
12  A.   Yes.
13  Q.   A few?
14  A.   I think it's 24.
15  Q.   Wow. That's great. All right. So what
16  do you do for a job?
17  A.   I'm a carpenter.
18  Q.   In Maryland?
19  A.   Yes.
20  Q.   Do you ever travel interstate or is it
21  generally in the same area that you live in?
22  A.   It's generally in the state of Maryland.
23  Q.   Do you own the business or do you work
24  for someone?
25  A.   I own the business.

Page 11

1   Q.   What's it called?
2   A.   Weathertight Services.
3   Q.   And how long have you worked or owned
4   that company?
5   A.   It's a company that started in 1979.
6   Q.   Okay. And when did you become involved?
7   At the time that it started or after?
8   A.   I started it.
9   Q.   You did, okay. What's your education
10  level?
11  A.   Through grade 10.
12  Q.   Okay. And then did you receive any sort
13  of graduation certificate, GED, anything like that or
14  was it just through grade 10 and you began working?
15  A.   That's correct.
16  Q.   Okay. And are you -- would you consider
17  yourself to be a member of the Eastern Pennsylvania
18  Mennonite Church or Eastern Pennsylvania Mennonite
19  faith?
20  A.   Yes.
21  Q.   And what congregation do you belong to?
22  A.   Hopewell.
23  Q.   And is that down in Maryland?
24  A.   Yes.
25  Q.   How long have you been a member of that

Page 12

1   specific congregation?
2   A.   It would be since 1968.
3   Q.   Oh, okay. So would it be safe to say
4   then that you've been a part of the Mennonite faith
5   your entire life?
6   A.   That is correct.
7   Q.   Have you always been a member of the
8   Eastern Pennsylvania Church?
9   A.   No. I was a member at Lancaster
10  Conference to begin with.
11  Q.   Okay. And then when did you switch over?
12  A.   In 1968.
13  Q.   Okay. So you had mentioned that you own
14  the one company. You said it was Weathertight?
15  A.   That's correct.
16  Q.   And what kind of work do you do?
17  A.   We build pole barns.
18  Q.   Okay. And is that the only work you do
19  or are there other types of construction or work that
20  you do with your company?
21  A.   We also work on the old bank barns.
22  Restore them.
23  Q.   Okay. Do you -- so you do both
24  construction from basically the ground up, and then
25  you also do restoration work?

Page 13

1   A.   That's correct.
2   Q.   Do you ever do any demolition work?
3   A.   Very little.
4   Q.   Do you have any employees?
5   A.   No. We're set up as a limited
6   partnership.
7   Q.   Okay. How many people are involved?
8   A.   It's approximately five.
9   Q.   Okay. And do you have any financial
10  interests in any other businesses?
11  A.   Not really, no.
12  Q.   What do you mean by that?
13  A.   Well, I have loaned some money to another
14  young man who is starting a business.
15  Q.   Oh, okay.
16  A.   But I don't have any interest in the
17  business.
18  Q.   Gotcha. That makes sense. And so in
19  that vein, I would assume then when you don't have any
20  other financial interests in other businesses, you
21  also don't have ownership interest in any other
22  businesses?
23  A.   That is correct.
24  Q.   Okay. And where do you generally hold
25  your personal bank accounts and your work bank

**Page 14**

1 accounts?  Is it a local bank in the area that you
2 live in or is it somewhere else?
3     A.    It's a local bank.
4     Q.    Which one is it?
5     A.    WesBanco.
6     Q.    Okay.  And do you own any property?
7     A.    Yes.
8     Q.    Down in Maryland?
9     A.    Yes.
10    Q.    Is it just in Maryland?
11    A.    Yes.
12    Q.    Okay.  What would that be?  Just your
13 personal property?
14    A.    Our personal property.
15    Q.    Okay.  So I'm going to jump a little bit
16 more specifically into the matters involving this case
17 and specifically involving the Mennonite Messianic
18 Mission which I'm just going to refer to as the
19 Mission so you don't have to hear me stumbling over
20 that through the entire deposition.  So if you could,
21 just starting out in your own words what is the
22 Mission?
23    A.    It is the body that the church has
24 commissioned to oversee the outreach activities of the
25 church.

**Page 15**

1     Q.    And are you aware of how long the Mission
2 has been in existence?
3     A.    I can give you an approximate date.
4     Q.    Sure.
5     A.    1966.
6     Q.    Okay.  So for some time now?
7     A.    Yes.
8     Q.    Okay.  And has the Mission always been
9 run by a board of directors?
10    A.    Yes.
11    Q.    And yesterday we spoke with a
12 representative of the Eastern Pennsylvania Church.
13 I'll just refer to it as the EPMC, again, so you don't
14 have to hear me keep stumbling over it throughout the
15 entire deposition.  And we learned a little bit
16 yesterday about the kind of governing body of the EPMC
17 and just the general guidance that it gives throughout
18 the community.
19          So as it relates to the Mission, does the
20 Mission receive any guidance from the EPMC at all?
21    A.    No.
22    Q.    Okay.  Are any of the EPMC leaders ever
23 involved in any of the board meetings at the Mission?
24    A.    Yes.
25    Q.    Okay.  And usually when does that occur?

**Page 16**

1     A.    I'm not sure if I understand your
2 question.
3     Q.    So let me rephrase it.  Are there any
4 times when the Mission Board asks for guidance from
5 the EPMC leaders or seeks their involvement in any
6 matters during their board meetings?
7     A.    No.
8     Q.    Okay.  And are you currently on the board
9 of directors?
10    A.    Yes.
11    Q.    What's your position?
12    A.    I'm the secretary.
13    Q.    And what are your duties and
14 responsibilities?
15    A.    To record the proceedings of the board
16 and to sign any legal documents that need to be
17 signed.
18    Q.    And how long have you been the secretary?
19    A.    Since 2013.
20    Q.    And were you on the board before that?
21    A.    Yes.
22    Q.    What was your position?
23    A.    I was just an ordinary board member with
24 no position --
25    Q.    Okay.

**Page 17**

1     A.    -- for a while, and then I was assistant
2 treasurer.
3     Q.    Okay.  And when were you the assistant
4 treasurer?
5     A.    I'm not really sure of that date.
6     Q.    Was it immediately preceding when you
7 became secretary?  Like did you go from assistant
8 treasurer to secretary?
9     A.    That is correct.
10    Q.    Okay.  So do you believe that you may
11 have been or approximately were the assistant
12 treasurer from the years of about 2010 to about 2013
13 or at least sometime during then?
14    A.    Sometime during then, yes.
15    Q.    Okay.  But maybe not the whole time?
16    A.    Probably the whole time.
17    Q.    Okay.  And what were your duties as the
18 assistant treasurer?
19    A.    Basically nothing.
20    Q.    I appreciate your honesty.  What did you
21 find yourself doing on the board when you were the
22 assistant treasurer?  If you didn't have any real
23 specific duties, what was your involvement?
24    A.    Just to give the treasurer's report.  And
25 in the very unlikely event that the treasurer was not

Page 18

1  there, he would give me the report, and then I would
2  share it with the board. And so really it was very
3  little that I did.
4      Q.   Then otherwise you just acted as a normal
5  board member?
6      A.   That's correct.
7      Q.   Okay. And who was the treasurer at the
8  time?
9      A.   Mervin Martin.
10     Q.   And who is the treasurer now?
11     A.   Nelson Nolt.
12     Q.   And do you know who the treasurer was
13 from about 2010 to about 2014, if you can recall?
14     A.   I do not recall.
15     Q.   Okay. Would it maybe have been one of
16 those two individuals?
17     A.   Probably would have been.
18     Q.   Okay. Does your board have any governing
19 documents like bylaws or any rules that govern the
20 conduct of the board?
21     A.   Yes, we do.
22     Q.   And are you aware of whether those bylaws
23 have been updated or altered in any way since about
24 2010 onward?
25     A.   No, they would not have.

Page 19

1      Q.   So I know you had said that the treasurer
2  generally handles the finances, and you are the
3  assistant treasurer and didn't do much in the form of
4  dealing with the treasurer's activities, but tell me a
5  little bit about the business structure of the Mission
6  and where it receives its funding from and financially
7  just how the Mission is structured, if you know.
8      A.   The funding that comes to the Mission
9  Board is strictly from congregational offerings and
10 from personal donations.
11     Q.   Does the Mission have any business
12 interests?
13     A.   No.
14     Q.   Okay. Do you know if the Mission has any
15 bank accounts?
16     A.   Yes.
17     Q.   Where are they held at?
18     A.   I don't know.
19     Q.   So tell me a little bit more about the
20 duties of the Mission. I know that it kind of
21 oversees a lot of different organizations and
22 different parts of the outreach for the Eastern
23 Pennsylvania Church. But if you could tell me a
24 little bit more about what the Mission does.
25     A.   The Mission primarily clears individuals

Page 20

1  for service in various fields, and in our foreign
2  fields would be responsible for making sure that the
3  fields have the necessary things that they need like
4  church houses, schools.
5      Q.   So the Mission oversees work in all sorts
6  of countries, not just here in the United States?
7      A.   That is correct.
8      Q.   Do you know approximately how many
9  countries it's doing work in now?
10     A.   Eight.
11     Q.   Oh, wow. Okay. Tell me about the
12 domestic entities or business that the Mission does.
13 I know obviously that we'll talk a little bit more
14 about Liberty Ridge in a bit. But Liberty Ridge
15 aside, what domestic business is the Mission involved
16 in?
17     A.   The Mission is not really involved in any
18 business.
19     Q.   Okay. Does it oversee or has it helped
20 set up any other domestic entities other than Liberty
21 Ridge?
22     A.   There would be a Publication Board.
23 There would also be two Bible schools. There would be
24 a rest home committee.
25     Q.   And are there any other residential

Page 21

1  type -- I don't want to say facilities or residential
2  type homes or programs other than Liberty Ridge that
3  the Mission has ever been involved in domestically?
4      A.   No.
5      Q.   Okay. So I'm going to get a little bit
6  more into Liberty Ridge now. And if there's anything
7  that I'm -- any road I'm going down or any questions I
8  ask that you don't know or you feel that somebody else
9  is better suited to answer those questions, please let
10 me know. I don't want to go down a whole line of
11 questions where you're just going to keep telling me I
12 don't know. I'll save you the time from that.
13          So were you on the board at the Mission
14 when the board first began discussing creating the
15 Liberty Ridge?
16     A.   Yes.
17     Q.   Do you remember about when that was?
18     A.   Not exactly.
19     Q.   When do you believe it may have been?
20     A.   I believe it may have been in 2009 to
21 2010.
22     Q.   How did that discussion first come up?
23     A.   It first came up because of the needs of
24 young men for more structure in their lives and young
25 men that needed help.

Page 22

1  Q.   And within the discussion of the board,
2  when you talk about the needs of young men or young
3  men that need help, could you elaborate a little bit
4  more just about what needs these are or what kind of
5  help it was believed that these men needed?
6      A.   It would have been primarily in their
7  spiritual lives.
8      Q.   What do you mean by that?
9      A.   Some of these young men were rebellious
10 and not manageable at home and not getting along with
11 their peers and just simply very unstructured.
12     Q.   Were these concerns that were brought to
13 the board by any individual people or was it from the
14 congregations or was it just a general sense within
15 the community?  If you could just elaborate on that a
16 little bit.
17     A.   I think it would have been a general
18 sense within the committee, I mean within the
19 community.
20     Q.   Okay.  So once the discussion began in
21 the board, how quickly did the, I guess, creation of
22 Liberty Ridge come about?  Was it discussed at length
23 for quite some time and then began implementing some
24 more ideas or how did that discussion work, if you
25 remember?

Page 23

1      A.   First of all, there was a committee
2  appointed to see if they could meet those needs by
3  just soliciting individual homes to care for these
4  boys.  And so they tried that for a while.  I'm not
5  sure exactly how long.
6      Q.   And when you say soliciting homes, do you
7  mean like actual homes of members of the church
8  community?
9      A.   That's correct.
10     Q.   Okay.  And when you say soliciting homes,
11 was the committee just simply asking other community
12 members if they'd be willing to house these young men
13 or what do you mean by that?
14     A.   That's correct.
15     Q.   Okay.  So you have that binder that's in
16 front of you.  I printed out all the documents in this
17 case.  They're all numbered.  Their pages are all
18 numbered.  I figured that would be easier than handing
19 documents back and forth.
20          So I'm going to have you turn to Page 86.
21 It's LRF-86, and it's probably about halfway through
22 the book.  I'll give you a second to get to it.  If
23 you could just let me know when you get there.  And
24 now that I'm looking back, I probably should have
25 tabbed the pages.  It would be Page 86.

Page 24

1      A.   Yes.  Oh, 86.  I'm sorry.
2      Q.   No.  That's okay.
3      A.   I'm at 186.
4      Q.   Now I'm thinking I should have put like
5  tabs, but it didn't even occur to me.
6          MS. WYNKOOP:  This has been pretty great,
7  though.  No complaints here.
8  BY MS. FRANCHI:
9      Q.   So I see you've turned to Page 86 in the
10 documents.  Do you recognize what this document is, if
11 not specifically, then generally?
12     A.   Yes, I do.
13     Q.   And what is this document?
14     A.   This would have been minutes from the
15 Mission Board.
16     Q.   Okay.  And is this generally how the
17 minutes of the Mission Board are kept during meetings?
18     A.   That is correct.
19     Q.   Okay.  Do you recall, and I believe the
20 date on this document is June 2nd, 2010.  I see at the
21 bottom that the names of the secretary and assistant
22 secretary.  Are those the individuals who likely would
23 have been the ones keeping the minutes at the time?
24     A.   That is correct.
25     Q.   Okay.  And I just want to make sure.  At

Page 25

1  the top of the page of this and the next pages until
2  Page 95 it says custom pole buildings, and there's a
3  date.  That isn't part of the minutes; correct?  That
4  looks like it would have been something that would
5  have been either printed or scanned on the documents?
6      A.   I don't understand your question.
7      Q.   At the very top of the page here where it
8  says custom pole buildings, I just want to make sure
9  that that's not a part of the actual minutes.  That
10 looks like it was just transposed onto the page?
11     A.   That is correct.
12     Q.   Okay.  Is that your business or were you
13 the one who compiled these documents or is that
14 somebody else?
15     A.   No.  That is my business.  I did not
16 compile these documents.
17     Q.   Okay.  Were you involved in printing -- I
18 just want to make sure I know what's on the page and
19 what isn't on the page that is part of what this is.
20 So that would have been then where it says here
21 12/19/21, you had somehow worked with either
22 transmitting or moving these documents from one place
23 to another, maybe your attorney?
24     A.   Apparently that was the case.
25     Q.   Okay.  So I want to go about two thirds

**Page 26**

1  down the page where it says boys home, specifically it
2  says it was reported that the committee working on
3  this interest will be at the next MMM meeting.
4         Is that what you were saying earlier then
5  about how there was a committee that was kind of put
6  together to look into either creating the boys home or
7  housing these young men with spiritual needs in other
8  homes?
9     A.   That is correct.
10    Q.   Okay. So I'm going to turn to the next
11 page. It would be Page 87, and this looks like the
12 minutes from June 29th, 2010. And I see now it says
13 boys home committee.
14        So, again, is this just going in the same
15 vein where you put a committee together to kind of
16 just look into the needs of the community with either
17 a boys home or placing these young men with other
18 families?
19    A.   My feeling at this point is that they
20 were moving from the mode of trying to do this with
21 individual homes to feeling that maybe should be an
22 institution.
23    Q.   Okay. So when it says investigative
24 committee, is that what it would be referring to?
25    A.   That is correct.

**Page 27**

1     Q.   Okay. So at this point it doesn't seem
2  like they were sold on the idea of a boys home yet.
3  They were just kind of leaning in that direction?
4     A.   That is correct.
5     Q.   So I see the next page, Page 88, looks
6  like a meeting on August 3rd of 2010. About two
7  thirds of the way down the page where it says boys
8  home, it says that there is a committee established,
9  and it lists some names. Ethan Weaver, Lamar Garman,
10 Nelson Martin, Scott Martin, and Jacob Brubaker.
11        Does that seem correct as the committee
12 of individuals who were kind of investigating and
13 looking into starting a boys home?
14    A.   I think that is correct.
15    Q.   Okay. Do you recall or do you have any
16 knowledge of how those individuals were selected?
17    A.   They were probably appointed by the
18 Mission Board to do that and would have been selected
19 on the basis that they had some personal interest in a
20 project like that.
21    Q.   Okay. Do you recall -- and, again, if
22 you don't remember, please let me know. Do you recall
23 whether there was any selection process like they
24 accepted resumes or did they just -- it was kind of
25 put out generally in the community that you were

**Page 28**

1  looking for someone to engage in this? Do you
2  remember the process at all?
3     A.   I do not remember any process like you
4  described.
5     Q.   Okay. And all of the members of the
6  Mission Board -- and I apologize, I can't recall if I
7  asked this before -- are all members of the EPMC in
8  some congregation or another?
9     A.   That is correct.
10    Q.   Okay. And then all of the men that are
11 in this investigative committee for the boys home,
12 would they also all be members of the EPMC in some
13 form or fashion, maybe not in the same congregation,
14 but somewhere?
15    A.   That is correct.
16    Q.   Okay. Do you recall whether any of the
17 individuals from the investigative committee were sent
18 to any other homes or properties to, I guess, look
19 into other boys homes and how they were run to kind of
20 fashion Liberty Ridge after?
21    A.   That would have been at their own
22 choosing if they did such a thing. We would not have
23 given any directive to that that I remember.
24    Q.   I guess you kind of anticipated my next
25 few questions then. With the committee, did the

**Page 29**

1  committee have any direction or oversight from the
2  Mission or was their job to go and work amongst
3  themselves and then come back and report their
4  findings to the Mission?
5     A.   They were to investigate and then come
6  back and report their findings, but we didn't
7  specifically tell them to go to other boys homes.
8     Q.   Okay. So would it be safe to say then
9  you just gave them a task and a goal and said, you
10 know, go figure it out and then let us know what you
11 found?
12    A.   That is correct.
13    Q.   Okay. I'm going to turn to the next
14 page, Page 89, where it talks about the purchase of a
15 property under the boys home notation. Do you know if
16 that purchase of the property it's referring is the
17 current Liberty Ridge location?
18    A.   It is.
19    Q.   Okay. Do you know who it was that
20 purchased the property?
21    A.   It would have been the Mission Board.
22    Q.   Okay. So the Mission Board would have
23 purchased the property?
24    A.   That is correct.
25    Q.   Okay. Does the Mission Board currently

**Page 30**
1  own the property?
2     A.   I'm not sure about that.
3     Q.   Okay. So you don't know if it changed
4  hands at all?
5     A.   I'm not sure about that.
6     Q.   Okay. Moving on to the next page, Page
7  90, it talks about under the boys home notation on
8  December 28th, 2010, that it was noted that township
9  approval set the maximum age at 18 for residents in
10 the program. Was the original discussion to also
11 include residents above the age of 18?
12    A.   I don't remember any discussion like
13 that.
14    Q.   Okay. Do you know what types of
15 approvals were sought from the township?
16    A.   I cannot be sure of that.
17    Q.   Okay. And, again, you may not know the
18 answers to these questions, but do you know if there
19 were any other governmental or agency approvals or
20 licensure that was sought out when creating Liberty
21 Ridge?
22    A.   I do not know that.
23    Q.   Okay. Do you know or was there any
24 discussion amongst the Mission Board of any
25 consultations with psychological or medical

**Page 31**
1  professionals as it relates to the treatment at this
2  boys home?
3     A.   I'm not sure that I understand that
4  question.
5     Q.   Were there any discussions amongst
6  yourselves when discussing the creation of the boys
7  home whether there would be any sort of medical
8  treatment or psychological treatment or at least a
9  consultation with a psychological professional in
10 developing the home?
11    A.   I do not remember any of that on the
12 board level.
13    Q.   Okay. So I'm going to turn to the next
14 page, Page 91. And this time I'll take you closer up
15 to the top of the page. It looks like the minutes
16 from November 29th, 2010, and I see here personnel for
17 approval were shared as follows, and it has a list of
18 house parents and a list of mentors.
19       Were these individuals that were brought
20 to the Mission Board from the Liberty Ridge committee
21 or was the Mission Board involved in the selection of
22 these individuals?
23    A.   They were brought to the Mission Board
24 from the boys home committee.
25    Q.   Okay. So the Mission Board didn't seek

**Page 32**
1  these people out?
2     A.   No.
3     Q.   Okay. Do you or did you have any prior
4  interaction with or knowledge of the individuals
5  listed for the house parents?
6     A.   In what way?
7     Q.   If you knew them personally, had any
8  business dealings with them before. I see here that
9  at least one of them, Ethan Weaver, I believe was on
10 the committee, so you were likely familiar with him
11 before, but did you know any of the other individuals
12 listed?
13    A.   Some of them I would have known, not all
14 of them personally.
15    Q.   Okay. And who are the individuals that
16 were known to you previously?
17    A.   Fred Miller, David Meck, Timothy
18 Newswanger, Raymond Martin. Maybe Leroy Allgyer in a
19 very limited way.
20    Q.   And when you say that you knew of them,
21 were these people that you either did business with
22 and knew personally or just knew of them generally?
23    A.   Just knew of them generally.
24    Q.   Okay. Do you know if there was any
25 selection process in indicating these individuals by

**Page 33**
1  the committee or was that not something you were
2  involved in?
3     A.   It was not something I was involved in.
4     Q.   Okay. And on the next page, Page 92,
5  where it says Liberty Ridge, where it says approval is
6  requested for the following for house parents Marlin
7  Mussers, Raymond Siegrists, Earl -- is it Gehmans? I
8  cannot read that. And Marlin Weavers.
9        Are these other individuals who acted as
10 house parents or were just deemed to be fit to be
11 house parents, if you know?
12    A.   They were just deemed to be fit for house
13 parents.
14    Q.   Okay. And we'll move on to the next
15 page, Page 92, specifically under boys home where it's
16 Line Item E where it talks about the committee
17 presented a proposal from Snyder Gates, LLC, that
18 would allow them to set up the shop to manufacture
19 fiberglass farm gates incorporating the labor of the
20 Liberty Farm residents.
21       Were you involved in any discussions
22 about incorporating the labor of these boys for
23 third-party businesses?
24    A.   I do not recall that.
25    Q.   Okay. Would this have been something

**Page 34**

1  that the committee came up with a proposal and then
2  presented it to the Mission Board?
3      A.   That is correct.
4      Q.   Okay. And it says a motion carried to
5  allow them to use this and enter into a one-year
6  agreement. So would it be safe to say then the
7  committee brought this idea to the board, and the
8  board approved it?
9      A.   That is correct.
10     Q.   Okay. Did the board when you were
11 involved have any other discussions involving the uses
12 of Liberty Ridge for any reason for any business
13 purpose or any other reason?
14     A.   Not that I remember.
15     Q.   Okay. Do you know of the business Snyder
16 Gates, LLC? Are you familiar with them at all?
17     A.   Not really.
18     Q.   Okay. Do you know who owns it or who's
19 involved in the business?
20     A.   I do not.
21     Q.   Okay. Are you aware in any way of how
22 Snyder Gates was contracted with or how its business
23 arrangements were set up with Liberty Ridge?
24     A.   No. I do not know that.
25     Q.   Okay. Are you familiar with -- and I'm

**Page 35**

1  just going to list a few business names that have come
2  up generally in discovery with counsel so far in this
3  case.
4           Are you familiar with any other business
5  that have done business with Liberty Ridge such as
6  Sensenig Chair Shop, Clark's Feed Mills, Wengerd
7  Pallet Company, or Dutch-Way Farm Market?
8      A.   I would be a little bit familiar with
9  Wengerd Feed Mills, and what was the other names that
10 you gave?
11     Q.   There's Clark's Feed Mills, Wengerd
12 Pallet Company, and Dutch-Way Farm Market.
13     A.   Yeah, the Wengerd Pallet Company.
14     Q.   And how were they known to you?
15     A.   Just by name.
16     Q.   Okay. You don't have any business
17 dealings or any financial interests in that company?
18     A.   No.
19     Q.   Okay. Do you know who owns it?
20     A.   No, I do not.
21     Q.   Are you aware personally of any other
22 businesses that from 2011 or about then when Liberty
23 Ridge began to the present that has done any business
24 at Liberty Ridge at all?
25     A.   Not other than the two that we talked

**Page 36**

1  about.
2      Q.   Okay. Are you aware of any training that
3  was given to any staff of Liberty Ridge?
4      A.   What kind of training are you talking
5  about?
6      Q.   Any.
7      A.   No. I'm not really aware of that.
8      Q.   Okay. Was that something that was
9  discussed at all during the Mission meetings?
10     A.   I don't recall that it was.
11     Q.   Are you aware of whether there was any
12 advertising or any publications put out to, I guess,
13 solicit residents for Liberty Ridge at any point?
14     A.   No. There would not have been.
15     Q.   So that would, I guess, go into the next
16 few questions. Are you aware of how people within the
17 community came to know of Liberty Ridge? Was it just
18 word of mouth? Was it preached at congregations? How
19 would that have worked, if you know?
20     A.   I think it mostly would have been by word
21 of mouth.
22     Q.   Okay. And do you know how Liberty Ridge
23 was being described or told to people what it would
24 have done for these boys?
25     A.   I don't recall of anything of that nature

**Page 37**

1  other than to help young men.
2      Q.   Okay. Was there any discussion with you
3  or with the Mission Board about the structure of the
4  programming at Liberty Ridge?
5      A.   Not in a specific way.
6      Q.   Okay. Generally, how was it brought up,
7  if at all?
8      A.   They would have mostly formed their own
9  structure.
10     Q.   Okay. And then just told the Mission
11 about it?
12     A.   That's correct.
13     Q.   Okay. So is it safe to say then the
14 committee would bring the general ideas of the program
15 to the Mission Board, and as long as it didn't sound
16 outrageous in any way, say that sounds okay?
17     A.   That is correct.
18     Q.   Okay. Do you know whether there is any
19 discussions about a number of work hours for the
20 residents or whether there was any consultation with
21 agencies like the Department of Labor or anything like
22 that?
23     A.   I'm not aware of that.
24     Q.   Okay. Was there any discussion about the
25 price of the programing, whether parents would be

**Page 38**

1  paying a certain amount of money in or anything like
2  that?
3      A.   No, not on the Mission Board level.
4      Q.   Okay. So I guess at the end of the day,
5  now moving forward, Liberty Ridge is now open. What
6  is the Mission's involvement once Liberty Ridge is now
7  its own entity?
8      A.   The only involvement that we would have
9  would be in approving personnel to serve there.
10     Q.   Okay. And what do you mean by that?
11     A.   The committee would bring names for house
12 parents or mentors, and we would approve or
13 disapprove.
14     Q.   Okay. And now that -- when I say now
15 that Liberty Ridge is open, I'm saying, you know, from
16 2011 and onward. So once Liberty Ridge is opened, did
17 they report to the Mission Board in any way? Like did
18 they give, you know, a report at board meetings or was
19 there any other type of oversight?
20     A.   They would have given a report at board
21 meetings if they had anything that they wanted to
22 request.
23     Q.   Okay. And when you say anything they
24 want to request, what do you mean by that?
25     A.   Personnel.

**Page 39**

1      Q.   Okay. Was there any involvement with the
2  Mission Board with funding in any way of Liberty
3  Ridge?
4      A.   The Mission Board would have purchased
5  the farm to begin with to give them a place to
6  operate.
7      Q.   Okay. Is the Mission Board or was the
8  Mission Board involved in any way with the actual
9  business entity generally of Liberty Ridge other than
10 the ownership of the property?
11     A.   No.
12     Q.   Okay. Did the Mission Board give Liberty
13 Ridge any direction that was unsolicited by Liberty
14 Ridge? Like say you told me earlier that Liberty
15 Ridge would report to the Mission Board and ask -- you
16 know, they would ask for certain things. But was
17 there any point where the Mission Board would take the
18 first step to say you need to do X, Y, and Z?
19     A.   I do not recall anything like that.
20     Q.   Okay. Have you personally been to the
21 Liberty Ridge property?
22     A.   Yes, I have.
23     Q.   Okay. How many times?
24     A.   I do not know.
25     Q.   Would it be more than two? More than

**Page 40**

1  ten? Less than ten?
2      A.   More than ten.
3      Q.   Okay. And when would that have been
4  generally over a time frame?
5      A.   Sporadic.
6      Q.   Okay. Do you know if other Mission Board
7  members have been to the Liberty Ridge property?
8      A.   I would think that most of them probably
9  have been.
10     Q.   Was there any direction from the Mission
11 Board to visit the Liberty Ridge property for any of
12 its members?
13     A.   No.
14     Q.   Okay. So it would be safe to say then
15 that if any Mission Board members went to the
16 property, it was on their own, I guess on their own
17 volition?
18     A.   That's correct.
19     Q.   Okay. When you went to the Liberty Ridge
20 property, did you give them any direction or make any
21 decisions for them or was it purely as an observer?
22     A.   It was purely as an observer for the most
23 part.
24     Q.   Okay. And when you say for the most
25 part, were there any other times that you weren't just

**Page 41**

1  observing that you were involved in any way?
2      A.   In the very beginning I was assigned to
3  help them to get started with the work.
4      Q.   Okay. What do you mean by that?
5      A.   It was mostly administrative things.
6      Q.   Okay.
7      A.   Structuring the committee and structuring
8  the work.
9      Q.   Okay. Did that involve any financial
10 reports or ledgers or anything like that?
11     A.   No.
12     Q.   Okay. It was just general guidance?
13     A.   That's correct.
14     Q.   Okay. Has your personal business ever
15 done any business with Liberty Ridge?
16     A.   No.
17     Q.   Okay. Are you familiar with the
18 corporate filing of Liberty Ridge and specifically the
19 registration of the Liberty Ridge name and the
20 corporate documents?
21     A.   No.
22     Q.   Do you know if any of the other Mission
23 Board members, either past or present, were involved
24 in any way with a financial interest in Liberty Ridge,
25 any labor that was there, or any business interest?

**Page 42**

1  A. No.
2  Q. Are you personally related to anyone
3  that's on the Liberty Ridge board currently?
4  A. No.
5  Q. Or past?
6  A. No.
7  Q. Okay. Do you know -- this may be outside
8  of your knowledge -- what is the involvement of any
9  individual congregations within the EPMC with Liberty
10 Ridge? Is there any?
11 A. No.
12 Q. Okay. I know we heard yesterday in
13 testimony that within individual congregations that
14 sometimes -- I forget. It wasn't the word solicit.
15 There was another word that was used for obtaining
16 donations from people that sometimes they would say
17 this week we're asking for donations for improvements
18 to the congregation or next week it will be for the
19 Mission Board.
20      Do you know was the Mission Board ever
21 directly asking any individual congregations for
22 money?
23 A. No.
24 Q. Okay. So you wouldn't know if Liberty
25 Ridge had ever done that?

**Page 43**

1  A. Not that I'm aware of.
2  Q. Okay. Is Liberty Ridge making any
3  payments to the Mission Board, say, for use of the
4  property? Anything like that?
5  A. No.
6  Q. Did they ever, if you know?
7  A. The only thing that they would have done
8  would have been if congregations voluntarily lifted an
9  offering for --
10 Q. Lifted an offering, okay. That was the
11 term I was looking for.
12 A. To help the expense.
13 Q. Okay.
14 A. To repay the loan.
15 Q. Okay.
16 A. Some of those offerings may have been
17 sent to Liberty Ridge.
18 Q. Okay.
19 A. They would have then taken it and sent
20 those offerings to the Mission Board because the
21 Mission Board was the one who supplied the funds to
22 buy the farm to begin with.
23 Q. Okay. So that would have been the only
24 financial, I guess, going back and forth between the
25 two entities?

**Page 44**

1  A. That is correct.
2  Q. Okay. Is that -- would it be considered
3  in the form of a loan or was it more casual in that
4  when you get money in, just pay it back to the Mission
5  Board when you have it from, say, these donations from
6  congregation members?
7  A. I'm not sure if I understand your
8  question.
9  Q. I guess when it comes to the property
10 being owned by the Mission Board that Liberty Ridge is
11 operating on, was it structured in a sense of like
12 this is a loan, you need to pay us this much money
13 every month, or was it more casual in that if
14 donations came in, then it would just go to the
15 Mission Board to help offset that payment?
16 A. There was nothing structured as far as
17 repaying the loan.
18 Q. Okay.
19 A. It was only a general understanding that
20 if offerings would come that were to pay toward the
21 farm, that those would be sent back to the Mission
22 Board.
23 Q. Okay. Were you aware of any of the work
24 that was done on Liberty Ridge such as there was --
25 there were crops that were being harvested. There

**Page 45**

1  were pallets being built, things like that. Were you
2  generally aware of the type of work that was being
3  done?
4  A. Generally.
5  Q. Okay. Was it anything that was brought
6  to your attention in the capacity of being a board
7  member or was it more just you heard about it and were
8  aware?
9  A. Just heard about it and was aware of it.
10 Q. Okay. Does Liberty Ridge in any way have
11 to report its finances or report its profits or
12 business or anything like that to the Mission Board?
13 A. No, they do not.
14 Q. Okay. So I guess in a bird's eye view of
15 the Mission Board's current or from 2011 when it was
16 created to the present involvement with Liberty Ridge,
17 does Liberty Ridge have to report any certain things
18 to the Mission Board or is it just what they feel they
19 should report at the time?
20 A. If they want to make any expenditure over
21 $5,000, then they would need to get approval from the
22 Mission Board for that.
23 Q. Okay. And why is that?
24 A. Just a system of checks and balances.
25 Q. Okay. Do you know if Liberty Ridge makes

**Page 46**

1  any income reports, files tax returns, anything like
2  that?
3      A.   I'm not aware of that.
4      Q.   Okay. When you say Liberty Ridge has to
5  report any expenditures over $5,000, do they ever have
6  to report any certain profits or income coming into
7  the program?
8      A.   No.
9      Q.   Okay. Are you personally familiar with
10 or have you met either of our clients either ▓▓▓▓
11 ▓▓▓▓ or ▓▓▓▓ ▓▓▓▓▓
12     A.   I am not familiar with them.
13          MS. FRANCHI: Okay. All right. I think
14 if we could maybe take like a ten-minute break. I
15 think I'm probably going to be done soon. I just want
16 to take a look at everything and then if you have any
17 questions after that.
18          MS. WYNKOOP: Sure.
19          THE VIDEOGRAPHER: We are going off the
20 record at 9:47 a.m.
21          (Recess)
22          THE VIDEOGRAPHER: We are going back on
23 the record. The time is 9:58 a.m.
24 BY MS. FRANCHI:
25     Q.   All right. So I only have a few more

**Page 47**

1  questions for you. I was hoping that you could
2  explain to me a little bit better about why is it that
3  the Mission has any sort of oversight over Liberty
4  Ridge.
5          And what I mean by that is once Liberty
6  Ridge became its own entity, why is it that the
7  Mission has any oversight over it at all?
8      A.   I think it would be primarily because we
9  feel that it's good for any committee to have a checks
10 and balance arrangement where somebody would be
11 overseeing it even if it's just in a general way.
12     Q.   Okay. And when you say checks and
13 balances, what is it that you're kind of making sure
14 that you keep an eye on?
15     A.   The personnel that they would use and the
16 funds that are being used.
17     Q.   And why is it that you or the Mission
18 Board feels that those types of things need to be --
19 there needs to be an eye kept on them, and I mean that
20 in that, you know, other business or non-profits kind
21 of report to their own individual governing structure.
22 So why is it that the Mission Board oversees these
23 other entities, Liberty Ridge or any of the other ones
24 within the community?
25     A.   I suppose it's just because that's the

**Page 48**

1  way we got started and doing it.
2      Q.   Okay. Does it have anything to do with
3  making sure it's also -- these organizations are kind
4  of working within the guidelines of the Eastern
5  Pennsylvania Church or are there other reasons?
6      A.   Could you be more specific?
7      Q.   Yeah. I guess what I'm trying to get at
8  is, you know, what is it that makes Liberty Ridge or
9  any of the other organizations overseen by the
10 Mission, why is it that they need this oversight for
11 checks and balances? Is it to adhere to certain
12 standards? Is it just to make sure that it's
13 following certain guidelines? I want to understand a
14 little bit better about how -- how that works.
15     A.   I wouldn't say that it's because we feel
16 that there's a need for it as far as being suspicious
17 of any particular thing. It's just probably the way
18 that we do these type of things that somebody knows in
19 a general way what's going on.
20     Q.   Okay.
21     A.   What's happening.
22     Q.   And I know we learned or at least I
23 learned a little bit more yesterday just about the
24 EPMC in general, and that it's not really an
25 organization in that it doesn't have an office or a

**Page 49**

1  bank account or anything like that. It's kind of a
2  nebulous association of the congregations.
3          So because of that, does the Mission then
4  kind of take on that role because it is an
5  organization to make sure that these institutions
6  within the church are kind of, I guess, acting
7  appropriately?
8      A.   The mandate of the Mission Board is that
9  it's the official organization that is looked to for
10 help whenever help is needed.
11     Q.   Okay.
12     A.   And so if it's a church wide program,
13 then it would in a certain manner be under the Mission
14 Board.
15     Q.   Okay.
16     A.   But not in any other way that I can think
17 of.
18          MS. FRANCHI: Okay. Okay. I think that
19 is probably everything that I have to ask today. I
20 don't know if you have any follow-up questions or
21 anything?
22          MS. WYNKOOP: No.
23          MS. FRANCHI: All right.
24          THE VIDEOGRAPHER: This marks the end of
25 the deposition of Mark Torkelson. We are going off

**Page 50**

```
 1  the record at 10:02 a.m.
 2         (The deposition was concluded at 10:02
 3  a.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 51**

```
 1  COMMONWEALTH OF PENNSYLVANIA  )
                                  )  SS.
 2  COUNTY OF YORK                )
 3
            I, Tracy L. Lloyd, a Registered
 4  Professional Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania and County of
 5  York, do hereby certify that the foregoing
    testimony was taken before me at the time and place
 6  hereinbefore set forth, and that it is the
    testimony of:
 7
 8              MARK TORKELSON
 9
            I further certify that said witness
10  was by me duly sworn to testify the whole and
    complete truth in said cause; that the testimony
11  then given was reported by me stenographically, and
    subsequently transcribed under my direction and
12  supervision; and that the foregoing is a full, true
    and correct transcript of my original shorthand
13  notes.
14          I further certify that I am not
    counsel for nor related to any of the parties to
15  the foregoing cause, nor employed by them or their
    attorneys, and am not interested in the subject
16  matter or outcome thereof.
17          Dated at York, Pennsylvania, this 1st
    day of November, 2022.
18
19
20          _____
            Tracy L. Lloyd, Notary Public
21          Registered Professional Reporter
22
    (The foregoing certification does not apply to any
23  reproduction of the same by any means unless under
    the direct control and/or supervision of the
24  certifying reporter.)
25  My Commission expires:
    April 21, 2023
```